**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 20-CR-219 (DLI) |
| | ) | |
| PAUL BELLOISI | ) | The Hon. Dora Irizarry |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S OMNIBUS MOTIONS**

February 4, 2022

David J. Cohen
Cohen Forman Barone, LLP.
950 Third Avenue, 11th Fl.
New York, NY 10022
(212) 766-9111
Fax: (212) 766-9166
David@cfblaw.com

1

# TABLE OF CONTENTS

Preliminary Statement………………………………………………………………...3

Factual and Procedural Background…………………………………………….....3-11

1. Mr. Belloisi's statements on February 4, 2020 should be suppressed
   because they were made under custodial interrogation and were not
   made after freely or after validly waiving his *Miranda* rights……………… 11-16

2. All physical evidence seized from Mr. Belloisi's person at the time of
   his arrest, including the entire contents of his cellular phone should
   be suppressed…………………………………………………………………16-25

   i.      All evidence seized from Mr. Belloisi's cellular phone prior to the
           execution of a search warrant should be suppressed as he never
           consented to law enforcement searching his device………………… 16-18

   ii.     The defendant's Fourth Amendment's rights are not diminished or
           suspended under the 'border search' doctrine…………………………18-19

   iii.    All evidence seized from Mr. Belloisi's cellular phone pursuant to
           the execution of the search warrant should be suppressed because
           the search warrant application did not establish probable cause and
           authorized an unlimited general warrant to law enforcement…………19-25

3. The court should issue an order compelling the government to produce full
   discovery…………………………………………………………………………..25

4. Granting such other and further relief as to the Court seems just and proper.

## PRELIMINARY STATEMENT

Defendant, PAUL BELLOISI, by his attorney, DAVID J. COHEN, respectfully submits this Memorandum of Law in Support of his Motion to: Suppress Statements and Physical Evidence; Compel Discovery, and to Order any additional relief that this Court deems just and proper.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Belloisi is charged, alone, with three (3) counts stemming from a single incident occurring on February 4, 2020 at John F. Kennedy Airport ("JFK").

*Events of February 4th and 5th 2020*

At trial, it is anticipated that the government will introduce law enforcement witnesses who will testify that after the arrival of American Airlines flight 1349 from Montego Bay, Jamaica to JFK, Terminal 8 at 3:36pm of February 4, 2020, agents of Customs and Border Protection ("CBP") conducted a comprehensive search of that aircraft. *See*, Exhibit 1, *Complaint.* It is expected that these witnesses will testify that attendant to that search of the aircraft, they discovered ten (10) bricks of a substance that appeared to be cocaine concealed inside the avionics compartment of the plane, located on the underside of the aircraft below the cockpit. Officers replaced what they found with "sham" bricks, sprayed the material they wrapped it in with a glow-in-the-dark substance and placed a transponder that would send a signal if disturbed. Thereafter, the officers left the aircraft and began visual surveillance of the aircraft's exterior from a distance away. Id.

During the time law enforcement officers were conducting their activities described above, the defendant, Paul Belloisi (herein after "Mr. Belloisi") a senior American Airlines mechanic, was in the middle of nine-and-a-half-hour shift that began at 2pm. See, *Defendant's Affidavit at ¶ 3.* On that particular day, Mr. Belloisi was assigned to work a specific job with a crew of other mechanics

on a different aircraft known as a "triple 7", which, once completed, left Mr. Belloisi generally at liberty to work on mechanical issues or fix other problems as they arose around the terminal area or airport. *Id* at ¶s 3, 4.

During a coffee break, Mr. Belloisi had noticed the aircraft in question was being serviced by Sky Chef, the company that refills the packaged foods, snacks, and drinks one finds aboard commercial airline flights. Later, after completing his specific assignment on the triple 7 aircraft, Mr. Belloisi went to the aircraft he had seen being serviced by Sky Chef (the aircraft in question) with the intention of boarding and taking food and snacks for himself. See, *Defendant's Affidavit at ¶ 4.* Once aboard the plane, he could see the flight crew were already aboard the plane meaning he would be unable to get the snacks he had come there for. *Id at ¶ 5*. However, while aboard the aircraft, Mr. Belloisi noticed that the heating and cooling system seemed to be malfunctioning. In his role as mechanic, Mr. Belloisi decided to go underneath the plane, to the avionics compartment, where he could reset the system. Id

Once inside the avionics compartment, Mr. Belloisi noticed an insulation blanket oddly fixed to a wall of the compartment that was a clear safety concern. *Defendant's Affidavit at ¶ 6.* In addressing the safety concern, Mr. Belloisi discovered packages taped to the wall and immediately became alarmed and afraid that he had discovered something dangerous. He then immediately exited the avionics compartment. *Id.*

After exiting the avionics compartment, Mr. Belloisi suddenly encountered officers under the aircraft. These officers immediately surrounded Mr. Belloisi, physically seized him, searched his person, immediately taking and keeping his cellular phone and American Airlines Mechanic ID Card from his person. *Defendant's Affidavit at ¶ 6.* While controlling and searching him, officers began asking him a host of questions including: "Who are you? Why are you here? What are you

doing here? What were you doing up there (avionics compartment)?" *Id. at* ¶ 7. They also began

to shout orders at Mr. Belloisi interspersed with the above questions including: "Don't move, turn

away from the plane." *Id.* The officers did not answer any of the questions Mr. Belloisi was asking,

as to why he was being treated in this manner, whether he could contact his union representative

and could he have his phone back. *Id at* ¶s 7 & 8. Mr. Belloisi continued to be questioned by

officers, while being held and searched against his will while on the tarmac near the aircraft for

approximately 30 minutes. He was kept there until after the aircraft had taxied away from the area

and believably taken off *en route* to its next destination. *Id*; see also, Exhibit 2, *AA 336 Departure*

*Information (Govt's Belloisi 00034).*

While on the tarmac, Mr. Belloisi was continuously questioned by law enforcement officers.

During this time, Mr. Belloisi was ordered not to look at the aircraft while the questioning about

his activities, his conduct and his presence at the aircraft continued. See, *Defendant's Affidavit at*

¶ 8. At no point while he was on the tarmac with officers was Mr. Belloisi ever apprised of his

rights under *Miranda v. Arizona,* 384 U.S. 436 (1966). See, *Defendant's Affidavit at* ¶ 11. From

the tarmac, Mr. Belloisi was placed in the back seat of a vehicle with agents in the front of the

vehicle and on either side of him. *Id at* ¶ 8.

When Mr. Belloisi arrived at the next location, officers immediately took the jacket he was

wearing from him. They placed him inside a room with a table, several chairs and (what appeared

to be a two way) mirror. Inside the room, Mr. Belloisi was ordered to empty the contents of his

pockets on the table. Again, Mr. Belloisi asked the officers if he was under arrest and they

responded that he was being detained to talk about what happened. See, *Defendant's Affidavit at*

¶ 9. At this point, Mr. Belloisi told them he wanted to call a lawyer. Id. The officers made an

offhand comment about this not being like television and left the room with Mr. Belloisi's property. One officer remained in close proximity to Mr. Belloisi.

A short while later, law enforcement officers again entered the room and began speaking to Mr. Belloisi. *Defendant's Affidavit at ¶ 10.* One of the officers had a piece of paper with several handwritten lines of writing in front of him and began asking Mr. Belloisi the same questions as he had been asked on the tarmac about why he was there (in the airplane), what he done in the avionics compartment and around the aircraft that evening. The officer did not give Mr. Belloisi *Miranda* warnings at this point or acknowledge his earlier request to call an attorney. *Id.* Mr. Belloisi said he had already explained everything and had nothing more to say. He asked to have his phone back (which lay on the table in front of all of them) so he could make a phone call to a lawyer or union representative. Rather than answer these requests, the officers looked at Mr. Belloisi's phone, appearing to scroll through his messages. *Id.*

Over the next three to four hours, Mr. Belloisi remained inside the same interrogation room mostly by himself with the officer posted at the doorway and groups of officers periodically coming in and asking Mr. Belloisi the same questions they had been asking earlier. Finally, a group of officers came in together and told Mr. Belloisi that he was being placed under arrest. He was asked if he would speak with them without an attorney and handed him a document that listed his *Miranda* rights which he was asked to sign. Mr. Belloisi refused to sign the waiver form or speak with officers at this time. See, *Defendant's Affidavit at ¶ 11;* see also, Exhibit 3, *Miranda Waiver Form (Refused to Sign) (Belloisi 00010).* After refusing to sign the *Miranda* form, one of the officers showed him a multi-page handwritten document he described to Mr. Belloisi as "his statement" and asked Mr. Belloisi to sign it. Mr. Belloisi refused to sign that document as well. *Defendant's Affidavit at ¶ 11.*

Later, after being placed inside of a holding cell, officers approached Mr. Belloisi and asked him for his wife's cellular phone number in order to complete a required form. Mr. Belloisi informed them that he did not have the number memorized but that it was on his phone and he could find it for them. *Defendant's Affidavit at ¶ 12.* The officer then asked Mr. Belloisi for permission to search his phone. Mr. Belloisi refused to give consent for a search of his phone. Mr. Belloisi asked the agent holding Mr. Belloisi's phone to give him the phone and he would find the number for his wife. Agents refused to give Mr. Belloisi the phone asking instead what name could they find the number under. When Mr. Belloisi told them her name was "Mitzie," the officer holding the phone scrolled down to her number and pushed the call button. The voicemail came on and the officer left a voicemail for Mr. Belloisi's wife. See, also, Exhibit 4, *Cellular Phone Consent to Search Form (Refused to Sign).*

*Cell Phone Search Warrant*

On February 24, 2020, the government submitted a search warrant application relating to Mr. Belloisi's device. In that application was an affidavit of Homeland Security Investigations (HSI), Special Agent John M. Moloney, as well as a proposed search warrant with two (2) attachments (A & B). See Exhibit 5, *Govt's Search Warrant Application.* In the section of his affidavit entitled "Probable Cause," Moloney recites the process by which officers discovered what they believed to be cocaine, replaced it with "sham" bricks, sprayed a substance on the sham bricks and a blanket used to conceal them, installed a transponder and then began a visual surveillance on the aircraft. *Id* at ¶7-8. The affidavit goes on to relate that the officers saw no one approach the area for several hours until a person, later discovered to be the defendant, approached the aircraft some 20 to 30 minutes prior to the aircraft's next scheduled departure. *Id* at ¶9. Moloney claims that within 3-5 seconds after Mr. Belloisi was observed entering the avionics compartment, the transponder was

"tripped" and his fellow officers then drove from their observation point to the avionics compartment of the aircraft. Once at the aircraft, they saw Mr. Belloisi inside the avionics compartment, re-adjusting and securing the insulation blanket that had formerly concealed the suspected contraband. *Id* at ¶10. According to Moloney, once Mr. Belloisi exited the plane, officers confronted Mr. Belloisi, beamed a light on his gloves which revealed he had touched the area where the sham contraband had been placed. *Id.* at ¶13.

Moloney opines that in his training and experience, "recipients of contraband smuggled in aircraft compartments often receive information from co-conspirators concerning the quantity or appearance of the contraband in advance of shipment," and therefore, the reason Mr. Belloisi had not taken the contraband was because he likely "already received information, by telephone or otherwise, about the quantity or appearance of the contraband that he was intended to receive, and he was therefore able to detect the sham contraband". *Id* at ¶s 11-12. **It is this specific supposition that stands as the exclusive connection between the factual recitation in Moloney's affidavit and request for the warrant to search the defendant's cellular device.**

On the same date, Magistrate Judge Robert Levy granted the search warrant application for Evidence, Fruits and Instrumentalities of Violations of 21 U.S.C. §§ 952, 960, and 963, as Set Forth in Attachment B (of the Search Warrant Application). See, <u>Exhibit 6</u>, *Search Warrant*.

In his affidavit, Moloney describes the procedures that the government intended to use when searching the cellular phone for electronically stored information ("ESI") or electronically stored data ("ESD"):

> "24.    Nature of examination. Based on the foregoing and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the

entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant."

Notably, Moloney's affidavit did not describe the particular procedures the government planned to employ when searching the phone with any greater specificity, nor did his affidavit contain language regarding the return of the device or ESI found to be non-contraband, lawfully possessed and unrelated to the offense or any other type of criminal activity, nor language regarding measures the government intended to employ to restrict their search to data falling within the categories of evidence specified in the warrant.

In his affidavit, Moloney asked the magistrate court to issue "a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B." See, Exhibit 5, *Govt Search Warrant Affidavit* at ¶26.

Attachment B, which was adopted, verbatim, by the Magistrate Court, states as follows:

"1.  All records on the Device described in Attachment A[1] that relate to violations of 21 U.S.C. §§ 952, 960, and 963 and involved PAUL BELLOISI and any co-conspirators since January 4, 2020, including:

a.  communications, photographs, videos, notes or sound recordings related to American Airlines flight 1349, or otherwise related to the February 4, 2020 transportation and importation of cocaine;

b.  communications, photographs, videos, notes or sound recordings related to drug trafficking or importation;

c.  any information related to the identities of BELLOISI's co-conspirators (including names, addresses, phone numbers, or any other identifying information);

d.  any Internet or search history relating to drug trafficking;

e.  list of customers and related identifying information;

---

[1] Attachment A simply states: "As set forth in Attachment A, the property to be searched is an Apple iPhone 8 bearing the serial number F4HVL9LMJ, hereinafter the 'Device.' The Device is currently located in the Evidence Storage Room at JFK Building 75, Suite 217
This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B."

f. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

g. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

h. any information recording BELLOISI's or his co-conspirator's schedule or travel from January 4, 2020 to the present;

i. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

a. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronically stored information seized or copies pursuant to this warrant in order to located evidence described in this warrant. The review of electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the law enforcement agents may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review."

The government conducted an exhaustive search of Mr. Belloisi's cellular device and intends to introduce a variety of different types of evidence obtained as a result thereof. Such evidence includes communication logs (phone calls, text messages, emails and other applications such as What's App), all saved contacts, photographs and video taken and received by the device. These communications include communications with many individuals in Mr. Belloisi's life whom

the government knows and have conceded have no involvement with the charged offenses and criminal conduct but which the defense surmises the government intends to introduce under a FRE § 404(b)(2) theory.

**ARGUMENT**

I. **THE EVIDENCE IN THE FORM OF WRITTEN OR RECORDED STATEMENTS ALLEGEDLY MADE BY THE DEFNEDANT TO LAW ENFORCEMENT OFFICERS ON FEBRUARY 4, 2020 SHOULD BE SUPPRESSED BECAUSE THEY WERE OBTAINED IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHTS**

The statements allegedly made by Mr. Belloisi to law enforcement officers on February 4 and 5, 2020, must be suppressed because they were obtained in violation of *Miranda v. Arizona,* 384 U.S. 437 (1966) and his Fifth Amendment rights. *U.S.C.A. Const. Amend. 5*. The purported statements of Mr. Belloisi to law enforcement could be effectively grouped into two categories. First, there are statements that Mr. Belloisi allegedly made to law enforcement officers in response to their questioning while under their control *on the tarmac* absent any notice of his *Miranda* rights. Importantly, the government's disclosures do not appear to include any alleged statements made by Mr. Belloisi during the period he was questioned on the tarmac near the aircraft.

The second group of statements are those allegedly made by Mr. Belloisi to officers after having been transported to an interrogation room where he remained for several hours. As Mr. Belloisi explains, he remained in that room while being questioned for several hours, after invoking his right to counsel and refusing to speak with officers. In contrast, the government's disclosures indicate their claim will be that Mr. Belloisi was *Mirandized* immediately, or nearly so, upon the officers first attempt to question him, which took place, they claim, after he was taken from the tarmac and to interrogation room. See, Exhibit 3, *Alleged Recorded Oral Statement of Defendant & Miranda Waiver form* (indicating that the defendant was informed of his rights at

20:27 or 8:05pm on February 4, 2020). Moreover, the government claims that despite his refusal to sign the waiver form they presented him, he nevertheless waived his rights and began answering their questions, ostensibly without invoking his right to counsel as Mr. Belloisi affirms that he did multiple times. See, _Affidavit of Defendant._

With regard to the statements on the tarmac, it would seem clear that were the government seeking to offer any evidence regarding such statements, they must be suppressed as Mr. Belloisi was unquestionably in custody and being interrogated by law enforcement absent being informed of his _Miranda_ rights. However, given that the government has not provided evidence of any such statements in fulfilling Rule 16 discovery obligations, the defendant hereby moves for an order precluding the introduction of any such evidence at trial.

"_Miranda_ safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." _Rhode Island v. Innis_, 446 U.S. 291, 300-301 (1980). In determining whether a person is 'in custody', a first step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt that they were not at liberty to terminate the questioning and leave. _Howes v. Fields_, 565 U.S. 499, 509 (2012); see also, _Stansbury v. California_, 511 U.S. 318, 322-323 (1994) (the initial determination of custody depends on the objective circumstances of the interrogation, not the subjective views held by either the law enforcement officers or the person being questioned). Accordingly, courts will examine such factors as: the location of the questioning, its duration, the nature of the statements made during the interrogation, the presence or absence of physical restraint during the interrogation and whether the individual was released at the end of the interrogation. See, _Howes, supra_ at 509.

Turning to the circumstances of the questioning of Mr. Belloisi on the tarmac, it may first be appropriate to consider that officers had significantly restrained his liberty in almost every conceivable way when they began questioning him outside the plane on the tarmac. See, _Affidavit of Defendant_. Coupled with their immediately accusatory questions, frisking of his person, and instant confiscation of his identification and cellular phone, Mr. Belloisi simply capitulated to the officers' full authority over his physical person and followed their instructions. He stood where they told him to and ultimately looked only in the direction they allowed for approximately 30 minutes while on the tarmac. It is also important to bear in mind that Mr. Belloisi was on the clock, at work and the officers were thus surrounding and controlling him in front of his peers and coworkers at his place of employment. The substantially unusual nature of this interaction between the defendant: an employee at work, and a group of law enforcement officers suddenly appearing, descending upon and surrounding him, demanding information and property from him, would lead any reasonable person to believe they would not be free to decline their demands or free to walk away. Accordingly, the government must be precluded from offering into evidence the substance of statements that the defendant uttered to officers on the tarmac while being questioned in their custody.

Turning to the statements allegedly made later inside an interrogation room, and for which the government has provided both handwritten and typed versions in discovery[2]; these alleged statements must be suppressed as they would have been made by Mr. Belloisi while being subjected to custodial interrogation well prior to his having been informed of his _Miranda_ rights. See, _Affidavit of Defendant_. The fact the defendant had been transported by officers from the tarmac to another building, to an interrogation room, had all his possessions taken from him and

---

[2] See, Exhibit 3.

was being guarded by an officer further cemented the manifest reality of Mr. Belloisi being in custody. In fact, the officers' interrogation simply migrated from one location to another. Accordingly, all statements made prior to Mr. Belloisi having been "informed" of his rights, must be suppressed.

The only difference between statements attributed to Mr. Belloisi on the tarmac and those back in the interrogation room, besides the location and point in time they were allegedly made, is the fact that Mr. Belloisi had also specifically and unequivocally invoked his right to counsel, by telling the agents he wanted to call a lawyer, upon his arrival at the interrogation room. See, *Defendant's Affidavit at ¶9.* Accordingly, the continued interrogation by officers after such a clear and unequivocal invocation of his right to counsel, when they should have cut off all questioning, provides an alternative basis under which the Court should order exclusion of the statements attributed to Mr. Belloisi by the government. *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981); *Minnick v. Mississippi*, 498 U.S. 146 (1990).

The government's disclosures indicate their claim that the statements they seek to introduce were *post-Miranda,* with Mr. Belloisi having waived his rights and agreeing to answer their questions. Given this claim of a waiver of *Miranda* rights, the burden falls on the government to demonstrate, by a preponderance of the evidence, that there was a valid waiver. *See generally*, *Colorado v. Connelly*, 479 U.S. 157 (1986); *Berghuis v. Thompkins*, 560 U.S. 370 (2010); *U.S. v. Murphy*, 703 F.3d 182, 192 (2nd Cir. 2012). In determining if a valid waiver took place, the inquiry focuses on whether the waiver was both knowing and voluntary. See, *Berghuis, supra* at 382; see also *supra*, *U.S. v. Plugh*, 648 F. 3d 118 (2nd Cir. 2011). First, the Court must be satisfied that there was a "knowing" decision to give up the rights, "which is to say that 'the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of

the decision to abandon it.'" *Plugh, supra*, at 127 [quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)]. The waiver must also be voluntary in so far as it was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* The totality of the particular circumstances must be examined in determining whether the government has shown a valid waiver "including the background, experience, and conduct of the accused." *U.S. v. Spencer*, 995 F.2d 10, 11 (2nd Cir. 1993).

One logical starting point in determining whether a valid waiver of *Miranda* rights was made would be to determine if officers obtained the signed consent of the defendant to waive such rights. While a defendant's refusal to sign a waiver of rights form is not necessarily tantamount to an invocation of such rights[3], such a direct, "refusal to sign a written waiver may be taken as an indication that no waiver was intended or freely given." See, *U.S. v. Boston*, 508 F.2d 1171, 1175 (2nd Cir. 1974). Of course, a defendant need not expressly waive her rights by either signing a written waiver of rights form or expressly stating their determination to waive the rights but can do implicitly, merely through their own words or actions after having been properly informed of their rights and having not invoked them. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

In the instant matter, all parties agree that Mr. Belloisi clearly and unequivocally refused to sign the waiver form officers presented to him. See, Exhibit 3. The factual dispute is that the government claims that his refusal to sign the waiver occurred at the beginning of their efforts to question him but he nonetheless answered all their questions while in the interrogation room (20:27 hours). The government claims that Mr. Belloisi freely agreed to waive those rights anyway, constituting an 'implied waiver', by speaking with officers for the next two and a half hours before suddenly and arbitrarily deciding that at that point (23:00) he no longer wanted to answer

---

[3] *U.S. v. Plugh*, 648 F.3d 118 (2nd Cir. 2011).

questions; and, now wanted to invoke both his right to silence and to obtain counsel. Id. Inherent in this factual dispute over *whether the defendant waived his rights* is, of course, another critical factual dispute regarding *when* his *Miranda* rights and the option to execute the written waiver of such rights was presented to and refused by him.

## II.     SUPPRESSION OF PHYSICAL EVIDENCE

### a)  *Suppression of Evidence Derived from the Warrantless Search of the Defendant's Cellular Phone and the later Execution of a Search Warrant relating to the Defendant's Cellular Phone*

i)     <u>Consent</u>

The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Place*, 462 U.S. 696, 702 (1983) (quoting U.S. Const. Amend. IV); see also *United States v. Galpin*, 720 F.3d 436, 446 (2nd Cir. 2013). In addition to ensuring that probable cause supports governmental intrusion upon an individual's liberty and privacy, the purpose of the Fourth Amendment warrant clause is to ensure that "those searches deemed necessary should be as limited as possible." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable…subject to only a few specifically established and well delineated exceptions'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347). One such exception to both the warrant and probable requirements is a search that is conducted pursuant to consent. *Davis v. United States*, 328 U.S. 582 (1946).

When the government asserts that proper consent to a search was given, the burden is on the government to so demonstrate. It must show that the consent was "in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Consent must be the product of that

individual's free and unconstrained choice. *United States v. Arango-Correa*, 851 F.2d 54, 57 (2nd Cir. 1988). Mere acquiescence in a show of authority is not voluntary consent. *United States v. Vasquez*, 638 F.2d 507, 524 (2nd Cir. 1980), cert. denied 450 U.S. 970 (1981). In determining whether voluntary consent was obtained, courts will review the totality factors and circumstances. *United States v. Wilson*, 11 F.3d 346, 351 (2nd Cir. 1993) (citing *Schneckloth, supra*, 412 U.S. at 227); see also, *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). A court may look to such factors as whether officers' conduct was highly intrusive[4], whether the defendant was aware he or she had a right to refuse consent[5], the length of time between initial contact between officers and defendant and the complete search taking place[6], as well as any number of other relevant factors, with the touchstone remaining whether the officers had "a reasonable basis for believing" that there had been consent to the search. See, *United States v. Garcia*, 56 F.3d 418, 423 (2nd Cir. 1995).

Importantly, given that the phone was charged, turned on, and was not locked or password-protected in any manner[7], nothing prevented officers from accessing his device and its entire contents once they took possession of it. Nevertheless, the government would appear to be claiming that the phone was not searched or reviewed in any manner prior to the officers' conversation with Mr. Belloisi in the holding cell regarding their need for his wife's phone number. See, Exhibit 5, *Search Warrant Application*. It was at that point, says the government, officers first became aware that the phone was not locked and could be freely accessed. It was also at that

---

[4] See, *United States v. Isofia*, 370 F.2d 226 (2nd Cir. 2004).
[5] See, *Schneckloth, supra*, 412 U.S. at 233
[6] *Isofia, supra*, 370 F.2d at 231.
[7] See, *Affidavit of Defendant*.

point, the government claims, that Mr. Belloisi granted the officers oral consent to look through his phone[8]. See, Exhibit 4, *(Belloisi_00011)*. Mr. Belloisi, of course, disputes that he ever gave any consent, maintaining that he did not give officers consent to look through his phone and his claim is supported by his refusal to sign the consent form the officers presented to him. Id., see also, *Affidavit of Defendant.*

ii) The Defendant's Fourth Amendment Rights are not Diminished or Suspended under the 'Border Search' Doctrine

As described above and in Mr. Belloisi's Affidavit, he was an individual who was stopped, seized, searched, arrested and interrogated while he was working at his place of employment in Queens, New York. He was not an international traveler who had just crossed or was seeking permission to cross an international border into the United States and the government has never alleged anything different. Accordingly, the defense submits that the "border search exception" to standard Fourth Amendment principles is wholly inapplicable to this case regardless of the fact that the entire incident took place at an International Airport. See generally, *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 264 (E.D.N.Y. 2021) [noting that the relaxation of Fourth Amendment protections as recognized in the 'border search doctrine' applies only to "individuals seeking to enter the country" at the border, citing, *Montoya de Hernandez*, 473 U.S. 531, 538 (1985), and *U.S. v. Ramsey*, 431 U.S. 606, 619 (1977)];

The Second Circuit, similarly, has applied the border search doctrine holding that suspicion-less searches at the border are permissible under the Fourth Amendment provided such searches are properly classified as being "routine." See, *Tabaa v. Chertoff*, 509 F.3d 89 (2nd Cir. 2007)

---

[8] The government nevertheless appears to maintain that no search of Mr. Belloisi's phone was conducted by law enforcement officers, "out of an abundance of caution," until after a search warrant had been applied for and issued on February 24, 2020. See, Exhibit 5, *Govt's Search Warrant Application, Affidavit of John M. Moloney, at ¶18.*

(citing *U.S. v. Irving*, 452 F.3d 110, 123 (2nd Cir. 2006); see also, *U.S. v. Levy*, 803 F.3d 120 (2nd Cir. 2015) (noting that it is well-established that "the Customs area of an international airport is the functional equivalent of a border for purposes of the border search doctrine") (emphasis added). Given that Mr. Belloisi was 1) not an international traveler, 2) was not "at the border" or its functional equivalent and encountering CBP officers attendant to his entry or admission to the country, and, 3) that the search of his person and effects, including his cellular were anything but "routine" under the circumstances described by the government, this Court should find any 'border search doctrine' principles that would operate to diminish and relax the Fourth Amendment protections to which Mr. Belloisi would otherwise be entitled, wholly inapplicable to this case.

iii) <u>The Search Warrant Issued and Executed in this Case Violated the Fourth Amendment</u>

The purpose of the warrant clause of the Fourth Amendment is ensure that "those searches deemed necessary should be as limited as possible." *Coolidge, supra*, 403 U.S. at 467 (1971); U.S. Const. Amend. IV ("no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."). "The specific evil" in the instant case "is the 'general warrant' abhorred by the colonists, and the problem is not the intrusion per se, but of a general, exploratory rummaging in a person's belongings." *Coolidge, supra,* 403 U.S. at 467; see also, *Galpin, supra*, 720 F.3d at 445 ("'[T]he central concern underlying the Fourth Amendment [is] the concern about giving police officers unbridled discretion to rummage at will among a person's private effects.'") (citing, *Arizona v. Grant*, 556 U.S. 332, 345 (2009)). The Constitution limits law enforcement's right to search only "the specific area and things for which there is a probable cause to search," which requires that the "search will be carefully tailored to its justifications, and will not take on the character of the wide-

ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

The Fourth Amendment both "requires particularity and forbids overbreadth." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013) (citing *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009)); see also *United States v. Barnes*, 13-CR-387, 2013 U.S. Dist. LEXIS 189631 at *6 (S.D.N.Y. Oct. 21, 2013) (Nathan, J.). The Court must consider "'(1) whether the items listed to be seized in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers.'" *Zemlyansky*, 945 F. Supp. At 450 (quoting *United States v. Hernandez*, 09-CR-625, 2010 WL 25644, at *7 (S.D.N.Y. Jan. 6, 2010).

Evidence that is seized in violation of the Fourth Amendment, as well as other fruits thereof, are subject to suppression. See, *Herring v. United States*, 555 U.S. 135, 139 (2009) (the exclusionary rule forbids use of improperly obtained evidence at trial); see also, *Wong Sun v. United States*, 371 U.S. 471 (1963). The primary purpose of the exclusionary rule is deterrence against future unlawful conduct of police, thereby effectuating "the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974); see also, *United States v. Bershchansky*, 788 F.3d 102, 112 (2nd Cir. 2015) (exclusionary rule deters "deliberate, reckless, grossly negligent, or in some circumstances recurring or systemic negligence") (quoting *Herring*, 555 U.S. at 144).

In the case at bar, the exclusionary rule ought to apply and the evidence derived from both the warrantless search and the execution of the search warrants should be suppressed. As set forth above, no consent was ever given by Mr. Belloisi to law enforcement officers to search his cellular device. The warrant in this case amounted to an impermissible 'general warrant' lacking in

necessary particularization and its fruits must therefore be suppressed. The fruits of the search warrant must also be suppressed because the warrants were issued upon applications that failed to establish probable cause. See, e.g., *United States v. Ganias*, 755 F.3d 125, 136-141 (2nd Cir. 2014) ("*Ganias I*"), *rehearing en banc*, 12-240 (2nd Cir. May 27, 2016) ("*Ganias II*").

The government may not rely on affidavits submitted with the search warrant application to supplement the warrants themselves. Rather, the warrant must stand on its own, because "[s]upplementary documents, including affidavits" can particularize a warrant "only if attached and incorporated into the warrant by reference." *Zemlyanskey*, 945 F. Supp. At 453 (collecting case, and citing *United States v. Rosa*, 626 F.3d 56, 64 (2nd Cir. 2010) ("[W]e may no longer reply on unincorporated, unattached supporting documents to cure an otherwise defective search warrant.")); see also, *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) ("[t]he fact that the application adequately described the things to be seized does not save the warrant from its facial invalidity" because the Fourth Amendment "by its terms requires particularity *in the warrant*") (emphasis added). If the warrant itself fails to satisfy the particularity requirement, the unincorporated application paperwork submitted to the Court with it cannot cure the warrant.

Cellular phone and electronic device searches implicate crucial privacy interests that cannot be done away with simply through the mere invocation of boilerplate language. Indeed, a unanimous Supreme Court in *Riley v. California* has held that police officers may not search a suspect's smartphone based exclusively upon probable cause to arrest its owner, but officers must instead apply for and have granted a valid search warrant. *Riley v. California*, 573 U.S. 373 (2014). The Supreme Court specifically noted the vast amount and types of information contained in the modern "smartphone" or stored remotely (in "the cloud") accessed through the smartphone, thus leading it to conclude that a person's privacy interest regarding such a device "dwarfed" those in

prior cases where limited information in a delineated and finite space was involved. *Id.* at 396. The Court's reasoning underlying the holding in *Riley* has clear implications for the kind of warrant that must be obtained to search a modern cellular phone.

Picking up on the Supreme Court's reasoning, a federal district court found a warrant to search all content on a suspect's device to be invalid when police failed to demonstrate probable cause that everything contained on the phone was evidence. See, *United States v. Winn*, 79 F. Supp.3d 904 (S.D. Ill. 2015), *appeal dismissed*, No. 15-1500 (7th Cir. July 16, 2015). In that case, witnesses had alleged that the defendant had been training his smartphone camera towards young girls in a swimming pool and either photographing or videotaping them. However, as in the case at bar, officers did not narrowly tailor a warrant request for the specific types of files for which they had probable cause. Instead, like here, officers copied a template seeking authorization for the broadest possible search, a search encompassing an expansive range and types of data. The district court in *Winn* held that the approach used violated the Fourth Amendment because it ran afoul of the particularity requirement. That court reasoned, that since the officer secured the warrant based on accusations about Winn's behavior at the swimming pool, the officers had probable cause only to investigate the crime of public indecency. But "only two types of data could possibly be evidence of (such a crime): photos and videos." *Id.* at 9. The court observed that the complaint did not even mention categories of data beyond photos or videos and therefore, officers could not permissibly rely on a template that failed to differentiate one category or data on a phone from another:

"Templates are, of course, fine to use as a starting point. But they must be tailored to the facts of each case. This particular template authorized the seizure of virtually every piece of data that could conceivably be found on the phone…Obviously, the police will not have probable cause to search through and seize such an expansive array of data every time they search a cell phone." *Id.,* citing *Riley*, 573 at 396.

As to the files for which no probable cause to search existed, the court in Winn ruled that the police should have established probable cause as to each type of data. The failure to do so at the time the warrant was applied for rendered fatally invalid:

> "The bottom line is that if (the officer) wanted to seize every type of data from the cell phone, then it was incumbent upon him to explain in the complaint how and why each type of data was connected to Winn's criminal activity, and he did not do so. Consequently, the warrant was overbroad, because it allowed the police to search for and seize broad swaths of data without probable cause to believe it constituted evidence." *Id*. at 10.

The search warrant for Mr. Belloisi's cellular phone violated the Fourth Amendment because it was unsupported by probable cause, insufficiently particularized, and overbroad. Accordingly, this Court should suppress the fruits of the warrant.

The same problems exist with the search warrant application in the instant case as in *Winn*, *supra*. Specifically, the "probable cause" portion of Moloney's Affidavit suggests that the warrant was needed to search the phone because of the belief that Mr. Belloisi had "already received information from co-conspirators concerning the quantity or appearance of the contraband in advance of the shipment." Exhibit 5, *Moloney's Affidavit at ¶11*. Critically, Moloney goes on to tell the issuing magistrate that, in his opinion, the reason Mr. Belloisi did not remove the 'sham contraband' is because "he had already received information, by telephone or otherwise, about the quantity or appearance of the contraband he was intended to receive, and he was therefore able to detect the sham contraband by discrepancies between it and the real contraband." *Id. at ¶12*. This is a very specific type of information Moloney is referring to, and this specific type of "information" would have to be either an image, or a written or a recorded description of the appearance of the contraband. Notably, none of the records or data recovered by the government, pursuant to the general warrant issued, could properly be described as fitting the description of the type of communication that formed the basis of Moloney's request.

The problem of course, as in *Winn*, *supra*, is that the authorization to search (set forth in the warrant incorporated in Attachment B[9]), was exponentially broader than the stated basis for the search in Moloney's affidavit.  There was no particularization in the warrant; nor, did it restrict the type of data, nor the time frame, that could be searched to the specific areas of the phone that could have produced the kind of evidence described in Moloney's sworn statement. See, Exhibit 5.  A review of the warrant reveals that each of the various line items describing the type of information to be searched for are independently broader than the specific type of evidence Moloney told the Court he wanted to search for. Instead of limiting the search to images, descriptions or recordings revealing the actual contraband in question, the warrant issued was a general warrant authorizing an unbounded search of Mr. Belloisi's entire device. See, Exhibit 6.

The infirmity with the issuing court granting the government carte blanche to conduct an unbounded, generalized search of Mr. Belloisi's cellular device, is that officers did not have probable cause to believe that everything on the device could contain evidence of the crime they were investigating. Importantly, Mr. Belloisi was not apprehended in possession of any quantity of controlled substance or even in possession of the "sham" drugs.  Law enforcement had no basis to connect Mr. Belloisi to possession of the real or fake narcotics.  Of course, Moloney was aware of this, and the defense submits, is precisely why, in order to attempt to generate legal authorization to search the device at all, he drafted his affidavit for the warrant to seek out a specific type of evidence that would account for why Mr. Belloisi was not caught in possession. However, Moloney's speculations about what potential evidence on the device could support the notion of Mr. Belloisi's involvement in drug trafficking, was extremely specific.  His specific request for potential evidence should not have furnished the issuing court with probable cause to authorize the

---

[9] See, Exhibit 6.

search of the entirety of Mr. Belloisi's phone. There simply was no probable cause for such a generalized and unparticularized search. Based on the lack of probable cause to issue the warrant as to all of the contents of Mr. Belloisi's phone, this Court should suppress in full all fruits of this unlawful search warrant.

## III.     THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE FULL DISCOVERY

Pursuant to Fed. R. Crim. P. 16(a) (1) and *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, Mr. Belloisi respectfully requests the Court for an order compelling discovery by the government. In this regard, defense counsel adopts by reference the Demand for Discovery dated September 21, 2020, filed and served upon the government via ECF by prior defense counsel, David H. Besso. See, Exhibit 7.

Defense counsel and the government have conferred regarding the following pieces of evidence requested in the defendant's Demand for Discovery, 10l; 10m; 10n; and, 10o. See, Exhibit 7.  AUSA Pollack has informed defense counsel that he will seek out the requested pieces of discovery and provide them to counsel upon receipt.

WHEREFORE, Mr. Belloisi respectfully requests the Court grant his motions, or in the alternative, conduct the requested evidentiary hearings on these matters, and grant such other and further relief that the Court may deem just and proper.

Dated: New York, New York           Respectfully Submitted,
          February 4, 2022                      BY: David Jason Cohen

                                                        _____/S/_____
                                                        David Jason Cohen
                                                        *Counsel for Defendant Paul Belloisi*
                                                        Cohen Forman Barone
                                                        950 Third Avenue
                                                        New York, NY 10022
                                                        david@cfblaw.com