## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 20-CR-219 (DLI) |
| | ) | |
| PAUL BELLOISI | ) | The Hon. Dora Irizarry |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PAUL BELLOISI'S MOTIONS IN LIMINE

November 28, 2022

David J. Cohen
Cohen Forman Barone, LLP.
950 Third Avenue, 11th Fl.
New York, NY 10022
Tel.  (212) 766-9111
Fax: (212) 766-9166
David@cfblaw.com

To:    BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Attn: Robert M. Pollack, Esq.
United States Attorney
Eastern District of New York

**Table of Contents**

Introduction ………………………………………….………………………...….……3

Argument……………………………………………….………………….……..…….…4

I.    Preclusion of Certain Electronically Stored Information Obtained from
Mr. Belloisi's Cell Phone and iCloud Storage Account ………………..…….…….4

    A.  Preclusion of certain Text and WhatsApp Messages between Mr. Belloisi and
Known Third Parties Identified as Non-Co-Conspirators regarding Uncharged and
Unrelated Criminal Activities…........................................................................5

    B.  Preclusion of Cellular Phone Calls Logs and the Content of certain Text and
WhatsApp Messages between Mr. Belloisi and an Unindicted Third Party Alleged
to be a Co-Conspirator………………………………………………….……….....9

    C.  Preclusion of Images and other Media Obtained from
Mr. Belloisi's Cell Phone and iCloud Storage Account………..……………….17

II.    Preclusion of Certain Electronically Stored Information Obtained from the iCloud
Storage Account of an Alleged Co-Conspirator……..…………………………….20

III.    Preclusion of Expert Testimony concerning Cell Site Location Data Regarding
Mr. Belloisi's Cell Phone and/or Another Individual and Other Undefined Matters
Regarding Cell Phone Technology and Data Extraction ………..…...…………….21
.
    A.  The government's notice regarding expert testimony on cell site extraction
and location data and other undefined matters relating to cellphone extraction and
technology must be supplemented………………..………………….……….....21

IV.    Exclusion of Recorded Prison Telephone Calls Between the Mr. Belloisi's
Previously Incarcerated Brother and the Defendant……………………….…..….23

V.    Adverse Inference Charge and/or Exclusion of a Truncated Surveillance Video
Depiction of the Aircraft and Surrounding Portions of the Airport for Lack of
Completeness Due to Deliberate Destruction of the Complete Relevant Footage by
Law Enforcement……………………………………………………….……………24

Conclusion………………………………………………………………………….33

**Introduction**

Pursuant to Fed. R. Evid. 103(a), Paul Belloisi submits these motions *in limine* as an "opening brief" consistent with the Court's Order of September 22, 2022. See, e.g., United States v. Yu-Leung, 51 F.3d 1116, 1121 (2d Cir. 1995) ["[A] motion *in limine* may preserve an objection when the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pre-trial hearing, and (3) is ruled upon without equivocation by the trial judge."]. We respectfully reserve the right to make further evidentiary objections, whether by motion *in limine* or at trial, as needed, or upon the government's compliance with its discovery and notices obligations or consistent with further orders of this Court.

Because the government has not yet provided the defense with its proposed trial exhibits, or its Rule 16(a)(1)(G) complaint notice of expert testimony[1], the defense is unable to move now on all objectionable material. Thus, we have made general motions *in limine* regarding, *inter alia*, the admissibility of various types of items seized from Mr. Belloisi's cellular phone and iCloud Storage Account as well as the iCloud storage account of an allegedly unknown, unindicted co-conspirator. However, in the interest of timely resolving certain disputed questions- involving evidence the government has told the defense it plans to introduce and to which we have definite evidentiary objections- we have also made certain specific motions *in limine* e.g., regarding the government's proposed expert testimony, recorded prison calls between defendant and his previously incarcerated older brother, and concerning a truncated surveillance video made so through deliberate destruction by law enforcement officers.

Now, the defense seeks:

I.        Preclusion at Trial of certain Electronically Stored Information Obtained from

---

[1] See discussion at §III, *infra*.

Mr. Belloisi's Cell Phone and iCloud Storage Account

II.      Preclusion at Trial of certain Electronically Stored Information Obtained from the iCloud Storage Account of an Alleged Co-Conspirator;

III.     Exclusion of Expert Testimony Regarding Cell Site Location Data Regarding Mr. Belloisi and/or Other Individuals and Other Undefined Matters Regarding Cellphone Technology and Data Extraction;

IV.     Exclusion of Recorded Prison Telephone Calls Between the Defendant's Previously Incarcerated Brother and the Defendant;

V.     An Adverse-Inference Charge and/or Exclusion of a Truncated Surveillance Video Depiction of the Aircraft and Surrounding Portions of the Airport for Lack of Completeness Due to Deliberate Destruction of the Complete Relevant Footage by Law Enforcement

**Argument**

**I.    The Court should Order Preclusion of Certain Electronically Stored Information Obtained from Paul Belloisi's Cell Phone and iCloud Storage Account**

The government took possession of the Mr. Belloisi's cell phone and began searching its contents without his consent and over his objections almost immediately upon encountering him on the day of his arrest. Some two weeks later, the government executed a search warrant for Mr. Belloisi's cell phone and iCloud storage account and acquired a trove of electronically stored information including communications such as text (SMS) and WhatsApp messages, telephone and application call logs, as well as photos, videos and other material. In denying the motion to suppress this material as obtained in violation of Mr. Belloisi's Fourth Amendment rights, the Court, of course, did not specifically rule as to the admissibility at trial of any of the particular items or types of items the government may seek to introduce. Although the government has not yet specified each of the seized items or stored information it will seek to admit against Belloisi at trial, it is clear that certain materials are patently inadmissible under the rules of evidence.

**A. The Content of Text and WhatsApp Messages between Mr. Belloisi and other Non-Co-Conspirators regarding Uncharged and Unrelated Allegedly Criminal Activities are Inadmissible Because they are Irrelevant, Pure Propensity Evidence, in many instances are Hearsay, and the Undue Prejudice of their Admission Substantially Outweighs any Probative Value.**

Pursuant to both the unconsented to, warrantless search of his cellular device on or about February 4th and 5th and the later search after issuance and execution of the search warrant, the government obtained a wide swath of information showing communications in the form of phone calls, text (SMS) and WhatsApp messages between Mr. Belloisi and various friends, coworkers and other "contacts" in his cellular phone. The defense submits that the government would concede that it has little, if any, suspicion or even evidence, that any of the individuals[2] were involved in the alleged cocaine conspiracy charged in the indictment. However, the substance of the communications with some of these contacts- who are indisputably unconnected to the charged offenses- may, nevertheless, constitute communications relating to discreet uncharged controlled substance activity by Mr. Belloisi involving distributing small amounts of prescription medication. The government has in fact disclosed the substance of a statement of one such individual as a *Brady* disclosure in its third discovery production cover letter confirming the same. See, ECF No. 20, *Government's Third Discovery Production Letter/Brady Disclosure dated January 20, 2021*.

The government has been candid that it does not believe there to be any specific connection between the various communications Mr. Belloisi had with these acquaintances, regarding prescription pills, and the charged offenses relating to cocaine trafficking such that these alleged bad acts[3] or other uncharged crimes, would be direct evidence of or are otherwise inextricably

---

[2] The defense is specifically excepting from this group of contacts the contact in Mr. Belloisi's phone with the name "Lester", as this contact represents the only third party with which the government is claiming the defendant conspired to traffic cocaine. As such, communication with that contact is dealt with discreetly, *infra*, at *Section I, B.*

[3] See, generally, *United States v. Scott*, 677 F.3d 72 (2nd Cir. 2012) [extending Rule 404(b) to include non-criminal acts or wrongs].

intertwined with the charged offense such that they may be admissible without being subject to Rule 404(b). See, *United States v. Quinones*, 511 F.3d 289, 309 (2nd Cir. 2007); *United States v. Baez*, 349 F.3d 90, 94 (2nd Cir. 2003). However, the government has maintained that it does believe the evidence may be admissible for a permissible purpose (other than propensity) under a Rule 404(b)(2) theory. The defense disputes that there would be any permissible purpose, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"[4] for the introduction of this type of evidence and submits that this type of evidence would only be received by the factfinder as impermissible propensity evidence against Mr. Belloisi. **The government is, and has been for some time, at liberty to charge Mr. Belloisi with other drugs crimes, but not having done so, the government must be precluded from introducing** communications constituting evidence of uncharged and unrelated, albeit drug-related activities of the defendant as such activity is so similar to the conduct alleged in the present case that the propensity nature of such evidence before the jury will be inescapable and incurable.

As the proponent of the evidence, the government will have to identify the proper purpose(s) for which it believes the evidence should be deemed admissible under the Rule, and how the evidence is relevant[5], however, even if the government should be successful in doing so, the defense nevertheless maintains that any probative value this evidence may have, is substantially outweighed by its prejudicial effect to Mr. Belloisi under Fed. R. Evid. 403. See, *U.S. v. Scott, supra*, 677 F.3d at 83 [citing, *Huddleston v. United States*, 485 U.S. 681, 691 (1988)]. The prejudicial effect is manifest in that admission of the communications relating to other, unrelated drug activity of a completely different nature and scale will immediately present itself as powerful evidence to the trier of fact that Mr. Belloisi has a propensity to commit drug-related acts such as

---

[4] See, FRE Rule 404(b)(2).
[5] See, *United States v. La Flam*, 369 F.3d 153, 156 (2nd Cir. 2004) (*per curium*).

those he would be facing trial on. That natural conclusion would dwarf, if not wholly eclipse, any permissible purpose the government might offer for admission under Fed. R. Evid. 404(b). Even a limiting instruction as to the purpose for which the evidence is admitted would be completely ineffectual. The defense posits the likely conclusion of jurors would be, if Mr. Belloisi has involvement in some other kind drug of activity, he is then vastly more likely to be guilty of the unrelated drug activity for which he is on trial for and for which there is vastly less evidence. And, such an incurable conclusion by jurors would impermissibly rob the defendant of his presumption of innocence and diminish the government's burden based on sheer propensity evidence, is the very "essence of prejudice." *Scott, supra*, at 84.

By way of specific example, the individual identified as the contact "Kev"[6] in Mr. Belloisi's phone sent text messages to Belloisi at or near the time of Belloisi's arrest on February 4, 2020 (in addition to calling and receiving calls from Belloisi throughout that day and the previous 24 hours) stating "I'll going to him" and "I'll be ready by nine"[7]. While the statements are arguably non-hearsay if not admitted for the truth of the assertions therein, the only possible relevance to this case and charges would be to argue Belloisi's lack of mistake in stumbling upon the not-so-well-hidden sham drugs in the avionics compartment of the aircraft just minutes later. But in truth, the contents of the communications with these non-conspirators does not address any factors that would relate to Mr. Belloisi's knowledge of circumstances surrounding the drug-trafficking indictment in this case. The communications with Kev, in context of other communications with another contact unrelated to the present indictment, are clearly related to Mr. Belloisi's coordination between Kev and this other individual contact on his phone- named John A[8]. The true

---

[6] This is the individual identified in the government's Brady Disclosure Letter (at <u>ECF No. 20</u>) who they do not suspect of being a co-conspirator with Mr. Belloisi in relation to the indictment.
[7] See, <u>Exh. A</u>, *Belloisi_00060*.
[8] Redacted to protect individual's anonymity.

relevance of those communications is to a propensity argument that is simply inescapable: if Belloisi was coordinating one set of drug-related activities at or about the time of his arrest, it makes it exponentially more likely he was part of a second one as well.

Exclusion of the content of a significant portion of these messages is also required due to the hearsay nature of the statements themselves. Hearsay statements- those uttered out-of-court and admitted for the purpose of proving truth of the matter asserted in the statement, are, of course inadmissible unless they fall within an enumerated exception even if they would be relevant to proving a fact of consequence in the case and did not cause undue prejudice or confusion of the issues before the jury. U.S. v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013) (quoting Fed. R. Evid. 801(c)); Fed. R. Evid. 802. There is simply no hearsay exception that would apply to many of these communications where any possible non-propensity purposes the government could claim justify their admission would be tied to the truth of the factual assertion in the statement and thus render the statement impermissible hearsay. While many of the messages do not contain such assertions of fact that the government must argue to be true to make the case for their probative value and relevance and, thus, are non-hearsay, many of the communications are hearsay and would be inadmissible on that basis alone. In light of this reality, the defense would suggest, should the government indeed be seeking to admit the content of some of these messages, and should the Court entertain the possibility of finding any of them admissible, that the government provide a detailed list for the Court and the defense setting forth the full list of the specific communications of this type it is seeking introduce at trial.

**B. Preclusion of Cellular Phone Call Logs and the Content of Certain Text and WhatsApp Messages between Defendant and an Unidentified Unindicted Third Party alleged to be a Co-conspirator is Warranted due to the Irrelevance and the Highly Prejudicial Nature of the Evidence and Likelihood of Jury Confusion when Weighed against their Scant Probative Value as well as the Hearsay Nature of the Content of the Communications.**

While the vast majority of the communications obtained from Mr. Belloisi's phone and iCloud account show communications with the types of third-party contacts discussed *supra*, there are also communications between the defendant and another contact, which, the government alleges, are communications between the defendant and a co-conspirator made in furtherance of the conspiracy charged in the indictment. Patently, such evidence is not propensity evidence but, allegedly, direct evidence of the defendant's agreement to engage in the common criminal purpose of trafficking the narcotics allegedly recovered in the case at bar. The defense views this material as being subdivided into two (2) types. The first type of material are the cellular phone communications themselves- the call and message logs- showing *the fact that* certain SMS or WhatsApp messages or telephone calls occurred between the defendant and this third party. The second type of material are the *actual content* of the SMS or WhatsApp Messages, set forth in the same set of cellular phone records and thus showing the specific actual content of the communications. Each type of material is dealt with discreetly below.

### *Cellular Phone Call and Messaging Logs*

The initial question with regard to the cellular phone call and messaging logs showing certain communications at certain times with the contact in Mr. Bellloisi's listed as "Lester" is one of relevance given that these materials, unlike the second type discussed, *infra*, contain no content of any communication between the defendant and this other phone subscriber. In a conspiracy prosecution with more than one defendant (unlike the present case), it would of course generally be presumed relevant in such an action to show the fact of some frequency or volume of

communications between two or more known and identified co-conspirators. The fact and frequency of such communications certainly creates a tendency for it to be more likely to be true that the participants have some common reason for being in such frequent contact with one another than if they did not have such communications. It would appear to be this general principle that the government will rely upon- that it is entitled to show the fact and frequency of communications between Mr. Belloisi and his co-conspirators, as the reason why this material is relevant evidence.

However, the government is in a far different position with respect to this type of evidence in the case at bar than in the multiple defendant conspiracy case example cited above, or even in a single defendant conspiracy prosecution where other co-conspirators are known, even if unindicted and unidentified[9] and where there exists some independent evidence, outside of the communications with the defendant themselves, of the other individual's status as a member of the conspiracy. In each of those situations there is some extrinsic proof, beyond the mere fact and frequency of communications themselves, that the unnamed co-conspirator either actually took, or the defendant reasonably believed the co-conspirator took, their own actions in furtherance of the conspiracy. Here however, the *only* evidence of the involvement of this "Lester" in any type of criminal conduct is the fact of (not even genuinely the content of the communications as discussed, *infra*) the communications with Belloisi- the very same evidence the government would purport to bring in as relevant to prove Belloisi's participation in a conspiracy with some other person in order to sustain their charges against him.

The government will no doubt argue that it is not required to prove or even identify who a defendant's co-conspirators are, or to prove that a defendant knew the identities of any or all of their co-conspirators, in order to secure a conspiracy conviction. See, *U.S. v. Dove*, 884 F.3d 138

---

[9] Such as in a typical case involving a confidential informant. See generally, *U.S. v. Olivo*, 664 Fed. Appx. 77 (2d 2016).

(2d Cir. 2018); see also, *U.S. v. Valencia*, 100 Fed. Appx 17 (2d Cir. 2004) [citing *U.S. v. Harris*, 8 F.3d 943 (2d Cir. 1993)]. While the defense does not challenge those legal truisms, the government still must demonstrate that "each alleged member (of the conspiracy) agreed to participate in what he knew to be a collective venture directed toward a common goal." *U.S. v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000) (quoting *U.S. v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990). And, while identity need not be shown specifically of all co-conspirators, the evidence must, at minimum, show "the existence of the unknown people with whom the defendant allegedly conspired." *U.S. v. Harris, supra*, at 946 (citing *U.S. v. Cepeda* 768 F.2d 1515 (2d Cir. 1985)).

While the government need not affirmatively identify this "Lester" or provide proof of his specific role within the conspiracy, the government is required to prove that this individual 1) actually existed, and 2) that the individual was a member of this particular conspiracy. See, *U.S. v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980) (noting that when sufficient evidence of conspiracy is presented, evidence sufficient to connect it to additional co-conspirators "need not be overwhelming" (quoting *U.S. v. Head*, 546 F.2d 6, 9-10 (2d Cir. 1976)). Outside of the communications with Mr. Belloisi as such, the government does not appear to have *any evidence* it will introduce to show that this "Lester" had any role in the conspiracy charged in the indictment. Rather, the government is seeking to introduce this evidence to prove Mr. Belloisi's communications demonstrate an agreement with another con-conspirator when it is, in fact, also the only evidence they have that this other individual had any involvement in the conspiracy at all. The circular nature of this reasoning is readily apparent, but the song remains the same, as it were: the evidence of the communications themselves cannot be both evidence of Mr. Belloisi's agreement to pursue a common criminal purpose with a co-conspirator and, also, be *the only proof*

of the other individual's involvement in the conspiracy. Were such logic to be applied, then numerous other contacts could be presumed to be in this conspiracy with Mr. Belloisi as well just by the sheer fact of their calls, text messages, or a combination thereof on the days surrounding and including the date of his arrest. Accordingly, the call and messaging logs are simply irrelevant in this case under the vacuous context in which the government would seek to introduce and then use them in a variety of ways simultaneously to meet their burden. This is true both with regard to Mr. Belloisi's agreement with another co-conspirator and as the only proof that this other person is, in fact, a co-conspirator at all.

The call and messaging logs should also be excluded from the government's case-in-chief due to the highly prejudicial nature of the communications and high likelihood of creating juror confusion. In truth, the latter of those two concerns is the more pertinent and prominent here. The government is planning to put the communications between Mr. Belloisi and this "Lester" contact before the jury and then seek to tell and color an entire story and narrative around them and what they must assuredly mean under the circumstances without providing any additional *evidence* of who this "Lester" person is, how they are involved in any criminality, (much less this conspiracy) or even how the content of any of the communications indicates any criminal purpose between them.

### *Content of Messages*

The potential admission of the *content* of the text messages between Mr. Belloisi and "Lester", as the government intends to offer, presents additional evidentiary problems beyond those that warrant exclusion of the call and messaging logs themselves. The most readily apparent additional problem is that the content of certain of the communications are hearsay because the government is seeking admission of these statements which contain assertions of fact and then the government

will want to argue the truth of the statements should be classified "as in furtherance of the conspiracy".

Before turning to address the content of certain messages- apparently sent to the defendant by the "Lester" contact- that constitute hearsay, the defense anticipates that the government will protest that there is no viable hearsay objection concerning statements by a co-conspirator to the defendant in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). However, before the Court can consider whether an alleged co-conspirator's statement comes within the exception set forth in the Rule, the Court must be satisfied that the statement actually falls within the Rule's definition. In order for the co-conspirator "non-hearsay" rule to apply, the government must establish, by a preponderance of the evidence that i) a conspiracy existed; ii) the defendant and the *declarant* were members of the conspiracy; iii) the statement was made in the course of the conspiracy; iv) the statement was made in furtherance of the conspiracy. U*.S. v. Bourjaily*, 483 U.S. 171, 175 (1987) (noting that the Court must preliminarily determine, consistent with Fed. R. Evid. 104 (a), that the government has met its obligations under the Rules); see also, *U.S. v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993); *U.S. v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996); *U.S. v. Coppola*, 671 F..3d 220, 246 (2d Cir. 2012).

In making its preliminary determination, the Court may consider the statements themselves, but given the presumptive unreliability of the out-of-court statements, in order for them to be admissible, "there must be some independent corroborating evidence" of, *inter alia*, the conspiracy itself and the defendant *and the declarant's* membership in it. See, *U.S. v. Tellier*, *supra*, at 580; *U.S. v. Diaz,* 176 F.3d 52, 83 (2d Cir. 1999). To show the existence of the conspiracy, Rule 801(d)(2)(E) requires proof of more than just the existence of a type of conspiratorial conduct generally. See, *U.S. v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (finding proof of "the general

existence of the mafia" insufficient to satisfy the rule).  Rather, independent evidence must be able to establish, to a preponderance standard, a common agreement to achieve *a particular objective* in the course and in furtherance of which the out-of-court statement was made. *U.S. v. Coppola*, supra at 28 (citing, *U.S. v. Russo,* 302 F.3d 37, 44 (2d Cir. 2002) (emphasis added)). Under the proper application of Fed. R. Evid. 801(d)(2)(E) (and 104(a)) these statements do not qualify as non-hearsay because the government does not have a) sufficient independent evidence establishing the existence of conspiracy alleged in the indictment or, b) any independent evidence that the defendant *and the declarant* were members of the conspiracy or c) that the statements were made in the course of and furtherance of the conspiracy.

One specific message the defense is aware the government seeks to introduce is a message allegedly received by Mr. Belloisi from the "Lester" contact at approximately 6:47pm on February 4, 2020. This text message was completely in Spanish and has since been translated by the government to read as follows: "Confirmed!! They just confirmed. Everyone already left, they are going to take them to dinner because they're hungry." See, <u>Exh. A</u>, *Belloisi_00059 (entry 345).* Setting aside the question of whether the government can provide evidence that Mr. Belloisi spoke or understood Spanish or whether he accessed any type of language translation software on his device or elsewhere to gain a translation of the message, it is clear that the messages, as translated, contains assertions of fact that are being communicated between the declarant and the recipient and would therefore normally constitute hearsay. Indeed, the government will unquestionably be proffering this statement for the truth of the assertion of fact that the beginning of the message (at least) contains, namely, that someone (some third party) had just confirmed some piece of information with the declarant ("Lester") that the declarant is, in this message, passing along to Mr. Belloisi. The truth of that assertion is in fact critical for the government and its theory because,

it will argue, that statement being true and being communicated to Mr. Belloisi is what then caused Belloisi to go to the aircraft and its avionics compartment to attempt to retrieve the narcotics his co-conspirator just "confirmed" were there. The necessity of the factual assertion being true would provide the only basis for arguing that the statement was in furtherance of the conspiracy[10].

Although the government will present a very precise and specific meaning to the first half of the Spanish message translated above, it will then have to simultaneously argue that the remaining portion of the message is unrelated gibberish lest it diminish the likelihood that the first part of the message means the things (in furtherance of the conspiracy) that they say it does[11]. The fundamental problem with the admissibility of the content of such hearsay statements is that independent of the statements themselves, there is simply no evidence whatsoever of the particular conspiracy existing or of "Lester" being a member of such conspiracy. In terms of independent evidence of the existence of the conspiracy, the government cannot simply rely on the generic argument regarding the existence of narcotics trafficking organizations utilizing airplanes in combination with the alleged discovery of narcotics on the aircraft at issue in this case. See, *U.S. v. Gigante, supra*, at 82. The government must have evidence of an actual common agreement to achieve a particular objective. *U.S. v. Russo, supra*, at 44. Even more glaringly perhaps, is the total lack of any independent evidence whatsoever that demonstrates that the declarant of the statements was a member of the specific conspiracy. The defense is not aware of any such independent

---

[10] There are additional messages from the declarant to Mr. Belloisi that clearly communicate factual assertions the government will argue are true, but the defense is not currently aware of which of the statements the government will be seeking to admit. There are also a number of messages from the "Lester" contact that would appear to be unintelligible or devoid of apparent meaning and the defense is presently ignorant of what of such messages the government would seek to introduce and under what theory.

[11] The defense submits that read as a whole the text message is most naturally understood to be a reference to having confirmed a dinner reservation or plan between multiple parties including the declarant and, perhaps the recipient of the message.

evidence the government has or would introduce, beyond the communications with Mr. Belloisi themselves, to prove the "Lester" contact's status as a member of the conspiracy alleged. Lacking any such evidence or evidence of the existence of the conspiracy itself, the hearsay statements made by the "Lester" contact to the defendant must be found inadmissible in the government's case-in-chief.

The content of the majority of the messages from the "Lester" contact to Mr. Belloisi are inadmissible on far simpler grounds (and, for the same reasons as the content-free communication logs themselves should be found inadmissible) whether or not they constitute hearsay and satisfy Fed. R. Evid. 801(d)(2)(E), in that they are utterly irrelevant. The content of the communications are irrelevant because, on their face, none of them appear to be in furtherance of any cocaine trafficking conspiracy and, as noted, the government has no independent evidence demonstrating the "Lester" contact is a member of such a conspiracy. The communications cannot be a) the exclusive proof of the existence of the conspiracy, b) the exclusive proof of the "Lester" contact's status as a co-conspirator, and c) the exclusive evidence of the agreement between the defendant and his co-conspirator which the government must prove beyond a reasonable doubt to secure the defendant's conviction.

The circular nature of the evidence the government would like to introduce to prove the defendant's guilt, as traced above, can be quite disorienting even for experienced counsel well-conditioned to assessing the admissibility and nature of a wide variety of evidence in criminal proceedings. For a jury of laypersons however, the confusion that would ensue in allowing the government to bring in facially irrelevant messages between the defendant and an unindicted, unknown party who it then argues is the defendant's co-conspirator and then to argue, essentially

just from the fact of such messages an elaborate, detailed conspiracy between the defendant and the "Lester" would depart far to fancifully from the actual evidence as to be permissible.

### C. Preclusion of Images and other Media from Defendant's Cellular Phone and iCloud Storage Account is Warranted due to the Irrelevance of the Material, the Lack of Proper Authentication, as well as the Highly Prejudicial Nature and Likelihood of Jury Confusion when Weighed Against the Scant Probative Value.

Beyond the message and phone communications between Mr. Belloisi and "Lester" (or, with third parties other than "Lester" regarding uncharged and unrelated drug-related activities discussed, *supra)*, there is no other material from Belloisi's cellular phone or iCloud account that is relevant to proving the tendency of a fact of consequence in this criminal action. Fed. R. Evid. 401. Given that Mr. Belloisi's cellular phone and iCloud account, like most anyone's, contained a vast array and variety of electronically stored information, and that the government both searched through his phone unfettered in the minutes and hours after his arrest (allegedly with consent at a certain point) and were later authorized to essentially search any and everywhere in his device and iCloud account after obtaining the search warrant, it is impossible for the defense to even begin to address or anticipate what type of irrelevant material the government may seek to introduce at trial. Rather, the government should set forth what evidence it seeks to introduce, including the most obvious types of information as addressed in the earlier sections of these motion papers, as well as the purpose and evidentiary bases or exceptions it relies upon for their admission to be proper, after which, the defense may address the same in its responsive papers.

Notwithstanding the foregoing position of the defense with regard to all of this potential material, based upon the government's discovery disclosures to date, the defense can pinpoint certain material it does anticipate the government will seek to admit in some manner. In particular, the government will likely seek to introduce a short (several seconds only) cellphone video

allegedly from Mr. Belloisi's device that appears to depict the interior of an aircraft and the backs of one or more persons some distance from the camera taking the footage.

The initial problem with the short video (as well as other videos or photos) is one of authentication. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that it is what the proponent claims it to be. Fed. R. Evid. 901(a). But scrutiny of the government's discovery and 18 U.S.C. §3500 materials thus far provided to the defense reveals no indication of any potential trial witness that would have personal knowledge of the circumstances surrounding the photos or video (see, Rule 901(b)(1)), and the ambiguous depictions in the photos and on the video footage, do not present "distinctive characteristics" sufficient to precisely identify what the what the photos or the video actually depict. See, Fed. R. Evid. 901(b)(4).

Second, even if the Court should find the government can properly authenticate this video, for example it is simply not relevant. While the video was apparently obtained from Mr. Belloisi's device or iCloud Storage Account, there is no proof that Mr. Belloisi took the video himself or that or that the video was taken at any specific time or physical location, or that it was ever shared with or sent to anyone else. Moreover, the video, in so far as it depicts other individuals (other than Mr. Belloisi) these individuals are unnamed, unidentified and unidentifiable without being able to see their faces or other identifying information. As a result, and absent any type of factual foundation, the photos and video add nothing to proving the existence of an agreement between Mr. Belloisi and others to traffic cocaine.

Third, any possible probative value the video could possibly have, is substantially outweighed by its prejudicial effect and its risk of confusing or misleading the jury. Fed. R. Evid. 403. The confusing nature of the evidence is manifestly clear and is intimately intertwined with the utter

lack of any foundation and irrelevance of the evidence that will, inevitably, lead jurors to speculate and invent their own theories as to what the evidence is and what it means and why it might have some importance to the government's case. Of course, in seeking to cure the lack of foundation and thoroughgoingly confusing nature of this evidence through the manner in which they offer it, and in order to argue its relevance and probative value, the government would then render the evidence unduly prejudicial to the defendant.

The government may attempt to argue the evidence has relevance and probative value by having one or more of its law enforcement officer witnesses attempt to provide sufficient authentication and then tell the jurors about their theory as to why the video was taken by the defendant (an assumption that must be inherent). The story the government will have its witness tell is that Mr. Belloisi took this video in order to be able send it at a later time to his co-conspirator(s) in order to show the presence of people or law enforcement officers both in and around the location and aboard the plane from which he was supposed to take the cocaine. The purpose of taking the video was thus to be able to take the narcotics for himself but have his co-conspirators believe he was simply thwarted in his effort to acquire the narcotics due to presence of law enforcement and that the narcotics must have been seized. But the story is simply that, an imagined theory of the government's that has no foundation in any other evidence, especially considering the video was never sent to anyone. Allowing the government witnesses to simply speculate wildly on what things might be and what they might mean is obviously impermissible evidence that would prejudice the defendant in fundamentally profound way and, therefore, must not permitted by the Court.

**II.    The Court Should Order Preclusion of Electronically Stored Information Obtained from the iCloud Storage Account of an Unidentified Third Party because the Evidence is Irrelevant and Likely to Lead to Confusion of Issues by the Jury**

On April 14, 2021, the government applied for and obtained a warrant for, *inter alia*, the iCloud storage account information, subscriber information, communications logs, and cell site location data for the cellular phone number associated with the contact identified as "Lester" in Mr. Belloisi's cellular device and communication logs. See, <u>ECF No. 30</u>. It is the defense's understanding that the government will be seeking to introduce some portion of this material in its case-in-chief in order to show the actions of an (unknown/unidentified/unindicted) individual they claim to be a co-conspirator, as well as the defendant's actions in communicating with this individual telephonically at different times in the days, hours and minutes prior to his arrest. The government should be precluded from offering any of this material in its case-in-chief for several reasons.

As noted above, (with respect to the defendant's device), one would normally expect that the relevance and probative value of such material would be to show the nature and volume of communications and at particular times, between the defendant and a co-conspirator in order to provide evidence that tends to show agreement between them necessary to prove a conspiracy. However, the problem that arises is that there is simply no other evidence that this "Lester" individual was involved in any way in a conspiracy other than the evidence of communications with Mr. Belloisi. For example, if there were evidence some independent criminal acts the "Lester" individual had engaged in in furtherance of the conspiracy, then the evidence of the communications between he and Belloisi would take on a completely new character and bolster the argument for relevance. But, simply introducing the evidence for purposes of showing

Belloisi's agreement with another co-conspirator, that very same evidence cannot be without more, the only evidence of the co-conspirator's status as such.

### III. Preclusion of Expert Testimony Regarding the Interpretation of Cell Site Location Data of Mr. Belloisi and/or Another Individual and Other Undefined Matters Regarding Cellphone Technology and Data Extraction

On April 13, 2022, the government provided oral notice of its intent to introduce expert testimony regarding cell site location data. The government argues that the evidence places Belloisi and/or an alleged unknown, unindicted co-conspirator ("Lester") in certain specific locations or vicinities relevant to the time and location of the alleged crime. Notably however, to date, the government has not complied with its obligations under Fed. R. Evid. 16(a)(1)(G) to provide the defense with a written summary of the expert testimony it intends for its witness to offer including a description of the witness's opinions, the bases and the reasons for those opinions, and the witness's qualifications as an expert. The defendant made the demand upon the government for such a written summary well over two (2) years ago in prior counsel's motion for discovery- a motion present counsel adopted in its omnibus filing on February 4, 2022. The government has also added to that notice, stating in recent correspondence with defense counsel, that it may seek to broaden the scope of the same expert witness' testimony.

### A. The Government Must Supplement its Expert Witness Notice in Compliance with Fed. R. Evid. 16(a)(1)(G).

The Second Circuit has noted the Federal Rule's "disclosure requirement creates an incentive for the government to limit its use of experts to proper subject matters of expert testimony, lest broader expert testimony require broader pre-trial disclosure." *U.S. v. Dukagjini*, 326 F.3d 45 (2003). With regard to timeliness, the Advisory Committee Notes to the 1993 Amendment provide: "(A)lthough no specific timing requirements are included, it is expected that the parties will make their requests and disclosures in a timely fashion." Here, only the foregoing

and increasingly generalized notice has been provided despite the defense's continuing demand (creating the obligation under Fed. R. Evid. 16(a)(1)(G)) and follow-up requests for clarification.) While the government has indicated its intention to comply with its obligation to provide a written summary closer to trial, the defense respectfully submits that the Court order the government to do so expeditiously given the amount of time the government has been in receipt of the defense's demand for compliance and the government's long held intention to call this witness. Continued delay in disclosure accomplishes no legitimate purpose and the sooner the government's written summary is provided, the sooner the defense can clarify any objections under Rule 702 and challenges under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 570 (1993).

Although the defense believes it has received the documentary reports associated with the seized and searched devices and iCloud Storage Accounts upon which this general "cellphone expert" will be relying, the government has not yet clarified the type of professional who will fill this general expert's role.  So far, all the defense has received is that it could be someone from a cellular phone company employee or someone else "with expertise in cellphone technology and interpreting cellphone data." The defense does not yet know whether the witness will indeed be someone employed by a cellular services provider or a law enforcement witness, including the possibility the government may seek to have a law enforcement officer who is also a fact witness in this case be the one to provide its expert testimony in this regard. Compliance with the notice requirement includes adequately identifying the witness who will provide the expert testimony in order to enable to defense to challenge the admissibility of such testimony.

The defense hereby requests that the Court set a specified date well in advance of trial by which the government must supplement its notice in order to comply with its obligation under Rule 16(a)(1)(G). Furthermore, we request an order that such written summary be sufficiently specific

to provide the defense with complete notice as to the scope of such testimony and the type of witness who will provide it in order for the defendant be able to fully challenge the same under Fed. R. Evid. 702, and, whether their conclusions and opinions comply with the test for expert testimony as set forth in *Daubert*.

**IV.    The Government Should be Precluded from Offering at Trial Recorded Phone Calls Between Defendant's Incarcerated Brother and Defendant as the Content of the Phone Calls are Wholly Irrelevant and Lacking in Probative Value**

The government has also provided in discovery a series of recorded telephone calls and conversations between Mr. Belloisi and his brother while the latter was incarcerated. It is the defense's understanding, given government disclosure to the defense in the discovery process, that the government may seek to admit these telephone conversations at trial. See generally, ECF No. 20 (government's second discovery production describing these recordings). Although, the defense does not presently have any specific representation from the government as to its intention to do so, or how or why the evidence would be introduced to prove the existence of any fact relevant to the issues in this case. Should the government presently be seeking to introduce any of these recordings, the defense vehemently opposes their introduction as content of such conversations are wholly irrelevant and have no probative value whatsoever in tending to establish Mr. Belloisi committed the charged offenses. Moreover, the introduction of these telephone calls entails a manifestly high risk of undue prejudice to Mr. Belloisi as their introduction would entail the finder of fact learning of his brother's recent, albeit wholly unrelated, incarceration which may easily function as improper general propensity evidence against Mr. Belloisi by familial relationship and ongoing association with his convicted felon brother. To the extent there is any relevance and probative value of any part of any these calls, the obvious prejudice clearly outweighs any such value.

In the event the government maintains its intention to introduce this material and identifies any particular telephone conversations that allegedly have relevance, probative value and seeks to introduce them, the defense will address the issue in its responsive papers.

**V.    The Court Should Provide the Jury with an Adverse-Inference Charge or in the Alternative, the Government's Proffered Surveillance Videotape Segments Should be Excluded from Trial for Lack of Completeness Under Fed. R. Evid. 106, Due to the Deliberate Destruction of the Full Footage by the Government**

The government has provided five (5) video files[12], each containing a segment of surveillance footage depicting either some portion of, or angle toward, the aircraft in question and its immediate vicinity or, another nearby part or area of the airport. All but one of these video segments are less than 70 seconds in length and appear to be proffered by the government to show Mr. Belloisi's presence in a particular location at a given point in time. By far the longest of the video file segments provided by the government shows a different angle, this angle depicting the aircraft in question from the front. The video footage, which was played for the Court at the continued hearing on the defendant's suppression motions on June 17, 2022 during the testimony of CBP Officer Michael Robinson[13], depicts the aircraft and the tarmac area upon which the aircraft sits as well as the "jet bridge" attached to the aircraft. Indeed, the video begins at the time stamp 7:17:00PM and continues for seven (7) minutes and five (5) seconds. See, *Govt's Belloisi 00032*. The video depicts an individual, the government will claim is Mr. Belloisi, drive a vehicle known as a "tug" into the screen and then exit that vehicle walking under or near the front (nose) of the aircraft before walking under the jet bridge and out of view. A few minutes later the video depicts lights, then vehicles approaching and then stopping near the aircraft with several people emerging near the aircraft and then numerous individuals both under and around the side of the aircraft

---

[12] *Govt's Belloisi 00028-00032* described in government's first production of discovery letter, <u>ECF No. 15.</u>
[13] *Hr. Tr. 204-209* (<u>ECF No. 43, Attachment 2</u>)

moving around until the video segment ends. The purpose of this segment of video surveillance footage for the government is to show "the defendant"[14] arriving at the aircraft and then "being caught" and taken into custody by law enforcement officers. The video footage is from too great a distance to show the specific interactions with specific law enforcement agents during the period of the defendant's arrest with any clarity, or the results of any searches incident to arrest.

According to the government's representations and theory of the case, once officers installed the "sham cocaine", they then set up *visual* surveillance on that part of the aircraft for the next few hours. See, ECF No. 1, *Complaint*. The government claims, and its law enforcement officer witnesses have already testified, that it was Mr. Belloisi, and only Mr. Belloisi, who went to or approached the avionics compartment throughout their four (4) hours of visual surveillance of the aircraft. ECF No. 43, Attachment 2 *(Hr. Tr. 169, 3-7; Hr. Tr. 178, 14-15)*. Presumably, had other individuals approached or entered the avionics compartment between the time officers placed the fake cocaine in the compartment and began their surveillance and Mr. Belloisi's arrival several hours later, such individuals would have been equally suspicious to officers as Mr. Belloisi. Given the officers claims in this regard- that no one else entered or went near that part of the plane the entire time- and the existence of surveillance video footage from this angle for the entire time law enforcement had it under surveillance, the defense has an absolute right to review such footage. Such review would allow the defense to test the veracity of the officers' claims regarding the discovery of the narcotics, operations related to taking the narcotics from the plane and replacing it with the "sham cocaine" and that Mr. Belloisi was the only person that approached that part of the aircraft during their hours of visual surveillance.

---

[14] The defense does not believe the government could claim that anyone could identify the defendant or any other particular individual from the video itself given the distance from which it is taken.

After providing the video footage segment in discovery to the defense, the defense inquired of the government as to why a complete copy of the footage of the aircraft (from the angle in *Belloisi 00032*) from the time it arrived until the time it left the gate and took off at 7:57pm, was not provided. The defense also inquired as to whether there were any *other* cameras and recordings that depicted the aircraft at a closer or better angle than in the video footage provided. The government disclaimed the existence of any other cameras or video footage other than they had provided to the defense. The government explained that the video footage and the cameras from which it came were the property of American Airlines Corporate Security and were obtained from that agency by the HSI officers in the days following Mr. Belloisi's arrest. The government explained that, evidently, HSI officers had only requested the short segments represented in the four (4) files at *Belloisi 00028-00031* and then just the approximately seven (7) minute segment in *Belloisi 00032.*According to the government, that was the entirety of what was obtained prior to the complete multi-hour footage being lost due to not having been preserved. The government explained that the HSI officers had simply made their own determinations vis-à-vis the video footage and the portions of it they chose to request and save, and, given the government's hope that the defendant may enter into a cooperation agreement, it did not appear necessary to take steps to preserve vastly more comprehensive video footage at that time.

At the hearing on the defendant's suppression motions, HSI Agent Moloney clarified how the video was obtained, what video was obtained and then what was done with it. Moloney explained that a few days[15] after February 4, 2020 he went and reviewed video footage maintained by American Airlines and that he ultimately obtained from American Airlines and provided to the U.S. Attorney's Office video footage "from the time the plane landed." ECF No. 43, Attachment

---

[15] *Hr. Tr. 49, 3-4* (ECF. No. 43, Attachment 1).

<u>1</u> (*Hr. Tr. 51, 11-14*). Nevertheless, the defense has not received the vast majority of that video footage, but only a tiny seven-minute snippet, nowhere even close to approaching footage from the time the plane landed. Accordingly, given the contrasting information provided by the U.S. Attorney's Office regarding the loss of the vast majority of the video footage and the testimony of Agent Moloney, it is presently unclear to the defense how the government will account for the loss of nearly all of the video footage Agent Moloney possessed.

Agent Moloney's testimony also brought to light another important factor with regard to the government's disclosures and discharge of its duties to preserve material discoverable evidence. Agent Moloney testified affirmatively when asked by defense counsel whether there were "multiple (cameras at Terminal 8, Gate 7) giving different angles of the airplane." See, <u>ECF No. 43, Attachment 1</u> (*Hr. Tr. 46-47)*. While it would have been beyond the scope of the suppression hearing (regarding Mr. Belloisi custodial statements) to inquire further of the witness at that time, the defense is ever-cognizant of the fact that there are, as Agent Moloney testified to generally, additional cameras maintained by American Airlines and trained on Terminal 8, Gate 7, that would have had video footage of the aircraft from the time the aircraft landed. Amongst these additional cameras, is a camera that is much lower and closer to the ground than the camera that took the footage viewed during the suppression hearing. Indeed, there is a camera that is in place at every Gate in the airport at essentially ground level pointing at the nose of the aircraft that is used to stop (park) and position an arriving aircraft. This camera is well-known to airline and airport personnel and used in the visual docking guidance system (VDGS). Such camera, given its location and angle, would have provided footage from a much closer distance and ostensibly a more accurate view of the activities of individuals on the ground and around the underside of the plane. As previously stated, the defense has never been provided a single second of footage from

this or any other angle depicting the aircraft, save the 7-minute snippet the government collectively decided to preserve.

In similar cases, where the government has failed to preserve the entirety of video footage depicting, *inter alia*, a search of a defendant, while selecting and using smaller segments thereof, courts have focused on whether the loss of the complete video is due to the deliberate acts or omissions resulting in destruction or inadvertent actions of law enforcement. See, *U.S. v. Yevakpor*, 419 F.Supp.2d 242, 252 (N.D.N.Y. 2006); see also, *U.S. v. Codrington*, 2009WL1766001 (E.D.N.Y. 2009). In *Yevakpor*, the court, citing Fed. R. Evid. 106 and the Doctrine of Completeness, found a Due Process violation had occurred and suppressed the "cherry-picked" segments of a longer surveillance video that the government sought to introduce where the CBP Officer in that case had specifically decided to delete certain portions of the recording in their possession. The court thus ordered the exclusion of the three selective segments of surveillance video footage that were offered without the rest of the video footage. In declining to extend *Yevakpor* to cases of unintentional deletion or inadvertent destruction, courts have looked closely at the circumstances that led to the destruction of the larger, complete record in order to determine whether the destruction was deliberate or not on the part of officers. See, *U.S. v. Tillard*, 2020 WL 57198 (W.D.N.Y. 2020); *U.S. v. Butt*, 2019 WL 479117 (S.D.N.Y. 2019). *U.S. v. Codrington*, *supra*, provides a useful example of inadvertent destruction where the officer in question had testified to having accidentally recorded over a portion of the surveillance footage by leaving tape in the VCR too long and also losing footage in the process of trying to combine multiple original tapes into a single one. See, *U.S. v. Codrington, supra* at *2.

The defense argues that, the officers' actions, or alternatively those of the U.S. Attorney's Office (if in fact the destruction took place after receiving the footage from HSI as Agent Moloney

testified to) in selecting to preserve just a seven (7) minute snippet of video from what was over four (4) hours of footage depicting the aircraft and all those who approached, touched, entered, and interacted with it was, manifestly, a deliberate choice. This is grounded in the fact that Agent Moloney confirmed he received and provided the entire footage from the time the plane landed. Moreover, the decision to not even request or request preservation of any video footage from additional angles depicting the aircraft, including the VDGS camera at Gate 7 only further demonstrates the mental state of the government collectively with regard to preserving and disclosing this material and clearly discoverable evidence. Counsel for the government, while telling a contrasting narrative from Agent Moloney as to who was responsible for the destruction of relevant evidence, inferred the destruction of the fuller video footage was done by the law enforcement officers, characterizing their thinking: 'they were not investigating themselves'. By contrast, Agent Moloney's testimony would lead to the inescapable conclusion that the deletion took place after he had provided the full videos to the U.S. Attorney's Office.

Regardless of whether it was indeed Agent Moloney and HSI Agents who deleted the vast majority of the video they had requested[16] and been provided, or it was deleted after being turned over to the U.S. Attorney's Office, the reality is that there was clearly an objective record in the government's possession, depicting the aircraft from the time it landed until it departed and that video has not been preserved. Rather than having the objective record the video(s) would provide, full reliance by the factfinder must now be placed upon the officers' testimony about their own actions and observations regarding what happened under and around the plane; when clearly the best evidence would have been the objective video surveillance footage. Moreover, the defendant has a right to review the footage in order to test the veracity of the officers' reported actions and

---

[16] Or never even requested at all from American Airlines in the case of video footage from better angles depicting the aircraft and its immediate surrounding at the gate.

observations against an objective record. With such a record destroyed, the defendant's right to present a defense beyond a neutered cross-examination on the subject has been severely compromised.

By only preserving such a tiny portion of the video footage they had and only requesting to receive and preserve a tiny portion of the full gamut of material and discoverable video footage that was available, the government clearly understood that the remaining footage would be destroyed and forever unavailable thereafter. Looking at the government's actions objectively, in light of the explanations provided by the government thus far in discussions regarding discovery, and Agent Moloney's testimony on these specific issues, it is clear the vast majority of the video footage is missing, long-deleted, and gone forever due to deliberate choices by the government in this case, not by accident or mistake in the process of trying to preserve it properly. The actions of the government here are thus consistent with the deliberately destructive actions of the officers in *Yevakpor* as opposed to accidental or inadvertent actions of officers as in *Codrington*.

The question of the proper remedy for the government's deliberate destruction of this evidence comes next. The defense requests that the Court provide the jury with an adverse inference instruction concerning the absence of this material as well as the exclusion of the selective video files proffered by the government due to the deliberate destruction of the complete record.

A party seeking an adverse inference instruction due to deliberate destruction of evidence "must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *U.S. v. Garcia*, 596 F. App'x

24, 26 (2d Cir. 2015) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). There can be little doubt that the government, whether it be HSI agents and/or the U.S. Attorney's Office, had control over the complete video footage and an obligation to preserve it as discoverable material under Rule 16. There can also be little doubt, as discussed *infra*, that the choice, whether it was made by HSI agents or within the U.S. Attorney's Office after receiving the full video footage from the time the aircraft landed and docked at the gate, the vast majority of the footage was deleted or not preserved due to a deliberate and conscious choice on the part of law enforcement, not by accident or mistake. See, *cf. Magassouba v. U.S.,* No. 03 CR 985 RPP, 2013 WL 5780767, at *5 (S.D.N.Y. 2013) (Where government produces evidence the material evidence was destroyed by mistake, a defendant is not entitled to an adverse-inference instruction). At this point, the government's representations to defense counsel and the testimony of HSI Agent Moloney at the hearing are devoid of any evidence of a mistake or inadvertent failure to preserve the full material but rather indicates the opposite- that the government took conscious and deliberate steps not to preserve or to delete the complete footage.

The footage (the vast majority of which was deleted) of the aircraft at the gate for some four (4) hours since it had landed and docked is, obviously, relevant and indeed critical to Mr. Belloisi defense such that it would support his defense[17] that he had no knowledge or involvement in manner with any real or sham narcotics that other individuals or law enforcement officers may have placed onto the aircraft. The government's theory of Mr. Belloisi's guilt is based upon the alleged circumstances that: a) there was cocaine discovered in the avionics compartment of the aircraft by CBP Agents after it had landed and been docked at the gate, b) the agents removed the cocaine and replaced it with sham cocaine there at the gate shortly afterwards, c) they then watched

---

[17] See generally, *U.S. v. Helbrans*, No. 19 CR 497 01 NSR, 2021 WL 3595720, at *4 (S.D.N.Y. 2021) (quoting, *Residential Funding Corp. v. DeGeorge Fin. Corp.*, *supra*, 306 F.3d at 107.

the aircraft visually for hours with no one going near or into the avionics compartment until someone, Mr. Belloisi, allegedly was the first and only person who went near to then ultimately entered the avionics compartment. The government's law enforcement witnesses have already testified setting forth this narrative of events and circumstances. The defense disputes the government's theory and the factual testimony on these points and the complete video footage that was available and under the government's control would have provided the objective record demonstrating whether the government's claims- critical claims to its theory of prosecution- are indeed true. The fact that this objective record of important factual disputes between the government and the defense- such as whether other individuals did in fact go near to or enter the avionics compartment before Mr. Belloisi- has been intentionally deleted by the government is clearly indicative of the fact that it would have contained evidence that both undermines the direct sworn testimony the government's witnesses would give at trial (and have already given at the hearing) and support Mr. Belloisi's claim that he was not the only person who came close to or entered the avionics compartment, a claim that patently supports his defense. This is especially true under the particular circumstances of this case where Mr. Belloisi was not found in actual possession of the either actual narcotics or sham narcotics, but simply in close proximity thereto.

The defendant obviously cannot speculate on all of the possible supporting evidence for his defense that may have been obtainable through the preservation and disclosure of the full video footage from the angle of the seven-minute snippet nor upon the wealth of material evidence that would, ostensibly, have been available in footage from the far superior ground level cameras that the government failed to preserve at all. Nevertheless, given the manifest pertinence of the video footage in terms of providing a true objective record of the critical events and the shockingly scant amount of material the government determined to preserve, any reasonable trier of fact could and

would find the evidence that full footage would have provided would have supported Mr. Belloisi's defense. Accordingly, the Court should find the test satisfied and provide the jury with an adverse-inference charge at trial regarding the destruction of the evidence by the government. The Court should also suppress the tiny 7-minute snippet of video footage the government seeks to introduce given its deliberate destruction of the complete record.

WHEREFORE, the defense submits the foregoing motions *in limine* concerning the admissibility of various forms of evidence it is anticipated the government will seek to introduce in its case-in-chief at trial. Where applicable, the defense respectfully seeks the Court's leave to amend and or augment the instant motions upon the government's further compliance with its notice and discovery obligations under Rule 16, or where far greater specificity or particularity with regard to proffered evidence is needed before the defense's evidentiary objections thereto may be articulated.

DATED: New York, New York
November 28, 2022

Respectfully Submitted,
BY: David Jason Cohen

_____/S/_____
David Jason Cohen, Esq.
*Counsel for Defendant, Paul Belloisi*
Cohen Forman Barone, LLP.
950 Third Avenue
New York, NY 10022
david@cfblaw.com