EDP:RMP
F. #2020R00153

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

        - against -                         Docket No. 20-CR-219 (DLI)

PAUL BELLOISI,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

## MEMORANDUM OF LAW IN SUPPORT OF
## THE GOVERNMENT'S MOTIONS IN LIMINE

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Robert M. Pollack
Assistant U.S. Attorney
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 1

ARGUMENT ......................................................................................................................... 5

    I.     The Court Should Admit Evidence of Uncharged Drug Trafficking as Inextricably Intertwined with the Charged Conspiracies and/or as Admissible "Other Crimes, Wrongs or Acts" Under Rule 404(b) .................................................. 5

    II.    The Court Should Preclude Evidence and Argument Concerning Possible Punishment and Collateral Consequences ................................................................... 9

    III.   If the Parties Do Not Reach Stipulations about Authenticity and Admissibility of Electronic Evidence, the Court Should Permit Authentication Pursuant to Certificate ................................................................................................................. 10

CONCLUSION .................................................................................................................... 14

## PRELIMINARY STATEMENT

The defendant, Paul Belloisi, is charged with conspiracy to possess cocaine with intent to distribute, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A)(ii)(II); conspiracy to import cocaine, in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(B)(ii); and importation of cocaine, in violation of Title 21, United States Code, Sections 952(a), 960(a)(1), and 960(b)(1)(B)(ii). Jury selection is set to begin on April 24, 2023, with trial to follow thereafter. In advance of trial, the government respectfully moves in limine and requests that the Court: (1) admit evidence of uncharged drug trafficking as inextricably intertwined with the charged conspiracies and/or pursuant to Rule 404(b) of the Federal Rules of Evidence ("FRE"); (2) preclude all testimony and argument about potential penalties or collateral consequences of conviction; and (3) in the event that the parties do not agree to stipulations about the authenticity and admissibility of certain electronic evidence, permit the government to authenticate such evidence by certificate pursuant to FRE 902(11), (13), and (14).

## BACKGROUND

On the afternoon of February 4, 2020, Customs and Border Patrol ("CBP") officers at John F. Kennedy International Airport ("JFK") found ten bricks of cocaine—a total quantity of 11.594 kilograms, or 25.56 pounds—hidden inside a mechanical compartment on the underside of a commercial jetliner shortly after it had arrived from Jamaica. Moving quickly, CBP replaced the cocaine with sham bricks, sprayed them with a substance that glows when illuminated with a certain light, placed an electronic transponder that would send a signal if the sham bricks were disturbed, and began visual surveillance of the aircraft from a distance. Several hours later, and less than 45 minutes before the aircraft was scheduled to depart on its

1

next flight, CBP saw the defendant—an airline mechanic assigned to work in a different part of the airport, who had no legitimate business in that aircraft—entering the mechanical compartment, where he swiftly tripped the electronic transponder. When CBP approached him, his gloves were covered with the substance that glows under a certain light. He also had cuts in the interior lining of his jacket that formed hidden pockets, and an empty tool bag in the vehicle he had driven to the aircraft. He was detained for questioning and later arrested.

About 30 minutes before the defendant drove up to the aircraft, he received a text message from someone saved in his cellphone contacts under the name "Lester," which said (in Spanish), "Confirmed!! They just confirmed to me. They already left, they're going to take them to dinner because they're hungry."[1] About two hours after the defendant was detained for questioning (and about an hour before the end of his shift), his phone started to receive calls from Lester. Specifically, Lester tried to call the defendant at 9:21 p.m., 9:23 p.m., 9:28 p.m., 9:34 p.m., 9:39 p.m., 9:46 p.m., 9:48 p.m., and then one last time at 11:41 p.m. Cell site location data show that Lester made most of these calls from directly outside of JFK, after having driven there from the Bronx; and other service provider data show that Lester was using a "burner" phone—that is, Lester had only begun using the phone two weeks earlier, and he abandoned it the day after the defendant's arrest became publicly known.

The night before the defendant's arrest, the defendant and Lester had a late-night rendezvous in the South Bronx (which was out of the way for the defendant, who worked at JFK and lived on Long Island). Specifically, at 10:36 p.m. on February 3, 2020, the defendant called Lester but got no answer; he then texted Lester, "Call me when you're not busy I got to tell you

---

[1] The original text read, "Confirmado!! Me acaban de confirmar. Ya todos salieron los van a llevar cenar que tienen hambre."

2

something." At 11:38 p.m., the defendant called Lester again and the call lasted about a minute. At 12:20 a.m., the defendant received a call from Lester and spoke for less than a minute. At 12:29 a.m., the defendant texted Lester, "Here." He tried calling Lester three minutes later but got no answer; Lester called him back at 12:34 a.m. and they spoke for less than a minute. The defendant tried calling Lester again at 12:41 a.m. but got no answer; two minutes later, the defendant texted Lester and asked, "Where are you." Between 12:47 a.m. and 12:55 a.m., the defendant received three calls from someone else and did not answer—which might suggest that he was with Lester at that time—and at 12:58 a.m. opened the Maps application on his phone, which activated the GPS on his phone and logged his location at the parking lot of a fast-food restaurant in the South Bronx. Subsequent GPS entries made by the Maps application after 1:00 a.m. reflect that the defendant was in Queens and then on his way home to Long Island.

    The defendant's cellphone also contains numerous text messages that clearly reflect drug trafficking, some of which reflect trafficking of prescription drugs and some of which use coded language that appears to refer to trafficking in illicit substances while being ambiguous as to what exactly. A series of text messages with evidently coded language began the evening before the defendant's arrest, when an individual ("Person-1") texted the defendant to ask, "anything you can do to expedite the saviata, savoiardi." The defendant replied, inexplicably changing the coded language from Italian pastries to fuel, asking, "Do u really think I make you wait cause of me ?? How low on fuel oil are you?" Person-1 responded, "I am out of oil as of 6 PM. I need to get quarts asap or my truck won't run tomorrow." The defendant responded, "Oh shit I thought u wer all right for a few more days[.] Well he knows I'm waiting on him." Person-1 replied, "Ok thanks. When you said Monday I appropriated accordingly. I'm refusing to suffer any longer. I'll come mi matter what time." At 1:47 a.m. (shortly after the

3

defendant's rendezvous with Lester in the Bronx), the defendant replied, "Tomorrow afternoon by 4."

The next day (the day of the defendant's arrest), Person-1 texted the defendant to ask if he "should come at that time," and the defendant replied, "Calling him now he said 4 gonna confirm," and then, "He's off work 630." Person-1 replied, "Ok question..... does that mean we'll get then or are we not sure? Every hour that goes by I'm hunching closer to the floor." Person-1 texted the defendant several more times that afternoon, asking, "Come through or no? Whaddayu think?" and "You think it's gonna work out I'm asking?" At 7:36 p.m. (just minutes after the defendant was confronted by CBP), Person-1 texted him, again inexplicably changing the coded language, "Please let me know when you've got the tomatoes for the pizza. San Marzano whole peeled plum. Thanks." In sum, these messages show the defendant arranging a transaction in some illicit substance the night before and the day of his arrest.

Other text messages are more explicit. For instance, a few weeks prior to the defendant's arrest, another individual ("Person-2") texted the defendant, "Dont want to b pain- can u get me couple-asap- I'll come to u- hurt till tues," and a few second later, "If I gotta get a min amt of 5/10 not prob." A few days later, Person-2 texted the defendant, "Dragged myself to work- get em later- cant believe how my body still addicted to these things- feel terrible." These texts again show the defendant's involvement in the trafficking of illicit substances, apparently in this instance an addictive drug.

About two weeks before his arrest, the defendant texted another individual ("Person-3"), "Just hold the money let me know if you need more," and then asked, "Did you get sleepys." Person-3 responded, "I didn't go to they dr yet. He filled my other script I have but I'll be going to see him this month soon to hopefully get the sleepys and also I'm going for three

4

month visit for my blood sooo I'm hoping he gives me them then hehehe." These texts show that that the defendant had and sought connections to sources of prescription drugs (i.e., "scripts"). At about 8:10 p.m. the night before his arrest, the defendant texted Person-3, "Did you say you had money for me? I can use it." Person-3 responded, "yes I have the $220 for uuuu." The defendant replied, "Can I stop by and grab that," and further cellphone data show that the defendant did go to Person-3's residence to pick up the money.

ARGUMENT

I.  The Court Should Admit Evidence of Uncharged Drug Trafficking as Inextricably Intertwined with the Charged Conspiracies and/or as Admissible "Other Crimes, Wrongs or Acts" Under Rule 404(b)

Evidence of uncharged acts, even uncharged acts that amount to criminal activity, is admissible as direct evidence of crimes charged in the indictment. See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989). In Towne, the Second Circuit specifically identified three categories of uncharged criminal activity that constitute direct evidence of a charged offense:

> Evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'

Towne, 870 F.2d at 886 (quoting United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983)); see also Carboni, 204 F.3d at 44; United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997); United States v. Khan, 591 F. Supp.2d 202, 205 (E.D.N.Y. 2008) (quoting Carboni).

The Second Circuit has stated more broadly that evidence does not fall within the category of prohibited "other-act evidence within the meaning of Rule 404(b)" when it is

5

relevant "to prove material facts other than [the defendant's] propensity to commit a crime[.]" United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992). Indeed, relevant evidence is "not confined to that which directly establishes an element of the crime." Gonzalez, 110 F.3d at 941. "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." Id.; see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

Additionally, under Rule 404(b), evidence of a defendant's "other crimes, wrongs, or acts" is admissible when it is offered for any purpose other than the defendant's criminal propensity. See United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998); United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984). Rule 404(b) itself contains a non-exhaustive list of proper purposes for which "other act or crime" evidence may be admitted, including "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FRE 404(b); see also Levy, 731 F.2d at 1002. The Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application. United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) ("We have adopted the inclusionary or positive approach to [Rule 404(b)]; as long as the evidence is not offered to prove propensity, it is admissible."). Indeed, the Second Circuit has long interpreted Rule 404(b) as an inclusive rule allowing the admission of relevant "other acts" evidence if the evidence is offered to prove something other than criminal propensity and if it passes the balancing test required by Rule 403. See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); United States v. Stevens, 83 F.3d 60, 68 (2d Cir. 1996) ("[T]his Circuit takes an inclusive approach to prior bad act testimony: such testimony can be

6

admitted for any purpose except to show criminal propensity"); Germosen, 139 F.3d at 127 ("[I]t can be admitted for any purpose except to show criminal propensity, unless the trial judge concludes that its probative value is substantially outweighed by its potential for unfair prejudice." (internal quotation marks and citation omitted)).

In this case, evidence of the defendant's drug distribution in the form of his communications with Person-1, Person-2, and Person-3 described above is "inextricably intertwined with the evidence" of the charged offenses, Towne, 870 F.2d at 886, and also "adds context and dimension to the government's proof of the charges," Gonzalez, 110 F.3d at 941. Indeed, the defendant's communications with Person-1 in particular were exactly contemporaneous with the charged conduct—even including a final message that was received while the defendant was on the tarmac after being confronted by CBP—and show what the defendant was doing immediately prior to his arrest: communicating with multiple parties using coded language about an illicit transaction. Even if the particular transactions being discussed in some of those text messages were transactions in prescription drugs rather than the cocaine that was seized, they fill out the context of the day and overlap with the evidence of the charged crimes. Similarly, the evidence that the night before his arrest, the defendant asked whether Person-3 "had money for" him, said "I can use it," and then went to pick it up—and the reasonable inference based on other communications with Person-3 that this money was payment for drugs—are directly relevant to the charged conspiracies, because they show the defendant's financial motive and his need to collect money that night, which a jury can reasonably infer was intended to be used for the drug transactions he planned for the very next day.

Additionally, even if this evidence were not admissible as directly relevant to the charged crimes (which it is), it should be admissible for the purposes allowed under FRE 404(b).

7

Specifically in the context of narcotics cases, evidence of prior narcotics transactions is regularly admitted to prove the defendant's knowledge and intent during the charged offenses. See United States v. Paulino, 445 F.3d 211, 221–22 (2d Cir. 2006). Past distribution of controlled substances is probative of whether the defendant had the knowledge, motive, and intent to import and distribute a controlled substance on the particular occasion charged. See, e.g., United States v. Thompson, 690 F. App'x 302, 308 (6th Cir. 2017) (finding no error in admitting evidence of defendant's past marijuana distribution under Rule 404(b) where defendant was charged with possessing with intent to distribute heroin, cocaine base, and marijuana); see also United States v. Thorne, No. CR 18-389 (BAH), 2020 WL 122985, at *19 (D.D.C. Jan. 10, 2020) ("The difference in the type of illegal narcotics at issue does not render the prior conviction irrelevant for [the purposes of showing a defendant's knowledge, motive and intent].").

Moreover, because the communications described above were close in time to the charged offenses, some of them even on the very day of the defendant's arrest, they are especially probative of his mental state at that time, which will be the key issue at trial. See, e.g., United States v. Baker, No. 09-CR-20055, 2009 WL 3672061, at *5 (C.D. Ill. Oct. 28, 2009) (noting that evidence of past drug activity was admissible in part because the past activity occurred over three months before the charged misconduct and was therefore "extremely close in time to the charged offense"). The government anticipates that the evidence at trial will establish indisputably that the defendant was found in a place where drugs had recently been intercepted, with the means to remove them, and the central question will be his knowledge, motive, and intent. His other acts of drug distribution, including precisely contemporaneous ones, are highly probative on those issues. In short, the admissibility requirements of Rule 404(b) will be readily satisfied by the government's proof at trial.

II.   The Court Should Preclude Evidence and Argument Concerning Possible Punishment and Collateral Consequences

The classification of charges and the penalties arising from conviction in this case are not relevant to the issue of defendant's guilt or innocence. Accordingly, they should not be alluded to, presented, or disclosed to the jury. "It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict." United States v. Frank, 956 F.2d 872, 879 (9th Cir. 1991). Indeed, "it is the practice in the federal courts to instruct juries that they are not to be concerned with the consequences to the defendant of the verdict, except where required by statute." Id.; see also Rogers v. United States, 422 U.S. 35, 40 (1975) (jury should have been admonished "that the jury had no sentencing function and should reach its verdict without regard to what sentence might be imposed").

In general, "[i]nformation regarding the consequences of a verdict is . . . irrelevant to the jury's task." Shannon v. United States, 512 U.S. 573, 579 (1994). Such evidence is not only irrelevant, but "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." Id. Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt. See generally Sand, et al., Modern Federal Jury Instructions, Instruction 9.01 (2021 ed.); see also Shannon, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation omitted)); United States v. Watts, 934 F. Supp. 2d 451, 464–65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion . . . would result.").

9

Thus, Courts regularly preclude evidence of the potential sentences defendants face on the grounds that such evidence is irrelevant, unfairly prejudicial and outside the province of the jury. See, e.g., United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences"). Allusion to or argument about consequences of conviction is an improper appeal to personal sympathy and an invitation to jury nullification; but guilt should determine punishment, not the other way around. See United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . . . We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that the courts may permit it to occur when it is within their authority to prevent."). Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct." Id. at 616. Although the defendant has not stated any intention to reference the possible consequences of conviction at trial, the government moves to preclude any mention of such consequences out of an abundance of caution. Any reference to sentencing will serve to confuse the jury, undermine its role as the trier of fact, and invite the jury to consider nullification, which is a violation of the Court's instructions and an outcome the Court is dutybound to prevent. Id. Therefore, the Court should preclude references to potential punishment or collateral consequences at trial.

III.    **If the Parties Do Not Reach Stipulations about Authenticity and Admissibility of Electronic Evidence, the Court Should Permit Authentication Pursuant to Certificate**

In the interest of streamlining trial and avoiding unnecessary witnesses, the government will attempt in good faith to reach agreement with the defendant about stipulations as to the authenticity and admissibility of certain electronic evidence. In the event that those efforts fail and the parties do not enter stipulations, the government will seek to authenticate

10

electronic evidence—including data recovered from T-Mobile and other data extracted from the defendant's cellphone—by means of certifications under FRE 902(11), (13), and (14).

Rules 902(13) and (14) of the FRE, which became effective in December 2017, provide a new mechanism for parties to authenticate evidence generated by electronic processes or systems. The new rules combine the conceptual frameworks of Rule 901(b)(9)—authentication by evidence describing a process or system that produces an accurate result—and Rules 902(11) and (12)—self-authentication of business records. Specifically, Rule 902(13) allows authentication by certification of "[a] record generated by an electronic process or system that produces an accurate result," and Rule 902(14) does the same for "[d]ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification."

Data received from cellphone service providers—including call and text message information and location data—pursuant to search warrants and other legal process, and which are certified by a competent custodian or technician, may include some data that constitutes business records and, even to the extent that they include data that are not business records, they are records generated by an electronic process or system that produces an accurate result. Those accounts, and excerpts from them, can therefore be authenticated by certification pursuant to Rule 902(11) and (13), and reliable copies and extracts from the originals by Rule 902(14).

Similarly, electronic files and data extracted from a cellphone using forensic extraction technology are records generated by an electronic process or system that produces an accurate result. See generally United States v. Dunnican, 961 F.3d 859, 872 (6th Cir. 2020) (affirming district court's decision to admit text message evidence extracted from defendant's phone as self-authenticating under FRE 902(14)); United States v. Anderson, 563 F. Supp. 3d. 691, 694–96 (E.D. Mich. Sept. 27, 2021) (finding text messages self-authenticating under FRE

11

902(14)); United States v. Davis, No. 18-CR-00131, 2021 WL 1931871, at *2-3 (D. Alaska May 13, 2021) (granting government's motions in limine to admit electronic evidence in the form of video surveillance under FRE 902(11) and 902(13)).  Excerpts from such records that are generated using standard electronic systems and processes to generate copies for use in discovery and as trial exhibits are examples of data copied from an electronic device, storage medium, or file which may be authenticated by a process of digital identification.  Accordingly, these items of electronic evidence can be authenticated, pursuant to Rule 902(13) and (14), by certification of competent technicians who performed the extractions and generated the copies rather than by the live testimony of those technicians.  Id. (finding digital records sufficiently authenticated under FRE 902(11) and 902(13) where the certificates were not testimonial in nature).

"The bar for authentication of evidence . . . is 'not particularly high.'" United States v. Bout, 651 Fed. App'x 62, 63 (2d Cir. 2016) (quoting United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007)).  "It is met where 'sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." Id. at 6364 (quoting United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004)).

In the context of business records, which provided the conceptual framework for self-authentication of electronic evidence under Rules 902(13) and (14), the Supreme Court has held that admitting evidence that has been authenticated by affidavit or certificate does not violate a defendant's right to confrontation because certifications are not testimonial.  See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).  Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and therefore are permissible.  See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United States v. Johnson, 688 F.3d 494, 504–05 (8th Cir. 2012);

United States v. Yeley-Davis, 632 F.3d 673, 680–81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005). The facts concerning the electronic systems that generate electronic records and the processes of making electronic copies, like the processes of maintaining business records, are not testimonial because they only establish authenticity—that the records were generated by a reliable process and are what they purport to be—and can therefore be established by certification without implicating the Confrontation Clause. It is the underlying records, not the certification of a custodian or technician who maintained or electronically copied them, that are introduced to establish the facts at trial. Consistent with this understanding of the confrontation right, federal law permits the authentication by certification of business records, electronic records generated by reliable electronic processes, and reliable electronic copies.

The government will work with defense counsel toward stipulations concerning electronic evidence, which, if reached, will obviate the need for a ruling on authentication by certification. In the event that those efforts fail, the government should be permitted to authenticate and offer as evidence copies and extracts from cellphone and cell site records and the defendant's cellphone by certification, as permitted by FRE 902(11), (13), and (14). In addition, such a process would streamline the presentation of evidence at trial, eliminate unnecessary persons from the courtroom, and shorten the amount of time that jurors will need to sit for trial, which promotes efficiency, particularly in light of ongoing concerns about COVID-19 transmission

CONCLUSION

For the reasons set forth above, the government respectfully submits that its motion should be granted.

Dated:  Brooklyn, New York
        November 28, 2022

                                        Respectfully submitted,

                                        BREON PEACE
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                                By:     /s/ Robert M. Pollack
                                        Robert M. Pollack
                                        Assistant United States Attorney
                                        (718) 254-6232