1 UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
2 - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,     :     20-CR-00219(DLI)
3                                    :
                                     :
4                              :     United States Courthouse
     -against-                 :     Brooklyn, New York
5                                    :
                                     :
6                              :     May 25, 2022
                               :     10:00 a.m.
7 PAUL BELLOISI,               :
                               :
8      Defendant.             :
- - - - - - - - - - - - - - X
9
     TRANSCRIPT OF CRIMINAL CAUSE FOR SUPPRESSION HEARING
10       BEFORE THE HONORABLE DORA L. IRIZARRY
         UNITED STATES SENIOR DISTRICT JUDGE
11

12               A P P E A R A N C E S :

13 For the Government:      BREON PEACE, ESQ.
                            Acting United States Attorney
14                          Eastern District of New York
                            271 Cadman Plaza East
15                          Brooklyn, New York 11201

16                          BY:  ROBERT POLLACK, ESQ.
                                 DREW ROLLE, ESQ.
17                               Assistant United States Attorneys

18 For the Defendant:       COHEN & FORMAN, LLP
                            950 Third Avenue, 10th Floor
19                          New York, NY 10022

20                          BY:  DAVID JASON COHEN, ESQ.
                                 BENJAMIN SIMPSON, ESQ.
21

   Court Reporter:          DENISE PARISI, RPR, CRR
22                          225 Cadman Plaza East
                            Brooklyn, New York 11201
23                          Telephone: (718) 613-2605
                            E-mail: DeniseParisi72@gmail.com
24

25 Proceedings recorded by computerized stenography.  Transcript
   produced by Computer-aided Transcription.

1           (In open court.)

2           THE COURTROOM DEPUTY:  Criminal cause for

3    suppression hearing, docket number 20-CR-219, United States

4    versus Paul Belloisi.

5           Please state your appearances.

6           MR. POLLACK:  I'm Robert Pollack for the United

7    States.  I'm accompanied by my colleague, AUSA Drew Rolle.

8           Good morning, Your Honor.

9           THE COURT:  Good morning.

10          MR. COHEN:  Good morning, Your Honor.

11          David Jason Cohen and Benjamin Simpson on behalf of

12   Mr. Belloisi.

13          THE COURT:  Good morning to all of you.

14          And before we get started, we are observing

15   distancing protocols and masking protocols because of all the

16   uncertainties that are going on in connection with the ongoing

17   COVID pandemic.  As a result of distancing, we have sectioned

18   off part of the seating in the public gallery which makes us

19   lose some space, and while it's not an issue today because we

20   don't have any observers, nonetheless, to ensure public access

21   to the court proceeding, we have made it accessible to the

22   public by telephone as well, and that information has been

23   provided on the court's calendar which is accessible on the

24   court's public website.

25          I do want to remind attorneys, litigants, and

1   members of the press and public, that pursuant to local civil

2   Rule 1.8 made applicable to criminal proceedings by local

3   criminal Rule 1.1(b), and Administrative Order 2020-24, issued

4   by the chief judge of this court, any audio and/or video

5   recording of any court proceeding, whether it's completely in

6   person; hybrid, like this one; or completely remote is

7   prohibited strictly and violators will be sanctioned.

8           How many witnesses does the Government have for

9   today?

10          MR. POLLACK:  Two, Your Honor.

11          THE COURT:  Is there anything you all want to

12  address before we get started?

13          MR. SIMPSON:  Yes, Your Honor, if I may.

14          THE COURT:  Yes.

15          MR. SIMPSON:  Just very quickly, Your Honor, we

16  wanted to hopefully clarify one particular item with the

17  Government and with the Court for the record before we call

18  the witnesses.

19          THE COURT:  Okay.

20          MR. SIMPSON:  And it stems from the Court's question

21  at the last conference to the Government -- asking the

22  Government what statements -- to identify the statement or

23  statements that the defendant made to law enforcement officers

24  that it was seeking to introduce --

25          THE COURT:  Right.

1        MR. SIMPSON:  -- and the Government's response

2   was -- at least initially -- was that it was seeking to

3   introduce the statements made by the defendant to Officers

4   Moloney and Gabay, who I expect to be the witnesses today, at

5   the Joint Narcotics Smuggling Unit -- I'm going to refer to

6   that as the JNSU -- location that were set forth in their

7   disclosures -- their Rule 16 disclosures to the defense.

8   Those disclosures, Judge, were handwritten notes, and a typed

9   version of the same notes -- they were literally the first

10  five items that were disclosed to prior counsel after the

11  demand -- and the question from the Court to the Government at

12  the last conference -- of course following the motion practice

13  wherein we, the defense, had sought to suppress those

14  statements at the JNSU location, but we had also, in our

15  motion, sought to preclude earlier statements that the

16  defendant concedes he made to law enforcement officers in

17  response to their custodial questioning of him on the tarmac

18  closer in time to the detention and arrest and prior to his

19  transport to the JNSU.  The reason why the defense sought

20  preclusion of any such tarmac statements is specifically

21  because the defense was not aware of any memorialization of

22  any such tarmac statements in the Government's Rule 16

23  disclosures.

24        The Government's opposition claimed, somewhat

25  opaquely to us, that all statements it sought to introduce had

1  been disclosed to the defense pursuant to Rule 16.  However,

2  Judge, it is only now after receiving the 3500 materials from

3  the Government two weeks ago, which includes previously

4  undisclosed reports, and previously disclosed but heavily

5  redacted portions of reports completed by the law enforcement

6  officer witnesses, it's now clear the tarmac statement was, in

7  fact, memorialized in writing in the Government's Rule 16

8  disclosures.

9          In this regard, one of the 3500 materials, Judge, is

10  an un-redacted version of a narrative portion that was

11  disclosed -- heavily redacted and was disclosed.  The reason

12  why the defense was unaware that this was a recording --

13          THE COURT:  Just to clarify, so the document -- the

14  report that is now un-redacted and disclosed with the 3500

15  material previously had been disclosed with redactions?

16          MR. SIMPSON:  A heavy redaction, that the only

17  portion that was un-redacted was literally the recitation of a

18  statement that the defendant made, but there was no context

19  whatsoever as to when or where or to whom that statement might

20  have been made.  And the defense, when comparing the substance

21  of that statement in that heavily redacted report, simply made

22  the assumption that it was just another memorialization of the

23  same JNSU statement that was otherwise much more clearly

24  disclosed by the Government.

25          So the reason why the defense is bringing this up

1   now, Judge, is we want, first, for the Government to state on

2   the record whether or not it is affirmatively seeking to

3   introduce the tarmac statement in addition to the JNSU

4   statement in its case in chief, or if it is not.

5           If it is -- if the Government is seeking to

6   introduce that statement, the defense wants to be clear that

7   it is moving for suppression of that statement.  Whereas,

8   preclusion, we believe, would be the proper remedy if the

9   Government had not, in fact, disclosed that statement at all.

10          So we believe we have put forth in our motion

11  grounds for suppression of the tarmac statement as well, but

12  we just wanted to make it clear for the record the reason why

13  we said preclusion in our initial motion is we did not believe

14  it had been disclosed because we simply did not know looking

15  at the heavily redacted report that this was the

16  memorialization of a different statement than the JNSU

17  statement.

18          THE COURT:  And, Mr. Pollack, do you want to address

19  that?

20          MR. POLLACK:  Yes, Your Honor.

21          Firstly, I'm happy to clarify that the statements

22  that the Government intends to use in its case in chief are

23  those made in JNSU --

24          THE COURT:  You need to speak a little louder and a

25  little slower, please.

1          MR. POLLACK:  I'm happy to clarify that the

2    statements that the Government intends to use in its case in

3    chief are those made in JNSU -- or in JNSU.  That's in the law

4    enforcement office.  These statements that were made on the

5    tarmac, I think, are part of the story.  They come in for the

6    effect on the law enforcement officers because the fact that

7    those statements were made is what explains why the law

8    enforcement officers went up into the airplane to speak to the

9    pilot, so I think they fill out that story.  But we're not

10   offering them for the truth that they're asserting; we intend

11   to offer the subsequent statements, which will recapitulate

12   those in the Government's case in chief.

13          The tarmac statements -- additionally, I anticipate

14   that the testimony the Court will hear today is that the

15   tarmac statements were not made directly to these witnesses;

16   that the CBP officers -- these witnesses -- heard about that

17   shortly thereafter within -- I think minutes thereafter, and

18   then the statements were recapitulated subsequently in the

19   JNSU office.

20          THE COURT:  I'm sorry, can you repeat that last

21   thing again because I lost, like, snippets of it.

22          MR. POLLACK:  I apologize.

23          I anticipate that the testimony that the Court will

24   hear today is that the two HSI officers who conducted the

25   interview in JNSU arrived at the aircraft within about a

1   minute, give or take, from when the CBP officers arrived, and

2   those first tarmac statements were made to the CBP officers

3   who then reported that to the HSI officers.  That explains why

4   the HSI officers -- or, I should say, the HSI special agents,

5   then, went up into the aircraft to attempt to verify or

6   determine the accuracy of those statements, but we're not

7   offering the tarmac statements for their truth, only for the

8   effect on those HSI agents.

9               THE COURT:  Mr. Simpson?

10              MR. SIMPSON:  Yes, Judge.  I think what it sounds

11   like the Government is saying -- well, it sounds like the

12   Government is saying two things, Judge.  It sounds like

13   they're saying, number one, the witnesses who are here today

14   were not present when the statements were made to other law

15   enforcement officers on the tarmac, so I'm not sure how the

16   Court is supposed to assess the constitutionality of the

17   statements if the witnesses the Government is offering were

18   not present when those statements were made.

19              The defense has certainly asserted that those

20   statements were made while the defendant was in custody and

21   was being interrogated by law enforcement officers, so I'm not

22   sure exactly how the Government is going to meet the

23   defendant's claim if they don't have the witnesses that were

24   actually there when the statements were made and can talk

25   about the conditions of custody and the nature of the

1   questions that were asked to the defendant.

2           MR. POLLACK:  May I respond, Your Honor?

3           THE COURT:  Yes, please.

4           MR. POLLACK:  Just to clarify, I anticipate that the

5   testimony today will include the statements made -- the

6   statements that were reported to the HSI special agents in

7   order to explain what the HSI special agents then did.  Those

8   are not being offered as evidence.  The statements made to CBP

9   officers, according to what the HSI special agents heard, are

10  not being offered as evidence; they're being offered to

11  explain the HSI special agents subsequent --

12          THE COURT:  But the witnesses who are testifying

13  today -- if I'm understanding what's being said here, the

14  witnesses who are testifying here today were not present at

15  the tarmac.

16          MR. POLLACK:  That is not correct, Your Honor.  They

17  were present at the tarmac.  They just arrived -- I anticipate

18  they will testify they arrived within about a minute --

19  perhaps slightly more, slightly less -- from when the CBP

20  officers first arrived.  The statements were not made directly

21  to them.  The statements were made to the very first CBP

22  officers who arrived at the scene.  The defendants arrived

23  shortly after Belloisi, essentially, and heard from the CBP

24  officers what had just been said; and these two witnesses, who

25  were then there on the tarmac for the rest of the time that

1    the defendant was on the tarmac, and who went up to speak to

2    the pilot of the plane and then accompanied the defendants to

3    the JNSU office, interviewed the defendant in the JNSU office.

4              THE COURT:  But my understanding is that the

5    defendants are seeking to prohibit the Government from using

6    Mr. Belloisi's statements made at the tarmac at all.

7              MR. POLLACK:  The Government would not intend to use

8    those statements for the truth of the matter -- I'm sure that

9    they wouldn't be seeking to admit them pursuant to a hearsay

10   exception, but rather to establish why the HSI special agents

11   then went up into the airplane to speak to the pilot.

12             THE COURT:  So how do you propose that the jury

13   makes the distinction?

14             MR. POLLACK:  I apologize.  I may have missed the

15   question, Your Honor.

16             THE COURT:  How do you propose that the jury make

17   the distinction between statements that are being introduced

18   as part of the Government's case in chief against the

19   defendant as opposed to part of the narrative?

20             MR. POLLACK:  Well, in this case, I anticipate the

21   jury would hear directly from the pilot to hear directly what

22   the pilot told the HSI special agents rather than hearing it

23   through the HSI special agents, so I don't anticipate the

24   jury --

25             THE COURT:  That's not the defendant's statements.

1    That's the pilot's statements.  We're talking about the

2    defendant's statements at the tarmac.  The Government is

3    saying that you intend to introduce it not for the truth of

4    the matter, but as part of the narrative, part of the story.

5    Okay, this is what happened.  Based on what happened, this is

6    why the officers did what they did.

7              Correct?

8              MR. POLLACK:  That's correct.

9              THE COURT:  Okay.  So the point is from -- again,

10   I'm playing devil's advocate here -- from the perspective of

11   the defendants who are saying, but, wait a minute, whatever

12   statements the defendant made -- and correct me if I'm wrong

13   if I'm not understanding your argument properly -- from the

14   defendant's perspective, they're saying, wait a minute, the

15   defendant believed he was not free to leave, he was in

16   custody, so anything -- he wasn't given Miranda, if I'm

17   recalling the papers right -- he was not given Miranda, and,

18   therefore, anything that he said was a custodial statement

19   that was obtained unconstitutionally and therefore the

20   Government should not be permitted to use it; am I correct?

21             MR. SIMPSON:  That's correct.

22             THE COURT:  So my question to you is:  How do you

23   propose that the jury understand the difference between being

24   part of the narrative as opposed to the statements that are

25   then made at the law enforcement office that are being

1    introduced against the defendant?

2          MR. POLLACK:  Your Honor, in light of the fact that

3    the statements made in the law enforcement office are

4    substantively the same statements just with more detail, I

5    don't think the Government needs to introduce the statements

6    on the tarmac as having been made on the tarmac at all.  The

7    jury wouldn't need to hear that.  We could simply proceed with

8    the statements made in the law enforcement office since they

9    are the same statements.

10          THE COURT:  Yes, sir.

11          MR. SIMPSON:  I was just going to say that the

12    Government just said that they're substantially the same, but

13    it goes back to the original point about the tarmac

14    statements.  If the tarmac statements are un-Mirandized

15    custodial interrogation statements, and then the exact same

16    interrogation took place after Miranda, the question becomes

17    whether or not that was a deliberate two-step technique that

18    was designed to diminish and abate the effect of the Miranda

19    warnings on the defendant, so it still goes back to the

20    Government needs to show --

21          THE COURT:  But the case is also saying that there

22    can be such an interruption between the giving of -- first,

23    let's assume, for argument sake, a set of perhaps

24    unconstitutionally obtained statements.  There can be a set of

25    events that cause a break in that unconstitutionality, let's

1    say, and -- where, all right, the defendant is Mirandized, or

2    the defendant changes his mind, or whatever the circumstances

3    are, that create such a break that the subsequent statements

4    are, in fact, constitutional.

5              MR. SIMPSON:  Absolutely, Your Honor.  We're simply

6    saying that that is why it's important to look at the tarmac

7    statements in order to determine whether or not there was that

8    sufficient break, there was sufficient safeguards to make

9    Miranda meaningful that second time, but this really goes

10   back --

11             THE COURT:  Why wouldn't the second set of

12   circumstances stand on their own?

13             MR. SIMPSON:  Well, I think the case law says that

14   you have to look at a variety of factors to determine whether

15   or not those safeguards given after an initial -- after an

16   initial un-Mirandized custodial statement actually would

17   reinforce Miranda the second time.  I think that's what the

18   Court's -- part of what the Court will be determining during

19   this hearing, right, is the tarmac statements, the JNSU

20   statements, but the JNSU statements -- if the tarmac

21   statements don't come in because they're un-Mirandized

22   custodial interrogation, then the Court will be looking at the

23   testimony that comes out today from the witnesses in order to

24   determine whether or not this was a deliberate two-step --

25   impermissible deliberate two-step interrogation or not.  I

1  think that's exactly what the Court is partially deciding here

2  with regard to the admissibility of the JNSU statement if the

3  Court should find that the defense submits that the tarmac

4  statements don't come in.

5          MR. POLLACK:  Your Honor, may I respond?

6          THE COURT:  Yes, of course.

7          MR. POLLACK:  The Government acknowledges that the

8  defendant was not Mirandized on the tarmac; he was Mirandized

9  when he arrived in the law enforcement office.  So I think

10  that the testimony today will establish, along the lines that

11  the Government argued already in its opposition papers, that

12  any statements made on the tarmac were not custodial

13  statements, so the analysis that defense counsel puts forward

14  now fails at the outset.  Nevertheless, the statements --

15          THE COURT:  You are mixing things up here.  You're

16  conceding the defendant wasn't Mirandized, all right, but it's

17  a separate question as to whether or not the defendant made

18  statements while not in custody versus making statements while

19  in custody.

20          So, on the one hand, you're claiming that he wasn't

21  in custody, and I'm not clear whether by extrapolation you're

22  saying he didn't have to be Mirandized accordingly, because

23  your arguments have gaps here.  You know, these are building

24  blocks, and you have to fill in the gaps --

25          MR. POLLACK:  I apologize.

1    THE COURT:  -- and that's part of the problem in the

2    briefing.  There were bunches of things that were not

3    addressed that were raised by the defense and then not

4    addressed by the Government.

5        Bottom line is this:  What I'm understanding from

6    the defense is that in order for the Court to make the

7    determination about the validity -- or the constitutionality,

8    let me say better -- that the constitutionality of the second

9    set of statements made by Mr. Belloisi, the Court needs to

10   hear what happened at the tarmac.  In order to understand what

11   happened at the tarmac, that means hearing from the people who

12   were at the tarmac.  There was a period of time before these

13   two HSI agents, who are going to testify here today, were not

14   present, so they don't really know firsthand what happened.

15   They basically know whatever they were told.  Now, hearsay is

16   admissible at a hearing, but the other issue is that we don't

17   know if they were told exactly everything that happened, or

18   everything that may be pertinent to my decision, which is a

19   different thing.  They may have been told whatever they need

20   as law enforcement officers to act, which is a whole different

21   ball of wax.

22       Do you follow what I'm saying?

23       MR. POLLACK:  I believe I do follow what you're

24   saying.

25       THE COURT:  All right.  So what is the big deal with

1  producing the officers who were at the tarmac, or at least one

2  of the officers who was there who could testify?

3          MR. POLLACK:  Your Honor, if the Court would like to

4  hear from the CBP officers and hold the hearing open until

5  then, we certainly can.  I anticipate that the CBP officers

6  don't have as clear recollection of the events of that night

7  as the officers -- as the special agents who are here today,

8  which is why --

9          THE COURT:  Why wouldn't they?

10         MR. POLLACK:  CBP, Your Honor, is not really an

11 investigative agency.  They deal with --

12         THE COURT:  They're law enforcement officers;

13 correct?  They participate in arrests at the airport all the

14 time.  I've heard testimony from CBP officers in prior cases,

15 especially when we used to do more of the courier cases back

16 when I started on this court, which enforcement seems to have

17 lag in recent years, but so be it, if they were the officers

18 on the scene, then whatever they remember, they remember.

19         Now, what I'm also hearing -- so then who prepared

20 the report that contains the statements from the tarmac?

21         MR. POLLACK:  The reports that -- I'm not sure

22 exactly which report defense counsel has in mind that was

23 produced in 3500, but all of the reports which we have, and

24 all of the reports that have been produced, were generated by

25 the people who are going to testify here today.  There are

1   no -- the HSI special agents -- there are no separate reports

2   from CBP.  I anticipate that the testimony today will be

3   sufficient for the Court to find that the defendant was not in

4   custody on the tarmac; therefore, Miranda was not necessary on

5   the tarmac, and that the two agents, who are here today to

6   testify, were present during the custodial interview -- to the

7   extent the interview was custodial -- in the law enforcement

8   office and that defendant waived Miranda at the outset.  But

9   if the Court would like to hear from CBP officers --

10          THE COURT:  But they don't know firsthand what

11  happened before they got there; correct?

12          MR. POLLACK:  It is correct that there was a short

13  period of time before they arrived.

14          THE COURT:  Right.  Well, a minute is a long time.

15  Two minutes is a long time.  A lot can happen in two minutes.

16          MR. POLLACK:  I would be happy to -- if the Court

17  wants to hold this hearing open --

18          THE COURT:  I will hold the hearing open until you

19  can determine -- you should have had the schedule of everybody

20  available.  I had said that I would have spillover time for

21  tomorrow.  I don't know if you could get the witnesses here

22  tomorrow, but I had scheduled spillover time into tomorrow,

23  but we can schedule it to continue another day if tomorrow is

24  not convenient.

25          MR. POLLACK:  I apologize, Your Honor, and I thank

1  the Court for your willingness to accommodate us.  I do

2  anticipate that the testimony today would be sufficient for a

3  ruling.

4          THE COURT:  Okay.  I've heard you say that, but

5  clearly I think that there's no reason why we can't have at

6  least one of the Customs and Border Patrol officers -- CBP

7  officers testify.

8          MR. POLLACK:  I understand.  I will make one

9  available.

10         THE COURT:  Okay.  You don't know whether they will

11 be available tomorrow?

12         MR. POLLACK:  I don't know now whether they will be

13 available tomorrow, but I will try to determine that as soon

14 as we finish today and let the Court know as soon as possible.

15         If it would be more convenient for the Court to

16 schedule a later date just in an abundance of caution --

17         THE COURT:  Well, we have how many witnesses today?

18 Two?

19         MR. POLLACK:  Two.

20         THE COURT:  Maybe you can take a break between the

21 two witnesses and try and reach out to the CBP officers while

22 I have everybody here and it would be a whole lot easier to

23 schedule with everybody here.

24         MR. POLLACK:  I will do, that Your Honor.

25         THE COURT:  Because, as I said, if the officer can

1   be available tomorrow, I set aside time for tomorrow, and I

2   think I asked the lawyers to keep time open tomorrow.

3            So, in the meantime, then, why don't we get started.

4            MR. POLLACK:  The Government will call Special Agent

5   John Moloney.

6            THE COURT:  You need to slow down, okay?

7            MR. POLLACK:  I apologize.

8            (Witness takes the stand.)

9            THE COURT:  You can take your mask off since you've

10  got the face shield on.

11           THE COURTROOM DEPUTY:  Please raise your right hand.

12           (Witness sworn.)

13           THE WITNESS:  Yes, I do.

14           THE COURTROOM DEPUTY:  Thank you.  Please be seated,

15  sir.

16           Please state and spell your name.

17           THE WITNESS:  John Moloney.  J-O-H-N M-O-L-O-N-E-Y.

18           THE COURTROOM DEPUTY:  Thank you.

19           THE COURT:  Good morning, sir.  You can adjust the

20  mic so that you are comfortable with it.  It should pick you

21  up pretty well.  Do try to keep your voice up nice and loud

22  and speak slowly and you may inquire when you are ready.

23           MR. POLLACK:  Thank you, Your Honor.

24           (Continued on next page.)

25

1   **JOHN MOLONEY**,

2              called as a witness, having been first duly

3              sworn/affirmed, was examined and testified as

4              follows:

5   DIRECT EXAMINATION

6   BY MR. POLLACK:

7   Q     Good morning.

8   A     Good morning.

9   Q     Who do you work for?

10  A     The Department of Homeland Security, Homeland Security

11  Investigations, also known as HSI.

12  Q     And what is your title?

13  A     Special agent.

14  Q     How long have you been an HSI special agent?

15  A     Approximately 12 and a half years.

16  Q     Are you assigned to a particular unit?

17  A     Yes.

18  Q     Which unit is that?

19  A     The Internal Conspiracy Group at JFK Airport.

20  Q     How long have you been assigned to the JFK Internal

21  Conspiracy Group?

22  A     Approximately five years.

23  Q     What, in general, are your duties as a special agent in

24  the Internal Conspiracy Group?

25  A     We investigate cases pertaining to customs law; in

1  particular, contraband smuggling; and, specifically, we

2  investigate JFK employees that are involved in contraband

3  smuggling at the airport.

4  Q    As part of your duties as a special agent, do you

5  sometimes interview people suspected of smuggling drugs?

6  A    Yes.

7  Q    Can you state approximately how many such interviews

8  you've participated in?

9  A    Over a hundred.

10  Q    I would like to direct your attention to February 4,

11  2020.

12           Were you working that day?

13  A    Yes.

14  Q    Where were assigned?

15  A    I was assigned to JFK Airport, Building 75.

16  Q    Were you working with anyone else?

17  A    Yes.

18  Q    Who?

19  A    I was working with Sean Gabay, Jason Brouzakis.

20  Q    Did there come a time that day when you became aware of

21  law enforcement finding drugs at JFK?

22  A    Yes.

23  Q    How did you first become aware of it?

24  A    I received a phone call from Special Agent Sean Gabay,

25  and he had told me that CBP had made a drug seizure at JFK

1   Airport, Terminal 8.

2   Q    Did you learn anything about the plan of action?

3   A    Yes.  Sean told me, from what he heard from CBP, that

4   they had seized the narcotics and they were planning to do a

5   controlled delivery.

6   Q    What was your understanding of what that controlled

7   delivery would entail?

8   A    The controlled delivery would entail removing the

9   narcotics off the plane and putting in sham products, what we

10  call it, safe narcotics, and then we wait and see if anybody

11  would try to take the drugs off the plane.

12  Q    Were you informed about any other measures that would be

13  used to determine whether someone had interfered with the sham

14  narcotics?

15  A    Yes.  We were told that CBP had sprayed the sham products

16  with a substance and also placed a trigger device in the sham

17  product that they would monitor with their radio and that if

18  anybody were to touch the product or compromise it in any way,

19  that it would trigger on their device to allow us to know that

20  somebody was moving it around.

21  Q    In the time immediately following your receiving this

22  information, did you do anything to assist in the

23  investigation?

24  A    Immediately when I got the call from Sean, I responded to

25  the airport, met up with him, and then we went over together

1   to Terminal 8.

2   Q    Was that particular plane, which was being monitored,

3   scheduled to depart on another flight?

4   A    Yes.

5   Q    Do you know approximately what time it was scheduled to

6   depart?

7   A    I believe 8:00 p.m.

8   Q    Do you know approximately -- do you remember

9   approximately when you arrived near the plane?

10  A    We arrived a little after 6:00 p.m.

11  Q    And when you arrived, what, if anything, did you do?

12  A    When we arrived, we spoke with CBP both on the phone and

13  the radio and we were in our vehicle and stood back from a

14  distance from the gate in which the plane was at so we could

15  do surveillance from a distance.

16  Q    Did there come a time when you became aware that someone

17  had entered the avionics compartment?

18  A    Yes.

19  Q    How did you become aware of that?

20  A    CBP announced it on the radio.

21  Q    Where were you when you received that information?

22  A    We were in Sean's vehicle a distance away from the plane.

23  Q    Who all was there in the vehicle with you?

24  A    In Sean's vehicle was myself and him.

25  Q    Do you remember approximately what time that was?

1   A     When we went to the --

2   Q     When you received the information that someone had

3   entered the avionics compartment.

4   A     Approximately 7:20 p.m.

5   Q     And what did you and Special Agent Sean Gabay do at that

6   time, if anything?

7   A     CBP made the call that the device was triggered and they

8   said to go towards the aircraft, so we followed CBP's lead and

9   we went toward the airplane.

10  Q     Did you do that driving the vehicle?

11  A     Yes.

12  Q     What did you see when you first arrived at the plane?

13  A     We saw CBP officers in front of the -- you know,

14  underneath the aircraft in the avionics unit, and also saw a

15  tug vehicle that was near the airplane.

16  Q     What is a tug vehicle?

17  A     A tug vehicle is a type of vehicle that only one person

18  can, you know, drive it; and in the back is a -- almost like

19  an empty flatbed that can hold suitcases and luggage.

20  Q     Are you able to estimate approximately how long CBP had

21  been there at the plane when you arrived?

22  A     About a minute.

23          THE COURT:  I'm sorry, when you say that the tug

24  vehicle holds two cases of luggage, does each case hold

25  multiple pieces of luggage?  I'm just trying to visualize it.

1      THE WITNESS:  It could hold many pieces of luggage.
2  There were no pieces of luggage at the time, but it can hold
3  many pieces of luggage.
4      THE COURT:  So when they unload the plane with the
5  luggage, they would put it on this vehicle?
6      THE WITNESS:  That's correct.
7      THE COURT:  Okay.
8      MR. POLLACK:  May I inquire?
9      THE COURT:  Yes.
10 BY MR. POLLACK:
11 Q    When you first arrived, what, if anything, did you see
12 the CBP officers doing?
13 A    They were talking to the airline mechanic.
14 Q    When you say "the airline mechanic," who are you talking
15 about?
16 A    Paul Belloisi.
17 Q    Do you see that airline mechanic in the courtroom today?
18 A    Yes.
19 Q    Can you identify him?
20 A    He's sitting at the table over there; blue suit, blue
21 tie.
22      MR. POLLACK:  And let the record show that the
23 witness identified the defendant.
24      THE COURT:  So noted.
25 BY MR. POLLACK:

1  Q    When you first arrived and you saw CBP officers talking

2  to Mr. Belloisi, did you talk to the CBP officers?

3  A    Yes.

4  Q    And was Mr. Belloisi in handcuffs at that time?

5  A    No, he was not.

6  Q    Was he physically restrained in any way?

7  A    No.

8  Q    Did anyone have a weapon out of its holster?

9  A    No.

10  Q    Can you describe the tone of the conversation at that

11  time?

12  A    It was pretty calm and relaxed at that point.

13  Q    Was anyone yelling?

14  A    No.

15  Q    Was it your understanding that Mr. Belloisi was or wasn't

16  free to leave at that point?

17  A    It was my understanding that he was not free to leave at

18  that time.

19  Q    Why wouldn't he have been free to leave at that time?

20  A    Because we wanted to gather all the facts and come to an

21  understanding of what was fully going on before we were to

22  either arrest anyone or let anyone go.

23  Q    Was it your understanding at that time that he was under

24  arrest?

25  A    No.

1  Q    And did there come a time when you spoke with the CBP
2  officers who were there?
3  A    Yes.
4  Q    Did you learn whether anyone asked the defendant what he
5  was doing in the avionics compartment?
6  A    Yes.  The CBP officers told me that the defendant stated
7  he was in the avionics unit because he was trying to fix the
8  air conditioning.
9  Q    And at that time, did you think it was plausible that
10 this mechanic may have been, in fact, fixing the air
11 conditioner?
12 A    Yes, possibly.
13 Q    Did you try to do anything to verify whether that was
14 true?
15 A    We did.
16 Q    What did you do?
17 A    CBP had told us that he was in the avionics unit trying
18 to fix the AC because he initially tried to fix the problem in
19 the cockpit upstairs because a light went on, so we decided to
20 go upstairs to the airplane to talk to the pilot to verify
21 that story.
22 Q    And when you say "we," who went to talk to the pilot?
23 A    Myself and a Sean Gabay.
24 Q    And what did you learn from talking to the pilot?
25 A    We asked the pilot if there were any problems --

1    THE COURT:  I'm sorry to interrupt you, but you say

2  "we."  Did you ask the questions?  Or who is "we," and who

3  asked the questions?

4    THE WITNESS:  It was myself and Special Agent Sean

5  Gabay, and I asked the questions.

6    THE COURT:  Okay.

7  BY MR. POLLACK:

8  Q    And what did you hear from the pilot?

9  A    He told me that there were no mechanical issues with the

10  plane, there were no problems with the air conditioning; and

11  if there were a problem, it would have been documented in the

12  logbook, which is located in the cockpit.

13  Q    Did he show you the logbook?

14  A    He did not.  But later on, we did receive a copy of it.

15  Q    Did he look at the logbook in front of you?

16  A    Yes.

17  Q    What did you do after talking to the pilot?

18  A    After talking to the pilot, Sean and I went -- we exited

19  the plane, we went back downstairs to the tarmac to speak with

20  the CBP officers.

21  Q    And what, if anything, happened then?

22  A    After that, I brought the defendant over in front of our

23  vehicle and explained to him that we were going to be going

24  back to our office in a little bit to talk things over.

25  Q    And is your office the JNSU office?

1   A    Yes.

2   Q    How would you ordinarily get to the JNSU office from

3   where you were?

4   A    We would drive.

5   Q    How far away is it?

6   A    About ten minutes.

7   Q    It's about a ten-minute drive?

8   A    About a ten-minute drive, yes.

9   Q    Prior to that time before you decided to go back to your

10  office with Mr. Belloisi, had Mr. Belloisi been in handcuffs

11  at any point?

12  A    No.

13  Q    Had anyone, to your knowledge, told him he was under

14  arrest?

15  A    No.

16  Q    Did anyone tell Mr. Belloisi he is not under arrest?

17  A    I had said that at this time you are not under arrest,

18  but you are being detained, and we're going to go back to our

19  office to ask you some questions.

20  Q    Did Mr. Belloisi ask for a lawyer at that time?

21  A    No, he did not.

22  Q    Did you put Mr. Belloisi in handcuffs before driving with

23  him?

24  A    Yes, I did.

25  Q    Why did you do that?

1  A    It's standard protocol to have the defendant in handcuffs

2  during a transport, so I explained to him that you're not

3  under arrest, but currently you are being detained, and for

4  our safety and yours, we have to put you in handcuffs for the

5  transport to our office, and once we get there, we'll take the

6  handcuffs off, and we'll talk like gentlemen to come to an

7  understanding on what's going on.

8  Q    To the best of your recollection, what vehicle did you

9  take?

10  A    We took a GMC Terrain.  It's a 2012.

11  Q    And who all rode in that vehicle?

12  A    Sean Gabay was driving it, I was the passenger, and the

13  defendant was in the backseat.

14  Q    And how would you characterize --

15        THE COURT:  I'm sorry to interrupt.  You were a

16  passenger in the front seat?

17        THE WITNESS:  Yes.

18  BY MR. POLLACK:

19  Q    How would you characterize the tone of your interactions

20  with Mr. Belloisi up to that point?

21  A    Very calm and relaxed.

22  Q    What happened when you arrived at the JNSU office?

23  A    When we arrived, we went into the interview room.  I had

24  handcuffed him, gave him a chair to sit in, I believe I gave

25  him a cup of water, and we said we were going to start the

1    interview in a few minutes.

2    Q    Can you describe the JNSU office?

3    A    Sure.

4            The JNSU office, it's a large room.  When you first

5    walk in, it's a big conference table such as the one right

6    here, chairs all around it, and then the table that the

7    defendant is sitting at, there would be two holding cells, and

8    then the table next to the defendant in front of where the TV

9    is would be interview rooms.

10   Q    Can you describe the interview room where you took

11   Mr. Belloisi?

12           THE COURT:  Just for one second.

13           So when you say, like, the tables where the other

14   prosecutor is sitting, they are actually two tables together.

15   Would it be one table or two tables?

16           THE WITNESS:  One big table.

17           THE COURT:  All right.  So one table -- I don't know

18   what the exact measurement is, but it would fit two people

19   sitting side by side.  I think they're approximately four

20   feet.

21           MR. POLLACK:  May I continue?

22           THE COURT:  Yes.

23   BY MR. POLLACK:

24   Q    Can you describe the interview room where you took

25   Mr. Belloisi?

1  A    Sure.

2         There's a table, there were three chairs in the

3  room, and then there's a window that you can't see the other

4  side, but if you're on the other side, that could look into

5  the interview room.

6              THE COURT:  One way mirror?

7              THE WITNESS:  That's correct.

8  BY MR. POLLACK:

9  Q    At that time, in February of 2020, was the interview room

10 equipped with cameras or recording equipment?

11 A    No.

12 Q    Did you -- after bringing the defendant to the interview

13 room, did you leave him alone in there?

14 A    No.  He was never left alone.

15 Q    After you brought him to the interview room, did he

16 continue to be in handcuffs?

17 A    Once we brought him into the interview room, no, we took

18 the handcuffs off of him.

19 Q    Was he physically restrained in any way when he was in

20 that room?

21 A    No.

22 Q    And did there come a point in time when you sat down in

23 that room to ask him questions?

24 A    Yes.

25 Q    Do you remember approximately how long after you arrived

1  in the JNSU office with him when you did that?

2  A    About ten minutes -- five, ten minutes after we arrived.

3  Q    And when you sat down to ask him questions, who all was

4  in the room?

5  A    Myself and Agent Sean Gabay.

6  Q    And Mr. Belloisi?

7  A    And the defendant, yes.

8        THE COURT:  I'm sorry, I didn't catch the name of

9  the other agent.

10        THE WITNESS:  Sean Gabay.

11  BY MR. POLLACK:

12  Q    At any time in that room, did anyone yell at

13  Mr. Belloisi?

14  A    No.

15  Q    When you sat down with Mr. Belloisi in the interview

16  room, what's the first thing you did?

17  A    First thing I did, I introduced myself.  Agent Gabay

18  introduced himself.  We explained the situation at hand; that

19  there had been a seizure, and the amount of narcotics

20  involved, and then I began to read the defendant the Miranda

21  rights.

22  Q    Is it your practice to always read Miranda before

23  conducting an interview like this?

24  A    Yes.

25  Q    Is it your practice to use a standard form of the

1    statement of Miranda rights?

2    A    Yes.

3             MR. POLLACK:   Your Honor, may I show the witness a

4    document marked for identification as Government's Exhibit 1?

5             THE COURT:   Yes.

6    BY MR. POLLACK:

7    Q    Can you see this?

8    A    Yes.

9    Q    Do you recognize this document --

10            THE COURT:   Okay.   First of all, you need to

11   identify the document.   It's Government's Exhibit what?

12            MR. POLLACK:   It's been marked for identification as

13   Government Exhibit 1.

14   BY MR. POLLACK:

15   Q    Do you recognize this document?

16   A    Yes.

17   Q    What is it?

18   A    That's the statement of rights form.

19   Q    Is that another way of saying a Miranda form?

20   A    Yes.

21   Q    Is this a fair and accurate copy of the document?

22   A    Yes.

23   Q    Do you recognize any signatures on this document?

24   A    Yes.

25   Q    What signatures do you recognize?

1  A    I recognize my signature and Agent Gabay's signature.

2  Q    Do you recognize the handwriting at the bottom?

3  A    Yes.

4  Q    Whose handwriting is that?

5  A    That's my handwriting.

6        MR. POLLACK:  Your Honor, the Government offers

7  Government Exhibit 1 into evidence.

8        THE COURT:  Any objection?

9        MR. COHEN:  None Your Honor.

10       THE COURT:  It's admitted.

11       (Government's Exhibit 1 received in evidence.)

12       (The above-referred to exhibit was published.)

13 BY MR. POLLACK:

14 Q    Did you read this -- to the best of your recollection,

15 did you read this document to Mr. Belloisi at the start of

16 that interview?

17 A    Yes, I did.

18 Q    Did you ask him whether he understood it?

19 A    Yes.

20 Q    What did he say?

21 A    He said that he understood his rights and he agreed to

22 speak with us without having an attorney present at the time.

23 Q    Is that what you memorialized at the bottom of the

24 document?

25 A    Yes.

1   Q    At that time, did Mr. Belloisi ask for an attorney?

2   A    No.

3   Q    And did you and Special Agent Gabay then proceed to

4   interview Mr. Belloisi?

5   A    Yes.

6   Q    Did you take contemporaneous notes while the interview

7   was happening?

8   A    Yes.

9   Q    To the best of your recollection, did Special Agent Gabay

10  take any notes?

11  A    No.

12  Q    Why did you take notes instead of him?

13  A    I was the -- I'm the case agent on the case, and I also

14  like to take notes.  My notes are generally easy to read.

15  Q    Is that because of your handwriting?

16  A    Yes.

17  Q    Did you ever show Special Agent Gabay your notes?

18  A    No.

19  Q    At any time after February 4th, 2020, up to the present,

20  did you ever discuss your notes with Special Agent Gabay?

21  A    No.

22  Q    During that interview, did you ask Mr. Belloisi about his

23  employment?

24  A    Yes.

25  Q    What did he say?

1   A     Mr. Belloisi stated that he is an American Airlines

2   mechanic, and he had been working for approximately 30 years,

3   27 of them at JFK Airport.

4   Q     Did you ask Mr. Belloisi where he was assigned to work

5   that day?

6   A     Yes.

7   Q     What did he say?

8   A     He told us he was assigned to work at Spot 1.

9   Q     Do you know what Spot 1 is?

10  A     I came to know that Spot 1 is a hanger on the tarmac, but

11  not at any gates.  It's on the other side of Terminal 8, and

12  it's used to hold grounded planes that are not working at the

13  time.

14  Q     So did Mr. Belloisi acknowledge that he was not assigned

15  to be in the plane where he was found?

16  A     Yes.

17  Q     Did he acknowledge that he had no legitimate reason to be

18  at that plane?

19  A     Correct.

20  Q     Did he say why he went to that plane in the first place?

21  A     He said that he was hungry and he saw a Sky Chef truck

22  near the airplane, and so he went in the airplane to get

23  something to eat and drink.

24  Q     Did he say whether he's allowed to do that?

25  A     He said he wasn't allowed to do that, but he said that he

1  often does that -- employees often do that.

2  Q    Did he say what, if anything, he did when he got to the

3  airplane?

4  A    Yeah.  He said he walked in, he was in galley of the

5  airplane, he ate a bag of chips, drank a soda, and he noticed

6  that it was very warm, so he turned on the AC, but noticed it

7  wasn't working properly, so he wanted to fix it.

8  Q    Did he say whether anyone else was on the plane with him

9  at the time?

10 A    He said he was the only one on the plane.

11 Q    Did he say what he did when he decided to fix the air

12 conditioning?

13 A    Yes.  He said he went to the cockpit to try to fix the

14 air conditioning, and he flipped the switch, but noticed that

15 a light came on, so he said he had to go downstairs to the

16 avionics section to fix the problem.

17 Q    Did he say that he indeed went to the avionics section?

18 A    Yes.

19 Q    Did he say what happened when he was in the avionics

20 section?

21 A    He said that he flipped the switch to fix the problem,

22 but then noticed an insulation blanket that didn't look right

23 and so he -- it was -- it was hanging, but it was half off, so

24 he tried to fix it, and he noticed something behind the

25 blanket.

1 Q    Did he say what happened after that?

2 A    He said at that time that he saw CBP officers underneath

3 looking up at him asking him, "What are you doing up there?"

4 and then he came down.

5 Q    At any time during the interview, did you and Special

6 Agent Gabay leave the interview room?

7 A    Yes.

8 Q    Why?

9 A    We would either leave the room to take a break for his

10 sake and ours, or to talk about what just happened in the

11 interview room.

12 Q    When you did that, was Mr. Belloisi alone in the room?

13 A    No.

14 Q    Who else would have been there?

15 A    There was another agent, Jason Brouzakis.  I had him

16 stand in the doorway and the door was half open so that the

17 defendant was never left alone.

18 Q    Did there come a time when Mr. Belloisi asked to speak

19 with an attorney?

20 A    Yes.

21 Q    To the best of your recollection, can you say

22 approximately what time that was?

23 A    Eleven o'clock at night.

24 Q    And what did you do then?

25 A    At that point, we stopped questioning.

1        MR. POLLACK:  Your Honor, may I show the witness a

2   document marked for identification as Government's Exhibit 2?

3        THE COURT:  Yes.

4        I haven't asked the Government to show it to

5   counsel.  I assume that you have copies.

6        MR. COHEN:  That's correct, Your Honor.

7   BY MR. POLLACK:

8   Q    This document is marked for identification as

9   Government's Exhibit 2.

10       Do you recognize this document?

11  A    Yes.

12  Q    What is it?

13  A    Those are the notes I took from the interview that night.

14  Q    Is this a fair and accurate copy of the notes you took?

15  A    Yes.

16       MR. POLLACK:  Your Honor, the Government offers

17  Government's Exhibit 2 into evidence.

18       THE COURT:  Any objection?

19       MR. COHEN:  No objection.

20       (Government's Exhibit 2 received in evidence.)

21       (The above-referred to exhibit was published.)

22       THE COURT:  I don't think, Mr. Pollack, that this

23  Court received copies of the Government's exhibits.

24       MR. POLLACK:  I sent them over, but I have extra

25  copies here.

1    THE COURT:  Well, I have the 3500 material.

2    MR. POLLACK:  We sent the exhibits a little bit

3 later.

4    THE COURT:  Oh, okay.  Got it.

5    Thank you.

6 BY MR. POLLACK:

7 Q    Mr. Moloney, what happened after the defendant asked for

8 a lawyer?

9 A    We stopped questioning and then brought him to one of the

10 holding cells.

11 Q    And when you say "one of the holding cells," what exactly

12 are you talking about?

13 A    There are two holding cells within the JNSU office, and

14 one of them we put him in.

15 Q    And are those in open view of the whole JNSU office?

16 A    Yes.

17 Q    Was there any subsequent discussion of the defendant's

18 cell phone?

19 A    Yes.

20 Q    How did that discussion arise?

21 A    Later on, I had asked the defendant for consent to look

22 at his cell phone because we needed an emergency contact to

23 put on the U.S. Marshal form as well as the remand form for

24 MDC detention facility.

25 Q    So was this processing for the arrest?

1    A    That's correct.

2    Q    And when you asked the defendant to look at his phone for

3    that purpose, what, if anything, did he say?

4    A    He said yes.  He said, You could look at my phone.  I

5    have nothing to hide.

6              MR. POLLACK:  Your Honor, may I show the witness a

7    document marked for identification as Government's Exhibit 3?

8              THE COURT:  Yes.

9    BY MR. POLLACK:

10   Q    This document is marked for identification as

11   Government's Exhibit 3.

12             Mr. Moloney, do you recognize this document?

13   A    Yes.

14   Q    What is it?

15   A    It's the Consent to Search form.

16   Q    Do you recognize any signatures on this document?

17   A    Yes.

18   Q    What signatures do you recognize?

19   A    I recognize my signature and Agent Jason Brouzakis's

20   signature.

21   Q    Do you recognize any handwriting on this document?

22   A    Yes.

23   Q    Whose handwriting do you recognize?

24   A    My handwriting.

25   Q    Is this a fair and accurate copy of the form?

1  A    Yes.

2        MR. POLLACK:  Your Honor, the Government offers

3  Government's Exhibit 3 into evidence.

4        THE COURT:  Any objection?

5        MR. COHEN:  None, Your Honor.

6        THE COURT:  It's admitted.

7        (Government's Exhibit 3 received in evidence.)

8        (The above-referred to exhibit was published.)

9  BY MR. POLLACK:

10  Q    Mr. Moloney, why did you write this comment on the bottom

11  of the form?

12  A    I wrote it --

13        THE COURT:  I'm sorry to interrupt you, but I don't

14  think the comment is in evidence or I didn't hear it.

15  BY MR. POLLACK:

16  Q    I'm sorry, Mr. Moloney, can you read the comment that you

17  wrote on the bottom of the note?

18  A    On February 5th, 2020, Belloisi gave verbal consent to

19  look in his phone, but refused to sign.

20  Q    Why did you write that comment?

21  A    I just wanted to be accurate and, as a reminder to us,

22  that he gave verbal consent to look at his phone, but he did

23  not want to sign any document.

24  Q    Why did you write February 5th instead of February 4th?

25  A    At the time it went into the next day.  It was just after

1  midnight now into February 5th.

2  Q    Apart from the emergency contact number, did you see

3  anything else on the phone when you looked at it?

4  A    Yes.

5  Q    In general, what else did you see?

6  A    When we opened the phone, it was opened to text messages

7  that he had between him and another individual at or around

8  the time of the seizure, and that's what I noticed when I --

9  when I opened the phone.

10 Q    And, in an abundance of caution, did you subsequently

11 obtain a search warrant for the phone?

12 A    Yes.

13           MR. POLLACK:  No further questions, Your Honor.

14           THE COURT:  There was no objection, but that was an

15 extremely leading question.

16           MR. POLLACK:  I apologize, Your Honor.

17           THE COURT:  You may inquire when you're ready.

18           MR. COHEN:  Thank you, Your Honor.

19           MR. SIMPSON:  Your Honor, might I sit behind

20 Mr. Cohen on the seats back there?

21           THE COURT:  Sure.  That's fine.

22           MR. COHEN:  May I inquire, Your Honor?

23           THE COURT:  Yes.

24           MR. COHEN:  Thank you.

25

1    CROSS-EXAMINATION

2    BY MR. COHEN:

3    Q    Agent Moloney, you have been working at JFK Airport for

4    approximately five years; is that right?

5    A    More than five years, yes.

6    Q    But you've been -- is it Internal Conspiracy Group at JFK

7    for approximately five years?

8    A    Yes, that's correct.

9    Q    What were you doing there at JFK prior to those five

10   years?

11   A    I was an acting group supervisor for one of the JNSU

12   groups, the JFK Narcotic Smuggling Units; and prior to that, I

13   was at JFK as an agent in one of the JNSU groups.

14   Q    So, in total, how long have you been working as law

15   enforcement at JFK?

16   A    At JFK, over ten years; and, in the city, in another

17   group, two years.

18   Q    So just -- these questions have directly to do with JFK

19   and not the two years in the city prior to.

20          So in your ten years working at JFK Airport, you

21   made several arrests there before; is that right?

22   A    Yes.

23   Q    I think you said over a hundred; is that correct?

24   A    That's correct.

25   Q    You seized drugs there before; is that right?

1  A    That's correct.

2  Q    So in your ten years there in law enforcement at JFK,

3  it's fair to say that you were very familiar with the airport.

4  A    That's correct.

5  Q    Familiar with the security at the airport; is that right?

6  A    Yes.

7  Q    Okay.  Familiar with, for instance, the security cameras

8  at the airport; right?

9  A    That's correct.

10  Q    And at the JFK Airport, there are security cameras both

11  inside and outside the terminal; is that right?

12  A    Yes.

13  Q    And, particularly, we'll focus on the Terminal 8, Gate 7

14  where this arrest happened.

15        Am I correct in that categorization, Terminal 8,

16  Gate 7?

17  A    Yes.

18  Q    And there are cameras located outside the terminal facing

19  the airplane at Terminal 8, Gate 7; is that correct?

20  A    Yes.

21  Q    And they are focused on there for security purposes; is

22  that right?

23  A    Yes.

24  Q    And there are multiple ones giving different angles of

25  the airplane; correct?

1   A     Yes.

2   Q     Now, prior to coming in today, you have had an

3   opportunity to review some of the security footage from

4   Terminal 8, Gate 7 at or around the time of Mr. Belloisi's

5   detention?

6               THE COURT:  That's a statement, not a question.

7               MR. COHEN:  I apologize, Your Honor.

8   BY MR. COHEN:

9   Q     Is it true, Mr. Moloney, that prior to coming in to

10  testify today, you have had the opportunity to review some of

11  the security footage from that gate on the outside of Terminal

12  8, Gate 7 facing the airplane?

13  A     Yes.

14               (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1   MR. COHEN: (Continuing.)

2   Q    In viewing that, do you recall how many camera

3   recordings you were able to view?

4   A    No.  I don't recall how many we reviewed.

5   Q    When you say "we," who are you speaking about, sir?

6   A    Myself, other agents involved in the case, and American

7   Airlines corporate security.

8   Q    You were the lead investigator for the detention and

9   arrest of Mr. Belloisi?

10  A    I am the lead investor.  That's correct.

11  Q    When you say "you are," and I don't mean to be picky;

12  but you have been the whole time; is that right?

13  A    That's correct.

14  Q    And after Mr. Belloisi's arrest, you went to view some

15  of the security cameras to see what had transpired during

16  that day; is that right?

17  A    That's correct.

18            THE COURT:  You mean the same day of the arrest?

19            MR. COHEN:  I will ask the witness, Your Honor.

20  Thank you.

21  Q    When did you have that opportunity to review the

22  security footage?

23            THE COURT:  For the first time?

24  Q    For the first time?

25  A    After the arrest.

1  Q    It is, like Your Honor asked, the day of February 5th or
2  February 4th or a different day, sir?
3  A    It was not February 4th.  It was not February 5th.  It
4  was afterwards.
5  Q    Approximately how long thereafter?
6  A    A few days.
7  Q    Were you able to view any footage that you so chose from
8  the -- withdrawn.
9         Let me be specific so we are all talking about the
10 same thing, if I may.
11        These questions now are in reference to the various
12 cameras that you just testified to, outside Terminal 8, Gate
13 7, which are facing the airplane.  Those are the ones I am
14 talking about.
15        Does that make sense to you, sir?
16 A    Okay.
17 Q    Does that make sense to you?
18 A    Yes.
19 Q    Were you able to view all of the footage that you asked
20 for whenever the day was that you viewed it from those
21 cameras that I just described?
22 A    The footage that we were provided by American Airlines,
23 we viewed it all, yes.
24 Q    So you did not have a say in what you were able to view.
25        Was it only what American Airlines provided to you

1    that you were allowed to view?

2              MR. POLLACK:  Objection, relevance.

3              THE COURT:  I am going to sustain as to form.

4              Who has custody of that footage?  Does his have

5    custody of that footage, or does the airline have custody of

6    the footage?

7              THE WITNESS:  Right now or at the time?

8              THE COURT:  At the time.

9              THE WITNESS:  American Airlines has -- they are in

10   control of the surveillance at that terminal -- in and around

11   the terminal and the gate.

12             THE COURT:  So when you want to view any security

13   footage, you have to make a request of the airline?

14             THE WITNESS:  That's correct.

15   Q    Did you make that request, sir?

16   A    Yes.

17   Q    Can you please explain to the Court first of all where

18   did you review the footage?

19             MR. POLLACK:  Objection, relevance.

20             THE COURT:  Sustained.

21   Q    Ultimately, Officer Maloney, you provided the government

22   here with security camera footage from that day at that time

23   that depicted Mr. Belloisi's detention at the airplane; is

24   that correct?

25   A    We provided surveillance that American Airlines gave us

1   from the entire day, including when the defendant was

2   detained.

3   Q    Whom did you provide the footage from the entire day to?

4         MR. POLLACK:  Objection, relevance.

5         THE COURT:  Overruled, I will allow it.

6   Q    Do you need me to repeat the question, sir?

7   A    Please.

8   Q    To whom did you provide the footage that you just

9   described, which was from the entire day, including the time

10  that Mr. Belloisi was detained?

11  A    It was surveillance from the aircraft.  So I apologize.

12  It's not the entire day.  It's from the time that the plane

13  landed.  And we were provided that by American Airlines and

14  then turned it over to United States Attorney's Office.

15  Q    What time did that plane land, sir, if you know?

16  A    I don't recall what time it landed.

17  Q    But you did receive a call from Agent Gabay, I believe

18  you said, some time prior to 6:00 p.m.; is that correct?

19  A    That's correct.

20  Q    So the airplane landed prior to 6:00 p.m. as far as you

21  know?

22  A    Correct.

23  Q    Did that call, the initial call from Agent Gabay, he

24  told you about the seizure of cocaine from a particular

25  airplane; is that right?

1  A     Yes.

2  Q     He told you that they planned to do a controlled

3  delivery; correct?

4  A     Yes.

5  Q     It is basically remove and replace.  Remove the real

6  drugs and replace them with sham drugs; is that right?

7  A     Yes.

8  Q     You have to answer.  You cannot shake your head.

9          Thank you, sir.

10          He called you on your cell phone?

11  A     Yes.

12  Q     Then did you drive to the airport in your own vehicle?

13  A     Yes.

14  Q     Did you have your cell phone with you still?

15  A     Yes.

16  Q     You had your cell phone with you the whole day?

17  A     Yes.

18  Q     Is that a Smartphone, sir?

19  A     Yes.

20  Q     When you got to the airport, can you please tell us

21  exactly what you did?

22  A     When I arrived at Building 75, our parking lot, I got

23  out of my vehicle and I got into Sean Gabay's vehicle and

24  then we drove over to Gate 11 together.

25  Q     What time did you arrive at the airport approximately?

1  A     Approximate 6:00 p.m.

2  Q     During the ride over to the terminal, fair to say that

3  you and Agent Gabay discussed what Agent Gabay was told by

4  CBP?

5  A     Yes.

6  Q     Fair to say that during that drive you discussed the --

7  withdrawn.

8         Earlier on direct I believe you testified that "we

9  were told that there was a trigger mechanism that was

10 connected to the sham drugs"; is that right?

11 A     Correct.

12 Q     I just want to be sure I am using the correct pronouns.

13        When you say "we were told," was Agent Gabay told

14 and then he relayed it to you, or did that information come

15 to the two of you together?

16 A     Agent Gabay was told, he relayed it to me, and later on,

17 and we were both told together by CBP.

18 Q     Some time prior to Mr. Belloisi's arrival at the

19 airplane, you had the opportunity to speak to CBP as well; is

20 that right?

21 A     Yes.

22 Q     From your parking lot, where did you and Officer Gabay

23 first drive to?

24 A     From the Building 75 parking lot to the tarmac at JFK.

25 Q     Is that where your ultimate observation post was?

1  A    On the tarmac, yes, within Terminal 8, correct.

2  Q    When you got to the tarmac at Terminal 8, you and

3  Agent Gabay, can you please describe for us what you did once

4  you arrived there?

5  A    Once we arrived, we pulled up next to a CBP vehicle.  We

6  were talking about what was going on.  They explained the

7  situation to us.  They were the lead on this operation.  And

8  they explained that once the device is triggered, they will

9  receive notification on their radio and they will relay it

10 over to us and we would follow their lead on going towards

11 the airplane.

12 Q    How were you to communicate -- withdrawn.

13         How was CBP to tell you once the device was

14 triggered?

15 A    By radio and by cell phone.

16 Q    CBP officers told you during that initial encounter on

17 the tarmac that the purpose of the trigger allows them to

18 know if anyone has moved the sham drugs or touched the sham

19 drugs; is that right?

20 A    That's correct.

21 Q    And they also told you in that initial encounter that

22 there was a spray that they sprayed onto both the drugs and

23 -- withdrawn.

24         Excuse me, Your Honor.  I apologize.

25         Where did they tell you they sprayed the spray that

1   ultimately would illuminate under a light if touched?

2   A    They told us that they sprayed the sham product.

3   Q    What did they tell you would happen if somebody touched

4   that sham product?

5   A    That if you put a certain light on there, if they

6   touched it with, say, their hands and you put a certain light

7   over their hands, you would see some coloration that would

8   indicate that they had touched the product or anything that

9   was sprayed.

10  Q    Was the insulation blanket also sprayed that covered the

11  product?

12  A    I learned later at the time that it might have, yes.

13  Q    I am sorry.  That it might have; or, yes, that it was or

14  was not?

15  A    I did not spray.  So, I cannot testify if it was sprayed

16  or not.

17  Q    Were you told that the insulation blanket was sprayed?

18  A    Yes.

19  Q    How long were you in conversation with CBP when you

20  first pulled up to the tarmac with Officer Gabay?

21  A    Ten minutes.

22  Q    What CBP officers were you speaking with that day?

23            THE COURT:  Sorry.  At what point?  Because there

24  were a couple of conversations with the CBP officer.

25  Q    Were your first conversations directly with CBP, did

1    that take place on the tarmac when you were inside Officer

2    Gabay's vehicle?

3    A    Directly, yes.  Like in person, yes.

4    Q    Did you have phone conversations with them prior to

5    that?

6    A    I don't recall if I did; but I know that Sean Gabay

7    definitely did because he received the information from them.

8    He got the duty call from them and Sean called me and we

9    responded together.

10   Q    So when you were on the tarmac and you first are

11   physically encountering CBP officers, are they relaying to

12   you in sum and substance the same information that

13   Agent Gabay gave you on the phone?

14   A    Yes.

15   Q    Did they relay to you any extra information that you did

16   not have prior to arriving on the tarmac?

17   A    No.  Not that I can recall.

18   Q    The CBP officers that were presents there, that was CBP

19   Officer Morrelli; is that right?

20   A    Yes.

21   Q    CBP Officer Robinson; is that right?

22   A    Yes.

23   Q    Do you know the names of the other CBP officers that

24   were present?

25             MR. POLLACK:  Objection, Your Honor.  It is unclear

1  what time frame the question is about.

2          MR. COHEN:  If I may, Your Honor.  Right while they

3  are there in the first meeting.

4          THE COURT:  The initial meeting?

5          MR. COHEN:  Correct, Your Honor.

6          THE COURT:  Do you know the names of the officers

7  that you spoke to -- the CBP officers that you spoke to when

8  you first got there?

9          THE WITNESS:  When we first arrived and we got the

10 information and we set up surveillance?

11         THE COURT:  Yes.

12         THE WITNESS:  No, but those names we did end up

13 talking to eventually later on when we encountered the

14 defendant; but at the time when we first arrived, I don't

15 remember exactly what name we were talking with.

16 Q    In the initial encounter, there were multiple CBP

17 officers present with you and Agent Gabay; is that right?

18 A    Yes.

19 Q    As you were speaking with CBP officers -- I don't know

20 if I am using the right terminology -- there was a tactical

21 plan that was discussed at that time?

22 A    Yes.

23 Q    What would you call that so I can use the proper

24 language?  Is it a tactical plan; is that correct?

25 A    Plan of action.

1   Q    Plan of action.  Thank you, sir.

2        What was your role in that plan of action, you

3   personally?

4   A    I was there to assist CBP with the controlled delivery.

5   Q    What was Agent Gabay's specific role that was discussed

6   at that plan of action?

7   A    Same role as mine.

8   Q    Was it determined at that point that you would be the

9   lead investigator from his?

10  A    Yes.  I discussed that with Sean that I would -- if

11  there is any arrest involved, even if there wasn't an arrest,

12  there is a seizure involved in narcotics, I would be the case

13  agent for the case.

14  Q    As being the case agent for the case, is part of your

15  responsibility to conduct any investigation of any potential

16  suspects?

17  A    Yes.

18  Q    At that plan of action meeting, was the observation

19  posts discussed where each agent would be located?

20  A    Yes.

21  Q    Where were you and Agent Gabay determined to set up your

22  observation post in relation to the plane?

23  A    A few gates away.  We set up from a distance, not

24  directly on the plane.

25  Q    Did you know where CBP was setting up?

1   A     Yes.

2   Q     Where were they set up?

3   A     They were also set up a few gates away from the plane.

4   Q     Were you able to have eyes on the plane?  In other

5   words, could you see the plane?

6   A     I could not see the plane.

7   Q     Do you know if the CBP officers could see the plane?

8   A     Yes.

9   Q     Agent Maloney, what time did you get to your observation

10  post?

11  A     When we arrived on the tarmac, shortly after 6:00 p.m.

12  Q     So you arrive on the tarmac.  You have approximately a

13  10-minute conversation with CBP and then you drive to your

14  observation post; is that correct?

15  A     Correct.

16  Q     Is it fair to say by 6:20 you would have been at your

17  observation post?

18  A     Well before that, yes.

19  Q     Just before I leave that initial meeting that you had

20  with CBP, was there a plan of action discussed what would

21  happen if somebody went into that avionics compartment?

22  A     Yes.  If someone went into the avionics compartment and

23  the product was triggered, the device was triggered, CBP

24  would make the call to head towards the airplane and we would

25  follow their lead.

1  Q    Was potential escape routes discussed if the person

2  tried to run?

3  A    No.

4  Q    At that initial meeting was it discussed what would

5  happen if -- withdrawn.

6         Did you know that the plane was scheduled to take

7  off at 8:00 p.m.?

8  A    Yes.

9  Q    So you had less than two hours to wait before that plane

10 would take off; correct?

11 A    Correct.

12 Q    Was it discussed what would happen if nobody went into

13 the avionics compartment?

14 A    If no one went in, we would have to take the sham

15 product off before the plane took off.

16 Q    What time did you all determine you would do that?

17 A    I don't know.  That wasn't my decision.  That would be

18 CBP.

19 Q    Did they tell you what time that they would do that?

20 A    I don't recall.

21 Q    They may have?

22 A    I don't know.  I don't recall.

23 Q    I believe you testified that you got the call from CBP

24 that the device had been triggered at or around 7:20 p.m.?

25 A    Correct.

1  Q    Prior to the device being triggered, you were in your
2  vehicle with Agent Gabay for approximately an hour, maybe a
3  little longer; is that right?
4  A    Correct.
5  Q    I want to talk to you about that hour sitting in the
6  vehicle.
7        Were you in contact with CBP on the radio and cell
8  phone during that hour?
9  A    Yes.
10 Q    Did CBP alert you that anyone else had gone to the plane
11 during that hour?
12       MR. POLLACK:  Objection.  This is beyond the scope
13 of the direct.  It's a trial matter, rather than matters of
14 hearsay.
15       THE COURT:  Sustained.
16 Q    All the information that you received about anyone going
17 onto the plane and into the avionics department was provided
18 to you by CBP; is that right?
19 A    From that -- can you repeat the question?
20 Q    Sure.
21       While you were at the observation post, you said
22 you were not able to see the plane; correct?
23 A    Correct.
24 Q    Any information you received about someone approaching
25 the avionics department was provided to you by CBP; right?

1    A    Correct.

2    Q    Was the 7:20 call from CBP the first time that CBP told

3    you anyone went into that avionics department?

4              MR. POLLACK:  Objection.  Same objection.  This is

5    about trial testimony.  It is not about the issues of consent

6    or custody.

7              THE COURT:  Was anybody else seen going onto the

8    plane into the avionics section?

9              THE WITNESS:  No.

10             THE COURT:  Done.  Move on, please.

11   Q    Please describe the content the best you remember of the

12   communication alerting you that somebody had gone into the

13   avionics compartment?

14   A    CBP told us that the device was triggered and we are

15   going to head in, and we followed their lead.

16   Q    And when you say "we followed their lead," does that

17   mean you also headed in as you stated?

18   A    Yes.

19   Q    Does that mean Agent Gabay drove you in his vehicle to

20   the plane?

21   A    Correct.

22   Q    Did you have eyes on the CBP vehicle during that time?

23   A    Yes.

24   Q    Is it fair to say that Agent Gabay was following

25   directly behind the CBP vehicle?

1   A    Either directly behind or, you know, right next to; but

2   yes, we were going to the plane together.

3   Q    Okay.  Did you at any time during that drive to the

4   plane see anybody either enter or exit the avionics

5   compartment?

6   A    No.

7   Q    Is it fair to say that Officer Gabay's vehicle and CBP's

8   vehicle arrived at the scene, meaning at the plane, at or

9   about the same time?

10  A    There were several CBP vehicles.  So the first vehicle

11  that arrived that encountered the defendant arrived there

12  first and other CBP vehicles, as well as ours, arrived about

13  a minute or two after.

14  Q    When you arrived in your vehicle, did you immediately

15  walk over to the area where the CBP officers were?

16  A    Yes.  We got out of the car and we were there.

17  Q    Simply because we'll have Agent Gabay here later, I will

18  ask you about you.

19          When you arrived there, the officers we spoke about

20  were already there -- CBP Officer Robinson was there; is that

21  right?

22  A    Yes.

23  Q    And CBP Morrelli?

24  A    Yes.

25  Q    CBP Officer Cambry; is that right?

1   A      Yes.

2   Q      CBP Officer -- I will spell his name.  I think it is

3   Ferrarza; is that right?

4   A      That's correct.  He was the supervisor on scene that

5   night.

6   Q      There were two other CBP officers there as well; is that

7   right, if you recall?

8   A      If you mention their names.

9   Q      Let's do it this way:  Do you remember how many CBP

10  officers were at the plane when you arrived?

11  A      No.

12  Q      There were at least four that we have already mentioned;

13  is that right?

14  A      That's correct.

15  Q      Were there more than four without knowing the exact

16  number?

17  A      Yes.

18  Q      When you arrived at the plane and there were those more

19  than four CBP officers there, they were speaking with or next

20  to Mr. Belloisi; is that right?

21  A      Not all of them were speaking to the defendant.

22  Q      If you recall, how many were next to Mr. Belloisi?

23  A      At least two.

24  Q      Did you walk over to Mr. Belloisi at that time?

25  A      Initially, no.

1  Q    What did you do when you first arrived?

2  A    We waited for CBP because they were the lead on the

3  operation.  I was waiting for them to tell us what they

4  assessed and what was going on, and I walked towards the tug

5  vehicle that was next to the airplane.

6  Q    While you were walking toward the tug vehicle were you

7  still in communication with CBP?

8  A    I think I might have said to CBP, you know, Excuse me

9  for a moment, and I walked toward the tug vehicle to see what

10 was in the vehicle.

11 Q    What did you see in the vehicle?

12 A    I saw an empty tool bag.

13 Q    Did you take that tool bag out to see that it was empty;

14 is that how you knew?

15 A    Yes.  It was visibly open and nothing was in it.

16 Q    When you walked over to that tug vehicle, did you have

17 to pass in close proximity to Mr. Belloisi and the CBP

18 agents?

19 A    No.

20 Q    So you weren't able to hear what they were speaking

21 about?

22 A    No.

23 Q    When is the first time that you actually saw

24 Mr. Belloisi on February 4th, 2020?

25 A    I saw him when we arrived from a distance.  He was

1  talking with the CBP officers right underneath the avionics

2  department.

3  Q    So literally underneath the airplane?

4  A    Correct.

5  Q    When you say "when we arrived from a distance," does

6  that mean when your vehicle pulled up and parked and you were

7  able to see them but unable to hear them?

8  A    Correct.

9  Q    And then as you got out of your vehicle to walk to the

10 tug, as you testified to, you could see them but you could

11 not hear them?

12           THE COURT:  Asked and answered.

13           Let's move on.

14 Q    When did you get the call from CBP to come over and join

15 their interaction with Mr. Belloisi?

16 A    After they gathered information from him on what he was

17 doing there.

18 Q    But when you received the call -- withdrawn.

19           My question is more a time question.

20           MR. POLLACK:  Objection.  It is not clear what call

21 counsel is asking.

22           MR. COHEN:  I withdrew the question.  I will ask

23 the question now.

24 Q    From the moment that you pulled up in your vehicle and

25 parked by the airplane, how much time elapsed before CBP told

1  you to come and join their investigation?

2           MR. POLLACK:  Objection.

3           THE COURT:  You mean come and join their

4  investigation?  They already joined the investigation.

5  Q    Come and join the interaction with Mr. Belloisi?

6           MR. POLLACK:  Your Honor, I don't believe the

7  witness ever testified exactly the way counsel is

8  questioning.

9           THE COURT:  He is asking the question.

10          Did there come a point when you actually approached

11 Mr. Belloisi and the CBP officers?

12          THE WITNESS:  Yes.

13          THE COURT:  How long before from that happened from

14 when you got there?

15          THE WITNESS:  When I arrived, I initially was

16 talking to CBP, went towards the tug vehicle to see what that

17 was about.  I waited for CBP to finish their first encounter

18 with the defendant, when they had told me that he was there

19 trying to fix the air conditioning because he initially tried

20 do it in the cockpit but it didn't work, myself and

21 Sean Gabay then immediately went up into the airplane into

22 the cockpit to talk to the pilot.

23          THE COURT:  You didn't go towards CBP and defendant

24 at that point?

25          THE WITNESS:  I did not talk to the defendant at

1    that point, no.

2          THE COURT:  Okay.  Move on.  Can we wrap it up?

3    Q    You've given us the information that CBP had told you

4    about what Mr. Belloisi had told them; is that right?

5    A    Yes.

6    Q    Now, I want to go through exactly what they had told

7    you.  They told you that Mr. Belloisi was in the aircraft to

8    steal food; is that correct?

9    A    No, CBP did not tell me that.

10   Q    CBP told you that Mr. -- why don't you tell me what the

11   CBP told you in relation to Mr. Belloisi's being on the

12   aircraft.  Please be as thorough as you can remember.

13   A    CBP told me that the defendant was trying to fix the air

14   conditioning and he couldn't do so properly in the cockpit so

15   that is why he went into the avionics compartment to try to

16   fix the air conditioning.

17   Q    CBP did not tell you anything about what Mr. Belloisi

18   said about being on the airplane to eat food and have a bag

19   of chips at that moment?

20   A    No.

21   Q    That information was relayed to you by Mr. Belloisi at

22   JNSU; is that right?

23   A    That's correct.

24          MR. COHEN:  Your Honor, I would like to show the

25   witness Defense Exhibit A for identification if I may.  It is

1   from the 3500 material.  It's JM 4 and it is page 8 of 9 if I

2   may.

3           THE COURT:  I appreciate getting copies of any

4   defense exhibit.

5           MR. COHEN:  I certainly can give you some now, Your

6   Honor.  I didn't expect the testimony to come out this way.

7           THE COURT:  Which is 3500?

8           MR. COHEN:  Yes, page 8 of 9.

9           THE COURT:  Is there a question?

10          MR. COHEN:  Yes.  I am waiting for Your Honor.

11          THE COURT:  I have it.

12          Is there a question --

13          MR. COHEN:  Yes.

14          THE COURT:  -- before you show it to him?

15          MR. COHEN:  Yes, there is, Your Honor.

16  Q   Agent Maloney, during the course of this investigation,

17  you filled out certain paperwork.  You filled out, for

18  instance, ROIs; is that right?

19  A   Correct.

20          THE COURT:  Can you not use abbreviations?  I know

21  we are in a real world where we use TikTok language.

22  Q   You filled out reports of investigation; is that right?

23  A   Yes.

24  Q   You filled those out at or near the time of the arrest

25  on February 4th, 2020; is that right?

1    A    Correct.

2    Q    And you filled those out with the information that was

3    provided to you by various people, Mr. Belloisi and CBP, on

4    February 4th, 2020; is that right?

5    A    Yes.

6    Q    You recorded the information that we are now speaking

7    about, for instance the information that CBP told you

8    Mr. Belloisi told them; is that right?

9    A    Yes.

10             MR. COHEN:  Your Honor, if I may show the witness a

11   report of investigation that was referred to.

12             THE COURT:  That's not a proper format.

13   Q    The information that was provided to you, you filled out

14   as fairly and as accurately as you could based on the

15   information that was provided to you; is that right?

16             THE COURT:  What is the basis for showing it to the

17   witness?

18             MR. COHEN:  The witness has testified that CBP had

19   told him that Mr. Belloisi --

20             THE COURT:  Let's use legal terminology.

21             Are you talking about a prior inconsistent

22   statement?

23             MR. COHEN:  Yes.

24             THE COURT:  Okay.  That's not the way to ask.

25   Q    You testified today that all CBP had told you was that

1  Mr. Belloisi went to check the air conditioning units and

2  then went down to the avionics compartment to fix it; is that

3  right?

4  A    Yes.

5  Q    But isn't it true that CBP officials also told you that

6  Mr. Belloisi was in fact stealing food from the galley area?

7  A    I don't recall them telling me that on the tarmac.

8  Q    They also told you that he noticed there was a warning

9  light inside the flight deck indicating that the air

10 conditioning pack unit had malfunctioned; is that right?

11 A    That's correct.

12 Q    As to the stealing food portion that I am asking you

13 about, is it your testimony that you don't recall if they

14 told you that, or that they did not tell you that?

15 A    I don't recall them telling me that.  I recall that the

16 defendant told me that during the interview at JNSU.

17 Q    After you and Agent Gabay went to speak to the airline

18 pilot, can you tell us what exactly was the conversation with

19 the airline pilot?

20       Let me break it down for you.

21       You went onto the airplane with Agent Gabay; is

22 that right?

23 A    Yes.

24 Q    Did anybody else go with you?

25 A    One of the CBP officers, the supervisor at the time.

1  Q    Is that Ferrarza?

2  A    That's correct.

3  Q    The three of you went to the plane and went into the

4  galley area; is that right?

5  A    We were on the jetway right outside the airplane.

6  Q    Did the pilot come out to speak with you there?

7  A    The pilot and first officer.

8  Q    The five of you were standing just outside the airplane

9  on the jetway; is that right?

10 A    Yes.

11 Q    And can you please tell us what you asked the pilot at

12 that time on the jetway just outside of the airplane?

13 A    I had asked the pilot if there had been any mechanical

14 issues with the airplane and he stated, No.  I also asked if

15 there were any problems with the air conditioning.  He said,

16 No.  And he said, If there were any mechanical issues or

17 problems that it would have to be properly documented in the

18 logbook.

19 Q    Did you ask him to go check the logbook?

20 A    I believe I did.

21 Q    Did he bring the logbook out to you?

22 A    I don't recall if he did.

23 Q    Do you recall his telling you at that time on the jetway

24 just outside the airplane there was nothing logged in the

25 logbook indicating any problems on the airplane; is that

1  right?

2  A    Yes.

3  Q    After the pilot gave you that information, did that end

4  your conversation with him?

5  A    Yes.  We asked for his phone number and, you know, he

6  may be needed to testify at a later date and we thanked him

7  and that was it.

8  Q    Did you ask the pilot if any airline mechanic had come

9  onto the plane?

10 A    I don't know if I asked him that.  I would have to check

11 in my notes.

12 Q    Do you have your notes with you, sir?

13 A    I don't.

14 Q    What part of your notes would help refresh your

15 recollection about whether you asked the airplane pilot that?

16 A    The interview notes of the airline pilot.

17 Q    Was that provided to the government?

18 A    Yes.

19        MR. COHEN:  With the Court's permission, may we

20 show that to the witness?

21        THE COURT:  Yes.

22        That's what we have electronic equipment for.

23        MR. COHEN:  You are right, Your Honor.  I

24 apologize.

25        THE COURT:  Can you tell us what the identification

1    number of that document is?

2            MR. COHEN:  Yes, Your Honor.  It is JM 1.

3            THE COURT:  If you can just read it to yourself and

4    then let us know if that refreshes your recollection, please.

5            THE WITNESS:  Sure.  Thank you.

6            (Pause.)

7            THE WITNESS:  Okay.

8    Q    Does that refresh your recollection, sir?

9    A    Yes.

10   Q    Did you ask the airline pilot if there was any mechanic

11   that came onto the airline?

12   A    I don't recall if I asked that.

13   Q    Did the pilot tell you that there was an airplane

14   mechanic that came onto the airplane?

15   A    Did he tell me there was an airline --

16   Q    An airplane mechanic that came onto the airplane?

17   A    No.  He didn't tell me that.

18   Q    Is this the extent of all your notes of your

19   conversation with the airplane pilot?

20   A    Yes.

21   Q    There is no place else that you recorded the information

22   discussed with the airplane pilot; is that right?

23           MR. POLLACK:  Objection; asked and answered.

24           THE COURT:  Asked and answered.

25   Q    After you left the pilot, where did you go?

1   A    I went downstairs to the tarmac.

2   Q    And what did you do when you got back to the tarmac?

3   A    Talked more with CBP officers and then brought the

4   defendant over to my vehicle.

5   Q    When did you first approach Mr. Belloisi?

6   A    After I came down from the tarmac, I spoke with CBP

7   officers and then I brought the defendant over to my vehicle.

8   Q    When you came back down onto the tarmac, where was

9   Mr. Belloisi?

10  A    He was with CBP officers.

11  Q    Do you know what CBP officers those were?

12  A    No.

13  Q    Were those the same CBP officers that you just testified

14  to that you came and spoke with?

15  A    Most likely, yes.

16  Q    Did you speak with those CBP officers in front of

17  Mr. Belloisi?

18  A    No.

19  Q    To finish up the conversations with CBP, when CBP

20  communicated to you on the radio, they gave you information

21  that you determined your plan of action should be to go speak

22  with the pilots to verify what CBP had told you; is that

23  right?

24  A    No.  They didn't tell me on the radio.

25  Q    They told you that Mr. Belloisi had told them that they

 1  had gone on the airplane; right?

 2          THE COURT:  Why are we going over this again?

 3          Can we move on, please?

 4          MR. COHEN:  I want to finish up and find out

 5  everything CBP told him.

 6          THE COURT:  It has been gone over already.

 7  Q    Is it your testimony, Agent Maloney, that Mr. Belloisi

 8  went on the airplane to fix an air conditioning issue?

 9  A    Yes.

10  Q    After you got off the airplane and spoke to CBP, you

11  then took Mr. Belloisi over to your vehicle; is that right?

12  A    Correct.

13  Q    What's the first thing you said to Mr. Belloisi?

14  A    I believe I introduced myself to him.

15  Q    You told him you were an his Homeland Security

16  investigator?

17  A    That's correct.

18  Q    You gave him your name; is that right?

19  A    All right.

20  Q    You told him that you are detaining him for some

21  questioning; is that right?

22  A    No.  I didn't say that right away.

23  Q    After you introduced yourself, what did you say next?

24  A    Please turn away from the airplane.  Look in this

25  direction.  You are not in any trouble at this time.  We need

1    to get to the bottom of it, and I don't want to talk out here

2    in front of everybody.  It is loud.  The airplane is on.  The

3    vehicles are on.  We are going to go back to our office and

4    it will be a more quiet setting.  We will sit down like

5    gentlemen and talk this out to figure out -- we will get to

6    the bottom of the problem here.

7    Q    When you told Mr. Belloisi he was not in any trouble,

8    that wasn't true at that point, was it?

9              MR. POLLACK:  Objection.

10   A    I didn't know all the information at hand.

11   Q    You did know he had tripped a wire; correct?

12   A    We believed, yes, he was possibly involved.  Correct.

13   Q    CBP had told you he had triggered the trip wires; is

14   that right?

15             MR. POLLACK:  Objection, Your Honor.  This line of

16   questioning is about his subjective understanding of the

17   witness as to whether the defendant was going to be arrested.

18             THE COURT:  I am going very briefly allow it.

19             And then you are going to move on, Mr. Cohen.

20             Let's move it.

21   Q    So my question to you was:  CBP had told you that

22   Mr. Belloisi had triggered the trip wire; correct?

23             MR. POLLACK:  Objection.  That mischaracterizes --

24             THE COURT:  I have overruled it.  Let him answer

25   the question.

1        And that is the last question you are going to ask

2   about what CBP told him, because I have already told you you

3   have gone over it ad nauseam.

4   Q    Do you need me to repeat?

5            THE COURT:  Can we move it on?

6            MR. COHEN:  Certainly.

7   Q    Do you need me to repeat the question?

8   A    Sure.

9   Q    CBP told that you Mr. Belloisi had triggered the trip

10  wire?

11  A    CBP had told me that --

12           THE COURT:  It wasn't a trip wire.  It was a

13  device; correct?

14           THE WITNESS:  Correct, that the device was

15  triggered.  That is what CBP told me and that they were going

16  to head towards the airplane and we would follow their lead.

17  Q    Right.  That was your understanding that the person they

18  were questioning was the person who had triggered --

19           THE COURT:  Move it.

20           I am going to sustain that objection.

21           Let's just go.

22  Q    When you got to your vehicle, you place Mr. Belloisi in

23  handcuffs; is that right?

24  A    Before we placed defendant into the vehicle, yes, I put

25  him many handcuffs.

1    Q    And he was in the backseat of your vehicle; right?

2    A    Yes.

3    Q    And there were other officers sitting next to him?

4    A    No.  He was in the backseat, I was the passenger in the

5    front seat, and Sean Gabay was the driver of the vehicle.

6    Q    You testified that on direct examination that you put

7    him in handcuffs and you told him part of the reason was for

8    his safety.

9             Can you, please, describe that, how it is for his

10   safety to be in handcuffs in back of the vehicle?

11   A    Because if he tried to -- we didn't want him fleeing or

12   leaving at -- the tarmac can be a dangerous place.  There are

13   vehicles driving, airplanes moving.  So for his safety and

14   ours, he is supposed to be handcuffed during a transport.

15   Q    It took you about 10 minutes to get back to your office,

16   the JNSU building?

17   A    Approximately.

18   Q    When you got to the JNSU building, what -- did you

19   immediately take Mr. Belloisi to your interview room?

20   A    Yes.

21   Q    Do you know if Mr. Belloisi had his phone on him at that

22   point?

23   A    He did not.

24   Q    That was taken by CBP at the tarmac?

25   A    Correct.

1   Q    Do you know if Mr. Belloisi had his American Airlines

2   identification on him at that point?

3   A    I believe that was taken from him as well on the tarmac.

4        THE COURT:  By CBP?

5        THE WITNESS:  Yes.

6   Q    How do you know that they had taken those two items from

7   him?

8   A    Because they later on handed it to me.

9   Q    Got it.

10       Did they hand you later any other items that

11  belonged to Mr. Belloisi?

12  A    Yes.

13  Q    What did they give you?

14  A    An American Airlines jacket.

15  Q    Anything else?

16  A    The gloves that the defendant was wearing at the time.

17  Q    Did you at any time observe those gloves being -- blue

18  light being shown on the gloves?

19       MR. POLLACK:  Objection.  This is going to trial

20  evidence.  It is outside the scope and beyond the direct.

21       THE COURT:  Overruled.  I will allow it.

22       Did you yourself observe anything on those gloves?

23       THE WITNESS:  No.

24  Q    When you got to the interrogation room, did you need to

25  take any property from Mr. Belloisi?

1  A    If he had anything on him at the time, I am sure we did

2  tell him to empty his pockets and everything; but if we

3  didn't do it initially on the tarmac before we got to the

4  vehicle, we definitely did it in the office.

5  Q    That is for your safety obviously; right?

6  A    And his.

7  Q    You said that you led Mr. Belloisi into the room where

8  you would question him; right?

9  A    Yes.

10 Q    It's a large conference room with a one-way mirror; is

11 that right?

12 A    No.

13 Q    Describe it for us, please.

14 A    The interview room is a smaller room with a desk, two to

15 three chairs.  And there is a window that if you are in the

16 room you cannot see out but if you are on the other side, you

17 can see in.

18 Q    Did CBP officers accompany you to this interview spot,

19 the JNSU office?

20 A    No -- excuse me.  Yes, to the JNSU office but not to the

21 interview room.

22 Q    So all the officers who were at the tarmac followed you,

23 accompanied you not to the interview room but to the JNSU

24 building?

25 A    Not all of the officers, but the ones that were

1    specifically involved in the case.

2    Q    Which ones were those?  Who was that that accompanied

3    you?

4    A    Morrelli, Robinson, and the supervisor that night.

5    Q    Ferrarza?

6    A    Correct.

7    Q    How long after you arrived at the JNSU building did you

8    begin questioning Mr. Belloisi?

9    A    About 5 to 10 minutes after we arrived.

10   Q    By the way, during the ride over, did Mr. Belloisi at

11   some point ask you if he could call a union rep?

12   A    No, not that I recall.

13   Q    Did Mr. Belloisi ask you if he could make a call to his

14   wife?

15   A    He might have.

16   Q    Did he also ask you if he could call an attorney?

17   A    No.

18   Q    Then when you were in the interrogation room at JNSU,

19   you say the first thing that you did was provide Mr. Belloisi

20   his Miranda rights; is that right?

21   A    The first thing I did is I believe we gave him a cup of

22   water.  I introduced myself again as well as Sean Gabay.  We

23   explained who we are, what we do, and what was going on and

24   we wanted to get to the bottom of it.  And then before we

25   asked him any questions, I advised the defendant of his

1   Miranda rights.

2   Q    Those were the rights that were shown to you before as

3   Government Exhibit's 1, the statements of rights; correct?

4   A    Yes.

5   Q    When you say you advised him of his rights, did you read

6   him all of the questions there?

7   A    Yes.

8   Q    And after you read him each question, did you ask him if

9   he understood that particular question?

10  A    Yes.  In fact, I showed him the Miranda rights form in

11  the center of the table and I read it to him while he was

12  looking at it; and after each statement I asked if he

13  understood, and he said yes.

14  Q    Did you ask Mr. Belloisi to initial after each of the

15  questions?

16  A    At the end, yes, I did.

17  Q    And Mr. Belloisi told you he would not initial after any

18  of the questions?

19  A    He told us that he wanted to talk to us, but he refused

20  to sign anything.

21  Q    And I am asking a separate question.

22         Did he refuse to initial after each of the

23  questions?

24  A    Yes.  He refused to initial and sign.

25         MR. COHEN:  Your Honor, may I put Government's 1 in

1   evidence up for the witness to look at?

2          THE COURT:  Of course.

3   Q    You see the Government 1 in evidence; is that right,

4   Agent Maloney?

5   A    Yes.

6   Q    So there is one, two, three, four, five, six, seven

7   statements there; is that right?

8   A    Yes.

9   Q    You are saying that this form that we are looking at

10  right now was in front of Mr. Belloisi?

11  A    Yes.

12  Q    And you read him each of those statements; is that

13  right?

14         THE COURT:  Asked and answered.

15  Q    Now, on the bottom underneath the line here, we have the

16  word "waiver" and there is two empty lines here.

17         I was taken into custody at, and a blank line, and

18  then on, and a blank line.

19         THE COURT:  You need to move it up because he

20  cannot be seen.

21  Q    That was for Mr. Belloisi to fill in; is that right?

22  A    Yes.

23  Q    Did you ask Mr. Belloisi to fill in the blank that comes

24  after the word "at"?  "I was taken into custody at," did you

25  ask him to fill that in?

1   A    No.

2   Q    Did you ask him to fill in the blank line that comes

3   after "on"?

4   A    No.

5   Q    And then the 2027 and the date, did you fill those in?

6   A    I filled those in, yes.

7   Q    Is there a reason you didn't ask Mr. Belloisi to fill in

8   any of these blank lines?

9   A    Well, he refused to sign anything on the document.  So

10  after he refused to sign, I didn't ask him to write anything

11  because he didn't want to.

12  Q    What happens is after he refused to initial these, at

13  the end you said, Would you sign this document; is that

14  right?

15  A    I said, Do you want to talk to us now without an

16  attorney present?  And he said, Yes, I have nothing to hide.

17  I want to talk, but I don't want to sign anything.  And then

18  he didn't sign anything and we didn't push forward to have

19  him sign the document because he already told us that he

20  didn't want to sign it.

21  Q    Okay.  Other than asking him if he understood this

22  document, did you ask him any other questions to determine

23  whether or not he understood what his rights were?

24  A    Can you repeat the question?

25              (Continued on next page.)

1   CROSS-EXAMINATION

2   BY MR. COHEN: (Continuing.)

3   Q     Sure.

4         Other than asking him to sign the document, did you

5   ask him any other questions to determine whether he understood

6   what his rights were?

7   A     Yes.  We read the document and we read each -- you took

8   it off.

9   Q     Sorry.

10  A     We read each statement and asked if he understood and he

11  said yes.

12  Q     The question and answers that were happening inside the

13  interview room at the JNSU, can you tell us, what was the

14  first question you asked him, and was it in narrative form, or

15  was it a question and answer --

16        THE COURT:  We're not going to go there, are we?

17  Seriously?  Like, there are grand jury minutes?  Did you ask

18  this question and were you given this answer?

19        MR. COHEN:  My question is, if the Court will permit

20  it, is whether this was a narrative or whether it was a

21  question and answer.

22        THE COURT:  How did you conduct the interview?

23        THE WITNESS:  I asked the defendant questions, and

24  when he answered them, I took diligent notes.

25        THE COURT:  So there you go.

1 BY MR. COHEN:

2 Q    And at this time, Mr. Belloisi told you he was there to

3 steal some food; is that right?

4 A    He said he went towards the airplane because he was

5 hungry.  He saw the Sky Chef truck near the airplane, and he

6 wanted to go to the airplane to get something to eat and

7 drink.

8 Q    He also told you inside that interview room that after he

9 ate a bag of chips, he noticed that it was warm on the plane;

10 is that right?

11 A    Yeah.  After he ate the chips and drank the soda, he

12 noticed that it was warm on the airplane.

13 Q    And he told you he was the only one on the airplane;

14 right?

15 A    Correct.

16 Q    And, at this point, you knew that was not true; correct?

17 A    At that point, no, I didn't fully believe him.

18 Q    Your -- withdrawn.

19        And he told you that he tried to turn on the air

20 conditioning unit, but it wouldn't go on; is that right?

21 A    Correct.

22 Q    And that he went into the cockpit to try to flip a switch

23 to try to turn it on; is that right?

24 A    Correct.

25 Q    And then when he flipped that switch, he realized that

1   there was a warning or a dummy light or something that

2   indicated it was malfunctioning; is that right?

3   A    Correct.

4   Q    And then he told you that he went underneath the plane to

5   the avionics compartment to try to troubleshoot that light

6   that indicated the AC unit wasn't working; is that right?

7   A    Yes.

8   Q    And he told you when he was underneath in the avionics

9   compartment that he did, in fact, flick a switch that he

10  believed fixed that problem; did he tell you that?

11  A    Yes.

12  Q    And he told you that he noticed an insulation blanket

13  that didn't look proper to him having been an airline mechanic

14  for all those years; right?

15  A    Correct.

16  Q    And he told you he went over to that insulation blanket

17  to try to tap it down to try to put it in its proper place; is

18  that right?

19  A    He tried to fix it, correct.

20  Q    And did he tell you that he moved the insulation blanket

21  in such a way that he was able to see what was under the

22  insulation blanket?

23  A    He said there was something under there, but I don't

24  think he said he saw what was behind there.

25  Q    He just told you that he felt that there was something

1  under there, but he didn't look; is that right?

2  A    I believe so.  My notes could probably clarify that.

3            MR. COHEN:  May I show him his notes, Your Honor?

4            THE COURT:  Please identify what it is that you're

5  showing him.

6            MR. COHEN:  It's Government's 2 in evidence, Your

7  Honor.

8            (The above-referred to exhibit was published.)

9  BY MR. COHEN:

10 Q    Can you see that, Agent Moloney?

11 A    Yes.

12 Q    Please take a -- please read through that and tell me

13 when you need -- when you need me to switch to turn the page.

14           (Pause.)

15 A    You can move it up.

16           (Pause.)

17 A    Okay.  You can turn the page.

18           (Pause.)

19 A    Okay.

20 Q    Do you now know if Mr. Belloisi told you that he observed

21 what was underneath the insulation blanket?

22 A    Yes.  He told us that he didn't exactly see what was

23 behind it.

24 Q    And during this conversation with Mr. Belloisi inside of

25 the interview room at JNSU, you stated that his demeanor was

1    calm; is that right?

2    A    He was very nervous.

3    Q    Earlier you testified that he was calm.  When did he

4    change from calm to nervous?

5    A    No.  The question was what was the demeanor, and it

6    was -- our demeanor was calm.  He was calm.  There was no

7    yelling or screaming or arguing, but he was definitely nervous

8    during the questioning.

9    Q    Did that nervousness start when you got back to the JNSU

10   building?

11   A    No.

12   Q    When did it start?

13   A    When talking about --

14        THE COURT:  How could he say that when he wasn't the

15   only person questioning him?

16        MR. COHEN:  I believe at the --

17        THE COURT:  No.  I'm striking the question.  Move

18   on.

19   BY MR. COHEN:

20   Q    What made you make the conclusion that Mr. Belloisi was

21   nervous?

22   A    He stated he was nervous when the customs officers

23   approached him.

24   Q    How did you get that information?

25   A    He told us.  It's in my notes.

1   Q      Got it.

2          How long did you spend speaking to Mr. Belloisi in

3   the interview room?

4   A      I believe we started at 8:25, and we ended at 11:00 p.m.

5   Q      So approximately two and a half hours, two hours and

6   35 minutes; right?

7   A      Correct.

8   Q      And everything that Mr. Belloisi had told you during that

9   2 hours and 35 minutes is contained in this interview notes

10  that you have?

11  A      Yes.

12  Q      You said that after a while of talking with him, you

13  would leave the room and then come back five to ten minutes

14  later; is that fair?

15  A      Yeah.  There were times we did take a break for him and

16  for us.

17  Q      During that two and a half hours, how many breaks would

18  you say you took?

19  A      I don't know, I can't recall.

20  Q      Is it just standard practice to take a break every 20 or

21  30 minutes?

22  A      Not necessarily.

23  Q      So out of that two hours and 35 minutes, how much of that

24  time was spent in the interview room with Mr. Belloisi?

25  A      Most of it.  At least two hours.

1  Q    After you finished speaking with Mr. Belloisi, you moved

2  him to a cell; is that right?

3  A    Yes.

4  Q    After he was in that cell sometime after midnight,

5  approximately 12:30, you told him that you needed some

6  information -- you needed a number of somebody to contact; is

7  that right?

8  A    Correct.

9  Q    Mr. Belloisi told you that he didn't have anybody's

10 number memorized; is that right?

11 A    Correct.

12 Q    He told you that the numbers he had are in his cell

13 phone; is that right?

14 A    Correct.

15 Q    And he asked to have his cell phone so he could give you

16 his wife's number?

17 A    We asked him if we could look through his phone and he

18 stated that he has nothing to hide and that we could look

19 through it, so he opened up the phone for us so we could look.

20 Q    How would he open up the phone for you?

21 A    I believe he gave us the password.

22 Q    He told it to you, or he did it himself?

23 A    I don't recall.

24 Q    But one way or the other, you got the pass code from

25 Mr. Belloisi.

1  A    Correct.

2  Q    Now, before you went into his phone -- you ultimately did

3  go into the phone and retrieve a number; is that right?

4  A    Yes.

5  Q    That was the number to his wife whose name he told you;

6  is that right?

7  A    Yes.

8  Q    So you knew where to look under her name; correct?

9  A    Yes.

10 Q    And prior to actually going into the phone, you asked him

11 to sign permission for you to look in his phone; is that

12 right?

13 A    Yes.

14 Q    And that was before you had looked into the phone.

15 A    Correct.

16 Q    And then Mr. Belloisi was provided a form to sign to give

17 you permission to go into his cell phone; is that right?

18 A    Yes.

19 Q    It's called a Consent to Search form; is that right?

20 A    Yes.

21        MR. COHEN:  It is the Government's evidence

22 Number 3.  May I put it on the monitor, Your Honor?

23        THE COURT:  Yes.

24 BY MR. COHEN:

25 Q    Can you see that, Agent Moloney?

1   A     Yes.

2   Q     Did you hand this form to Mr. Belloisi?

3   A     Yes.

4   Q     Did you read the information on the form to him?

5   A     Yes.

6   Q     Was that before or after you handed it to him?

7   A     I read it with him.  I -- I had it in front of him and

8   myself, and I read it aloud to him as he was reading it.

9   Q     You had one copy that you were, sort of, sharing and

10  looking at together?

11  A     Yes.

12  Q     And these blank lines, the first one is:  "I have been

13  informed of my constitutional right not to have a search made

14  of my blank without a search warrant."

15          You read him that?

16  A     Yes.

17  Q     Did you ask him to write in there his cell phone?

18  A     Did I ask him to write in his cell phone number?

19  Q     No.  To write in the word "cell phone."  The purpose of

20  this line is to indicate what you were looking to search;

21  isn't that right?

22  A     Yes.

23  Q     Did you ask him to write in the property you wanted to

24  search; in this case, his cell phone?

25  A     No.

1  Q    When you asked him -- read him the second line, did you

2  ask him to write in the term -- word "cell phone" there?

3  A    No.

4  Q    You read him the third line as well; correct?

5  A    Correct.

6  Q    And on the fourth question, there's a line here that also

7  would be cell phone.  Did you ask him to write cell phone in

8  there?

9  A    No.

10 Q    And then you asked him to sign on the bottom; is that

11 right?

12 A    Yes.

13 Q    And you explained to him that signing here will give us

14 consent to go in so we could make sure that this is done the

15 proper way and have the proper documentation; right?

16 A    We had told him that we would like to search your phone.

17 I read all these statements to him.  He said that he

18 understood his rights, he gave verbal consent to us to search

19 it, but he did not want to sign or write anything on the form.

20 Q    Other than what you have written in on the bottom -- and

21 when did you write that in on the bottom -- the handwritten on

22 2/5/2020, when was that written in?

23 A    I wrote it on 2/5/2020.

24 Q    And that was after Mr. Belloisi had refused to sign

25 anything; is that right?

1   A     That was after he gave verbal consent to look at his

2   phone but refused to sign the form.

3   Q     And at no time prior to 11:00 p.m. on that day did

4   Mr. Belloisi ever ask you for an attorney; right?

5   A     No.

6   Q     Agent Moloney, you testified several times today that

7   Mr. Belloisi was not under arrest until after you brought him

8   back to the JNSU Unit; he was not under arrest when you began

9   questioning him after he refused to sign the Miranda form; is

10  that right?

11  A     He was not under arrest at the time.

12  Q     Let me rephrase --

13          THE COURT:  At what time was he formally placed

14  under arrest?

15          THE WITNESS:  May I answer?

16          THE COURT:  Yes.

17          THE WITNESS:  I believe it was 11:48 p.m.

18  BY MR. COHEN:

19  Q     It was not at 8:00 p.m. that Mr. Belloisi was placed --

20          THE COURT:  You are not going to do that.  You are

21  not going to tick down the minutes before -- what was it,

22  11:35?

23          THE WITNESS:  11:48.

24          THE COURT:  -- 11:48.

25          MR. COHEN:  It's --

1    THE COURT:  No.

2    MR. COHEN:  -- three hours and 40 minutes.

3    THE COURT:  No.  He was formally placed under arrest

4  at 11:48.

5    MR. COHEN:  I wanted to impeach the witness with a

6  prior document stating otherwise.

7    THE COURT:  I'm going to give you very short leeway

8  to do that, but, you know, I'm not a jury.  I have 43 years of

9  experience handling criminal cases.

10 BY MR. COHEN:

11 Q    One of the reports of investigation that you filled -- a

12 report of investigation you filled out, isn't it true that you

13 told -- you reported that Mr. Belloisi's arrest took place at

14 approximately 8:00 p.m.?

15 A    I don't recall that.  I would have to see the specific

16 documentation that you are referring to.

17 Q    Certainly.

18      And didn't you also say that Mr. Belloisi was placed

19 under arrest at Terminal 8, Gate 7?

20      THE COURT:  Are you going to show him the document

21 or not?

22      MR. COHEN:  With the can Court's permission, I will

23 show him document that's in JM6, it's page 4 of 4.  It is a

24 report of investigation entitled "Post-Arrest Interview of

25 Paul Belloisi."

1           May I do so?

2           THE COURT:  Yes.

3           (The above-referred to exhibit was published.)

4    BY MR. COHEN:

5    Q    Do you see this document, Agent Moloney?

6    A    Yes.

7    Q    Do you recognize it?

8    A    Yes.

9    Q    Is it a document that you created?

10   A    Yes.

11   Q    Now, after reviewing this document, isn't it true that

12   Mr. Belloisi was placed under arrest at approximately

13   8:00 p.m.?

14   A    No.  That's what it says, but that's not true.  He was

15   detained at 8:00 p.m. at JFK Airport at Terminal 8, Gate 7.

16   He was officially placed under arrest in the JNSU office at

17   11:48 p.m.

18   Q    So the date, time, and place of arrest -- the date is

19   correct here, but you're saying the time and the place aren't

20   correct; is that right?

21   A    Correct.  That should have been "detained," not "arrest."

22   Q    And in the same document, page 1, when you entitled this

23   report of investigation "Post-Arrest Interview of Paul

24   Belloisi," that's not correct either; is that right?

25   A    That is correct.  That's the terminology that's used.

1  Q    But it was not -- the interview was not post his arrest,

2  as you stated; correct?

3  A    The interview was post detainment, which further led to

4  the arrest.

5           MR. COHEN:  With the Court's permission, I would

6  like to show the witness JM9 in the 3500 material, which is

7  entitled "USM129/312 Prisoner Intake."

8           THE COURT:  Yes.

9           (The above-referred to exhibit was published.)

10  BY MR. COHEN:

11  Q    Can you see this document, Agent Moloney?

12  A    Yes.

13  Q    That was filled out by you; is that correct?

14  A    Correct.

15  Q    And do you see on the bottom third, it says "arrest

16  information"; do you see that?

17  A    Yes.

18  Q    Where it says "location of arrest," it says JFK Terminal

19  8, Gate 7; is that correct?

20  A    Correct.

21  Q    But that's not accurate; is that right?  That is an

22  inaccurate place of arrest?

23  A    Technically, that is where the defendant was detained,

24  and he was officially formally arrested in the JNSU office

25  after we spoke with the United States Attorney and got

1   verification that they officially accepted prosecuting --

2   excuse me -- prosecution, that's when we put the time of

3   11:48 p.m.

4   Q    And on the same document that's in front of you, Agent

5   Moloney, it says, "Date and time of arrest:  2/4/2020 20:00

6   hours," which is 8:00 p.m., so that information on that

7   document is also incorrect; is that right?

8   A    That's -- that's when he was detained.

9   Q    He was not arrested at that time.

10  A    Officially, no.  That was when he was detained.

11        MR. COHEN:  Lastly, Your Honor, with the Court's

12  permission, I would like to show the witness JM5, page 2 of 3.

13        May I do so, Your Honor?

14        THE COURT:  Yes.

15        (The above-referred to exhibit was published.)

16  BY MR. COHEN:

17  Q    Can you see that document, Agent Moloney?

18  A    Yes.

19  Q    That's contained in the Report of Investigation that you

20  filled out; right?

21  A    Yes.

22  Q    This is not a standard form; this is the details that you

23  actually wrote in; is that correct?

24  A    Correct.

25  Q    Drawing your attention to the last line of that document,

1   do you see where it says, "The post-arrest interview will be

2   documented in the subsequent ROI"; do you see that?

3   A    Yes.

4   Q    That's the interview that was conducted in the JNSU

5   building; correct?

6   A    Correct.

7   Q    But it was not -- according to you today, it is not a

8   post-arrest interview; is that right?  It is a post detention

9   interview; right?

10  A    Technically, but based on the official time we got of the

11  prosecution being accepted by EDNY.

12  Q    So, as you sit here today, again, his arrest did not

13  happen at 8:00 p.m.; is that right?

14  A    Officially, he was detained at 8:00 p.m. and he was

15  arrested after EDNY accepted prosecution at 11:48 p.m.

16  Q    Did you write what you just said on the record anywhere

17  that he was arrested only after EDNY accepted prosecution?

18  Did you put that in any of your notes anywhere?

19  A    In my notes?  I don't recall I put them in my notes.

20  Q    Do you need to see anything to make sure that that last

21  statement is true?

22  A    I think somewhere I did document that the time of the

23  arrest was at 11:48 p.m.

24  Q    My question to you -- my only question to you, Agent

25  Moloney, is:  Anywhere in the paperwork that you filled out in

1   connection with Mr. Belloisi's arrest, did you say that the

2   arrest took place only after the EDNY accepted prosecution?

3   A    I don't understand the question, sir.

4   Q    You've testified several times, Agent Moloney, that the

5   arrest --

6            THE COURT:  Did you make a notation anywhere that

7   the defendant was arrested after the U.S. Attorney's Office

8   agreed to take the prosecution?

9            THE WITNESS:  I don't think I made a note of writing

10  down that an arrest was made because EDNY accepted the

11  prosecution.

12           MR. COHEN:  That's all, Your Honor.

13           THE COURT:  Any redirect?

14           MR. POLLACK:  Very briefly, Your Honor.

15           (Pause.)

16           MR. POLLACK:  May I inquire?

17           THE COURT:  Yes.

18  REDIRECT EXAMINATION

19  BY MR. POLLACK:

20  Q    You were asked on cross-examination a few questions about

21  when you first arrived at the airplane on the tarmac, and you

22  were asked how many CBP officers were there talking to the

23  defendant, and I think you said there were at least two; is

24  that correct?

25  A    Correct.

1  Q    Do you remember about how long they were talking to him

2  before they told you that he said he was there to fix the air

3  conditioning?

4  A    About five to ten minutes.

5  Q    Do you recall how they were standing and how far they

6  were from the defendant?

7  A    The two initial officers were right in front of the

8  defendant.

9  Q    And where were the other CBP officers who were present?

10 A    Back a distance somewhere near myself and Sean Gabay.

11 Q    You were also asked on cross-examination about whether

12 any of those CBP officers went with you to your office, and I

13 think you said that none were in the vehicle with you, but

14 that some did meet up there; is that right?

15 A    Yes.

16 Q    Were there CBP officers there at the tarmac that did not

17 go back to the office with you?

18 A    Yes.

19 Q    And did anyone at all from CBP go into the interview

20 room?

21 A    No.

22 Q    Did any of the CBP officers from the tarmac tell you what

23 questions to ask in the interview room?

24 A    No.

25         MR. POLLACK:  May I briefly confer with my

1  colleague, Your Honor?

2          THE COURT:  Yes.

3          (Pause.)

4          MR. POLLACK:  Nothing further, Judge.

5          THE COURT:  Any redirect?

6          MR. COHEN:  No recross, Your Honor.

7          THE COURT:  I'm sorry, recross.

8          Thank you, Agent.  You can step down.

9          THE WITNESS:  Thank you, Your Honor.

10          (Witness excused.)

11          MR. POLLACK:  Would the Court like me to call the

12  next witness?

13          THE COURT:  No.  It's already almost one o'clock, so

14  why don't we take a lunch break now, let's resume at 2:15, and

15  that will give the Government time, as well, to reach out to

16  whatever CBP officers you need to contact to see when they are

17  available.  I would get a few available dates and -- my

18  calendar is a bit crazy, so just bear with me for a minute.  I

19  would like to get a day when we have at least a clear morning

20  or a clear afternoon.  We have the Memorial weekend coming

21  next week.  As I said, I have time tomorrow if they are able

22  to come in tomorrow, since I did ask the parties to --

23          MR. POLLACK:  To the extent it helps, Your Honor, I

24  can represent that any testimony from CBP officers would be

25  extremely short from the Government's perspective.  Obviously,

1   I can't speak to the cross-examination.

2           THE COURT:  I can put this on for the afternoon

3   of -- like beginning two o'clock on June 10th.  Again, that's

4   subject to the availability of the officers.

5           MR. POLLACK:  We'll propose June 10th, if that's --

6           THE COURT:  Or June 15th.  I have the whole day --

7   oh, I'm sorry.

8           MR. COHEN:  Your Honor, on June 10th, I have a

9   sentencing at EDNY in Central Islip.

10          THE COURT:  Okay.  Forget it.  June 17th is

11  available.

12          MR. COHEN:  That's works fine for the defense, Your

13  Honor.

14          THE COURT:  After that, we're really pushing this

15  out more just because of the schedule.  I have other

16  suppression hearings and sentences.  Let's see if we can do it

17  tomorrow and -- when did I say?

18          MR. POLLACK:  June 17th.

19          THE COURT:  -- June 17th.

20          MR. POLLACK:  I will check their availability, Your

21  Honor.

22          THE COURT:  I would like to say the afternoon of

23  June 16th.  The problem is that I have a sentencing in a case

24  where I have sentenced co-defendants, and not one of those

25  sentences has gone quickly in under an hour, so I'm afraid

1  that there might be spillover.  One was nearly three hours,

2  and the other one was more than an hour.  Okay.  Let's try to

3  shoot for tomorrow, if at all possible, and if not, June 17th,

4  okay?

5          MR. POLLACK:  I will try to confirm that.

6          Thank you.

7          THE COURT:  Okay.  I will see everybody back here at

8  2:15.

9          Thank you.

10          I don't know if you all left anything on the

11  evidence thing there.

12          THE COURTROOM DEPUTY:  I don't think so.

13          THE COURT:  If you do get them to do the 17th, let's

14  try to do it in the morning.

15          MR. POLLACK:  Okay.  Understood, Judge.

16          (Lunch recess.)

17

18

19

20

21

22

23

24

25

1              **AFTERNOON SESSION**

2              (In open court.)

3              THE DEPUTY CLERK:  Suppression hearing, Untied

4    States v. Paul Belloisi.

5              Please state your appearances.

6              MR. POLLACK:  Robert Pollack for the United States.

7    I am accompanied by my colleague AUSA Rolle.

8              Good afternoon, Your Honor.

9              MR. COHEN:  David Cohen and Benjamin Simpson on

10   behalf of the defendant, Paul Belloisi.

11             THE COURT:  Welcome back everyone.  I am sure, like

12   I did, all of you were trying to cram in all you could in an

13   hour and 15 minutes.  I do want to remind all members of the

14   public that there is to be no audio and/or video recording of

15   any court proceeding and that violators will be sanctioned.

16             So for the administrative matters, was the

17   government able to reach out to the CBP officers and figure

18   out what the schedule is?

19             MR. POLLACK:  Yes, Your Honor.  I was able to speak

20   with CBP.  With apologies to the Court, they are not

21   available tomorrow.  The morning of June 17th will work.  I

22   will note if it is earlier in the morning, it is better for

23   the government.

24             THE COURT:  Earlier would be better for the Court

25   as well.  10:00.

1        MR. POLLACK:  That's fine.

2        MR. COHEN:  Of course.

3        THE COURT:  10:00 a.m.  6-17 at 10:00 a.m. to

4   continue the hearing.

5        Are there any matters to address before we proceed

6   with the next witness?

7        MR. POLLACK:  Not from the government.

8        MR. COHEN:  Nothing from the defense.

9        THE COURT:  Bring him in.

10        MR. POLLACK:  The government will call Special

11   Agent Sean Gabay.

12        (Witness takes stand.)

13        THE COURT:  You can administer the oath.

14        THE COURTROOM DEPUTY:  Please raise your right

15   hand.

16        (Witness sworn.)

17        THE COURTROOM DEPUTY:  Please state and spell your

18   name.

19        Sean, S-e-a-n; Gabay, G-a-b-a-y.

20        THE COURTROOM DEPUTY:  Thank you.

21        THE COURT:  G-a-b-a-y?

22        THE WITNESS:  Yes, ma'am.

23        THE COURT:  Spell your first name again.

24        THE WITNESS:  Sean, S-e-a-n.

25        THE COURT:  I am going to ask that you keep your

1  voice up nice and loud.  You can adjust the microphone so you

2  are comfortable.  It should pick you up well.

3          You may inquire when you are ready.

4          MR. POLLACK:  Thank you, Your Honor.

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **SEAN GABAY**,

2              called as a witness, having been first duly

3              sworn/affirmed, was examined and testified as

4              follows:

5  DIRECT EXAMINATION

6  BY MR. POLLACK:

7  Q    Good afternoon, Mr. Gabay.

8       Who do you work for?

9  A    Homeland Security Investigation.

10 Q    What is your title?

11 A    Special agent.

12 Q    How long have you been with Homeland Security special

13 agent?

14 A    16 years.

15 Q    On February 4th, 2020, were you assigned to a particular

16 unit?

17 A    Yes.

18 Q    What unit was that?

19 A    I was assigned to JFK Airport's Anti-conspiracy Group.

20 Q    At that time in February of 2020, how long had you been

21 assigned to the conspiracy group?

22 A    A little less than two years.

23 Q    What in general are your duties as a special agent in

24 that group?

25 A    We investigate corrupt airport employees, airport

1   employees that use their position and access to smuggle

2   contraband in and out of the airport.

3   Q    As part of your duties as a special agent, do you

4   sometimes interview people suspected of smuggling narcotics?

5   A    Yes.

6   Q    Can you say approximately how many of these interviews

7   you have participated in?

8   A    Suspect interviews, I think 50 or a hundred or more.  I

9   couldn't put a direct number on it.

10  Q    I would like to direct your attention to February 4th,

11  2020.

12              Are you aware of a criminal case that was initiated

13  that day at JFK?

14  A    Yes.

15  Q    Are you a case agent in that case?

16  A    No, I am not.

17  Q    How would you characterize your role in the case?

18  A    I was assisting Agent John Moloney with the

19  investigation on that day.

20  Q    Did you swear out any affidavits in this case?

21  A    No, I did not.

22  Q    Did you write my reports in this case?

23  A    Yes, case opening.

24  Q    What is a case opening?

25  A    Basically it is the opening report that generate a case

1  number for a case.  Basically it happens in the beginning of

2  a case.

3  Q    Is it made on the day?

4  A    Yes.

5  Q    Did you write any reports related to that one in case?

6  A    No.

7  Q    In preparation for your testimony today, did you review

8  the complaint?

9  A    No.

10  Q    Did you review any affidavits?

11  A    No.

12  Q    Were you working on the evening of February 4th, 2020?

13  A    Yes.

14  Q    Were you working with anyone else?

15  A    Yes.

16  Q    Who?

17  A    Agent Maloney and Jason Brouzakis.

18  Q    Did there come a time that day when you became aware of

19  law enforcement finding drugs at JFK?

20  A    Yes.

21  Q    How did you first become aware of that?

22  A    I received a telephone call from Customs and Border

23  Protection.  I believe it was in the early evening stating

24  that they had found narcotics on an American Airlines flight.

25  Q    Where were you when you received that call?

1   A    I believe I recently had gotten home from work.

2   Q    Do you remember approximately what time that was?

3   A    It was the early.  I couldn't tell you exactly.

4   Q    Did you learn anything from CBP about the plan of

5   action?

6   A    Yes.  They were going to conduct a controlled delivery,

7   attempt a controlled delivery.

8   Q    Can you say what that entails?

9   A    They were going to remove the ten bricks of cocaine that

10  they found and replace it with sham or fake bricks that don't

11  contain drugs.

12  Q    And was it your understanding that as part of the

13  controlled delivery, they would do anything else to determine

14  whether somebody had interfered with the sham --

15           MR. COHEN:  Objection, leading.

16           THE COURT:  Sustained as to form.

17  Q    Did you understand that CBP would do anything else as

18  part of the plan of action?

19  A    Yes.  They would place a trip device on the sham so you

20  could tell if -- monitor the frequency so they could tell if

21  it was moved.

22  Q    After you first received this information, what, if

23  anything, did you do?

24  A    I called Agent John Maloney and informed him.

25  Q    What, if anything, did you do after that?

1  A    Responded to the airport.

2  Q    Do you remember approximately when you arrived at the

3  airport?

4  A    I don't know what time.  It was still the early evening.

5  Q    When you got to the airport, what, if anything, did you

6  do?

7  A    Myself and Agent Maloney got into my car and we drove

8  onto the tarmac and then Customs and Border Protection -- we

9  met with the Customs and Border Protection officers.

10 Q    What is your understanding of what those CBP officers

11 were doing at that time?

12 A    They were -- we met with an officer who wasn't directly

13 near the plane or watching it.  He told us that they -- they

14 were the officers that were watching the plane and monitoring

15 the trip device.

16 Q    Did you do anything then to assist in the investigation?

17 A    We sat and waited next to the car with the CBP officer

18 in it.

19 Q    Who was waiting with you?

20 A    It was myself and Agent Maloney.

21 Q    Where were you?

22 A    We were in my GMC Terrain.

23 Q    To your knowledge, was the plane that the drugs were

24 recovered from scheduled to depart to another place?

25 A    Yes.

1  Q    Do you remember what time it was scheduled to depart?

2  A    I don't recall.  It was that evening.

3  Q    Did there come a time when you became aware that someone

4  had entered that aircraft where the drugs had been found?

5  A    Yes.

6  Q    How did you become aware?

7  A    The CBP officer that was next to us told us what

8  happened and we followed him over to the plane.

9  Q    To the best of your recollection, how did the officer

10 tell you?

11 A    I believe he said that the device had tripped.

12 Q    Do you remember approximately what time that was?

13 A    I don't recall exactly what time.

14 Q    Do you remember how long you had been waiting at that

15 location?

16 A    I couldn't put an exact time.  Half hour, 45 minutes.  I

17 couldn't say.  It wasn't a very long time.  We weren't

18 waiting for hours.

19 Q    After you received that information from CBP, what did

20 you and Special Agent Maloney do?

21 A    We responded over to the gate where the plan was at.

22 Q    How did you respond?

23 A    We drove there.

24 Q    Do you remember how long it took you to get there?

25 A    It was pretty quick.  Within a minute or two, I think.

1 Q    What did you see when you first arrived at the plane?

2 A    There was CBP officers and an individual, Mr. Belloisi,

3 on the tarmac next to the plane.

4 Q    Are you able to estimate how long after the first CBP

5 officers arrived that you arrived?

6 A    I believe it was pretty close in proximity.  We were

7 told and then we responded and we were there within a minute

8 or so I would say.

9 Q    When you arrived, what were the CBP officers doing?

10 A    There were some CBP officers talking to Mr. Belloisi.

11 Q    Do you remember approximately how many there were?

12 A    There was, I don't know, maybe 10.  I couldn't say

13 exactly how many.

14 Q    All 10 in the same location?

15 A    In the vicinity of, but not all standing and talking to

16 him, no.

17 Q    Do you remember approximately how many were talking to

18 him?

19 A    I couldn't tell exactly how many.

20 Q    When you arrived was Mr. Belloisi in handcuffs?

21 A    No.

22 Q    Was he physically restrained in any way?

23 A    No.

24 Q    Was anyone yelling?

25 A    No.

1  Q    Did anyone have a weapon out of his holster?

2  A    No.

3  Q    Was it your understanding at that time that Mr. Belloisi

4  was or was not free to leave?

5  A    He was not free to leave.

6  Q    Why was he not free to leave?

7  A    Under the circumstances, he came out of the plane, the

8  trip device had gone off and he was coming from the bay where

9  the narcotics were and we had to investigate further.

10  Q    Was it your understanding at that time he was under

11  arrest?

12  A    No.

13  Q    Was there a time when you spoke with any of the CBP

14  officers?

15  A    Yes.

16  Q    How long after you arrived there did you talk to the CBP

17  officers?

18  A    We were getting information when they were speaking to

19  him.

20  Q    Did you or anyone else ask Mr. Belloisi why he was in

21  the airplane?

22  A    The officers did.

23  Q    How, if at all, did Mr. Belloisi answer that question?

24  A    The CBP told us that he said that he was there to fix an

25  air conditioning.

1  Q    At that time did you consider it plausible that he might

2  have been there in fact in order to fix the air conditioning?

3              MR. COHEN:  Objection.

4              THE COURT:  Overruled.

5  A    Yes, I did.

6  Q    Did you do anything to verify whether that story was

7  true?

8  A    We went and spoke to the pilot.

9  Q    Who went to speak with the pilot?

10 A    Myself and Agent Maloney.

11 Q    What did you learn from speaking with the pilot?

12 A    That there was no problem -- documented problem.  He had

13 a logbook that would have any documented issues with the

14 plane and there was nothing in the logbook and he wasn't

15 aware of any problems with the aircraft.

16 Q    After you and Special Agent Maloney spoke to the pilot,

17 what did you do next?

18 A    We went back down to where Mr. Belloisi was and the

19 Customs officers.

20 Q    What did you when you got down there?

21 A    Explained to Mr. Belloisi that we needed to speak to him

22 further -- we would like to speak to him further.

23 Q    Did you tell him where you were going to speak with him

24 further?

25 A    We have an office at Terminal 4 at the airport.  We were

1  going to bring him there to speak to him outside the tarmac.

2  Q    Is that something called a JNSU office?

3  A    Yes.

4  Q    How far is the JNSU office from the airplane?

5  A    It is probably a five-minute ride on the tarmac.

6  Q    Were you going to drive to get there?

7  A    Yes.

8  Q    Prior to the time when you went to the office, had

9  Mr. Belloisi been in handcuffs at any point?

10  A    No.

11  Q    Had anyone at that point told Mr. Belloisi that he was

12  under arrest?

13  A    No.

14  Q    Did anyone tell Mr. Belloisi that he was not under

15  arrest?

16  A    We did when we were putting him in the car, and

17  explained to him he was being detained.

18  Q    When you say "we did," who is "we"?

19  A    Myself and Agent Maloney.  I am sorry.

20  Q    At that time did Mr. Belloisi ask for a lawyer?

21  A    No.

22  Q    What did you say to Mr. Belloisi when you put him in the

23  car?

24  A    I don't know if myself or Agent Maloney explained that

25  he was not being arrested but he was being detained and we

1  needed to place him in handcuffs to escort him to our JNSU

2  office to speak further.

3  Q    Is it your custom and practice to always place suspects

4  in handcuffs before transporting them?

5  A    Yes.

6  Q    To the best of your recollection, what vehicle did you

7  take?

8  A    GMC Terrain at the time.

9  Q    Who, if anyone, traveled in that vehicle with you?

10 A    It was myself, Agent Maloney, and Mr. Belloisi.

11 Q    Did any of the CBP officers from the tarmac travel with

12 you?

13 A    No.  I don't think so.

14 Q    How would you characterize the tone of your interactions

15 with Mr. Belloisi up until that point?

16 A    I was calm.

17 Q    What happened when you arrived at the JNSU office?

18 A    We walked up into the stairs and into the office,

19 unlocked it.  We placed Mr. Belloisi in the interview room,

20 not handcuffed.

21 Q    Can you describe the JNSU office?

22 A    When you walk in, it's kind of an open area with

23 computers on your left.  There is a bunch of tables pushed

24 together kinda with chairs around them; and to your right

25 there is some -- two bathrooms, two cells; and then past that

1    and to the left is where narcotics are processed in.

2    Q    Can you describe the interview room where you took

3    Mr. Belloisi?

4    A    It is a rectangular room with a table and a few chairs

5    in it.

6    Q    At that time, February of 2020, was the interview room

7    equipped with cameras or recording equipment?

8    A    No.

9    Q    Did you leave the defendant alone in the interview room?

10   A    No.

11   Q    When you brought Mr. Belloisi into the interview room,

12   was he still wearing handcuffs?

13   A    When we brought him in, yes.

14   Q    Did you remove the handcuffs?

15   A    Yes.  We removed his handcuffs when we went in.

16   Q    Once those handcuffs were removed, was he physically

17   restrained in any way?

18   A    No.

19   Q    Did there come a time when you sat down with

20   Mr. Belloisi in that room asking questions?

21   A    Yes.

22   Q    Can you say approximately how long after you and

23   Mr. Belloisi arrived at JNSU that you sat down to ask him

24   questions?

25   A    It was, I believe, within a few minutes.

1  Q    When you sat down to ask those questions, who else was

2  in the room?

3  A    Agent Maloney.

4  Q    So it was just Agent Moloney, yourself and Mr. Belloisi?

5  A    Yes.

6  Q    Can you describe the tenor of your interactions with

7  Mr. Belloisi up until that point?

8  A    It was calm.  Just speaking to him, I was calm.

9  Q    When you sat down for that interview, what was the first

10 thing you did?

11 A    We provided a Miranda rights form.

12 Q    Is it your practice to always provide Miranda before

13 conducting any interview in the JNSU office?

14 A    Yes.

15 Q    Is it your practice to use the standard form with the

16 Miranda on it?

17 A    Yes, it is.

18          MR. POLLACK:  Your Honor, may I show the witness a

19 document that has been admitted as Government Exhibit 1?

20          THE COURT:  Yes.

21 Q    I am showing you a document that has been marked and

22 admitted as Government Exhibit 1.

23          Do you recognize this?

24 A    Yes.

25 Q    What is it?

 1  A     It's the statement of rights form, Miranda form.

 2  Q     Do you recognize any of the signatures on this document?

 3  A     Yes.  My signature is on it.

 4  Q     Do you recognize any other signatures on it?

 5  A     Yes.  Agent Maloney is on it as well.

 6              THE WITNESS:  Can you hear me?

 7              THE COURT:  You might want to keep your voice up a

 8  little more.  You tend to trail off.

 9              Mr. Pollack, you too have a tendency to trail off

10  towards the end.

11              MR. POLLACK:  I will, Your Honor.

12              May I continue?

13              THE COURT:  Yes.

14  Q     Do you remember if you or Special Agent Maloney read

15  this document to Mr. Belloisi at the start of the interview?

16  A     I believe we offered to and provided it to him.  I

17  believe he read it himself.

18  Q     Did you ask him whether he understood it?

19  A     Yes, we did.

20  Q     What did he say?

21  A     He did understand it.

22  Q     Did you ask whether understanding his Miranda rights, he

23  would still agree to speak to you?

24  A     Yes.

25  Q     What did he say?

1  A    He wanted to speak to us, but he didn't want to sign the

2  form.

3  Q    Up until that point or at that point, did Mr. Belloisi

4  ask for an attorney?

5  A    No.

6  Q    Did you and Special Agent Maloney then proceed to

7  interview Mr. Belloisi?

8  A    Yes.

9  Q    Did you take any notes?

10 A    I did not.

11 Q    To the best of your recollection, did Special Agent

12 Maloney take any notes?

13 A    Yes, he did.

14 Q    Why did he take notes but not you?

15 A    It was his case so he wanted to take the notes.

16 Q    Have you ever at any time read the notes that Special

17 Agent Maloney took that day?

18 A    No.

19 Q    Did you ever discuss with Special Agent Maloney the

20 notes that he took?

21 A    No.

22 Q    During the interview, did you ask Mr. Belloisi about his

23 employment?

24 A    Yes.

25 Q    What did he say?

1    A    That he was employed as a mechanic for American

2    Airlines -- I forget how many years.  I believe it was over

3    20.

4    Q    Did you ask Mr. Belloisi where he was assigned to work

5    that day?

6                MR. COHEN:  Objection.

7                THE COURT:  Overruled.

8    A    I believe we did.

9                I believe he was assigned to a hard stand that day.

10   He wasn't assigned to this particular area.  He was

11   assigned -- I can't remember if we got that information from

12   a supervisor before that or we had asked him at some point,

13   but he was not assigned to that plane.  He was assigned to a

14   different area of the terminal.

15   Q    Did you say he was assigned to the hard stand?

16   A    I remember that.  I don't recall if he used that term or

17   if we got that term from speaking to -- Agent Maloney, I

18   believe, spoke to a supervisor there.

19               THE COURT:  I am sorry.  What is that term?  Can

20   you spell that?

21               THE WITNESS:  I don't know if it's an actual -- I

22   am not familiar with the term.  Basically where the plane

23   goes to sit for awhile, but it is not at a gate.

24               THE COURT:  But what did you call it?

25               THE WITNESS:  A hard stand.

1            THE COURT:  A what?

2            THE WITNESS:  S-t-a-n-d.  I am not sure.

3            (Continued on next page.)

1  DIRECT EXAMINATION

2  BY MR. POLLACK: (Continuing.)

3  Q    What is your understanding of what a hard stand is?

4  A    Basically when the planes come into the gate, they have

5  to come in and out; and if they're going to be at a spot for a

6  while -- this is my understanding -- they would park somewhere

7  and park there and -- I don't know how long or...

8  Q    So is it your understanding that the hard stand is a

9  place where planes are that are not at the gate?

10  A    Yes.

11        MR. COHEN:  Objection.

12        THE COURT:  Overruled.

13  A    I don't recall if -- if Mr. Belloisi explained this as a

14  hard stand, or if that's information that we had acquired from

15  his supervisor.

16  Q    Do you recall whether Mr. Belloisi acknowledged that he

17  had no legitimate reason to be at the aircraft where he was

18  found?

19        MR. COHEN:  Objection.

20        THE COURT:  Overruled.

21  A    Yes.

22        THE COURT:  This is the subject of this hearing,

23  what he said.

24        I'm sorry, can you read the question back again,

25  please.

1          (Record read.)

2   A    Yes.

3   Q    Did Mr. Belloisi say why he went to that aircraft in the

4   first place?

5   A    He did.

6   Q    What did he say?

7   A    He said it was common practice for -- for employees to go

8   to the galley of planes and, you know, take chips and soda.

9   He said it was -- you are not allowed to do that, but it was

10  common practice for him and others to do that.

11  Q    Did he say that he, in fact, entered the plane and did

12  that?

13  A    Yes.  He said he went to the galley and had chips and a

14  soda.

15  Q    Did he say whether anyone else was on the plane with him?

16  A    Yes.  There was nobody else.

17  Q    He said there was nobody else?

18  A    Yes.

19  Q    Did he say what -- what, if anything, happened after

20  that?

21  A    He said he noticed that one of the air conditioning packs

22  wasn't -- wasn't working.  I took that to mean that one of the

23  air conditioners wasn't working correctly.

24  Q    Did he say what, if anything, he did then?

25  A    He said that you can fix it in the cockpit, so he went to

1  the cockpit to try to fix it.  I think there was a switch or

2  something that you can try to fix it with.

3  Q    Did he say whether that worked?

4  A    He said it did not work.

5  Q    Did he say whether he did anything after that?

6  A    He said another way to fix that problem is in the

7  avionics bay underneath the plane.

8  Q    Did he say whether he went to the avionics bay of the

9  plane?

10  A    Yes.  He said after he couldn't fix it from there, he

11  went to the avionics bay there to fix it.

12  Q    Did he say what, if anything, happened when he was in the

13  avionics bay?

14  A    He said that he noticed that there was, like, insulation

15  that was -- had like a bump and it was out of place.

16  Q    Did he say what, if anything, happened then?

17  A    He said he pulled it up and straightened it so it fit

18  correctly.

19  Q    Did he say what, if anything, happened then?

20  A    He said at that point CBP officers came to the plane.

21  Q    At any time during the interview, did you and Special

22  Agent Moloney leave the interview room?

23  A    Yes.

24  Q    Why?

25  A    We left the interview room to speak to each other

1  regarding Mr. Belloisi's statements and to speak to CBP

2  regarding the statements.

3  Q    What specifically would you have asked, or did you ask,

4  CBP about Mr. Belloisi's statements?

5  A    Basically, if that's plausible.  Is there -- I'm not an

6  aircraft mechanic, so how the air conditioning -- is there a

7  way to -- we wanted to know if there was a way to fix the air

8  conditioning in the cockpit and then avionics.

9  Q    Was anybody from CBP in the interview room with you?

10  A    No.

11  Q    Did CBP, at any point, tell you any questions to ask?

12  A    No.

13  Q    Did there come a time when Mr. Belloisi asked to speak

14  with an attorney?

15  A    Yes.

16  Q    Do you remember, even approximately, what time that was?

17  A    I couldn't put a time frame on it.

18  Q    Do you remember approximately how long you had been --

19          (Court reporter requested clarification.)

20          THE COURT:  Your voice trails off.  You need to keep

21  your voice up.

22          MR. POLLACK:  I'm sorry, Judge.

23  BY MR. POLLACK:

24  Q    Do you remember approximately how long you had been in

25  the interview --

1    A    It wasn't the middle of the night.  It was still in the

2    evening.  I don't remember exactly the time.  I apologize.

3    Q    After he said he wanted a lawyer, what did you do then?

4    A    We stopped speaking to him.

5    Q    And what happened after the interview ended and you

6    stopped speaking to him?

7    A    At some point he was placed in the cell -- holding cell.

8    Q    After that interview ended, do you remember there being

9    any discussion of the defendant's cell phone?

10   A    Yes.

11   Q    What, if anything, did you learn about that?

12   A    That he consented to Agent Moloney to look at his phone.

13   Q    How did you learn about that?

14   A    Agent Moloney told me that he consented to him looking at

15   his phone and -- I can't remember if Agent Moloney -- if I

16   remember -- if I heard him say this or if I overheard agent --

17   Mr. Belloisi, because it was -- it's kind of an open area in

18   there, you know, that he had nothing to hide.

19   Q    Where was that?

20   A    That would have happened -- I don't remember if I

21   overheard Mr. Belloisi say that or if Agent Moloney told me

22   that he said that.  I can't recall.

23   Q    You just referred to an open area.

24   A    Or, like, the JNSU, kind of, like, processing area that I

25   described earlier with computers and tables, so it's kind of,

1    like, all open.

2         MR. POLLACK:  May I confer with my colleague, Your

3    Honor?

4         THE COURT:  Yes.

5         (Pause.)

6         MR. POLLACK:  I have nothing further, Judge.

7         THE COURT:  Mr. Simpson, who is going to inquire?

8         MR. COHEN:  I'm going to, Your Honor.

9         THE COURT:  Mr. Cohen?

10        MR. COHEN:  Thank you.

11   CROSS-EXAMINATION

12   BY MR. COHEN:

13   Q    Agent Gabay, when you received the first call from CBP,

14   they told you -- did they tell you that there were drugs found

15   on a flight?

16   A    Yes.

17   Q    And did they tell you something -- I didn't hear you

18   exactly right -- that there was a trip device set up?  What

19   terminology did you use, sir?

20   A    I -- I called it a trip device.  I don't -- I don't

21   remember if they told us when we learned, if it was on that

22   initial call, or if on our way to the airport, or when we got

23   there.

24   Q    And you were describing how it works.  Did you know that,

25   or did CBP tell you how it worked?

1  A    No.  I -- I haven't used it before in this sense, but,

2  yes, I'm kind of familiar with it.

3  Q    Okay.  You met up with Agent Moloney in the parking lot

4  of the airport before going to the tarmac; is that right?

5  A    Yes.

6  Q    Then you drove with Agent Moloney to the tarmac together?

7  A    Yes.

8  Q    In your vehicle?

9  A    Yes.

10 Q    And then you said you met up with the CBP officer on the

11 tarmac; is that right?

12 A    In our cars, yes, next to it.

13 Q    Did I hear you that that officer was not directly

14 involved in the observation of the aircraft; is that right?

15 A    Yes.

16 Q    What was that officer's name?

17 A    I don't recall.

18 Q    After meeting with that officer on the tarmac, had you

19 seen that officer again in the evening?

20 A    I believe so.

21 Q    He may have been one of the ten officers that you

22 ultimately observed around the plane when you arrived at the

23 aircraft?

24 A    I would think, yes.

25 Q    And was he one of the officers who was back at the JNSU

1   building with you?

2   A    I'm not a hundred percent sure.

3   Q    You said that you were waiting for some period of time;

4   it was not inordinately long before you got word from CBP that

5   the -- was it the wire was tripped?  What terminology did you

6   learn from CBP when they told you it was time to move?

7   A    Basically that -- that the -- it's basically like a

8   frequency that they're listening to, and when it gets moved,

9   it beeps faster.  That's generally how they work.  I don't

10  know exactly how that one works.

11  Q    How did they communicate the information to you?

12  A    We were parked next to a car that had a CBP officer -- I

13  don't know if there was more than one in there -- I believe he

14  told us.

15  Q    Did he tell you using a phone or a radio, or just tell

16  you in person?

17  A    I think he just told us through the window, if I remember

18  correctly.

19  Q    And then you proceeded with Agent Moloney to drive to the

20  aircraft; is that right?

21  A    Yes.

22  Q    And were you able to see the aircraft from the

23  observation post where you were seated in your car?

24  A    I don't remember knowing exactly which gate it was at or

25  the proximity where we were to exactly where it was.

1    Q    During the time you were sitting in your car with Agent

2    Moloney, did you hear anybody from CBP say to you -- either

3    personally or on the radio -- that there's somebody walking up

4    the jet bridge of the aircraft?

5    A    I don't recall that.

6    Q    Do you recall if they told you that there's somebody who

7    was walking down the jet bridge of the aircraft?

8    A    I don't remember.  This is two years ago.

9    Q    Did the CBP officer tell you that somebody is entering

10   the avionics compartment?

11   A    We were parking next to the CBP officer.  He may have.  I

12   couldn't say for certain right now.

13   Q    So what's the first thing that you can say for certain

14   that you were told that indicated that somebody was a suspect

15   or somebody had tripped the wire, whatever terminology is

16   appropriate for you.

17   A    I can't recall exactly what was said in the car between

18   the CBP officers and us.  They may have told us that.  I just

19   can't recall.

20   Q    And once you got whatever information that cars use to go

21   to drive to the tarmac, the drive to the aircraft was, did you

22   say, one to two minutes, approximately?

23   A    Yes.  It was pretty quick.

24   Q    And when you arrived at the tarmac, could you see

25   Mr. Belloisi at that point -- excuse me.  You had been on the

1  tarmac.

2          When you arrived at the aircraft after leaving your

3  observation post, could you see Mr. Belloisi when you parked

4  your vehicle?

5  A    Yes.  I believe I could see him from -- after we parked

6  and got out of the car.  I don't know exactly where we parked,

7  but we could see him from where the car was -- when we got out

8  of the car, we could see him, yes.

9  Q    Did you walk over to the CBP officers who were next to

10 Mr. Belloisi?

11 A    We were in that area.  We were letting them, kind of, do

12 their thing at the time.

13 Q    Mr. Pollack had asked you if anybody was yelling at him

14 and asked you questions about their interactions.  You were

15 able to hear the discussion between CBP and Mr. Belloisi?

16 A    No.  I couldn't hear exactly what they were asking him.

17 I don't remember being able to hear exactly what they were

18 talking -- how they were talking -- at the initial point, but

19 it didn't -- I don't remember hearing anybody yelling.

20 Q    But do you remember hearing any voices, either

21 Mr. Belloisi's or the CBP officers' who were questioning him?

22          THE COURT:  Okay.  Asked and answered.  If he can't

23 overhear a conversation, he couldn't hear anything, no.

24 Q    When you arrived at the aircraft in your vehicle, did you

25 see any other vehicles -- withdrawn.

1          When you arrived there, were there already other

2     vehicles -- CBP vehicles -- parked there?

3     A     Yes, I believe so.

4     Q     And there were already CBP officers outside of their

5     vehicles; is that right?

6     A     Yes.

7     Q     And CBP, at that time, told you -- I think you said that

8     somebody came out of the bay where the narcotics were found;

9     is that right?

10    A     Yeah.  Something to that effect, yes.

11    Q     And was that told to you in person or over the radio?

12    A     No, I don't believe we were in radio communication with

13    them.

14    Q     So you believe one of the CBP officers told you that?

15    A     Yes.

16    Q     Do you happen to recall who that was?

17    A     I don't.

18    Q     Did you see that there was an airplane tug parked by the

19    aircraft?

20    A     Yes.

21    Q     Did you walk over to that airplane tug with Officer

22    Moloney?

23    A     At some point.  I don't -- yes.  I did go over to the

24    tug, yes.

25    Q     And did you see a tool bag in that tug?

1   A    I did, yes.

2   Q    Did you examine that with Agent Moloney?

3   A    I don't know if I examined it or just looked at it.

4   Q    At any point while you were on the aircraft -- on the

5   tarmac near the aircraft prior to speaking to the pilots, did

6   you have any interactions at all with Mr. Belloisi?

7   A    I don't remember -- I don't believe we spoke to him at

8   that point.

9   Q    And prior to going to speak to the American Airlines

10  pilots, did you overhear any of the conversation between

11  Mr. Belloisi and CBP?

12          THE COURT:  Asked and answered.

13          MR. COHEN:  I believe we just asked when he --

14          THE COURT:  Asked and answered.

15  BY MR. COHEN:

16  Q    I know you said you hadn't reviewed any of Agent

17  Moloney's notes in preparation for this hearing today; right?

18  A    That's correct.

19  Q    And at some point, you were asked about what happened

20  in -- withdrawn.

21          On February 18th, 2022, this year, you had a

22  discussion with Mr. Pollack about the arrest of Mr. Belloisi;

23  is that correct?

24  A    I'm not sure of the date, but okay.

25  Q    But you do remember having a conversation with him a few

1  months back about this hearing; is that right?

2  A    Yes.

3  Q    And do you recall -- withdrawn.

4        What motivated you to go to speak to the American

5  Airlines pilot?  Why did you go speak to the American Airlines

6  pilot?

7  A    To investigate if there were any problems with the plane.

8  Q    And who told you that -- to go do that?

9  A    I don't think anybody told us to do it.

10 Q    Somebody told you, did they not, that Mr. Belloisi had

11 said that there was a problem with the plane's air

12 conditioning?

13 A    Yes.

14 Q    So CBP was reporting to you some of the things that

15 Mr. Belloisi had told them; is that right?

16 A    Yes, I believe that's what occurred.

17 Q    They told you that he said that there was a problem with

18 the air conditioning you just said; correct?

19 A    Yes.

20 Q    And he told them a similar -- he told them that he had

21 gone onto the plane to also get something to eat; is that

22 right?

23 A    Yes.

24 Q    And they told you that he told you that; is that right?

25 A    No, I don't believe -- I don't believe we knew that at

1   that point.  I don't remember knowing that until later.

2   Q    And CBP officers told you before speaking to the American

3   Airlines pilot that Mr. Belloisi had claimed to be on the

4   airplane by himself prior to going to the avionics

5   compartment; is that right?

6   A    No.  I don't remember that being specifically told to us.

7   I remember learning that in an interview later on.

8   Q    At some point, that red tool bag that we just discussed

9   was taken into custody; is that right?

10          MR. POLLACK:  Objection.  It's not relevant.

11          THE COURT:  I'm sorry, can you read back the

12   question?

13          (Record read.)

14          THE COURT:  Sustained.  I didn't hear anything in

15   evidence about the color of the tool bag.

16  BY MR. COHEN:

17  Q    At some point, the tool bag that you testified to --

18          THE COURT:  Sustained.

19  Q    Other than the information regarding Mr. Belloisi going

20   into the airplane -- withdrawn.

21          Did CBP tell you why Mr. Belloisi said that he went

22   onto the airplane?

23          THE COURT:  That's been asked and answered.

24          MR. COHEN:  I didn't think it was, Your Honor.  I

25   don't think the witness gave an answer to that question.

1           THE COURT:  He did.

2           MR. COHEN:  As to why he went onto the airplane,

3     Your Honor.

4           THE COURT:  As to who went on the airplane.  The

5     defendant?

6           MR. COHEN:  Yes.

7           THE COURT:  No.

8           MR. COHEN:  Right.  My question is, did CBP tell you

9     what --

10          THE COURT:  Yes, that question has been asked.

11          MR. COHEN:  I know that the witness --

12          THE COURT:  The question has been asked and

13    answered.  Asking the same question ten different ways is

14    still the same question.

15          MR. COHEN:  With all due respect, Your Honor, I

16    don't think I --

17          THE COURT:  Yes, it is the same question.

18    BY MR. COHEN:

19    Q    What did CBP tell you that Mr. Belloisi had told them

20    other than he went to the avionics compartment to try to fix

21    an air conditioning problem?

22    A    I don't recall offhand.

23    Q    And you don't have anything that would help refresh your

24    recollection; is that right?

25    A    That's correct.

1  Q    The one thing that you remember is what you've already

2  testified to that CBP told you -- correct? -- about going to

3  the avionics compartment to fix the air conditioning unit.

4  A    I don't remember when we learned that -- the one thing I

5  know is that -- can you repeat your question?  I'm sorry.

6  Q    That's all right.

7         How about you can tell us -- withdrawn.  I'm going

8  to withdraw the question.

9         You went and spoke to the pilot, and then after you

10 spoke to the pilot, you learned that the -- that they reported

11 to you that there was no air conditioning issue; is that

12 right?

13 A    Yes.  I believe that's correct.

14 Q    And you were speaking to the pilots with Agent Moloney?

15 A    Yes.

16 Q    And who else was up there speaking with the pilots with

17 you?

18 A    I don't remember.  I don't recall.

19 Q    I'm sorry, you gave a name earlier that I didn't catch.

20 Is there an Agent Brouzakis?  Can you tell me who that is?

21 A    Agent Brouzakis was there, I believe, back in JNSU.

22         THE COURT:  Would you happen to know how to spell

23 that agent's name?

24         THE WITNESS:  I could spell it for you, yes.

25         THE COURT:  Could you spell that for us?

1          THE WITNESS:  B-R-O-U-Z-A-K-I-S.

2          THE COURT:  Okay.  Thank you.

3    BY MR. COHEN:

4    Q    Is he an his member?

5    A    Yes.

6    Q    But you think he was only there in the interview -- at

7    JNSU?

8    A    I think he met us over at the JNSU office, yes.

9    Q    Is it fair to say, Agent Gabay, that while you were on

10   the tarmac, you do not recall any debriefing from CBP?

11          MR. POLLACK:  Objection to form.

12   Q    Do you recall being debriefed with CBP while on the

13   tarmac?

14   A    You mean them talking to us?

15   Q    Yes.

16   A    We spoke to them, yes, on the tarmac.  They were there

17   too.

18   Q    Now, I'm using the term "debrief."  I know that that's a

19   term of art, but I believe -- is it correct to say that you

20   reported to the Government that you do not recall being

21   debriefed by CBP while on the tarmac?

22   A    I don't -- you mean now?  I'm confused again.

23   Q    Sure.

24          Well, we spoke about an interview a few months ago

25   that you had with Mr. Pollack regarding the incident on

1  February 4th, 2020; correct?

2  A    Yes.

3  Q    Okay.  And did you tell Mr. Pollack that you do not

4  recall a debrief with CBP on the tarmac?

5  A    I guess it depends -- I don't recall saying that, but we

6  had spoken to CBP with -- I don't -- I don't remember the

7  specific question from talking to Mr. Pollack, but, I mean, we

8  spoke to CBP officers on the tarmac the day of, but I wouldn't

9  call it debrief.  We were speaking to them.

10  Q    How long after you arrived at the aircraft did you

11  ultimately go speak to the pilots?  How much time?

12  A    I couldn't say.

13  Q    Was it less than a half hour?

14  A    I really don't want to say for sure.  I apologize.

15  Q    And when you were speaking with the airplane pilots, did

16  any of the -- either the pilot or the co-pilot go to check the

17  logbook that you were discussing to see if there was any

18  malfunction of an air conditioning unit?

19  A    Yeah.  I believe they had the logbook, if I remember

20  correctly.

21  Q    And you believe that they checked that before telling you

22  that nothing was in the logbook?

23  A    Yes.

24  Q    When you went back to the -- you did go back to the

25  tarmac around Mr. Belloisi and CBP after you spoke with the

1    pilots; is that right?

2    A    Yes.

3    Q    And did you go over and report to CBP what the airplane

4    pilot had told you?

5    A    I don't know if I did or Agent Moloney -- we may have.  I

6    don't remember.

7    Q    You had a conversation with CBP post speaking to the

8    pilot and before you took Mr. Belloisi into custody?

9    A    I can't say for certain.  I'm sure we did.

10   Q    And when you came back from speaking to the pilot and

11   came to the tarmac again, can you describe where Mr. Belloisi

12   was, please?

13   A    I can't describe exactly where he was at that time.  I

14   believe he was in the same area he was before.

15   Q    Was he near CBP agents?

16   A    Yes.

17   Q    But he was not in handcuffs like you stated; correct?

18   A    No, he was not.

19   Q    Do you know if, at that point, Mr. Belloisi's phone had

20   been taken from him?

21   A    I don't recall that.

22   Q    Do you know if at that point Mr. Belloisi's American

23   Airlines ID had been taken from him?

24   A    I don't recall that either.

25   Q    Do you know if later on when you went to the JNSU Unit

1   that Mr. Belloisi had his phone with him?

2   A    I don't remember that either.

3   Q    You don't remember one way or the other?

4   A    If he had his phone in -- like, on his person?

5   Q    Right.

6   A    I don't remember.

7   Q    Okay.  And do you know if when you got back from the JNSU

8   Unit he had his American Airlines ID on his person?

9   A    I don't remember that either.

10  Q    You said that Mr. Belloisi was handcuffed by either you

11  or Agent Moloney before going in your vehicle; is that right?

12  A    That's correct.

13  Q    And is it fair to say that you basically took custody of

14  him from CBP at that point; right?

15  A    He was being detained and they put him in my car, but

16  they came back to JNSU as well.

17  Q    They did -- so when you described getting to JNSU and

18  walking up the stairs to go to JNSU, CBP officers were right

19  there with you?

20  A    I don't know if they were right there with us or we got

21  there first.  I don't -- I don't remember.  I don't think -- I

22  really couldn't say for certain.

23  Q    But you remember them being in the JNSU office while you

24  were questioning Mr. Belloisi in the separate interview room?

25  A    Yes.  They would be in there processing the procedure.

1  Q    And were those some of the same officers who were on the

2  tarmac earlier?

3  A    I believe so.

4       THE COURT:  Would seized narcotics be processed at

5  the JNSU office?

6       THE WITNESS:  Yeah.  There's an area -- another room

7  where drugs get processed and weighed and then put -- dropped

8  into a secure, like, bolted area.

9       THE COURT:  Regardless of where they're found in the

10  airport?

11       THE WITNESS:  Most times, yes.  If they're saying --

12  yes, they would get put there if a passenger or something like

13  that was arrested with drugs, they would, yes.

14  BY MR. COHEN:

15  Q    Did you escort Mr. Belloisi up to the JNSU Unit?

16  A    I believe, yes.

17  Q    And that's with Agent Moloney as well?

18  A    Yes.

19  Q    And when you got inside the JNSU Unit -- is there, like,

20  an anteroom before you go into the interview room?

21  A    A what room?  I'm sorry.

22  Q    Is there a room that you -- I called it an anteroom, but

23  there's an interview room which is separate from the initial

24  room that you walk into in the JNSU Unit; is that right?

25  A    Yes.  There's a door -- sorry.  Yes, there's -- you walk

1   into an open area, and then -- it's hard to describe with my

2   hands.  Yes, it's as you walk through, pass to the right,

3   there's another door.  I mean, there's a few -- it's across

4   from the -- the processing room, but yes.

5   Q    And is it a common -- well, did you, that day, have

6   Mr. Belloisi, for instance, empty all of his pockets and give

7   you all of the property he has before going into the interview

8   room?

9   A    I don't remember exactly if we did that.  I don't recall

10  exactly.

11  Q    Do you recall receiving any of Mr. Belloisi's property

12  from CBP officers?

13  A    Receiving?

14  Q    Receiving any of Mr. Belloisi's property from CBP

15  officers.

16  A    Agent Moloney would have received property from --

17  Q    I'm sorry?

18  A    Agent Moloney would have taken custody of that property

19  from -- from Mr. Belloisi.

20  Q    So you don't -- because when I -- I had asked you about

21  the phone and the ID, but you don't know if --

22  A    I -- you go.  I'm sorry.

23  Q    -- if CBP had taken that, or if Agent Moloney had taken

24  that?

25              THE COURT:  That's been gone over already.  Move on.

1   Q    Did Mr. Belloisi have on his American Airlines jacket

2   when he got to the JNSU Unit?

3   A    I don't remember if he was wearing it at the time, but

4   there was an American Airlines jacket that he did have, yes.

5   I don't remember if he had it on in the office, though.

6   Q    You're not sure if you or Agent Moloney removed it or if

7   somebody else did at some point?

8   A    That's correct.  It was February, though, so...

9   Q    When you were inside the interview room discussing things

10  with Mr. Belloisi, it was only you and Agent Moloney in there

11  with him; correct?

12  A    Yes.

13  Q    And, now, Mr. Pollack had asked you, once he was inside

14  that room, was he physically restrained at all and you said

15  no; is that right?

16  A    That's correct.

17  Q    And he was not free to leave, though, either; is that

18  right?

19  A    No, he was not.

20  Q    And in addition to the two agents, you and Agent Moloney

21  inside, there were the other agents outside the door doing

22  other processing work related to this case; is that right?

23  A    CBP officers and Jason Brouzakis at some point.

24  Q    You were speaking with Mr. Belloisi -- you and Agent

25  Moloney -- from approximately 8:25 until about eleven o'clock

1   with some breaks during that time; is that right?

2   A    I -- I don't have -- I don't have the times in front of

3   me.

4   Q    At some point, you said Mr. Belloisi asked to speak with

5   an attorney; is that right?

6   A    Yes.

7   Q    And that was at approximately eleven o'clock when the

8   interview ceased; is that right?

9   A    I don't know at what time the interview ceased.

10  Q    Sure.

11       What was said to Mr. Belloisi immediately proceeding

12  his request to speak to an attorney?

13  A    I don't recall exactly what was said to him.

14  Q    Do you remember him -- the words coming from his mouth

15  asking for an attorney?

16  A    Yes, he did ask for an attorney.  That's why we stopped

17  the interview.

18  Q    What exactly did Mr. Belloisi say?

19  A    I couldn't say exactly what he said.

20  Q    After he asked to speak with an attorney, he was

21  ultimately brought into a holding cell; is that right?

22  A    Yes.  At some point, yes.

23  Q    Was his -- did you have possession -- by "you," I mean

24  did law enforcement officers -- have possession of his cell

25  phone, if you know, before he went into the holding cell?

1  A    Probably, I would have to say.  That would be common

2  practice, yes.

3  Q    He wouldn't likely be bringing that cell phone into a

4  holding cell; is that right?

5  A    No.

6  Q    He probably wouldn't be bringing any of his property into

7  the holding cell; is that right?

8  A    We would, at some point, probably remove his personal

9  property, yes.

10  Q    And "at some point," you mean before going into the

11  holding cell?

12  A    Generally, yes.  But I don't recall in this exact

13  instance, but yes.

14  Q    And were you -- who was the law enforcement officer who

15  went to Mr. Belloisi to ask him for the -- a phone contact --

16  a phone number contact?

17  A    Agent Moloney.

18  Q    Did you hear Agent Moloney ask him that?

19  A    I don't -- no, I did not hear him ask him that.

20  Q    Did you -- were you there when Agent Moloney presented

21  Mr. Belloisi with a -- permission to search the cell phone

22  form?

23  A    No.

24  Q    Did you -- okay.  Withdrawn.

25         MR. COHEN:  One second, please, Your Honor.

1          THE COURT:  Yes.

2          (Pause.)

3  BY MR. COHEN:

4  Q    Other than the information that you said CBP provided you

5  regarding what Mr. Belloisi told them about going to the

6  avionics compartment and going into the airplane, did CBP give

7  you any other information regarding what Mr. Belloisi had told

8  them prior to interviewing Mr. Belloisi?

9  A    I -- there's information that we ascertained from

10  Mr. Belloisi, and there's some information that we learned out

11  on the tarmac, and it's hard to remember which we learned

12  when.

13  Q    You're not sure?

14  A    It's been two years.  I'm sorry.

15  Q    That's okay.  Thank you for your honesty.

16          MR. COHEN:  That's all, Your Honor.

17          THE COURT:  Any redirect?

18          MR. POLLACK:  No, Your Honor.

19          THE COURT:  Thank you.  You may step down.

20          THE WITNESS:  Thank you.

21          (Witness excused.)

22          THE COURT:  So, Mr. Pollack, I gather those are all

23  the witnesses you have for today; correct?

24          MR. POLLACK:  That's correct.

25          THE COURT:  Okay.

1       Does the defense -- I'm just asking for planning

2  purposes -- does the defense anticipate putting on a case for

3  the hearing, presentation of any witnesses?

4       MR. COHEN:  With all candor, Your Honor, we did not,

5  but I think that there's a possibility now that we may be

6  putting on a case.

7       THE COURT:  Okay.  All right.  I just wanted to,

8  kind of, gauge it for planning purposes, scheduling purposes.

9       Are the parties planning to order the minutes of the

10  hearing?

11       MR. POLLACK:  Yes, Your Honor.

12       MR. COHEN:  Yes, Your Honor.

13       THE COURT:  Okay.

14       And if we could get a hardcopy and a PDF.  If you

15  can send the PDF to Christy, that would be appreciated.

16       Okay.  Is there anything else you want to address

17  today?  I think we are all set for the 17th in the morning at

18  ten o'clock.

19       MR. POLLACK:  Nothing else from the Government.

20       MR. COHEN:  Nothing from the defense.

21       Thank you, Your Honor.

22       THE COURT:  Thank you, gentlemen.  Have a great day.

23       (Matter adjourned to June 17, 2022, at 10:00 a.m.)

24                 ooo0ooo

25

1                    I N D E X

2

3    WITNESS                                    PAGE

4

5    JOHN MOLONEY

6        DIRECT EXAMINATION

7        BY MR. POLLACK                          20

8        CROSS-EXAMINATION

9        BY MR. COHEN                            44

10       REDIRECT EXAMINATION

11       BY MR. POLLACK                         102

12   SEAN GABAY

13       DIRECT EXAMINATION

14       BY MR. POLLACK                         110

15       CROSS-EXAMINATION

16       BY MR. COHEN                           132

17

18

19

20

21

22

23

24

25

1                    **E X H I B I T S**

2

3

4     Government's Exhibit 1                          35

5

6     Government's Exhibit 2                          40

7

8     Government's Exhibit 3                          43

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## 1

**1** [15] - 34:4, 34:13, 35:7, 35:11, 37:8, 37:9, 37:10, 74:2, 83:3, 83:25, 84:3, 98:22, 122:19, 122:22, 155:4
**1.1(b** [1] - 3:3
**1.8** [1] - 3:2
**10** [4] - 79:15, 82:9, 116:12, 116:14
**10-minute** [1] - 59:13
**10022** [1] - 1:19
**102** [1] - 154:11
**10:00** [5] - 1:6, 107:25, 108:3, 153:23
**10th** [4] - 1:18, 105:3, 105:5, 105:8
**11** [1] - 52:24
**110** [1] - 154:14
**11201** [2] - 1:15, 1:22
**11:00** [2] - 91:4, 96:3
**11:35** [1] - 96:22
**11:48** [8] - 96:17, 96:23, 96:24, 97:4, 98:17, 100:3, 101:15, 101:23
**12** [1] - 20:15
**12:30** [1] - 92:5
**132** [1] - 154:16
**15** [1] - 107:13
**15th** [1] - 105:6
**16** [5] - 4:7, 4:22, 5:1, 5:7, 110:14
**16th** [1] - 105:23
**17** [1] - 153:23
**17th** [7] - 105:10, 105:18, 105:19, 106:3, 106:13, 107:21, 153:17
**18th** [1] - 138:21

## 2

**2** [8] - 40:2, 40:9, 40:17, 40:20, 89:6, 91:9, 100:12, 155:6
**2/4/2020** [1] - 100:5
**2/5/2020** [2] - 95:22, 95:23
**20** [3] - 91:20, 125:3, 154:7
**20-CR-00219(DLI** [1] - 1:2
**20-CR-219** [1] - 2:3
**2012** [1] - 30:10
**2020** [13] - 21:11, 32:9, 36:19, 43:18, 65:24, 69:25, 70:4, 110:15, 110:20, 111:11, 112:12, 121:6, 144:1
**2020-24** [1] - 3:3
**2022** [3] - 1:6, 138:21, 153:23
**2027** [1] - 85:5
**20:00** [1] - 100:5
**225** [1] - 1:22
**25** [1] - 1:6
**27** [1] - 37:3
**271** [1] - 1:14
**2:15** [2] - 104:14, 106:8

## 3

**3** [7] - 42:7, 42:11, 43:3, 43:7, 93:22, 100:12, 155:8
**30** [2] - 37:2, 91:21
**35** [4] - 91:6, 91:9, 91:23, 155:4

## 3500

**3500** [8] - 5:2, 5:9, 5:14, 16:23, 41:1, 69:1, 69:7, 99:6

## 4

**4** [5] - 21:10, 69:1, 97:23, 118:25
**40** [2] - 97:2, 155:6
**43** [2] - 97:8, 155:8
**44** [1] - 154:9
**45** [1] - 115:16
**4th** [11] - 36:19, 43:24, 49:2, 49:3, 65:24, 69:25, 70:4, 110:15, 111:10, 112:12, 144:1

## 5

**5** [1] - 82:9
**50** [1] - 111:8
**5th** [5] - 43:18, 43:24, 44:1, 49:1, 49:3

## 6

**6-17** [1] - 108:3
**613-2605** [1] - 1:23
**6:00** [5] - 23:10, 51:18, 51:20, 53:1, 59:11
**6:20** [1] - 59:16

## 7

**7** [9] - 46:13, 46:16, 46:19, 47:4, 47:12, 49:13, 97:19, 98:15, 99:19
**718** [1] - 1:23
**75** [3] - 21:15, 52:22, 53:24
**7:20** [3] - 24:4, 60:24, 62:2

## 8

**8** [16] - 22:1, 23:1, 37:11, 46:13, 46:15, 46:19, 47:4, 47:12, 49:12, 54:1, 54:2, 69:1, 69:8, 97:19, 98:15, 99:19
**8:00** [5] - 23:7, 60:7, 96:19, 97:14, 98:13, 98:15, 100:6, 101:13, 101:14
**8:25** [2] - 91:4, 149:25

## 9

**9** [2] - 69:1, 69:8
**950** [1] - 1:18

## A

**a.m** [4] - 1:6, 108:3, 153:23
**abate** [1] - 12:18
**abbreviations** [1] - 69:20
**able** [17] - 24:20, 48:3, 49:7, 49:19, 49:24, 59:4, 61:22, 65:20, 66:7, 88:21, 104:21, 107:17, 107:19, 116:4, 134:22, 136:15, 136:17
**above-referred** [7] - 35:12, 40:21, 43:8, 89:8, 98:3, 99:9, 100:15
**absolutely** [1] - 13:5
**abundance** [2] - 18:16, 44:10
**AC** [3] - 27:18, 38:6, 88:6

**accepted** [6] - 100:1, 101:11, 101:15, 101:17, 102:2, 102:10
**access** [2] - 2:20, 111:1
**accessible** [2] - 2:21, 2:23
**accommodate** [1] - 18:1
**accompanied** [5] - 2:7, 10:2, 81:23, 82:2, 107:7
**accompany** [1] - 81:18
**according** [2] - 9:9, 101:7
**accordingly** [1] - 14:22
**accuracy** [1] - 8:6
**accurate** [5] - 34:21, 40:14, 42:25, 43:21, 99:21
**accurately** [1] - 70:14
**acknowledge** [2] - 37:14, 37:17
**acknowledged** [1] - 127:16
**acknowledges** [1] - 14:7
**acquired** [1] - 127:14
**act** [1] - 15:20
**Acting** [1] - 1:13
**acting** [1] - 45:11
**action** [10] - 22:2, 57:25, 58:1, 58:2, 58:6, 58:18, 59:20, 75:21, 113:5, 113:18
**actual** [1] - 125:21
**ad** [1] - 78:3
**addition** [2] - 6:3, 149:20
**additionally** [1] - 7:13
**address** [4] - 3:12, 6:18, 108:5, 153:16
**addressed** [2] - 15:3, 15:4
**adjourned** [1] - 153:23
**adjust** [2] - 19:19, 109:1
**administer** [1] - 108:13
**Administrative** [1] - 3:3
**administrative** [1] - 107:16
**admissibility** [1] - 14:2
**admissible** [1] - 15:16
**admit** [1] - 10:9
**admitted** [4] - 35:10, 43:6, 122:19, 122:22
**advised** [2] - 82:25, 83:5
**advocate** [1] - 11:10
**affidavits** [2] - 111:20, 112:10
**affirmatively** [1] - 6:2
**afraid** [1] - 105:25
**afternoon** [5] - 104:20, 105:2, 105:22, 107:8, 110:7
**AFTERNOON** [1] - 107:1
**afterwards** [1] - 49:4
**agency** [1] - 16:11
**Agent** [94] - 19:4, 21:24, 24:5, 28:4, 33:5, 33:17, 35:1, 36:3, 36:9, 36:17, 36:20, 39:6, 42:19, 51:17, 51:23, 53:3, 53:13, 53:16, 54:3, 56:13, 57:17, 58:5, 58:21, 59:9, 61:2, 62:19, 62:24, 63:17, 69:16, 71:17, 71:21, 76:7, 84:4, 89:10, 93:25, 96:6, 98:5, 99:11, 100:4, 100:17, 101:24, 102:4, 104:8, 108:11, 111:18, 112:17, 113:24, 114:7, 114:20, 115:20, 118:10, 118:16,

119:19, 119:24, 120:10, 122:3, 122:4, 123:5, 123:14, 124:6, 124:11, 124:17, 124:19, 125:17, 129:22, 131:12, 131:14, 131:15, 131:21, 132:13, 133:3, 133:6, 134:19, 135:1, 138:2, 138:16, 142:14, 142:20, 142:21, 143:9, 145:5, 146:11, 147:17, 148:16, 148:18, 148:23, 149:6, 149:10, 149:20, 149:24, 151:17, 151:18, 151:20

**agent** [18] - 20:13, 20:14, 20:23, 21:4, 33:9, 36:13, 39:15, 45:3, 45:13, 58:13, 58:14, 58:19, 110:11, 110:13, 110:23, 111:3, 111:15, 131:16

**agent's** [1] - 142:23

**agents** [18] - 8:4, 8:8, 9:6, 9:7, 9:9, 9:11, 10:10, 10:22, 10:23, 15:13, 16:7, 17:1, 17:5, 48:6, 65:18, 145:15, 149:20, 149:21

**ago** [3] - 5:3, 135:8, 143:24

**agree** [1] - 123:23

**agreed** [2] - 35:21, 102:8

**aided** [1] - 1:25

**air** [26] - 27:8, 27:10, 28:10, 38:11, 38:14, 67:19, 68:13, 68:16, 71:1, 71:9, 72:15, 76:8, 87:19, 103:2, 117:25, 118:2, 128:21, 128:23, 130:6, 130:7, 139:11, 139:18, 141:21, 142:3, 142:11, 144:18

**aircraft** [25] - 7:25, 8:5, 24:8, 24:14, 51:11, 68:7, 68:12, 115:4, 118:15, 127:17, 128:3, 130:6, 133:14, 133:23, 134:20, 134:22, 135:4, 135:7, 135:21, 136:2, 136:24, 137:19, 138:4, 138:5, 144:10

**airline** [13] - 25:13, 25:14, 25:17, 50:5, 50:13, 71:17, 71:19, 73:8, 73:16, 74:10, 74:11, 74:15, 88:13

**Airlines** [19] - 37:1, 48:7, 49:22, 49:25, 50:9, 50:25, 51:13, 80:1, 80:14, 112:24, 125:2, 138:9, 139:5, 140:3, 145:23, 146:8, 149:1, 149:4

**airplane** [62] - 7:8, 10:11, 24:9, 24:15, 27:20, 37:22, 38:3, 38:5, 46:19, 46:25, 47:12, 49:13, 50:23, 51:20, 51:25, 53:19, 54:11, 59:24, 65:5, 66:3, 66:25, 67:21, 68:18, 71:21, 72:5, 72:8, 72:12, 72:14, 72:24, 72:25, 73:15, 74:13, 74:14, 74:16, 74:19, 74:22, 76:1, 76:8, 76:10, 76:24, 77:2, 78:16, 87:4, 87:5, 87:6, 87:12, 87:13, 102:21, 117:21, 119:4, 137:18, 137:21, 140:4, 140:20, 140:22, 141:2, 141:4, 144:15, 145:3, 152:6

**airplanes** [1] - 79:13

**airport** [19] - 16:13, 21:3, 22:25, 46:3, 46:5, 46:8, 52:12, 52:20, 52:25, 110:25, 111:2, 114:1, 114:3, 114:5, 118:25, 132:22, 133:4, 147:10

**Airport** [8] - 20:19, 21:15, 22:1, 37:3, 45:3, 45:20, 46:10, 98:15

**Airport's** [1] - 110:19

**alert** [1] - 61:10

**alerting** [1] - 62:12

**allow** [4] - 22:19, 51:5, 77:18, 80:21

**allowed** [4] - 37:24, 37:25, 50:1, 128:9

**allows** [1] - 54:17

**almost** [2] - 24:18, 104:13

**alone** [5] - 32:13, 32:14, 39:12, 39:17, 121:9

**aloud** [1] - 94:8

**AMERICA** [1] - 1:2

**American** [19] - 37:1, 48:6, 49:22, 49:25, 50:9, 50:25, 51:13, 80:1, 80:14, 112:24, 125:1, 138:9, 139:4, 139:5, 140:2, 145:22, 146:8, 149:1, 149:4

**amount** [1] - 33:19

**analysis** [1] - 14:13

**angles** [1] - 46:24

**announced** [1] - 23:20

**answer** [8] - 52:8, 77:24, 86:15, 86:18, 86:21, 96:15, 117:23, 140:25

**answered** [10] - 66:12, 74:23, 74:24, 84:14, 86:24, 136:22, 138:12, 138:14, 140:23, 141:13

**answers** [1] - 86:12

**anteroom** [2] - 147:20, 147:22

**Anti** [1] - 110:19

**Anti-conspiracy** [1] - 110:19

**anticipate** [10] - 7:13, 7:23, 9:4, 9:17, 10:20, 10:23, 16:5, 17:2, 18:2, 153:2

**apart** [1] - 44:2

**apologies** [1] - 107:20

**apologize** [12] - 7:22, 10:14, 14:25, 17:25, 19:7, 44:16, 47:7, 51:11, 54:24, 73:24, 131:2, 144:14

**appearances** [2] - 2:5, 107:5

**applicable** [1] - 3:2

**appreciate** [1] - 69:3

**appreciated** [1] - 153:15

**approach** [1] - 75:5

**approached** [2] - 67:10, 90:23

**approaching** [1] - 61:24

**appropriate** [1] - 135:16

**approximate** [1] - 53:1

**area** [14] - 63:15, 71:6, 72:4, 120:22, 125:10, 125:14, 131:17, 131:23, 131:24, 136:11, 145:14, 147:6, 147:8, 148:1

**argued** [1] - 14:11

**arguing** [1] - 90:7

**argument** [2] - 11:13, 12:23

**arguments** [1] - 14:23

**arise** [1] - 41:20

**arrest** [45] - 4:18, 26:22, 26:24, 29:14, 29:16, 29:17, 30:3, 41:25, 46:14, 48:9, 48:14, 48:18, 48:25, 58:11, 69:24, 96:7, 96:8, 96:11, 96:14, 97:3, 97:13, 97:19, 98:12, 98:16, 98:18, 98:21, 99:1, 99:4, 99:15, 99:18, 99:22, 100:5, 101:1, 101:8, 101:12, 101:23, 102:1,

102:2, 102:5, 102:10, 117:11, 119:12, 119:15, 138:22

**Arrest** [2] - 97:24, 98:23

**arrested** [8] - 77:17, 99:24, 100:9, 101:15, 101:17, 102:7, 119:25, 147:13

**arrests** [2] - 16:13, 45:21

**arrival** [1] - 53:18

**arrive** [2] - 52:25, 59:12

**arrived** [57] - 7:25, 8:1, 9:17, 9:18, 9:20, 9:22, 14:9, 17:13, 23:9, 23:10, 23:11, 23:12, 24:12, 24:21, 25:11, 26:1, 30:22, 30:23, 32:25, 33:2, 52:22, 54:4, 54:5, 57:9, 57:14, 59:11, 63:8, 63:11, 63:12, 63:14, 63:19, 64:10, 64:18, 65:1, 65:25, 66:5, 67:15, 82:7, 82:9, 102:21, 114:2, 116:1, 116:5, 116:9, 116:20, 117:16, 120:17, 121:23, 133:22, 135:24, 136:2, 136:24, 137:1, 144:10

**arriving** [1] - 56:16

**art** [1] - 143:19

**ascertained** [1] - 152:9

**aside** [1] - 19:1

**asserted** [1] - 8:19

**asserting** [1] - 7:10

**assess** [1] - 8:16

**assessed** [1] - 65:4

**assigned** [17] - 20:16, 20:20, 21:14, 21:15, 37:4, 37:8, 37:14, 110:15, 110:19, 110:21, 125:4, 125:9, 125:10, 125:11, 125:13, 125:15

**assist** [3] - 22:22, 58:4, 114:16

**Assistant** [1] - 1:17

**assisting** [1] - 111:18

**assume** [2] - 12:23, 40:5

**assumption** [1] - 5:22

**ate** [3] - 38:5, 87:9, 87:11

**attempt** [2] - 8:5, 113:7

**attention** [3] - 21:10, 100:25, 111:10

**Attorney** [2] - 1:13, 99:25

**attorney** [13] - 35:22, 36:1, 39:19, 82:16, 85:16, 96:4, 124:4, 130:14, 150:5, 150:12, 150:15, 150:16, 150:20

**Attorney's** [2] - 51:14, 102:7

**attorneys** [1] - 2:25

**Attorneys** [1] - 1:17

**audio** [2] - 3:4, 107:14

**AUSA** [2] - 2:7, 107:7

**availability** [2] - 105:4, 105:20

**available** [9] - 17:20, 18:9, 18:11, 18:13, 19:1, 104:17, 105:11, 107:21

**Avenue** [1] - 1:18

**avionics** [33] - 23:17, 24:3, 24:14, 27:5, 27:7, 27:17, 38:16, 38:17, 38:19, 59:21, 59:22, 60:13, 61:17, 61:25, 62:3, 62:8, 62:13, 63:4, 66:1, 68:15, 71:2, 88:5, 88:8, 129:7, 129:8, 129:11, 129:13, 130:8, 135:10, 140:4, 141:20, 142:3, 152:6

**aware** [11] - 4:21, 21:20, 21:23, 23:16,

23:19, 111:12, 112:18, 112:21, 115:3, 115:6, 118:15
**awhile** [1] - 125:23

## B

**B-R-O-U-Z-A-K-I-S** [1] - 143:1
**backseat** [3] - 30:13, 79:1, 79:4
**bag** [9] - 38:5, 65:12, 65:13, 68:18, 87:9, 137:25, 140:8, 140:15, 140:17
**ball** [1] - 15:21
**based** [3] - 11:5, 70:14, 101:10
**basis** [1] - 70:16
**bathrooms** [1] - 120:25
**bay** [6] - 117:8, 129:7, 129:8, 129:11, 129:13, 137:8
**bear** [1] - 104:18
**became** [4] - 21:20, 23:16, 112:18, 115:3
**become** [4] - 21:23, 23:19, 112:21, 115:6
**becomes** [1] - 12:16
**beeps** [1] - 134:9
**BEFORE** [1] - 1:10
**began** [2] - 33:20, 96:8
**begin** [1] - 82:8
**beginning** [2] - 105:3, 112:1
**behalf** [2] - 2:11, 107:10
**behind** [4] - 38:24, 44:19, 62:25, 63:1, 88:24, 89:23
**BELLOISI** [1] - 1:7
**Belloisi** [164] - 2:4, 2:12, 9:23, 15:9, 25:16, 26:2, 26:4, 26:15, 29:10, 29:16, 29:20, 29:22, 30:20, 31:11, 31:25, 33:6, 33:13, 33:15, 35:15, 36:1, 36:4, 36:22, 37:1, 37:4, 37:14, 39:12, 39:18, 43:18, 48:9, 51:10, 64:20, 64:22, 64:24, 65:17, 65:24, 66:15, 67:5, 67:11, 68:4, 68:7, 68:17, 68:21, 70:3, 70:8, 70:19, 71:1, 71:6, 75:5, 75:9, 75:17, 75:25, 76:7, 76:11, 76:13, 77:7, 77:22, 78:9, 78:22, 79:19, 79:21, 80:1, 80:11, 80:25, 81:7, 82:8, 82:10, 82:13, 82:19, 83:14, 83:17, 84:10, 84:21, 84:23, 85:7, 87:2, 89:20, 89:24, 90:20, 91:2, 91:8, 91:24, 92:1, 92:9, 92:25, 93:16, 94:2, 95:24, 96:4, 96:7, 96:19, 97:18, 97:25, 98:12, 98:24, 107:4, 107:10, 116:2, 116:10, 116:20, 117:3, 117:20, 117:23, 118:18, 118:21, 119:9, 119:11, 119:14, 119:20, 119:22, 120:10, 120:15, 120:19, 121:3, 121:11, 121:20, 121:23, 122:4, 122:7, 123:15, 124:3, 124:7, 124:22, 125:4, 127:13, 127:16, 128:3, 130:13, 131:17, 131:21, 135:25, 136:3, 136:10, 136:15, 138:6, 138:11, 138:22, 139:10, 139:15, 140:3, 140:19, 140:21, 141:19, 144:25, 145:8, 145:11, 146:1, 146:10, 146:24, 147:15, 148:6, 148:19, 149:1, 149:10,
149:24, 150:4, 150:11, 150:18, 151:15, 151:21, 152:5, 152:7, 152:8, 152:10
**Belloisi's** [15] - 10:6, 47:4, 48:14, 50:23, 53:18, 68:11, 97:13, 102:1, 130:1, 130:4, 136:21, 145:19, 145:22, 148:11, 148:14
**belonged** [1] - 80:11
**BENJAMIN** [1] - 1:20
**Benjamin** [2] - 2:11, 107:9
**best** [8] - 30:8, 35:14, 36:9, 39:21, 62:11, 115:9, 120:6, 124:11
**better** [3] - 15:8, 107:22, 107:24
**between** [8] - 10:17, 11:23, 12:22, 18:20, 44:7, 135:17, 136:15, 138:10
**beyond** [2] - 61:12, 80:20
**big** [3] - 31:5, 31:8, 31:16
**bit** [3] - 28:24, 41:2, 104:18
**blank** [7] - 84:17, 84:18, 84:23, 85:2, 85:8, 94:12, 94:14
**blanket** [9] - 38:22, 38:25, 55:10, 55:17, 88:12, 88:16, 88:20, 88:22, 89:21
**blocks** [1] - 14:24
**blue** [3] - 25:20, 80:17
**bolted** [1] - 147:8
**Border** [4] - 18:6, 112:22, 114:8, 114:9
**bottom** [13] - 15:5, 35:2, 35:23, 43:10, 43:17, 77:1, 77:6, 82:24, 84:15, 95:10, 95:20, 95:21, 99:15
**break** [6] - 12:25, 13:3, 13:8, 18:20, 39:9, 71:20, 91:15, 91:20, 104:14
**breaks** [2] - 91:17, 150:1
**BREON** [1] - 1:13
**bricks** [2] - 113:9, 113:10
**bridge** [2] - 135:4, 135:7
**briefing** [1] - 15:2
**briefly** [3] - 77:18, 102:14, 103:25
**bring** [3] - 72:21, 108:9, 119:1
**bringing** [4] - 5:25, 32:12, 151:3, 151:6
**Brooklyn** [3] - 1:4, 1:15, 1:22
**brought** [10] - 28:22, 32:15, 32:17, 41:9, 75:3, 75:7, 96:7, 121:11, 121:13, 150:21
**Brouzakis** [6] - 21:19, 39:15, 112:17, 142:20, 142:21, 149:23
**Brouzakis's** [1] - 42:19
**building** [8] - 14:23, 79:16, 79:18, 81:24, 82:7, 90:10, 101:5, 134:1
**Building** [3] - 21:15, 52:22, 53:24
**bump** [1] - 129:15
**bunch** [1] - 120:23
**bunches** [1] - 15:2
**BY** [46] - 1:16, 1:20, 20:6, 25:10, 25:25, 28:7, 30:18, 31:23, 32:8, 33:11, 34:6, 34:14, 35:13, 40:7, 41:6, 42:9, 43:9, 43:15, 45:2, 47:8, 86:2, 87:1, 89:9, 90:19, 93:24, 96:18, 97:10, 98:4, 99:10, 100:16, 102:19, 110:6, 127:2, 130:23, 132:12, 138:15, 140:16, 141:18, 143:3, 147:14, 152:3, 154:7,

154:9, 154:11, 154:14, 154:16

## C

**Cadman** [2] - 1:14, 1:22
**calendar** [2] - 2:23, 104:18
**calm** [10] - 26:12, 30:21, 90:1, 90:3, 90:4, 90:6, 120:16, 122:8
**Cambry** [1] - 63:25
**camera** [2] - 48:2, 50:22
**cameras** [8] - 32:10, 46:7, 46:10, 46:18, 48:15, 49:12, 49:21, 121:7
**candor** [1] - 153:4
**cannot** [4] - 52:8, 55:15, 81:16, 84:20
**car** [13] - 63:16, 114:7, 114:17, 119:16, 119:23, 134:12, 134:23, 135:1, 135:17, 136:6, 136:7, 136:8, 146:15
**cars** [2] - 133:12, 135:20
**case** [35] - 6:4, 6:22, 7:2, 7:12, 10:18, 10:20, 12:21, 13:13, 24:24, 36:13, 48:6, 58:12, 58:13, 58:14, 82:1, 94:24, 105:23, 111:12, 111:15, 111:17, 111:20, 111:22, 111:23, 111:24, 111:25, 112:1, 112:2, 112:5, 124:15, 149:22, 153:2, 153:6
**cases** [5] - 16:14, 16:15, 20:25, 24:24, 97:9
**catch** [2] - 33:8, 142:19
**categorization** [1] - 46:15
**CAUSE** [1] - 1:9
**caution** [2] - 18:16, 44:10
**CBP** [190] - 7:16, 8:1, 8:2, 9:8, 9:19, 9:21, 9:23, 16:4, 16:5, 16:10, 16:14, 17:2, 17:9, 18:6, 18:21, 21:25, 22:3, 22:15, 23:12, 23:20, 24:7, 24:13, 24:20, 25:12, 26:1, 26:2, 27:1, 27:6, 27:17, 28:20, 39:2, 53:4, 53:17, 53:19, 54:5, 54:13, 54:16, 55:19, 55:22, 55:24, 55:25, 56:11, 56:18, 56:21, 56:23, 57:7, 57:16, 57:19, 58:4, 58:25, 59:7, 59:13, 59:20, 59:23, 60:18, 60:23, 61:7, 61:10, 61:18, 61:25, 62:2, 62:14, 62:22, 62:25, 63:10, 63:12, 63:15, 63:20, 63:23, 63:25, 64:2, 64:6, 64:9, 64:19, 65:2, 65:7, 65:8, 65:17, 66:1, 66:14, 66:25, 67:11, 67:16, 67:17, 67:23, 68:3, 68:9, 68:10, 68:11, 68:13, 68:17, 70:3, 70:7, 70:18, 70:25, 71:5, 71:25, 75:3, 75:6, 75:10, 75:11, 75:13, 75:16, 75:19, 75:22, 76:5, 76:10, 77:13, 77:21, 78:2, 78:9, 78:11, 78:15, 79:24, 80:4, 81:18, 102:22, 103:9, 103:12, 103:16, 103:19, 103:22, 104:16, 104:24, 107:17, 107:20, 113:4, 113:17, 114:10, 114:17, 115:7, 115:19, 116:2, 116:4, 116:9, 116:10, 117:13, 117:16, 117:24, 120:11, 129:20, 130:1, 130:4, 130:9, 130:11, 132:13, 132:25, 133:10, 134:4, 134:6, 134:12, 135:2, 135:9, 135:11, 135:18, 136:9, 136:15,

136:21, 137:2, 137:4, 137:7, 137:14, 138:11, 139:14, 140:2, 140:21, 141:8, 141:19, 142:2, 143:10, 143:12, 143:21, 144:4, 144:6, 144:8, 144:25, 145:3, 145:7, 145:15, 146:14, 146:18, 148:12, 148:14, 148:23, 149:23, 152:4, 152:6

**CBP's** [2] - 24:8, 63:7

**ceased** [2] - 150:8, 150:9

**cell** [30] - 41:18, 41:22, 52:10, 52:14, 52:16, 54:15, 61:7, 92:2, 92:4, 92:12, 92:15, 93:17, 94:17, 94:18, 94:19, 94:24, 95:2, 95:7, 131:7, 131:9, 150:21, 150:24, 150:25, 151:3, 151:4, 151:7, 151:11, 151:21

**cells** [5] - 31:7, 41:10, 41:11, 41:13, 120:25

**center** [1] - 83:11

**Central** [1] - 105:9

**certain** [7] - 55:5, 55:6, 69:17, 135:12, 135:13, 145:9, 146:22

**certainly** [5] - 8:19, 16:5, 69:5, 78:6, 97:17

**chair** [1] - 30:24

**chairs** [5] - 31:6, 32:2, 81:15, 120:24, 121:4

**change** [1] - 90:4

**changes** [1] - 13:2

**characterize** [4] - 30:14, 30:19, 111:17, 120:14

**check** [5] - 71:1, 72:19, 73:10, 105:20, 144:16

**checked** [1] - 144:21

**Chef** [2] - 37:21, 87:5

**chief** [6] - 3:4, 6:4, 6:22, 7:3, 7:12, 10:18

**chips** [6] - 38:5, 68:19, 87:9, 87:11, 128:8, 128:13

**chose** [1] - 49:7

**Christy** [1] - 153:15

**circumstances** [3] - 13:2, 13:12, 117:7

**city** [2] - 45:16, 45:19

**civil** [1] - 3:1

**claim** [1] - 8:23

**claimed** [2] - 4:24, 140:3

**claiming** [1] - 14:20

**clarification** [1] - 130:19

**clarify** [6] - 3:16, 5:13, 6:21, 7:1, 9:4, 89:2

**clear** [8] - 5:6, 6:6, 6:12, 14:21, 16:6, 66:20, 104:19, 104:20

**clearly** [2] - 5:23, 18:5

**CLERK** [1] - 107:3

**close** [2] - 65:17, 116:6

**closer** [1] - 4:18

**co** [2] - 105:24, 144:16

**co-defendants** [1] - 105:24

**co-pilot** [1] - 144:16

**cocaine** [2] - 51:24, 113:9

**cockpit** [10] - 27:19, 28:12, 38:13, 67:20, 67:22, 68:14, 87:22, 128:25,

129:1, 130:8

**code** [1] - 92:24

**COHEN** [89] - 1:18, 1:20, 2:10, 35:9, 40:6, 40:19, 43:5, 44:18, 44:22, 44:24, 45:2, 47:7, 47:8, 48:1, 48:19, 57:2, 57:5, 66:22, 68:24, 69:5, 69:8, 69:10, 69:13, 69:15, 70:10, 70:18, 70:23, 73:19, 73:23, 74:2, 76:4, 78:6, 83:25, 86:2, 86:19, 87:1, 89:3, 89:6, 89:9, 90:16, 90:19, 93:21, 93:24, 96:18, 96:25, 97:2, 97:5, 97:10, 97:22, 98:4, 99:5, 99:10, 100:11, 100:16, 102:12, 104:6, 105:8, 105:12, 107:9, 108:2, 108:8, 113:15, 118:3, 125:6, 127:11, 127:19, 132:8, 132:10, 132:12, 138:13, 138:15, 140:16, 140:24, 141:2, 141:6, 141:8, 141:11, 141:15, 141:18, 143:3, 147:14, 151:25, 152:3, 152:16, 153:4, 153:12, 153:20, 154:9, 154:16

**Cohen** [5] - 2:11, 44:20, 77:19, 107:9, 132:9

**colleague** [4] - 2:7, 104:1, 107:7, 132:2

**color** [1] - 140:15

**coloration** [1] - 55:7

**comfortable** [2] - 19:20, 109:2

**coming** [5] - 47:2, 47:9, 104:20, 117:8, 150:14

**comment** [4] - 43:10, 43:14, 43:16, 43:20

**common** [4] - 128:7, 128:10, 148:5, 151:1

**communicate** [2] - 54:12, 134:11

**communicated** [1] - 75:20

**communication** [3] - 62:12, 65:7, 137:12

**comparing** [1] - 5:20

**compartment** [17] - 23:17, 24:3, 27:5, 59:21, 59:22, 60:13, 62:13, 63:5, 68:15, 71:2, 88:5, 88:9, 135:10, 140:5, 141:20, 142:3, 152:6

**complaint** [1] - 112:8

**completed** [1] - 5:5

**completely** [2] - 3:5, 3:6

**compromise** [1] - 22:18

**Computer** [1] - 1:25

**Computer-aided** [1] - 1:25

**computerized** [1] - 1:24

**computers** [2] - 120:23, 131:25

**concedes** [1] - 4:16

**conceding** [1] - 14:16

**conclusion** [1] - 90:20

**conditioner** [1] - 27:11

**conditioners** [1] - 128:23

**conditioning** [24] - 27:8, 28:10, 38:12, 38:14, 67:19, 68:14, 68:16, 71:1, 71:10, 72:15, 76:8, 87:20, 103:3, 117:25, 118:2, 128:21, 130:6, 130:8, 139:12, 139:18, 141:21, 142:3, 142:11, 144:18

**conditions** [1] - 8:25

**conduct** [3] - 58:15, 86:22, 113:6

**conducted** [2] - 7:24, 101:4

**conducting** [2] - 33:23, 122:13

**confer** [2] - 103:25, 132:2

**conference** [4] - 3:21, 4:12, 31:5, 81:10

**confirm** [1] - 106:5

**confused** [1] - 143:22

**connected** [1] - 53:10

**connection** [2] - 2:16, 102:1

**Consent** [2] - 42:15, 93:19

**consent** [7] - 41:21, 43:18, 43:22, 62:5, 95:14, 95:18, 96:1

**consented** [2] - 131:12, 131:14

**consider** [1] - 118:1

**conspiracy** [2] - 110:19, 110:21

**Conspiracy** [4] - 20:19, 20:21, 20:24, 45:6

**constitutional** [2] - 13:4, 94:13

**constitutionality** [3] - 8:16, 15:7, 15:8

**contact** [7] - 41:22, 44:2, 61:7, 92:6, 104:16, 151:15, 151:16

**contain** [1] - 113:11

**contained** [2] - 91:9, 100:19

**contains** [1] - 16:20

**contemporaneous** [1] - 36:6

**content** [1] - 62:11

**context** [1] - 5:18

**continue** [5] - 17:23, 31:21, 32:16, 108:4, 123:12

**continued** [1] - 19:24, 109:5

**Continued** [3] - 47:14, 85:25, 126:3

**continuing** [2] - 86:2, 127:2

**Continuing** [1] - 48:1

**contraband** [3] - 21:1, 21:2, 111:2

**control** [1] - 50:10

**controlled** [4] - 22:5, 22:6, 22:8, 52:2, 58:4, 113:6, 113:7, 113:13

**convenient** [1] - 17:24, 18:15

**conversation** [11] - 26:10, 55:19, 59:13, 71:18, 73:4, 74:19, 89:24, 136:23, 138:10, 138:25, 145:7

**conversations** [4] - 55:24, 55:25, 56:4, 75:19

**copies** [4] - 40:5, 40:23, 40:25, 69:3

**copy** [5] - 28:14, 34:21, 40:14, 42:25, 94:9

**corporate** [1] - 48:7

**correct** [114] - 9:16, 11:7, 11:8, 11:12, 11:20, 11:21, 16:13, 17:11, 17:12, 25:6, 32:7, 37:19, 40:6, 42:1, 45:8, 45:23, 45:24, 46:1, 46:4, 46:9, 46:15, 46:19, 46:25, 48:10, 48:13, 48:17, 50:14, 50:24, 51:18, 51:19, 51:22, 52:3, 53:11, 53:12, 54:1, 54:20, 57:24, 59:14, 59:15, 60:10, 60:11, 60:25, 61:4, 61:22, 61:23, 62:1, 62:21, 64:4, 64:14, 66:4, 66:8, 68:8, 68:23, 69:19, 70:1, 71:11, 72:2, 76:12, 76:17, 77:11, 77:12, 77:22, 78:13, 78:14, 79:25, 82:6, 83:3, 87:15, 87:16, 87:21, 87:24,

88:3, 88:15, 88:19, 91:7, 92:8, 92:11, 92:14, 93:1, 93:8, 93:15, 95:4, 95:5, 98:19, 98:20, 98:21, 98:24, 98:25, 99:2, 99:13, 99:14, 99:19, 99:20, 100:23, 100:24, 101:5, 101:6, 102:24, 102:25, 138:18, 138:23, 139:18, 141:25, 142:2, 142:13, 143:19, 144:1, 145:17, 146:12, 149:8, 149:11, 149:16, 152:23, 152:24
**Correct** [1] - 57:5
**correctly** [4] - 128:23, 129:18, 134:18, 144:20
**corrupt** [1] - 110:25
**counsel** [6] - 4:10, 14:13, 16:22, 40:5, 66:21, 67:7
**couple** [1] - 55:24
**courier** [1] - 16:15
**course** [5] - 4:12, 14:6, 69:16, 84:2, 108:2
**COURT** [201] - 1:1, 2:9, 2:13, 3:11, 3:14, 3:19, 3:25, 5:13, 6:18, 6:24, 7:20, 8:9, 9:3, 9:12, 10:4, 10:12, 10:16, 10:25, 11:9, 11:22, 12:10, 12:21, 13:11, 14:6, 14:15, 15:1, 15:25, 16:9, 16:12, 17:10, 17:14, 17:18, 18:4, 18:10, 18:17, 18:20, 18:25, 19:6, 19:9, 19:19, 24:23, 25:4, 25:7, 25:9, 25:24, 28:1, 28:6, 30:15, 31:12, 31:17, 31:22, 32:6, 33:8, 34:5, 34:10, 35:8, 35:10, 40:3, 40:18, 40:22, 41:1, 41:4, 42:8, 43:4, 43:6, 43:13, 44:14, 44:17, 44:21, 44:23, 47:6, 48:18, 48:23, 50:3, 50:8, 50:12, 50:20, 51:5, 55:23, 57:4, 57:6, 57:11, 61:15, 62:7, 62:10, 66:12, 67:3, 67:9, 67:13, 67:23, 68:2, 69:3, 69:7, 69:9, 69:11, 69:14, 69:20, 70:12, 70:16, 70:20, 70:24, 73:21, 73:25, 74:3, 74:24, 76:2, 76:6, 77:18, 77:24, 78:5, 78:12, 78:19, 80:4, 80:21, 84:2, 84:14, 84:19, 86:16, 86:22, 86:25, 89:4, 90:14, 90:17, 93:23, 96:13, 96:16, 96:20, 96:24, 97:1, 97:3, 97:7, 97:20, 98:2, 99:8, 100:14, 102:6, 102:13, 102:17, 104:2, 104:5, 104:7, 104:13, 105:2, 105:6, 105:10, 105:14, 105:19, 105:22, 106:7, 106:13, 107:11, 107:24, 108:3, 108:9, 108:13, 108:21, 108:23, 108:25, 113:16, 118:4, 122:20, 123:7, 123:13, 125:7, 125:19, 125:24, 126:1, 127:12, 127:20, 127:22, 130:20, 132:4, 132:7, 132:9, 136:22, 138:12, 138:14, 140:11, 140:14, 140:18, 140:23, 141:1, 141:4, 141:7, 141:10, 141:12, 141:17, 142:22, 142:25, 143:2, 147:4, 147:9, 148:25, 152:1, 152:17, 152:19, 152:22, 152:25, 153:7, 153:13, 153:22
**Court** [26] - 1:21, 3:17, 4:11, 7:14, 7:23, 8:16, 13:18, 13:22, 14:1, 14:3, 15:6, 15:9, 16:3, 17:3, 17:9, 17:16, 18:1, 18:14, 18:15, 40:23, 50:17, 86:19,

104:11, 107:20, 107:24, 130:19
**court** [7] - 2:1, 2:21, 3:4, 3:5, 16:16, 107:2, 107:15
**court's** [2] - 2:23, 2:24
**Court's** [6] - 3:20, 13:18, 73:19, 97:22, 99:5, 100:11
**Courthouse** [1] - 1:4
**COURTROOM** [8] - 2:2, 9:11, 19:14, 19:18, 106:12, 108:14, 108:17, 108:20
**courtroom** [1] - 25:17
**covered** [1] - 55:10
**COVID** [1] - 2:17
**cram** [1] - 107:12
**crazy** [1] - 104:18
**create** [1] - 13:3
**created** [1] - 98:9
**CRIMINAL** [1] - 1:9
**criminal** [5] - 2:2, 3:2, 3:3, 97:9, 111:12
**CROSS** [5] - 45:1, 86:1, 132:11, 154:8, 154:15
**cross** [3] - 102:20, 103:11, 105:1
**CROSS-EXAMINATION** [5] - 45:1, 86:1, 132:11, 154:8, 154:15
**cross-examination** [3] - 102:20, 103:11, 105:1
**CRR** [1] - 1:21
**cup** [2] - 30:25, 82:21
**custodial** [8] - 4:17, 11:18, 12:15, 13:16, 13:22, 14:12, 17:6, 17:7
**custody** [17] - 8:20, 8:25, 11:16, 14:18, 14:19, 14:21, 17:4, 50:4, 50:5, 62:6, 84:17, 84:24, 140:9, 145:8, 146:13, 148:18
**custom** [1] - 120:3
**Customs** [5] - 18:6, 112:22, 114:8, 114:9, 118:19
**customs** [2] - 20:25, 90:22

# D

**dangerous** [1] - 79:12
**Date** [1] - 100:5
**date** [6] - 18:16, 73:6, 85:5, 98:18, 138:24
**dates** [1] - 104:17
**DAVID** [1] - 1:20
**David** [2] - 2:11, 107:9
**days** [1] - 49:6
**deal** [2] - 15:25, 16:11
**debrief** [3] - 143:18, 144:4, 144:9
**debriefed** [2] - 143:12, 143:21
**debriefing** [1] - 143:10
**decided** [3] - 27:19, 29:9, 38:11
**deciding** [1] - 14:1
**decision** [2] - 15:18, 60:17
**deck** [1] - 71:9
**defendant** [60] - 1:8, 3:23, 4:3, 4:16, 5:18, 8:20, 9:1, 10:1, 10:3, 10:19, 11:12, 11:15, 12:1, 12:19, 13:1, 13:2, 14:8, 14:16, 14:17, 17:3, 17:8, 25:23, 27:4, 27:6, 28:22, 30:1, 30:13, 31:7,

31:8, 32:12, 33:7, 33:20, 39:17, 41:7, 41:21, 42:2, 51:1, 57:14, 63:11, 64:21, 67:18, 67:23, 67:25, 68:13, 71:16, 75:4, 75:7, 77:17, 78:24, 80:16, 82:25, 86:23, 99:23, 102:7, 102:23, 103:6, 103:8, 107:10, 121:9, 141:5
**Defendant** [1] - 1:18
**defendant's** [6] - 8:23, 10:25, 11:2, 11:14, 41:17, 131:9
**defendants** [5] - 9:22, 10:2, 10:5, 11:11, 105:24
**Defense** [1] - 68:25
**defense** [21] - 4:7, 4:13, 4:19, 4:21, 5:1, 5:12, 5:20, 5:25, 6:6, 8:19, 14:3, 14:13, 15:3, 15:6, 16:22, 69:4, 105:12, 108:8, 153:1, 153:2, 153:20
**definitely** [3] - 56:7, 81:4, 90:7
**deliberate** [3] - 12:17, 13:24, 13:25
**delivery** [8] - 22:5, 22:7, 22:8, 52:3, 58:4, 113:6, 113:7, 113:13
**demand** [1] - 4:11
**demeanor** [3] - 89:25, 90:5, 90:6
**DENISE** [1] - 1:21
**DeniseParisi72@gmail.com** [1] - 1:23
**depart** [4] - 23:3, 23:6, 114:24, 115:1
**department** [4] - 61:17, 61:25, 62:3, 66:2
**Department** [1] - 20:10
**depicted** [1] - 50:23
**DEPUTY** [9] - 2:2, 19:11, 19:14, 19:18, 106:12, 107:3, 108:14, 108:17, 108:20
**describe** [14] - 26:10, 31:2, 31:10, 31:24, 54:3, 62:11, 79:9, 81:13, 120:21, 121:2, 122:6, 145:11, 145:13, 148:1
**described** [4] - 49:21, 51:9, 131:25, 146:17
**describing** [1] - 132:24
**designed** [1] - 12:18
**desk** [1] - 81:14
**detail** [1] - 12:4
**details** [1] - 100:22
**detained** [13] - 29:18, 30:3, 51:2, 51:10, 98:15, 98:21, 99:23, 100:8, 100:10, 101:14, 119:17, 119:25, 146:15
**detaining** [1] - 76:20
**detainment** [1] - 99:3
**detention** [6] - 4:18, 41:24, 47:5, 48:8, 50:23, 101:8
**determination** [1] - 15:7
**determine** [11] - 8:6, 13:7, 13:14, 13:24, 17:19, 18:13, 22:13, 60:16, 85:22, 86:5, 113:13
**determined** [3] - 58:8, 58:21, 75:21
**determining** [1] - 13:18
**device** [17] - 22:16, 22:19, 24:7, 54:8, 54:13, 59:23, 60:24, 61:1, 62:14, 78:13, 78:14, 113:19, 114:15, 115:11, 117:8, 132:18, 132:20
**devil's** [1] - 11:10

**difference** [1] - 11:23
**different** [7] - 6:16, 15:19, 15:20, 46:24, 49:2, 125:14, 141:13
**diligent** [1] - 86:24
**diminish** [1] - 12:18
**DIRECT** [5] - 20:5, 110:5, 127:1, 154:6, 154:13
**direct** [7] - 21:10, 53:8, 61:13, 79:6, 80:20, 111:9, 111:10
**direction** [1] - 76:25
**directly** [12] - 7:15, 9:20, 10:21, 45:18, 55:25, 56:3, 58:24, 62:25, 63:1, 114:12, 133:13
**disclosed** [10] - 4:10, 5:1, 5:4, 5:11, 5:14, 5:15, 5:24, 6:9, 6:14
**disclosures** [5] - 4:7, 4:8, 4:23, 5:8
**discuss** [2] - 36:20, 124:19
**discussed** [12] - 53:3, 53:6, 57:21, 58:5, 58:10, 58:19, 59:20, 60:1, 60:4, 60:12, 74:22, 140:8
**discussing** [2] - 144:17, 149:9
**discussion** [5] - 41:17, 41:20, 131:9, 136:15, 138:22
**distance** [7] - 23:14, 23:15, 23:22, 58:23, 65:25, 66:5, 103:10
**distancing** [2] - 2:15, 2:17
**distinction** [2] - 10:13, 10:17
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [1] - 1:14
**docket** [1] - 2:3
**document** [42] - 5:13, 34:4, 34:9, 34:11, 34:15, 34:21, 34:23, 35:15, 35:24, 40:2, 40:8, 40:10, 42:7, 42:10, 42:12, 42:16, 42:21, 43:23, 74:1, 85:9, 85:13, 85:19, 85:22, 86:4, 86:7, 97:6, 97:20, 97:23, 98:5, 98:9, 98:11, 98:22, 99:11, 100:4, 100:7, 100:17, 100:25, 101:22, 122:19, 122:21, 123:2, 123:15
**documentation** [2] - 95:15, 97:16
**documented** [5] - 28:11, 72:17, 101:2, 118:12, 118:13
**done** [2] - 62:10, 95:14
**door** [4] - 39:16, 147:25, 148:3, 149:21
**doorway** [1] - 39:16
**DORA** [1] - 1:10
**down** [22] - 19:6, 32:22, 33:3, 33:15, 39:4, 71:2, 71:20, 75:6, 75:8, 77:4, 88:17, 96:21, 102:10, 104:8, 118:18, 118:20, 121:19, 121:23, 122:1, 122:9, 135:7, 152:19
**downstairs** [3] - 28:19, 38:15, 75:1
**drank** [2] - 38:5, 87:11
**drawing** [1] - 100:25
**Drew** [1] - 2:7
**DREW** [1] - 1:16
**drink** [2] - 37:23, 87:7
**drive** [13] - 24:18, 29:4, 29:7, 29:8, 52:12, 53:6, 53:23, 59:13, 63:3, 119:6, 134:19, 135:21
**driver** [1] - 79:5

**driving** [4] - 24:10, 29:22, 30:12, 79:13
**dropped** [1] - 147:7
**drove** [5] - 52:24, 62:19, 114:7, 115:23, 133:6
**drug** [1] - 21:25
**drugs** [17] - 21:5, 21:21, 22:11, 45:25, 52:6, 53:10, 54:18, 54:19, 54:22, 112:19, 113:11, 114:23, 115:4, 132:14, 147:7, 147:13
**due** [1] - 141:15
**duly** [2] - 20:2, 110:2
**dummy** [1] - 88:1
**during** [25] - 13:18, 17:6, 30:2, 36:22, 39:5, 48:15, 53:2, 53:6, 54:16, 61:8, 61:11, 62:22, 63:3, 69:16, 71:16, 79:14, 82:10, 89:24, 90:8, 91:8, 91:17, 124:22, 129:21, 135:1, 150:1
**duties** [4] - 20:23, 21:4, 110:23, 111:3
**duty** [1] - 56:8

**E**

**E-mail** [1] - 1:23
**early** [3] - 112:23, 113:3, 114:4
**easier** [1] - 18:22
**East** [2] - 1:14, 1:22
**EASTERN** [1] - 1:1
**Eastern** [1] - 1:14
**easy** [1] - 36:14
**eat** [4] - 37:23, 68:18, 87:6, 139:21
**EDNY** [6] - 101:11, 101:15, 101:17, 102:2, 102:10, 105:9
**effect** [4] - 7:6, 8:8, 12:18, 137:10
**either** [13] - 26:22, 39:9, 63:1, 63:4, 98:24, 135:2, 136:20, 144:16, 145:24, 146:2, 146:9, 146:10, 149:17
**elapsed** [1] - 66:25
**electronic** [1] - 73:22
**eleven** [3] - 39:23, 149:25, 150:7
**emergency** [2] - 41:22, 44:2
**employed** [1] - 125:1
**employees** [5] - 21:2, 38:1, 110:25, 111:1, 128:7
**employment** [2] - 36:23, 124:23
**empty** [6] - 24:19, 65:12, 65:13, 81:2, 84:16, 148:6
**encounter** [4] - 54:16, 54:21, 57:16, 67:17
**encountered** [2] - 57:13, 63:11
**encountering** [1] - 56:11
**end** [5] - 57:12, 73:3, 83:16, 85:13, 123:10
**ended** [3] - 91:4, 131:5, 131:8
**enforcement** [22] - 3:23, 4:16, 5:5, 7:4, 7:6, 7:8, 8:15, 8:21, 11:25, 12:3, 12:8, 14:9, 15:20, 16:12, 16:16, 17:7, 21:21, 45:15, 46:2, 112:19, 150:24, 151:14
**ensure** [1] - 2:20
**entail** [2] - 22:7, 22:8
**entails** [1] - 113:8
**enter** [1] - 63:4

**entered** [4] - 23:17, 24:3, 115:4, 128:11
**entering** [1] - 135:9
**entire** [4] - 51:1, 51:3, 51:9, 51:12
**entitled** [3] - 97:24, 98:22, 99:7
**equipment** [2] - 32:10, 73:22, 121:7
**equipped** [2] - 32:10, 121:7
**escape** [1] - 60:1
**escort** [2] - 120:1, 147:15
**especially** [1] - 16:15
**ESQ** [5] - 1:13, 1:16, 1:16, 1:20, 1:20
**essentially** [1] - 9:23
**establish** [2] - 10:10, 14:10
**estimate** [2] - 24:20, 116:4
**evening** [6] - 112:12, 112:23, 114:4, 115:2, 131:2, 133:19
**events** [2] - 12:25, 16:6
**eventually** [1] - 57:13
**evidence** [16] - 9:8, 9:10, 35:7, 35:11, 40:17, 40:20, 43:3, 43:7, 43:14, 80:20, 84:1, 84:3, 89:6, 93:21, 106:11, 140:15
**exact** [5] - 12:15, 31:18, 64:15, 115:16, 151:12
**exactly** [30] - 8:22, 14:1, 15:17, 16:22, 41:11, 52:21, 57:15, 67:7, 68:6, 71:18, 89:22, 113:3, 115:13, 116:13, 116:19, 131:2, 132:18, 134:10, 134:24, 134:25, 135:17, 136:6, 136:16, 136:17, 145:13, 148:9, 148:10, 150:13, 150:18, 150:19
**EXAMINATION** [12] - 20:5, 45:1, 86:1, 102:18, 110:5, 127:1, 132:11, 154:6, 154:8, 154:10, 154:13, 154:15
**examination** [4] - 79:6, 102:20, 103:11, 105:1
**examine** [1] - 138:2
**examined** [3] - 20:3, 110:3, 138:3
**exception** [1] - 10:10
**excuse** [4] - 54:24, 81:20, 100:2, 135:25
**Excuse** [1] - 65:8
**excused** [2] - 104:10, 152:21
**Exhibit** [19] - 34:4, 34:11, 34:13, 35:7, 35:11, 40:2, 40:9, 40:17, 40:20, 42:7, 42:11, 43:3, 43:7, 68:25, 122:19, 122:22, 155:4, 155:6, 155:8
**exhibit** [8] - 35:12, 40:21, 43:8, 69:4, 89:8, 98:3, 99:9, 100:15
**Exhibit's** [1] - 83:3
**exhibits** [2] - 40:23, 41:2
**exit** [1] - 63:4
**exited** [1] - 28:18
**expect** [2] - 4:4, 69:6
**experience** [1] - 97:9
**explain** [3] - 9:7, 9:11, 50:17
**explained** [11] - 28:23, 30:2, 33:18, 54:6, 54:8, 82:23, 95:13, 118:21, 119:17, 119:24, 127:13
**explains** [2] - 7:7, 8:3
**extent** [3] - 17:7, 74:18, 104:23
**extra** [2] - 40:24, 56:15

**extrapolation** [1] - 14:21
**extremely** [2] - 44:15, 104:25
**eyes** [2] - 59:4, 62:22

## F

**face** [1] - 19:10
**facility** [1] - 41:24
**facing** [3] - 46:18, 47:12, 49:13
**fact** [11] - 5:7, 6:9, 7:6, 12:2, 13:4, 27:10, 71:6, 83:10, 88:9, 118:2, 128:11
**factors** [1] - 13:14
**facts** [1] - 26:20
**fails** [1] - 14:14
**fair** [12] - 34:21, 40:14, 42:25, 46:3, 53:2, 53:6, 59:16, 62:24, 63:7, 91:14, 143:9, 146:13
**fairly** [1] - 70:14
**fake** [1] - 113:10
**familiar** [5] - 46:3, 46:5, 46:7, 125:22, 133:2
**far** [4] - 29:5, 51:20, 103:5, 119:4
**faster** [1] - 134:9
**February** [22] - 21:10, 32:9, 36:19, 43:18, 43:24, 44:1, 49:1, 49:2, 49:3, 65:24, 69:25, 70:4, 110:15, 110:20, 111:10, 112:12, 121:6, 138:21, 144:1, 149:8
**feet** [1] - 31:20
**felt** [1] - 88:25
**Ferrarza** [3] - 64:3, 72:1, 82:5
**few** [11] - 31:1, 49:6, 58:23, 59:3, 102:20, 104:17, 121:4, 121:25, 138:25, 143:24, 148:3
**figure** [2] - 77:5, 107:17
**fill** [8] - 7:9, 14:24, 84:21, 84:23, 84:25, 85:2, 85:5, 85:7
**filled** [12] - 69:17, 69:22, 69:24, 70:2, 70:13, 85:6, 97:11, 97:12, 99:13, 100:20, 101:25
**fine** [3] - 44:21, 105:12, 108:1
**finish** [4] - 18:14, 67:17, 75:19, 76:4
**finished** [1] - 92:1
**first** [52] - 4:9, 6:1, 8:2, 9:20, 9:21, 12:22, 20:2, 21:23, 24:12, 25:11, 26:1, 31:4, 33:16, 33:17, 34:10, 37:20, 48:23, 48:24, 50:17, 53:23, 55:20, 55:25, 56:10, 57:3, 57:8, 57:9, 57:14, 62:2, 63:10, 63:12, 65:1, 65:23, 67:17, 72:7, 75:5, 76:13, 82:19, 82:21, 86:14, 94:12, 102:21, 108:23, 110:2, 112:21, 113:22, 116:1, 116:4, 122:9, 128:4, 132:13, 135:13, 146:21
**firsthand** [2] - 15:14, 17:10
**firstly** [1] - 6:21
**fit** [2] - 31:18, 129:17
**five** [12] - 4:10, 20:22, 33:2, 45:4, 45:5, 45:7, 45:9, 72:8, 84:6, 91:13, 103:4, 119:5
**five-minute** [1] - 119:5

**fix** [27] - 27:7, 27:18, 38:7, 38:11, 38:13, 38:16, 38:21, 38:24, 67:19, 68:13, 68:16, 71:2, 76:8, 88:19, 103:2, 117:24, 118:2, 128:25, 129:1, 129:2, 129:6, 129:10, 129:11, 130:7, 141:20, 142:3
**fixed** [1] - 88:10
**fixing** [1] - 27:10
**flatbed** [1] - 24:19
**fleeing** [1] - 79:11
**flick** [1] - 88:9
**flight** [4] - 23:3, 71:9, 112:24, 132:15
**flip** [1] - 87:22
**flipped** [3] - 38:14, 38:21, 87:25
**Floor** [1] - 1:18
**focus** [1] - 46:13
**focused** [1] - 46:21
**follow** [5] - 15:22, 15:23, 54:10, 59:25, 78:16
**followed** [5] - 24:8, 62:15, 62:16, 81:22, 115:8
**following** [4] - 4:12, 22:21, 47:14, 62:24
**follows** [2] - 20:4, 110:4
**food** [5] - 68:8, 68:18, 71:6, 71:12, 87:3
**footage** [14] - 47:3, 47:11, 48:22, 49:7, 49:19, 49:22, 50:4, 50:5, 50:6, 50:13, 50:18, 50:22, 51:3, 51:8
**FOR** [1] - 1:9
**forget** [2] - 105:10, 125:2
**form** [28] - 33:25, 34:18, 34:19, 41:23, 42:15, 42:25, 43:11, 50:3, 83:10, 84:9, 86:14, 93:16, 93:19, 94:2, 94:4, 95:19, 96:2, 96:9, 100:22, 113:16, 122:11, 122:15, 123:1, 124:2, 143:11, 151:22
**formally** [3] - 96:13, 97:3, 99:24
**FORMAN** [1] - 1:18
**format** [1] - 125:1
**forth** [2] - 4:6, 6:10
**forward** [2] - 14:13, 85:18
**four** [5] - 31:19, 64:12, 64:15, 64:19, 84:6
**fourth** [1] - 95:6
**frame** [2] - 57:1, 130:17
**free** [8] - 11:15, 26:16, 26:17, 26:19, 117:4, 117:5, 117:6, 149:17
**frequency** [1] - 113:20, 134:8
**front** [14] - 24:13, 28:15, 28:22, 30:16, 31:8, 75:16, 77:2, 79:5, 84:10, 94:7, 100:4, 103:7, 150:2
**fully** [2] - 26:21, 87:17

## G

**G-a-b-a-y** [1] - 108:19
**Gabay** [43] - 4:4, 21:19, 21:24, 24:5, 27:23, 28:5, 30:12, 33:5, 33:10, 33:17, 36:3, 36:9, 36:17, 36:20, 39:6, 51:17, 51:23, 53:3, 53:13, 53:16, 53:22, 54:3, 55:20, 56:6, 56:13, 57:17, 58:21, 61:2, 62:19, 62:24, 63:17, 67:21, 71:17, 71:21, 79:5, 82:22, 103:10, 108:11,

108:19, 110:7, 132:13, 143:9
**GABAY** [3] - 108:21, 110:1, 154:12
**Gabay's** [5] - 35:1, 52:23, 56:2, 58:5, 63:7
**gallery** [1] - 2:18
**galley** [5] - 38:4, 71:6, 72:4, 128:8, 128:13
**gaps** [2] - 14:23, 14:24
**Gate** [10] - 46:13, 46:16, 46:19, 47:4, 47:12, 49:12, 52:24, 97:19, 98:15, 99:19
**gate** [8] - 23:14, 47:11, 50:11, 115:21, 125:23, 127:4, 127:9, 134:24
**gates** [3] - 37:11, 58:23, 59:3
**gather** [2] - 26:20, 152:22
**gathered** [1] - 66:16
**gauge** [1] - 153:8
**general** [2] - 20:23, 44:5, 110:23
**generally** [3] - 36:14, 134:9, 151:12
**generate** [1] - 111:25
**generated** [1] - 16:24
**gentlemen** [3] - 30:6, 77:5, 153:22
**given** [5] - 11:16, 11:17, 13:15, 68:3, 86:18
**gloves** [4] - 80:16, 80:17, 80:18, 80:22
**GMC** [3] - 30:10, 114:22, 120:8
**Government** [41] - 1:13, 3:8, 3:17, 3:21, 3:22, 4:11, 5:3, 5:24, 6:1, 6:5, 6:9, 6:22, 7:2, 8:11, 8:12, 8:17, 8:22, 10:5, 10:7, 11:2, 11:20, 12:5, 12:12, 12:20, 14:7, 14:11, 15:4, 19:4, 34:13, 35:6, 35:7, 40:4, 40:16, 43:2, 83:3, 84:3, 104:15, 122:19, 122:22, 143:20, 153:19
**government** [6] - 50:21, 73:17, 107:17, 107:23, 108:7, 108:10
**Government's** [25] - 4:1, 4:22, 4:24, 5:7, 7:12, 10:18, 34:4, 34:11, 35:11, 40:2, 40:9, 40:17, 40:20, 40:23, 42:7, 42:11, 43:3, 43:7, 83:25, 89:6, 93:21, 104:25, 155:4, 155:6, 155:8
**grand** [1] - 86:17
**great** [1] - 153:22
**grounded** [1] - 37:12
**grounds** [1] - 6:11
**Group** [5] - 20:19, 20:21, 20:24, 45:6, 110:19
**group** [4] - 45:11, 45:17, 110:21, 110:24
**groups** [2] - 45:12, 45:13
**guess** [1] - 144:5

## H

**half** [7] - 20:15, 38:23, 39:16, 91:5, 91:17, 115:16, 144:13
**hand** [7] - 14:20, 19:11, 33:18, 77:10, 80:10, 94:2, 108:15
**handcuffed** [4] - 30:24, 79:14, 120:20, 146:10
**handcuffs** [21] - 26:4, 29:10, 29:22, 30:1, 30:4, 30:6, 32:16, 32:18, 78:23,

78:25, 79:7, 79:10, 116:20, 119:9, 120:1, 120:4, 121:12, 121:14, 121:15, 121:16, 145:17

**handed** [2] - 80:8, 94:6
**handling** [1] - 97:9
**hands** [3] - 55:6, 55:7, 148:2
**handwriting** [7] - 35:2, 35:4, 35:5, 36:15, 42:21, 42:23, 42:24
**handwritten** [2] - 4:8, 95:21
**hanger** [1] - 37:10
**hanging** [1] - 38:23
**happy** [3] - 6:21, 7:1, 17:16
**hard** [8] - 125:9, 125:15, 125:25, 127:3, 127:8, 127:14, 148:1, 152:11
**hardcopy** [1] - 153:14
**head** [4] - 52:8, 59:24, 62:15, 78:16
**headed** [1] - 62:17
**hear** [24] - 7:14, 7:24, 10:21, 12:7, 15:10, 16:4, 17:9, 28:8, 43:14, 65:20, 66:7, 66:11, 123:6, 132:17, 133:13, 135:2, 136:15, 136:16, 136:17, 136:23, 140:14, 151:18, 151:19
**heard** [7] - 7:16, 9:9, 9:23, 16:14, 18:4, 22:3, 131:16
**HEARING** [1] - 1:9
**hearing** [18] - 2:3, 10:22, 13:19, 15:11, 15:16, 16:4, 16:19, 17:17, 17:18, 107:3, 108:4, 127:22, 136:19, 136:20, 138:17, 139:1, 153:3, 153:10
**hearings** [1] - 105:16
**hearsay** [3] - 10:9, 15:15, 61:14
**heavily** [4] - 5:4, 5:11, 5:21, 6:15
**heavy** [1] - 5:16
**help** [2] - 73:14, 141:23
**helps** [1] - 104:23
**hide** [4] - 42:5, 85:16, 92:18, 131:18
**himself** [4] - 33:18, 92:22, 123:17, 140:4
**hold** [8] - 16:4, 17:17, 17:18, 24:19, 24:24, 25:1, 25:2, 37:12
**holding** [10] - 31:7, 41:10, 41:11, 41:13, 131:7, 150:21, 150:25, 151:4, 151:7, 151:11
**holds** [1] - 24:24
**holster** [2] - 26:8, 117:1
**home** [1] - 113:1
**Homeland** [5] - 20:10, 76:15, 110:9, 110:12
**honesty** [1] - 152:15
**Honor** [79] - 2:8, 2:10, 3:10, 3:13, 3:15, 6:20, 9:2, 9:16, 10:15, 12:2, 13:5, 14:5, 16:3, 16:10, 17:25, 18:24, 19:23, 34:3, 35:6, 35:9, 40:1, 40:6, 40:16, 42:6, 43:2, 43:5, 44:13, 44:16, 44:18, 44:19, 44:22, 47:7, 48:19, 49:1, 54:24, 56:25, 57:2, 57:5, 67:6, 68:24, 69:6, 69:10, 69:15, 70:10, 73:23, 74:2, 77:15, 83:25, 89:3, 89:7, 93:22, 100:11, 100:13, 102:12, 102:14, 104:1, 104:6, 104:9, 104:23, 105:8, 105:13, 105:21, 107:8, 107:19, 109:4,

122:18, 123:11, 132:3, 132:8, 140:24, 141:3, 141:15, 151:25, 152:16, 152:18, 153:4, 153:11, 153:12, 153:21
**HONORABLE** [1] - 1:10
**hopefully** [1] - 3:16
**hour** [9] - 61:2, 61:5, 61:8, 61:11, 105:25, 106:2, 107:13, 115:16, 144:13
**hours** [11] - 60:9, 91:5, 91:9, 91:17, 91:23, 91:25, 97:2, 100:6, 106:1, 115:18
**HSI** [16] - 7:24, 8:3, 8:4, 8:8, 9:6, 9:7, 9:9, 9:11, 10:10, 10:22, 10:23, 15:13, 17:1, 20:11, 20:14
**hundred** [4] - 21:9, 45:23, 111:8, 134:2
**hungry** [2] - 37:21, 87:5
**hybrid** [1] - 3:6

---

## I

**ID** [3] - 145:23, 146:8, 148:21
**identification** [9] - 34:4, 34:12, 40:2, 40:8, 42:7, 42:10, 68:25, 73:25, 80:2
**identified** [1] - 25:23
**identify** [4] - 3:22, 25:19, 34:11, 89:4
**illuminate** [1] - 55:1
**immediately** [6] - 22:21, 22:24, 63:14, 67:21, 79:19, 150:11
**impeach** [1] - 97:5
**impermissible** [1] - 13:25
**important** [1] - 13:6
**inaccurate** [1] - 99:22
**incident** [1] - 143:25
**include** [1] - 9:5
**includes** [1] - 5:3
**including** [2] - 51:1, 51:9
**inconsistent** [1] - 70:21
**incorrect** [1] - 100:7
**indeed** [1] - 38:17
**indicate** [2] - 55:8, 94:20
**indicated** [3] - 88:2, 88:6, 135:14
**indicating** [2] - 71:9, 72:25
**individual** [2] - 44:7, 116:2
**information** [40] - 2:22, 22:22, 23:21, 24:2, 53:14, 56:7, 56:12, 56:15, 57:10, 61:16, 61:24, 66:16, 68:3, 68:21, 70:2, 70:6, 70:7, 70:13, 70:15, 73:3, 74:21, 75:20, 77:10, 90:24, 92:6, 94:4, 99:16, 100:6, 113:22, 115:19, 117:18, 125:11, 127:14, 134:11, 135:20, 140:19, 152:4, 152:7, 152:9, 152:10
**informed** [3] - 22:12, 94:13, 113:24
**initial** [19] - 6:13, 13:15, 13:16, 51:23, 54:16, 54:21, 57:4, 57:16, 59:19, 60:4, 83:14, 83:17, 83:22, 83:24, 85:12, 103:7, 132:22, 136:18, 147:23
**initiated** [1] - 111:12
**inordinately** [1] - 134:4
**inquire** [7] - 19:22, 25:8, 44:17, 44:22, 102:16, 109:3, 132:7
**inside** [10] - 46:11, 56:1, 71:9, 86:12, 87:8, 89:24, 147:19, 149:9, 149:13,

149:21
**instance** [5] - 46:7, 69:18, 70:7, 148:6, 151:13
**instead** [2] - 36:12, 43:24
**insulation** [9] - 38:22, 55:10, 55:17, 88:12, 88:16, 88:20, 88:22, 89:21, 129:14
**Intake** [1] - 99:7
**intend** [3] - 7:10, 10:7, 11:3
**intends** [2] - 6:22, 7:2
**interaction** [2] - 66:15, 67:5
**interactions** [5] - 30:19, 120:14, 122:6, 136:14, 138:6
**interfered** [2] - 22:13, 113:14
**Internal** [4] - 20:19, 20:20, 20:24, 45:6
**interrogated** [1] - 8:21
**interrogation** [6] - 12:15, 12:16, 13:22, 13:25, 80:24, 82:18
**interrupt** [3] - 28:1, 30:15, 43:13
**interruption** [1] - 12:22
**interview** [75] - 7:25, 17:6, 17:7, 21:5, 30:23, 31:1, 31:9, 31:10, 31:24, 32:5, 32:9, 32:12, 32:15, 32:17, 33:15, 33:23, 35:16, 36:4, 36:6, 36:22, 39:5, 39:6, 39:11, 40:13, 71:16, 73:16, 79:19, 81:14, 81:18, 81:21, 81:23, 86:13, 86:22, 87:8, 89:25, 91:3, 91:9, 91:24, 99:1, 99:3, 101:1, 101:4, 101:8, 101:9, 103:19, 103:23, 111:4, 120:19, 121:2, 121:6, 121:9, 121:11, 122:9, 122:13, 123:15, 124:7, 124:22, 129:21, 129:22, 129:25, 130:9, 130:25, 131:5, 131:8, 140:7, 143:6, 143:24, 146:24, 147:20, 147:23, 148:7, 149:9, 150:8, 150:9, 150:17
**Interview** [2] - 97:24, 98:23
**interviewed** [1] - 10:3
**interviewing** [1] - 152:8
**interviews** [3] - 21:7, 111:6, 111:8
**introduce** [7] - 3:24, 4:3, 4:25, 6:3, 6:6, 11:3, 12:5
**introduced** [7] - 10:17, 12:1, 33:17, 33:18, 76:14, 76:23, 82:22
**investigate** [5] - 20:25, 21:2, 110:25, 117:9, 139:7
**investigation** [14] - 22:23, 58:15, 67:1, 67:4, 69:16, 69:22, 70:11, 97:11, 97:12, 97:24, 98:23, 111:19, 114:16
**Investigation** [2] - 100:19, 110:9
**Investigations** [1] - 20:11
**investigative** [1] - 16:11
**investigator** [3] - 48:8, 58:9, 76:16
**investor** [1] - 48:10
**involved** [8] - 21:2, 33:20, 48:6, 58:11, 58:12, 77:12, 82:1, 133:14
**IRIZARRY** [1] - 1:10
**Islip** [1] - 105:9
**issue** [4] - 2:19, 15:16, 76:8, 142:11
**issued** [1] - 3:3
**issues** [5] - 28:9, 62:5, 72:14, 72:16,

118:13
**item** [1] - 3:16
**items** [3] - 4:10, 80:6, 80:10

## J

**jacket** [3] - 80:14, 149:1, 149:4
**JASON** [1] - 1:20
**Jason** [6] - 2:11, 21:19, 39:15, 42:19, 112:17, 149:23
**jet** [2] - 135:4, 135:7
**jetway** [4] - 72:5, 72:9, 72:12, 72:23
**JFK** [24] - 20:19, 20:20, 21:2, 21:15, 21:21, 21:25, 37:3, 45:3, 45:6, 45:9, 45:12, 45:13, 45:15, 45:16, 45:18, 45:20, 46:2, 46:10, 53:24, 98:15, 99:18, 110:19, 111:13, 112:19
**JM** [2] - 69:1, 74:2
**JM5** [1] - 100:12
**JM6** [1] - 97:23
**JM9** [1] - 99:6
**JNSU** [65] - 4:6, 4:14, 4:19, 5:23, 6:3, 6:16, 6:23, 7:3, 7:19, 7:25, 10:3, 13:19, 13:20, 14:2, 28:25, 29:2, 30:22, 31:2, 31:4, 33:1, 41:13, 41:15, 45:11, 45:13, 68:22, 71:16, 79:16, 79:18, 81:19, 81:20, 81:23, 82:7, 82:18, 86:13, 89:25, 90:9, 96:8, 98:16, 99:24, 101:4, 119:2, 119:4, 120:1, 120:17, 120:21, 121:23, 122:13, 131:24, 133:25, 142:21, 143:7, 143:8, 145:25, 146:7, 146:16, 146:17, 146:18, 146:23, 147:5, 147:15, 147:19, 147:24, 149:2
**John** [4] - 19:5, 19:17, 111:18, 113:24
**JOHN** [3] - 19:17, 20:1, 154:5
**join** [4] - 66:14, 67:1, 67:3, 67:5
**joined** [1] - 67:4
**Joint** [1] - 4:5
**judge** [1] - 3:4
**Judge** [10] - 4:8, 5:2, 5:9, 6:1, 8:10, 8:12, 104:4, 106:15, 130:22, 132:6
**JUDGE** [1] - 1:10
**June** [11] - 105:3, 105:5, 105:6, 105:8, 105:10, 105:18, 105:19, 105:23, 106:3, 107:21, 153:23
**jury** [8] - 10:12, 10:16, 10:21, 10:24, 11:23, 12:7, 86:17, 97:8

## K

**keep** [5] - 19:2, 19:21, 108:25, 123:7, 130:20
**kind** [7] - 120:22, 131:17, 131:24, 131:25, 133:2, 136:11, 153:8
**kinda** [1] - 120:24
**knowing** [3] - 64:15, 134:24, 140:1
**knowledge** [2] - 29:13, 114:23
**known** [1] - 20:11

## L

**lag** [1] - 16:17
**land** [1] - 51:15
**landed** [3] - 51:13, 51:16, 51:20
**language** [2] - 57:24, 69:21
**large** [2] - 31:4, 81:10
**last** [6] - 3:21, 4:12, 7:20, 78:1, 100:25, 101:20
**lastly** [1] - 100:11
**law** [23] - 3:23, 4:16, 5:5, 7:3, 7:6, 7:7, 8:14, 8:21, 11:25, 12:3, 12:8, 13:13, 14:9, 15:20, 16:12, 17:7, 20:25, 21:21, 45:14, 46:2, 112:19, 150:24, 151:14
**lawyer** [4] - 29:20, 41:8, 119:20, 131:3
**lawyers** [1] - 19:2
**lead** [11] - 24:8, 44:8, 48:10, 54:7, 54:10, 58:9, 59:25, 62:15, 62:16, 65:2, 78:16
**leading** [1] - 44:15, 113:15
**learn** [8] - 22:2, 27:4, 27:24, 113:4, 118:11, 131:11, 131:13, 134:6
**learned** [6] - 55:12, 132:21, 142:4, 142:10, 152:10, 152:11
**learning** [1] - 140:7
**least** [8] - 4:2, 16:1, 18:6, 64:12, 64:23, 91:25, 102:23, 104:19
**leave** [15] - 11:15, 26:16, 26:17, 26:19, 32:13, 39:6, 39:9, 59:19, 91:13, 117:4, 117:5, 117:6, 121:9, 129:22, 149:17
**leaving** [2] - 79:12, 136:2
**led** [2] - 81:7, 99:3
**leeway** [1] - 97:7
**left** [7] - 32:14, 39:17, 74:25, 106:10, 120:23, 121:1, 129:25
**legal** [1] - 70:20
**legitimate** [2] - 37:17, 127:17
**less** [4] - 9:19, 60:9, 110:22, 144:13
**letting** [1] - 136:11
**light** [10] - 12:2, 27:19, 38:15, 55:1, 55:5, 55:6, 71:9, 80:18, 88:1, 88:5
**likely** [2] - 75:15, 151:3
**line** [11] - 15:5, 77:15, 84:15, 84:17, 84:18, 85:2, 94:20, 95:1, 95:4, 95:6, 100:25
**lines** [4] - 14:10, 84:16, 85:8, 94:12
**listening** [1] - 134:8
**literally** [3] - 4:9, 5:17, 66:3
**litigants** [1] - 2:25
**LLP** [1] - 1:18
**local** [2] - 3:1, 3:2
**located** [3] - 28:12, 46:18, 58:19
**location** [4] - 4:6, 4:14, 99:18, 115:15, 116:14
**logbook** [12] - 28:12, 28:13, 28:15, 72:18, 72:19, 72:21, 72:25, 118:13, 118:14, 144:17, 144:19, 144:22
**logged** [1] - 72:24
**look** [21] - 13:6, 13:14, 28:15, 32:4, 38:22, 41:21, 42:2, 42:4, 43:19, 43:22, 76:24, 84:1, 88:13, 89:1, 92:17, 92:18, 92:19, 93:8, 93:11, 96:1, 131:12

**looked** [3] - 44:3, 93:14, 138:3
**looking** [8] - 6:14, 13:22, 39:3, 83:12, 84:9, 94:10, 94:20, 131:14
**lose** [1] - 2:19
**lost** [1] - 7:21
**loud** [3] - 19:21, 77:2, 109:1
**louder** [1] - 6:24
**luggage** [7] - 24:19, 24:24, 24:25, 25:1, 25:2, 25:3, 25:5
**lunch** [2] - 104:14, 106:16

## M

**M-O-L-O-N-E-Y** [1] - 19:17
**ma'am** [1] - 108:22
**mail** [1] - 1:23
**malfunction** [1] - 144:18
**malfunctioned** [1] - 71:10
**malfunctioning** [1] - 88:2
**Maloney** [23] - 50:21, 59:9, 69:16, 76:7, 84:4, 112:17, 113:24, 114:7, 114:20, 115:20, 118:10, 118:16, 119:19, 119:24, 120:10, 122:3, 123:5, 123:14, 124:12, 124:17, 124:19, 125:17
**marked** [7] - 34:4, 34:12, 40:2, 40:8, 42:7, 42:10, 122:21
**Marshal** [1] - 41:23
**mask** [1] - 19:9
**masking** [1] - 2:15
**material** [4] - 5:15, 41:1, 69:1, 99:6
**materials** [2] - 5:2, 5:9
**Matter** [1] - 153:23
**matter** [3] - 10:8, 11:4, 61:13
**matters** [3] - 61:13, 107:16, 108:5
**MDC** [1] - 41:24
**mean** [13] - 48:11, 48:18, 62:17, 62:19, 66:6, 67:3, 128:22, 143:14, 143:22, 144:7, 148:3, 150:23, 151:10
**meaning** [1] - 63:8
**meaningful** [1] - 13:9
**means** [1] - 15:11
**meantime** [1] - 19:3
**measurement** [1] - 31:18
**measures** [1] - 22:12
**mechanic** [12] - 25:13, 25:14, 25:17, 27:10, 37:2, 73:8, 74:10, 74:14, 74:16, 88:13, 125:1, 130:6
**mechanical** [3] - 28:9, 72:13, 72:16
**mechanism** [1] - 53:9
**meet** [2] - 8:22, 103:14
**meeting** [6] - 57:3, 57:4, 58:18, 59:19, 60:4, 133:18
**member** [1] - 143:4
**members** [2] - 3:1, 107:13
**Memorial** [1] - 104:20
**memorialization** [3] - 4:21, 5:22, 6:16
**memorialized** [2] - 5:7, 35:23
**memorized** [1] - 92:10
**mention** [1] - 64:8
**mentioned** [1] - 64:12
**messages** [1] - 44:6

**met** [6] - 22:25, 114:9, 114:12, 133:3, 133:10, 143:8
**mic** [1] - 19:20
**microphone** [1] - 109:1
**middle** [1] - 131:1
**midnight** [2] - 44:1, 92:4
**might** [9] - 5:19, 44:19, 55:12, 55:13, 65:8, 82:15, 106:1, 118:1, 123:7
**mind** [2] - 13:2, 16:22
**mine** [1] - 58:7
**minute** [13] - 8:1, 9:18, 11:11, 11:14, 17:14, 24:22, 29:7, 29:8, 63:13, 104:18, 115:25, 116:7, 119:5
**minutes** [24] - 7:17, 17:15, 29:6, 31:1, 33:2, 55:21, 79:15, 82:9, 86:17, 91:6, 91:9, 91:13, 91:21, 91:23, 96:21, 97:2, 103:4, 107:13, 115:16, 121:25, 135:22, 153:9
**Miranda** [21] - 11:16, 11:17, 12:16, 12:18, 13:9, 13:17, 17:4, 17:8, 33:20, 33:22, 34:1, 34:19, 82:20, 83:1, 83:10, 96:9, 122:11, 122:12, 122:16, 123:1, 123:22
**Mirandized** [8] - 12:14, 13:1, 13:16, 13:21, 14:8, 14:16, 14:22
**mirror** [2] - 32:6, 81:10
**mischaracterizes** [1] - 77:23
**missed** [1] - 10:14
**mixing** [1] - 14:15
**Moloney** [45] - 4:4, 19:5, 19:17, 41:7, 42:12, 43:10, 43:16, 45:3, 47:9, 89:10, 93:25, 96:6, 98:5, 99:11, 100:5, 100:17, 101:25, 102:4, 111:18, 122:4, 129:22, 131:12, 131:14, 131:15, 131:21, 133:3, 133:6, 134:19, 135:2, 137:22, 138:2, 142:14, 145:5, 146:11, 147:17, 148:16, 148:18, 148:23, 149:6, 149:10, 149:20, 149:25, 151:17, 151:18, 151:20
**MOLONEY** [2] - 20:1, 154:5
**Moloney's** [1] - 138:17
**moment** [3] - 65:9, 66:24, 68:19
**monitor** [3] - 22:17, 93:22, 113:20
**monitored** [1] - 23:2
**monitoring** [1] - 114:14
**months** [2] - 139:1, 143:24
**morning** [12] - 2:8, 2:9, 2:10, 2:13, 19:19, 20:7, 20:8, 104:19, 106:14, 107:21, 107:22, 153:17
**Morrelli** [3] - 56:19, 63:23, 82:4
**most** [3] - 75:15, 91:25, 147:11
**motion** [4] - 4:12, 4:15, 6:10, 6:13
**motivated** [1] - 139:4
**mouth** [1] - 150:14
**move** [5] - 62:10, 66:13, 68:2, 76:3, 77:19, 77:20, 78:5, 78:19, 84:19, 89:15, 90:17, 134:6, 148:25
**moved** [5] - 54:18, 88:20, 92:1, 113:21, 134:8
**moving** [3] - 6:7, 22:20, 79:13

**MR** [207] - 2:6, 2:10, 3:10, 3:13, 3:15, 3:20, 4:1, 5:16, 6:20, 7:1, 7:22, 8:10, 9:2, 9:4, 9:16, 10:7, 10:14, 10:20, 11:8, 11:21, 12:2, 12:11, 13:5, 13:13, 14:5, 14:7, 14:25, 15:23, 16:3, 16:10, 16:21, 17:12, 17:16, 17:25, 18:8, 18:12, 18:19, 18:24, 19:4, 19:7, 19:23, 20:6, 25:8, 25:10, 25:22, 25:25, 28:7, 30:18, 31:21, 31:23, 32:8, 33:11, 34:3, 34:6, 34:12, 34:14, 35:6, 35:9, 35:13, 40:1, 40:6, 40:7, 40:16, 40:19, 40:24, 41:2, 41:6, 42:6, 42:9, 43:2, 43:5, 43:9, 43:15, 44:13, 44:16, 44:18, 44:19, 44:22, 44:24, 45:2, 47:7, 47:8, 48:1, 48:19, 50:2, 50:19, 51:4, 56:25, 57:2, 57:5, 61:12, 62:4, 66:20, 66:22, 67:2, 67:6, 68:24, 69:5, 69:8, 69:10, 69:13, 69:15, 70:10, 70:18, 70:23, 73:19, 73:23, 74:2, 74:23, 76:4, 77:9, 77:15, 77:23, 78:6, 80:19, 83:25, 86:2, 86:19, 87:1, 89:3, 89:6, 89:9, 90:16, 90:19, 93:21, 93:24, 96:18, 96:25, 97:2, 97:5, 97:10, 97:22, 98:4, 99:5, 99:10, 100:11, 100:16, 102:12, 102:14, 102:16, 102:19, 103:25, 104:4, 104:6, 104:11, 104:23, 105:5, 105:8, 105:12, 105:18, 105:20, 106:5, 106:15, 107:6, 107:9, 107:19, 108:1, 108:2, 108:7, 108:8, 108:10, 109:4, 110:6, 113:15, 118:3, 122:18, 123:11, 125:6, 127:2, 127:11, 127:19, 130:22, 130:23, 132:2, 132:6, 132:8, 132:10, 132:12, 138:13, 138:15, 140:10, 140:16, 140:24, 141:2, 141:6, 141:8, 141:11, 141:15, 141:18, 143:3, 143:11, 147:14, 151:25, 152:3, 152:16, 152:18, 152:24, 153:4, 153:11, 153:12, 153:19, 153:20, 154:7, 154:9, 154:11, 154:14, 154:16
**multiple** [3] - 24:25, 46:24, 57:16

## N

**name** [12] - 19:16, 33:8, 57:15, 64:2, 76:18, 93:5, 93:8, 108:18, 108:23, 133:16, 142:19, 142:23
**names** [4] - 56:23, 57:6, 57:12, 64:8
**Narcotic** [1] - 45:12
**narcotics** [12] - 22:4, 22:9, 22:10, 22:14, 33:19, 58:12, 111:4, 112:24, 117:9, 121:1, 137:8, 147:4
**Narcotics** [1] - 4:5
**narrative** [6] - 5:10, 10:19, 11:4, 11:24, 86:14, 86:20
**nature** [1] - 8:25
**nauseam** [1] - 78:3
**near** [9] - 23:9, 24:15, 37:22, 69:24, 87:5, 103:10, 114:13, 138:5, 145:15
**nearly** [1] - 106:1
**necessarily** [1] - 91:22
**necessary** [1] - 17:4

**need** [16] - 6:24, 12:7, 15:19, 19:6, 34:10, 51:6, 76:25, 78:4, 78:7, 80:24, 84:19, 89:13, 101:20, 104:16, 130:20
**needed** [6] - 41:22, 73:6, 92:5, 92:6, 118:21, 120:1
**needs** [3] - 12:5, 12:20, 15:9
**nervous** [5] - 90:2, 90:4, 90:7, 90:21, 90:22
**nervousness** [1] - 90:9
**never** [2] - 32:14, 39:17
**nevertheless** [1] - 14:14
**NEW** [1] - 1:1
**New** [5] - 1:4, 1:14, 1:15, 1:19, 1:22
**next** [24] - 19:24, 31:8, 43:25, 54:5, 63:1, 64:19, 64:22, 65:5, 76:23, 79:3, 85:25, 104:12, 104:21, 108:6, 109:5, 114:17, 115:7, 116:3, 118:17, 126:3, 133:12, 134:12, 135:11, 136:9
**nice** [2] - 19:21, 109:1
**night** [6] - 16:6, 39:23, 40:13, 64:5, 82:4, 131:1
**nobody** [3] - 60:12, 128:16, 128:17
**none** [3] - 35:9, 43:5, 103:13
**nonetheless** [1] - 2:20
**notation** [1] - 102:6
**note** [3] - 43:17, 102:9, 107:22
**noted** [1] - 25:24
**notes** [31] - 4:8, 4:9, 36:6, 36:10, 36:12, 36:14, 36:17, 36:20, 40:13, 40:14, 73:11, 73:12, 73:14, 73:16, 74:18, 86:24, 89:2, 89:3, 90:25, 91:9, 101:18, 101:19, 124:9, 124:12, 124:14, 124:15, 124:16, 124:20, 138:17
**nothing** [13] - 42:5, 65:15, 72:24, 85:16, 92:18, 104:4, 108:8, 118:14, 131:18, 132:6, 144:22, 153:19, 153:20
**noticed** [12] - 38:5, 38:6, 38:14, 38:22, 38:24, 44:8, 71:8, 87:9, 87:12, 88:12, 128:21, 129:14
**notification** [1] - 54:9
**Number** [1] - 93:22
**number** [15] - 2:3, 8:13, 44:2, 64:16, 73:5, 74:1, 92:6, 92:10, 92:16, 93:3, 93:5, 94:18, 111:9, 112:1, 151:16
**numbers** [1] - 92:12
**NY** [1] - 1:19

## O

**o'clock** [6] - 39:23, 104:13, 105:3, 149:25, 150:7, 153:18
**oath** [1] - 108:13
**objection** [27] - 35:8, 40:18, 40:19, 43:4, 44:14, 50:2, 50:19, 51:4, 56:25, 61:12, 62:4, 66:20, 67:2, 74:23, 77:9, 77:15, 77:23, 78:20, 80:19, 113:15, 118:3, 125:6, 127:11, 127:19, 140:10, 143:11
**observation** [10] - 53:25, 58:18, 58:22, 59:9, 59:14, 59:17, 61:21, 133:14, 134:23, 136:3
**observe** [2] - 80:17, 80:22

**observed** [2] - 89:20, 133:22
**observers** [1] - 2:20
**observing** [1] - 2:14
**obtain** [1] - 44:11
**obtained** [2] - 11:19, 12:24
**obviously** [2] - 81:5, 104:25
**occurred** [1] - 139:16
**OF** [3] - 1:1, 1:2, 1:9
**offer** [1] - 7:11
**offered** [4] - 9:8, 9:10, 123:16
**offering** [3] - 7:10, 8:7, 8:17
**offers** [3] - 35:6, 40:16, 43:2
**offhand** [1] - 141:22
**office** [44] - 7:4, 7:19, 10:3, 11:25, 12:3, 12:8, 14:9, 17:8, 28:24, 28:25, 29:2, 29:10, 29:19, 30:5, 30:22, 31:2, 31:4, 33:1, 41:13, 41:15, 77:3, 79:15, 81:4, 81:19, 81:20, 98:16, 99:24, 103:12, 103:17, 118:25, 119:2, 119:4, 119:8, 120:2, 120:17, 120:18, 120:21, 122:13, 143:8, 146:23, 147:5, 149:5
**Office** [2] - 51:14, 102:7
**officer** [16] - 5:6, 18:25, 55:24, 72:7, 114:12, 114:17, 115:7, 115:9, 133:10, 133:13, 133:18, 133:19, 134:12, 135:9, 135:11, 151:14
**Officer** [11] - 50:21, 53:22, 55:20, 56:1, 56:19, 56:21, 63:7, 63:20, 63:25, 64:2, 137:21
**officer's** [1] - 133:16
**officers** [104] - 3:23, 4:16, 7:6, 7:8, 7:16, 7:24, 8:1, 8:2, 8:3, 8:4, 8:15, 8:21, 9:9, 9:20, 9:22, 9:24, 11:6, 15:20, 16:1, 16:2, 16:4, 16:5, 16:7, 16:12, 16:14, 16:17, 17:9, 18:6, 18:7, 18:21, 24:13, 25:12, 26:1, 26:2, 27:2, 27:6, 28:20, 39:2, 54:16, 55:22, 56:11, 56:18, 56:23, 57:6, 57:7, 57:17, 57:19, 59:7, 63:15, 63:19, 64:6, 64:10, 64:19, 66:1, 67:11, 71:25, 75:3, 75:7, 75:10, 75:11, 75:13, 75:16, 79:3, 81:18, 81:22, 81:25, 90:22, 102:22, 103:7, 103:9, 103:12, 103:16, 103:22, 104:16, 104:24, 105:4, 107:17, 114:9, 114:10, 114:14, 116:2, 116:5, 116:9, 116:10, 117:14, 117:17, 117:22, 118:19, 120:11, 129:20, 133:21, 133:25, 135:18, 136:9, 137:4, 137:14, 140:2, 144:8, 146:18, 147:1, 148:12, 148:15, 149:23, 150:24
**Officers** [1] - 4:3
**officers'** [1] - 136:21
**official** [1] - 101:10
**officially** [5] - 98:16, 99:24, 100:1, 100:10, 101:14
**officials** [1] - 71:5
**often** [2] - 38:1
**once** [9] - 30:5, 32:17, 54:3, 54:5, 54:8, 54:13, 121:16, 135:20, 149:13
**one** [47] - 3:6, 3:16, 5:9, 8:13, 14:20, 16:1, 18:6, 18:8, 24:17, 31:5, 31:12,

31:15, 31:16, 31:17, 32:6, 38:10, 41:9, 41:11, 41:14, 45:11, 45:13, 60:14, 71:25, 81:10, 84:6, 87:13, 92:24, 94:9, 94:12, 97:11, 104:13, 105:24, 106:1, 106:2, 112:5, 128:21, 128:22, 133:21, 133:25, 134:10, 134:13, 135:22, 137:14, 142:1, 142:4, 146:3, 151:25
**one-way** [1] - 81:10
**ones** [4] - 46:24, 49:13, 81:25, 82:2
**ongoing** [1] - 2:16
**oooOooo** [1] - 153:24
**opaquely** [1] - 4:25
**open** [15] - 2:1, 16:4, 17:17, 17:18, 19:2, 39:16, 41:15, 65:15, 92:20, 107:2, 120:22, 131:17, 131:23, 132:1, 148:1
**opened** [4] - 44:6, 44:9, 92:19
**opening** [3] - 111:23, 111:24, 111:25
**operation** [2] - 54:7, 65:3
**opportunity** [4] - 47:3, 47:10, 48:21, 53:19
**opposed** [2] - 10:19, 11:24
**opposition** [2] - 4:24, 14:11
**or..** [1] - 127:7
**Order** [1] - 3:3
**order** [7] - 9:7, 13:7, 13:23, 15:6, 15:10, 118:2, 153:9
**ordinarily** [1] - 29:2
**original** [1] - 12:13
**otherwise** [2] - 5:23, 97:6
**outset** [2] - 14:14, 17:8
**outside** [46] - 46:11, 46:18, 47:11, 49:12, 72:5, 72:8, 72:12, 72:24, 80:20, 119:1, 137:4, 149:21
**overhear** [2] - 136:23, 138:10
**overheard** [2] - 131:16, 131:21
**overruled** [5] - 51:5, 77:24, 80:21, 118:4, 125:7
**Overruled** [2] - 127:12, 127:20
**own** [2] - 13:12, 52:12

**P**

**p.m** [23] - 23:7, 23:10, 24:4, 51:18, 51:20, 53:1, 59:11, 60:7, 60:24, 91:4, 96:3, 96:17, 96:19, 97:14, 98:13, 98:15, 98:17, 100:3, 100:6, 101:13, 101:14, 101:15, 101:23
**pack** [1] - 71:10
**packs** [1] - 128:21
**PAGE** [1] - 154:3
**page** [12] - 19:24, 47:14, 69:1, 69:8, 85:25, 89:13, 89:17, 97:23, 98:22, 100:12, 109:5, 126:3
**pandemic** [1] - 2:17
**papers** [2] - 11:17, 14:11
**paperwork** [2] - 69:17, 101:25
**PARISI** [1] - 1:21
**park** [2] - 127:6, 127:7
**parked** [8] - 66:6, 66:25, 134:12, 136:3, 136:5, 136:6, 137:2, 137:18
**parking** [5] - 52:22, 53:22, 53:24, 133:3,

135:11
**part** [16] - 2:18, 7:5, 10:18, 10:19, 11:4, 11:24, 13:18, 15:1, 21:4, 58:14, 73:14, 79:7, 111:3, 113:12, 113:18
**partially** [1] - 14:1
**participate** [1] - 16:13
**participated** [2] - 21:8, 111:7
**particular** [8] - 3:16, 20:16, 21:1, 23:2, 51:24, 83:9, 110:15, 125:10
**particularly** [1] - 46:13
**parties** [2] - 104:22, 153:9
**pass** [3] - 65:17, 92:24, 148:2
**passenger** [4] - 30:12, 30:16, 79:4, 147:12
**password** [1] - 92:21
**past** [1] - 120:25
**Patrol** [1] - 18:6
**Paul** [6] - 2:4, 25:16, 97:25, 98:23, 107:4, 107:10
**PAUL** [1] - 1:7
**Pause** [7] - 74:6, 89:14, 89:16, 89:18, 104:3, 132:5, 152:2
**pause** [1] - 102:15
**PDF** [2] - 153:14, 153:15
**PEACE** [1] - 1:13
**people** [6] - 15:11, 16:25, 21:5, 31:18, 70:3, 111:4
**percent** [1] - 134:2
**perhaps** [2] - 9:19, 12:23
**period** [3] - 15:12, 17:13, 134:3
**permission** [7] - 73:19, 93:11, 93:17, 97:22, 99:5, 100:12, 151:21
**permit** [1] - 86:19
**permitted** [1] - 11:20
**person** [7] - 3:6, 24:17, 56:3, 60:1, 78:17, 78:18, 90:15, 134:16, 137:11, 146:4, 146:8
**personal** [1] - 151:8
**personally** [2] - 58:3, 135:3
**perspective** [3] - 11:10, 11:14, 104:25
**pertaining** [1] - 20:25
**pertinent** [1] - 15:18
**phone** [54] - 21:24, 23:12, 41:18, 41:22, 42:2, 42:4, 43:19, 43:22, 44:3, 44:6, 44:9, 44:11, 52:10, 52:14, 52:16, 54:15, 56:4, 56:13, 61:8, 73:5, 79:21, 92:13, 92:15, 92:17, 92:19, 92:20, 93:2, 93:3, 93:10, 93:11, 93:14, 93:17, 94:17, 94:18, 94:19, 94:24, 95:2, 95:7, 95:16, 96:2, 131:9, 131:12, 131:15, 134:15, 145:19, 146:1, 146:4, 148:21, 150:25, 151:3, 151:15, 151:16, 151:21
**physically** [6] - 26:6, 32:19, 56:11, 116:22, 121:16, 149:14
**pick** [2] - 19:20, 109:2
**picky** [1] - 48:11
**pieces** [4] - 24:25, 25:1, 25:2, 25:3
**pilot** [42] - 7:9, 10:2, 10:11, 10:21, 10:22, 27:20, 27:22, 27:24, 27:25, 28:8, 28:17, 28:18, 67:22, 71:18,

71:19, 72:6, 72:7, 72:11, 72:13, 73:3, 73:8, 73:15, 73:16, 74:10, 74:13, 74:19, 74:22, 74:25, 118:8, 118:9, 118:11, 118:16, 139:5, 139:6, 140:3, 142:9, 142:10, 144:16, 145:4, 145:8, 145:10

**pilot's** [1] - 11:1

**pilots** [8] - 75:22, 138:5, 138:10, 142:14, 142:16, 144:11, 144:15, 145:1

**place** [19] - 12:16, 37:20, 56:1, 74:21, 78:22, 79:12, 88:17, 97:13, 98:18, 98:19, 99:22, 102:2, 113:19, 114:24, 120:1, 120:3, 127:9, 128:4, 129:15

**placed** [10] - 22:16, 78:24, 96:13, 96:19, 97:3, 97:18, 98:12, 98:16, 120:19, 131:7

**plan** [13] - 22:2, 57:21, 57:24, 57:25, 58:1, 58:2, 58:6, 58:18, 59:20, 75:21, 113:4, 113:18, 115:21

**plane** [61] - 10:2, 22:9, 22:11, 23:2, 23:9, 23:14, 23:22, 24:12, 24:21, 25:4, 28:10, 28:19, 37:15, 37:18, 37:20, 38:8, 38:10, 51:12, 51:15, 58:22, 58:24, 59:3, 59:4, 59:5, 59:6, 59:7, 60:6, 60:9, 60:15, 61:10, 61:17, 61:22, 62:8, 62:20, 63:2, 63:4, 63:8, 64:10, 64:18, 72:3, 73:9, 87:9, 88:4, 114:13, 114:14, 114:23, 115:8, 116:1, 116:3, 117:7, 118:14, 125:13, 125:22, 128:11, 128:15, 129:7, 129:9, 129:20, 133:22, 139:7, 139:21

**plane's** [1] - 139:11

**planes** [4] - 37:12, 127:4, 127:9, 128:8

**planned** [1] - 52:2

**planning** [4] - 22:4, 153:1, 153:8, 153:9

**plausible** [3] - 27:9, 118:1, 130:5

**playing** [1] - 11:10

**Plaza** [2] - 1:14, 1:22

**pockets** [2] - 81:2, 148:6

**point** [47] - 11:9, 12:13, 26:12, 26:16, 29:11, 30:20, 32:22, 39:25, 55:23, 58:8, 67:10, 67:24, 68:1, 77:8, 79:22, 80:2, 82:11, 87:16, 87:17, 119:9, 119:11, 120:15, 122:7, 124:3, 125:12, 129:20, 130:11, 131:7, 135:25, 136:18, 137:23, 138:4, 138:8, 138:19, 140:1, 140:8, 140:17, 145:19, 145:22, 146:14, 149:7, 149:23, 150:4, 150:22, 151:8, 151:10

**POLLACK** [110] - 1:16, 2:6, 3:10, 6:20, 7:1, 7:22, 9:2, 9:4, 9:16, 10:7, 10:14, 10:20, 11:8, 12:2, 14:5, 14:7, 14:25, 15:23, 16:3, 16:10, 16:21, 17:12, 17:16, 17:25, 18:8, 18:12, 18:19, 18:24, 19:4, 19:7, 19:23, 20:6, 25:8, 25:10, 25:22, 25:25, 28:7, 30:18, 31:21, 31:23, 32:8, 33:11, 34:3, 34:6, 34:12, 34:14, 35:6, 35:13, 40:1, 40:7, 40:16, 40:24, 41:2, 41:6, 42:9, 43:2, 43:9, 43:15, 44:13, 44:16, 50:2, 50:19, 51:4, 56:25, 61:12, 62:4, 66:20,

67:2, 67:6, 74:23, 77:9, 77:15, 77:23, 80:19, 102:14, 102:16, 102:19, 103:25, 104:4, 104:11, 104:23, 105:5, 105:18, 105:20, 106:5, 106:15, 107:6, 107:19, 108:1, 108:7, 108:10, 109:4, 110:6, 122:18, 123:11, 127:2, 130:22, 130:23, 132:2, 132:6, 140:10, 143:11, 152:18, 152:24, 153:11, 153:19, 154:7, 154:11, 154:14

**Pollack** [12] - 2:6, 6:18, 40:22, 107:6, 123:9, 136:13, 138:22, 143:25, 144:3, 144:7, 149:13, 152:22

**portion** [3] - 5:10, 5:17, 71:12

**portions** [1] - 5:5

**position** [1] - 111:1

**possession** [2] - 150:23, 150:24

**possibility** [1] - 153:5

**possible** [2] - 18:14, 106:3

**possibly** [2] - 27:12, 77:12

**Post** [2] - 97:24, 98:23

**post** [14] - 53:25, 58:22, 59:10, 59:14, 59:17, 61:21, 99:1, 99:3, 101:1, 101:8, 134:23, 136:3, 145:7

**Post-Arrest** [2] - 97:24, 98:23

**post-arrest** [2] - 101:1, 101:8

**posts** [1] - 58:19

**potential** [2] - 58:15, 60:1

**practice** [10] - 4:12, 33:22, 33:25, 91:20, 120:3, 122:12, 122:15, 128:7, 128:10, 151:2

**preclude** [1] - 4:15

**preclusion** [3] - 4:20, 6:8, 6:13

**preparation** [2] - 112:7, 138:17

**prepared** [1] - 16:19

**present** [12] - 8:14, 8:18, 9:14, 9:17, 15:14, 17:6, 35:22, 36:19, 56:24, 57:17, 85:16, 103:9

**presentation** [1] - 153:3

**presented** [1] - 151:20

**presents** [1] - 56:18

**press** [1] - 3:1

**pretty** [5] - 19:21, 26:12, 115:25, 116:6, 135:23

**previously** [3] - 5:3, 5:4, 5:15

**Prisoner** [1] - 99:7

**problem** [14] - 15:1, 27:18, 28:11, 38:16, 38:21, 77:6, 88:10, 105:23, 118:12, 129:6, 139:11, 139:17, 141:21

**problems** [7] - 27:25, 28:10, 72:15, 72:17, 72:25, 118:15, 139:7

**procedure** [1] - 146:25

**proceed** [3] - 12:7, 36:3, 108:5, 124:6

**proceeded** [1] - 134:19

**proceeding** [4] - 2:21, 3:5, 107:15, 150:11

**Proceedings** [1] - 1:24

**proceedings** [1] - 3:2

**processed** [2] - 121:1, 147:4, 147:7

**processing** [5] - 41:25, 131:24, 146:25, 148:4, 149:22

**produced** [3] - 1:25, 16:23, 16:24

**producing** [1] - 16:1

**product** [8] - 22:17, 22:18, 55:2, 55:4, 55:8, 55:11, 59:23, 60:15

**products** [2] - 22:9, 22:15

**prohibit** [1] - 10:5

**prohibited** [1] - 3:7

**pronouns** [1] - 53:12

**proper** [7] - 6:8, 57:23, 70:12, 88:13, 88:17, 95:15

**properly** [4] - 11:13, 38:7, 68:14, 72:17

**property** [9] - 80:25, 94:23, 148:7, 148:11, 148:14, 148:16, 148:18, 151:6, 151:9

**propose** [4] - 10:12, 10:16, 11:23, 105:5

**prosecuting** [1] - 100:1

**prosecution** [7] - 100:2, 101:11, 101:15, 101:17, 102:2, 102:8, 102:11

**prosecutor** [1] - 31:14

**Protection** [2] - 112:23, 114:8, 114:9

**protocol** [1] - 30:1

**protocols** [1] - 2:15

**provide** [4] - 51:3, 51:8, 82:19, 122:12

**provided** [16] - 2:23, 49:22, 49:25, 50:21, 50:25, 51:13, 61:17, 61:25, 70:3, 70:13, 70:15, 73:17, 93:16, 122:11, 123:16, 152:4

**proximity** [3] - 65:17, 116:6, 134:25

**public** [6] - 2:18, 2:20, 2:22, 2:24, 3:1, 107:14

**published** [7] - 35:12, 40:21, 43:8, 89:8, 98:3, 99:9, 100:15

**pulled** [5] - 54:5, 55:20, 66:6, 66:24, 129:17

**purpose** [3] - 42:3, 54:17, 94:19

**purposes** [4] - 46:21, 153:2, 153:8

**pursuant** [3] - 3:1, 5:1, 10:9

**push** [1] - 85:18

**pushed** [1] - 120:23

**pushing** [1] - 105:14

**put** [24] - 6:10, 25:5, 29:22, 30:4, 41:14, 41:23, 55:5, 55:6, 78:24, 79:6, 83:25, 88:17, 93:22, 100:2, 101:18, 101:19, 105:2, 111:9, 115:16, 119:22, 130:17, 146:15, 147:7, 147:12

**puts** [1] - 14:13

**putting** [4] - 22:9, 119:16, 153:2, 153:6

## Q

**questioning** [13] - 4:17, 39:25, 41:9, 67:8, 76:21, 77:16, 78:18, 82:8, 90:8, 90:15, 96:9, 136:21, 146:24

**questions** [25] - 9:1, 28:2, 28:3, 28:5, 29:19, 32:23, 33:3, 44:13, 45:18, 49:11, 82:25, 83:6, 83:15, 83:18, 83:23, 85:22, 86:5, 86:23, 102:20, 103:23, 121:20, 121:24, 122:1, 130:13, 136:14

**quick** [2] - 115:25, 135:23

**quickly** [2] - 3:15, 105:25

**quiet** [1] - 77:4

## R

**radio** [12] - 22:17, 23:13, 23:20, 54:9, 54:15, 61:7, 75:20, 75:24, 134:15, 135:3, 137:11, 137:12
**raise** [2] - 19:11, 108:14
**raised** [1] - 15:3
**rather** [3] - 10:10, 10:22, 61:13
**reach** [3] - 18:21, 104:15, 107:17
**read** [29] - 33:20, 33:22, 35:14, 35:15, 36:14, 43:16, 74:3, 83:5, 83:8, 83:11, 84:12, 86:7, 86:10, 89:12, 94:4, 94:7, 94:8, 94:15, 95:1, 95:4, 95:17, 123:14, 123:17, 124:16, 127:24, 128:1, 140:11, 140:13
**reading** [1] - 94:8
**ready** [3] - 19:22, 44:17, 109:3
**real** [2] - 52:5, 69:21
**realized** [1] - 87:25
**really** [6] - 13:9, 15:14, 16:10, 105:14, 144:14, 146:22
**reason** [9] - 4:19, 5:11, 5:25, 6:12, 18:5, 37:17, 79:7, 85:7, 127:17
**recalling** [1] - 11:17
**recapitulate** [1] - 7:11
**recapitulated** [1] - 7:18
**receive** [3] - 28:14, 51:17, 54:9
**received** [17] - 21:24, 23:21, 24:2, 35:11, 40:20, 40:23, 43:7, 56:7, 61:16, 61:24, 66:18, 112:22, 112:25, 113:22, 115:19, 132:13, 148:16
**receiving** [5] - 5:2, 22:21, 148:11, 148:13, 148:14
**recent** [1] - 16:17
**recently** [1] - 113:1
**recess** [1] - 106:16
**recitation** [1] - 5:17
**recognize** [17] - 34:9, 34:15, 34:23, 34:25, 35:1, 35:2, 40:10, 42:12, 42:16, 42:18, 42:19, 42:21, 42:23, 98:7, 122:23, 123:2, 123:4
**recollection** [12] - 16:6, 30:8, 35:14, 36:9, 39:21, 73:15, 74:4, 74:8, 115:9, 120:6, 124:11, 141:24
**record** [7] - 3:17, 6:2, 6:12, 25:22, 101:16, 128:1, 140:13
**recorded** [3] - 1:24, 70:6, 74:21
**recording** [5] - 3:5, 5:12, 32:10, 107:14, 121:7
**recordings** [1] - 48:3
**recovered** [1] - 114:24
**recross** [2] - 104:6, 104:7
**rectangular** [1] - 121:4
**red** [1] - 140:8
**redacted** [7] - 5:5, 5:10, 5:11, 5:14, 5:17, 5:21, 6:15
**redaction** [1] - 5:16
**redactions** [1] - 5:15
**redirect** [1] - 102:13, 104:5, 152:17

**REDIRECT** [2] - 102:18, 154:10
**refer** [1] - 4:5
**reference** [1] - 49:11
**referred** [9] - 35:12, 40:21, 43:8, 70:11, 89:8, 98:3, 99:9, 100:15, 131:23
**referring** [1] - 97:16
**refresh** [3] - 73:14, 74:8, 141:23
**refreshes** [1] - 74:4
**refuse** [1] - 83:22
**refused** [9] - 43:19, 83:19, 83:24, 85:9, 85:10, 85:12, 95:24, 96:2, 96:9
**regard** [2] - 5:9, 14:2
**regarding** [6] - 130:1, 130:2, 140:19, 143:25, 152:5, 152:7
**regardless** [1] - 147:9
**reinforce** [1] - 13:17
**related** [2] - 112:5, 149:22
**relation** [2] - 58:22, 68:11
**relaxed** [2] - 26:12, 30:21
**relay** [2] - 54:9, 56:15
**relayed** [3] - 53:14, 53:16, 68:21
**relaying** [1] - 56:11
**relevance** [3] - 50:2, 50:19, 51:4
**relevant** [1] - 140:10
**remand** [1] - 41:23
**remedy** [1] - 6:8
**remember** [58] - 16:18, 23:8, 23:25, 32:25, 57:15, 62:11, 64:9, 68:12, 103:1, 113:2, 114:2, 115:1, 115:12, 115:14, 115:24, 116:11, 116:17, 123:14, 125:11, 125:16, 130:16, 130:18, 130:24, 131:2, 131:8, 131:15, 131:16, 131:20, 132:21, 134:17, 134:24, 135:8, 136:17, 136:19, 136:20, 138:7, 138:25, 140:1, 140:6, 140:7, 142:1, 142:4, 142:18, 144:6, 144:19, 145:6, 146:2, 146:3, 146:6, 146:9, 146:21, 146:23, 148:9, 149:3, 149:5, 150:14, 152:11
**remind** [2] - 2:25, 107:13
**reminder** [1] - 43:21
**remote** [1] - 3:6
**remove** [5] - 52:5, 113:9, 121:14, 151:8
**removed** [3] - 121:15, 121:16, 149:6
**removing** [1] - 22:8
**rep** [1] - 82:11
**repeat** [7] - 7:20, 51:6, 61:19, 78:4, 78:7, 85:24, 142:5
**rephrase** [1] - 96:12
**replace** [3] - 52:5, 52:6, 113:10
**report** [11] - 5:14, 5:21, 6:15, 16:20, 16:22, 70:11, 97:12, 97:24, 98:23, 111:25, 145:3
**Report** [1] - 100:19
**reported** [5] - 8:3, 9:6, 97:13, 142:10, 143:20
**reporter** [1] - 130:19
**Reporter** [1] - 1:21
**reporting** [1] - 139:14
**reports** [10] - 5:4, 5:5, 16:21, 16:23,

16:24, 17:1, 69:22, 97:11, 111:22, 112:5
**represent** [1] - 104:24
**request** [3] - 50:13, 50:15, 150:12
**requested** [1] - 130:19
**respect** [1] - 141:15
**respond** [3] - 9:2, 14:5, 115:22
**responded** [5] - 22:24, 56:9, 114:1, 115:21, 116:7
**response** [2] - 4:1, 4:17
**responsibility** [1] - 58:15
**rest** [1] - 9:25
**restrained** [5] - 26:6, 32:19, 116:22, 121:17, 149:14
**result** [1] - 2:17
**resume** [1] - 104:14
**retrieve** [1] - 93:3
**review** [6] - 47:3, 47:10, 48:21, 50:18, 112:7, 112:10
**reviewed** [2] - 48:4, 138:16
**reviewing** [1] - 98:11
**ride** [3] - 53:2, 82:10, 119:5
**rights** [16] - 33:21, 34:1, 34:18, 35:21, 82:20, 83:1, 83:2, 83:3, 83:5, 83:10, 85:23, 86:6, 95:18, 122:11, 123:1, 123:22
**ROBERT** [1] - 1:16
**Robert** [2] - 2:6, 107:6
**Robinson** [5] - 56:21, 63:20, 82:4
**rode** [1] - 30:11
**ROI** [1] - 101:2
**ROIs** [1] - 69:18
**role** [4] - 58:2, 58:5, 58:7, 111:17
**ROLLE** [1] - 1:16
**Rolle** [2] - 2:7, 107:7
**room** [59] - 30:23, 31:4, 31:10, 31:24, 32:3, 32:5, 32:9, 32:13, 32:15, 32:17, 32:20, 32:23, 33:4, 33:12, 33:16, 39:6, 39:9, 39:11, 39:12, 79:19, 80:24, 81:7, 81:10, 81:14, 81:16, 81:21, 81:23, 82:18, 86:13, 87:8, 89:25, 91:3, 91:13, 91:24, 103:20, 103:23, 120:19, 121:2, 121:4, 121:6, 121:9, 121:11, 121:20, 122:2, 129:22, 129:25, 130:9, 146:24, 147:6, 147:20, 147:21, 147:22, 147:23, 147:24, 148:4, 148:8, 149:9, 149:14
**rooms** [1] - 31:9
**routes** [1] - 60:1
**RPR** [1] - 1:21
**Rule** [6] - 3:2, 3:3, 4:7, 4:22, 5:1, 5:7
**ruling** [1] - 18:3
**run** [1] - 60:2

## S

**S-e-a-n** [1] - 108:24
**S-t-a-n-d** [1] - 126:2
**safe** [1] - 22:10
**safeguards** [2] - 13:8, 13:15
**safety** [5] - 30:4, 79:8, 79:10, 79:13,

81:5

**sake** [2] - 12:23, 39:10
**sanctioned** [2] - 3:7, 107:15
**sat** [8] - 32:22, 33:3, 33:15, 114:17, 121:19, 121:23, 122:1, 122:9
**saw** [10] - 24:13, 24:14, 26:1, 37:21, 39:2, 65:12, 65:23, 65:25, 87:5, 88:24
**scene** [4] - 9:22, 16:18, 63:8, 64:4
**schedule** [6] - 17:19, 17:23, 18:16, 18:23, 105:15, 107:18
**scheduled** [6] - 17:22, 23:3, 23:5, 60:6, 114:24, 115:1
**scheduling** [1] - 153:8
**scope** [2] - 61:12, 80:20
**screaming** [1] - 90:7
**Sean** [22] - 21:19, 21:24, 22:3, 22:24, 24:5, 27:23, 28:4, 28:18, 30:12, 33:5, 33:10, 52:23, 56:6, 56:8, 58:10, 67:21, 79:5, 82:22, 103:10, 108:11, 108:19, 108:24
**SEAN** [3] - 108:19, 110:1, 154:12
**Sean's** [2] - 23:22, 23:24
**Search** [2] - 42:15, 93:19
**search** [8] - 44:11, 94:13, 94:14, 94:20, 94:24, 95:16, 95:18, 151:21
**seat** [2] - 30:16, 79:5
**seated** [2] - 19:14, 134:23
**seating** [1] - 2:18
**seats** [1] - 44:20
**second** [7] - 13:9, 13:11, 13:17, 15:8, 31:12, 95:1, 151:25
**section** [4] - 38:16, 38:17, 38:20, 62:8
**sectioned** [1] - 2:17
**secure** [1] - 147:8
**security** [11] - 46:5, 46:7, 46:10, 46:21, 47:3, 47:11, 48:7, 48:15, 48:22, 50:12, 50:22
**Security** [5] - 20:10, 76:15, 110:9, 110:12
**see** [51] - 22:10, 24:12, 25:11, 25:17, 32:3, 34:7, 44:2, 44:5, 48:15, 55:7, 59:5, 59:6, 59:7, 61:22, 63:4, 65:9, 65:11, 65:13, 66:7, 66:10, 67:16, 81:16, 81:17, 84:3, 88:21, 89:10, 89:22, 93:25, 97:15, 98:5, 99:11, 99:15, 99:16, 100:17, 101:1, 101:2, 101:20, 104:16, 105:16, 106:7, 116:1, 134:22, 135:24, 136:3, 136:5, 136:7, 136:8, 136:25, 137:18, 137:25, 144:17
**seeking** [6] - 3:24, 4:2, 6:2, 6:5, 10:5, 10:9
**seized** [3] - 22:4, 45:25, 147:4
**seizure** [5] - 21:25, 33:19, 44:8, 51:24, 58:12
**send** [1] - 153:15
**SENIOR** [1] - 1:10
**sense** [3] - 49:15, 49:17, 133:1
**sent** [2] - 40:24, 41:2
**sentenced** [1] - 105:24
**sentences** [2] - 105:16, 105:25

**sentencing** [2] - 105:9, 105:23
**separate** [5] - 14:17, 17:1, 83:21, 146:24, 147:23
**seriously** [1] - 86:17
**SESSION** [1] - 107:1
**set** [13] - 4:6, 12:23, 12:24, 13:11, 15:9, 19:1, 57:10, 58:21, 58:23, 59:2, 59:3, 132:18, 153:17
**setting** [2] - 58:25, 77:4
**seven** [1] - 84:6
**several** [4] - 45:21, 63:10, 96:6, 102:4
**shake** [1] - 52:8
**sham** [14] - 22:9, 22:13, 22:15, 22:16, 52:6, 53:10, 54:18, 55:2, 55:4, 60:14, 113:10, 113:14, 113:19
**sharing** [1] - 94:9
**shield** [1] - 19:10
**shoot** [1] - 106:3
**short** [3] - 17:12, 97:7, 104:25
**shortly** [3] - 7:17, 9:23, 59:11
**show** [18] - 12:20, 25:22, 28:13, 34:3, 36:17, 40:1, 40:4, 42:6, 68:24, 69:14, 70:10, 73:20, 89:3, 97:20, 97:23, 99:6, 100:12, 122:18
**showed** [1] - 83:10
**showing** [3] - 70:16, 89:5, 122:21
**shown** [2] - 80:18, 83:2
**side** [6] - 31:19, 32:4, 37:11, 81:16
**sign** [20] - 43:19, 43:23, 83:20, 83:24, 85:9, 85:10, 85:13, 85:17, 85:18, 85:19, 85:20, 86:4, 93:11, 93:16, 95:10, 95:19, 95:24, 96:2, 96:9, 124:1
**signature** [5] - 35:1, 42:19, 42:20, 123:3
**signatures** [6] - 34:23, 34:25, 42:16, 42:18, 123:2, 123:4
**signing** [1] - 95:13
**similar** [1] - 139:20
**simply** [5] - 5:21, 6:14, 12:7, 13:5, 63:17
**SIMPSON** [12] - 1:20, 3:13, 3:15, 3:20, 4:1, 5:16, 8:10, 11:21, 12:11, 13:5, 13:13, 44:19
**Simpson** [4] - 2:11, 8:9, 107:9, 132:7
**sit** [5] - 30:24, 44:19, 77:4, 101:12, 125:23
**sitting** [7] - 25:20, 31:7, 31:14, 31:19, 61:5, 79:3, 135:1
**situation** [2] - 33:18, 54:7
**six** [1] - 84:6
**Sky** [2] - 37:21, 87:5
**slightly** [2] - 9:19
**slow** [1] - 19:6
**slower** [1] - 6:25
**slowly** [1] - 19:22
**smaller** [1] - 81:14
**Smartphone** [1] - 52:18
**smuggle** [1] - 111:1
**Smuggling** [2] - 4:5, 45:12
**smuggling** [4] - 21:1, 21:3, 21:5, 111:4
**snippets** [1] - 7:21
**so..** [1] - 149:8

**soda** [4] - 38:5, 87:11, 128:8, 128:14
**someone** [6] - 22:13, 23:16, 24:2, 59:22, 61:24, 115:3
**sometime** [1] - 92:4
**sometimes** [2] - 21:5, 111:4
**somewhat** [1] - 4:24
**somewhere** [3] - 101:22, 103:10, 127:6
**soon** [2] - 18:13, 18:14
**sorry** [24] - 7:20, 24:23, 28:1, 30:15, 33:8, 43:13, 43:16, 55:13, 55:23, 86:9, 104:7, 105:7, 119:19, 125:19, 127:24, 130:22, 140:11, 142:5, 142:19, 147:21, 147:25, 148:17, 148:22, 152:14
**sort** [1] - 94:9
**sought** [4] - 4:13, 4:15, 4:19, 4:25
**sounds** [3] - 8:10, 8:11, 8:12
**space** [1] - 2:19
**speaking** [24] - 48:5, 55:22, 57:19, 64:19, 64:21, 65:20, 70:6, 91:2, 92:1, 117:18, 118:11, 122:8, 125:17, 131:4, 131:6, 138:5, 140:2, 142:14, 142:16, 144:9, 144:15, 145:7, 145:10, 149:24
**Special** [18] - 19:4, 21:24, 24:5, 28:4, 36:3, 36:9, 36:17, 36:20, 39:5, 108:10, 115:20, 118:16, 123:14, 124:6, 124:11, 124:16, 124:19, 129:21
**special** [18] - 8:4, 9:6, 9:7, 9:9, 9:11, 10:10, 10:22, 10:23, 16:7, 17:1, 20:13, 20:14, 20:23, 21:4, 110:11, 110:12, 110:23, 111:3
**specific** [4] - 49:9, 58:5, 97:15, 144:7
**specifically** [5] - 4:20, 21:1, 82:1, 130:3, 140:6
**spell** [8] - 19:16, 64:2, 108:17, 108:23, 125:20, 142:22, 142:24, 142:25
**spend** [1] - 91:2
**spent** [1] - 91:24
**spillover** [1] - 17:20, 17:22, 106:1
**spoken** [1] - 144:6
**spot** [2] - 81:18, 127:5
**Spot** [3] - 37:8, 37:9, 37:10
**spray** [3] - 54:22, 54:25, 55:15
**sprayed** [8] - 22:15, 54:22, 54:25, 55:2, 55:9, 55:10, 55:15, 55:17
**stairs** [2] - 120:18, 146:18
**stand** [10] - 13:12, 19:8, 39:16, 108:12, 125:9, 125:15, 125:25, 127:3, 127:8, 127:14
**standard** [5] - 30:1, 33:25, 91:20, 100:22, 122:15
**standing** [3] - 72:8, 103:5, 116:15
**start** [5] - 30:25, 35:15, 90:9, 90:12, 123:15
**started** [5] - 2:14, 3:12, 16:16, 19:3, 91:4
**state** [6] - 2:5, 6:1, 19:16, 21:7, 107:5, 108:17
**statement** [25] - 3:22, 5:6, 5:18, 5:19, 5:21, 5:23, 6:3, 6:4, 6:6, 6:7, 6:9, 6:11,

6:16, 6:17, 11:18, 13:16, 14:2, 34:1, 34:18, 47:6, 70:22, 83:12, 86:10, 101:21, 123:1

**statements** [67] - 3:22, 3:23, 4:3, 4:14, 4:15, 4:20, 4:22, 4:25, 6:21, 7:2, 7:4, 7:7, 7:11, 7:13, 7:15, 7:18, 8:2, 8:6, 8:7, 8:14, 8:17, 8:18, 8:20, 8:24, 9:5, 9:6, 9:8, 9:20, 9:21, 10:6, 10:8, 10:17, 10:25, 11:1, 11:2, 11:12, 11:24, 12:3, 12:4, 12:5, 12:8, 12:9, 12:14, 12:15, 12:24, 13:3, 13:7, 13:19, 13:20, 13:21, 14:4, 14:12, 14:13, 14:14, 14:18, 15:9, 16:20, 83:3, 84:7, 84:12, 95:17, 130:1, 130:2, 130:4

**STATES** [3] - 1:1, 1:2, 1:10

**States** [9] - 1:4, 1:13, 1:17, 2:3, 2:7, 51:14, 99:25, 107:4, 107:6

**stating** [2] - 97:6, 112:23

**steal** [2] - 68:8, 87:3

**stealing** [2] - 71:6, 71:12

**stems** [1] - 3:20

**stenography** [1] - 1:24

**step** [5] - 12:17, 13:24, 13:25, 104:8, 152:19

**still** [8] - 12:19, 52:14, 65:7, 114:4, 121:12, 123:23, 131:1, 141:14

**stood** [1] - 23:13

**stopped** [5] - 39:25, 41:9, 131:4, 131:6, 150:16

**story** [5] - 7:5, 7:9, 11:4, 27:21, 118:6

**straightened** [1] - 129:17

**strictly** [1] - 3:7

**striking** [1] - 90:17

**subject** [2] - 105:4, 127:22

**subjective** [1] - 77:16

**submits** [1] - 14:3

**subsequent** [5] - 7:11, 9:11, 13:3, 41:17, 101:2

**subsequently** [2] - 7:18, 44:10

**substance** [3] - 5:20, 22:16, 56:12

**substantially** [1] - 12:12

**substantively** [1] - 12:4

**sufficient** [4] - 13:8, 17:3, 18:2

**suit** [1] - 25:20

**suitcases** [1] - 24:19

**sum** [1] - 56:12

**supervisor** [7] - 45:11, 64:4, 71:25, 82:4, 125:12, 125:18, 127:15

**supposed** [2] - 8:16, 79:14

**suppress** [1] - 4:13

**SUPPRESSION** [1] - 1:9

**suppression** [5] - 2:3, 6:7, 6:11, 105:16, 107:3

**surveillance** [5] - 23:15, 50:10, 50:25, 51:11, 57:10

**suspect** [2] - 111:8, 135:14

**suspected** [2] - 21:5, 111:4

**suspects** [2] - 58:16, 120:3

**sustain** [2] - 50:3, 78:20

**sustained** [1] - 113:16

**Sustained** [4] - 50:20, 61:15, 140:14, 140:18

**swear** [1] - 111:20

**switch** [7] - 38:14, 38:21, 87:22, 87:25, 88:9, 89:13, 129:1

**sworn** [2] - 19:12, 108:16

**sworn/affirmed** [2] - 20:3, 110:3

## T

**table** [10] - 25:20, 31:5, 31:6, 31:8, 31:15, 31:16, 31:17, 32:2, 83:11, 121:4

**tables** [3] - 31:13, 31:14, 31:15, 120:23, 131:25

**tactical** [2] - 57:20, 57:24

**tap** [1] - 88:17

**tarmac** [83] - 4:17, 4:20, 4:22, 5:6, 6:3, 6:11, 7:5, 7:13, 7:15, 8:2, 8:7, 8:15, 9:15, 9:17, 9:25, 10:1, 10:6, 11:2, 12:6, 12:13, 12:14, 13:6, 13:19, 13:20, 14:3, 14:8, 14:12, 15:10, 15:11, 15:12, 16:1, 16:20, 17:4, 17:5, 28:19, 37:10, 53:24, 54:1, 54:2, 54:17, 55:20, 56:1, 56:10, 56:16, 59:11, 59:12, 71:7, 75:1, 75:2, 75:6, 75:8, 79:12, 79:24, 80:3, 81:3, 81:22, 102:21, 103:16, 103:22, 114:8, 116:3, 119:1, 119:5, 120:11, 133:4, 133:6, 133:11, 133:18, 135:21, 135:24, 136:1, 138:5, 143:10, 143:13, 143:16, 143:21, 144:4, 144:8, 144:25, 145:11, 147:2, 152:11

**technically** [2] - 99:23, 101:10

**technique** [1] - 12:17

**telephone** [2] - 2:22, 112:22

**Telephone** [1] - 1:23

**ten** [15] - 29:6, 29:7, 29:8, 33:2, 45:16, 45:20, 46:2, 55:21, 91:13, 103:4, 113:9, 133:21, 141:13, 153:18

**ten-minute** [2] - 29:7, 29:8

**tend** [1] - 123:8

**tendency** [1] - 123:9

**tenor** [1] - 122:6

**term** [7] - 95:2, 125:16, 125:17, 125:19, 125:22, 143:18, 143:19

**terminal** [6] - 46:11, 46:18, 50:10, 50:11, 53:2, 125:14

**Terminal** [15] - 22:1, 23:1, 37:11, 46:13, 46:15, 46:19, 47:4, 47:11, 49:12, 54:1, 54:2, 97:19, 98:15, 99:18, 118:25

**terminology** [6] - 57:20, 70:20, 98:25, 132:19, 134:5, 135:15

**Terrain** [3] - 30:10, 114:22, 120:8

**testified** [16] - 20:3, 49:12, 53:8, 60:23, 66:10, 67:7, 70:18, 70:25, 75:13, 79:6, 90:3, 96:6, 102:4, 110:3, 140:17, 142:2

**testify** [9] - 9:18, 15:13, 16:2, 16:25, 17:6, 18:7, 47:10, 55:15, 73:6

**testifying** [2] - 9:12, 9:14

**testimony** [14] - 7:14, 7:23, 9:5, 13:23, 14:10, 16:14, 17:2, 18:2, 62:5, 69:6, 71:13, 76:7, 104:24, 112:7

**text** [1] - 44:6

**thanked** [1] - 73:6

**THE** [250] - 1:10, 2:2, 2:9, 2:13, 3:11, 3:14, 3:19, 3:25, 5:13, 6:18, 6:24, 7:20, 8:9, 9:3, 9:12, 10:4, 10:12, 10:16, 10:25, 11:9, 11:22, 12:10, 12:21, 13:11, 14:6, 14:15, 15:1, 15:25, 16:9, 16:12, 17:10, 17:14, 17:18, 18:4, 18:10, 18:17, 18:20, 18:25, 19:6, 19:9, 19:11, 19:13, 19:14, 19:17, 19:18, 19:19, 24:23, 25:1, 25:4, 25:6, 25:7, 25:9, 25:24, 28:1, 28:4, 28:6, 30:15, 30:17, 31:12, 31:16, 31:17, 31:22, 32:6, 32:7, 33:8, 33:10, 34:5, 34:10, 35:8, 35:10, 40:3, 40:18, 40:22, 41:1, 41:4, 42:8, 43:4, 43:6, 43:13, 44:14, 44:17, 44:21, 44:23, 47:6, 48:18, 48:23, 50:3, 50:7, 50:8, 50:9, 50:12, 50:14, 50:20, 51:5, 55:23, 57:4, 57:6, 57:9, 57:11, 57:12, 61:15, 62:7, 62:9, 62:10, 66:12, 67:3, 67:9, 67:12, 67:13, 67:15, 67:23, 67:25, 68:2, 69:3, 69:7, 69:9, 69:11, 69:14, 69:20, 70:12, 70:16, 70:20, 70:24, 73:21, 73:25, 74:3, 74:5, 74:7, 74:24, 76:2, 76:6, 77:18, 77:24, 78:5, 78:12, 78:14, 78:19, 80:4, 80:5, 80:21, 80:23, 84:2, 84:14, 84:19, 86:16, 86:22, 86:23, 86:25, 89:4, 90:14, 90:17, 93:23, 96:13, 96:15, 96:16, 96:17, 96:20, 96:23, 96:24, 97:1, 97:3, 97:7, 97:20, 98:2, 99:8, 100:14, 102:6, 102:9, 102:13, 102:17, 104:2, 104:5, 104:7, 104:9, 104:13, 105:2, 105:6, 105:10, 105:14, 105:19, 105:22, 106:7, 106:12, 106:13, 107:3, 107:11, 107:24, 108:3, 108:9, 108:13, 108:14, 108:17, 108:20, 108:21, 108:22, 108:23, 108:24, 108:25, 113:16, 118:4, 122:20, 123:6, 123:7, 123:13, 125:7, 125:19, 125:21, 125:24, 125:25, 126:1, 126:2, 127:12, 127:20, 127:22, 130:20, 132:4, 132:7, 132:9, 136:22, 138:12, 138:14, 140:11, 140:14, 140:18, 140:23, 141:1, 141:4, 141:7, 141:10, 141:12, 141:17, 142:22, 142:24, 142:25, 143:1, 143:2, 147:4, 147:6, 147:9, 147:11, 148:25, 152:1, 152:17, 152:19, 152:20, 152:22, 152:25, 153:7, 153:13, 153:22

**thereafter** [3] - 7:17, 49:5

**therefore** [3] - 11:18, 11:19, 17:4

**third** [2] - 95:4, 99:15

**Third** [1] - 1:18

**thorough** [1] - 68:12

**three** [6] - 32:2, 72:3, 81:15, 84:6, 97:2, 106:1

**tick** [1] - 96:21

**tie** [1] - 25:21

**TikTok** [1] - 69:21
**title** [2] - 20:12, 110:10
**today** [30] - 2:19, 3:9, 4:4, 7:14, 7:24, 8:13, 9:5, 9:13, 9:14, 13:23, 14:10, 15:13, 16:7, 16:25, 17:2, 17:5, 18:2, 18:14, 18:17, 25:17, 47:2, 47:10, 70:25, 96:6, 101:7, 101:12, 112:7, 138:17, 152:23, 153:17
**together** [10] - 22:25, 31:14, 52:24, 53:15, 53:17, 56:9, 63:2, 94:10, 120:24, 133:6
**tomorrow** [14] - 17:21, 17:22, 17:23, 18:11, 18:13, 19:1, 19:2, 104:21, 104:22, 105:17, 106:3, 107:21
**tone** [3] - 26:10, 30:19, 120:14
**took** [22] - 12:16, 30:10, 31:10, 31:24, 32:17, 40:13, 40:14, 60:15, 76:11, 79:15, 86:7, 86:24, 91:18, 97:13, 102:2, 115:24, 121:2, 124:17, 124:20, 128:22, 145:8, 146:13
**tool** [6] - 65:12, 65:13, 137:25, 140:8, 140:15, 140:17
**total** [1] - 45:14
**touch** [1] - 22:18
**touched** [5] - 54:18, 55:1, 55:3, 55:6, 55:8
**toward** [3] - 24:9, 65:6, 65:9
**towards** [9] - 24:8, 54:10, 59:24, 65:4, 67:16, 67:23, 78:16, 87:4, 123:10
**trail** [2] - 123:8, 123:9
**trails** [1] - 130:20
**Transcript** [1] - 1:24
**TRANSCRIPT** [1] - 1:9
**Transcription** [1] - 1:25
**transpired** [1] - 48:15
**transport** [4] - 4:19, 30:2, 30:5, 79:14
**transporting** [1] - 120:4
**travel** [1] - 120:11
**traveled** [1] - 120:9
**trial** [3] - 61:13, 62:5, 80:19
**tried** [7] - 27:18, 38:24, 60:2, 67:19, 79:11, 87:19, 88:19
**trigger** [4] - 22:16, 22:19, 53:9, 54:17
**triggered** [13] - 24:7, 54:8, 54:14, 59:23, 60:24, 61:1, 62:14, 77:13, 77:22, 78:9, 78:15, 78:18
**trip** [9] - 77:13, 77:22, 78:9, 78:12, 113:19, 114:15, 117:8, 132:18, 132:20
**tripped** [4] - 77:11, 115:11, 134:5, 135:15
**trouble** [2] - 76:25, 77:7
**troubleshoot** [1] - 88:5
**truck** [2] - 37:21, 87:5
**true** [10] - 27:14, 47:9, 71:5, 77:8, 87:16, 97:12, 98:11, 98:14, 101:21, 118:7
**truth** [4] - 7:10, 8:7, 10:8, 11:3
**try** [18] - 18:13, 18:21, 19:21, 22:11, 27:13, 38:13, 68:15, 87:22, 87:23, 88:5, 88:17, 106:2, 106:5, 106:14, 129:1, 129:2, 141:20

**trying** [6] - 24:25, 27:7, 27:17, 67:19, 68:13, 107:12
**tug** [14] - 24:15, 24:16, 24:17, 24:23, 65:4, 65:6, 65:9, 65:16, 66:10, 67:16, 137:21, 137:24, 137:25
**turn** [5] - 76:24, 87:19, 87:23, 89:13, 89:17
**turned** [2] - 38:6, 51:14
**TV** [1] - 31:8
**two** [48] - 3:10, 5:3, 7:24, 8:12, 9:24, 12:17, 13:24, 13:25, 15:13, 17:5, 17:15, 18:18, 18:19, 18:21, 24:24, 31:7, 31:14, 31:15, 31:18, 41:13, 45:17, 45:19, 53:15, 60:9, 63:13, 64:6, 64:23, 80:6, 81:14, 84:6, 84:16, 91:5, 91:17, 91:23, 91:25, 102:23, 103:7, 105:3, 110:22, 115:25, 120:25, 135:8, 135:22, 149:20, 152:14
**two-step** [3] - 12:17, 13:24, 13:25
**type** [1] - 24:17
**typed** [1] - 4:8

# U

**U.S** [2] - 41:23, 102:7
**ultimate** [1] - 53:25
**ultimately** [6] - 50:21, 55:1, 93:2, 133:22, 144:11, 150:21
**un-Mirandized** [3] - 12:14, 13:16, 13:21
**un-redacted** [3] - 5:10, 5:14, 5:17
**unable** [1] - 66:7
**unaware** [1] - 5:12
**uncertainties** [1] - 2:16
**unclear** [1] - 56:25
**unconstitutionality** [1] - 12:25
**unconstitutionally** [2] - 11:19, 12:24
**under** [23] - 26:23, 29:13, 29:16, 29:17, 30:3, 55:1, 88:21, 88:23, 89:1, 93:8, 96:7, 96:8, 96:11, 96:14, 97:3, 97:19, 98:12, 98:16, 105:25, 117:7, 117:10, 119:12, 119:14
**underneath** [9] - 24:14, 39:2, 66:1, 66:3, 84:15, 88:4, 88:8, 89:21, 129:7
**understood** [11] - 35:18, 35:21, 83:9, 83:13, 85:21, 85:23, 86:5, 86:10, 95:18, 106:15, 123:18
**undisclosed** [1] - 5:4
**union** [1] - 82:11
**unit** [12] - 20:16, 20:18, 24:14, 27:7, 27:17, 71:10, 87:20, 88:6, 110:16, 110:18, 142:3, 144:18
**Unit** [8] - 4:5, 96:8, 145:25, 146:8, 147:15, 147:19, 147:24, 149:2
**UNITED** [3] - 1:1, 1:2, 1:10
**United** [8] - 1:4, 1:13, 1:17, 2:3, 2:6, 51:14, 99:25, 107:6
**Units** [1] - 45:12
**units** [1] - 71:1
**unload** [1] - 25:4
**unlocked** [1] - 120:19
**Untied** [1] - 107:3

**up** [50] - 5:25, 7:8, 8:5, 10:1, 10:11, 14:15, 19:21, 22:25, 30:20, 36:19, 39:3, 54:5, 55:20, 57:10, 57:12, 58:21, 58:23, 58:25, 59:2, 59:3, 66:6, 66:24, 67:21, 68:2, 75:19, 76:4, 84:1, 84:19, 89:15, 92:19, 92:20, 103:14, 109:1, 109:2, 120:15, 120:18, 122:7, 123:7, 124:3, 129:17, 130:21, 132:18, 133:3, 133:10, 135:3, 142:16, 146:18, 147:15
**upstairs** [2] - 27:19, 27:20
**USM129/312** [1] - 99:7

# V

**validity** [1] - 15:7
**variety** [1] - 13:14
**various** [2] - 49:11, 70:3
**vehicle** [54] - 23:13, 23:22, 23:23, 23:24, 24:10, 24:15, 24:16, 24:17, 24:24, 25:5, 28:23, 30:8, 30:11, 52:12, 52:23, 54:5, 56:2, 61:2, 61:6, 62:19, 62:22, 62:25, 63:7, 63:8, 63:10, 63:14, 65:5, 65:6, 65:9, 65:10, 65:11, 65:16, 66:6, 66:9, 66:24, 67:16, 75:4, 75:7, 76:11, 78:22, 78:24, 79:1, 79:5, 79:10, 81:4, 103:13, 120:6, 120:9, 133:8, 136:4, 136:24, 146:11
**vehicles** [8] - 63:10, 63:12, 77:3, 79:13, 136:25, 137:2, 137:5
**verbal** [4] - 43:18, 43:22, 95:18, 96:1
**verification** [1] - 100:1
**verify** [5] - 8:5, 27:13, 27:20, 75:22, 118:6
**version** [2] - 4:9, 5:10
**versus** [2] - 2:4, 14:18
**vicinity** [1] - 116:15
**video** [2] - 3:4, 107:14
**view** [8] - 41:15, 48:3, 48:14, 49:7, 49:19, 49:24, 50:1, 50:12
**viewed** [2] - 49:20, 49:23
**viewing** [1] - 48:2
**violators** [2] - 3:7, 107:15
**visibly** [1] - 65:15
**visualize** [1] - 24:25
**voice** [5] - 19:21, 109:1, 123:7, 130:20, 130:21
**voices** [1] - 136:20

# W

**wait** [4] - 11:11, 11:14, 22:10, 60:9
**waited** [3] - 65:2, 67:17, 114:17
**waiting** [6] - 65:3, 69:10, 114:19, 115:14, 115:18, 134:3
**waived** [1] - 17:8
**waiver** [1] - 84:16
**walk** [10] - 31:5, 63:15, 64:24, 66:9, 120:22, 136:9, 137:21, 147:24, 147:25, 148:2
**walked** [5] - 38:4, 65:4, 65:9, 65:16, 120:18

**walking** [4] - 65:6, 135:3, 135:7, 146:18
**wants** [2] - 6:6, 17:17
**warm** [3] - 38:6, 87:9, 87:12
**warning** [2] - 71:8, 88:1
**warnings** [1] - 12:19
**warrant** [2] - 44:11, 94:14
**watching** [2] - 114:13, 114:14
**water** [2] - 30:25, 82:22
**wax** [1] - 15:21
**ways** [1] - 141:13
**weapon** [2] - 26:8, 117:1
**wearing** [3] - 80:16, 121:12, 149:3
**website** [1] - 2:24
**week** [1] - 104:21
**weekend** [1] - 104:20
**weeks** [1] - 5:3
**weighed** [1] - 147:7
**welcome** [1] - 107:11
**whatsoever** [1] - 5:19
**whereas** [1] - 6:7
**wherein** [1] - 4:13
**whole** [6] - 15:20, 18:22, 41:15, 48:12, 52:16, 105:6
**wife** [2] - 82:14, 93:5
**wife's** [1] - 92:16
**willingness** [1] - 18:1
**window** [3] - 32:3, 81:15, 134:17
**wire** [6] - 77:11, 77:22, 78:10, 78:12, 134:5, 135:15
**wires** [1] - 77:13
**withdraw** [1] - 142:8
**withdrawn** [13] - 49:8, 53:7, 54:12, 54:23, 60:5, 66:18, 87:18, 136:25, 138:20, 139:3, 140:20, 142:7, 151:24
**withdrew** [1] - 66:22
**witness** [26] - 19:8, 19:12, 20:2, 25:23, 34:3, 40:1, 42:6, 48:19, 67:7, 68:25, 70:10, 70:17, 70:18, 73:20, 77:17, 84:1, 97:5, 99:6, 100:12, 104:12, 108:6, 108:12, 110:2, 122:18, 140:25, 141:11
**Witness** [3] - 104:10, 108:16, 152:21
**WITNESS** [41] - 19:13, 19:17, 25:1, 25:6, 28:4, 30:17, 31:16, 32:7, 33:10, 50:7, 50:9, 50:14, 57:9, 57:12, 62:9, 67:12, 67:15, 67:25, 74:5, 74:7, 78:14, 80:5, 80:23, 86:23, 96:15, 96:17, 96:23, 102:9, 104:9, 108:22, 108:24, 123:6, 125:21, 125:25, 126:2, 142:24, 143:1, 147:6, 147:11, 152:20, 154:3
**witnesses** [18] - 3:8, 3:18, 4:4, 5:6, 7:15, 7:16, 8:13, 8:17, 8:23, 9:12, 9:14, 9:24, 13:23, 17:21, 18:17, 18:21, 152:23, 153:3
**word** [5] - 84:16, 84:24, 94:19, 95:2, 134:4
**words** [2] - 59:5, 150:14
**works** [3] - 105:12, 132:24, 134:10
**world** [1] - 69:21
**wrap** [1] - 68:2
**write** [15] - 43:10, 43:20, 43:24, 85:10, 94:17, 94:18, 94:19, 94:23, 95:2, 95:7, 95:19, 95:21, 101:16, 111:22, 112:5
**writing** [2] - 5:7, 102:9
**written** [2] - 95:20, 95:22
**wrote** [4] - 43:12, 43:17, 95:23, 100:23

## Y

**year** [1] - 138:21
**years** [20] - 16:17, 20:15, 20:22, 37:2, 45:4, 45:5, 45:7, 45:10, 45:16, 45:17, 45:19, 45:20, 46:2, 88:14, 97:8, 110:14, 110:22, 125:2, 135:8, 152:14
**yell** [1] - 33:12
**yelling** [5] - 26:13, 90:7, 116:24, 136:13, 136:19
**YORK** [1] - 1:1
**York** [5] - 1:4, 1:14, 1:15, 1:19, 1:22
**yourself** [4] - 74:3, 76:23, 80:22, 122:4