FJN:RMP/MS
F. #2020R00153

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    – against –                                       Docket No. 20-CR-219 (DLI)

PAUL BELLOISI,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

THE GOVERNMENT'S MEMORANDUM OF LAW IN
OPPOSITION TO THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Robert M. Pollack
Margaret Schierberl
Assistant U.S. Attorneys
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

    I.    BACKGROUND ........................................................................................................ 1

        A.    The Indictment and Charges at Trial ...............................................................1

        B.    The Government's Case at Trial ......................................................................2

        C.    Unanimous Conviction.....................................................................................6

    II.    DEFENDANT'S MOTION SHOULD BE DENIED........................................................ 7

        A.    Legal Standard..................................................................................................7

        B.    The Evidence Proved Beyond a Reasonable Doubt that the Defendant
             Was Guilty of Each Conspiracy Count ...........................................................9

        C.    The Evidence Proved Beyond a Reasonable Doubt the Defendant's
             Knowledge and Intent to Import Cocaine .....................................................13

CONCLUSION................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

United States v. Anderson, 747 F.3d 51 (2d Cir. 2014) .................................................. 9

United States v. Guadagna, 183 F.3d 122 (2d Cir. 1999) ............................................ 7, 8

United States v. Huezo, 546 F.3d 174 (2d Cir. 2008) .................................................. 10

United States v. Klein, 913 F.3d 73 (2d Cir. 2019) ........................................................ 8

United States v. Landesman, 17 F.4th 298 (2d Cir. 2021) ............................................. 9

United States v. Londono-Villa, 930 F.2d 994 (2d Cir. 1991) ..................................... 14

United States v. Lorenzo, 534 F.3d 153 (2d Cir. 2008) .................................................. 8

United States v. Mariani, 725 F.2d 862 (2d Cir. 1984) .................................................. 9

United States v. Martoma, 894 F.3d 64 (2d Cir. 2017) .................................................. 8

United States v. Monica, 295 F.2d 400 (2d Cir. 1961) .................................................. 8

United States v. Pugh, 945 F.3d 9 (2d Cir. 2019) ........................................................... 8

United States v. Rodriguez, 392 F.3d 539 (2d Cir. 2004) ......................................... 8, 12

United States v. Rosa, 17 F.3d 1531 (2d Cir. 1994) ....................................................... 8

United States v. Temple, 447 F.3d 130 (2d Cir. 2006) ................................................... 8

United States v. Wexler, 522 F.3d 194 (2d Cir. 2008) .................................................... 9

United States v. White, 7 F.4th 90 (2d Cir. 2021) .......................................................... 7

**Statutes**

21 U.S.C. § 841 ........................................................................................................... 1, 6

21 U.S.C. § 846 ........................................................................................................... 1, 6

21 U.S.C. § 952 ................................................................................................. 1, 6, 8, 10

21 U.S.C. § 960 ................................................................................................. 1, 6, 8, 10

21 U.S.C. § 963 ................................................................................................. 1, 6, 8, 10

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant's post-trial motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29").

On May 2, 2023, following a one-week trial, a jury convicted the defendant Paul Belloisi of (1) conspiracy to possess cocaine with the intent to distribute, in violation of Title 21, United States Code, Sections 846 and 841(a)(1) (Count One), (2) conspiracy to import cocaine, in violation of Title 21, United States Code, Sections 963 and 960(a)(1) (Count Two), and (3) importation of cocaine, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1) (Count Three). Defendant Belloisi now moves pursuant to Rule 29 to overturn the jury's guilty verdicts on all counts, arguing that the trial evidence was insufficient to sustain the convictions. See ECF No. 86 ("Def. Mot.").

The defendant's motion falls far short of meeting the significant burden set forth under Rule 29. The government presented overwhelming evidence at trial—including substantial physical evidence, surveillance video, and telephonic records, as well as the testimony of expert, law enforcement and civilian witnesses—that proved the defendant's guilt beyond a reasonable doubt with respect to each count. The defendant's motion to overturn the jury's unanimous verdict is meritless and should be denied in its entirety.

I. BACKGROUND

   A. The Indictment and Charges at Trial

On June 18, 2020, a grand jury sitting in the Eastern District of New York returned an indictment (the "Indictment") charging the defendant with: (1) conspiracy to possess cocaine with the intent to distribute, in violation of Title 21, United States Code, Sections 846

and 841(b)(1)(A)(ii)(II) (Count One), (2) conspiracy to import cocaine, in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(B)(ii) (Count Two), and (3) importation of cocaine, in violation of Title 21, United States Code, Sections 952(a), 960(a)(1) and 960(b)(1)(B)(ii) (Count Three). See ECF No. 11.

On April 6, 2023, the government filed a letter in advance of trial advising the Court that, pursuant to recent revisions to Department of Justice policies on mandatory minimum charges, the government did not intend to pursue the charged mandatory minimum penalties and instead sought conviction on the lesser-included offenses, and accordingly requested that the jury not be instructed to make specific findings as to drug quantity. See ECF No. 65.

B. The Government's Case at Trial[1]

At trial, the government presented ample evidence that the defendant conspired with others to abuse his access to the tarmac at John F. Kennedy International Airport ("JFK Airport") and his specialized knowledge of aircraft to import cocaine into the United States and to possess with intent to distribute that cocaine, and that, together with others, he did import cocaine.

On February 4, 2020, the defendant was employed by American Airlines as an aircraft mechanic at JFK Airport. Trial Transcript ("Tr.") 75–76; Government Exhibit ("GX") 7. He had held this role for decades. Tr. 657. On that date, the defendant was specifically assigned to work at the hangar, Tr. 313–15; GX 103, on a specific aircraft, 7CC, located at Spot One. Tr. 320–21; GX 103. The hangar, and Spot One, were separate and distinct from the terminal. Tr. 310–11. The defendant was a hangar mechanic—not a terminal mechanic. Tr. 314, 324.

---

[1] The evidence set forth herein is only a summary of certain evidence supporting each count and does not include all of the trial evidence in support of each count.

Terminal mechanics, not hangar mechanics, were assigned to work on aircraft located at the terminal. Tr. 333–34. Because the defendant did not have a customs seal on his airport ID on February 4, 2020, on that date, he was not permitted to work on international aircraft located at the terminal. Tr. 198–200; GX 7.

On February 4, 2020, American Airlines aircraft 3BG flew from Montego Bay, Jamaica and landed at JFK Airport at 3:30 p.m. Tr. 438–41, 442; GX 104. It taxied for six minutes to Gate 7 where it parked at 3:36 p.m. Tr. 439, 442. Gate 7 was located at American Airlines Terminal 8. Tr. 133, 279; GX 401 – GX 405. Just prior to 4:00 p.m., Customs and Border Protection ("CBP") Officer Michael Robinson found ten bricks of cocaine hidden within the avionics compartment of aircraft 3BG while it was parked at Gate 7. Tr. 42–47; 78; GX 201, 201A, 202, 202A, 301. The drugs were photographed and video recorded. Id. Each brick subsequently tested positive for cocaine, and the total seized cocaine had a gross weight (including packaging) of 12.24 kilograms and a net weight of 10.020 kilograms. Tr. 91; GX S–1. The street value of that quantity of cocaine in New York City was well in excess of a quarter million dollars. Tr. 365.

After discovering and documenting the drugs, CBP removed them and replaced them with sham bricks. Tr. 47–49; 50–51; 56–58; GX 2, 6. The sham cocaine was sprayed with Clue Spray, a spray invisible to the naked eye but which glows green under a blacklight. Tr. 51; GX 2. One of the sham bricks was outfitted with a transponder, a small radio that emits a signal. Tr. 58. When the switch to the transponder is depressed, it emits a confidence tone every 30 seconds, which signifies that the transponder is working properly and that it is within range of the radio receiving the signal. Tr. 58–59; Tr. Ex 6. When the switch to the transponder is released, the radio emits an alarm tone. Id. When CBP sets up the transponder, the weight of the

3

brick depresses the switch; thus, the alarm tone signifies to law enforcement that the sham brick has been lifted. Tr. 59, 65. The transponder was properly functioning on February 4, 2020, and it sent a confidence tone to CBP Officer Robinson's radio once placed inside the avionics compartment. Tr. 60.

The defendant was observed entering the avionics compartment of aircraft 3BG at approximately 7:19 p.m. on February 4, 2020. Tr. 80–82; GX 306. The defendant remained in the avionics compartment and while inside, tripped the transponder's alarm transponder hidden inside the sham cocaine. Tr. 82. CBP Officer Robinson then approached the aircraft and observed the defendant fully inside the avionics compartment, adjusting the insulation blanket in front of where the sham cocaine was hidden. Tr. 83, 85. The defendant's gloves glowed green with Clue Spray when held under a blacklight—and at trial it was established that they still glow green—especially on the gripping surface of the fingertips and inside of the thumb of the right glove. Tr. 86–88; GX 4.

The evidence at trial further established that the defendant was wearing an American Airlines jacket with slits cut into the inside lining when he entered the avionics compartment of aircraft 3BG. Tr. 360–363; GX 3, 210. Special Agent Sean Gabay of the Department of Homeland Security testified that in his experience, such secret holes are used to hide items like bricks of cocaine in the lining of a jacket. Tr. 361. Testimony from the defendant's witness, Frank Ricci, established that airline mechanics use tools while working, and use tool bags to carry them. Tr. 642. The evidence established that the defendant drove to aircraft 3BG with a new-looking, empty, tool bag. Tr. 356; GX 205; 205A.

When CBP asked the defendant what he was doing inside the avionics compartment, the defendant stated that he was there to reset the air conditioning. Tr. 159. The

4

evidence at trial established that there was no problem with the air conditioning system, nor any mechanical issues, facing that aircraft that night. Tr. 249–253; GX 101. The evidence further established that the defendant was not an avionics mechanic, Tr. 320, nor a terminal mechanic, Tr. 314, 324, and that there was no legitimate reason for the defendant to be in the avionics compartment of that aircraft. Tr. 256.

When interviewed later that night, the defendant stated to Special Agent Gabay that he had gone into aircraft 3BG and eaten chips and a soda. Tr. 358. Video surveillance capturing the defendant's approach to the aircraft—and which showed he cannot have been in the aircraft or jetway for more than a minute, if at all, before he entered the avionics compartment—disproved this false statement. GX 306.

The evidence further established that at 12:58 a.m. on February 4, 2020, the night before the cocaine arrived at JFK, the defendant's cell phone—which is usually located in Long Island where the defendant lives—was in the parking lot of a White Castle in the South Bronx. Tr. 506–507; GX 505–506. The defendant's cell phone had sent a text message to a contact "Lester" shortly before that meeting, requesting to speak with "Lester." Tr. 507–512; GX 501. Evidence at trial established that the "Lester" cellphone had only been activated onto the cellphone network in January 2020. GX 504.

The defendant and "Lester" exchanged multiple calls and text messages on February 4, 2020. GX 501. At 6:47 p.m., the "Lester" cell phone sent a text message to the defendant stating, in part, "Confirmado!! Me acaban de confirmar." GX 501. The parties stipulated to the English–language translation of the message. GX S–4. In English, the message read, in part, "Confirmed!! They just confirmed to me." Id. Shortly thereafter, law enforcement

observed the defendant arrive at aircraft 3BG and enter its avionics compartment. Tr. 82; GX 306.

The evidence established that around the time of the defendant's arrest, and shortly after the "confirmed" message, the "Lester" cell phone was traveling from the Bronx to JFK Airport. GX 507. As the cell phone was moving from the Bronx to JFK Airport, and after arriving at or near JFK Airport, it repeatedly called the defendant's cell phone—"Lester" obviously unaware that the defendant was already in custody. Tr. 515–518; GX 504. The day after the defendant's arrest, the "Lester" cell phone was evidently abandoned, as evidenced by the fact that it permanently went off the network. GX 504.

The evidence further established that a particular phone number belonged to a friend of the defendant named Marco Buono, Tr. 542–547; GX 502–503, and that another number belonged to the defendant's daughter. Tr. 542–47, 557; GX 504. Prior to February 6, 2020, neither of those phones had contact with the "Lester" cell phone. Tr. 557–58. On the night of February 6, 2020—the night after the defendant's release on bond—the evidence showed the defendant's daughter's cell phone attempted to contact "Lester" for the first time ever at 11:14 p.m. and then again at 12:39 a.m. Tr. 557–58; GX 504. That same night, for the first time ever, Marco Buono's phone attempted to call the "Lester" number over twenty times. Tr. 558–59; GX 504. The "Lester" cell phone was already off the network by this time. Tr. 559; GX 504.

    C.    <u>Unanimous Conviction</u>

Trial commenced with jury selection on April 24, 2023 before the Honorable Magistrate Judge Robert M. Levy. On May 2, 2023, after less than one full day of deliberations, the jury unanimously found the defendant guilty on all counts. <u>See</u> ECF No. 84.

II.     DEFENDANT'S MOTION SHOULD BE DENIED

The defendant moves under Rule 29 for the Court to overturn the jury's unanimous verdict and enter a judgment of acquittal on all counts, contending that the government's evidence was insufficient on each count. As set forth below, the defendant misconstrues or ignores the significance of much of the evidence presented at trial and the reasonable inferences the jury was permitted to draw therefrom. Contrary to the defendant's contentions, the trial evidence supporting the defendant's conviction on each count was overwhelming, and the defendant's motion should be denied.

A.      Legal Standard

"If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal pursuant to Federal Rule of Criminal Procedure 29(c), but it may do so only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (internal quotation marks omitted). "A conviction must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," and the evidence must be viewed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." Id. (internal quotation marks omitted) (emphasis in original). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).

Thus, a defendant challenging a jury's guilty verdict "bears a heavy burden." United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017) (internal quotation marks omitted). In assessing a Rule 29 motion, a reviewing court must consider the evidence as a whole, not in isolation. United States v. Klein, 913 F.3d 73, 78 (2d Cir. 2019). This is so because "each fact may gain color from others." Guadagna, 183 F.3d at 130 (citing United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961)).

In addition to resolving any issue regarding witness credibility in the government's favor, the Court must leave to the jury the task of choosing among permissible competing inferences that can be drawn from the evidence. See, e.g., United States v. Pugh, 945 F.3d 9, 19 (2d Cir. 2019). In deciding which inferences to draw, the jury is entitled to use its common sense, Klein, 913 F.3d at 79, and "[t]he fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences not drawn were not available or were not reasonable," United States v. Rosa, 17 F.3d 1531, 1542 (2d Cir. 1994). Furthermore, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004)).

Even if the Court concludes that the jury could have acquitted the defendant, the Court may not disturb the jury's verdict on that ground, because, "[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." United States v. Temple, 447 F.3d 130, 137 (2d Cir. 2006). As the Second

Circuit recently explained, this "high degree of deference" given to the jury's verdict "is especially important when reviewing a conviction of conspiracy." United States v. Landesman, 17 F.4th 298, 320 (2d Cir. 2021). "'This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" Id. (quoting United States v. Anderson, 747 F.3d 51, 73 (2d Cir. 2014)). "The 'agreement to participate in the conspiracy may be inferred from the facts and circumstances of the case,' and 'both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence.'" Id. (quoting United States v. Wexler, 522 F.3d 194, 207–08 (2d Cir. 2008). "Moreover, 'seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.'" Id. (quoting United States v. Mariani, 725 F.2d 862, 865–66 (2d Cir. 1984)).

  B. <u>The Evidence Proved Beyond a Reasonable Doubt that the Defendant Was Guilty of Each Conspiracy Count</u>

Viewed in the light most favorable to the government, the evidence clearly supports the jury's verdict that the defendant knowingly and intentionally joined the charged conspiracies. Nevertheless, the defendant argues that the jury's verdict must be overturned because, he says, there was no indication that he knew the nature and specific object of the conspiracy, or that he agreed with anyone to do anything. Def. Mot. at 11. The defendant is wrong.

First, proof of the conspiracies themselves was overwhelming and largely uncontested. Indeed, the most fundamental fact of this case is undisputed: that on February 4, 2020, over a quarter million dollars' worth of cocaine was found in the avionics compartment of an aircraft that arrived at JFK from Montego Bay, Jamaica. It follows necessarily from the mere

9

fact of that discovery that someone put the cocaine into that compartment; and it requires only common sense to conclude that no one would put a quarter million dollars' worth of cocaine into a compartment on an airplane headed to JFK without an inside man at JFK with access to that compartment who had agreed to take it out. Cf. United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008) ("[J]urors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."). It is overwhelmingly likely that the conspiracy would involve still more people both "upstream" (in the manufacture, procurement and transportation of the cocaine) and "downstream" (in the arranging of the shipment and plans for distribution), but even when setting those reasonably inferred co-conspirators aside, the mere fact of the discovery of the cocaine in the place and circumstances where it was discovered is sufficient to prove a conspiracy between at least two people to import and distribute that cocaine.

All that remains to prove is that the defendant was that inside man with access to the tarmac at JFK who had agreed to remove the cocaine. And the evidence shows overwhelmingly that he was. As described at greater length above, the basic facts proven at trial were that: (1) nobody entered the avionics compartment after the drugs were removed by CBP until shortly before the aircraft was set to depart on its next flight; (2) the defendant then arrived—despite the fact that he was not assigned to work in that aircraft, or even in that part of the airport—and promptly entered the avionics compartment; and (3) the defendant almost immediately tripped the radio transponder by lifting a sham cocaine brick, which caused the telltale glow of Clue Spray under the black light on the grasping surfaces of his right glove. Moreover, the defendant had slits on the inside lining of his jacket that formed improvised interior pockets, as well as an empty tool bag in his vehicle—and although the defendant now makes much of the fact that he did not take the empty tool bag into the plane with him, it is

precisely because it would be so suspicious to enter with an empty tool bag that it is entirely reasonable for the defendant to enter without the bag first, only to return for it after confirming the presence of the cocaine and only if needed after filling the surreptitious interior pockets of his jacket. These basic facts alone are sufficient for a reasonable jury to conclude that the defendant went to the aircraft—where he had no business being—with the specific purpose and intent to retrieve the drugs that he knew were there because he was a knowing co-conspirator.

Additionally, although the defendant clearly handled the sham bricks (which upon close inspection are obviously not real drugs), he put them back the way he found them and did not report them to the CBP officers who appeared next to the aircraft when he exited. Rather, he pretended as if everything were normal and asked, "What's up, guys?" Tr. 74. The defendant's own witness, his fellow American Airlines mechanic Frank Ricci, examined a sham brick on the witness stand and testified that if he were to see such a thing inside the avionics compartment of an aircraft, he would report it. Tr. 809. The defendant's effort to pretend he had <u>not</u> handled the bricks when confronted by CBP—he would not have known he triggered the radio transponder or had invisible spray on his hands, so re-concealing the bricks would appear to him a means of getting away undetected—differentiates his conduct from that of an innocent mechanic and shows consciousness of guilt. Similarly, the fact that the defendant told law enforcement a false exculpatory story that he ate chips and drank a soda on the airplane before going down to fix the air conditioner, which the video evidence shows he did not have sufficient time to do, shows consciousness of guilt.

The above facts, without more, are sufficient to support the jury's verdict of guilty—that the defendant went to the aircraft with the specific intent (and fully prepared) to remove narcotics from the avionics compartment, because he had joined a conspiracy to import

and to possess with intent to distribute it. The additional evidence of a specific co-conspirator—the individual saved in the defendant's phone as "Lester"—is not necessary to convict the defendant, but provides additional support for the jury's verdict. Specifically, the evidence showed that the defendant had a late-night rendezvous with this person at a fast food restaurant in the South Bronx—far from the defendant's home on Long Island and his workplace at JFK Airport—the night before these events; that this person sent the defendant a "confirmed" message shortly before the defendant headed to the aircraft at issue; that this person shortly thereafter drove to JFK and called the defendant over and over and over again, not knowing the defendant was unable to answer because he was in custody; and that this person abandoned his burner phone the next day after the defendant's arrest, showing his own efforts to avoid the same fate, and his own consciousness of guilt.

In sum, the evidence was far more than sufficient to support the jury's conclusion that the defendant was a knowing co-conspirator, who was aware of the objects of the conspiracies and knowingly joined them.

The defendant's argument to the contrary on the basis that this case is supposedly similar to United States v. Rodriguez, 392 F.3d 539 (2d Cir. 2004), is meritless, because this case is not like Rodriguez at all. The defendant in Rodriguez was charged with participating in an attempted heroin sale because he served as a "lookout" for the drug dealer. Id. at 541–42. The Second Circuit concluded that the evidence was sufficient to "permit[] the jury to conclude that Rodriguez acted as a lookout," but not that he knew what specifically he was serving as a lookout for, which from his perspective might have been something other than a drug transaction. Id. at 546. Here, by contrast, the defendant's role was much more central: he was the inside man with access to sensitive aircraft compartments, and his role in the conspiracy was

12

thus to physically remove the drugs and transport them to the next man. This role, unlike that of a mere lookout, cannot be performed in ignorance of the nature of the task. Rodriguez thus is wholly inapposite, and the defendant's arguments should be rejected.[2]

      C.      The Evidence Proved Beyond a Reasonable Doubt the Defendant's Knowledge and Intent to Import Cocaine

Lastly, the defendant challenges his conviction on the importation and conspiracy to import counts on the basis that, he argues, the evidence was insufficient to establish the defendant's knowledge that the cocaine was imported into the United States from somewhere outside of the country. Def. Mot. at 15–17. Again, the defendant is wrong.

The defendant does not dispute that the trial evidence showed that the cocaine in this case did get imported: specifically, it entered the United States at JFK Airport on a flight from Montego Bay, Jamaica. Nevertheless, the defendant argues that the evidence is insufficient for a rational jury to conclude that he knew that at the time. This argument strains credulity. First, any person who works at an airport—and for that matter, any person who can Google flight numbers—is capable of quickly finding the origin city and other details of any flight. Moreover, because the defendant did not have a customs seal on his airport ID and could therefore face discipline for entering international aircraft, he can reasonably be expected to be aware, if not more mindful of the distinction between domestic and international flights. When he went to an

---

[2] The defendant also cites, on page 14 of his motion, the purported case United States v. Bulgin with the citation 19 F.3d 270 (2d Cir. 1994), which he also quotes in his discussion of the applicable legal standard on page 4. That citation is not correct—rather, it is the citation to a non-criminal case from the Sixth Circuit, Jewish Hosp., Inc. v. Sec'y of Health & Hum. Servs., 19 F.3d 270 (6th Cir. 1994)—and the government has not been able to locate any case that contains the quotations the defendant attributes to Bulgin. The defendant's discussion of the legal standard on page 4 also quotes United States v. Farhane, 634 F.3d 127 (2d Cir. 2011), which is a reported case but does not contain the quotation that the defendant attributes to it.

13

international terminal and entered a particular airplane that had arrived on an international flight—as the evidence as trial showed he did—the jury could rationally conclude that he was aware of that fact, even if the same aircraft was scheduled to depart on a domestic flight thereafter.

Second, the defendant's role in the conspiracy as the inside man at JFK Airport was necessary for the conspiracy's success precisely because the heightened security measures at airports make it difficult to smuggle contraband through them. Drug traffickers who move drugs domestically within the United States can avoid those heightened security measures simply by using cars and trucks rather than commercial aircraft. It is reasonable to infer that an airline mechanic at an international airport who agrees to smuggle large quantities of narcotics using airplanes will necessarily know that those narcotics are being brought into the United States from overseas on those planes, and not from other parts of the country. In short, the undisputed evidence that the seized cocaine was in fact imported into the United States in the very same avionics compartment in which the defendant was caught red-handed, together with the evidence that the defendant was an airline mechanic at JFK Airport who was not lawfully permitted into international aircraft, and basic common sense, are sufficient for a rational jury to conclude beyond a reasonable doubt—as the jury did conclude—that the defendant knowingly conspired to import and assisted in the importation of cocaine.

The defendant's suggestion that United States v. Londono-Villa, 930 F.2d 994 (2d Cir. 1991), says anything to the contrary is mistaken. The defendant in Londono-Villa helped load cocaine in Colombia into an airplane headed to Panama. Id. at 996. That cocaine later made its way to the United States, but there was no evidence at trial that the defendant in that case knew or had any reason to expect that. Id. Accordingly, the Second Circuit held that the

14

evidence was insufficient to support guilt on an importation charge. Here, by contrast, the defendant was an airline employee in the United States, caught attempting to unload cocaine that had arrived on an international flight to an international terminal. The evidence is more than sufficient to support the jury's verdict.

## CONCLUSION

For the reasons set forth above, the government respectfully submits that the Court should deny the defendant's motion for a judgment of acquittal.

Dated: Brooklyn, New York
May 31, 2023

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: /s/
Robert M. Pollack
Margaret Schierberl
Assistant United States Attorneys
(718) 254-6232/6187