1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  ------------------------------x
                                        20-CR-219(DLI)
3  UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5          -versus-                     May 1, 2023
                                        9:30 a.m.
6  PAUL BELLOISI,

7          Defendant.

8  ------------------------------x

9            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
               BEFORE THE HONORABLE DORA L. IRIZARRY
10                 UNITED STATES DISTRICT JUDGE
                        BEFORE A JURY
11

12 APPEARANCES

13 For the Government:      UNITED STATES ATTORNEY'S OFFICE
                            Eastern District of New York
14                          271 Cadman Plaza East
                            Brooklyn, New York 11201
15                          BY:  ROBERT POLLACK, ESQ.
                                 MARGARET SCHIERBERL, ESQ.
16                               PAUL ERICKSEN, ESQ.
                            Assistant United States Attorneys
17
   For the Defendant:       COHEN & FORMAN LLP
18                          950 Third Avenue
                            New York, New York 10022
19                          BY:  DAVID COHEN, ESQ.
                                 BENJAMIN SIMPSON, ESQ.
20

21 Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
                            Phone:  718-613-2268
22                          Email:  RivkaTeich@gmail.com

23 Proceedings recorded by mechanical stenography.  Transcript
   produced by computer-aided transcription.
24

25

1                    (In open court.)

2          THE COURTROOM DEPUTY:  All Rise.  On for trial,

3    20-CR-219, United States vs. Belloisi.

4          State your appearances.

5          MR. POLLACK:  Robert Pollak for the United States,

6    accompanied by my colleagues Margaret Schierberl, Erik

7    Paulsen, Sofia Cronin, and John Maloney.

8          Good morning, your Honor.

9          THE COURT:  Good morning to all of you.

10         MR. COHEN:  On behalf of Mr. Belloisi, who is seated

11   to my right, David Cohen and Benjamin Simpson good morning.

12         THE COURT:  Good morning to all of you.  Good

13   morning to all of our observers.

14         The jury is not present.

15         The Court is aware based on the filing of the

16   Government of a letter this weekend of an issue that the

17   Government wants to raise with the Court.  I assume the

18   defendants has received the copy of the Government's filing.

19         MR. COHEN:  That's correct.

20         THE COURT:  And that's docket entry 78.

21         Who wishes to address it from the Government?

22         MR. POLLACK:  I will, your Honor.

23         THE COURT:  Okay, you may proceed.

24         MR. POLLACK:  As noted in the letter, we just wanted

25   to alert the Court and also defense counsel of a potential

1    issue, it's not clear to us that it necessarily has to become

2    an issue.  But because there was a prior sworn statement of

3    the defendant in this case that there were already flight crew

4    members and others on the plane when he arrived, it appeared

5    from both some the testimony of the defense witness yesterday

6    and comments of defense counsel at sidebar quoted in the

7    letter, that the defense seemed to be suggesting that the

8    defendant arrived to an empty plane.  We were concerned that

9    would run afoul of defense counsel's ethical obligations if he

10   were to either refute something that was already stated in a

11   sworn statement of the defendant, or essentially implicate the

12   defendant in having filed a false affidavit.

13         From a brief discussion with defense counsel before

14   the proceedings today, he suggested to me that their intention

15   is only to argue that the pilot wasn't present not that

16   others, not that it was actually an empty plane.  If that's

17   correct, as long as that is the only argument or suggestion, I

18   don't think that does directly contradict the statement in the

19   declaration.  So I think that could avoid the issue.

20         We wanted to make sure that the Court is aware of it

21   and that defense counsel is essentially on notice that it is a

22   fine needle to thread.

23         THE COURT:  You wish to be heard from the defense

24   side?

25         MR. SIMPSON:  Yes, Judge.

1          The Government has essentially stated the defense's

2    position; that yes, we plan -- we don't think it's threading

3    as fine a needle as the Government does.

4          THE COURT:  I do.

5          MR. SIMPSON:  The issue is whether or not the

6    captain was on the plane and whether he was in the cockpit.

7    None of that is talked about in the defendant's statement at

8    all.

9          We never had an intention, and we won't be arguing

10   that no one was on the plane at all when Mr. Belloisi arrived.

11   That argument won't be heard.  It will only be about the

12   captain and the cockpit; and the captain and the cockpit do

13   not appear in his sworn declaration.

14         THE COURT:  As long as the Government is comfortable

15   with that representation and the defense adheres to what it is

16   representing it will do, there won't be sanctions that will

17   flow from failure to adhere to what the parties have

18   represented.  Otherwise you might find yourselves subjected to

19   having the Government reopen the case and introduce the

20   defendant's prior statement.  You can't have it both ways.

21         All of our jurors are here.  If there is nothing

22   else to address, we can bring in the jury.

23         Who is going to be the Government's first witness?

24         MR. POLLACK:  I believe we need to begin with the

25   cross-examination of the defense witness.

1          THE COURT:  That's correct, yes, Mr. Ricci.

2          MR. POLLACK:  I don't know whether he's here.

3          MR. COHEN:  I saw him outside.

4          THE COURT:  Why don't we bring in the jury.

5          MR. SIMPSON:  Your Honor, I'm sorry to interrupt.

6  If the defense may be heard with respect to the Government's

7  proffered rebuttal case.

8          The defense generally objects, as to our

9  understanding, that the Government's rebuttal case is going to

10  be bringing in witnesses to talk about aircraft maintenance

11  policies, procedures, norms, American Airlines mechanic job

12  assignments, procedures, protocols, norms.  These are things

13  that four of their witnesses already talked about extensively

14  on their case in chief.

15          The way the Government structured their case, they

16  introduced the defendant's self-exonerating statements or

17  partially self-exonerating statements, then introduced all of

18  these witnesses to talk about the procedures and the rules and

19  the protocols so as to prove that his statement must be false

20  and is therefore indicative of guilt.  That's essentially what

21  they laid out in their case this chief.

22          The defendant's one witness, Mr. Ricci, simply met

23  those issues in his testimony.

24          THE COURT:  And the Government is entitled to

25  challenge that testimony.  So your objection is overruled.

1          Let's bring in the jury.

2          (Jury enters the courtroom.)

3          THE COURT:  Jury entering.  All rise.

4          Good morning jurors.  Welcome back.  Everyone may be

5     seated.

6          Do the parties agree that all of our jurors are

7     present and properly seated?  Government?

8          MR. POLLACK:  Yes, your Honor.

9          THE COURT:  Defense?

10         MR. COHEN:  Yes, your Honor.

11         THE COURT:  I hope everyone had a nice restful

12    weekend.  I know it was raining, kind of nothing else you

13    could do but eat soup and go to sleep.

14         Any way, we are continuing with the defense case.

15    Please ask Mr. Ricci to come in.  And we are beginning with

16    the cross-examination by the Government.

17         (Witness takes the witness stand.)

18    **FRANK RICCI,** called as a witness, having been previously first

19    duly sworn/affirmed, was examined and testified further as

20    follows:

21         THE COURT:  Good morning.  If you could just state

22    your name again please for the record.

23         THE WITNESS:  Frank Ricci, R-I-C-C-I.

24         THE COURT:  Please have a seat.  Just keep your

25    voice up nice and loud and speak slowly if you would please.

1    Thank you.

2              You may inquire when you're ready, Ms. Schierbel.

3              MS. SCHIERBERL:  Thank you, Judge.

4    CROSS-EXAMINATION

5    BY MS. SCHIERBERL:

6    Q    You do undocumented mechanical work on airplanes,

7    correct?

8    A    There is a -- all mechanics will do it.  Pilots don't put

9    items in the book.  There are items that are, you know, that

10   could cause delay that a pilot wouldn't put in a book.

11   Everybody does.

12   Q    So by everybody, you would include yourself?

13   A    Yes.

14   Q    So you do undocumented mechanical work on airplanes?

15   A    I have done, yes.

16   Q    What undocumented maintenance work did you do last week?

17   A    Last week I actually had a plane come in with a tire that

18   was questionable, and the pilot never put the tire in the

19   book.  I had a reference which said the tire was good for

20   service, but it was never documented that I looked at the tire

21   or went out to the tire.

22   Q    What was the tail number of that aircraft?

23   A    I don't remember offhand.

24   Q    How many times last week did you do undocumented

25   maintenance work on airplanes?

1   A    I don't recall how many times.

2   Q    More than five?

3   A    Probably not.

4   Q    More than two?

5   A    Probably yes.

6   Q    So last week you did more than two undocumented items of

7   work on airplanes; is that correct?

8   A    Yes.

9   Q    How many undocumented mechanical issues did you resolve

10  last month?

11  A    I don't recall.

12  Q    More than five?

13  A    Yes, probably.

14  Q    What type of work did you do that did you not document?

15  A    We'll get gate calls for lost cellphones, which is

16  undocumented.  We're supposed to find cellphones, we're

17  supposed to -- hydraulic servicing has been done on airplanes

18  that hasn't been documented.

19  Q    Just to be clear Mr. Ricci, I'm asking about your

20  behavior.  So not what is supposed to happen --

21  A    I --

22  Q    But what did you last week or last month.

23  A    I'm telling --

24        THE COURT:  Wait until she finishes the question

25  then you can answer.

1    Q    What types of undocumented mechanical work did you do on

2    airplanes last month?

3    A    Lost cellphones, seatbelts in aircraft, the tire that I

4    had mentioned.  Basically it's different every day.  We have

5    gate calls that don't get documented.

6    Q    Other than the items that you listed, have you done any

7    other undocumented mechanical work on airplanes?

8    A    Not that I can remember.

9    Q    So other than lost cellphones, seat bests and an issue

10   with a tire, you've never done any other undocumented

11   maintenance work on an airplane?

12   A    I don't recall.

13   Q    Would you expect that you have done other undocumented

14   mechanical work on an airplane other than those two or items?

15   A    I probably have, yes.

16   Q    What types of work do you expect you've done that did you

17   not document?

18   A    We have gone out, we get gate calls from the pilots and

19   we run out to the gates to see what the issue is.  A lot of

20   the issues are not, it's more research than maintenance.  It's

21   finding it in the log book, finding it in the damage log, or

22   other issues that are not really maintenance but documentation

23   problems.  So they call maintenance for other things other

24   than just maintenance.

25   Q    What types of undocumented mechanical work have you done

1  on airplanes?

2  A     The ones I mentioned.

3  Q     Other than the lost cellphones, the seatbelts, and the

4  tire, are there any other types of mechanical work that you

5  have done on airplanes that you did not document?

6          MR. COHEN:  Objection.

7          THE COURT:  Overruled.

8  Q     Would you like me to read back the question?

9  A     Yes.

10          MS. SCHIERBERL:  Can I get that question read,

11 please.

12          (Whereupon, the record was read.)

13 A     Offhand I can't recall any specific items, but I'm sure I

14 if I went back and looked I would find things that I have

15 done.

16 Q     You testified on Thursday that your job as a mechanic is

17 to, quote, "insure that the aircraft are safe and air worthy

18 for departures."  Do you recall that?

19 A     Yes.

20 Q     Is it fair of me to say that safety is important to you?

21 A     It's utmost importance, yes.

22 Q     It's of the utmost importance to you because human beings

23 fly in airplanes; is that correct?

24 A     Yes.

25 Q     Sometimes hundreds of people fly in a plane?

1    A    Yes.

2    Q    How many people fit on a 737?

3    A    It's a little over 100, 130 I believe.  Depends on the

4    size of the airplanes, different models of 737.

5    Q    In fact, a 737 has 160.

6    A    Yes.

7    Q    That's just passengers, right, it doesn't include the

8    flight crew?

9    A    Correct.

10   Q    That's a narrow-bodied plane, correct?

11   A    Yes.

12   Q    Also wide-bodied planes?

13   A    Yes.

14   Q    Those hold even more people, correct?

15   A    Yes.

16   Q    Fair of me to say that a wide-bodied plane can hold more

17   than 400 human beings?

18   A    I never worked on an aircraft that held 400 human beings.

19   Q    How many persons fit on a wide-bodied airplane?

20   A    The ones we work on, 250.

21   Q    250 people.  Can we agree, human beings place their trust

22   in that airplane when they fly?

23   A    Yes.

24   Q    Fair of me to say that you, as an airplane mechanic, play

25   a critical control in that trust?

1    A    Yes.

2    Q    You take that responsibility seriously, don't you?

3    A    I do.

4    Q    Can we agree that your work as an airline mechanic can

5    literally mean the difference between life and death?

6    A    Yes.

7    Q    In the 20-plus years you've been an airline mechanic,

8    you've received training at work, correct?

9    A    Yes.

10   Q    That training includes how to properly document the

11   maintenance work you perform on airplanes?

12   A    Yes.

13   Q    That training includes the ways in which failing to

14   properly document maintenance work could get you fired?

15   A    Yes.

16   Q    That training includes how failing to properly document

17   maintenance could result in violating federal law, correct?

18   A    Yes.

19   Q    Was that a yes?

20   A    Yes.

21   Q    You've been a mechanic almost 30 years?

22   A    I came in '96, 23, 24.

23   Q    Twenty-six years ago?

24   A    Yes.

25   Q    You're familiar with the American Airlines general

1   procedures manual?

2   A    Yes.

3   Q    You understand that Section 5 of that manual regards

4   aircraft maintenance and the log book, correct?

5   A    I wouldn't be able to tell that you without it in front

6   of me.

7   Q    Would it surprise you if I told that you Section 5 of the

8   American Airlines procedure manual regarding aircraft

9   maintenance?

10  A    No, it won't.

11  Q    Would it surprise you if I told you that the log book is

12  the, quote, "main record of the aircraft engines and their

13  systems and components"?

14  A    No.

15  Q    Is it fair to say that the log book is literally the

16  record of mechanical discrepancies?

17  A    Yes.

18  Q    You're aware that under Section 5, each person who takes

19  action critical to the safety of a flight must make a record

20  of that action?

21  A    Yes.

22  Q    As part of the rules of your job, mechanical

23  discrepancies observed by maintenance personnel must be

24  recorded?

25  A    Yes.

1    Q    Maintenance personnel, that's you, right?

2    A    It's me and several other people, yes.

3    Q    You're aware that under Section 5.1 any accomplishment of

4    maintenance and other maintenance operations must be recorded?

5    A    Without the document in front of me, I can't tell what

6    you section is what.

7    Q    Would it surprise you that under Section 5.1, quote, "an

8    accomplishment of maintenance and other maintenance operations

9    must be recorded"?

10           MR. COHEN:  Objection.

11           THE COURT:  Sustained.

12   Q    Are you or are you not aware whether Section 5.1 states

13   that any accomplishment --

14           THE COURT:  You can't read from a document that's

15   not in evidence.  Sustained.

16   Q    You're aware that any maintenance -- that after any

17   maintenance there must be a --

18           THE COURT:  Form, please.  It's not a question.

19   Q    Are you aware that after any maintenance there must be an

20   aircraft air worthiness release or appropriate entry in the

21   log book before the next flight?

22   A    There is not necessarily an air worthiness release for

23   every time it lands, only after major alterations and major

24   work.

25   Q    I'll repeat my question.  Are you aware that after any

1  maintenance there must be an aircraft air worthiness release

2  or an appropriate entry in the log book before the next

3  flight?

4  A     There should be an entry, yes.

5  Q     Pursuant to the manual, in fact, there must be an

6  aircraft air worthiness release or and appropriate entry in

7  the log book?

8  A     What was the question?

9  Q     Is it true that according to the manual, there must be

10  either an aircraft air worthiness release or an appropriate

11  entry in the log book before the next flight?

12  A     I can't quote from the manual, but yes.

13  Q     That's your job, right, air worthiness?

14  A     Aircraft maintenance.

15  Q     As you testified on Thursday, your job is safety and air

16  worthiness, correct?

17  A     Yes.

18  Q     Fair of me to say your job includes air worthiness?

19  A     It includes it, yes.

20  Q     Are you aware that under Section 5, all maintenance must

21  be reflected in the log book?

22          MR. COHEN:  Objection.

23          THE COURT:  Sustained as to form.  Be mindful you

24  can't read from something that is not in evidence.

25          MS. SCHIERBERL:  May we briefly have a sidebar, your

1   Honor?

2           THE COURT:  Yes.

3           (Continued on the next page.)

1          (Sidebar conference.)

2          MS. SCHIERBERL:  Your Honor, I'm just attempting to

3  elicit whether or not the witness is aware of the contents of

4  the log book.

5          THE COURT:  I'll hear from you, sir.

6          MR. COHEN:  One is, I believe that's a question

7  about the maintenance manual, not the log book.  But separate

8  and apart from that, it's still an indirect quote from what

9  counsel is suggesting in his presence in the maintenance

10 manual, which is similar to quoting from something not in

11 evidence.

12         She can say, what does the log book speak about?

13 What does the maintenance manual speak about in regards to

14 XYZ.

15         To cite a chapter, it's a way to get around your

16 Honor's ruling to do an indirect quote.

17         MS. SCHIERBERL:  May I respond, your Honor?

18         THE COURT:  Yes.

19         MS. SCHIERBERL:  I'm not trying to get around your

20 Honor's ruling.  I'm trying to elicit whether or not this

21 witness is aware of what that section of the manual says.

22         MR. COHEN:  By suggesting what it says, what is in

23 essence quoting from the manual.

24         THE COURT:  It's straddling very close, almost to

25 the point of stepping over the line.  So you can rephrase your

1    question.  Isn't it required to, or are you required to make

2    such and such entry in a log book.

3                I don't know if you're planning to put the manual in

4    or not, but you're coming really close to basically

5    insinuating what is on the document.

6                MS. SCHIERBERL:  I'll rephrase, your Honor.  Thank

7    you.

8                THE COURT:  Rephrase.

9                (End of sidebar conference.)

10               (Continued on the next page.)

1           (In open court.)

2           THE COURT:  The objection is sustained as to form.

3    You may rephrase.

4           MS. SCHIERBERL:  Thank you, Judge.

5    BY MS. SCHIERBERL:

6    Q    Mr. Ricci, isn't it required under Section 5 that all

7    maintenance must be reflected in the log book?

8    A    Section 5, I'm not sure of the section, but I do believe

9    it is, yes.

10   Q    Isn't it required under Section 9 of the manual that

11   there must be a record of all work done, who did the work, and

12   what date the work was done?

13          MR. COHEN:  Objection.

14          THE COURT:  As to form.

15          MS. SCHIERBERL:  Your Honor, may I approach the

16   witness with what has been marked for identification purposes

17   only as Government Exhibit -- may I have a moment, your Honor?

18          THE COURT:  Yes.

19          MS. SCHIERBERL:  Permission to approach the witness

20   with what has been marked for identification purposes only as

21   Government Exhibit 708?

22          THE COURT:  You want to show it to counsel?

23          MS. SCHIERBERL:  Yes, your Honor.

24   BY MS. SCHIERBERL:

25   Q    Mr. Ricci, I've handed you what is marked as Government

1    Exhibit 708.  Can we agree this is Section 9.03 of the

2    American Airlines maintenance manual?

3              MR. COHEN:  Objection.

4              THE COURT:  Sustained as to form.

5              Do you know what that is?

6              THE WITNESS:  It says 9.03 --

7              THE COURT:  You can't read from the document.

8              THE WITNESS:  No.

9              THE COURT:  Do you recognize what that document is?

10             THE WITNESS:  It's a portion of the GPM, the general

11   procedures manual.

12   BY MS. SCHIERBERL:

13   Q    Am I correct that pursuant to Section 9.03.1B in

14   accordance with federal requirements, records show the work

15   done, who did the work, and what date the work was done --

16             MR. COHEN:  Objection.

17             THE COURT:  Sustained.

18             You cannot read from something that's not in

19   evidence.

20   BY MS. SCHIERBERL:

21   Q    Mr. Ricci, can you please read silently section 9.03.1B

22   and look up at me when you're done?

23             MR. COHEN:  Objection.

24             THE COURT:  Sustained.

25   Q    Mr. Ricci, are you aware of what Section 9.03.1B states?

1           MR. COHEN:  Objection.

2    A    No, I'm not.

3           THE COURT:  May I see counsel, please.

4           (Continued on the next page.)

1      (Sidebar conference.)

2      THE COURT:  I'll let you state your objection.

3      MR. COHEN:  Again, we're talking -- counsel is

4  introducing and referencing something, citing chapter and

5  versus, what is listed in something that is not in evidence.

6  That's impermissible.  The document is not in evidence.

7      MS. SCHIERBERL:  Your Honor, I'm simply trying to

8  establish this witness's familiarity with the American

9  Airlines general procedures manual.  He's answered a few

10 questions already about the manual and he testified that he's

11 been an American Airlines mechanic --

12     THE COURT:  I understand that.  But this is not the

13 proper way to do that.  You can't just go and have him start

14 looking at it and answering questions after reading the

15 document.  It's the same thing as reading from the document.

16     You have to lay the foundation, whether he's

17 familiar with the manual, the contents of the manual, has he

18 seen this before, is he familiar with the contents.

19     All he said is, I don't know what that section, but

20 the manual requires it.  So all he's not familiar with is the

21 particular section of the manual, but he has said he's

22 familiar with what the manual requires.  So I'm not

23 understanding what you're trying to get at here.

24     MS. SCHIERBERL:  I can lay the foundation, your

25 Honor, that the witness is familiar with this the specific

1  section of the manual before I ask him about it.

2          THE COURT:  You're still trying to ask him about the

3  document.  You're still trying to ask him about the document,

4  which is the same thing that Mr. Simpson was trying to do with

5  your expert with the chart.

6          MR. SIMPSON:  Timeline.

7          THE COURT:  The timeline, thank you, that was

8  prepared.  This is the same thing on a different foot.

9          MS. SCHIERBERL:  Yes, your Honor.  I understood the

10  Court's ruling to be that Mr. Simpson could use the document

11  himself to inform his questions of the witness.  And that was

12  what I was attempting to --

13          THE COURT:  That's fine, but you're asking him what

14  is in the document, specifically by referencing the document.

15  So either you introduce the document, lay the foundation for

16  the introduction of the document, and go from there.  But he

17  hasn't said anything about that that is contradicted, what is

18  in the document proper, other than saying I don't know the

19  section.

20          I may not know every single subsection of the

21  federal rule of evidence.

22          MR. COHEN:  I don't believe that.

23          THE COURT:  But that kind of particularity.

24          MS. SCHIERBERL:  At this point, your Honor, what I

25  would like to do is have the witness be able to use the

1   document to refresh his recollection.

2           THE COURT:  But he hasn't said he doesn't recall.

3           MS. SCHIERBERL:  Okay, I won't ask questions about

4   the contents of the document without seeking to admit it.

5           (End of sidebar conference.)

6           (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2     BY MS. SCHIERBERL:

3     Q    Mr. Ricci, you've been an American Airlines mechanic for

4     about 26 years, correct?

5     A    Yes.

6     Q    You received training on how to be an American Airlines

7     mechanic, correct?

8     A    Yes.

9     Q    Part of that training included a review of the American

10    Airlines general procedures manual, correct?

11    A    It was 26 years ago, I don't recall going over the

12    general procedures manual.

13    Q    The only time you've reviewed the general procedures

14    manual governing your position --

15         THE COURT:  As to form.  You can't stand there and

16    testify.

17    Q    Have you ever reviewed the American Airlines general

18    procedures manual?

19    A    Yes.

20    Q    I've handed you what is marked for identification

21    purposes only as Government Exhibit 708.  Does that appear to

22    be a fair and accurate copy of Section 9 of the American

23    Airlines general procedures manual?

24         MR. COHEN:  Objection.

25         THE COURT:  Are you familiar with that document

1    that's in front of you?

2               THE WITNESS:  It would seem to be a general

3    procedures manual.  I can't testify as to the revision dates

4    or the revision of this document.

5               THE COURT:  When was the last time you saw a

6    procedures manual?

7               THE WITNESS:  We're supposed to pull it up daily;

8    it's revised, certain things are changed.

9               THE COURT:  When was the last time that you saw a

10   procedures manual?

11              THE WITNESS:  I saw it last week.

12              THE COURT:  Overruled.

13   BY MS. SCHIERBERL:

14   Q    Does this appear to be a fair and accurate copy of the

15   American Airlines general procedures manual Section 9?

16   A    Other than the revision date, I would say yes.

17              MS. SCHIERBERL:  Your Honor, at this time the

18   Government moves to admit Government Exhibit 708 in evidence.

19              THE COURT:  Any objection?

20              MR. COHEN:  I do, your Honor.

21              THE COURT:  Let me talk to counsel, please.

22              (Continued on the next page.)

23

24

25

1          (Sidebar conference.)

2          MR. COHEN:  The witness testified that when he

3    makes, when he needs references to the GPM, or the general

4    procedure manual, he needs to look at it daily because

5    revisions are made daily.  He testified he can't attest to how

6    accurate this is because of those revisions.

7          These revisions were made, 18 months ago was the

8    last time this was revised.  He says the revisions are made

9    daily.  He cannot testify to the accuracy of what is in there

10   or what should be in there as of today.  If we had one that

11   was dated today, yesterday, somewhat closer, I think it would

12   be a more fair accurate representation.  This witness stated

13   it's changed daily.

14         MS. SCHIERBERL:  Beg your pardon, your Honor.  I

15   believe this witness has testified that this appears to be a

16   fair and accurate copy of the American Airlines general

17   procedures manual Section 9.

18         THE COURT:  Can you read the last question and

19   answer?

20         (Whereupon, the record was read.)

21         MR. COHEN:  May I be heard?

22         THE COURT:  Yes.

23         MR. COHEN:  I believe on a prior answer, just one or

24   two questions prior, when counsel asked when was the last time

25   he looked at it, he said he picked it up daily because of

1   daily revisions.  This copy --

2               THE COURT:  He didn't say daily revisions to each

3   section.

4               MR. COHEN:  He did not.  But he said he has to pick

5   it up daily because of daily revisions.  This copy that

6   counsel is trying to put into evidence is dated November 1st,

7   2021.

8               MS. SCHIERBERL:  Your Honor, we can establish

9   through this witness that from the revision date, this is a

10  fair and accurate copy of Section 9 of the American

11  Airlines --

12              THE COURT:  I'll admit it.

13              (End of sidebar conference.)

14              (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  The objection is overruled.  The

3    document is admitted as Government Exhibit 708.

4          (Government Exhibit 708, was received in evidence.)

5    BY MS. SCHIERBERL:

6    Q    Section 9 of American Airlines general procedures manual

7    applies to you, Mr. Ricci, correct?

8    A    I only have a portion of Section 9, it starts at 9.03.

9    Q    Does Section 9 of the American Airlines general

10   procedures manual apply to you?

11   A    As far as 9.03 does, yes.

12   Q    That section makes reference to federal requirements,

13   correct?

14   A    Yes.

15   Q    That section makes reference to records showing the work

16   done, who did the work, and what date the work was done; is

17   that correct?

18   A    Yes.

19   Q    That includes pursuant to section 9.03.3C records of all

20   unscheduled maintenance, correct?

21   A    It says records of unscheduled that have not been

22   superseded by other work equipment scope.

23   Q    Section 17 of the American Airlines general procedures

24   manual also applies to you, correct?

25   A    I don't know I don't have a copy of 17.

1    Q    You don't know offhand whether or not Section 17 --

2    A    I do not.

3    Q    -- of the American Airlines general procedures manual

4    applies to you?

5    A    Not offhand, no, I do not.

6    Q    Do you know whether or not Section 17 regards the

7    American Airlines requirements for recording all work in the

8    form of repairs?

9    A    No, I do not.

10   Q    Do you know whether or not Section 17 regards making a

11   record of all work resulting from mechanical discrepancies?

12   A    No, I do not.

13   Q    Would you agree with me that the purpose of these

14   procedures is to ensure mechanical discrepancies are properly

15   record and accounted for?

16   A    In an ideal world, yes.

17   Q    In layman's terms, all these rules basically require the

18   making of a record, correct?

19   A    Documentation, yes.

20   Q    Is it fair of me to say that that documentation allows

21   pilots to know what mechanical issues face their aircraft

22   before they fly sometimes hundreds of human beings through the

23   air?

24   A    Not necessarily.

25   Q    You signed up to follow the rules when you took this job,

1    correct?

2    A    Yes.

3    Q    It's a violation of your collective bargaining agreement

4    to violate these rules, correct?

5    A    I don't know it's a violation of the collective

6    bargaining agreement.

7    Q    Under don't know whether violating American Airlines

8    rules is a violation of your collective bargaining agreement?

9    A    I don't remember.  I don't recall reading it in the

10   contract that we have now.

11   Q    Is non-compliance with federal regulation a violation of

12   your collective bargaining agreement?

13   A    I don't know.

14   Q    You don't know whether breaking federal law is a

15   violation of your collective bargaining agreement?

16              MR. COHEN:  Objection.

17              THE COURT:  Overruled.

18   Q    You don't know whether breaking federal law is a

19   violation --

20              THE COURT:  Ask it as a question please.

21   Q    Do you know whether or not breaking federal law is a

22   violation of your collective bargaining agreement?

23   A    I don't have my collective bargaining agreement.  I

24   couldn't tell you word for word what it is.  It's hundreds of

25   pages.

1    Q    Would it surprise you that breaking federal law is a

2    violation of your collective bargaining agreement?

3             MR. COHEN:  Objection.

4             THE COURT:  Sustained.

5    Q    Without reviewing your collective bargaining agreement,

6    are you aware whether or not breaking federal law is a

7    violation of that agreement?

8             MR. COHEN:  Objection.

9    A    Without --

10            THE COURT:  There is an objection, so wait until I

11   rule on the objection.

12            Can I have the last question read back, please.

13            (Whereupon, the record was read.)

14            THE COURT:  Sustained.  Asked and answered.

15   Q    Is misrepresentation of facts or falsification of records

16   prohibited by your collective bargaining agreement?

17            MR. COHEN:  Objection.

18            THE COURT:  Overruled.

19   Q    Is misrepresentation of facts or falsification of records

20   prohibited by your collective bargaining agreement?

21   A    The collective bargaining agreement is something

22   different, it's between the union and the company.  It doesn't

23   pertain to issues of that --

24   Q    Mr. Ricci --

25   A    -- that I know of.  I don't have it in front of me, I

1    don't know.

2              THE COURT:  One person speaks at the time.

3              (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. SCHIERBERL (Continuing):

2   Q    I'd like to direct you back to my question.

3   A    Okay.

4   Q    Is misrepresentation of facts or falsification of records

5   prohibited by your collective bargaining agreement?

6   A    I do not know.

7   Q    You have an airframe and powerplant license, don't you?

8   A    Yes, I do.

9   Q    Is it fair to say you could lose those licenses for doing

10  undocumented maintenance work?

11  A    In some cases, probably.

12  Q    Is it fair of me to say that given the life and death

13  nature of your work, you're also familiar with Federal

14  Aviation Regulations that govern airline mechanics?

15  A    Not necessarily.

16  Q    Are you aware that Federal Aviation Regulations govern

17  airline mechanics?

18  A    I have not got involved with...

19  Q    Are you aware whether or not Federal Aviation Regulations

20  govern airline mechanics?

21  A    No, I'm not.

22  Q    So, you don't know whether or not your job is governed by

23  Federal Aviation Regulations?

24            MR. COHEN:  Objection.

25            THE COURT:  Sustained.  Asked and answered.

1   Q    Are you aware that Title 14 Section 43.5 of the Code of

2   Federal Regulations regards approving an aircraft for service?

3           MR. COHEN:  Objection.

4           THE COURT:  Sustained.

5   Q    Are you familiar with Title 14 Section 43.5 of the Code

6   of Federal Regulations?

7   A    No, I'm not.

8   Q    Are you familiar with Title 14 Section 121.367 of the

9   Code of Federal Regulations?

10  A    No, I'm not.

11  Q    Are you familiar with Section 121.380 of Title 14 of the

12  Federal Aviation Regulations?

13  A    No, I'm not.

14  Q    Are you familiar with Title 14 Section 121.709 of the

15  Federal Aviation Regulations?

16  A    No, I'm not.

17  Q    Are you aware of any federal aviation regulations that

18  govern your work as a mechanic?

19  A    No.

20          MS. SCHIERBERL:  Ms. Cronin, can we please pull up

21  Government Exhibit 103?

22          THE COURT:  And this is in evidence.

23          MS. SCHIERBERL:  Yes, your Honor.

24          I'm so sorry, 101.

25          THE COURT:  Is your monitor working?

1    THE WITNESS:  Yes, it is.

2  Q    Mr. Ricci, can you see what's in evidence as Government

3  Exhibit 101?

4         (Exhibit published to the jury.)

5  A    Yes, I can.

6  Q    This is a page from a logbook, correct?

7  A    Yes, it is.

8         MS. SCHIERBERL:  Ms. Cronin, could we please go to

9  Page 2 of this document?

10  Q    Am I correct that IFE stands for in-flight entertainment?

11  A    Yes, you are.

12  Q    Is it fair of me to say that the inflight entertainment

13  system can be reset fairly easily?

14  A    This is not a reset of the in-flight entertainment

15  system, this is a PM check.

16  Q    Mr. Ricci, is it fair of me to say that the in-flight

17  entertainment system can be reset fairly easily?

18  A    It does require some work, but it's not hard.

19  Q    Is it fair of me to say that in-flight entertainment is

20  not a matter of life and death?

21  A    No, it wouldn't be -- well, it's part of the flight

22  attendants' announcement system.  It's all tied in together,

23  so it could be, yes.

24  Q    Am I correct that it's your testimony that in-flight

25  entertainment is a matter of life and death?

1    A    In the correct situation it could be, yes.

2    Q    The gentleman who performed this check recorded it in the

3    logbook, correct?

4              MR. COHEN:  Objection.

5              THE COURT:  Sustained as to form.

6    Q    Do you see an entry in this logbook for an in-flight

7    entertainment PM check?

8    A    Yes, I do.

9    Q    Does that mean the gentleman who performed the in-flight

10   entertainment PM check wrote it in this logbook?

11             MR. COHEN:  Objection.

12             THE COURT:  Overruled.

13             MS. SCHIERBERL:  Can you please read back the

14   question?

15             (Record read.)

16   A    It doesn't necessarily mean he performed the whole check

17   himself.  He performed a portion of it, maybe.

18   Q    I'm just asking if the gentleman wrote an entry in the

19   logbook that says IFE PM check.

20   A    It's an item in the book, yes.

21   Q    It looks like there's an applicable code section he was

22   working under reflected in the logbook; is that correct?

23   A    What code are you referring to?

24   Q    44-21-00 reflects the code this mechanic was working

25   under; is that correct?

1   A    Yes.

2   Q    And he dated this entry, correct?

3   A    Yes.

4   Q    And he signed this entry, correct?

5   A    Yes.

6   Q    And he provided his employee ID number, correct?

7   A    Yes.

8   Q    That would make it pretty easy for someone to find him if

9   they had a question about the work he --

10           THE COURT:  Would you please ask a question and not

11   a give a statement?

12           MS. SCHIERBERL:  Yes, your Honor.

13   Q    Can we agree that would make it fairly easy to find this

14   individual if someone had a question about his work?

15   A    The work card would be what they would look at.  They

16   wouldn't look at the logbook entry.

17   Q    Can we agree that providing one's name and employee ID

18   number would make it fairly easy to find that individual if

19   someone had a question about his work?

20   A    Yes, with an employee number, yes, you could find who it

21   was.

22   Q    Can we agree that this gentleman thought it important

23   enough to make this entry in the logbook?

24           MR. COHEN:  Objection.

25           THE COURT:  Sustained.

1    Q    Mr. Ricci, you know the Defendant, don't you?

2    A    I do know him from work, yes.

3    Q    You guys came up through the ranks together?

4    A    We were in cargo together, yes, and we were in

5    maintenance together.

6    Q    Is it fair to say you've known the Defendant since 1996?

7    A    Yes.

8    Q    Am I right that you've worked with the Defendant for more

9    than 20 years?

10   A    We work on different crews in different work areas but in

11   the same department.

12   Q    Have you ever worked a shift with the Defendant in those

13   twenty-odd years?

14   A    In 26 years I'm sure I have, yes.

15   Q    Is it fair of me to say that at work you're friendly with

16   the Defendant?

17   A    I say hello to him, yes.

18   Q    Have you ever hung out in the break room together?

19   A    He works at the hangar, I work at the terminal.  We're

20   separated.  We're in different crews.

21   Q    But some time over the last 20 years you have worked a

22   shift together, correct?

23   A    Yes, I'm sure we have.

24   Q    Have you ever hung out with him in the break room in

25   those 20 years?

1    A    In 20 years, I'm sure I have, yes.

2    Q    Have you ever helped him out with an assignment in those

3    20 years?

4    A    I'm sure I have, yes.

5    Q    Have you ever shared a snack with him in those 20 years?

6    A    I can't recall that.

7    Q    Have you ever shared workplace gossip with him in 20

8    years?

9    A    Not really.

10   Q    You have his personal phone number, correct?

11   A    I did, yes.

12   Q    Is it fair of me to say that you don't want to see

13   anything bad happen to the Defendant?

14   A    I don't want to see anything bad happen to anybody.  It's

15   just a matter of telling the truth.

16   Q    Is it fair of me to say you don't want to see anything

17   bad happen to the Defendant?

18   A    Yeah, that's fair.

19   Q    Is it fair of me to say you don't want to see him go to

20   prison?

21        MR. COHEN:  Objection.

22        THE COURT:  Sustained.

23   Q    This is the second day you've --

24        THE COURT:  That's stricken.

25   Q    Today is the second day that you've had to testify here

1    in court, correct?

2    A    Yes, that's correct.

3    Q    You did not receive a subpoena from the Government to

4    show up last week, did you?

5    A    No, I did not.

6    Q    You didn't receive a subpoena from the Defendant either,

7    did you?

8    A    No, I did not.

9    Q    Did defense counsel call you prior to last Thursday?

10   A    Yes, they did.

11   Q    Did he ask you to come here and testify?

12   A    Yes, he did.

13   Q    Did he ask you to come here and testify for the defense?

14   A    Yes, he did.

15   Q    Did you say yes voluntarily?

16   A    Yes, I did.

17   Q    You normally work Thursdays, don't you?

18   A    Yes, I do.

19   Q    You took the day off in order to be here in court,

20   correct?

21   A    I picked up a shift on Monday so I could have Thursday

22   off.

23   Q    And you confirmed your availability with defense counsel,

24   correct?

25   A    Yes, I did.

1    Q    You texted him:  Okay, I got the day.

2    A    Yes.

3    Q    That was a text that you sent in response to his request

4    for you to voluntarily appear on behalf of the Defendant?

5    A    Yes.

6    Q    In fact, you text with the defense, don't you?

7    A    Not recently.

8    Q    You haven't recently text messaged --

9    A    Well, to let him know I was in the court, yes.

10   Q    You text with defense counsel, correct?

11   A    Yes, to let him know I was here.

12   Q    And, in fact, you have recently texted with defense

13   counsel, correct?

14   A    Yes.

15   Q    And that was in addition to just letting him know you

16   were in court today, correct?

17   A    Prior to Thursday, yes.  Not after Thursday.

18   Q    Prior to Thursday, you text messaged with defense

19   counsel?

20   A    Yes, I did.

21   Q    You and I don't text, do we, Mr. Ricci?

22   A    No, we don't.

23   Q    You don't text with Mr. Pollack, do you?

24   A    No, I do not.

25   Q    You don't text with Mr. Paulsen, do you?

1    A    No, I don't.

2    Q    In fact, Agent Moloney tried to call you on Thursday,

3    didn't he?

4    A    He tried to call wile I was driving and I was driving

5    here.

6    Q    He left you a voicemail?

7    A    Yes, while I was driving.  I didn't get the voicemail

8    until I got here.

9    Q    He identified himself in that voicemail as Homeland

10   Security?

11   A    Yes, he did.

12   Q    He asked if he could speak with you?

13   A    Yes.

14   Q    He provided to you his cell phone number in that

15   voicemail?

16   A    Yes, he did.

17   Q    You didn't call him back, did you?

18   A    No, I didn't.

19   Q    Prior to Thursday, you've spoken on the phone with

20   defense counsel?

21   A    Yes, I have.

22   Q    Defense counsel asked you to do a number of things,

23   correct?

24   A    Yes.

25   Q    And you did those things, correct?

1    A    Yes.

2    Q    And when you did those things, you then confirmed with

3    him?

4    A    Yes.

5    Q    You speak with defense counsel over the phone, correct?

6    A    I did, yes.

7    Q    You've spoken to defense counsel more than once --

8            THE COURT:  Again, you're making statements.  Please

9    ask in the form of a question.

10           MS. SCHIERBERL:  Thank you, Judge.

11   Q    Am I correct that you've spoken to defense counsel more

12   than once prior to today?

13   A    Prior to Thursday, yes.

14   Q    Did you speak with the Defendant over the weekend?

15   A    The Defendant?  No.

16   Q    Did you speak with anyone associated with the Defendant

17   over the weekend?

18   A    No, not over the weekend.

19   Q    Did you speak with any friends of the Defendant over the

20   weekend?

21   A    We had a common friend that was in the courthouse that I

22   haven't seen since 2013 and he said hello to me, yes.

23   Q    Did you speak with him about anything else, other than

24   hello?

25   A    No.

1   Q    Did you speak with any other mutual friends from work

2   over the weekend?

3   A    No.

4   Q    Did you speak with any family members of the Defendant

5   over the weekend?

6   A    No.

7   Q    You testified on Thursday that before Thursday you had

8   not seen the Defendant since 2020, correct?

9   A    No, I had not.

10  Q    Had you communicated with the Defendant in any way prior

11  to --

12          THE COURT:  I'm sorry, no, you did not say that or

13  no, you hadn't seen him?

14          THE WITNESS:  No, I hadn't seen him.

15  Q    Had you communicated with the Defendant in any way prior

16  to Thursday since 2020?

17  A    He had texted me once.

18  Q    What did he say in the text?

19  A    Just thank you for talking to his lawyer.

20  Q    What did you say in response?

21  A    I just said you're welcome and that was it.

22  Q    Did he send you any other text messages?

23  A    No, not that I recall.

24  Q    Did you send him any other text messages?

25  A    No.

1   Q    You didn't talk to the Defendant about coming here to

2   testify on his behalf prior to doing so, did you?

3   A    No, I did not.

4   Q    Have you talked to the Defendant's wife since 2020?

5   A    No, I have not.

6   Q    Have you spoken with the Defendant since his arrest in

7   2020?

8   A    Once in March of 2020.

9   Q    And what did he say to you?

10  A    Nothing.  He had asked me if I would be willing to talk

11  to his lawyer and that was it.  And then I hadn't heard

12  anything.

13  Q    He asked you if you'd be willing to talk to his defense

14  counsel?

15  A    Yes.

16  Q    And what did you say in response?

17  A    I said yes.

18  Q    What else did he say to you?

19  A    Nothing else.

20  Q    What else did you say to him?

21  A    Nothing.

22  Q    Since the Defendant's arrest, have you spoken to anyone

23  on behalf of the Defendant?

24  A    No, I have not.

25  Q    Have you spoken to any friends of the Defendant?

1   A   All the guys I work with, I mean...

2   Q   Have you spoken to any friends of the Defendant?

3           MR. COHEN:  Objection.

4           THE COURT:  Asked and answered.  Sustained.

5   Q   We haven't met before today, have we, Mr. Ricci?

6   A   No, we have not.

7   Q   I've never spoken to you before today; is that correct?

8   A   That's correct.

9   Q   You've never spoken to Mr. Pollack prior to today?

10  A   That's correct.

11  Q   You've never spoken to Mr. Paulsen prior to today?

12  A   That's correct.

13  Q   You've never spoken to Agent Moloney prior to today?

14  A   I still haven't spoken to Agent Moloney.

15  Q   When did you first find out the Defendant got arrested?

16  A   February.

17  Q   February of what year?

18  A   2020.

19  Q   Did you have all of the information you testified to on

20  Thursday when you found out the Defendant got arrested in

21  February of 2020?

22  A   As far as what?

23  Q   Did you know all of the information that you testified to

24  on Thursday in February of 2020?

25          MR. COHEN:  Objection.

1      THE COURT:  Sustained.

2  Q    After finding out the Defendant got arrested in February

3  of 2020, you didn't contact law enforcement, did you?

4  A    No I did not.

5  Q    You didn't call my office, did you?

6  A    No, I did not.

7  Q    You didn't call the police, did you?

8  A    No, I did not.

9  Q    You didn't call CBP, did you?

10  A    No, I did not.

11  Q    Did you speak to any security at JFK after finding out

12  the Defendant got arrested?

13  A    No, I did not.

14  Q    You didn't get in touch with anyone at the airport to

15  provide information, did you?

16  A    No, I did not.

17  Q    Is it fair of me to say there's a system in place to

18  anonymously report violations?

19  A    Violations of what nature?

20  Q    Violations of the American Airlines rules.

21  A    Yes, there is.

22  Q    Is that called the ASAP reporting system?

23  A    Yes, it is.

24  Q    Did you report yourself for performing undocumented

25  mechanical work before you testified on Thursday?

1   A    No, I did not.

2   Q    Do you think that would have been a good idea?

3   A    It's a common practice at American Airlines.  It's done

4   by supervisors, it's done by other mechanics.  It's not a --

5   it's not something that's out of the ordinary.

6   Q    Do you think that would have been a good idea?

7   A    I'm not sure, no.

8   Q    Do you expect to have a conversation with your union rep

9   following your testimony on Thursday?

10  A    No, I do not.

11  Q    You testified about PACKs, correct?

12  A    Yes, I did.

13  Q    So, do you know whether or not a PACK pressurizes the air

14  in the cabin?

15  A    Yes, it does.

16  Q    Is it fair of me to say having pressurized air on a plane

17  at 30,000 feet above ground is a safety issue?

18  A    Yes, it is.

19  Q    Can we agree it's possible to reset a PACK from the

20  cockpit of an airplane?

21  A    The only reset you could do from the cockpit is an

22  overheat, PACK overheat.  Every other reset must be done from

23  the PACK controllers.

24  Q    Can we agree it's possible to reset a PACK from the

25  cockpit?

1          MR. COHEN:  Objection.

2          THE COURT:  Overruled.  I'll allow it.

3     A    For 99.9 percent of the times, no, it's not.

4     Q    Are you saying it's not possible to reset a PACK from the

5     cockpit?

6     A    Not for 99.9 percent of the faults, no.

7     Q    Is it possible to turn off the air to the PACK from the

8     cockpit?

9     A    Yes, it is.

10    Q    If there were a six-foot-two pilot sitting in the cockpit

11    and you noticed a PACK issue, would you tell him about it?

12    A    If I noticed a PACK issue?

13    Q    If there were a six-foot-two pilot sitting in a cockpit

14    and you noticed a PACK issue, would you tell the pilot about

15    it?

16         MR. COHEN:  Objection.

17         THE COURT:  Overruled.

18         You may answer the question.

19    Q    If you noticed a six-foot-two pilot sitting in the

20    cockpit and you noticed a PACK issue, would you tell him about

21    it?

22    A    He should have already been aware of it.  He would have

23    had the master caution, he would have had the other lights on

24    the overhead.

25    Q    Mr. Ricci, it's a fairly simple question.

1          THE COURT:  No argument.

2          MR. COHEN:  Objection.

3          THE COURT:  No argument.

4          Please answer the question.

5          MS. SCHIERBERL:  Can we have the question read back,

6    please?

7          THE COURT:  If there was a pilot in the cockpit and

8    you saw a PACK issue, would you tell the pilot?

9          THE WITNESS:  I would let him know I'm going to fix

10   it, yes.

11   Q    And yet you testified on Thursday that you wouldn't tell

12   anyone about resetting the PACK, correct?

13   A    We didn't discuss if there was a pilot in the cockpit or

14   not.  You just said would I reset -- if the plane was there

15   and I walked into the airplane and saw the fault, I would

16   reset the fault.

17   Q    Mr. Ricci, you testified on Thursday that you wouldn't

18   tell anyone about resetting the PACK, correct?

19   A    If there was nobody there, yes, I wouldn't tell anybody.

20   Q    But if there were someone there, like the pilot, then you

21   would tell him, correct?

22   A    I would, Oh, by the way, I'm going to reset the PACK

23   unit.

24   Q    Is that a yes?

25   A    Yes.

1    Q    If that issue resurfaced while the plane was in the air

2    and it had gone unrecorded, am I correct there'd be no record

3    of it?

4    A    There would be no record.

5    Q    Could that waste time while that pilot is trying to

6    figure out what is malfunctioning at 30,000 feet?

7    A    No, it wouldn't.

8    Q    That wouldn't waste any time if the pilot had no record

9    of a mechanical issue with his plane?

10   A    No, it would not.

11   Q    If an airplane crashes, does the investigation review the

12   logbook to figure out what went wrong?

13            MR. COHEN:  Objection.

14            THE COURT:  Overruled.

15   Q    Mr. Ricci, do you know if an airplane crashes, does the

16   investigation review the logbook to figure out what went

17   wrong?

18   A    I'm sure they would.

19   Q    And they do that so that they can review the record of

20   the mechanical issues that previously faced that plane,

21   correct?

22   A    Yes.

23   Q    In fact, would you agree that if an airplane crashes, the

24   logbook is one of the most important pieces of that

25   investigation?

1    A    It's an important part, but I wouldn't say one of the

2    most important.

3    Q    It's an important part because it's a record of the

4    mechanical issues that face that plane, correct?

5    A    Yes.

6    Q    And in investigating why that plane crashed, that's where

7    the investigators would look to see what went wrong, correct?

8              MR. COHEN:  Objection.

9              THE COURT:  Sustained.

10   Q    Would it make it harder to figure out what went wrong in

11   a plane crash if there was no document of the maintenance work

12   done?

13             MR. COHEN:  Objection.

14             THE COURT:  Sustained.

15   Q    Can we agree that if the logbook has no information it

16   would be harder to figure out what went wrong in an airplane

17   crash?

18             MR. COHEN:  Objection.

19             THE COURT:  Sustained.

20   Q    Why does an investigation review the logbook to figure

21   out what went wrong?

22             MR. COHEN:  Objection.

23             THE COURT:  Sustained.

24   Q    Why do you say the logbook is an important piece of an

25   investigation in an airline crash?

1    A    You used -- there are several things that would be used.

2    The black box on the airplane would be the most important,

3    telling you what position certain flight controls were, in.

4    And then you would go back to the logbook and compare notes

5    with the flight recorder.

6    Q    Why would you compare pair those notes?

7    A    I don't know.  They have logbooks, they have the flight

8    deck recorders, they would check and see if anything was done

9    to the plane.  I don't know, it's just common what they do.  I

10   don't get involved --

11   Q    They check the logbook to see --

12        THE COURT:  Let the witness finish.

13        MS. SCHIERBERL:  I'm so sorry, your Honor.

14   Q    Mr. Ricci, did you just testify that they check the

15   logbook to see if there were any issues with the plane?

16   A    For certain items, yes.

17   Q    So, the logbook would be the record of those issues,

18   correct?

19   A    It would be a partial record of it, yes.

20        MS. SCHIERBERL:  I'd like to publish only to counsel

21   and the witness what's been marked for identification purposes

22   only as Government Exhibit 8.

23        THE COURT:  Yes.

24   Q    Mr. Ricci, can you see what's on your screen?

25   A    Yes.

1    Q      Do you recognize this?

2    A      Yes.

3    Q      Is this a photograph of your work ID?

4    A      It's my Port Authority ID, yes.

5    Q      Is this a fair and accurate photograph of your Port

6    Authority ID?

7    A      Yes.

8           MS. SCHIERBERL:  Your Honor, the Government offers

9    Government Exhibit 8 in evidence.

10          THE COURT:  Any objection?

11          MR. COHEN:  No, your Honor.

12          THE COURT:  It's admitted.

13          (Government Exhibit 8 was received in evidence.)

14          MS. SCHIERBERL:  Permission to publish to the jury?

15          THE COURT:  Yes.

16          (Exhibit published to the jury.)

17   Q      Mr. Ricci, do you see below your name there's a small

18   blue emblem on your Port Authority ID?

19   A      Yes.

20   Q      Is that a Customs seal?

21   A      Yes.

22   Q      Did you go through the process of getting a Customs seal

23   at some point?

24   A      Yes, I did.

25   Q      That allows you to work on aircraft that fly

1    internationally, correct?

2    A    No.

3    Q    What does a Customs seal allow you to do?

4    A    The Customs seal is supposed to allow me to go on the

5    aircraft while passengers are still -- from an international

6    destination are still onboard to speak with the pilot and

7    discuss things.

8              But that is -- that's no longer a practice that they

9    use.

10   Q    You had to get fingerprinted to obtain that Customs seal,

11   correct?

12   A    Yes, I did.

13   Q    You had to pass a background check?

14   A    Yes, I did.

15   Q    Mr. Ricci, are you a DR1?

16   A    Yes.

17   Q    Does that mean driver one?

18   A    Yes.

19   Q    Does that mean you have to get fingerprinted every 18

20   months to maintain your Customs seal?

21   A    Every 18 months?  It's no longer -- that's no longer the

22   issue.  They don't fingerprint anymore.

23   Q    When did they stop doing fingerprints to obtain a Customs

24   seal?

25   A    From what I understand, they told me when I renewed this

1    one I will no longer be fingerprinted because it's -- now they

2    maintain the fingerprints.

3    Q    In the past, have you been fingerprinted in order to

4    maintain your Customs seal?

5    A    Yes.

6    Q    Was that approximately every 18 months.

7    A    Twelve months for certain times and then 18 months, yes.

8    Q    So, either once a year or once every year and a half you

9    got fingerprinted to maintain your Customs seal?

10   A    Yes.

11   Q    And you had to pass a background check, correct?

12   A    Yes.

13   Q    Is it fair of me to say that most of your mechanic

14   colleagues go through the fingerprint and background check to

15   obtain a Custom seal?

16   A    I would say about 75 percent.

17   Q    I'm showing you Government Exhibit 7, which is in

18   evidence.

19          MS. SCHIERBERL:  If we can just pull it up, Ms.

20   Cronin.

21          Ms. Carosella, can we publish from the Elmo?

22          THE COURTROOM DEPUTY:  Oh, sure.

23          MS. SCHIERBERL:  Thank you.

24          (Exhibit published to the jury.)

25   Q    Mr. Ricci, is there a Customs seal on this Port Authority

1   ID?

2   A    No, there is not.

3   Q    You testified on Thursday that you finish your work

4   assignments early almost every day, correct?

5   A    Yes.

6   Q    You testified that after that, you can wander around,

7   correct?

8   A    I guess.

9   Q    Are there areas at JFK where you are not allowed to go?

10  A    Other than the FIS area, no.

11  Q    Are there any areas at JFK that you are not allowed to

12  go?

13          MR. COHEN:  Objection.

14          THE COURT:  Overruled.

15          You may answer the question.

16  A    Just the FIS area.

17  Q    How often do you wander into the FIS area?

18  A    I never wander in there.

19  Q    You testified on Thursday that you have no real

20  responsibility once you've completed your assignment, correct?

21  A    Yes.

22  Q    Is it fair of me to say that once you're done with your

23  assignment, you're basically killing time?

24  A    Yes.

25  Q    I'm now showing you what is in evidence as Defense

1   Exhibit A-2.

2             (Exhibit published to the jury.)

3   Q    You testified that this is the jet bridge at Gate 7 at

4   American Airlines, correct?

5   A    Yes.

6   Q    You testified that it looks the same in this picture as

7   it did in 2020, correct?

8   A    Yes.

9   Q    Is it fair of me to say there's about 30 stairs in that

10  staircase?

11  A    I never counted, but yeah.

12  Q    Is it fair of me to say, looking at that picture, that

13  there are approximately 30 stairs in that staircase?

14  A    Yes.

15  Q    Is it fair of me to say there are approximately 10 to 15

16  steps you'd take from the top of that staircase to get on to

17  the plane?

18  A    No.

19  Q    No?

20            How many steps would it take you to get from the top

21  of that staircase on to the plane on Gate 7?

22  A    Oh, steps from there to the airplane?  Approximately 20.

23  Q    Twenty steps?

24  A    Yes.

25  Q    Is it fair of me to say it would take a normal person at

1   a normal pace 30 to 45 seconds to get from the ground up into

2   an airplane parked at Gate 7?

3           MR. COHEN:  Objection.

4           THE COURT:  Overruled.

5   Q    Is it fair of me to say that it would take a normal

6   person at a normal pace approximately 30 to 45 seconds to get

7   from the ground up into an airplane parked at Gate 7?

8   A    Yes.

9   Q    Is it fair of me to say it would take the same amount of

10  time to get off that airplane and back down onto the tarmac?

11  A    Well, coming down the stairs is a little quicker.

12  Q    Approximately how long would it take to get off a plane

13  at Gate 7 and back onto the tarmac?

14  A    About 30 seconds, the most.

15  Q    Mr. Ricci, how long does it take you to eat a bag of

16  chips?

17          MR. COHEN:  Objection.

18          THE COURT:  Sustained.

19  Q    Is it fair of me to say it takes a normal person about

20  two minutes to eat a bag of chips?

21          MR. COHEN:  Objection.

22          THE COURT:  Sustained.

23  Q    I'm now showing you what is in evidence as Defense

24  Exhibit E-8.

25          (Exhibit published to the jury.)

1   Q    Can you see this image on your screen?

2   A    Yes, I can.

3   Q    You took this picture, correct?

4   A    Yes, I did.

5   Q    When did you take it?

6   A    Probably about two to three weeks ago.

7   Q    Fair to say you took it in April of 2023?

8   A    Yes.

9   Q    Who asked you to take it?

10  A    The lawyer, the defense lawyer.

11  Q    Did he explain this photograph may be evidence in a

12  federal trial for the Defendant?

13  A    Yes.

14  Q    Did he explain to you that it was important that you take

15  an accurate photograph?

16  A    Yes.

17  Q    Did he provide you that tape measure?

18  A    No.

19  Q    Did you already have it?

20  A    Yes, I did.

21  Q    Was it in your toolbag?

22  A    It's part of the required tool list, yes.

23  Q    There's a required tool list?

24  A    Yes, there is.

25  Q    What types of tools are on the required tool list?

1   A    Screwdrivers, wrenches, there was different types of

2   wrenches, Allen keys.  There's all sorts of different tools.

3   Q    Does it make sense to you as an airline mechanic that you

4   have a required tool list?

5   A    Yeah, somewhat.

6   Q    Do you use tools in your work as a mechanic?

7   A    Yes, I do.

8   Q    Was that tape measure already in your toolbag?

9   A    It's in my locker, yes.

10  Q    Were you already at work when you took this picture?

11  A    Yes, I was.

12  Q    In fact, you took a couple of photographs at defense

13  request, correct?

14  A    Yes.

15  Q    You testified that this avionics compartment is about

16  17 inches by 23 inches, correct?

17  A    Correct.

18  Q    Can we agree that you've been inside an avionics

19  compartment before?

20  A    Yes.

21  Q    So, that's big enough to fit a grown man?

22  A    Yes.

23  Q    Can we agree that's a fairly tight squeeze?

24  A    For one person it's not tight, it's -- I mean it's...

25  Q    So, it's not a tight squeeze?

1  A    It's not a tight squeeze, but you're not going to fit

2  anybody else in with you.

3  Q    Can we agree it isn't all that comfortable to go inside

4  of an avionics compartment?

5  A    It's not bad.

6  Q    Can you stand up straight in an avionics compartment?

7  A    Yes.

8  Q    Is it fair of me to say that if you didn't have to go

9  into an avionics compartment but could do the work with your

10 feet on the ground you'd do so?

11 A    Not necessarily.  I mean, it's hard to reach -- even from

12 the doorway it's hard to reach certain areas in there.

13 Q    If you didn't have to go into the avionics compartment,

14 if you had the option of keeping your feet on the ground and

15 reaching your arm out to do what you had to do, would you do

16 that instead of climbing into the avionics compartment?

17 A    I'm trying to think of a job that I could do from the

18 ground just reaching in, without climbing in.

19       I would, yes, I would rather stay on the ground, but

20 I can't think of anything that I've done that didn't require

21 me climbing in.

22 Q    Do you know what a tail number is?

23 A    Yes.

24 Q    What is the tail number of this airplane?

25 A    This aircraft?  I don't remember what the tail number is.

1    Q    Is this a photograph of the avionics compartment that

2    Defendant came out of on February 4, 2020?

3    A    It is a similar one, yes.

4    Q    Is this a photograph of the avionics compartment the

5    Defendant came out of on February 4, 2020?

6    A    No, it is not.

7    Q    Is it fair of me to say this is not aircraft three bravo

8    golf?

9    A    Yes.

10           MS. SCHIERBERL:  Ms. Cronin, can we please publish

11   what's in evidence as Government Exhibit 204?

12           (Exhibit published to the jury.)

13   Q    What is the tail number of this aircraft?

14   A    I don't know.

15   Q    When was this photograph taken?

16   A    I don't know.

17   Q    Are those black boxes to the right of the screen in the

18   top right quadrant electronics?

19   A    Yes.

20   Q    Is it fair of me to say you could reach those with your

21   feet on the ground?

22   A    Those ones, yes.

23           MS. SCHIERBERL:  Ms. Cronin, may we publish what's

24   in evidence as Defense Exhibit E-4?

25           (Exhibit published to the jury.)

1  Q    This is another photograph you took at the Defendant's

2  request, correct?

3  A    Yes.

4  Q    This also is not flight three bravo golf, correct.

5  A    No, it is not.

6  Q    This picture was not taken on February 4, 2020, was it?

7  A    No, it was not.

8  Q    Was this picture also taken by you some time in April of

9  2023?

10 A    Yes, it was.

11 Q    Was this picture taken at the Defendant's request?

12 A    At the Defendant's lawyer's request, yes.

13 Q    Is it fair of me to say that those are seats reflected in

14 this image for the pilot and co-pilot.

15 A    Yes.

16 Q    Am I correct there's no one in this cockpit?

17 A    Correct.

18 Q    Am I correct that if there with a gentleman sitting in

19 one of those seats you would have seen him?

20 A    Yes.

21         MS. SCHIERBERL:  I'd like to publish government

22 Exhibit 306; specifically, at 7:19:30.

23         (Exhibit published to the jury.)

24 Q    Mr. Ricci, on direct examination you were asked about the

25 individual in the bottom left corner of the screen; do you

1    recall that?

2    A    Yes.

3    Q    You were asked who this individual was, correct?

4    A    Yes.

5    Q    You were asked if this individual was an American

6    Airlines employee, correct?

7    A    Yes.

8    Q    You said it was hard to tell, didn't you?

9    A    I said it was hard to tell who it was, yes.

10   Q    Is it fair to say that you typically identify American

11   Airlines employees by their uniform?

12   A    Or the vehicle they're driving.

13   Q    Or the vehicle they're driving?

14   A    Yes.

15   Q    Perhaps you even recognize the person from work?

16   A    No, absolutely not.

17   Q    You don't recognize American Airlines employees from

18   work?

19   A    Not in this picture, no.  I mean, if I met them on the

20   street maybe, yes, I would.

21   Q    In general, is it fair of me to say that you recognize

22   American Airlines employees from work?

23   A    About 50 percent of them.

24   Q    Is it fair of me to say that if I were out on the tarmac

25   I'd stand out pretty badly?

1       MR. COHEN:  Objection.

2       THE COURT:  Sustained.

3   Q    Is it fair of me to say that someone wearing civilian

4   clothes on the tarmac might stand out?

5       MR. COHEN:  Objection.

6       THE COURT:  Sustained.

7   Q    Would someone wearing civilian clothes on the tarmac

8   stand out to you?

9       MR. COHEN:  Objection.

10      THE COURT:  I'll allow the question.

11  Q    Would someone wearing civilian clothes on the tarmac

12  stand out to you?

13  A    It's a common practice for people to wear jeans to work.

14  Like, they'll wear jeans and come into work.  It's not -- I

15  mean, you don't really look for the uniform.  I look for an

16  ID.

17  Q    Would someone stand out less on a tarmac in an American

18  Airlines uniform?

19  A    Yes.

20  Q    Is it fair to say it's fairly common to see airline

21  mechanics on the tarmac?

22  A    Yes.

23  Q    You testified on direct examination how a loose

24  insulation blanket could cause damage in the avionics

25  compartment, correct?

1   A    Yes.

2   Q    You said it could get caught or tangled, correct?

3   A    Yes.

4   Q    Causing damage in an avionics compartment, that would be

5   a safety hazard, correct?

6   A    Yes.

7   Q    And that's why you'd fix the issue?

8   A    Yes.

9   Q    You testified that you guys tend to put things back in

10  place?

11  A    Yes, we do.

12  Q    I'm going to approach you with Government Exhibit 2.

13       MS. SCHIERBERL:  With your Honor's permission?

14       THE COURT:  Yes.

15       This is in evidence.

16  Q    Mr. Ricci, do you recognize Government Exhibit 2?

17  A    No, I do not.

18  Q    Is it fair to describe it as a rectangle weighing a few

19  pounds?

20  A    About a pound.

21  Q    I'm sorry?

22  A    Yeah, about a pound.  It's a rectangle.

23  Q    I'm sorry?

24  A    It's a rectangle, yes, and it weighs about a pound.

25  Q    If you saw a number of those in an avionics compartment,

1    you'd report them, wouldn't you?

2    A    Yes.

3    Q    Was that a yes?

4    A    Yes.

5         MS. SCHIERBERL:  Your Honor, may I approach the

6    witness with what's marked as Government Exhibit 6?

7         THE COURT:  Yes.

8         This is in evidence.

9    Q    You don't recognize Government Exhibit 6, do you,

10   Mr. Ricci?

11   A    No, I do not.

12   Q    Does it appear to be a box with wires coming out of it?

13   A    Yes.

14   Q    Can we agree that if you saw an unidentified box with

15   wires coming out of it in an avionics compartment you'd report

16   it?

17        MR. COHEN:  Objection.

18        THE COURT:  Overruled.

19   Q    Can we agree that if you saw an unidentified box with

20   wires coming out of it in an avionics compartment you'd report

21   it?

22   A    If I saw it, yes.

23        MS. SCHIERBERL:  Your Honor, just a brief moment to

24   confer before I step down?

25        THE COURT:  Yes.

1          (Pause in proceedings.)

2          MS. SCHIERBERL:  At this time, your Honor, we have

3   no further questions for this witness.

4          THE COURT:  Can I speak with counsel for just a

5   minute, please?

6

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (The following occurred at sidebar.)

2            THE COURT:  Are you planning to redirect?

3            MR. COHEN:  I am, your Honor.

4            THE COURT:  So, why don't I give the jury a break, I

5    don't know, about 15 minutes or so?

6            MR. COHEN:  Sure.

7            Just for the record, your Honor, the reason I made

8    the last objection is because according to the Government's

9    own witness, that last exhibit that was shown to the witness

10   did not have wires coming out of it.  Quite the contrary, the

11   witness testified those wires were tucked away underneath via

12   outside, which was the reason that they allege the transponder

13   went off.

14           So, as it was shown to the witness was not the

15   correct way, so I believe it was a mischaracterization of the

16   evidence.  I'm just explaining to you why I objected.

17           THE COURT:  Understood, though if you saw a box

18   wires coming out of it, you'd report it.  Okay.

19

20           (Continued on the following page.)

21

22

23

24

25

1          (Sidebar ends; in open court.)

2          THE COURT:  Before the defense conducts a redirect

3     of Mr. Ricci --

4          We're not done with you yet, sir.  And I forgot to

5     remind you that you're still under oath, but I think you

6     understood that.

7          -- we're going to take a break for about 15 minutes

8     or so.  I'm going to ask everyone to come back at 11:20.

9          You all know the drill, jurors, right?

10          Keep an open mind.  Do not talk about this case or

11     anything connected with this case among yourselves or with

12     anyone else.  Don't read or listen to anything at all that

13     might touch on this case.  And do not do any research on your

14     own about anything or investigation on anything connected with

15     this case.

16          I'll see everyone at 11:20.

17          (Jury exits.)

18          THE COURT:  The jury's no longer present.  Everyone

19     can take a break.

20          You as well, sir.

21          THE WITNESS:  Thanks.

22          THE COURT:  I'm just going to ask you to come back

23     at 11:20, back here.

24          THE WITNESS:  Thank you.

25          (Recess taken; continued on the following page.)

1   (Continuing.)

2           THE COURT:  Please have a seat, everybody.  You may

3   have a seat, sir.

4           This is case on trial continued.  We're checking to

5   see if all the jurors are back.  The jury is almost ready.

6           THE COURT:  Jury entering.  All rise.

7           (Jury enters the courtroom.)

8           THE COURT:  Everybody may be seated.  Thank you.

9           Do all of the parties agree that all of our jurors

10  are present and properly seated?

11          MR. POLLACK:  Yes, Your Honor.

12          MR. SIMPSON:  Yes, Judge.

13          THE COURT:  Welcome back, jurors.

14          And my understanding is that the defense wishes to

15  redirect Mr. Ricci?

16          MR. COHEN:  That's correct, Judge.

17          THE COURT:  You may proceed when you're ready.

18  Mr. Ricci, I remind you that you're still under oath.  Keep

19  your voice up nice and loud just the way that you were doing.

20  That was perfect.  Okay.  Thank you.

21  REDIRECT EXAMINATION

22  BY MR. COHEN:

23  Q    Good morning again, Mr. Ricci?

24  A    Good morning.

25  Q    When was the last time you and I went out for a beer?

1   A    Never.

2   Q    How about come over my house for a beer?

3   A    Never.

4   Q    Lunch?

5   A    No.

6   Q    How about me come to your house?

7   A    No.

8   Q    When was the last time you and Paul went out for a beer?

9   A    Maybe 1995.

10  Q    Oh.  And how about go out after work with Mr. Belloisi.

11       When was the last time you and Paul went out after

12  work?

13  A    About the same, 1995.

14  Q    After the questions from Ms. Schierberl on

15  cross-examination regarding your decisions to sometimes not

16  write things in the logbook, are you at all fearful now of

17  retaliation by American Airlines?

18  A    Well, yes.  I mean, ultimately my license is held by the

19  federal government, so, yes.

20  Q    What would your immediate supervisor -- what would your

21  immediate supervisor's response be for a mechanical thing that

22  you fixed that got a plane out on time, but you didn't put it

23  in the logbook?

24       MS. SCHIERBERL:  Objection.

25       THE COURT:  Can you read back the question, please.

1    (Whereupon, the record was read.)

2    THE COURT:  I'll allow the question.

3  A    There were multiple different ways a supervisor will show

4  appreciation, paid lunches which means, like, you went to a

5  meal late, so they give you the extra half hour's pay, the

6  contract hour which mean it's seven minutes after your

7  punch-out time, and you get paid for an hour.

8  Q    Would you get in trouble by your supervisor for doing a

9  technical fix that got a plane out on time that was not put in

10 the logbook?

11 A    Absolutely not.

12 Q    But if the regulations say you have to, why would you not

13 get in trouble?

14 A    I've walked up on airplanes where supervisor were telling

15 pilots not to put items in logbooks to avoid getting a delay

16 on a plane.

17 Q    Does that in some way -- withdrawn.

18    You testified on cross-examination about a flight

19 recorder or a black box recorder in the cockpit; do you

20 remember that?

21 A    Yes.

22 Q    What is that?

23 A    It's a recorder that -- there's two different recorders.

24 There's a voice recorder and a flight data recorder.  They're

25 usually located in the tail of the plane.

1   Q    I'm just going to stick with the voice recorder.

2             Can you tell us what the purpose of that is?

3   A    It records the conversations in the cockpit.

4   Q    Is that a mandatory piece of equipment?

5   A    Yes.

6   Q    On cross-examination, you were shown the photo where you

7   measured the avionics hatch door.

8             Do you remember seeing that?

9   A    Yes, I do.

10  Q    Do you remember also seeing a photo of an open avionics

11  hatch door.

12            Do you remember that?

13  A    Yes, I do.

14  Q    What is the difference in size between those two doors,

15  two hatch doors?

16  A    They're the same size.

17  Q    Oh.  And what is the difference in size between the

18  avionics hatch door that you measured and the avionics hatch

19  door of the 737 that Mr. Belloisi was arrested near?

20  A    They're the same size.

21  Q    You also were asked about the custom seal on your

22  identification.

23            Do you remember that?

24  A    Yes, I do.

25  Q    If a plane is coming in from an international flight, can

1  you tell us, is that considered a customs plane?

2  A    Yes, it is.

3  Q    And at what point, if, at all, does it cease to become a

4  customs plane?

5  A    When all the passengers and cargo are off the plane.

6  Q    And approximately how long after an international flight

7  lands does it cease to become an international flight or

8  customs flight, excuse me?

9  A    Anywhere up to an hour.

10 Q    And according to American Airlines policy, when can an

11 American Airlines mechanic who does not have a customs badge

12 go onto a flight that has arrived internationally?

13      Should I ask the question again, Mr. Ricci?

14 A    No.  Okay.  After customs -- when customs is on board,

15 they usually put the -- there's, like, a red rope that goes

16 across the doorway to stop us going on.  So you if you see the

17 red rope, you just leave.  When they're done with the plane,

18 they'll take the red rope down, and that signifies that you

19 can go onboard.

20 Q    Have you ever had reason to assist another mechanic on a

21 plane?

22 A    Absolutely.

23 Q    Have you assisted another mechanic on a plane that you

24 were not assigned to?

25 A    Absolutely.

1    Q    When you are done assisting that mechanic, have you

2    checked whether the work you helped the other mechanic resolve

3    was placed in the logbook?

4    A    No, I did not.

5    Q    Have you ever been called to the gate of an outgoing

6    aircraft?

7    A    Yes, I have.

8    Q    Is that what's commonly returned to as a gate call?

9    A    Yes.

10   Q    Have you ever been called to the -- withdrawn.

11        Have you ever been asked by a pilot who's sitting at

12   the gate of a departing plane not to put a fix in a logbook?

13   A    They'll ask -- generally, they'll us ask, do you want it

14   in the book or not.  Like, you know, they'll call us out for

15   certain items, and if they see it's close to departure time,

16   they won't put it in the book automatically.  They'll ask if

17   you want it in or not.

18   Q    And in that circumstance --

19        THE COURT:  You need to slow down.  You're going too

20   fast.

21   Q    In the circumstance that you just described, Mr. Ricci,

22   why would you choose not to put something in the logbook?

23   A    To avoid delay.

24   Q    And how does American Airlines feel about delay?

25   A    They don't like delays.

1  Q    Mr. Ricci, technically speaking, if a light bulb is

2  changed in an aircraft, is that supposed to be placed in a

3  logbook?

4  A    Yes.

5  Q    If a pilot changes a light bulb, is he supposed to put

6  that in the logbook?

7  A    A pilot would never change a light bulb, but if he did,

8  yes.

9  Q    And if he didn't, would that be in violation of the

10 general procedures manual?

11 A    It would, yes.

12 Q    You were asked on cross-examination if you have ever

13 been -- had the occasion to help Mr. Belloisi with a

14 mechanical assignment.

15       Do you remember that?

16 A    Yes, I do.

17 Q    Strictly speaking only about Mr. Bellosi's qualifications

18 as a mechanic, how would you rate those qualifications?

19 A    He has the same qualifications I have.

20       MR. COHEN:  Nothing further.

21       THE COURT:  Any recross?

22       MS. SCHIERBERL:  No, Your Honor.

23       THE COURT:  Thank you.  Now you may step down.

24 Thank you, sir.

25       (The witness steps down.)

1          THE COURT:  May I speak with counsel, please.

2          (Continued on the next page.)

3          (Sidebar conference.)

1          (The following occurred at sidebar.)

2          THE COURT:  Does the defense have any additional

3  rebuttal?

4          MR. COHEN:  No, we do not, Your Honor.

5          THE COURT:  I'm sorry, that was an incorrect

6  question.  Withdrawn.

7          Does the defense wish to --

8          MR. COHEN:  Objection.

9          THE COURT:  Sorry about that.

10          Does the defense have -- I haven't had enough coffee

11  this morning.

12          Does the defense have any additional evidence to

13  present?

14          MR. COHEN:  We do not, Your Honor.

15          THE COURT:  So the defense rests?

16          MR. COHEN:  That's correct, Your Honor.

17          THE COURT:  Does the Government have rebuttal?

18          MR. POLLACK:  Yes, Your Honor.  We have two rebuttal

19  witnesses we expect based on direct examination alone.

20          They can be done by a 12:30 lunch.

21          THE COURT:  All right.  We'll see if that happens.

22          MR. COHEN:  And just so you know Your Honor -- I

23  just caught what you said.  We do keep our objections.  We

24  understand Officer Campbell is going to be called to validate

25  some timestamped or metadata, but the other witness, for all

1    the reasons put forth before, we keep our objection.

2              THE COURT:  Noted.  Okay.

3              So then I'm going to ask you to rest on the record

4    in front of the jury, and then we'll start.

5              MR. SIMPSON:  Okay.

6              THE COURT:  Okay.  Thank you.

7              (End of sidebar conference.)

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court; Jury present.)

 2              THE COURT:  Does the defense have any additional

 3      evidence to present?

 4              MR. COHEN:  We do not, Your Honor.

 5              THE COURT:  Does the defense rest?

 6              MR. COHEN:  The defense rests.

 7              THE COURT:  Thank you.  And does the Government have

 8      any rebuttal evidence?

 9              MS. SCHIERBERL:  Yes, Your Honor.

10              THE COURT:  You may call your first witness.

11              MS. SCHIERBERL:  Thank you, Your Honor.  I'd ask

12      Agent Moloney to step out and bring in Customs and Border

13      Protection Officer Garry Camry.

14              (The witness takes the stand.)

15              THE COURTROOM DEPUTY:  Please raise your right hand,

16      sir.

17              (The witness was sworn and/or affirmed in by the

18      courtroom deputy.)

19              THE WITNESS:  I do.

20              THE COURTROOM DEPUTY:  Thank you.  Would you please

21      state and spell your name, sir.

22              THE WITNESS:  Do you mind if you --

23              THE COURT:  Yes, you can remove it.

24              THE COURTROOM DEPUTY:  My name is Journael Cambry,

25      J-O-U-R-N-A-E-L, middle name is Garry, G-A-R-R-Y, Cambry,

1    C-A-M-B-R-Y.

2              THE COURT:  And Ms. Schierberl, there's, I think

3    exhibits that were left from the prior witness on the witness

4    table, if you want to remove that.

5              MS. SCHIERBERL:  Thank you, Judge.  I appreciate

6    that.

7              THE COURT:  And good morning, sir.

8              THE WITNESS:  Good morning.

9              THE COURT:  There should be some water there for

10   you.

11             THE WITNESS:  Thanks.

12             THE COURT:  And that volume was perfect, and adjust

13   the mic so that it's comfortable for you.

14             You may inquire, Ms. Schierberl.

15             MS. SCHIERBERL:  Thank you, Judge.

16   **JOURNAEL CAMBRY**, called as a witness, having been first duly

17   sworn/affirmed, was examined and testified as follows:

18   DIRECT EXAMINATION

19   BY MS. SCHIERBERL:

20   Q    Good morning, Officer Cambry.

21   A    Good morning, ma'am.

22   Q    I'm showing you what's in evidence as Government

23   Exhibit 204.

24             Can you see this image on your screen?

25             THE COURT:  And this is in evidence, I'm sorry.

1    Q    Can you see what's on your screen?

2    A    Yes, ma'am.

3    Q    Who took this photograph?

4    A    I did.

5    Q    Have you reviewed the metadata for this photograph?

6    A    Yes.

7         MS. SCHIERBERL:  Ms. Cronin, can we please publish,

8    only to defense counsel and the witness, what's been marked

9    for identification purposes only as Government Exhibit 204A.

10        THE COURT:  It may be shown.

11   Q    Mr. Cambry, do you recognize this?

12   A    Yes, ma'am.

13   Q    Officer Cambry, excuse me.

14        What is this?

15   A    This is the avionics entrance, as she called it, the

16   electronic and equipment bay area.  That's the access door

17   panel.

18   Q    Does this photograph represent the metadata for this

19   photograph?

20   A    That's correct, yes.

21   Q    Is that a fair and accurate copy of the metadata for the

22   paragraph marked as Government Exhibit 204?

23   A    Yes.

24        MS. SCHIERBERL:  Your Honor, the Government offers

25   what's been marked as Government Exhibit 204A in evidence.

1          THE COURT:  Any objection?

2          MR. SIMPSON:  No.

3          THE COURT:  It's admitted.

4          (Government Exhibit 204A, was received in evidence.)

5          MS. SCHIERBERL:  Permission to publish to the jury.

6          THE COURT:  Yes.

7          (Exhibit published.)

8    Q    Officer Cambry, what is this?

9    A    This is the access door panel for the aircraft.  That's

10   where you get access to go inside the avionics area.

11   Q    Is that the avionics compartment on flight three bravo

12   golf?

13   A    That's -- yes.  That's the main avionics bay, yes.

14   Q    When was that photograph taken?

15   A    I took that picture back in February 4th, 2020.

16   Q    What time did you take this photograph?

17   A    1936.

18   Q    In civilian time, what time is that?

19   A    7:36.

20   Q    7:36 p.m.?

21   A    P.m., yes.

22   Q    Is the avionics compartment the defendant came out of on

23   February 4th, 2020?

24   A    Yes.  That's correct.

25          MS. SCHIERBERL:  No further questions, Your Honor.

1          THE COURT:  Any questions by the defense?

2          MR. SIMPSON:  No, Your Honor.

3          THE COURT:  Thank you, sir.  You may step down.

4          (The witness steps down.)

5          THE COURT:  You may call your next witness.

6          MR. POLLACK:  Government calls Lorenzo Meccariello.

7          THE COURTROOM DEPUTY:  Come over here.

8          (The witness takes the stand.)

9          THE COURTROOM DEPUTY:  Please raise your right hand,

10    sir.

11          (The witness was sworn and/or affirmed in by the

12    courtroom deputy.)

13          THE WITNESS:  I do.

14          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

15          There's bottled water for you there.  You can remove

16    your mask.

17          THE COURT:  You may take off your mask if you feel

18    comfortable.

19          THE WITNESS:  Thank you.

20          THE COURTROOM DEPUTY:  Please state and spell your

21    name, sir.

22          THE WITNESS:  I'm sorry?

23          THE COURTROOM DEPUTY:  Please state and spell your

24    name.

25          THE WITNESS:  State my name?

1          THE COURTROOM DEPUTY:  And then spell it.

2          THE WITNESS:  Lorenzo Meccariello, L-O-R-E-N-Z-O,

3     M-E-C-C-A-R-I-E-L-L-O.

4          THE COURTROOM DEPUTY:  Thank you.

5          THE COURT:  And good morning, sir.

6          THE WITNESS:  Good morning.

7          THE COURT:  I'm going to ask you to keep your voice

8     up nice and loud.  You can adjust the microphone and speak

9     slowly, if you would, please.

10          THE WITNESS:  Thank you.

11          THE COURT:  All right.  And you may inquire when

12     you're ready, Mr. Pollack.

13          MR. POLLACK:  Thank you, Your Honor.

14     **LORENZO MECCARIELLO**, called as a witness, having been first

15     duly sworn/affirmed, was examined and testified as follows:

16     DIRECT EXAMINATION

17     BY MR. POLLACK:

18     Q     Good morning, Mr. Meccariello.

19     A     Good morning.

20     Q     Who do you work for?

21     A     American Airlines.

22     Q     And where are you based?

23     A     JFK.

24     Q     What's your title?

25     A     Line maintenance supervisor.

1    Q    What does it mean to be a line maintenance supervisor?

2    A    I manage the day-to-day operations of an inbound and

3    outbound aircraft mechanical to make sure that they're safe,

4    issues that arise, and we address them and dispatch the

5    aircraft.

6    Q    How long have you worked in the aviation industry?

7    A    In total, I'm going to say over 45 years.

8    Q    Do you have an airframe and powerplant license?

9    A    Yes.

10   Q    When did you get it?

11   A    I got my A in '74 and my P in '75.

12   Q    In total, how long have you worked at JFK?

13   A    Probably in excess of 30 years.

14   Q    How long have you worked specifically for American

15   Airlines?

16   A    Six plus years, six and a half.

17   Q    Have you ever met the defendant in this case,

18   Paul Belloisi?

19   A    I may have.  I do not recall ever meeting him, no.

20   Q    On a given day, how many mechanics do you supervise?

21   A    Generally, between 30 and 70, depending on the day.

22   Q    And how many planes are being worked on by the mechanics

23   you supervisor every day?

24   A    Well, we average about 60 some odd flights a day, and

25   while I'm on duty, we transit about, I want to say, about 30

1  of them.

2  Q    What kind of -- what kinds of airplanes are in the fleet

3  that you supervise the maintenance of?

4  A    We -- through JFK, we transit three types of fleet, 737

5  Airbus A320, and the Triple 7-200 and 300.

6  Q    Have you taken the fleet-specific American Airlines

7  courses that are required to be able to individually do work

8  on all of those aircrafts?

9  A    The Airbus and the Triple 7-200, 300.

10  Q    Are you able to supervise the work overall of those

11  aircrafts?

12  A    Yes.

13  Q    Do you know what a PACK is?

14  A    Yes.

15  Q    What is a PACK?

16  A    A PACK is the air conditioning system.  It provides heat

17  and air, and it also pressurizes the aircraft inflight.

18  Q    Are there issues that can arise where a PACK system would

19  set off an alarm in the cockpit?

20  A    Not that I'm aware of.  A PACK on the ground does not set

21  off an alarm in the -- on the cockpit.  It sends a message,

22  PACK fault, but not an alarm.

23  Q    And if there's a message of a PACK fault, how would a

24  mechanic address that?

25  A    Well, it depends on what the issue is, but if there's an

1   issue with the PACK, I would first turn off the air supply to

2   the PACK, find out what the issue is, what the PACK fault is,

3   interrogate the system.

4   Q    Is that something that a pilot can do?

5   A    He would not interrogate the system, but he would shut

6   the PACK off, yes.

7   Q    Is that something the pilot would do from the cockpit?

8   A    Shut off the PACK, yes.

9   Q    Are you aware of any reason to go to the avionics

10  compartment to do that?

11  A    No.

12  Q    Are you generally familiar with airplane logbooks?

13  A    Yes.

14  Q    What kind of things go in the airplane's logbook?

15  A    Anything and everything related to the aircraft.

16  Q    Why is that?

17  A    Everything must be documented.  All aircraft maintenance

18  is documented by the CFRs.

19  Q    What are CFRs?

20  A    Code of Federal Regulations.

21  Q    Would an issue with the PACK need go in the logbook?

22  A    Certainly.

23  Q    Why?

24  A    It's a system critical of system for flight.  We have two

25  of them, and anything going wrong with them, we need them

1   documented to see what's going on.

2   Q    In your experience supervising all those mechanics at

3   JFK, are you aware of mechanics addressing PACK issues without

4   putting it in a logbook?

5   A    No.

6   Q    To your knowledge, what kind of consequences could there

7   be for a mechanic who addressed PACK issues without putting it

8   in the logbook?

9   A    The FARs and the FAA in familiar would censure that

10  personal.  Depending on the severity, it could go anything

11  from a letter of suspension and/or removal of your licenses,

12  and if it's really severe, you can be criminally prosecuted.

13  Q    Are you aware of mechanics that you supervise doing

14  maintenance work on aircraft that they have not been assigned

15  to do?

16  A    That's not normal, no.

17  Q    Why would you say it's not normal?

18  A    A mechanic, there's -- when you're in a group of

19  mechanics, you're each assigned to an aircraft.  If you're

20  assigned to one aircraft, you don't normally go to another

21  aircraft and research it or troubleshoot it.

22        MR. POLLACK:  May I have a brief moment with my

23  cocounsel, Your Honor?

24        THE COURT:  Yes.

25        MR. POLLACK:  Nothing further.

1        THE COURT:  Any cross-examination?

2        MR. COHEN:  Yes, Judge.

3   CROSS-EXAMINATION

4   BY MR. COHEN:

5   Q    Good morning, sir.

6   A    Good morning.

7   Q    If I ask you a question that is difficult to understand

8   or I'm being confusing, just let me know, and I will rephrase

9   it.

10  A    Okay.

11  Q    Are you here today, sir, pursuant to a subpoena?

12  A    Yes.

13  Q    When did you receive that subpoena?

14  A    Friday.

15  Q    Did you speak with the prosecutors prior to coming today?

16  A    Yes.  This morning.

17  Q    Did you have a call with them over the weekend, as well?

18  A    Yes.

19  Q    Do you remember who you spoke with on that call?

20  A    On the call, I think it was the prosecutor, Robert.

21  Q    Robert Pollack?

22  A    Yes.

23  Q    Do you know if there was anybody else on the call?

24  A    No.  My company attorney was on the call, as well.

25  Q    You've received training on the Triple 7; is that right?

1   A    Correct.

2   Q    And on the Airbus, as well?

3   A    Correct.

4   Q    727?

5   A    727, yes.

6   Q    And the A320 family of airplanes?

7   A    Yes.

8   Q    I'm sorry, sir, I have to repeat it because I was

9   speaking too fast.

10       So my last question was, did you also receive

11  training on the A320 family?

12  A    Yes.

13  Q    And when was the last time that you received training on

14  the 737?

15  A    I did not receive training on the 737.

16  Q    How long have you been in the aviation business for, sir?

17  A    Since 1975.  I'm going to say that's about 48 years

18  total.

19           MR. COHEN:  Just one moment, please, Your Honor.

20           THE COURT:  Yes.

21           MR. COHEN:  Thank you, sir.  Good day.

22           THE COURT:  Any redirect?

23           MR. POLLACK:  No, Your Honor.

24           THE COURT:  Thank you.  You may step down, sir.

25  Thank you.

1          (The witness steps down.)

2          THE COURT:  May I see counsel, please.

3          (The following occurred at sidebar.)

4          THE COURT:  Is this the Government's rebuttal case,

5    the end of the Government's rebuttal case?

6          MR. POLLACK:  Yes, it is.

7          THE COURT:  Do you have anything else?

8          MR. COHEN:  I do not, Your Honor.

9          THE COURT:  So Government rests.  Defense rests.

10         What I can do is, perhaps, give the jury a longer

11   lunch just because I do want to discuss with you all that last

12   remaining charge about prior inconsistent statement that we

13   didn't fine tune the last time.  We inputted all of the

14   changes, but I'm still reviewing it to make sure that it's all

15   in there.  And then this way, you would be prepared with

16   openings by 2:00 o'clock?

17         MS. SCHIERBERL:  That works for the Government.

18         MR. POLLACK:  Closings.

19         THE COURT:  Right.  Right.  Sorry.  I really do need

20   more coffee.  Closings, yeah.  I don't think anybody wants to

21   start all over again.

22         Okay.  Closings, at 2:00 o'clock.

23         If the parties go for as long as you say that you're

24   going to go, that would take us into about 3:30ish or so.  If

25   I started charging them after a break, at the earliest it

1   would be a quarter to the four, and the charge is going to

2   take at least an hour to read to them.  So I think I'm going

3   to have you close, unless I hear an objection.  I'm going to

4   have you close and then charge them first thing in the

5   morning.

6           MR. POLLACK:  We have no objection.  If I may

7   interject, we would ask at some point outside of the presence

8   of the jury, the defendant be asked to allocute to his

9   decision not to testify on the record.

10          THE COURT:  Well, that, and I haven't entertained

11  yet, motions at the end of the case which I can just excuse

12  the jury and we can deal with all of the housekeeping issues

13  that we need to deal with.

14          MR. POLLACK:  Understood.

15          THE COURT:  You know.  In fact, I could let them

16  come back at 2:30 since we're not going to charge them today.

17          MR. COHEN:  That makes sense.

18          THE COURT:  Okay.

19          MS. SCHIERBERL:  Okay.

20          THE COURT:  All right.  All right.

21          (End of sidebar conference.)

22          (Continued on the next page.)

23

24

25

1          (In open court; Jury present.)

2          THE COURT:  Does the Government have any additional

3   rebuttal evidence to present?

4          MR. POLLACK:  No, Your Honor.

5          THE COURT:  Does the Government rest?

6          MR. POLLACK:  Yes, Your Honor.

7          THE COURT:  Does the defense rest?

8          MR. COHEN:  Yes, Your Honor, we do.

9          THE COURT:  Okay.  Ladies and gentlemen, so that

10  concludes the presentation of the evidence, and the next steps

11  are going to be closing arguments by the attorneys.  We still

12  have some housekeeping things to take care of before they

13  start.  So what we're going to do is give you an early and

14  longer lunch than usual.  You'll hear closing arguments today,

15  since by the time we get done with that, it's going to be

16  fairly close to the end of the day.  I'm going to give you the

17  legal instructions, what we call the jury charge or the jury

18  instructions tomorrow morning so you can have a full day of

19  deliberation.  The good news is that we're way ahead of

20  schedule of where we expected to be at this point in time.  I

21  do want to thank the lawyers for all their hard work in really

22  trying to move the case along.

23          So, it is still just as important now as it was the

24  very first day when you walked into this courthouse and didn't

25  know anything at all about this case and the first day that

1    you came here before me, that you keep an open mind and not

2    form or draw any conclusions about this case or the guilty or

3    non-guilt of the defendant, because you still have not heard

4    closing arguments even though they're not evidence, but you

5    haven't heard my instructions on the law, you haven't had a

6    chance to deliberate with one another.  You still cannot talk

7    about the case amongst yourselves or with anyone else over any

8    kind of medium.  You cannot tell do any research or

9    investigation on your own over any kind of media, and you

10   can't read or listen to anything at all that might be

11   connected with this case or go to or visit any location that

12   you may have heard mentioned here.

13          So I hope it's nice and sunny outside.  I'm going to

14   ask you to come back at 2:30, and we will be prepared to go

15   forward with closing arguments at the time.  I'll give you

16   some brief instructions, and then we'll go forward with the

17   closing arguments.

18          And I have to thank you, as well, because without

19   your punctuality, we would not have been able to move as

20   quickly.  You know, it all plays together to be able to move

21   along quickly.  Everybody has to make their contributions.  So

22   we really appreciate the fact that you all have been very very

23   punctual throughout this whole trial.  So enjoy your lunch and

24   we'll see you back here at 2:30.

25          (Jury exits the courtroom.)

1           THE COURT:  Please have a seat.

2           Motions at the end of the case.  Defense?

3           MR. SIMPSON:  Yes, Judge.  Judge the defense moves

4   for motion for acquittal.  There's insufficient evidence for a

5   rational juror to conclude beyond a reasonable doubt

6   Mr. Belloisi had the requisite knowledge and specific intent

7   to import cocaine or possess cocaine with the intent to

8   distribute, so as to support a conviction under any of the

9   charge of the indictment.

10          The importation count and conspiracy to import

11  counts require the defendant have knowledge and intent that

12  the narcotic drug would be brought into the U.S. from

13  throughout its border.  In short, the Government must prove

14  not merely that a defendant was a member of a conspiracy to

15  traffic in cocaine, but also, that a defendant had the

16  knowledge and intent that the cocaine was coming from beyond

17  U.S. border.  This knowledge requirement also applies to

18  Mr. Bellosi's conspiracy charge with respect to importation,

19  *United States Versus Monaco*.  At the very best, the evidence

20  might weakly support the inference that Belloisi may have

21  known that the avionics compartment of the aircraft in

22  question contained drugs, but the evidence supporting this

23  inference certainly does not establish Bellosi's knowledge and

24  intent that the drugs previously therein had been on an

25  incoming international flight some four hours earlier.  The

1    defense would cite to the Supreme Court's reasoning in

2    *Regalado Cuellar*, although there is some evidence --

3            THE COURT:  You can't just give a name without a

4    citation to the case.  And if you could spell, please, I'd

5    appreciate it.

6            MR. SIMPSON:  Yes.  I will get the citation.  It's

7    spelled R-E-G-A-L -- R-E-G-A-L-A-D-O space Cuellar,

8    C-U-E-L-L-A-R.  I will get the citation for Your Honor

9    momentarily.

10           Although there is some evidence of a drug

11   trafficking scheme in the case before us, the proof of

12   Bellosi's knowledge of a drug trafficking scheme or an

13   international one, at that, is not qualitatively or

14   quantitatively greater than the proof at issue in *Regalado*

15   *Cuellar*.

16           In *Regalado Cuellar*, the defendant was caught hiding

17   a large sum of money in his car.  Here, Mr. Belloisi was seen

18   merely entering an area where drugs had been located hours

19   earlier.  Considering, first, Bellosi's knowledge regarding

20   the international origin of the cocaine, notably, there's no

21   evidence that Belloisi ever was told about which flight and

22   from which country the drugs would be arriving.  Indeed, there

23   is no direct evidence of any kind that he was ever told about

24   the arrival of the drugs by anyone or that he could have

25   inferred their international origin through conversations or

1    activities in which he participated.

2            For example, Belloisi was not present at, nor has

3    the Government presented any evidence of any conversations or

4    communications of any type among with or amongst any

5    co-conspirators or anything with respect to the drugs or

6    origin thereof or the flight on which they arrived would be

7    discussed.  At the only alleged meeting between Belloisi and

8    any alleged co-conspirator, Lester, on February 3rd or early

9    February 4th where Belloisi was apparently present, but there

10   is no evidence the meeting had any relationship to narcotics

11   or even if it did concern narcotics, that any information was

12   contained was conveyed to Belloisi about where the following

13   day's shipment of cocaine was coming from.  Nor is there any

14   evidence in the record suggesting that Lester was a member of

15   any conspiracy beyond the evidence that simply establishes

16   that he and Belloisi had some type of evidence.  The absence

17   of such evidence is fatal to the Government's case.

18           The facts at issue here, Your Honor, are similar to

19   those in *United States versus Rodriguez*, 392 F. 3d 539, Second

20   Circuit 2004, where the Circuit found the evidence

21   insufficient to support the defendant's conviction for

22   possession of heroin with intent to distribute and conspiracy

23   to distribute heroin, despite the fact that the Government

24   presented sufficient evidence in which the jury could have

25   found the defendant served as a lookout in a drug transaction.

1    Critically, although the defendant in Rodriguez was in close

2    proximity to boxes containing heroin, the heroin was hidden

3    inside a telephone box and also wrapped in two bags.  Because

4    the appearance of the boxes did not establish their content,

5    the Circuit concluded that the defendant's proximity to the

6    hidden contraband did not amount to circumstantial evidence

7    adequate to prove the defendant's knowledge and specific

8    intent to aid and abet a drawing transaction.

9         The Circuit similarly found the fact that Rodriguez

10   owned the car used in the drug transaction, just as Belloisi

11   had a means of accessing the avionics compartment used in the

12   crime at issue in this case, did not establish his knowledge

13   of the origin of the cocaine as being from outside the United

14   States.

15        Furthermore, although there was evidence that the

16   defendant in *Rodriguez* participated in planning conversations,

17   the Circuit found that this participation was insufficient to

18   support a conviction because there was no evidence of the

19   precise contents of the conversations, and particularly,

20   whether these conversations mentioned drugs.

21        I would refer also the Court to *United States v.*

22   *Labat* 905 F.2d 18, Page 22, Second Circuit 1990.  Here, in

23   this case, there is even qualitatively less than there was in

24   *Rodriguez* or *Labat* with respect to evidence of planning

25   conversations, as there was no evidence of any content of any

1    communications that the Government has been able to point to

2    as having been about drugs at all.  If the evidence viewed in

3    the light most favorable to the prosecution gives equal or

4    nearly equal circumstantial support to a theory of guilt and a

5    theory of innocence then a reasonable jury must necessarily

6    entertain a reasonable doubt.  United States versus Glen, 312

7    F.3d 58, Page 70, Second Circuit 2002.

8            Accordingly -- sorry.  Reviewing the evidence in its

9    totality, a rational juror could not conclude beyond a

10   reasonable doubt that Belloisi knew and intended the cocaine

11   was going to be imported from without to within the U.S.

12   While each piece of circumstantial evidence may be probative

13   to some degree of Bellosi's guilty knowledge that he was

14   involved in something illegal, the evidence in, its totality,

15   is insufficient to demonstrate beyond a reasonable doubt that

16   Belloisi was involved in any type of drug trafficking

17   conspiracy, and even if he were, that the transaction in which

18   he participated related to bringing in -- the bringing in of

19   cocaine to the U.S. from abroad.

20           As the Supreme Court has observed, where the

21   consequences of an action are commonly known, a criminal

22   defendant's knowledge or purpose can be circumstantially based

23   on inferences drawn from evidence of a fact.  But simply

24   having a meeting with someone the night before one is found in

25   an area that had, a few hours earlier, contained narcotics

1    does not lead to a rational inference that the meeting was

2    about a drug transaction or by any stretch of the imagination,

3    that certain facts and circumstances regarding the details of

4    the meeting included the defendant gaining knowledge, and

5    thus, intent the drugs come in from abroad.

6            The evidence of Mr. Bellosi's knowledge must be

7    something more than presence of the avionics compartment, and

8    the fact he had a meeting with someone the night before who

9    subsequently cut ties with him after his arrest.  Because the

10   evidence presented at trial fails to demonstrate that Belloisi

11   knew the specific purpose of the transaction in which he

12   allegedly participated, the Court should order a verdict of

13   acquittal, in particular, with respect to the counts of

14   importation and conspiracy to import cocaine.  Thank you.

15           THE COURT:  Thank you.  Does the Government wish to

16   be heard?

17           MR. POLLACK:  Yes, Your Honor.

18           For all of the same reasons articulated last week,

19   at or near the close of the Government's case, I submit that

20   there is more than sufficient evidence for a rational jury to

21   convict.  First of all, specifically with respect to a

22   conspiracy to possess and intent to distribute, the mere fact

23   that over 10 kilograms of cocaine were ceased from a sensitive

24   area of an airplane and that the defendant was then found

25   going into that airplane, into that same area, where he had no

1    legitimate business being, and especially in light of

2    testimony that there was no problem with that airplane, nobody

3    needed to go in there, much less the defendant, that he then

4    tripped the transponder device that had been placed in a sham

5    brick of cocaine that law enforcement had placed in that

6    compartment and had the invisible spray going on his hands is

7    sufficient for a rational jury to find that he went there in

8    order to take the cocaine out.  In light of the quantity of

9    cocaine that was seized, a rational jury can certainly find

10   that he did so intending to distribute.

11          Specifically, with respect to the international

12   nature of the flight or the importation charge and conspiracy

13   to import charge, a jury can rationally conclude that any

14   person, and especially a person who works in an airport, and

15   even more so, a person who works at the airport and must be

16   mindful of the differences between domestic and international

17   flights, because he is not permitted to go into international

18   flights, will know the difference and will be mindful of the

19   difference between domestic and international flights.  From

20   that alone, the jury can rationally conclude that the

21   defendant knew that the cocaine he went to pick up had been

22   imported, that it arrived in an international flight.

23          Additionally, the notion that cocaine would be

24   smuggled from one city to another in an airplane within the

25   United States, rather than in a car, for instance, is a

1   fanciful notion.  Any rational person who is presented with

2   facts of cocaine being smuggled in an avionics compartment on

3   an aircraft should expect that that cocaine is being smuggled

4   into the United States, and not cross domestic boarders only.

5           (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        MR. POLLACK:  Lastly, with respect to the connection

2    with the co-conspirator.  The fact that the co-conspirator

3    abandoned the cellphone immediately following the defendant's

4    arrest is probative of the conscientiousness of guilt on the

5    co-conspirator.  The defendant was caught and the

6    co-conspirator attempted not to get caught as well.

7        And in totality a rational juror could convict the

8    defendant on all three counts.

9        THE COURT:  Thank you.  Defendant's motion for a

10   directed verdict of acquittal is denied.

11       As an initial matter at this stage, the evidence

12   must be viewed in the light most favorable to the Government.

13       Secondly, the Government is entitled to prove its

14   case completely on circumstantial evidence if it so chooses.

15   And from what I can tell from a very quick review of at least

16   the Supreme Court case cited by counsel, *Regalado vs. Cuellar*

17   and *United States vs. Rodriguez*, those cases are in opposite.

18   Money laundering has very particular requirements that require

19   very specific knowledge as to why money is concealed,

20   understandably, because money is presumably legal; the

21   possession of which is presumed legal unless proven otherwise.

22   *Rodriguez* is not an importation case.

23       But that is aside, the Government has pointed to

24   evidence that is sufficient for this case to go to the jury.

25   It's undisputed that the plane came from Jamaica, a known

1    source country for drugs.  It was at an international

2    terminal, not a domestic terminal.  And the defendant did not

3    have the proper identification to be on that international

4    flight; and in fact, he wasn't assigned to be in that terminal

5    at all on that evening.

6            There is additional evidence, including his presence

7    inside the avionics compartment, where there was no basis for

8    him to be.  And the shiny Clue Spray that was on his hands and

9    the other evidence that was presented by the Government.  So

10   there is sufficient evidence to go to the jury.

11           The defendant's motion is denied.

12           There was one piece of jury charge that was left

13   open so that we could see the results of the testimony today,

14   and that was the prior inconsistent statement.  That would be

15   paragraph 14, right after interviewed witnesses.

16           I will hear from you all because it's a question of

17   whether we identify -- I have in prior cases simply left it

18   open and just said a witness or witnesses in the plural as

19   opposed to naming individual witnesses.  Of course, the

20   attorneys are free to make comment during closing arguments.

21           MR. POLLACK:  In the Government's view, it's

22   perfectly appropriate to leave it generic, witness or

23   witnesses.  We have no objection to that.

24           THE COURT:  The question is whether it's in singular

25   or plural.  It gets a little clumsy.

1          MR. POLLACK:  We defer to the Court.  We believe it

2     was only one witness who was in fact impeached for allegedly

3     inconsistent prior statements.  But whether it says a witness

4     was or witness or witnesses were, we defer.

5          MR. SIMPSON:  Defense thinks the plural makes more

6     sense.  Because if you say a witness, they try to start

7     thinking who you're talking about.

8          THE COURT:  Shouldn't they try to figure it out?

9     Isn't that what they are supposed to do, figure out who made

10    the prior inconsistent statement and what was it.  That's

11    their job.

12         MR. SIMPSON:  We would defer to the Court, yes.

13         THE COURT:  My proposal is to leave it as a witness

14    made a statement or statements -- as his testimony in this

15    trial.

16         You may consider the earlier statement or statements

17    to help you decide how much of that witness's testimony to

18    believe.  If you find that the prior statement or

19    statements -- how about this to be less clumsy -- if you find

20    that a prior statement was not consistent with the testimony

21    of that witness -- you don't need to say at this trial, I

22    don't think.

23         Do you want me to leave that in there?

24         MR. COHEN:  It doesn't seem necessary.

25         THE COURT:  I don't think it's necessary.  We're not

1    talking about some other place.

2              Then you should decide whether that affects the

3    believability of his testimony at this trial.

4              I also instructed that a prior statement, that if

5    you find in fact it was made is not evidence that the

6    statement is true.  You may consider the prior consistency or

7    inconsistency only as bearing on the weight or credibility

8    that you wish to give the testimony that the witness presented

9    in this trial.

10             Is that okay?

11             MR. POLLACK:  No objection.

12             MR. SIMPSON:  No objection from the defense.

13             THE COURT:  Is there anything else we all want to

14   address with the Court?

15             MR. POLLACK:  As noted at sidebar, we would like now

16   or later for the defendant to allocute to his decision not to

17   testify.  Other than that, the Government has nothing at this

18   point.

19             THE COURT:  Mr. Belloisi, obviously you have a right

20   not to testify if you do not wish to testify.  That is your

21   constitutional right under the Fifth Amendment of the

22   Constitution.  You may testify if you wish, even though I told

23   them that you've rested.

24             And after conferring with counsel, what is your wish

25   to testify or not to testify?

1              MR. COHEN:  As counsel for Mr. Belloisi, your Honor,

2    he will do -- he will answer the question if the Court

3    requires to.  But I advise my clients not to answer the

4    question, but of course he has to answer if the Court

5    requests.

6              THE COURT:  I'm only asking him if he wishes to

7    testify or not testify, that's all I'm asking.

8              Mr. Belloisi, what do you wish to do?

9              THE DEFENDANT:  I wish not to testify.

10             THE COURT:  All right, sir.  You had enough time to

11   confer with counsel?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Thank you.

14             Thank you all.  I will see you all at 2:30 p.m.

15             (Lunch recess.)

16             THE COURTROOM DEPUTY:  All Rise.

17             THE COURT:  Have a seat everyone.  All of our jurors

18   are ready.  Is everyone ready to start?

19             MR. POLLACK:  Yes, your Honor.

20             THE COURT:  Yes.

21             MR. COHEN:  Yes, Judge.

22             THE COURT:  We can go and send out for our jury.

23             (Jury enters the courtroom.)

24             THE COURT:  Jury is entering.

25             Everyone may be seated.  Thank you.

1            Do all of the parties agree that all of our jurors

2      are present and properly seated?

3            MR. POLLACK:  Yes, your Honor.

4            MR. COHEN:  Yes, your Honor.

5            THE COURT:  Thank you.

6            Welcome back, ladies and gentlemen.

7            Members of the jury, the proof having been closed,

8      we have now reached that point where you are about to hear the

9      summations of counsel.  Following the summations, not likely

10     this afternoon but tomorrow morning first thing, I will

11     instruct you as to the principles of law that will guide you

12     during your deliberations and assist you in rendering your

13     final verdict.

14           It is our law that the Government presents its

15     closing arguments first.  Then defense counsel will sum up.

16     And then the Assistant United States attorney has the

17     opportunity to rebut.  It is done in this order because the

18     prosecution has the burden of proof.

19           In their summations, counsel will review the

20     evidence received at trial and suggest that you draw certain

21     inferences or conclusions from the evidence.  That is the

22     purpose of such summations.

23           Arguments and statements by the attorneys, however,

24     are not evidence.  You may, however, accept or reject these

25     arguments, either in whole or in part, depending on whether

1   you find the particular attorney's summary of the evidence is

2   accurate and the inferences and conclusions you have been

3   asked to draw are logical and warranted.

4           I remind you that the jurors alone, you alone, are

5   the sole and exclusive judges of the facts in this case.

6           We will now proceed with the summations of counsel.

7   The Government will go first.

8           Who is proceeding first on behalf of the Government?

9           MS. SCHIERBERL:  I am, your Honor.

10          THE COURT:  You may proceed when you are ready

11  Ms. Schierbel.

12          MS. SCHIERBERL:  Thank you, Judge.

13          Members of the jury, this is over a quarter of a

14  million dollars of cocaine.  No one disputes that it flew from

15  outside of the United States, from Montego Bay, Jamaica, into

16  the United States to J.F.K. Airport.  No one disputes that it

17  was hidden inside the avionics compartment.  And the only

18  person, other than law enforcement, who went into that

19  avionics compartment that night was the defendant, Paul

20  Belloisi.

21          It is not in dispute that while inside that avionics

22  compartment, the defendant tripped the transponder hidden in

23  the fake cocaine, and came out of that compartment with Clue

24  Spray on his gloves.  It is not in dispute that the defendant

25  came out of that compartment wearing a jacket with secret

1    holes cut into the sides and an empty tool bag in his truck.

2         The defendant was the inside man there to retrieve

3    that cocaine.  The evidence shows how he was ideally situated

4    for that role.  As an airline mechanic he had the cover, the

5    uniform.  He had the knowledge of flights and aircraft.  And

6    he had the access so he could get onto the tarmac at J.F.K.

7    and get into the most sensitive parts of an aircraft.  And on

8    February 4, 2020, he did so.

9         His conduct was intentional.  He was somewhere he

10   had no legitimate reason to be.  Somewhere important.

11   Somewhere critical to the safety and success of that flight

12   with the tools that he needed to carry out his plan.

13        And you know it was a plan all along.  At

14   1:00 o'clock in the morning, the night before the cocaine

15   arrived, the defendant wasn't out on Long Island near his home

16   but up in the south Bronx meeting with his co-conspirator

17   Lester to talk to Lester about something important in the

18   parking lot of a White Castle.  The following day the

19   defendant repeatedly scoped out that airplane waiting until

20   Lester texted him:  Confirmado, or confirmed.

21        After the defendant got caught and was arrested, the

22   evidence shows Lester was driving down from the Bronx to

23   J.F.K. calling the defendant over and over because by that

24   point the defendant should have had those drugs in hand.

25        For his actions, the defendant is charged with three

1    crimes.  Judge Irizarry will instruct you on the law.  If

2    anything I say differs from what the judge says, you should

3    always follow the judge's instructions.

4              Counts One and Two charge the defendant with

5    conspiracy.  A conspiracy is just an agreement to break the

6    law between at least two people.  It doesn't need to be

7    formal, it's just an understanding between two or more people

8    to commit a crime.  Count One means that the defendant agreed

9    with at least one other person to possess with the intent to

10   distribute cocaine.  Count Two means that the defendant agreed

11   with at least one other person to play a role in bringing

12   cocaine into the United States.

13             To prove Counts One and Two the Government must

14   prove that two or more persons entered into an unlawful

15   agreement.  And that the defendant knowingly and intentionally

16   became a member of that agreement.

17             Count Three charges the defendant with importation

18   of cocaine.  This means the defendant played a role in

19   bringing cocaine into the United States from somewhere else.

20   Even though he didn't succeed in his plan to actually possess

21   that cocaine, together with his co-conspirators he succeeded

22   in getting that cocaine into the U.S. from overseas.

23             For Count Three the Government must prove that the

24   defendant intentionally played a role in bringing drugs into

25   the U.S., knew the substance was drugs, and knew that he was

1    importing drugs into the United States.

2           There is no dispute that this is it cocaine.

3    Cocaine is a Schedule II controlled substance, I expect the

4    Court will instruct you on that.  The defendant stipulated to

5    these facts.

6           There is no dispute that it was imported into the

7    United States when it arrived at J.F.K from Montego Bay,

8    Jamaica.

9           It is not in dispute that two or more persons

10   entered into an unlawful agreement.  Someone put this cocaine

11   on an airplane in Jamaica with the intent that some else

12   retrieve it at J.F.K.  You're common sense alone tells you

13   that.

14          So what is this case actually about?  Whether the

15   defendant knowingly and intentionally became a member of that

16   conspiracy; and the evidence shows that he did.

17          At nearly 1:00 o'clock in the morning, the night

18   before the cocaine arrived, the defendant was not out by his

19   home on Long Island but up in the south Bronx.  Mr. Valinchus

20   explained to you what these dots mean.  The red dogs show

21   where Lester's phone was, the blue dots show the GPS location

22   for the defendant's phone on these dates and times. The

23   defendant's phone is usually out on Long Island, that makes

24   sense, at the time of these crimes that's where the defendant

25   lived.  And yet at nearly 1:00 a.m. the night before the

1   cocaine arrives, the defendant was up in the south Bronx.  He

2   wasn't lost.  He was there to meet Lester at their agreed-upon

3   location, the parking lot of a White Castle.

4          You know this from the evidence.  The defendant's

5   own text messages sent to Lester that night:  Call me when

6   you're not busy I got something to tell you.  The defendant

7   asked for a call because, I submit, he didn't want to put this

8   plan in writing.

9          Then at nearly 12:30 in the morning he tested

10  Lester:  Here.

11         They spoke on the phone.  Then again he texted

12  Lester:  Where are you.

13         The defendant was ideally situated to be the inside

14  man.  He had the cover.  He had the knowledge.  He had the

15  access.  Without causing a stir, he could get on the tarmac at

16  J.F.K because he was employed as an airline mechanic.  You saw

17  his ID with his name and picture.  The defendant had no

18  legitimate reason to be in the avionics compartment of that

19  aircraft that night.  He was specifically assigned to work out

20  of spot one, an overflow area separate and apart from the

21  terminal on a specific aircraft, Seven Charlie Charlie.  You

22  can see that in the defendant's work assignment for that day.

23         Consistent with the defendant's assignment,

24  Mr. Guerra testified that the defendant was a hanger guy not a

25  terminal mechanic.  The hanger was located here.  Aircraft

1   Seven Charlie Charlie, to which the defendant was actually

2   assigned, was located at spot one, that's here.  Spot one is

3   an overflow area that is separate and apart from the terminal

4   where flight 1349 was parked at gate seven.

5          The defendant didn't even have clearance to work on

6   international aircraft at that terminal, as you saw from his

7   ID.  He didn't have Custom seal permitting him to be in the

8   international working on international flights.

9          You know from Officer Cambry that the defendant was

10  taking on a risk of being fined or even fired for being in

11  areas he had no permission to be.

12         Just after arriving to work the defendant got in

13  touch with Lester.  Lester called the defendant twice at 2:35,

14  and one minute later the defendant called him back and they

15  spoke for nearly five minutes.

16         The cocaine was still in the air at this point

17  flying from Jamaica to New York City, but the defendant, he

18  was in place ready to receive those drugs.  Within a minute of

19  talking to Lester, the defendant was taking pictures of law

20  enforcement.  We know that a few hours later the defendant was

21  in that aircraft lifting the insulation blanket looking for

22  cocaine.

23         Why are these pictures important?  They show that

24  the very same day the defendant was picking up cocaine he was

25  conscious of the location of security.

1           Now Mr. Ricci, the defendant's own witness, told you

2   at length all the ways he's familiar with airport security,

3   having been a mechanic, just like the defendant, for decades.

4   He talked to you about cameras, TSA, Customs, CBP, private

5   security, corporate security.  Yet despite all this

6   interaction with security on daily basis, in all of his time

7   on the job the defendant chose this day to conduct his own

8   surveillance and to surveil the location of law enforcement.

9           He didn't just take pictures.  The defendant, using

10  his right hand held down by his waist, also took a secret

11  video of officers on a plane.

12          The cocaine landed at J.F.K at 3:30 p.m., just about

13  an hour after the defendant last spoke with Lester and took

14  that secret video.  It parked at gate seven at 3:36 p.m.  CBP

15  searched that flight just after it parked in the terminal at

16  gate seven.  That plane was specifically selected for

17  investigation because it had just arrived from Montego Bay,

18  Jamaica, a known transit country, a country known to send

19  drugs into the United States.  And Officer Robinson found

20  drugs, these drugs, hidden in its avionics compartment.  The

21  cocaine was photographed at 3:44 and 3:55 p.m.

22          Officer Robinson told you how these bricks of

23  cocaine constituted to FOD, Foreign Object Debris or Damage.

24  He testified just how dangerous it is to have loose objectives

25  in the sensitive area of the plane with the potential to

1    damage equipment necessary to the safety of that flight.

2           Mr. Ricci, the defendant's own witness, agreed.  He

3    admitted to being fairly comfortable breaking the rules; but

4    even he said, if he saw loose bricks in an avionics

5    compartment, even he would report them.

6           Barely two hours after arriving to work that day,

7    the defendant wasn't up at the hanger with his colleagues, he

8    wasn't at spot one working on the aircraft where he was

9    actually assigned and permitted to be; no, he was swiping into

10   the terminal at gates eight and ten domestic, directly across

11   from gate seven.

12          Why was he up in the terminal with a view of gate

13   seven?  Again, I submit, to conduct his own surveillance.

14   Conducting surveillance on flight 1349 from above from the

15   domestic side of the terminal where he was allowed to be

16   instead of doing his assignment.

17          He didn't notice CBP because, I submit, at nearly

18   that exact minute they were inside the avionics compartment of

19   that plane photographing his cocaine.  CBP videotaped the

20   drugs as Officer Robinson found them.

21          (Video played)

22          Then CBP replaced the real drugs with fake cocaine.

23   This is one of the sham bricks that they used that night.

24   Officer Robinson told you how they did the best with what they

25   had.  Wrapping the bricks in green tape to look more like the

1    real thing, and spraying the fake cocaine in the insulation

2    blanket with Clue Spray, a spray that appears invisible to the

3    naked eye but shines when illuminated under a black light.

4    Then they took the real cocaine, swapped cars with a

5    supervisor to monitor the plane from an unmarked vehicle, and

6    they waited.

7              At almost exactly 5:00 p.m., about an hour

8    and-a-half after the cocaine landed, the defendant again went

9    to conduct surveillance on that aircraft.  You know it's the

10   defendant from swipes.  And you know where he went, back to

11   gate seven.  Doors 10-105 are immediately next to gate seven,

12   right where that flight was parked.

13             There is the defendant at 5:01 p.m. swiping his ID.

14   Then exiting the same area at 5:03 p.m. now with a cup of

15   coffee.  What is interesting about that coffee run, well,

16   that's the nose of that aircraft in the top left corner of

17   that screen.  You can see the body of that plane reflected in

18   those windows.  As you can see on video, the defendant doesn't

19   take the normal road, but instead drives right up alongside

20   that aircraft.  Notice the tunnel in the background that he

21   could have taken, as Mr. Guerra told you would have been the

22   most sensible way to get coffee if you're working at spot one.

23   Instead you watch him on video drive from the opposite

24   direction coming from behind the plane.  Once again, I submit,

25   conducting his own surveillance, taking the long way so he

1    could drive around that aircraft and scope it out for the

2    second time that day.

3          We know it was the defendant driving that van that

4    Officer Robinson reported driving suspiciously around the

5    plane.  You saw the defendant swipe, and Officer Cambry told

6    you.  No one disputes that it was the defendant coming out of

7    that avionics compartment that night.

8          Shortly after his second round of surveillance the

9    defendant got a text from Lester at 6:47 p.m.:  Confirmado! Me

10   acaban de confirmar, they just conferred to me.  Ya todos

11   salieron los van a llevar cenar que tienen hambre, they all

12   already left.  They are going to take them to dinner because

13   they are hungry.

14         No one disputes what this text says.  That's been

15   stipulated.  You know this text is coded language.  Your

16   common sense tells you that if you're working on an

17   international conspiracy to import cocaine, you don't call it

18   cocaine in writing.

19         You know from the defendant's swipe history 14

20   minutes later, at 7:01 that night, the defendant was at the

21   hanger.  But after getting this text, he drove from the hanger

22   back to gate seven where he knew from his own surveillance the

23   plane with the cocaine was waiting.

24         Why hasn't he tried to remove the cocaine from that

25   airplane earlier in the day?  Because, I submit, he didn't

1    want to get caught in a place he could get fired for for no

2    reason.  He wanted confirmation that the risk he was taking

3    would be worth it.

4          At the same moment he swiped at the hanger, the

5    defendant texted himself the secret video of law enforcement

6    that made the video appear to have been taken at 7:01 p.m.

7    instead of when it was actually filmed at 2:37, a video made

8    to look like law enforcement was on the plane at the moment he

9    was going to collect that cocaine just in case, for any

10   reason, he couldn't hold up his end of the bargain.

11         You know the defendant had no legitimate reason to

12   be in the avionics compartment that night.  There were no

13   mechanical issues with that aircraft.  As the pilot

14   responsible for the safety of that aircraft, the lives of the

15   people on that plane, Captain LeRuth testified, quote, "Were

16   you aware of any mechanical issues facing that aircraft before

17   you flew it across the country that night?"  Answer, quote,

18   "No, we would not have done that flight had we had any issues

19   that were not addressed."

20         You heard the evidence it wasn't hot on that

21   airplane.  There was nothing wrong with the AC.  The captain

22   told you it was working.  Putting aside the fact that flight

23   safety concerns are mandatory to put in the log book, the AC

24   also pressurizes the cabin, something the captain would know

25   about as soon as he boarded the plane.  Don't just take his

1    word for it, look at the pages from the log book for

2    February 3 and 4, 2020, for that aircraft.  They show there

3    were no unresolved issues when the captain opened the book for

4    that aircraft that night.  They show he made no entries in

5    that log book for that aircraft that night.  And they show

6    that no work was done on that aircraft until it arrived in San

7    Diego.  Given there were no issues facing that airplane, there

8    was no reason at all for someone to be in the avionics

9    compartment of his plane.

10          Captain LeRuth was on the plane when the defendant

11   drove down to the hanger, from the hanger to the terminal with

12   his empty tool bag in hand.  Mr. Ricci, a witness hand-picked

13   by the defendant, told you all about the required list of

14   tools that a mechanic uses.  It doesn't make sense that a

15   mechanic would bring an empty tool bag to an aircraft unless

16   he intended to fill it.

17          That wasn't all he did to prepare, he brought this

18   the jacket, he cut secret holes into it.  Agent Gabay

19   explained to you how he's familiar with this practice in drug

20   trafficking conspiracies, traffickers cut these secret holes

21   into the lining of their coats, and use them to conceal bricks

22   of cocaine.  That I submit was the defendant's plan here.  He

23   wasn't wearing this jacket at 5:00 p.m. when he went to get

24   coffee and scope out that plane.  He went back to the hanger

25   and he grabbed it before driving down to gate seven that

1    night.  With his empty tool bag and secret holes in his jacket

2    the, defendant drove back to gate seven.

3              That's him in the moving vehicle driving across the

4    top of the screen.  He drove up in that tug with his empty

5    tool bag in tow, having grabbed his jacket.  Those are CBP's

6    head lights on the top of the screen.  The defendant drives

7    right up to the aircraft and parks right next to the plane.

8    That's him there pulling up at the bottom of the screen.

9              Officer Robinson watched him as we are right now.

10   He exits the vehicle and he walks toward the jet bridge at

11   7:17 p.m.

12             Now you know the defendant never boarded that plane.

13   You can see lights in the cockpit.  Captain LeRuth is there,

14   he told you he boarded an empty plane.  No one entered that

15   cockpit that night except for himself, his co-pilot, and

16   ultimately law enforcement.

17             Watch the defendant pass under the jet bridge and

18   under the plane to enter its avionics compartment.  One minute

19   and seven seconds, that's how long the defendant is off

20   camera.  According to what he told Agent Gabay the night he

21   was arrested, Agent Gabay and Agent Maloney, the defendant

22   walked up to the jet bridge, approximately 30 stairs, into the

23   plane, ate a bag of chips, drank a soda.  Noticed an issue, a

24   critical safety issue, didn't tell the pilot sitting right

25   there, didn't write it in the log book, risks his job.  Tried

1    to fix it by entering the cockpit with the pilot, went

2    unnoticed, failed to fix it.  Still didn't talk to the pilot

3    right there.  Left the plane.  Walked back down 30-odd stairs

4    and back on screen.  In one minute and seven seconds.

5            Members of the jury, that's not possible.  Those are

6    the defendant's feet passing under the plane.  The defendant

7    is out of view for one minute and seven seconds.  I submit he

8    wasn't being a good Samaritan wandering around in areas he

9    wasn't permitted doing other people's work.

10           He walked up to that jet bridge to once again

11   surveil the area and ensure the coast was clear, before

12   heading down to where he knew that cocaine was hidden.

13           Officer Robinson saw the defendant enter the

14   avionics compartment.  And he told you how he waited to see if

15   the defendant would remain in the brains of that aircraft.

16           See his car begin to move at about 7:19 p.m. because

17   as the defendant remained in that compartment, CBP drove

18   closer.  Within approximately 20 seconds of the defendant

19   entering the avionics compartment, the defendant tripped the

20   transponder hidden all the way under that insulation blanket

21   in the fake cocaine.

22           You heard that sound in court.  Officer Robinson

23   demonstrated it for you.  He told you what it meant, it meant

24   the defendant lifted that brick.

25           Hearing the alarm, you see CBP drove to the

1    aircraft.  That's officer Robinson getting out of that car and

2    crouching under that airplane.  That's where he saw the

3    defendant fully inside the avionics compartment, no where near

4    the electronics, but over by the insulation blanket

5    reattaching it to the wall.

6           You heard officer Robinson testify to where he

7    placed those fake bricks, all the way to the left of the

8    screen.  In order to trip that device, the defendant had to

9    have pulled that blanket all the way over from the right and

10   lift that brick.  And when he saw that something wasn't right,

11   perhaps because CBP had only placed a few bricks when he was

12   expecting ten, perhaps because they looked fake, or perhaps

13   because he saw the wires fall out of transponder when he

14   picked it up, he quickly re-covered the bricks and hopped out

15   of the airplane.

16          Officer Cambry took this picture of the avionics

17   compartment the defendant exited on February 4, 2020, 7:37

18   that night.

19          Now, when he exits that aircraft he doesn't

20   immediately alert CBP to strange boxes in the avionics

21   compartment; boxes even Mr. Ricci said he would report.  He

22   didn't say, I am so glad you're here, I just saw something I

23   didn't recognize in one of the most sensitive areas of an

24   airplane, help me.  He said:  What's up man.  Then he made up

25   a lie, because he knew he wasn't supposed to be there.

1         That's why, I submit, when he showed his ID to CBP

2    he held his hand over the bottom portion concealing the fact

3    that he didn't have permission to be where he was.  The CBP

4    checked the defendant's gloves for Clue Spray.

5         You recall how Officer Robinson shined this black

6    light over these gloves and demonstrated for you how they glow

7    with Clue Spray.  These gloves have been in an evidence bag

8    since February of 2020.  You saw in particular how the finger

9    tips on the defendant's right glove glowed with that spray.

10   You saw how that same spray glowed on Government Exhibit 2,

11   the fake cocaine.

12        THE COURT:  Five minutes.

13        MS. SCHIERBERL:  The real cocaine was weighed and

14   tested.  That's this cocaine right here.

15        Agent Gabay explained to you that this much cocaine

16   isn't for personal use, it's for sale.  And it is sold on the

17   street from are anywhere from 28 to $32,000 a kilo, meaning

18   this kilo (sic) was worth over a quarter of a million dollars.

19        Where was Lester as the defendant was arrested and

20   taken into custody?  You know from his cellphone he left the

21   Bronx shortly after sending that confirmation and drove down

22   to J.F.K.  After his arrest, the defendant was released on

23   bail.  He didn't have his phone, that was in evidence.  So

24   what did he do?  I submit he used the phones he had access to

25   his friend Marco Buono, his daughter Carolina.  You can see

1    this in the call log from Lester's phone.

2            For the first time ever on February 6 after the

3    defendant's release, Marco Buono's phone calls Lester.  And

4    not just once, but over 20 times.  Who else was calling Lester

5    for the first time ever that night?  The defendant's daughter

6    Carolina.  Was the defendant's daughter actually calling

7    Lester at 11:15 p.m., and 30 minutes after midnight?  That

8    doesn't make sense.  Rather, I submit, the defendant stuck

9    without his own phone and desperate, grabbed whatever phone he

10   could.

11           Why do the calls go unanswered?  What did Lester do

12   with the burner phone that he had been using that he only

13   purchased in January?  He dumped in.

14           Mr. Valinchus explained to you what it means when a

15   phone goes O2B, it means off the network.  By 9:46 p.m. the

16   day after the defendant's arrest, the Lester phone went O2B

17   and it did not come back.

18           Members of the jury, there can be no dispute that

19   this defendant knowingly and intentionally engaged as a member

20   of this conspiracy.  On February 4, 2020, he went into the

21   avionics compartment of that aircraft with no purpose other

22   than to retrieve that cocaine, and he did so with the tools

23   that he needed.  And when he got caught, he lied.

24           Even though he didn't succeed in possessing that

25   cocaine, together with his accomplices he succeeded in getting

1    that cocaine into the United States.  You know that because

2    this is that cocaine right here.

3              Members of the jury, this case is going be in your

4    hands very soon.  We ask that you consider the evidence,

5    follow the law, and use your common sense.  Find the defendant

6    guilty.

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Thank you.

2          Does the defense wish to close?

3          MR. COHEN:  I do, Judge, thank you.

4          THE COURT:  You may proceed when you're ready.

5          MR. COHEN:  Lorenzo Meccariello, remember him, the

6     last witness that the Government called?

7          Well, apparently, desperate times do call for

8     desperate measures because after Frank Ricci got finished

9     testifying on Friday, the Government went looking for a

10    witness to try and counter all of the honest testimony that

11    Mr. Ricci gave you.  They could have subpoenaed anybody,

12    dozens of mechanics at JFK or LaGuardia or Newark or Islip

13    that have experience with 737 aircrafts, dozens of them who

14    understand how they work.

15         What did they do?  They brought you a guy with no

16    training whatsoever on 7373s and their equipment.

17         I start there because Mr. Ricci and what happens on

18    a 737 is of utmost importance to the facts in this case.  I

19    had a lot more questions for Lorenzo, but when I found out he

20    didn't know the first thing about 737s I didn't think there

21    was a need for him to go on anymore.

22         Not one witness to come in and contradict what Frank

23    Ricci said about the PACK units and the restarting the units.

24    And he got asked a lot of questions about:  Don't you have to

25    reset from the cockpit?  Don't you have to do this here?

1          And he said:  99 percent of PACK unit failures have

2     to be fixed in the avionics compartment.

3          Then there was this transparent attempt to place

4     fear into Mr. Ricci so he would agree with the questions

5     instead of fearing potential consequences from his employer.

6          Frank Ricci was just a regular guy.  2020, he gets a

7     call a month after Mr. Belloisi is arrested, he says:  Hey,

8     can you just talk to my lawyer?

9          That's it.  That's the last time he talks to

10    Mr. Belloisi.

11         A regular guy, American Airlines mechanic, just

12    doing his job.  He didn't need a subpoena.  He willingly

13    switched his days off to come in here to avoid having to take

14    a day off, to use a vacation day.  Regular blue collar worker

15    just being a decent human being.

16         Is that what it's come to, right, decent human

17    beings have to fear retaliation by their employers for coming

18    into court and testifying?

19         Mr. Belloisi is not guilty of any of the three

20    charges he stands before you facing.  What you heard here over

21    the last week is not competent evidence, it's not what you

22    would expect or not what the law demands, not what you would

23    expect from federal law enforcement agencies, and nowhere

24    close to proof beyond a reasonable doubt.

25         Paul Belloisi, just like all accused in criminal

1  trials, is presumed to be innocent.  And faulty memories and

2  withholding of objective evidence is what this predominantly

3  consisted of, what this trial predominantly consisted of, and

4  it did not overcome the presumption of innocence and it is

5  nowhere near proof beyond a reasonable doubt.

6         All of the evidence, and I did this with each

7  witness and Mr. Simpson did it with his witnesses, that should

8  have been available to you.  All of the objective evidence, it

9  never made its way to you.  And that's because if you saw the

10 videos around JFK, if you saw the swipe card readers, if you

11 heard the voice recorder on the black box that's in every

12 cockpit that you knew about even before you heard the

13 testimony, or maybe, maybe, if you just heard from the lead

14 case agent about what happened, you could have quickly

15 realized that Paul Belloisi should not be here on trial in

16 front of you.

17        Now, in any conspiracy case, the very first thing

18 the prosecution must prove is that there's agreement between

19 two people to engage in illegal activity.  And the prosecution

20 has not proven to you beyond a reasonable doubt that there was

21 an agreement between Mr. Belloisi and anybody to do anything.

22 And certainly not to possess, distribute, or import cocaine.

23        And because there isn't that proof, Mr. Belloisi is

24 not guilty.  It's that easy.  I've been doing this a long

25 time.  This one is not close, ladies and gentlemen.

1          Mr. Belloisi never entered into an agreement with

2    anybody regarding anything.  Prosecution should not have

3    gotten this far and now it's your job, sworn to by your oath,

4    to find Mr. Belloisi not guilty of anything unless you want to

5    find him guilty of trying to steal a bag of chips and soda.

6          According to the prosecution, Mr. Belloisi, an

7    American Airlines mechanic for 30 years at JFK, conspired to

8    bring kilos of cocaine into the airport, a place he's worked

9    at for decades.  And they need you to believe that

10   Mr. Belloisi had a plane full of cocaine come into an area

11   that while they say he had access to on one hand, on the other

12   hand they say:  Oh, but he wasn't allowed there.

13         Internally inconsistent, like most of the witnesses

14   you heard from.

15         Their theory relies on believing that Mr. Belloisi

16   drove to a plane that he was not assigned to and, instead of

17   going -- all right, you're going to retrieve all of this

18   cocaine, you're going to do it, I've got this empty toolbag,

19   instead of going right under into the avionics compartment,

20   where the cocaine, was he says:  You know what?  It's a little

21   too easy.  Let me make it riskier.  Let me first go around the

22   plane, walk up the jet bridge, let me walk into the plane,

23   hang out for a little while, come back outside of the plane,

24   and then go down and get it.  And you know that bag that I had

25   that was going to carry all these drugs?  Nah, I don't need

1    that bag.  Let me put it in a few slits -- the slits

2    supposedly made before he was arrested -- see if this cocaine,

3    these ten kilos, would fit in that jacket.

4              And then, of course, he comes out carrying -- oh,

5    no, no, no, he doesn't come out carrying anything.

6              Where is the real evidence here?  That's really the

7    question.

8              Where is the real evidence beyond speculation,

9    innuendo, conjecture?

10             Like I told you in my opening, agents moved in too

11   quickly here.  They arrested a man who had nothing to do with

12   a cocaine conspiracy.  They could have and should have simply

13   just waited.

14             What was the harm in waiting?

15             You had dozens of federal agents from different law

16   enforcement agencies sitting up and around the tarmac watching

17   from over there and over there and behind here.  You had guys

18   watching cameras galore everywhere over the airport.

19             What's the purpose of rushing in there?

20             But they did.  And since they ain't got anybody

21   else, now you have Paul Belloisi.

22             And why Paul Belloisi?

23             Why don't they just say:  Okay, we don't have much.

24   Let him go.

25             You know why, right?  Ten kilos were taken off an

1     American Airlines airplane.  Somebody's got to pay for that.

2          Why?  Because a dozen or more law enforcement

3     officers set up surveillance all around the tarmac, set up a

4     fake drug location, waited, and, while on the clock, getting

5     paid for their time, they worked for hours because law

6     enforcement officers were called in who were already home, had

7     finished their day, to come back to assist in the

8     investigation because they screwed up.

9          We all screwed up before, every one of us.  We've

10    made mistakes.  And now Paul Belloisi is paying for law

11    enforcement's mistake because you don't let $300,000 worth of

12    cocaine be found and not prosecute anybody.  That's why Paul

13    Belloisi is here.  The amount of man hours needed, the

14    financial outlay, overtime surveillance, and a long federal

15    prosecution demands that somebody be held accountable.

16    American Airlines, Customs and Border Patrol, Homeland

17    Security, FBI, DEA, even JFK itself, they got to make somebody

18    pay, and they've enlisted all of you to do their dirty work.

19         This is a completely circumstantial case that

20    doesn't come near proof beyond a reasonable doubt.  Let's look

21    at some of the evidence.

22         The lack of easily obtainable yet unprovided

23    evidence screams out to be noticed in its absence.  Do not

24    forget, ever, all of the events happened at JFK, a place where

25    every witness, including the jury, knows is blanketed with

1    cameras.  Why were you just provided --

2           THE COURT:  Excuse me.  The jury is supposed to

3    assess the evidence based on what was presented here, not what

4    they may have seen on their own at any other point in time in

5    history.

6           MR. COHEN:  Please use your common sense when

7    assessing the evidence.  Ask why you were only provided a few

8    minutes of video from one camera and one angle at an airport

9    that is blanketed with cameras.

10          There's over four hours of alleged surveillance,

11   dozens of cameras that capture most of what transpired, most

12   of the testimony that came right from that seat in this very

13   courtroom.  Doesn't it seem strange to you that the

14   prosecution with the burden of proof didn't provide you with

15   one stitch of objective evidence?

16          If even one camera angle supported one fact that one

17   of their witnesses testified to, you would have seen it.  Why

18   wasn't it given to you?

19          The first person to encounter Paul Belloisi, the

20   first witness you heard from, was Michael Robinson.  And I

21   submit to you that Michael Robinson was not a credible

22   witness.  I'm not saying he's a liar.  You don't have to think

23   of him or any of the witnesses as liars.

24          But Michael Robinson, like Officer Cambry and

25   Agent Gabay, has no notes.  No notes of an event that goes

1   back three years.  And the prosecution wants you simply:  Just

2   trust them.  Just trust their memory.

3           And accept what their witnesses have to say from

4   memory, from real evidence.  Of course, Michael Robinson, like

5   all the Government witnesses, could have reviewed notes --

6   there were notes taken -- could have reviewed the one video,

7   the lone video you have, but, like the other witnesses,

8   decided not to.  Why not?

9           THE COURT:  Excuse me.  I hate to interrupt you, but

10  I need to see counsel at the sidebar.

11          (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following occurred at sidebar.)

2          THE COURT:  The Government hasn't objected where

3    they could have objected, and now I'm objecting because you

4    started off talking about how Mr. Ricci was honest.  I

5    specifically instructed the parties on Friday not to vouch for

6    your witnesses.

7          Mr. Cohen, then you say I've been doing this for a

8    long time.  Well, you're not to set yourself up as somebody

9    vouching for whatever it is that you're saying.  So, that

10   shouldn't have been done.

11         They are sitting by and not saying anything.  But

12   now you're talking about reports that Robinson should have

13   read when, in fact, witnesses are not supposed to review

14   documents that they haven't prepared, as a general matter.

15   They can review their own testimony if they testified in the

16   grand jury, reports that they wrote.

17         You know darn well that you would have crucified

18   Robinson that:  Oh, you prepared by reading somebody else's

19   reports.

20         So, please, you need to stay away from the items

21   that I suggested that the parties -- that I asked the parties

22   to stay away from.

23         And be careful.  I really don't like to interrupt

24   parties in their summation.

25         MR. COHEN:  Your Honor, on both of the main --

1    Officer Robinson as well as Agent Gabay were -- especially

2    Agent Gabay, were brought here, and, as your Honor stated

3    yesterday, the elephant in the room is Agent Moloney was not

4    testifying.

5              It is our position that Agent Moloney was purposely

6    kept from the jury and he has participated, and many witnesses

7    testified --

8              THE COURT:  You can say that.  There's nothing wrong

9    with you saying that.  But don't talk about things that you

10   know would be improper.  It would have been improper for

11   Robinson to read other people's reports and prepare based on

12   other people's reports.  That's inappropriate.

13             If you want to say:  You know what?  It was Moloney

14   that went and spoke to the witnesses.  Why didn't he testify?

15             MR. COHEN:  I believe that Robinson testified that

16   he gave information to Cambry, who would have been his

17   supervisor, and Cambry would have put that in his report.

18             THE COURT:  It wasn't his report.  Don't argue with

19   me on this.

20             MR. COHEN:  I'm not arguing with you, your Honor.

21             THE COURT:  Yes, you are.  You are.  You're arguing

22   with me on this.

23             MR. COHEN:  I believe Robinson testified that it was

24   Cambry's responsibility as a supervisor and that Cambry --

25             THE COURT:  But it was not his report.

 1          MR. COHEN:  No, I'm just saying, your Honor, there's

 2   information --

 3          THE COURT:  It was not his report.  Let's move it.

 4          MR. COHEN:  I will.

 5          And I just want to say this:  They both testified

 6   that information given by Robinson appeared in Cambry's

 7   report.

 8          THE COURT:  I understand that, but it was not

 9   Robinson's report.

10          MR. POLLACK:  Your Honor, may I note one thing?

11          I just want to note for the record in light of the

12   suggestion that perhaps Mr. Cohen will refer to Mr. Moloney as

13   not testifying here, I want to make clear on the record that

14   counsel certainly knows what Mr. Moloney would testify to

15   because counsel saw it in the suppression hearing.

16          So, I want to be clear that there's no insinuation

17   made.  Although I don't object to noting that he's not

18   testifying here, there should certainly not be any insinuation

19   that his testimony would be different than Mr. Gabay's

20   testimony because Mr. Cohen knows exactly what his testimony

21   would be.

22          MR. COHEN:  I do believe it would be different.  He

23   remembers everything and has notes, which your Honor says he

24   would be allowed to review in preparation.

25          And he said to me walking out one day:  You know

1   what my notes are.  They're like a Bible.

2          So, I do believe he would testify significantly

3   different from Gabay.

4          And I believe your Honor has told me that I cannot

5   talk about other people not looking at other people's notes

6   but I could suggest what Moloney would testify to.

7          Is that correct, your Honor?

8          THE COURT:  No, that's not quite correct.

9          MR. COHEN:  So, where am I mistaken.

10         THE COURT:  That is not quite correct.

11         You've already spoken about other things that the

12  Government could have done, presented so and so, but I'm not

13  going to allow you to have this jury engage in speculation

14  either.

15         MR. COHEN:  Your Honor --

16         THE COURT:  As you said, you've been doing this a

17  long time.  Do it properly.

18         MR. COHEN:  I just want to make sure of something.

19  A big part of my summation is the absence of the videos.

20  Obviously, that, I can talk to, just not about other people's

21  notes.

22         Am I correct?

23         THE COURT:  Yes.

24

25         (Continued on the following page.)

1          (Sidebar ends; in open court.)

2          THE COURT:  The last portion of counsel's remarks

3     concerning witnesses reading reports that they did not review

4     is stricken.

5          And the jury is reminded that counsels', both sides,

6     for both the Government and defense, their remarks are not

7     evidence.  It's your recollection of the evidence that

8     controls.  Not mine either.  It's always your recollection of

9     the evidence that controls.

10         You may continue, sir.

11         MR. COHEN:  According to Michael Robinson, he was

12    sitting in front of a plane in a law enforcement officer

13    uniform with his partner Frank Morelli, also in a Customs and

14    Border Patrol uniform, parked in a Customs and Border Patrol

15    vehicle, right at or around the plane.  They were there for an

16    hour.  Robinson went in and out of the avionics compartment by

17    himself in full uniform and then Morelli came in in full

18    uniform.  They moved their vehicle at one point closer from I

19    think the rear of the plane to get closer to the avionics

20    compartment to remove all of the kilos.  Then they took out a

21    duffle bag filled with ten kilos of cocaine while still in

22    uniform, still with their car, and brought it and put it in

23    the car.

24         And I asked Agent Robinson, Michael Robinson:  Did

25    you tell American Airlines employees what was going on, right,

1   so they would know to stay away?

2           He said, I quote:  They would have seen us.  Ground

3   crew was there, security personnel was there.  They see us

4   doing what they're doing.

5           And then he testifies that while he's doing that in

6   full uniform, Paul Belloisi drives up in a blue van, hangs out

7   by the -- stops -- he says the speed limit is ten miles per

8   hour but he was driving slower, and then stops and literally

9   watches them.  And then, of course, comes back later to go in

10  that same avionics compartment that they were just going in

11  and out of in their uniform with their truck.

12          And he then comes back to the plane?

13          I mean, what kind of sense does that make?

14          He's going to sit there and watch and then he's

15  gonna come back knowing what's going on?

16          If you were provided the video footage from American

17  Airlines that they maintain and law enforcement has access to,

18  it would not have shown the blue van stopping there.  And not

19  just because it didn't happen but also, also, the Government's

20  witness Guarnieri, corporate security guy, says he never saw a

21  blue van stopping by the nose of the plane.  That's from a guy

22  who has access to all the cameras.

23          If it would have happened, you would have seen the

24  video.  And that's what you should think about most of the

25  stuff here:  If it would have happened, why didn't we see the

1   video?

2          Everyplace has video.  Why didn't you see it?

3          Next, you hear about this Clue Spray and the

4   insulation.  So, let me get this right, Officer Robinson tells

5   you he takes, I don't know, what, two feet by five feet or

6   something, pretty big piece of insulation, he goes inside what

7   everybody agrees is a small room on the aircraft, the avionics

8   compartment, and he sprays an aerosol can all over the

9   insulation blanket.  He wants to try and mark the area so when

10  somebody comes in and touches it, it shows up on whatever they

11  touch it with, their hands or gloves.

12         You're not spraying some graffiti on a wall in

13  Bushwick or a big float in a gymnasium, you're talking about a

14  little place, a little spot.  And I asked him, I asked him:

15  Did you use anything just to cover up to make sure it doesn't

16  go anywhere?

17         Aerosol spray.  Use your common sense, ladies and

18  gentlemen.  It's going to go different places.  It's not going

19  exactly where you want it to go.  But, nonetheless, he covers

20  the insulation, which means you can touch the insulation and

21  still get it on your hands.

22         They could have done it outside, they could have

23  done it outside their own truck, they could have done it

24  inside their truck, in the bed of the truck, on the side of

25  the aircraft.  Why did they do it in there?

1          I'm just showing you the sloppiness of the

2     investigation.  I'm showing the sloppiness because when we

3     hear these agencies, Customs and Border Patrol and FBI and

4     special agents, we all get a little stiff, it feels a little

5     intimidating, right?

6          But this is what they do.  This is how they operate.

7     And you saw it firsthand here.  You don't have to think about

8     what's on television or what somebody else told you, you saw

9     how it happens here.

10         The Clue Spray that is on the fingertips of

11    Mr. Belloisi's gloves tells you nothing.  We already know he's

12    in the avionics compartment.  And he told you -- withdrawn.

13         It came out that he patted down the insulation

14    bracket and hit a reset button on the PACK unit.  If you're

15    down there and you're touching something, you're gonna get it

16    on your hands.

17         How about take a photo?

18         It's not something like:  Oh, that slipped our mind.

19         No.  They took a photo.  You just saw it, right?

20         They took a video.  You just saw it.

21         But when I put it back, when I put the insulation

22    back into place, nah, maybe I shouldn't take a photo right

23    now.

24         Why?

25         Again, opportunity for objective evidence.

1    Objective evidence doesn't lie, it doesn't shade the truth, it

2    doesn't have a motive.  It just reports what it sees or what

3    it hears.

4          But you have none of it.  You had the opportunity to

5    get it.  They had the opportunity to preserve it.  But you

6    were never shown it.

7          What would that photo have shown you?

8          Would it have shown the insulation blanket hanging

9    down?  We'll talk about that and those clips in a moment.

10         Then there's this transponder thing.  Now,

11   Mr. Robinson, Michael Robinson, got impeached by his own

12   testimony about when it went off.  He said a year ago in this

13   very courtroom on that very stand that it went off when he

14   finally reached the aircraft.  But here, earlier, last week,

15   it went off way earlier.  So it wasn't at the time he got to

16   the aircraft; then, it went off sometime in the back.  I think

17   he said:  See where my car pauses in the video?  It goes off

18   there.

19         But I said:  Hey, wait a second.  You testified here

20   a year ago.  You said something different.

21         I don't know if the transponder went off.  You saw

22   what they tried to do here or what he try to do.  You saw the

23   trouble he had in trying to fix it and getting it to work

24   right.

25         Nobody else heard it.  They all said:  He told us he

1    heard it.

2           And Frank Morelli, he was sitting next to him in the

3    car, we didn't hear from him.  What would he have said about

4    the transponder going off?  Where was he?

5           The transponder was supposedly under the insulation

6    that was not clipped down.  You're supposed to believe beyond

7    a reasonable doubt.  I don't just mean believe like, nah, more

8    likely than not, I mean beyond a reasonable doubt you're

9    supposed to believe that Mr. Belloisi tripped that

10   transponder.  And that's not enough evidence.  That's not

11   nearly enough evidence.

12          Seeing a photo of that room would have told you how

13   they really left it, especially after Frank Ricci, a seasoned

14   mechanic of 25 plus years, told you, told you, anybody walking

15   into that avionics compartment would have noticed the

16   insulation blanket, would have known how it was hanging down.

17          And Michael Robinson admitted, he said:  Yeah,

18   normally there are clips to clip down the insulation.

19          Well, why is that?  To hold it in place.  To hold it

20   in place.

21          Frank Ricci told you there would have been more than

22   a dozen clips.  And they describe it as half of a circle, the

23   bottom half of a circle.  And I think Frank Ricci said where

24   this was shown, and if you look at the pictures, it's sort of

25   like up here.  Frank Ricci said between 10 and 11 o'clock on

1    the face of a clock.

2              That's a pretty steep angle.  That's not 90 degrees,

3    but maybe it's a little more.  Maybe it's a hundred degrees.

4              And I asked him, Transcript Page 127:  Did you clip

5    the insulation blanket down after replacing the cocaine?

6              No.

7              What do you mean "no"?  Twelve clips and you don't

8    clip it down, trying to hide this and make it look normal, you

9    didn't clip it down?

10             Now I know why they didn't take photos.

11             Failure to properly isolate where the Clue Spray was

12   sprayed, take a photo of how the insulation looked, the fact

13   that Mr. Belloisi did not leave that avionics compartment with

14   any bricks, are all independent reasons to have a reasonable

15   doubt.  This is not enough, it's not nearly enough.

16             Officer Cambry tells you:  Mr. Belloisi was a

17   target.  I followed him around the airport for almost two

18   hours.

19             Two hours.  He used the term "target."  Target

20   sounds serious.  Target is serious.

21             There was video of this target.  If this target's

22   being followed, where is the video of it?

23             He says he was observing him for two hours.  Where

24   is the video of him observing the target?

25             Again, the prosecution says:  Trust us.  Trust us.

1   All on video, all at JFK, but we don't have to show you that,

2   just trust us.  We don't need video, we have law enforcement

3   testimony.

4           As if somehow that is a substitute.  And that is not

5   enough.  It is not nearly enough.  There's no video, there's

6   no contemporaneous notes by Cambry, there's no notes later on

7   in that same day.

8           You know what else Cambry tells you?

9           He tells you that he told Homeland security about

10  his observations of Mr. Belloisi.  He told you that he told

11  them that.  And I asked them about it.  And you see up in the

12  screen:  Did you tell HSI about what you had seen earlier in

13  the day?

14          Yes, we discussed that.

15          And by "that," we mean you're following those two

16  vehicles that you described earlier?

17          That's correct.

18          And then when Agent Gabay got on the stand:  Did you

19  speak with any CBP officer about their surveillance prior to

20  Mr. Belloisi being arrested.

21          No.

22          My question is, did you speak to them before he was

23  arrested, but did you speak to them afterwards about what they

24  were observing beforehand?

25          I didn't, no.

1          It's like this, you know, he went that way.  Two

2     people, one saying one thing, the other saying no, this didn't

3     happen, but you're supposed to believe both of them somehow.

4     It's internally inconsistent.  Of course, the video would have

5     shown you, but you don't get the video.

6          Do you see why you don't get the video?

7          Do you see why you need the video for most, if not

8     all, of this?

9          It's because it's not today, not tomorrow, not ever

10    does a jury convict on these facts.  This is just not evidence

11    beyond a reasonable doubt.  It's unacceptable.  It doesn't

12    happen here.

13         Let's talk about the phantom toolbag.  Again, is

14    this a law enforcement lapse?  Is it a lie?  Is it a really

15    big mistake?  Truth is, I don't care.  But I know it is not

16    proof beyond a reasonable doubt.  What it is is a reason to

17    doubt.

18         Where in the world did this phantom toolbag come

19    from?

20         Everyone agrees that Paul neither went to the

21    avionics compartment or the plane nor came out of the avionics

22    compartment with the phantom toolbag.  But a photo was taken

23    about it because, I quote:  It could have been used to put

24    narcotics in.

25         Why didn't they secure it if it was on the target's

1   vehicle?

2            Where did the phantom toolbag disappear to?

3            Why in the world would you not keep for evidence the

4   very toolbag that you believe would be used to carry the

5   narcotics?  Why?

6            Why don't you have the tool bag?

7            He said:  Personally, I thought it could have been

8   used to put narcotics in.

9            Mr. Belloisi would have never been questioned about

10  carrying a toolbag in the airport.  Why in the world does he

11  go to get 25 pounds of cocaine and not bring the very bag that

12  he needs to carry it?

13           Right there, is a reason to doubt this.  And a very

14  strong reason.  And if the bag was there and if the bag was on

15  his vehicle, you would have had it.

16           So, they turned to the jacket.  And instead they

17  give you this cockamamie story about Paul Belloisi cutting

18  slits in his jacket to carry 25 pounds of cocaine.  It's

19  absurd.  You know it's absurd, I know it's absurd, and they

20  know it's absurd.

21           I'm going to get 25 pounds of cocaine.  I've got an

22  empty toolbag because they aren't going to suspect I'm

23  carrying it or need it, I'll cut some slits in my jacket as

24  well, and then I'll go get the cocaine.  But, nah, I won't

25  bring the toolbag, and, nah, I won't get the drugs right away.

1    I'll go hang out on the plane.  I'll come back and, nah, I

2    won't go get the toolbag again, I'll just go onto the plane

3    with slits in any jacket.

4         Take a look at the kilos.  They were wrapped in two

5    other packagings.  Take a look at the jacket.  You're allowed

6    to come out here and pick up the cocaine and see would it have

7    really fit in the jacket.  And if it wouldn't have, that's

8    reasonable doubt.

9         Remember, they were hard bricks before they were

10   unraveled.  Do it.

11        And when I ask the agent and the officers, they

12   never tried to measure, they never tried to check it out.

13        Why not?  Because it would have undermined the

14   prosecution.

15        Another thing about that, bringing the toolbag into

16   the avionics compartment.  That would be the perfect place

17   that does not have cameras to take them and put it in the tool

18   bag.  That's what this theory is.  Would have been the perfect

19   place to do it.

20        So, why not bring the toolbag and put it in the only

21   place in the airport that doesn't have cameras where you can

22   actually move it?

23        If you believe he's put it in the jacket, he's gonna

24   walk out looking like the Michelin Man or something or

25   Pillsbury Doughboy with all this stuff coming out, where's he

1   going to put it into the toolbag?

2          The only place in that airport that doesn't have

3   cameras is the avionics and toilet, which is where this case

4   should wind up.

5          Agent Gabay, or, as he's been referred to, Mr. I

6   Don't Remember, he tells you he's not prohibited from taking

7   notes, not prohibited from watching video.  He said to you:  I

8   would not remember the date that this happened if you asked me

9   one month later.

10          That's in the transcript.  Wouldn't remember the

11   date if you asked him one month later, but he's testifying

12   about an incident that happened three years earlier; an

13   incident he was not the lead agent on, an incident that he was

14   not the one responsible or at least making the decisions not

15   to take notes about.

16          How in the world does somebody testify in a federal

17   criminal manner, law enforcement officer no less, and

18   willfully refuse to look at the same video that he's

19   testifying about it?

20          It's unacceptable.  A not guilty verdict tells law

21   enforcement that this is unacceptable.

22          MR. POLLACK:  Objection.

23          THE COURT:  Sustained.  It's stricken.

24          MR. COHEN:  Agent Gabay tells you that notes would

25   have been taken while they were getting information.  That's

 1    what he tells you.  Agent Gabay tells you -- and if you want

 2    to review the transcript, his "I don't recalls," "I don't

 3    remembers," "I wasn't timing it" answers dominated my

 4    conversation with him but not the Government's.

 5           Agent Gabay was put here because he doesn't remember

 6    much.  He was asked to remember a few facts, a few facts.

 7    Like he said:  Well, I don't remember but I -- much about what

 8    he said here, what he said there, but I do remember, I do

 9    remember, Belloisi telling me he ate chips and drank a soda on

10    the plane.

11           Office Robinson said:  As soon as I saw him, he told

12    me he was going there to get chips and a soda.

13           That's what Robinson said, but Gabay says:  He

14    actually told me that he ate chips and a soda.

15           Remember, no notes, no reviewing anything, three

16    years later.

17           I just asked him:  Is it possible that he said he

18    was going to get as opposed he went to eat?

19           Gabay is 100 percent sure, 100 percent sure, and he

20    said:  No, he ate it.

21           I found Mr. Gabay's testimony unreliable at best and

22    untrustworthy and inaccurate.

23           THE COURT:  It is up to the jury to determine what

24    witness is testifying truthfully and not truthfully and

25    counsel are not to vouch for witnesses or not vouch for

1    witnesses.

2            MR. COHEN:  Doesn't mean he was necessarily or

3    purposefully lying, but it does mean you can't trust him for

4    proof beyond a reasonable doubt.

5            You know, he testified last week, this is Agent

6    Robinson -- you know, let's move on.

7            They showed you the photos of Officer Robinson and

8    the view he had of the avionics compartment, remember that,

9    and how it looks so large you can see grown men on the other

10   side of the photo.  But when we saw the side of it, it was a

11   foot and a half or so by two feet or so -- I don't have the

12   exact dimensions, but it's close -- and you see the video or

13   the photos of it.

14           He testified last year that he actually -- this is

15   Michael Robinson -- that he went down under the avionics

16   compartment and he stood up and his head was in the avionics

17   compartment.  This year, he testified:  I was just looking at

18   it.

19           I said:  Well, didn't you say last year your head

20   was in it?

21           No, no, I didn't say that.

22           So, when I read to him what he said last year in his

23   testimony, he said:  Oh, yeah, I said that.

24           So, he testifies differently, says he doesn't

25   testify differently, then when he's confronted with it

1   acknowledges it.  I don't know what to believe about what he

2   said except that there was a lot of contradictions.  And the

3   judge will read to you about inconsistencies in her charge to

4   you tomorrow.

5           But the theme here is not providing objective

6   available evidence.  And let's forget about law enforcement,

7   let's move to Captain LeRuth.  I mean, if I was -- withdrawn.

8           Like Robinson, Cambry, and Gabay, my only

9   interactions with Captain LeRuth were here inside the

10  courtroom.  He said he was on the plane at 7 p.m., an hour

11  before the plane's scheduled departure.  And that simply can't

12  be true.  And I'm going to talk to you about it.

13          THE COURT:  You have five minutes.

14          MR. COHEN:  He had internal contradictions in his

15  testimony that make his entrance into the cockpit come well

16  after the objective evidence showing Paul Belloisi was already

17  under the plane.

18          Hear this out:  He could not have been on the plane

19  when Paul Belloisi was on the plane.  The avionics compartment

20  door was open, everyone agrees, and that happens at about

21  7:18, everyone agrees.  Everybody agrees Paul Belloisi was on

22  the plane before he opened the avionics compartment door.

23  Captain LeRuth and Frank Ricci both told you that when the

24  avionics compartment door opens, there's a warning light in

25  the cockpit.  Makes sense, you don't want to travel with the

1    electronics equipment door being opened.

2              Captain LeRuth testified that no avionics light ever

3    came on in the cockpit.  His testimony is up there, no

4    avionics light ever came on in the cockpit.  That's a very

5    important point.

6              Mr. Belloisi definitively opened the avionics

7    compartment door only after he was on the plane, definitely

8    not before.  And you see that on the video.  So, there is no

9    question that Paul Belloisi went into the avionics compartment

10   after he had already gone onto the plane.

11             If Captain LeRuth never left the cockpit unless to

12   use the bathroom in flight, why didn't he see the warning

13   light for the avionics compartment door being opened by Paul

14   Belloisi?

15             And the only explanation is that Captain LeRuth was

16   not in the cockpit when Paul entered that plane or the later

17   time when Paul went into the avionics compartment.  And that

18   makes sense.  It makes sense.  That's why he didn't see the

19   light.

20             Paul Belloisi entered through the jet bridge, that's

21   agreed upon by all sides.  Definitely went into the avionics

22   compartment and that's agreed upon by all sides.  The door

23   would he have caused a warning light, agreed upon again by all

24   sides.  If the captain didn't see it, it's because he was not

25   on the plane.

1          And, of course, he doesn't remember ever being asked

2   that question about when he got on the plane and Agent Gabay

3   doesn't remember ever asking him when he got on the plane.

4          And Agent Moloney sits and says nothing.  Doesn't

5   get called to the stand.

6          Captain LeRuth tried the best to recall what he

7   could out of hundreds of flights that he's taken since three

8   years later.  But data actually recorded --

9          How about that jet bridge?  There was a jet bridge

10  camera, everybody acknowledges that.

11         What would that jet bridge camera have shown?  It

12  would have shown exactly when LeRuth went on the plane it

13  would have shown exactly when Belloisi went there, exactly

14  when Gabay, and exactly when Moloney went there.  It would

15  have showed you all of that.  But you weren't given it.  That

16  jet bridge camera could have been the key for the Government

17  if it supported their position.  Actual

18  electronically-recorded and stored data that is required by

19  American Airlines and the FAA that was -- existed but never

20  provided.

21         Swipes, which are required by all AA employees,

22  including pilots, you were told by multiple government

23  witnesses that AA would have that record.  The jet bridge

24  camera, the cockpit recorder, which the captain told you is

25  there and is always on.  And the captain tells you 99 percent

1   of the time, he swipes his card at the gate leading to the jet

2   bridge.

3            Why weren't they provided to you?

4            Instead, again, you are left with:  Trust us.  Trust

5   us.

6            Imagine what you would have seen if you had the jet

7   bridge camera.

8            Lastly, the other nonlaw enforcement witness, Darryl

9   Valinchus.  Law enforcement agents jumped the gun when they

10  grabbed Mr. Belloisi without any cocaine or means of carrying

11  the cocaine or any proof that he was involved in the

12  conspiracy.  As I told you in opening, they jumped the gun and

13  then they tried to work backwards to get evidence to prove

14  they didn't mess it up and they brought in Darryl Valinchus.

15           I won't spend much time on him, but let me tell you

16  this:  He said he's a law enforcement liaison.  He's never had

17  any of peer-reviewed or published work whatsoever.  He admits

18  his location data doesn't give actual location.  He says the

19  only thing he knows is:  I'm trying to connect two people to

20  help the Government.

21           He can't give the range of any of the cell sites he

22  testifies about.  He admits never trying to go find out their

23  range.  He cannot give any definitive range of how close the

24  use of the Lester cell phone was to the JFK sites.

25           And then there's this text that everybody's making a

1   big deal about, Valinchus and the Government, this

2   "confirmado" text.  Do you remember that Valinchus said that

3   that confirmado text he contrasted with the other text that

4   had the read status, R-E-A-D, meaning they were looked at, and

5   the confirmado text, which did not have the read, R-E-A-D,

6   status symbol on it.  That text was not read.  That text was

7   not seen by Mr. Belloisi.  They're trying to use that to tell

8   you, well, he knew what to do, but it was never even looked

9   at.

10          And the most important point of Mr. Valinchus'

11  testimony came at the end, the very last thing he was asked.

12  He talked about the two points depicted at two different spots

13  on the map that he drew.  And he told you that both of those

14  spots was where Mr. Belloisi' handset was.  In both of those

15  spots, he said the handset was in one place and then two

16  minutes and seven seconds later it was in a second place.  But

17  then he told you, he admitted, that getting from one place to

18  the other in two minutes and seven seconds was unheard of.

19          I don't know, what's the distance, 20 miles?  I

20  don't know what it is, but he said from Hicksville to beyond

21  the Sagtikos Parkway.  And what that means is that his data,

22  Valinchus' data, is unreliable by its own proponent:

23  Mr. Valinchus.

24          Now, lastly, before we conclude, let's just talk

25  about Customs' authority and Customs --

1          THE COURT:  You have one more minute.  You've gone

2    over.

3          MR. COHEN:  The Customs authority, Customs seal.

4    Frank Ricci told you once a plane comes in and Customs leaves,

5    it's no longer a Customs plane, everybody can go on it.

6          Phil Guerra, the one they brought in to tell you

7    what Customs seal means, was asked that same question:  Once

8    an international flight clears and people are off it and

9    Customs and Border Patrol are off it, is it then no longer a

10   Customs plane and other mechanics work on it?

11         He says:  You know what?  I don't know.  I've never

12   been asked that question.

13         And you know what?  He's the one who directs who is

14   allowed to go on it and who's not allowed to go on it, and he

15   doesn't even know.  That's what the mechanics are doing.

16         Where are the records that you should be having?

17   Where are they?

18         You must find Paul Belloisi not guilty on all

19   counts.  There was never an agreement to do anything.

20   Illegal, never.  Today, ladies and gentlemen, you are the law,

21   you make the decisions here, you decide whether what you heard

22   over the last week is actual --

23         THE COURT:  They are not the law.  The law is what I

24   will give them tomorrow.  They are the deciders of the facts.

25         MR. COHEN:  You decide whether what law enforcement

1    did is the kind of proof that is acceptable, is the kind of

2    proof that raises the proof beyond a reasonable doubt.

3           This investigation was terrible.  It was done by

4    trained federal agents who ought to know better.  If you're

5    ever going to convict somebody for an international drug

6    smuggling conspiracy, please demand real proof.  Demand more

7    than the junk you saw here.

8           This case is not a close call.  This case, you will

9    remember.  And when you think about it, you'll have no doubt

10   that you did the right thing by finding Mr. Belloisi not

11   guilty.

12          THE COURT:  The jury will do the right thing when

13   they review all of the evidence and listen to the law and

14   deliberate appropriately.

15          Does the Government wish to rebut?

16          MR. POLLACK:  Yes, your Honor.

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

1          MR. POLLACK:  May I address the jury?

2          THE COURT:  Yes.

3          MR. POLLACK:  Members of the jury, what you just

4    heard is an effort to distract you from the evidence in this

5    case.  Let's come back to the evidence.  First of all, defense

6    counsel just said about the Government's American Airlines

7    within at the end today that he didn't know the first thing

8    about 737s.  First of all, that's false.  He told you he

9    supervises the maintenance of a fleet of 737s.  But there's

10   one thing that defense counsel and I will agree about with --

11   will agree about with respect to that witness is that he

12   wasn't there that day and neither was the defense witness,

13   Mr. Ricci.  He's the defendant's friend, his hand picked

14   witness.  He wasn't there.  Captain LeRuth was there, Officer

15   Robinson was there, Officer Cambry was there.  They told you

16   what they remember.

17          Defense counsel also misrepresented something that

18   Officer Robinson said.  Defense counsel said that Officer

19   Robinson said that the suspicious vehicle that drove up, that

20   Mr. Belloisi was in it.  He didn't say that, because

21   Officer Robinson, he wasn't being sloppy.  He didn't know who

22   was driving that vehicle.  He saw a suspicious van driving

23   suspiciously close, and he called it in.  He testified he

24   couldn't see who was driving it.  He doesn't know.  His boss

25   or his supervisor that day, Officer Cambry, also testified, he

1    said he got that call, he followed the van, and he recognized

2    that the person who was driving that van is the same person

3    who came out of the avionics compartment at the end of the

4    day.  That shows you that these witnesses, they aren't

5    reviewing each other's notes.  They aren't getting their

6    stories straight.  They're telling you what they remember

7    individually, and what they remember corroborates each other.

8    The testimony you heard from Officer Robinson fits together

9    with the testimony you hear from Officer Cambry.

10           Defense counsel says somehow you should expect that

11   the real inside man would just go straight up into the

12   avionics compartment.  That's not how -- it makes it riskier

13   that the defendant would go into the jet wing first.  I submit

14   he has that exactly backwards.  It would be scary to go and

15   take 10 kilos of cocaine out of an airplane.  Any person who's

16   planning to do that is going to be careful.  They're going to

17   scope out the area first.  They might worry that agents are

18   hiding somewhere to jump out.  Where might think be?  Perhaps

19   in the jetway.  The real inside man is not going to go diving

20   into the avionics compartment with an empty tool bag.  He's

21   goes to park, he's going to look around, he's going to go up,

22   peak in the jetway, and then he's going to come in, exactly

23   like the defendant did.

24           Defense counsel also said -- you know Captain LeRuth

25   was there, notwithstanding his testimony.  He said he was

there at 7:00 o'clock or thereabouts.  Defense counsel says

that can't be true because the avionics door was open, and

Captain LeRuth didn't remember seeing a light.  We have a

photograph of the avionics door opened and the timestamp on

that photograph is 7:36 p.m.  There is also data in evidence

that the passengers were already boarding the plane at that

time.  So not only was the captain in the plane, but at that

point, passengers and crew were in the plane with the avionics

door open, so it can't be that unusual that the captain didn't

notice the avionics light on.

        Now, defense counsel spoke a lot about hypothetical

other evidence, surveillance videos, and all this other stuff.

He referred to the Government having these videos or the

Government having access to them.  That's not true and you

didn't hear any evidence about that.  Every video that we saw

in this trial was either an American Airlines video or it was

the defendant's video when he was surveilling law enforcement

with his own telephone -- cell phone.  There is not one piece

of Government video in this case.  We have the video we have

that American Airlines gave that was presented to you.  I

anticipate the judge will instruct you that either side can

subpoena evidence.

        But what difference could it make if there are more

cameras?  There is no dispute that the defendant went into

that avionics compartment.  The defense counsel acknowledged

1   it just now.  We all agreed he went into that compartment.  So

2   what would more videos show, the defendant committing the

3   crime from multiple angles?  We don't have to prove the

4   defendant's guilt 10 times over.  We only have to prove it

5   once.  When there is no reasonable doubt, our burden is met,

6   and there is no doubt reasonable or otherwise, that the

7   defendant went into that avionics compartment where he did not

8   belong, where he had no business being on that night.  Defense

9   counsel acknowledges it.  We don't need videos from more

10  angles to prove that.

11        The defense also tries to distract you with this

12  notion about GPS pins on that map that Mr. Valinchus made.  He

13  suggests there's no possible explanation for this and it

14  undermines everything.  I submit you can infer an explanation

15  for Mr. Valinchus's testimony, but that's all a distraction

16  any way.  Now, if you're interested, Mr. Valinchus testified

17  that cell phones capture GPS data when certain applications

18  are used, including when they take photographs.  So I submit

19  you can infer from that testimony that photographs in the

20  defendant's phone can contain GPS locations and where those

21  photos are taken, even if he received them from someone else.

22  But that's all beside the point any way.  The map that

23  Mr. Valinchus made shows as he testified that the defendant is

24  generally a Long Island guy, and Lester is generally a Bronx

25  guy.  That is not seriously disputed.  The exact locations of

1   all those pins on Long Island don't matter, and you didn't

2   hear any evidence about them.  The point that matters is that

3   the defendant had a late-night meeting with Lester in the

4   South Bronx the night he was arrested.  That is on the map,

5   but it's supported by the full context that corroborates that

6   map.  The defendant tried calling Lester after 10:30 that

7   night on February 3rd and said -- when Lester didn't answer,

8   the defendant texted him, Call me when you're not busy, I got

9   to tell you something.  That's because the defendant had to

10  tell Lester something that he didn't put want to put in a text

11  message.  They had a couple of short calls after that and the

12  defendant texted, Here.  And a little while later, he texted,

13  where are you?  I don't mean to rush you, but I got to pick up

14  my daughter.

15          So you know even before looking at the map, before

16  looking at any location date, that the defendant was meeting

17  Lester somewhere to do something that he didn't want to text

18  about, and that he was frustrated that Lester was late because

19  he had to go pick up his daughter somewhere else afterwards.

20  And the GPS data corroborates that.  It supports it.  It says

21  he was at that White Castle in the South Bronx a little before

22  1:00 a.m. and that he want to La Guardia afterward.  That must

23  be where he went to pick up his daughter.

24          Defense counsel also tries to distract you with the

25  idea that the defendant supposedly didn't see the confirmed or

1   confirmado message because there is no WhatsApp read receipt.

2   First of all, that directly contradicts Mr. Valinchus's

3   testimony.  Mr. Valinchus testified the read receipt doesn't

4   mean it was actually read, it means it was opened in the

5   application in WhatsApp.  And he also said that the absence of

6   a read receipt doesn't mean that the message wasn't read, it

7   just means it wasn't opened in the WhatsApp application.  So

8   you cannot conclude from the absence of a read receipt that

9   the message wasn't seen on a lock screen or otherwise, just

10  that it wasn't viewed in the WhatsApp application.

11          But like I said, that's all a distraction anyway.

12  Just suppose for sake of argument that the defendant didn't

13  see the, confirm message, and he just went to the airplane

14  because it was almost time for the plane to leave and he

15  wasn't going to have another chance.  So what.  The fact that

16  Lester sent that message and that he therefore intended the

17  defendant to see it, and then Lester drove down to JFK to meet

18  the defendant and called him over and over and over and over

19  again not knowing that the defendant was already under arrest

20  and that the next day Lester dumped that phone, that's

21  evidence of a conspiracy, whether or not the defendant ever

22  saw the message.

23          Defense counsel asked in the opening why didn't the

24  CBP officers just wait, why didn't they wait a little longer.

25  But wait for what?  For somebody else to come and enter the

1    avionics compartment and trip the transponder and get the Clue

2    Spray on his hands?  They had been waiting for hours and hours

3    for the inside men to come and do that, and almost the last

4    possible minute before the airplane was going to take off, he

5    did.  It was the defendant.

6            Defense counsel suggests that the fact that the

7    defendant didn't take the shams out of plane mean he's not

8    guilty.  Members of the jury, I submit the fact that he

9    tripped the device and got the Clue Sprays on his hands, but

10   didn't take them out of the avionics compartment is evidence

11   that he's guilty.  What would an innocent mechanic do if he

12   found this thing in an avionics compartment?  The defendant's

13   own witness told you what he would do.  Now, I want to be

14   clear, the defense has obligation to put on any witnesses at

15   all.  It's not his burden.  It's others.  But he chose to put

16   on his friend, and his friend said, if I saw this in the

17   compartment, I would report it.  An innocent mechanic who just

18   happened upon that and tripped the device accidentally, would

19   recognize that is fog, that is dangerous, it should not be in

20   the avionics department.  If that plane runs into turbulence,

21   it can bounce around and damage something.  If he sees the

22   wires and he gets scared -- we've all heard, if you see

23   something, say something.  He would probably take it out and

24   report it, and if he is scared of it, he might run out, not

25   stop to leave to close the hatch.  He would get out of there

1  and call someone.  But he didn't hop out and see CBP and say,

2  Oh, my God, I'm so glad you guys are here, I was just about to

3  call you.  He shut the hatch and said, what's up, guys.  What

4  would the inside man do?  What would the inside man who shows

5  up thinking he's going to pick up 10 bricks of cocaine and

6  finds four of these or three of these and one of these?  I

7  don't want to criticize CBP's craftsmanship, they do the best

8  they can in a pinch, but I submit the inside real inside man

9  is not going to think these are the drugs.  He's not going to

10 come out with them.  He's going to realize law enforcement got

11 here first.  And he won't know that he tripped the device, he

12 won't know that he got the spray on his hands.  He's going to

13 put it back just the way it was and get out of there, close

14 the gate, and pretend like he didn't see anything.  That's

15 exactly what the defendant did.

16         Setting aside all of the distractions and coming

17 back to the evidence, the most basic of fact of this case is

18 that pile of cocaine.  That is real cocaine, and it's worth

19 over a quarter of a million dollars, and it came here on an

20 airplane from Montego Bay, Jamaica.  There is no dispute about

21 any of that.  That means somebody put it there.  And you know

22 from your common sense that nobody would put a quarter of a

23 million dollars worth of cocaine into an electronics

24 compartment on an airplane on its way to JFK unless they had

25 an inside man at JFK who had agreed to take it out.

1    International drug traffickers are criminals, but they're not

2    idiots.  They don't put a quarter of a million dollars of

3    illegal product into the wind and just hope that somebody

4    somewhere is going to get it to them.  That's not a message in

5    a bottle in the sea, it's a quarter of a million dollars worth

6    of cocaine.

7            I submit you can conclude from the simple fact of

8    that cocaine and the testimony of how it got here that there

9    was a conspiracy to possess that cocaine, to import that

10   cocaine, there was importation of that cocaine, and there was

11   an inside man at JFK.  And the only question left for all of

12   the other evidence to answer is was the defendant the inside

13   man.  I submit to you the overwhelming force of the evidence

14   answers the question, yes.  He was there.  He went inside that

15   compartment, he had no business being there, and nobody had

16   any business being there.  The pilot of that plane told you

17   there was nothing wrong with that plane.  If you looked in the

18   logbook, had something about the in-flight entertainment

19   system.  Nothing about anything that would require going in

20   the avionics compartment.  Nobody had any legitimate business

21   in that compartment and the only person with illegitimate

22   business in that compartment was inside man.  And not only did

23   he go there where he had no business being, where nobody had

24   any business being, but he went there and he tripped the

25   device and got the Clue Spray on his hands.

1      And not only that, but he came prepared.  He had the

2  smuggler cutouts on the inside of his jacket and the empty

3  toolbag.  He was not prepared as a mechanic.  He didn't have

4  any tools.  He was prepared as the inside man to take the

5  drugs out and hand them off in the next guy.

6      And how else do you know he's the inside man?

7  Because he told a lie about why he was there.

8  Special Agent Gabay testified that he and Agent Moloney

9  together interviewed the defendant and defendant said he was

10  and the airplane to eat some food, he had some chips, he drank

11  a soda, he noticed it was hot tried to go the cockpit to fix

12  it, went downstairs to fix it in the avionics compartment.

13  The pilot was already there.  That can't have happened.  And

14  you saw the video that he was only there for about a minute.

15  It's not enough time for him to have done all that.  Why would

16  he lie, except that the truth was that he had gone there to

17  take the cocaine.

18      And that leads you to yet another reason you know

19  the defendant was the inside man, Lester.  Even without

20  Lester, you know for all the other reasons I said that the

21  defendant was there to pick up the cocaine.  But we also know

22  that his role was to hand the cocaine off to somebody else,

23  and that somebody else was already on his way to the airport.

24  The defendant met him the previous night and the South Bronx,

25  and the defendant was driving down to JFK after sending the

1    confirm message to meet with the defendant, and he called him

2    over and over and over again from the airport or near the

3    airport and the next day, dumped his phone.

4            Members of the jury, I submit that all of that

5    evidence is consistent with only one conclusion.  That the

6    defendant is the inside man.

7            Proof beyond a reasonable doubt is the Government's

8    burden and we embrace that burden.  A reasonable doubt is just

9    that, reasonable.  This is the same burden of proof used every

10   day in every criminal trial in this district and throughout

11   the country.  A reasonable doubt is not speculation or

12   conjecture or hypothetical other evidence.  Now, remember,

13   it's the judge who will instruct you on the law, and it's

14   judge's instructions that you should follow.  I expect Judge

15   Irizarry will tell you that proof beyond a reasonable doubt

16   does not mean proof beyond all possible doubt or proof to a

17   mathematical certainty.  Proof beyond a reasonable doubt is

18   proof that you would act upon in the most important matters in

19   your own lives.  You should consider only the evidence using

20   your experience, good judgment, and common sense.  Speculation

21   is not evidence.  Theories are not evidence.  The judge will

22   instruct you that you are to decide this case on the evidence,

23   and I submit to you that the evidence in this case leads you

24   to conclusion, that the defendant is guilty.

25           Now, defense counsel has referred several times to

1   the defendant being on trial and his supposed reasons why the

2   defendant is on trial and the great power of the Government.

3   I want to be very clear, everyone accused of a crime is

4   entitled to a fair trial.  That's why we're here.  That's why

5   you're here.  Not because of the mighty power of the

6   Government, not to cover up what defense counsel thinks is a

7   bad investigation.  We're here because the defendant is

8   entitled to a fair trial.  And now he's had one.

9          Every case is important.  Not every case is

10  complicated.  This is not a complicated case.  You've seen the

11  evidence, you've seen what it shows.  I submit that the

12  evidence proves beyond a reasonable doubt that the defendant

13  is guilty.  That's why we ask that you return the only verdict

14  consistent with the evidence, guilty.

15         Thank you.

16         THE COURT:  Thank you.  Okay.  So ladies and

17  gentlemen, as I mentioned to you earlier, because it's so late

18  in the day, I'm not going to give you the jury charge -- we

19  call it, the jury charge -- the instructions on the law today.

20  We will start tomorrow at 9:30.  So make sure that you rest up

21  tonight, because you're really going to go to work tomorrow,

22  okay.

23         But remember, it's still very important, maybe even

24  more important, that you really keep an open mind and not form

25  or draw any conclusions about the guilt or nonguilt of the

1  defendant.  Remember, you have not heard my instructions on

2  the law, and you have not had the opportunity to deliberate

3  with one another.  You cannot talk about this case among

4  yourselves or with anyone else over any kind of media.

5  Remember that you can't do any research or read or listen to

6  anything about anything at all connected with this case, and

7  you can't go to any location that may have been mentioned

8  during the course of this case.

9          So enjoy the rest of the evening, rest up, and we

10  will see you tomorrow at 9:30.  And again, thank you for your

11  punctuality.

12          (Jury exits the courtroom.)

13          THE COURT:  All right.  You can have a seat for just

14  a minute.  I'm not going to keep everyone.

15          I will be posting tonight on the docket, the final

16  jury instructions, so this way, you all will have a chance to

17  take a look it, and if for some reason you see something that

18  you think was not covered by us at the charge conference,

19  there is a typo or something, just please let me know tonight

20  so that we can take a look it first thing in the morning.  I

21  would like to get started and charge the jury first thing

22  tomorrow morning.

23          Okay.  Anything -- oh, the only other things I

24  wanted to discuss with you very quickly, with respect to --

25  we've had some discussions about it already.  With respect to

1   the non-contraband evidence, there's photos, there's

2   documents, and things of na signature nature, do the parties

3   have any objection to sending that back to the jury once they

4   ask for it?

5           MR. POLLACK:  No objection.

6           MR. COHEN:  No objection.

7           MR. SIMPSON:  No.

8           THE COURT:  And then, of course, with respect to any

9   testimony that they ask, I find as a general matter, the

10  parties are pretty good about talking about that, the

11  Government is very good about getting the transcripts redacted

12  properly.

13          Do the parties have any objection to just sending

14  the appropriate portions back to the jury?

15          MR. POLLACK:  No objection, and the redactions are

16  in progress now.  We've talked to defense counsel about it.

17          THE COURT:  Perfect.

18          MR. COHEN:  No objection.

19          THE COURT:  Okay.  And we do -- our practice here --

20  when I say, we, my case manage and I, our practice is as soon

21  as we get the notes, you will all be contacted right away and

22  get a copy right away.  So we get working on it right away, as

23  well.  Okay.

24          All right.  Anything else?

25          MR. POLLACK:  Nothing substantive, Your Honor.  That

1    reminds me, we discussed a little bit with defense counsel

2    before the trial.  We can take care of this tomorrow if Your

3    Honor wishes, but we would like to ask for a limited sealing

4    order to seal for all purposes other than trial, any exhibits

5    that have third-party phone numbers in them.  A number of the

6    exhibits have phone numbers.  So of course, it's appropriate

7    for the jury to see those, but we wouldn't want third-party

8    inquiries from the public, to hand out personally identifying

9    information.

10              THE COURT:  Is there any objection to that?

11              MR. COHEN:  No.  We agree.

12              THE COURT:  That's fine.

13              MR. POLLACK:  We'll provide a list.

14              THE COURT:  Okay.

15              MR. POLLACK:  Thank you, Your Honor.

16              THE COURT:  Thank you all very much.  Have a good

17   night.

18                    *     *     *     *     *

19              (Proceedings adjourned at 4:20 p.m. to resume on

20   May 2, 2023 at 9:30 a.m.)

21

22

23

24

25

I N D E X

WITNESS                                    PAGE

FRANK RICCI

CROSS-EXAMINATION     BY MS. SCHIERBERL   747
REDIRECT EXAMINATION  BY MR. COHEN        813

JOURNAEL CAMBRY

DIRECT EXAMINATION    BY MS. SCHIERBERL   824

LORENZO MECCARIELLO

DIRECT EXAMINATION    BY MR. POLLACK      828
CROSS-EXAMINATION     BY MR. COHEN        833

E X H I B I T S

GOVERNMENT                                 PAGE

708                                        769

8                                          795

204A                                       826