1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - -   X
3
UNITED STATES OF AMERICA,    :   20-CR-219(DLI)(RLM)
4
5        -against-           :   United States Courthouse
                                 Brooklyn, New York
6
PAUL BELLOISI,               :
7                                April 25, 2023
              Defendant.     :   9:30 o'clock a.m.
8
   - - - - - - - - - - - -   X
9

10              TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE DORA L. IRIZARRY
11            UNITED STATES DISTRICT JUDGE

12 APPEARANCES:

13 For the Government:        BREON PEACE
                             United States Attorney
14                           BY: ROBERT M. POLLACK
                                 MARGARET SCHIERBERL
15                               FRANCISCO J. NAVARRO
                             Assistant United States Attorneys
16                           271 Cadman Plaza East
                             Brooklyn, New York
17

18 For the Defendant:        COHEN & FORMAN, LLP
                             950 Third Avenue, 10th Floor
19                           New York, NY 10022

20                           BY: DAVID J. COHEN, ESQ.
                                 BENJAMIN L. SIMPSON, ESQ.
21

22 Court Reporter:  Michele D. Lucchese, RPR, CRR
                    225 Cadman Plaza East
23                  Brooklyn, New York
                    (718) 613-2272
24
Proceedings recorded by mechanical stenography, transcript
25 produced by computer-aided transcription.

1           (In open court - jury not present.)

2           (Defendant present.)

3           THE COURTROOM DEPUTY:  Criminal cause on trial,

4    docket number 20-CR-219, United States versus Paul Belloisi.

5           Please state your appearances.

6           MR. POLLACK:  I'm Robert Pollack for the United

7    States, accompanied by my colleagues Assistant U.S. Attorneys

8    Margaret Schierberl and Francisco Navarro, Paralegal

9    Specialist Sophia Cronin, and Special Agent John Moloney of

10   the Department of Homeland Security.

11          Good morning.

12          MR. NAVARRO:  Good morning.

13          THE COURT:  Good morning to all of you.  Please have

14   a seat.

15          MR. COHEN:  On behalf of defendant, Paul Belloisi to

16   my right, I'm David Cohen and this is Benjamin Simpson.

17          THE COURT:  Good morning to all of you.  Please have

18   a seat.

19          All of our jurors are here and, so, we will be able

20   to commence shortly.

21          I just did want to note that yesterday, later

22   yesterday, closer to the afternoon, the Court did receive,

23   through the Court's interoffice mail defendant's hard copies

24   of the jury instructions.

25          You still didn't follow my instructions.  You were

1    able to provide chambers with a copy of Defendant's Exhibit

2    lists before 9 o'clock yesterday.  I don't know why you

3    couldn't deliver the jury instructions at the same time.

4            Dumping them into mail chute in the court lobby on

5    Friday doesn't get it here before 9 o'clock in the morning,

6    because it's got to go through the marshal, be checked by the

7    marshals.  It has to go through the clerk's office and then it

8    might make its way to my mailbox at some point the next

9    business day.

10           So, I expect my deadlines and instructions to be

11   followed moving forward.

12           That being said, is there anything that the parties

13   need to address before we bring in the jury to get started?

14           MR. POLLACK:  Your Honor, briefly.  I spoke with

15   defense counsel about this, and we would like to put on the

16   record today that on March 8th, 2023, the Government did

17   extend a plea offer, which, by its term, expired on March 20,

18   2023.  We just want to put that on the record, and if

19   possible, have the defense -- the defense told us, and we

20   trust that defense counsel did share that with the defendant,

21   who declined to accept it.  We just want to have that

22   acknowledged on the record.

23           MR. COHEN:  We acknowledge that that offer was made

24   and rejected.

25           THE COURT:  Okay.

1          MR. POLLACK:  And, Your Honor, apart from that, we

2     are prepared to proceed.

3          THE COURT:  Okay.

4          MR. POLLACK:  I would also just note that of course

5     we don't know whether there will be an affirmative defense

6     case here.  But since we notice there are a number of people

7     in the audience, we would as defense counsel to represent

8     whether there are or are not potential witnesses in the room,

9     not including, of course, the defendant.

10         THE COURT:  I would assume that no one in the

11    audience is a witness for either the Government or defense?

12         MR. COHEN:  No.  We don't have any intention of

13    calling anyone who's present in the gallery today.

14         THE COURT:  Okay.

15         MR. POLLACK:  Thank you, Judge.

16         THE COURT:  All right.  And obviously all of the

17    members of the gallery are welcome to come and observe the

18    trial.

19         One other thing, how long do counsel expect the

20    openings to go?  I think we talked about this before, but just

21    remind me.

22         MR. POLLACK:  I think at most, maybe seven or eight

23    minutes for the Government.

24         THE COURT:  And who's going to open for the

25    Government?

1          MR. POLLACK:  I will, Your Honor.

2          THE COURT:  Okay.  And for defendant?

3          MR. COHEN:  David Cohen will do the opening, Your

4     Honor.  I expect it to be 15 to 20 minutes.

5          THE COURT:  Why so long?

6          MR. COHEN:  There's a good deal of information that

7     we want to draw the jurors' attention to.

8          THE COURT:  Your comments aren't evidence.  It's not

9     summation; it's opening.

10         All right.  So, Mr. Cohen, it's Jason Cohen,

11     correct?

12         MR. COHEN:  David Jason Cohen, Your Honor.  Thank

13     you.

14         THE COURT:  It's David Jason Cohen.  I want to make

15     sure I have the right name.  Okay.

16         So if there's nothing else, we will bring in the

17     jury.

18         MR. SIMPSON:  Judge, I'm so sorry.  I did have one

19     more thing.

20         THE COURT:  Yes, sir.

21         MR. SIMPSON:  Your Honor, with respect to the jury

22     charge that the Court -- and the defense apologizes for our

23     with regard to filing that on Friday.  I did want to bring to

24     the Court's attention to the defense had made an error in the

25     charge.

1      THE COURT:  We are not going to discuss that now.

2      MR. SIMPSON:  Okay.  I will bring it up later,

3 sorry.

4      THE COURT:  The jury is entering.  All rise.

5      (The jury enters the courtroom.)

6      THE COURT:  Everyone may be seated.

7      Do the parties agree that the jurors are all present

8 and properly seated?

9      MR. POLLACK:  Yes, Your Honor.

10      MR. COHEN:  Yes.

11      THE COURT:  Good morning, ladies and gentlemen.

12      JURORS:  Good morning.

13      THE COURT:  My name is Dora Irizarry.  I am the

14 judge who will be presiding over the trial.  I know you spent

15 the day yesterday with Magistrate Judge Levy.  My thanks to

16 you, first of all, for being prompt this morning.  It will

17 certainly help us move through the case more efficiently if

18 everyone is here promptly.

19      As you probably heard yesterday, if even one of you

20 is missing, we can't go forward.  So every single one of you

21 is very important.

22      I will be giving you some preliminary instructions

23 to help guide you during the trial.  But before we do that,

24 I'm going to ask my case manager, my right-hand person, who

25 you met already, Christy Carosella, to administer the oath to

1  the jury.

2       THE COURTROOM DEPUTY:  You can remain seated, but

3  please raise your right hands.

4       Do each of you affirm that you well and truly try

5  this case without fear or favor to any person and a true

6  verdict render according to the evidence and the law?

7       JURORS:  (Collectively) I do.

8       (Jury sworn.)

9       THE COURT:  I'm also glad to see that some of you

10 are wearing layers and so on.  We can't control the

11 temperature very well.  Sometimes it's too cold and sometimes

12 it's too hot.  I am glad to see that you have bottled water.

13 Do feel free to use bottled water throughout the day.

14      And now that you have been sworn, I am going to give

15 you some preliminary instructions to guide you in your

16 participation in the trial.

17      It will be your duty to find from the evidence what

18 the facts are.  You and you alone will be the judges of the

19 facts.  You then will have to apply to those facts the law as

20 I give it to you.  I alone am the judge of the law.  You must

21 follow that law whether you agree with it or not.  Nothing the

22 Court may say or do during the trial is intended to indicate

23 or should be taken by you as indicating what your verdict

24 should be.

25      The evidence from which you will find the facts will

1  consist of the sworn testimony of witnesses, documents, and

2  other things received into the record as evidence, and any

3  facts that the lawyers agree to or stipulate to or that the

4  Court may instruct you to find.

5          Certain things are not evidence and must not be

6  considered by you.  I will list them for you now.  Statements,

7  arguments and questions by the lawyers are not evidence.

8  Questions in and of themselves are not evidence; therefore,

9  you cannot infer any fact from the mere asking of a question.

10  It is the answer, coupled with the question, that constitutes

11  evidence.  For example, if a witness is asked the question do

12  you own an automobile and the witness answers no, you may not

13  infer from the mere asking of the question that the witness

14  does own an automobile.

15          Objections to questions are not evidence.  Lawyers

16  have an obligation to their clients to make objections when

17  they believe evidence being offered is improper under the

18  rules of evidence.  You should not be influenced by the

19  Court's ruling on it.  If the objection is sustained, ignore

20  the question.  If it is overruled, treat the answer like any

21  other.

22          If you are instructed that some item of evidence is

23  received for a limited purpose only, you must follow that

24  instruction.

25          Testimony that the Court has excluded or told you to

1  disregard is not evidence and must not be considered.

2  Anything you may have seen or heard outside the courtroom is

3  not evidence and must be disregarded.  You are to decide the

4  case solely on the evidence presented here in the courtroom.

5           There are two kinds of evidence:  Direct and

6  circumstantial.  Direct evidence is direct proof of a fact,

7  such as testimony of an eyewitness.  Circumstantial evidence

8  is proof of facts from which you may infer or conclude that

9  other facts exist.

10           I will give you further instructions on these, as

11  well as other matters at the end of the case.  But keep in

12  mind that you may consider both kinds of evidence.

13           It will be up to you to decide which witnesses to

14  believe or not to believe and how much of any witness'

15  testimony to accept or reject.  I will give you some

16  guidelines for determining the credibility of witnesses at the

17  end of the case.

18           As you know, this is a criminal case.  There are

19  certain important basic rules about criminal cases that you

20  must keep in mind:  First, the indictment brought against the

21  defendant by the Government is only an accusation, nothing

22  more.  It is not proof of guilt or anything else.

23           Second, the defendant is presumed innocent and this

24  presumption of innocence remains with the defendant throughout

25  the trial and may be overcome only if and until, after

1   appropriate deliberation, the jury unanimously finds that the

2   Government has proven the defendant's guilt of each and every

3   element of the crime charged beyond a reasonable doubt.

4           The defendant has no burden to prove that he is not

5   guilty or to present any evidence or to testify.  Since the

6   defendant has the right to remain silent, you must not draw

7   any adverse inference against the defendant from the fact that

8   he may chose not to testify.

9           During the course of the trial, you may hear

10  testimony about other individuals who may have been involved

11  in the crimes charged in the indictment but who are not on

12  trial before you.  You may not draw any inference, favorable

13  or unfavorable towards the Government or the defendant on

14  trial from the fact that no other defendant is present at this

15  trial, nor should you speculate as to why that is.  Your sole

16  concern is the defendant on trial before you.

17          In this case, the defendant, Paul Belloisi, is

18  charged with conspiracy to possess cocaine with the intent to

19  distribute, conspiracy to import cocaine, and importation of

20  cocaine.

21          I will give you detailed instructions on the

22  elements of the crimes charged and other legal principles at

23  the end of the case.  Those instructions will control your

24  deliberations and verdict.

25          Now, a few words about your conduct as jurors

1  throughout this trial.  First, I have instructed the parties

2  that they must not have any contact with the members of the

3  jury.  There is another side to that coin.  The jurors must

4  not have any exchange of conversation whatsoever with the

5  Court or any of the parties, including witnesses.

6         So if you see any of the parties in the hallways of

7  the Court or on the street or any other location and they look

8  away, do not speak to you and keep on walking, please do not

9  hold it against them.  They are following the Court's

10 instructions and I'm instructing you to behave in similar

11 manner.  This is not meant to encourage rudeness or

12 anti-social behavior, but is simply the best method of

13 avoiding any possible appearance of impropriety and of

14 assuring the absolute impartiality requirement of you as

15 jurors in this trial.

16        If, while serving on this jury, any attempt is made

17 by any person to converse with you about this case or any

18 incident occurs within your knowledge involving an attempt by

19 any person to improperly influence any member of the jury, you

20 must report it promptly to the Court.

21        If it becomes necessary to report such an incident,

22 do not discuss with any of your fellow jurors either the

23 incident or the fact that you feel it necessary to bring it to

24 the Court's attention.  Report it only to the Court and please

25 do so as quickly as possible.  Any such incident should be

1    reported to my case manager, Christy Carosella or either one
2    of my law clerks:  Reed Erhardt, who's sitting next to me, or
3    Joshue Couce, who's sitting next to Ms. Carosella.

4             Second, I instruct you that during the trial, you
5    must absolutely not discuss this case with anyone or permit
6    anyone to discuss it with you.  Until you are directed by the
7    Court to retire to the jury room at the end of the case to
8    deliberate on your verdict, you simply are not to talk about
9    this case.

10            I know that many of you use cell phones, tablets,
11   smart phones, laptops, the internet, social media, like
12   Instagram or Facebook, for example, and other tools of
13   technology.  You must not talk to anyone about this case or
14   use any such tools to communicate electronically with anyone
15   about the case.  This includes your family, coworkers,
16   neighbors and friends.

17            Again, you may not communicate with anyone about the
18   case on your cell phones, smartphones, or other electronic
19   devices, through e-mail, instant messaging, text messaging,
20   any blog, website, internet chat room, or by way of any other
21   social networking website, such as Twitter, Facebook,
22   Instagram, Linkedin, or YouTube, for example.

23            Third, you must not read or listen to or view
24   anything touching on this case in any way over any media.
25   This includes newspapers, magazine, radio, television, and

1   internet.

2          Fourth, do not try to do any research or conduct any

3   investigation about the case on your own.  As jurors, you must

4   decide this case only on the evidence presented here within

5   the walls of this courtroom.

6          I instruct you that you may not visit or view any

7   place where the offenses charged allegedly took place, nor may

8   you conduct any research or investigation over the internet or

9   any other media.  In other words, you should not consult

10  dictionaries or reference materials, search the web, look at

11  blogs, or use any other electronic tools or other media to

12  obtain information about this case or to help you decide the

13  case.

14         Finally, do not form any opinion until all the

15  evidence is in, you have received my instructions on the law,

16  and you have begun to deliberate.  You must keep an open mind

17  until you have deliberated sufficiently at the end of the

18  case.

19         These admonitions apply whenever the Court stands in

20  recess and I will repeat them each time we break.  By the end

21  of the trial, you will be able to recite them back to me.

22  You're going to hear them so often.

23         Please be here promptly at the time directed by the

24  Court.  As I mentioned earlier, we cannot begin until all of

25  you are here.  I am highly encouraged that you made it through

1  the security in the lobby and were here on time and we

2  appreciate that very much.

3          The trial will now begin.

4          First the Government will make an opening statement,

5  which simply is an outline to help you understand the evidence

6  as it comes in.

7          Next, the defendant's attorney may make an opening

8  statement but is not required to do so.

9          Opening statements neither are evidence nor

10  arguments.  You may consider the opening statements as a

11  preview of what each side expects the evidence in the case

12  will show.

13          Then the Government will present its witnesses.

14  This is called direct examination.

15          Counsel for the defendant may cross-examine them.

16          Then they there may be further questions on what we

17  call redirect and recross.

18          This process will be repeated with each witness.

19          Following the Government's case, the defendant may,

20  if he wishes, present witnesses whom the Government may

21  cross-examine.  Again, bear in mind that there is no

22  obligation on the defendant to offer evidence because the

23  entire burden of proof remains on the Government at all times.

24          After all the evidence is in, the attorneys will

25  present their closing arguments to summarize and interpret the

1  evidence for you.  However, these closing arguments are not

2  evidence.

3          The Court then will instruct you on the law.  After

4  that, you will retire to deliberate on your verdict.

5          We will now proceed with the next step in the trial,

6  which is the opening statement by the Assistant United States

7  Attorney, and I believe Mr. Robert Pollack is going to

8  proceed.

9          OPENING STATEMENT - MR. POLLACK

10         MR. POLLACK:   May I address the jury, Your Honor?

11         THE COURT:  Yes, you may.

12         MR. POLLACK:  An airplane on an international flight

13  landed at JFK with over a quarter of a million dollars worth

14  of cocaine hidden in an electronics compartment underneath the

15  cockpit.  That man, the defendant, Paul Belloisi, was the

16  inside man at the airport who was there to take it out.

17         Members of the jury, my name is Robert Pollack and

18  I'm an Assistant United States Attorney here in the Eastern

19  District of New York.  I am joined today by my colleagues

20  Assistant United States Attorneys Margaret Schierberl and

21  Francisco Navarro, Paralegal Specialist Sophia Cronin, and

22  Special Agent John Moloney from the Department of Homeland

23  Security.

24         Together, we represent the United States of America.

25         It's our responsibility to present you with the

1  evidence in this case.  Here's what that evidence will show:

2          On the afternoon of February 4, 2020, an American

3  Airlines flight from Montego Bay, Jamaica landed at JFK here

4  in New York City.

5          Within minutes of its arrival, it was selected for a

6  routine search by the anti-terrorism and contraband

7  enforcement team of the U.S. Customs and Border Protection, or

8  CBP.

9          CBP found 10 bricks of cocaine inside an electronics

10  compartment that's underneath the airplane.  It's a special

11  compartment underneath the cockpit that only airplane

12  mechanics go in.  Moving swiftly, because they knew that an

13  inside man, someone with access to airplanes on the tarmac

14  could be anywhere watching and waiting, CBP set out a plan to

15  catch him.  They took out the cocaine bricks and replaced them

16  with fake, sham bricks.  They sprayed the sham bricks with a

17  chemical that's invisible to the naked eye that glows under

18  black light.  And one of the bricks had a radio transponder

19  inside that sends a signal when the brick is picked up.

20          Then the officers drove off to a distance and

21  watched the airplane with binoculars.  Hours passed.  They

22  just sat and watched.  And for hours, nobody went into that

23  compartment until just about 40 minutes before that plane was

24  scheduled to take off on its next flight.  When the pilots and

25  first officer were already inside getting ready for passengers

1  to board, CBP saw an American Airlines mechanic driving up to

2  the plane.  That was the defendant.

3          They watched him open the compartment.  They watched

4  him pull himself all the way up inside and they started

5  driving slowly towards the airplane to have a closer look.

6  And within seconds, the radio transponder tripped, sending

7  them a signal that the brick had been picked up.

8          CBP then quickly drove the rest of the way up to the

9  plane and confronted the defendant.  He hopped down out of the

10 plane and acted as if nothing had happened, acted like he

11 belonged there, just an airline mechanic doing his job.  But

12 as you'll hear, he wasn't just an airline mechanic doing his

13 job.  He had been caught almost literally red-handed.  His

14 gloves glowed under the black light showing that he had

15 handled the fake drugs.

16         As it turns out, he was a hanger mechanic who was

17 supposed to be working in a hole different part of the

18 airport, not that plane.  And there was nothing wrong with

19 that plane that required anybody, let alone the defendant, to

20 be in that highly-sensitive compartment.  And he had brought

21 an empty tool bag in the vehicle he drove up to the airplane

22 and he had cutouts on the inside lining of his jacket of a

23 type that smugglers used to carry drugs.

24         For his actions, the defendant is charged with three

25 counts:  Conspiring to possess cocaine, conspiring to import

1   cocaine, and importation of cocaine.

2          We will prove beyond a reasonable doubt that the

3   defendant committed these crimes.  We will prove it by witness

4   testimony, physical evidence, documents, and electronic

5   evidence.  You will hear from that CBP officer who found the

6   cocaine.  He will tell you all about it and you'll see the

7   pictures and the video that he and his partner took.  You will

8   also see the radio transponder in that sham brick and you will

9   hear how it works.

10         You'll see the defendant's gloves that were taken

11  from him that night and which still, to this day, glow under

12  the black light, showing the outline of the defendant's

13  fingers where he handled the fake drugs.

14         You will also hear from another CBP officer who was

15  there that night and who followed the defendant earlier in the

16  evening before he actually entered the aircraft, but he was

17  just driving slowly around the aircraft while CBP was

18  watching.

19         You'll hear from the pilot of that airplane who was

20  sitting in the cockpit, getting ready for the next flight when

21  the defendant entered underneath.  He'll tell you there was

22  nothing wrong with that plane and nobody should have been

23  inside that compartment.

24         You'll hear from an American Airlines maintenance

25  supervisor who will tell you that the defendant was a hanger

1   man.  He was assigned to an airplane in a different part of

2   the airport.  He was not supposed to be at that gate at all.

3          And you'll hear from a cell phone data expert who

4   will show you some electronic evidence taken from the

5   defendant's cell phone and from cell phone company records.

6   Those records show that late at night, the night before these

7   events, the defendant drove far from his home on Long Island

8   and his work at JFK to a fast-food restaurant South Bronx to

9   meet with the person who's number was saved in his cell phone

10  under the name Lester.

11         Those records also show that not long after the

12  defendant went up into that airplane Lester was driving down

13  from the Bronx to JFK, and he called the defendant over and

14  over and over again when he got there, not knowing the

15  defendant couldn't answer because he had already been

16  arrested.  And those records also show that Lester was using a

17  temporary phone, a burner phone, and he abandoned it the very

18  next day, after the defendant got caught.

19         After you've heard all of this evidence, we will

20  have the opportunity to come back before you and ask you to

21  apply your commonsense and hold the defendant accountable for

22  his crimes.  We will ask you to return the only verdict

23  supported by the evidence:  Guilty.

24         Thank you.

25         THE COURT:  Thank you.

1          Does the defense wish to open?

2          MR. COHEN:  I do, Your Honor.  Thank you.

3          THE COURT:  And this is Mr. David Jason Cohen.

4          OPENING STATEMENT - MR. COHEN

5          MR. COHEN:  Good morning.

6          Hours and hours of surveillance in the most

7    photographed and videotaped place maybe in the world, JFK

8    International Airport, and you're going to see the Government

9    has about five minutes of video to show you.  The United

10   States of America versus Paul Belloisi.

11         Who is the United States of America?  Homeland

12   Security, Customs and Border Patrol, FBI, DEA, all federal

13   agencies, the evidence will show, trying to prove to you that

14   Paul Belloisi is guilty.

15         The evidence will show that each of these agencies

16   played a role in the arrest, prosecution, and now an attempt

17   to prove Paul Belloisi guilty beyond a reasonable doubt for a

18   crime he didn't commit.

19         The case will move fast.  The Government expects

20   their evidence presentation to be done in two days.  Mr.

21   Belloisi has been waiting for this day for three years.  The

22   Government's case will take two days.

23         Because of the speed that it's going to move, we are

24   going to need your undivided attention.  It is an incredibly

25   serious matter, but it's not really that complicated.

1    What the evidence will not show is the facts that

2    the video would have shown had they been preserved.  What the

3    evidence will not show is any electronic data that would

4    support the Government's position despite it being a JFK

5    Kennedy International Airport.

6            What you will hear is people's memories, events that

7    happened three years ago.

8            What the evidence is will not show is proof, real

9    proof about what Mr. Belloisi did on that day, the kind of

10   evidence that is objective, that doesn't shade the truth, that

11   doesn't have memory as its basis.

12           What the evidence will show in this case is that law

13   enforcement officers who blew their cover, moved in too

14   quickly and destroyed their opportunity to gather real

15   evidence and find the real culprit or culprits.  They failed

16   to secure vital evidence not only that day but days, weeks,

17   months after Mr. Belloisi's arrest.  Instead, they looked only

18   for evidence that would support their theory while ignoring

19   the potential to get real evidence, which would have helped

20   exonerate Paul Belloisi.

21           And the evidence will show that as a result of this,

22   Paul Belloisi, sitting in front of you now in federal court as

23   a federal defendant in a federal smuggling narcotic

24   conspiracy, facing the most powerful and resourceful

25   Government in the world, and it's only because federal law

1  enforcement agents jumped the gun.

2         When you hear the evidence, you will learn Paul

3  Belloisi was about to celebrate his 30th year as an airline

4  mechanic at American Airlines.  It was a normal day on the job

5  for him, working his normal shift, finishing his an assignment

6  a little early like most mechanics and then going on to an

7  airplane to try to get some free food.  He noticed it was warm

8  on the plane.  He went down to the place under the plane where

9  one would go if it was warm and the air condition needed a

10  reset.  He pressed the reset button.  That's what he did.

11  That's where he was supposed to be.  It happened to be that

12  somebody was trying to smuggle drugs in the compartment where

13  the air conditioning reset button is.  It's called the

14  avionics compartment.  You'll hear that a lot.

15         And when leaving the avionics compartment, he was

16  immediately -- he came down and he was immediately surrounded

17  by law enforcement officers, asked one question -- remember,

18  they just took off a quarter million -- hundreds of thousands

19  of dollars in drugs and federal agents everywhere watching

20  this plane.  And Mr. Belloisi came down out of the avionics

21  compartment with none of it, none of the drugs, none of the

22  fake drugs.  And when he was asked what were you doing?  He

23  said, I went to hit the reset button on the air conditioning.

24  That's where the reset air conditioning button was.  And the

25  answer:  You're liar.

1     It was a normal day on the job for Paul Belloisi

2  until that moment, when his life turned upside down.  And

3  without the evidence they were expecting to have --  they're

4  sitting there, watching the plane.  Without the evidence, the

5  man coming down carrying those fake bricks and no other

6  evidence to support him, federal officer Michael Robinson,

7  who's going to walk here in the next few minutes and testify,

8  decided after one question to Mr. Belloisi that Paul Belloisi

9  was guilty.

10     And the evidence will show because of Officer

11  Robinson's split second decision, that became the defining

12  moment in this case.  That was the moment that the United

13  States of America came after Paul Belloisi.

14     And the worst part of it is is it didn't have to

15  happen that way.  They could have just waited, see what

16  happens.

17     Officer Robinson went up, took the 10 kilos, I'm

18  told, and brought them away and packaged some fake kilos and

19  put them back up there and replaced them, went down to the

20  avionics compartment.  It's way down on the airplane.  You

21  have to go way down to get under there, push it up and go back

22  in.  He went in there and replaced the real cocaine and put in

23  fake cocaine so you couldn't tell the difference.  He tried to

24  make it look exactly the same.

25     To get the real cocaine off the plane, you'll hear

1   it took two law enforcement officers, one to take a brick,

2   pass it down through the avionics compartment hatch door to

3   another officer, who's there with a duffle bag, take ten

4   bricks.

5           After that, they sat and watched the plane.  The

6   idea was the guilty party would go up there, take those fake

7   bricks, catch them -- as Mr. Pollack just said, red-handed,

8   but it didn't happen that way -- arrest the person for

9   possession of real cocaine.  But the evidence will show that

10  Paul Belloisi went up into that compartment.

11          Now, they said he went up there with a bag.  He

12  didn't go up there with a bag.  The evidence will tell you he

13  didn't go up with a bag.

14          They will say he had cutouts in his jacket and was

15  going to carry 20-something pounds of cocaine in his jacket.

16  He's a mechanics.  If he wanted to have a bag up in the

17  avionics compartment, that's what mechanics do; they have

18  bags.  He didn't bring a bag up into that compartment.  That's

19  what they want you to believe.  Stuffed 10 kilos, kilos into

20  your jacket.

21          The evidence will show that he was surrounded by

22  federal officers.  He was held right outside the airplane, the

23  same tarmac he's been working for 30 years.  He was not free

24  to leave.  He could not call a supervisor.  He could not call

25  a union rep, had his phone taken away from him.  He was

1  humiliated right there at his job site.

2          The evidence will show that he was then handcuffed

3  and taken to an interrogation room.  The interrogation room

4  will be referred to by the acronym JNSU.  They didn't have to

5  do that.  They could have just waited to see what happened.

6          The evidence will show that without having any real

7  evidence linking Paul Belloisi to this conspiracy nor linking

8  him to any co-conspirators.  They put together some theory.

9          And when Paul Belloisi said I'm not guilty, he was

10 forced to come here and have a trial against the United States

11 of America.

12         The evidence will show, and Officer Robinson will

13 tell you, when Mr. Belloisi came down out of that avionics

14 compartment, he saw Officer Robinson and was surprised, but he

15 wasn't nervous.  He was surprised but not nervous.

16         Mr. Belloisi said, Hey, what's up guys?  There was a

17 couple of them there.  Very normal question.  They weren't

18 supposed to be there.  He was asked what are you doing in the

19 avionics compartment?  And Mr. Belloisi said, I went to hit a

20 reset button for the air conditioning.  A reset button that's

21 into avionics compartment.  It's the mechanic's job to go down

22 there and hit that button.  Pilots don't do that stuff and

23 federal agents don't do that stuff.  And federal agents aren't

24 normally on that tarmac.

25         And Officer Robinson responded back to Paul

1    Belloisi:  You're a liar, in essence, you're not telling the

2    truth.

3           Paul Belloisi tried to explain more, well, how he

4    came down there?  He was on the plane and what he did and why

5    he came down there.  He wasn't listened to at all.

6           After arresting him, taking his phone, you know what

7    happened next?  You just heard about it.  In the ensuing

8    months after his arrest, they downloaded, read every text

9    message, every e-mail, looked at his phone records, his call

10   logs, who called him, who did he call, WhatsApp, regular text

11   messages.  It didn't matter how personal the photos or the

12   videos or the text messages on his phone were.  They looked at

13   it.  And you know what, they found no real evidence whatsoever

14   telling them that Paul Belloisi was involved in this

15   conspiracy.

16          What the evidence will show is the agents blew their

17   cover.  They moved in too quickly, gave up the opportunity to

18   find the culprit.  The evidence will show that they rushed in

19   when they should have waited.  And with no real evidence and

20   hundreds of thousands of dollars in drugs recovered, federal

21   agents from two different law enforcement agencies, they had

22   nothing.  So with no real suspect but now an indictment, which

23   the judge has told you has no evidentiary value, and having

24   blown their chances to find the real culprit, they reached out

25   to another law enforcement agent.  They hired a man named

1    Darryl Valinchus.  His name doesn't mean anything to you now,

2    but he's a lifelong law enforcement officer, who you'll hear

3    from, who left the Government after -- I don't know -- I think

4    30 years to work in the private sector.  And in the private

5    sector, Mr. Valinchus did exactly what he did in his law

6    enforcement, tried to help law enforcement in any way he

7    could.  He was tasked to pour through all of that database on

8    Mr.  Belloisi's phone, to take everything he could using

9    cellphone extraction, location data analysis, to the extent

10   that you consider that science or real science.  And how a man

11   with no drugs, no money, no photos, no real evidence against

12   him became the only suspect in a drug conspiracy worth

13   hundreds of thousands of dollars.  And they have already told

14   you that's the basis to find Paul Belloisi guilty beyond a

15   reasonable doubt.

16           What you'll learn is that Mr. Belloisi went on that

17   plane to take some food.  And, yes, he was not assigned to

18   that plane.  That's absolutely true.  And you'll learn it's a

19   common occurrence for lots of airline people to go on a plane

20   and take food that they leave behind that's there, nobody is

21   touching, maybe before people take it.  Yes.  That happens.

22   And you'll hear that that happens, especially mechanics, who

23   are sort of like firefighters.  They work a little bit.  But

24   then they have to -- when they're done with their assignment,

25   they have to be around the airport in case they are needed,

1   but oftentimes they go hours without being needed.

2           You will learn that that avionics compartment, that

3   houses all of the electronic and navigational equipment for

4   the plane.  That's where they are.  That's where Mr. Belloisi

5   was.

6           It's the Government's burden to prove this case and

7   we need you to listen very carefully, please.  The allegations

8   of a 30-year mechanic one day decided to transport 22 pounds

9   of cocaine on his own company's airplane, not on someone's

10  else's plane, but on his own.  But what you'll most

11  importantly remember is these are only allegations.

12          Now, I will be challenging some of the things that

13  the witnesses say on the witness stand which I'm sure will

14  come as no surprise to anybody.  It may get contentious.  I'll

15  ask questions.  Her Honor may not permit me to ask certain

16  questions.  That's how it happens.  And it gets contentious

17  because we are fighting over something that's very, very

18  important.

19          Although, it will be a quick trial, our questions to

20  the witnesses, they may become tedious and I apologize in

21  advance if you're like what's the heck is going on here?

22  Please do not hold any of that against Paul Belloisi.

23  Cross-examinations may last longer than you would hope, but

24  points need to be developed.  These witnesses are not in the

25  business of helping out the accused or his lawyer.

1          The evidence will show many of these witnesses will

2    be testifying almost exclusively from memory and you can bet

3    that we will challenge their memory.  If a witness says

4    something happened three years ago, ask yourself can their

5    memory be trusted, ask yourself do you remember what you did

6    three years ago.

7          THE COURT:  I will be instructing the jury as to how

8    to assess witness credibility at the close of the case.

9          You have two more minutes, sir.

10          MR. COHEN:  The evidence will show that when they

11    need a fact to be true, they rely on memory.  The evidence

12    will show when there are several opportunities to get

13    objective evidence, the Government agents chose not to.

14    Remember, this happened at JFK Airport.  JFK Airport regulated

15    by the Federal Government.

16          I think the most important question for you to think

17    about when listening to the evidence is is there any other

18    proof of what the witnesses are saying?  Was there other proof

19    of what the witnesses were saying?  And if there was other

20    proof, where is it and why don't you have it?

21          As you listen to the testimony, ask yourself is what

22    the witness testifying to, was it recorded on a camera, a

23    video camera, on a black box, on a phone, on a voice recording

24    in a cockpit.

25          Drugs are illegal.  You know that.  Paul Belloisi

1  knows that.  We all know that.  This case is about law

2  enforcement investigation gone awry.

3          Yes, he was on that plane.  And no, he was not

4  assigned to that plane.  Please stay with us during this

5  trial.  It will be over before you know it.  Watch the

6  witnesses on the witness stand.

7          You must listen to the evidence and ask yourself

8  what does it really tell you?  And when there is not evidence

9  when you expected there to be, ask yourself why?  Why?

10          We are here in the federal courthouse in Brooklyn,

11  New York.  You are all New Yorkers.  I know you won't let the

12  titles and the badges stand in the way of commonsense and

13  analytical reason.

14          Paul Belloisi has said he is not guilty.  That's all

15  he has to say.  That's all you will hear him say.

16          Thank you.

17          (Continued on next page.)

18

19

20

21

22

23

24

25

1    (Continuing.)

2         THE COURT:  Ladies and gentlemen, I just want to

3    remind you that the opening statements of counsel are not

4    evidence.  The evidence is about to be presented to you, as I

5    said, by way of witnesses, physical evidence, documents and

6    any stipulations that the parties may have agreed to.

7         I also want to advise you that the fact that this

8    prosecution is brought in the name of the United States

9    Government does not entitle the United States any greater

10   consideration than the defendant.  By the same token, the

11   United States is entitled to no less consideration.  All

12   parties, the United States and the defendant, are equal before

13   this Court and are entitled to equal consideration.  Neither

14   the Government nor the defendant are entitled to any sympathy

15   or favor.  In fact, sympathy is not to enter your judgment in

16   any way, as I will be instructing you at the close of this

17   case.

18        The Government may call its first witness.

19        MS. SCHIERBERL:  Thank you, Judge.  The Government

20   calls Customs and Border Protection Officer Michael Robinson

21   to the stand.

22        Judge, I would just ask, as the agent goes to

23   collect our witness, I have before me what's been previously

24   marked as Government Exhibit S-2.  This is a stipulation

25   between the parties.  And I would ask the Court's permission

1    to publish the stipulation and read it onto the record.

2              THE COURT:  Yes.

3              The officer can come up this way.

4              (Witness takes the stand.)

5              THE COURTROOM DEPUTY:  Do you swear or affirm that

6    your testimony will be the truth, the whole truth and nothing

7    but the truth?

8              THE WITNESS:  Yes.

9              THE COURTROOM DEPUTY:  Please state and spell your

10   name.

11             THE WITNESS:  Michael Robinson, R-O-B-I-N-S-O-N.

12             THE COURTROOM DEPUTY:  Thank you.

13             THE COURT:  And if you feel comfortable, sir, you

14   can remove your mask while you testify.

15             You may proceed, Ms. Schierberl.

16             MS. SCHIERBERL:  Thank you, Judge.

17             "It is hereby stipulated and agreed by and between

18   the undersigned parties that, first, the documents marked as

19   Government Exhibits 401 through 405 are satellite images dated

20   April 27, 2020 taken from the Google Earth software

21   application, which fairly and accurately show portions of John

22   F. Kennedy International Airport at different scales or levels

23   of zoom, as reflected by the distance markings on each which

24   are accurate approximations of actual distances.  The

25   documents marked as Government Exhibits 401 through 405 may be

1  received in evidence as Government exhibits at trial.  This

2  stipulation marked as Government Exhibit S-2 may be received

3  in evidence as a Government exhibit at trial.  This

4  stipulation is agreed and consented to by counsel for the

5  defendant and the United States."

6         THE COURT:  Did you say 402 or 403 to 405?

7         MS. SCHIERBERL:  Your Honor, 401 through 405.

8         THE COURT:  Thank you.

9         MS. SCHIERBERL:  And I would ask, based on that

10 stipulation, that Government Exhibits 401 and 405 be admitted

11 into evidence.

12        THE COURT:  You've heard the use of the term

13 "stipulation," and now you've also heard that evidence in this

14 case includes facts to which the parties have agreed or

15 stipulated.  A stipulation means simply that the Government

16 and the defendant accepts the truth of a particular

17 proposition or fact.  As there is no disagreement, there is no

18 need for evidence apart from the stipulation.  You must accept

19 the stipulation as evidence and regard that fact and give it

20 whatever weight you choose.  And the items are admitted in

21 evidence as there's no objection.

22        (Government Exhibits 401-405 received in evidence.)

23        MS. SCHIERBERL:  Thank you, Judge.  May I proceed?

24        THE COURT:  Yes.  (Continued on the next page.)

25

1    **MICHAEL ROBINSON**,

2                    called by the Government, having been

3                    first duly sworn, was examined and testified

4                    as follows:

5    DIRECT EXAMINATION

6    BY MS. SCHIERBERL:

7    Q    Good morning, Officer Robinson.

8    A    Good morning.

9    Q    Who do you work for?

10   A    Customs and Border Protection.

11   Q    Where do you work?

12   A    John F. Kennedy Airport.

13   Q    Is that located in Queens, New York?

14   A    Yes.

15   Q    What is your title?

16   A    CBP officer.

17   Q    How long have you been a CBP officer?

18   A    Seventeen years.

19   Q    Are you assigned to any particular team?

20   A    I'm on the aircraft search team, which is a subteam of

21   the antiterrorism contraband enforcement team.

22   Q    How long have you worked on the aircraft search team?

23   A    Since October of 2014.

24   Q    What, if any, training have you received to perform your

25   duties on the aircraft search team?

1  A     Well, my job on the aircraft search team is to search for

2  illegal contraband and, in particular, narcotics.  I've been

3  trained to detect the trends that the drug traffickers use and

4  the methods they employ to bring drugs into the United States.

5  Q     Do you hold any relevant licenses?

6  A     Yes.

7  Q     What licenses do you hold?

8  A     I'm licensed by the FAA to work on aircraft.  I have

9  what's called the airframe and power plant licenses.

10  Q     What do these licenses mean?

11  A     They allow me to work on an aircraft and sign out the

12  logbook.  I've worked in the aviation industry for 20 years.

13  I started building aircraft for Grumann Aerospace, and also

14  helicopters.  I've worked for Pan American Airlines and Trans

15  World Airlines repairing aircraft.  I also joined the Navy

16  Reserves as a licensed mechanic in 2003 at the age of 37 to

17  teach full-time sailors and Navy reservists how to inspect,

18  service and maintain aircraft.

19  Q     How long have you held these licenses?

20  A     Since 1995.

21  Q     Tell us about your job responsibilities on the aircraft

22  search team.

23  A     Our job is to target particular flights coming in from

24  drug source countries or drug transit countries and look for

25  drugs.

1    Q    What is a source country?

2    A    A source country would be like Columbia or Mexico where

3    they actually manufacture the drugs.  And a transit country

4    would be one of the countries that they would use to transit

5    through.  It could be Jamaica or Dominican Republic, Aruba,

6    any of the Caribbean islands.

7    Q    Where are the drugs transited to, in your experience?

8    A    To John F. Kennedy Airport.

9    Q    Are you familiar with the term "turnaround flight"?

10   A    Yes.

11   Q    What does that mean?

12   A    When a flight comes in and lands, they'll block the

13   aircraft, which means they'll put the chocks behind the tires.

14   They'll offload the passengers, get a clean crew on board,

15   switch the flight crew, and then start loading passengers up.

16   Q    Are you familiar with the term "overnight"?

17   A    Yes.  That's when a plane comes in after they offload all

18   the passengers.  It's not going to go out right away.  It will

19   probably go into what's called the hard stand or to the hangar

20   for maintenance.

21   Q    In your role on the aircraft search team, tell us how an

22   airplane is searched for contraband like narcotics?

23   A    Well, we try to get this to the mindset of a drug dealer

24   or a smuggler.  We look for areas that are easy to get to, in

25   and out quick, depending -- if it's a turnaround flight, they

1  don't have much time to work with.  So they're going to need a

2  place that's easy to get into, take it out quick and get it

3  off the airplane.

4  Q    I'd like to turn your attention to February 4, 2020.

5  Were you working as a CBP officer on the aircraft search team

6  at John F. Kennedy Airport that day?

7  A    Yes.

8  Q    What was your assignment?

9  A    My assignment was to search aircraft looking for drugs.

10  Q    What shift were you working that day?

11  A    I was working 12 to 8.

12  Q    And with whom, if anyone, were you working?

13          THE COURT:  I am sorry, 12 in the afternoon?

14          THE WITNESS:  Yes.

15  A    My partner was Officer Morelli.

16  BY MS. SCHIERBERL:

17  Q    Did there come a time that day that you investigated

18  American Airlines Flight 1349?

19  A    Yes.

20  Q    To your knowledge, how was American Airlines Flight 1349

21  selected for investigation?

22  A    It was a random check.  We chose that flight because of

23  the time we were working, and it looked like a good flight.

24  So we randomly selected it and went to that area.

25  Q    Do you know the originating location of that flight?

1  A    Montego Bay, Jamaica.

2  Q    And is Jamaica a transit country?

3  A    Yes.

4  Q    Did that play a role in any way in your decision to

5  search Flight 1349?

6  A    Yes.

7  Q    At approximately what time was Flight 1349 selected for

8  investigation?

9  A    Well, we got there around 3:30 in the afternoon and the

10 plane had already blocked.

11 Q    Where was the plane when you first approached it?

12 A    It was at Gate 7 at American Airlines terminal.

13 Q    How long had the plane been at the gate by the time you

14 arrived?

15 A    It wasn't there long because the ground crew was just

16 starting to get the belt loaders to the cargo hold so they can

17 start offloading the luggage.

18      MS. SCHIERBERL:  Your Honor, permission to publish

19 to the jury what has been admitted into evidence as Government

20 Exhibit 404.

21      THE COURT:  Yes, you may.

22      (Exhibit published.)

23 BY MS. SCHIERBERL:

24 Q    Officer Robinson, looking at Government Exhibit 404, can

25 you tell us what we are seeing in this image?

1    A     That's an aerial view of American Airlines terminal,

2    Gates 7, 5 and 3.

3    Q     And if you are able, on your monitor, can you indicate

4    with an X on your screen the location of Gate 7?

5    A     I'm going to show you Gate 7.  This is where the plane

6    would block and the passengers get off at that gate.  They get

7    off there to go into the building itself.

8    Q     Is Gate 7 also labeled with a number 7 on the tarmac?

9    A     Yes.

10   Q     Can you indicate for us where that 7 is located?

11          THE COURT:  So -- but indicating the first mark was

12   made in the top right quadrant, if you will, of the photograph

13   and the second marking is a little bit below and to the right

14   of that.

15          MS. SCHIERBERL:  Thank you, Judge.

16   BY MS. SCHIERBERL:

17   Q     Officer Robinson, looking at Government Exhibit 404, do

18   you see a yellow line --

19   A     Yes.

20   Q     -- through the Number 7?

21   A     Yes.

22   Q     How is the plane positioned at Gate 7 relative to that

23   yellow line on the tarmac?

24   A     The pilot will follow that yellow line all the way up to

25   where the gate is to offload the passengers.  So the spine of

1  the aircraft goes along that line where the Gate 7 number is

2  indicated.

3  Q    Focusing back on February 4, 2020, what did you first do

4  upon arriving at the plane?

5  A    My partner got out of the vehicle.  He went over to the

6  belt loader to monitor the offloading of bags.  And since he

7  was doing that, I started to check the outer panels and the

8  wheel wells and systematically worked my way forward to the

9  avionics compartment.

10  Q    Officer Robinson, what is an avionics compartment?

11  A    The avionics compartment houses the electronic equipment

12  that's used for things such as navigation, communication,

13  autopilot and collision avoidance system.  The navigation

14  guides the pilots and gets them to where they are going.

15  Without it, they would get lost.  The communication allows

16  them to maintain contact with air traffic control, and they

17  need that information so that they can land the plane safely.

18        The collision avoidance system prevents a mid-air

19  collision or prevents the plane from crashing into something

20  to the ground below, such as a mountain.  And the auto pilot

21  is pretty self-explanatory.  The big job of the pilot is

22  takeoff and landing, and everything else in between is handled

23  by the autopilot.  And the autopilot is linked in with

24  communication and collision avoidance systems.  It's not a

25  complete list of everything that's in the avionics

1  compartment.  But what I have mentioned shows you how

2  important that this area is for the safe operation of the

3  aircraft.

4  Q    On the specific plane, Flight 1349, where was the

5  avionics compartment located?

6  A    The avionics compartment is underneath the flight deck

7  where the pilots sit.  It's just behind the nose landing gear.

8  It's on the underside of the aircraft, on the belly.

9  Q    How does one access the avionics compartment?

10  A    There's like a T-handle to open it, but you have to press

11  a button to release the T-handle so it drops down.  Then you

12  turn this counterclockwise to unlock it.  Then you push the

13  door upwards, and then it slides on rails to be stowed

14  underneath another piece of equipment inside of there.

15  Q    Approximately how large is the avionics compartment?

16  A    It's hard to estimate.  Maybe ten feet wide.  It's not

17  that tall because you can't stand up in there.  You have to be

18  kneeling.  It's a tight area, although it opens up on the

19  sides on the outer edge of the compartment to go upwards.

20  Q    Approximately how far above the ground is the entrance to

21  the avionics compartment?

22  A    It depends if the plane is loaded with passengers and

23  luggage or empty.  If it's completely loaded, it comes up to

24  about three feet eight inches, like the lower edge of my

25  chest.  And when it's completely empty, it's the upper edge of

1  my chest, maybe four feet two inches off the ground.

2  Q    With your feet on the ground, can you reach into the

3  compartment to access the electronics that are stored within

4  the avionics compartment?

5  A    Some of them, yes.

6  Q    Is there an insulation blanket within the avionics

7  compartment?

8  A    Yes.

9  Q    What is the insulation blanket?

10  A    The insulation blanket keeps the heat inside the

11  aircraft.  The plane is flying at 400 miles per hour at 35,000

12  feet.  So you're looking at temperatures as low as 60 degrees

13  below zero.  So the insulation blanket is used to prevent

14  what's called thermal transfer where the heat inside the cabin

15  goes through the walls of the aircraft and be dissipated into

16  the atmosphere.  The insulation blanket also serves as a sound

17  barrier.  Traveling at that high speed, in combination with

18  the vibration of the engines creates a lot of noise.  So the

19  insulation blanket acts as a sound barrier to make it a quiet

20  ride inside the cabin.

21  Q    Are there any electronics stored behind the insulation

22  blanket?

23  A    No.

24  Q    Did there come a time when you discovered narcotics on

25  Flight 1349 that day?

1  A     Yes.

2  Q     Did you personally find drugs in the avionics compartment

3  of that aircraft?

4  A     Yes.

5  Q     Tell us about what you found.

6  A     When I got to the left side of the fuselage inside of

7  there, I lifted up the insulation blanket and I found ten

8  brick-shaped objects which, from my experience, I knew to be

9  narcotics.

10  Q     What does fuselage mean?

11  A     It's like the outer body of the aircraft.

12  Q     How were the drugs packaged?

13  A     They were packaged like bricks.

14  Q     How were the bricks placed relative to the body of the

15  aircraft?

16  A     They were laying in between the ribs of the aircraft

17  side-by-side.  Some of them were stacked on top of each other

18  leaning up against the fuselage.

19  Q     After you found the drugs, were they photographed?

20  A     Yes.

21  Q     By whom?

22  A     My partner.

23         MS. SCHIERBERL:  Your Honor, I would ask permission

24  to show only to defense counsel, the Court and the witness at

25  this time, what's been previously marked for identification

1    purposes only as Government Exhibits 201, 201A, 202, and 202A.

2          THE COURT:  Yes, they may be shown only to the

3    witness and the parties.

4       (Exhibit published to witness, counsel and Court only.)

5    BY MS. SCHIERBERL:

6    Q    Officer Robinson, looking at these one at a time.

7          THE COURT:  I am sorry.  These are for

8    identification?

9          MS. SCHIERBERL:  Thank you, Judge.

10   BY MS. SCHIERBERL:

11   Q    Officer Robinson, do you recognize these photographs?

12   A    Yes.

13   Q    What do they depict?

14         THE COURT:  The question is:  What is this?  Start

15   with that.

16   BY MS. SCHIERBERL:

17   Q    What is depicted in these photographs?

18   A    This is showing the insulation blanket concealing where

19   the bricks were hidden inside the avionics compartment on the

20   left-hand side of the aircraft.

21   Q    Do these photographs also depict the metadata when these

22   pictures were taken?

23   A    Yes.

24   Q    Were you with Officer Morelli when he took Government

25   Exhibits 201 and 202?

1  A     Yes.

2  Q     Did you personally observe the metadata associated with

3  Government Exhibits 201 and 202?

4  A     Yes.

5  Q     Are Government Exhibits 201 and 202 fair and accurate

6  copies of the photographs that Officer Morelli took of the

7  drugs as you observed them on February 4, 2020?

8  A     Well, looking at the pictures here, I saw 201 and 201A.

9  I haven't seen -- okay.  202, yes.  202 shows the insulation

10 blanket removed and exposing the bricks of narcotics that are

11 in there.  And 202A shows the metadata on that.

12 Q     Are Government Exhibits 201 and 202 fair and accurate

13 copies of the photographs taken of the drugs as you observed

14 them on February 4, 2020?

15 A     Yes.

16 Q     And are Government Exhibits 201A and 202A fair and

17 accurate copies of the same photographs with their associated

18 metadata?

19 A     Yes.

20        MS. SCHIERBERL:  Your Honor, at this time, the

21 Government offers Government Exhibits 201, 201A, 202 and 202A

22 in evidence.

23        THE COURT:  Any objection?

24        MR. COHEN:  No.

25        THE COURT:  They are admitted.

1           (Government Exhibits 201, 201A, 202, 202A received

2    in evidence.)

3           MS. SCHIERBERL:  Your Honor, permission to publish

4    Government Exhibit 201 to the jury.

5           THE COURT:  Yes.

6           (Exhibit published.)

7    BY MS. SCHIERBERL:

8    Q    Officer Robinson, looking first at Government Exhibit

9    201.  What is this?

10   A    This is showing the left-hand side wall inside the

11   avionics compartments, and that's the insulation blanket that

12   was used to conceal the bricks.

13   Q    Was this photograph taken at or about the time you first

14   discovered the drugs on that day?

15   A    Yes.

16          MS. SCHIERBERL:  Your Honor, permission to publish

17   Government Exhibit 201A to the jury.

18          THE COURT:  Yes.

19          (Exhibit published.)

20   BY MS. SCHIERBERL:

21   Q    Looking at Government Exhibit 201A.  What is the date and

22   time reflected on this image?

23   A    February 4, 2020 at 3:54 p.m.

24          MS. SCHIERBERL:  Your Honor, permission to publish

25   Government Exhibit 202 to the jury.

1          THE COURT:  Yes.

2          (Exhibit published.)

3   BY MS. SCHIERBERL:

4   Q    Officer Robinson, looking at Government Exhibit 202, what

5   do we see in this image?

6   A    This is where insulation blanket is removed and you can

7   see the ten bricks -- or most of the bricks that are inside

8   there.  Those are the narcotics.

9   Q    Do we see any electronics in this image?

10  A    No.

11         MS. SCHIERBERL:  Your Honor, permission to publish

12  Government Exhibit 202A to the jury.

13         THE COURT:  Yes.

14         (Exhibit published.)

15  BY MS. SCHIERBERL:

16  Q    And Officer Robinson, looking at Government Exhibit 202A,

17  what is the date and time of this photograph?

18  A    February 4, 2020, 3:55 p.m.

19  Q    In addition to the photographs, did you video record the

20  drugs you found in any way?

21  A    Yes.

22  Q    Prior to video recording the drugs, what, if anything,

23  did you do?

24  A    My partner and I went back to our truck to strategize on

25  the best way to remove the real bricks and replace them with

1    the fake bricks that we call shams.  We also -- we had moved

2    the truck from behind the aircraft closer to forward of the

3    wings to be closer to the area to make it easier and easier to

4    do what we had to do.

5            When I got to the flatbed on the truck, I looked for

6    shams to replace the real bricks.  And I noticed that I didn't

7    have as many shams as there were real bricks.  I only had

8    three shams and there were ten breaks.  And also, the shams

9    were not the same color as the real bricks.  The real bricks

10   were dark blue in color and the shams we had were tan in

11   color.

12   Q    What, if anything, did you do to change the appearance of

13   the sham bricks?

14   A    We have different colors of duct tape.  And

15   unfortunately, we didn't have blue duct tape, so I grabbed the

16   closest thing to it, which was a dark green.

17   Q    Walk us through what your plan entailed.

18   A    Well, what we did was I took the shams from the bed of

19   the truck and put it into a duffle bag along with the duct

20   tape and a can of clue spray.  I brought that into the cabin

21   with me and my partner.  My partner was on the phone notifying

22   our supervisors what we had, and I started to wrap the shams

23   with the green duct tape.

24   Q    Why did you change the appearance of the shams?

25   A    So that -- I mean, because we expect that whoever is

1  coming to pick up the bricks knows what he's supposed to pick

2  up, how many there are, what color they are.  So I wanted to

3  get it as close as possible to the real thing.

4  Q    What, if anything, did you observe while you were duct

5  taping the sham cocaine?

6  A    I noticed an American Airlines van driving past me very

7  slowly.  Even though the speed limit around an aircraft is 10

8  miles per hour, he was driving slower than that, which caught

9  my attention.  I didn't get to see what the driver looked

10 like, but I observed him go from passing us to park forward of

11 the aircraft, in front of the nose.

12        He didn't get out of the vehicle.  This still caught

13 my attention, so I relayed the information, the vehicle

14 identification number, it's an alphanumeric number.  I relayed

15 to my acting supervisor a description of the van, its color

16 and the alphanumeric vehicle identification number.  Then the

17 van drove away, and I went back to wrapping bricks or the

18 shams with the green duct tape.

19 Q    How did you recognize that van to be an American Airlines

20 van?

21 A    It's typical of the vans that we see that the American

22 Airlines maintenance personnel drive in that area.

23 Q    Why did you report that information to your supervisor?

24 A    Because the speed at which he drove by, it appeared to me

25 that this person may have been monitoring us, what we were

1  doing.  The fact that he didn't get out of the vehicle when he

2  stopped in front of the aircraft, it could have been nothing,

3  but I figured it would be better to just relay that

4  information just in case.

5  Q    Did you see where the van went to?

6  A    No.  Once he started leaving, I went back to doing what I

7  was doing.

8  Q    Other than taping the fake bricks, did you modify them in

9  any other way?

10 A    We sprayed a clear spray on it.  We call it clue spray.

11 It's invisible to the naked eye and it's a last resort of

12 letting us know if somebody was in the area where the bricks

13 were hidden.  If the person does not set off the transponder

14 that has an alarm inside of it and if we don't see them inside

15 there, the only way we would know they were in the area is if

16 they got the clue spray on their hands.  Once they have the

17 clue spray on their hands, what you do is you shine a black

18 light on it and their hands will glow green.

19 Q    Other than the bricks, what else, if anything, did you

20 spray with clue spray?

21 A    The bricks with the transponder inside and also the

22 insulation blanket.

23 Q    Why?

24 A    Well, just in case he didn't pick up the insulation

25 blanket, then the only way that I would -- if he didn't pick

1  up the transponder to set off the alarm, then the only way

2  that I would know that he was in that area was if he touched

3  the insulation blanket.

4  Q    And just tell us how clue play works.

5  A    It's a clear spray.  Once you touch it, it transfers onto

6  the hands.  You would then shine a black light on it and the

7  hands will glow green.

8  Q    After preparing your fake cocaine, you mentioned that you

9  video recorded the bricks as you originally found them?

10 A    Yes.

11        MS. SCHIERBERL:  Your Honor, permission just to show

12 defense counsel and the witness what has been marked for

13 identification purposes only as Government Exhibit 301.

14        THE COURT:  Yes.  It may be shown.

15        MS. SCHIERBERL:  Your Honor, I also have a disk that

16 Officer Robinson has previously viewed and signed.  May I

17 approach the witness to show him this disk?  It contains

18 Government Exhibit 301.

19        THE COURT:  You may show him that without all the

20 preamble next time.

21        MS. SCHIERBERL:  Thank you, Judge.

22        THE COURT:  Is there a number for the disk?

23        MS. SCHIERBERL:  Judge, this itself does not have a

24 number, but it's labeled as Government Exhibit 301.

25        THE COURT:  Okay.

1              (Exhibit published to witness only.)

2    BY MS. SCHIERBERL:

3    Q    Officer Robinson, what is this?

4    A    This is the that has the video on it of us exposing the

5    bricks, removing the insulation blanket.

6    Q    Have you previously reviewed the contents of this disk?

7    A    Yes.

8    Q    Is that your signature on the disk?

9    A    Yes.

10   Q    Is Government Exhibit 301 a fair and accurate copy of the

11   video that Officer Morelli took of the drugs as you found them

12   on that day?

13   A    Yes.

14         MS. SCHIERBERL:  Your Honor, the Government offers

15   Government Exhibit 1 [sic] in evidence.

16         THE COURT:  Any objection?

17         MR. COHEN:  No, Your Honor -- 301.

18         MS. SCHIERBERL:  301.  I beg your pardon.

19         THE COURT:  301 is the disk that he's holding in his

20   hand.

21         MR. COHEN:  No objection.

22         THE COURT:  It's admitted.

23         (Government Exhibit 301 received in evidence.)

24         MS. SCHIERBERL:  Permission to publish Government

25   Exhibit 301 to the jury.

1      THE COURT:  Yes.

2      MS. SCHIERBERL:  Ms. Cronin, can we please play

3  Government Exhibit 301 from zero to nine seconds.

4      Ms. Carosella, if it's possible, could we dim the

5  lights in the courtroom.

6      THE COURT:  If someone has any problem seeing the

7  images on the monitor, just raise your hand.

8      You may proceed when you are ready.

9      MS. SCHIERBERL:  Can we please play Government

10  Exhibit 301 from zero to nine seconds.

11      (Video played; video paused.)

12  BY MS. SCHIERBERL:

13  Q    Officer Robinson, what are we seeing in this clip?

14  A    We are seeing the bricks of cocaine that are -- that were

15  hidden underneath the blanket.  And if you notice on the very

16  -- on the right side of the screen, there's one brick that it

17  doesn't have any kind of means of keeping it in place.

18  There's no tape on it whatsoever.  All of this is what we

19  would call FOD.

20  Q    And can you please spell FOD.

21  A    FOD.

22  Q    What is FOD?

23  A    It's an acronym, foreign object debris or foreign object

24  damage.  Sometimes I've seen it referred to foreign object

25  debris and damage, FODD.

1   Q    Why is that significant to you?

2   A    Because FOD is an item or an object that's in an

3   inappropriate area that could possibly cause damage.  And

4   inside this avionics compartment, if this plane would hit some

5   serious turbulence, those bricks could go bouncing around and

6   damage some of the sensitive electronic equipment, and that

7   could cause an emergency situation.

8            MS. SCHIERBERL:  Ms. Cronin, can we play Government

9   Exhibit 301 from nine seconds to the end of the video.

10           (Video played; video paused.)

11  BY MS. SCHIERBERL:

12  Q    What are we seeing in this clip?

13  A    That's the area where the narcotics were hidden first

14  with the insulation blanket concealing it, and then me

15  removing the insulation blanket.  And the reason why we

16  photograph these things and videotape them is because we share

17  it with officers throughout the nation.  Because where you

18  find drugs on an aircraft, especially a significant load like

19  that, you find it in one city, you're going to find it in

20  another city.

21           MS. SCHIERBERL:  Your Honor, permission to show

22  defense counsel and the witness what's been previously marked

23  for identification purposes only as Government Exhibit 301A.

24           THE COURT:  Yes, it may be shown.

25           (Exhibit published to witness, counsel and Court only.)

1  BY MS. SCHIERBERL:

2  Q    Officer Robinson, what is this?

3  A    This those the metadata from the video that was taken.

4  Q    Did you personally observe the metadata associated with

5  Government Exhibit 301 reflected in this exhibit?

6  A    Yes.

7  Q    Is this a fair and accurate copy of the image of the

8  metadata associated with Government Exhibit 301 as filmed on

9  February 4, 2020?

10 A    Yes.

11        MS. SCHIERBERL:  Your Honor, the Government offers

12 Government Exhibit 301A in evidence.

13        THE COURT:  Any objection?

14        MR. COHEN:  No.

15        THE COURT:  It is admitted.

16        (Government Exhibit 301A received in evidence.)

17        MS. SCHIERBERL:  Permission to publish 301A to the

18 jury.

19        THE COURT:  Yes.

20        (Exhibit published.)

21 BY MS. SCHIERBERL:

22 Q    Officer Robinson, what is this?

23 A    It's a clip from the video that we just watched that has

24 the metadata on it.

25 Q    What is the date and time of the video that -- of the

1  drugs that was taken on that day?

2  A    February 4, 2020 at 4:12 p.m.

3         MS. SCHIERBERL:  Your Honor, permission to approach

4  defense counsel and then the witness with what has been

5  previously marked for identification as Government Exhibit 2.

6         THE COURT:  Yes.

7         (Counsel approaches.)

8  BY MS. SCHIERBERL:

9  Q    Officer Robinson, I've just handed you what's been marked

10 for identification as Government Exhibit 2.  What is this?

11 A    This is a sham.

12 Q    How do you recognize it?

13 A    Well, this is what was in my truck.  This is one of the

14 actual bricks that we used that day to swap out with the real

15 ones.

16 Q    Does this exhibit appear to be in the same or

17 substantially the same condition as it was on February 4,

18 2020?

19 A    Yes.

20        MS. SCHIERBERL:  Your Honor, the Government offers

21 Government Exhibit 2 in evidence.

22        THE COURT:  Any objection?

23        MR. COHEN:  No, no.

24        THE COURT:  It is admitted.

25        (Government Exhibit 2 received in evidence.)

1          MS. SCHIERBERL:  Permission to publish the same to

2    the jury.

3          THE COURT:  Yes.

4          (Exhibit published.)

5    BY MS. SCHIERBERL:

6    Q    Officer Robinson, you can remove Government Exhibit 2

7    from the evidence bag.  Can you please explain to the jury

8    what that is.

9    A    This is a sham.  We try to make it look as close as

10   possible to the real bricks themselves.  They're usually

11   packaged like this.  They're not always this size, this

12   dimension, but they usually are.  This is probably a kilo's

13   worth of whatever drug that's in there.

14   Q    How is Government Exhibit 2, this fake brick of cocaine,

15   used on February 4, 2020?

16   A    It was used to substitute for the real ones that were in

17   there.

18          MS. SCHIERBERL:  Your Honor, I would ask to

19   republish what's in evidence as Government Exhibit 202 to the

20   jury.

21          THE COURT:  Yes.

22          (Exhibit published.)

23   BY MS. SCHIERBERL:

24   Q    Looking back at Government Exhibit 202, relative to that

25   first loose brick on the right of the screen, where did you

1  place the sham cocaine that you had that night?

2  A    Closer to the left side.  All the way on the left-hand

3  side, the opposite end.

4  Q    Even duct taped, did your fake cocaine look like the real

5  cocaine as you found it that day?

6  A    As close as possible.

7  Q    Has this brick been used since February 4, 2020?

8  A    Not to my knowledge.

9  Q    You mentioned that you sprayed the sham cocaine that

10  night with clue splay?

11  A    Yes.

12  Q    Have you attempted to determine whether or not this brick

13  still displays remnants of that clue spray?

14  A    Yes.

15  Q    And did it?

16  A    Yes.

17  Q    You also mentioned a transponder.  What is a transponder?

18  A    A transponder is a small radio that makes a signal.  And

19  there's only two kinds of signals that it will emit, depending

20  on which position the switch is in.  The switch is a button

21  type of switch.  When it's depressed inwards, it will only

22  emit one beep every 30 seconds.  When the switch is released,

23  it will emit an alarm of a continuous series of beeps.

24  Q    And what, if anything, does the release of the switch

25  communicate to you?

1    A    It tells us that this person picked up the brick.  The

2    reason why the button is pushed in and out is because we lay

3    that switch underneath the sham, and the weight of it will

4    keep the button pressed in so that it will only emit one beep

5    every 30 seconds.  When you pick up the sham or the brick, it

6    will release the switch and it will go into the alarm mode and

7    emit a series of continuous beeps.

8    Q    How are those beeps communicated to you?

9    A    Through my radio.  I have a special channel that my radio

10   receives the signal.

11   Q    I'm so sorry.  Officer Robinson, would you please repeat

12   your answer for me.

13   A    My radio is programmed to receive the signals from the

14   transponder.

15   Q    Officer Robinson, are you familiar with the term

16   confidence tone?

17   A    Yes.

18   Q    What is a confidence tone?

19   A    That is when we lay the brick on top of the switch.  It

20   will depress the switch inwards so it will only emit one peep

21   every 30 seconds.  By that peep, it gives us confidence that

22   the unit is working.  And when we set up in our position for

23   surveillance, it lets us know if we are within range of the

24   transponder.

25   Q    When you set up the transponders on February 4, 2020, did

1  you encounter any issues?

2  A    Yes.

3  Q    What were those issues?

4  A    The switch was damaged.  It wouldn't release to the open

5  position, so it would only emit the confidence tone.  It

6  wouldn't beep every 30 seconds, so we had to switch the -- we

7  had to change the switch.

8  Q    Were you able to resolve that issue?

9  A    Yes.

10 Q    After you resolved that issue, was the transponder able

11 to send the confidence tone in its position as you placed it

12 in the plane?

13 A    Yes.

14      MS. SCHIERBERL:  Your Honor, permission to approach

15 defense counsel and the witness with what has been previously

16 marked for identification as Government Exhibit 6.

17      THE COURT:  Yes.  And that's for identification.

18      (Exhibit published to witness, counsel and Court

19 only.)

20 BY MS. SCHIERBERL:

21 Q    Officer Robinson, do you recognize Government Exhibit 6?

22 A    Yes.

23 Q    What is it?

24 A    This is the case that contained the transponder and the

25 transponder is inside of it.  We always have this in our

1    truck.

2    Q    Has this exhibit been used since February 4, 2020?

3    A    Yes.

4    Q    How is it different, if at all, from when it was used on

5    February 4, 2020?

6    A    The green duct tape is no longer on it.

7    Q    Other than the new duct tape, is this in the same or

8    substantially the same condition as it was when used on

9    February 4, 2020?

10         MS. SCHIERBERL:  Your Honor, the Government offers

11   Government Exhibit 6 in evidence.

12         THE COURT:  Any objection?

13         MR. COHEN:  No.

14         THE COURT:  It is admitted.

15         (Government Exhibit 6 received in evidence.)

16         MS. SCHIERBERL:  Your Honor, I would ask permission

17   to be able to step down from the witness stand to set up

18   Government Exhibit 6 for the jury, from probably counsel

19   table, if possible.

20         THE COURT:  Yes.

21   BY MS. SCHIERBERL:

22   Q    Officer Robinson, you can step down off the witness stand

23   and approach the Government's counsel table.

24

25         (Continued on the following page.)

1   DIRECT EXAMINATION

2   BY MS. SCHIERBERL: (Continuing)

3   Q    Officer Robinson, before you begin, I would just ask can

4   you please set up the transponder as you did on February 4,

5   2020 for the jury to observe?

6   A    Yes.

7   Q    And narrate as you do so.

8   A    Yes.  I'm going to turn this table towards you so you can

9   see what I'm actually doing.

10          This is the transponder.  That's actually the sham

11  where  the transponder is hidden inside.

12          That little black radio inside there, that's the

13  transponder itself.

14          This here is the wire.  At the end of this wire is

15  the switch.

16          I don't know if you can see it from where you are.

17  There's a little white button inside there.  That actually is

18  depressed inwards.  And when depressed inwards, it will only

19  emit the confidence tone:  One beep every 30 seconds.

20          In it's normal relaxed position, when the button is

21  out, that's when it emits the alarm of continuous series of

22  beeps.

23          So it's operated by four double A batteries, which I

24  have in my hand.  I'm going to set it up.  It's actually

25  easier for me to set it up when I'm in front of it.  So I'm

1  going to block your view temporarily as I put the batteries

2  in.  After I have the batteries in place, I'll let you see

3  what it looks like.

4          And I'm also going to turn my radio on, and I'm keep

5  it in its lowest setting volume-wise.  This will help me to

6  set the gear up.

7          I will make sure it is on the correct channel.  It

8  is on the correct channel.

9          THE COURT:  Counsel, I would appreciate it if you

10 stayed on the side, please.

11         MR. COHEN:  I just couldn't see what he was doing.

12         THE COURT:  I understand.  You can stand on the side

13 please.

14 A    As soon as I put this last battery in, its going to start

15 transmitting.

16         Can you hear that?  It's on its lowest setting.

17         As you can see, the batteries are in place.

18         I will close the lid.

19         Now I have to set up the switch itself.  So I'm

20 going to, once more, block your view temporarily so I can set

21 it up in place.  Then I'm going to close this lid on top of

22 it.  When I close the lid, I have to make sure that I don't

23 pull it too taut.  If I pull it too taut, it'll depress the

24 button and it won't send the alarm signal.

25         So this is part of the process when we actually set

1   it up.

2          The radio being on let us know whether or not it's

3   working, whether we have it set up in such a way that it will

4   stop transmitting the alarm signal.

5          Now it's....

6          Okay.  Now, this is the position that we put the

7   transponder in place.  It was laying in between the ribs

8   inside the avionics compartment.

9          Now it's going off.  Okay.

10  Q    Officer Robinson, does this, in part, indicate to you how

11  precise you have to be when you set up this transponder?

12  A    Yes.

13  Q    Walk us through what just happened?

14  A    Okay.  I was having issues with it.  The bunch of wires

15  that --

16          THE COURT:  You can turn the microphone towards you,

17  so you can-

18  A    I was having issues with the wire that's -- all the wire,

19  the long length of it, I have to bunch it up just right to get

20  the switch laying on to top of it and then close the lid down,

21  this flap to get it to set right.

22  Q    And is that part of your normal process when you use this

23  transponder in real life?

24  A    Yes.

25  Q    And was that part of your process when you used this

1    transponder on February 4, 2020?

2    A    Yes.

3    Q    So talk us through the difference between the confidence

4    tone and the alarm that we were just hearing?

5    A    Well, the confidence tone will only go off once every 30

6    seconds.  It lets us know that the transponder is working.

7            Once you lift up the transponder, it will start

8    setting off its continuous series of beeps.

9    Q    And was that alarm that we just heard -- Well, I'll start

10   here.

11           That beep we just heard, was that an indication of

12   the confidence tone?

13   A    Yes.

14   Q    And tell us what the confidence tone means to you right

15   now.

16   A    It lets us know that the radio is still working, the

17   transponder is working.  And it also lets us know, when we get

18   into our position of surveillance, that we're still within

19   range of the transponder.

20   Q    And that alarm that we just heard, what does that

21   indicate to you?

22   A    That it's working.

23   Q    And what does it indicate when the alarm goes off?

24   A    That somebody picked up the brick.

25   Q    Thank you, Officer Robinson, you can unset up Government

1    Exhibit 6 and return to the witness stand.

2            Now, Officer, Robinson, for this demonstration, I

3    noticed you were standing next to the brick.

4    A    Yeah.

5    Q    Is it correct that it's your radio emitting the sound of

6    the alarm and the confidence tone?

7    A    Yes.

8    Q    Does the brick itself emit any noise?

9    A    No.

10   Q    And, so, if you were hundreds of yards away from the

11   brick, the brick or anyone near the brick would not, in fact,

12   hear the alarm or the confidence tone?

13   A    That's correct.

14           MR. COHEN:  Objection.

15           THE COURT:  Overruled.

16   Q    Is that correct, Officer Robinson?

17   A    Yes.

18   Q    What did you do after placing --

19           THE COURT:  Let me stop you there.

20           I don't know if Judge Levy explained to you

21   yesterday, but we do take a brief midmorning break so

22   everybody can get comfy and stretch your legs.  I don't know

23   about you, but I can no longer sit for too long because of my

24   knees.  But, in any event, we're going to take a break.  We're

25   going to do the same thing in the afternoon.

1          And everyone should gather back at 11:45.

2          Remember, you can't talk about the case among

3    yourselves or with anyone else or do any kind of research or

4    any investigation on your own during the breaks.  And we will

5    see you back here at 11:45.

6          I'm going to ask you to remain seated while the jury

7    goes out, but we will ask you also to come back at 11:45.

8          THE COURTROOM DEPUTY:  All rise.

9          (Jury exits the courtroom.)

10          THE COURT:  You're free to take a break as well, sir.

11          You're still on direct examination, so you can

12    discuss scheduling and your testimony with the Government.

13          Everyone can take a break as well.  We will see you

14    back at 11:45.  I will see everybody at 11:45.

15          MS. SCHIERBERL:  Thank you, Judge.

16          (Recess taken.)

17          THE COURT:  Please, everyone, have a seat.

18          This is case on trial continued, same appearances as

19    this morning.  All of our jurors are ready to come in.  Our

20    witness is seated.  We're ready to start, unless there's

21    something that you need to address?

22          MS. SCHIERBERL:  No, Your Honor.

23          THE COURT:  Okay.  And we'll go get the jury.

24          (Continued on next page.)

25

1          THE COURT:  Jury is entering.  All rise.

2          (Jury enters.)

3          THE COURT:  Everyone may be seated.

4          Do the parties agree that all of our jurors are

5    present and properly seated?

6          MS. SCHIERBERL:  Yes, Your Honor.

7          MR. COHEN:  Yes.

8          THE COURT:  Okay.  Thank you.

9          And still good morning, Officer Robinson.  I remind

10   you that you are still under oath.

11         And Ms. Schierberl you may proceed when you're

12   ready.

13         MS. SCHIERBERL:  Thank you, Judge.

14   DIRECT EXAMINATION

15   BY MS. SCHIERBERL:  (Continuing)

16   Q    Officer Robinson, what do you do after placing the

17   transponder in the avionics compartment?

18   A    We concealed the transponder and the shams with the

19   insulation blanket, and I sprayed the insulation blanket with

20   the Clue Spray.

21         We then exited the avionics compartment with the

22   real drugs, went into our truck and drove to a secluded

23   location so that we could switch vehicles with one of our

24   supervisors so that we could be in an unmarked vehicle as we

25   conducted our surveillance.

1  Q    What did you put the real cocaine in, if anything?

2  A    A duffle bag.

3  Q    Approximately how big was that duffle bag?

4  A    Two and a half -- about two and a half feet wide by

5  15 inches deep and 15 inches -- 15 by 15 by two and a half

6  feet.

7  Q    At approximately what time did you begin to watch the

8  aircraft?

9  A    Approximately 4:30.

10  Q    From where did you conduct this surveillance?

11  A    We were diagonally behind the aircraft that had the shams

12  in it over 100 yards away.

13         MS. SCHIERBERL:  Ms. Cronin, can you please publish

14  Government Exhibit 404.

15  Q    Officer Robinson, can you please indicate with a line on

16  Government Exhibit 404 the area from which you conducted

17  surveillance that day?

18  A    Approximately this area here.

19         MS. SCHIERBERL:  Your Honor, I ask that the record

20  reflect the witness has indicated with an "X" at the bottom

21  center of Government Exhibit 404.

22         THE COURT:  So noted.

23  Q    Did you use anything to assist you in observing the

24  aircraft?

25  A    Yes.  Binoculars.

1  Q    And what, if anything, did you observe while you were

2  watching the plane?

3  A    About an hour and a half into our surveillance, we got

4  notified by Supervisor Cambry that there was a white pickup

5  truck heading in our direction.  Sure enough, it came by us

6  and drove by us slowly, and I observed it going to a small

7  alcove a couple yards ahead of us and to the right.

8         Then exited that alcove and left the area, and then

9  I turned my attention back to the nose tire of the aircraft.

10 Q    What, if anything, happened next?

11 A    Approximately an hour, maybe a little more, afterwards a

12 small utility vehicle came driving to the aircraft.  It drove

13 around to the front of the aircraft and parked to the right

14 side, closer to the nose.

15 Q    After that individual drove up to the plane, did you see

16 where they went?

17 A    I saw the individual get out of his, vehicle, and he

18 started walking towards the avionics compartment.  But instead

19 of going to the compartment, he passed it by and he went to

20 the stairs that lead up to the jet bridge that lead to the

21 aircraft.

22 Q    And what did you observe the person do next?

23 A    He went up the stairs, entered the jet bridge.  And I

24 returned about my attention to the nose tire of the aircraft.

25 Q    What did you see him do next?

1   A      A couple minutes later, I noticed peripherally through

2   the binoculars that somebody was exiting the jet bridge, going

3   down the stairs, and he started walking towards the avionics

4   compartment.

5              I notified my partner that there was somebody

6   walking towards the avionics compartment, and that he had gone

7   under the aircraft, and that he was under the entry hatch,

8   that he opened the entry hatch, and then he climbed inside.

9   Q      What happened next?

10  A      My partner and I drove from our location where we were

11  surveilling, we started driving forward to go around the

12  aircraft.  As we got to a closer -- closer to the wing, that's

13  when we heard -- that's when I heard the transponder go off.

14  Q      How did you hear it?

15  A      It just went off the continuous beeps.

16  Q      Did you hear it through your radio?

17  A      Through my radio, yes.

18  Q      And was that sound the same sound of the alarm we heard

19  moments ago?

20  A      Yes.

21  Q      And what, if anything, did that signify to you that

22  night?

23  A      That somebody had picked up the brick.

24  Q      Approximately how much time had passed since seeing the

25  individual enter the avionics compartment and hearing the

1    transponder trip?

2    A    About 20 seconds.

3    Q    What did you do in response?

4    A    We drove around to the front of the aircraft.  My partner

5    parked next to the aircraft with the vehicle headlights facing

6    towards the airplane.  We exited the vehicle.  I walked

7    towards the avionics compartment.  I crouched under the

8    aircraft.  And from my position, I was able to see somebody

9    inside there touching the insulation blanket in the area where

10   the bricks were hidden.

11   Q    What did you observe that individual doing with the

12   insulation blanket?

13   A    It looked like he was adjusting it and securing it.

14   Q    Looking back at Government Exhibit 202, relative to that

15   loose brick pictured on the right side of the screen, where

16   was the individual resecuring the insulation blanket?

17   A    I would say his hands were approximately in this area.

18        MS. SCHIERBERL:  Your Honor, may the record please

19   reflect that the witness has drawn an "X" in the upper right

20   side of the photograph.

21        THE COURT:  So noted.

22   Q    And Officer Robinson, where had you placed the

23   transponder relative to that "X"?

24   A    Approximately here.

25        MS. SCHIERBERL:  Your Honor, may the record reflect

1  the witness has drawn an "X" towards the middle of the

2  photograph on the left-hand side.

3          THE COURT:  So noted.

4  A    Just a correction.  The transponder is actually closer to

5  the left-hand side.  So it's not in the center; more towards

6  the end.

7  Q    Just to be clear, the "X" to the leftmost side of the

8  photograph, does that reflect where you placed the

9  transponder?

10 A    Yes.

11 Q    Do you recognize the individual you saw entering and

12 exiting the avionics compartment on February 4, 2020, here in

13 the courtroom?

14 A    Yes.

15 Q    Can you please identify him by an article of clothing?

16 A    He's wearing a red tie.

17         MS. SCHIERBERL:  Your Honor, please let the record

18 reflect that the witness has identified the Defendant by his

19 red tie.

20         THE COURT:  So noted.

21 Q    What happened next?

22 A    I noticed him moving his body.  And it looked like he was

23 getting ready to exit the aircraft, so I backed my upper body

24 away from the entry hatch to allow him space to drop down.

25         When he dropped down, he closed and secured the

1    entry hatch.  And then when he turned his gaze towards me and

2    my partner, that's when he said, "What's up, guys?"

3    Q    What happened next?

4    A    I asked him what he was doing in there.  And he answered

5    with words to the effect of that he was resetting an alarm for

6    the air conditioning system.  I told him with words to the

7    effect, that "That's not true, I saw you, you were touching

8    the insulation blanket on the side wall."

9    Q    Was the Defendant asked for his identification?

10   A    Yes.

11   Q    What type of ID did he present, if any?

12   A    It's a JFK Airport port ID.

13   Q    What is a JFK port ID?

14   A    Anyone who works at the airport needs to have that kind

15   of identification.

16   Q    What, if anything, did the Defendant do with his hands

17   when he presented his ID?

18   A    He presented the ID to my partner, and his hand was

19   covering the lower portion of the ID badge.

20   Q    Why, if at all, is that significant?

21   A    Because that is -- that's the area where we have what's

22   called a customs seal.

23   Q    What is a customs seal?

24   A    It allows you to be on an aircraft or near an aircraft

25   that has nexus to international travel, international

1    passengers or international cargo.  If you don't have that

2    customs seal, you cannot be on the aircraft or near the

3    aircraft.

4                MS. SCHIERBERL:  Your Honor, permission to approach

5    and show counsel and the witness what has been previously

6    marked for identification purposes only as Government

7    Exhibit 7?

8                THE COURT:  Yes.

9                MS. SCHIERBERL:  Thank you.

10   Q    Officer Robinson, I just handed you what's been marked as

11   Government Exhibit 7.

12   A    Yes.

13   Q    What is it?

14   A    This is JFK port ID badge.

15   Q    How do you recognize it?

16   A    Well, it says JFK -- John F. Kennedy International

17   Airport.  It's JFK on the bottom portion.  This is typical

18   what someone who works at Kennedy Airport needs to have on

19   them.

20   Q    Does this appear to be in the same or substantially the

21   same condition as when it was taken from the Defendant on

22   February 4, 2020?

23   A    Yes.

24                MS. SCHIERBERL:  Your Honor, the government offers

25   Government Exhibit 7 in evidence.

1          THE COURT:  Any objection?

2          MR. COHEN:  No.

3          THE COURT:  It is admitted.

4          (Government Exhibit 7 received in evidence.)

5          MS. SCHIERBERL:  Permission to publish the same to

6    the jury?

7          THE COURT:  Yes.

8    Q    Officer Robinson, whose port ID is Government Exhibit 7?

9    A    It's Paul Belloisi.

10   Q    Does this ID have a customs seal?

11   A    It does not.

12   Q    And what does that mean?

13   A    It means he was not allowed to be near the aircraft or on

14   the aircraft on the day that we found him there.

15   Q    To your knowledge, were the events you've described

16   captured on surveillance video?

17   A    Yes.

18         MS. SCHIERBERL:  Your Honor, the witness has been

19   provided a disc marked Government Exhibit 301 --

20         THE COURT:  Were you going to publish the badge to

21   the jury?

22         MS. SCHIERBERL:  Yes, Your Honor.  Thank you so

23   much.  I'll retrieve the badge and I'll place it on the ELMO.

24         THE COURT:  Yes, you may.

25         MS. SCHIERBERL:  Thank you, Judge.

1   Q    I'm placing Government Exhibit 7 on the ELMO.

2        Officer Robinson, is this the port ID we've been

3   discussing?

4   A    Yes.

5   Q    Is that the name of the Defendant, Paul Belloisi?

6   A    Yes.

7   Q    And does that say American Airlines?

8   A    Yes.

9   Q    And is this the area where the customs seal would be

10  indicated if it were present?

11  A    Yes.

12  Q    Is there a customs seal on this ID?

13  A    No.

14  Q    Thank you.

15       To your knowledge, were the events you've described

16  captured on video?

17  A    Yes.

18       MS. SCHIERBERL:  Your Honor, I've previously handed

19  to the witness what's been marked as Government Exhibit 306

20  for identification purposes only.

21  Q    Officer Robinson, do you recognize this disc?

22  A    Yes.

23  Q    Have you reviewed the contents of this disc previously?

24  A    I have.

25  Q    Is that your signature on the disc?

1  A    Yes.

2  Q    Have you specifically reviewed the contents of Government

3  Exhibit 306?

4  A    Yes.

5  Q    And what is Government Exhibit 306?

6  A    That would be the surveillance footage.

7  Q    Does Government Exhibit 306 contain a fair and accurate

8  video of the events of the evening of February 4, 2020, as you

9  experienced them?

10  A    Yes.

11         MS. SCHIERBERL:  Your Honor, the government offers

12  Government Exhibit 306 in evidence.

13         THE COURT:  Any objection?

14         MR. COHEN:  No.

15         THE COURT:  It is admitted.

16         (Government Exhibit 306 received in evidence.)

17         MS. SCHIERBERL:  Permission to publish to the jury?

18         THE COURT:  Yes.

19         MS. SCHIERBERL:  Ms. Cronin, can we please pull up

20  Government Exhibit 306 to the title page.

21  Q    Officer Robinson, do you know what Gate 7 means?

22  A    Yes.

23  Q    What does Gate 7 mean?

24  A    That's the Gate 7 at American Airlines terminal where the

25  plane, where they found the drugs are.

1  Q    Do you know what high 700 means?

2  A    No.

3           MS. SCHIERBERL:  Ms. Cronin, can we please play

4  Government 306 from 7:17.

5           And Ms. Carosella, if you don't mind, could we dim

6  the lights in the courtroom?  Thank you.

7           Ms. Cronin, could we please play Government

8  Exhibit 306 from 7:17 to 7:17 and 6 seconds.

9  Q    Officer Robinson, what is the time and date stamp in the

10 top left corner?

11 A    February 4, 2020, Time:  7:17:06 p.m.

12          MS. SCHIERBERL:  Ms. Cronin, can we please play from

13 7:17:06 to 7:17 and 40 seconds.

14 Q    Officer Robinson, what are we seeing in this clip?

15 A    We're seeing a small utility vehicle driving behind the

16 aircraft.

17 Q    Is that the utility vehicle that you previously

18 described?

19 A    Yes.

20 Q    And where are you in this surveillance video?

21 A    Right where that second light is in the back.

22          MS. SCHIERBERL:  Your Honor, may the record please

23 reflect the witness has drawn a line at the top center of the

24 screen in front of headlights.

25          THE COURT:  So noted.

1    Q     What are you doing at this point?

2    A     Still surveilling, making commentary to my partner that I

3    see a vehicle approaching the side of the aircraft.

4              MS. SCHIERBERL:  Ms. Cronin, can we please play

5    Government 306 from 7:17:42 to 7:18 and 2 seconds.

6              (Video played; video stopped.)

7    Q     What are we seeing in this clip?

8    A     He's walking towards the direction of the, he's passing

9    it by, stepping over -- it looks like a tow -- a tow bar.

10   He's walking towards the stairway to the jet bridge.

11   Q     When you say "he," to whom are you referring?

12   A     The Defendant.

13             MS. SCHIERBERL:  Ms. Cronin, can we please play that

14   same clip again, zooming in on the Defendant exiting the

15   utility vehicle and walking to the jet bridge.

16             (Video played; video stopped.)

17   Q     Officer Robinson, what are we seeing in this clip?

18   A     We're seeing the Defendant walking going towards the jet

19   bridge stairs, stepping over the tow bar.

20   Q     And what is a jet bridge?

21   A     A jet bridge is where the passengers offload or load onto

22   the aircraft.  It goes from the building itself to the

23   aircraft.

24   Q     Does this capture the events, as you previously

25   testified, on the night of February 4th, 2020?

1    A    Yes.

2         MS. SCHIERBERL:  Ms. Cronin, could we please play

3    Government Exhibit 306 from 7:18 and 55 seconds to 7:19 and

4    6 seconds.

5         (Video played; video stopped.)

6    Q    Officer Robinson, about how much time passed between

7    seeing the individual approach the jet bridge and seeing that

8    individual approach the avionics compartment?

9    A    Two minutes.

10        MS. SCHIERBERL:  Ms. Cronin, can we please, again,

11   play 7:19 to 7:19:06, zooming in on the space under the plane

12   where the Defendant walks to the avionics compartment.

13        (Video played; video stopped.)

14   Q    Officer Robinson, focusing on that area between the jet

15   bridge and the plane, is this where you saw the Defendant

16   walking under the jet bridge and up into the avionics

17   compartment?

18   A    Yes.

19   Q    Is that the Defendant passing just there?

20   A    Yes.

21        MS. SCHIERBERL:  Ms. Cronin, could we please play

22   Government Exhibit 306 from 7:19:06 to 7:19:28.

23        (Video played; video stopped.)

24   Q    Officer Robinson, what's happening in this clip?

25   A    We're starting to move from our position of surveillance

1  going around the aircraft.

2  Q    And why was that?

3  A    Because we saw him enter the compartment.

4  Q    Why do you pause?

5  A    My partner wanted to see if he would drop down quickly.

6         MS. SCHIERBERL:  Ms. Cronin, could we please play

7  from 7:19:28 to 7:20 and 2 seconds.

8         (Video played; video stopped.)

9  Q    What are we seeing now?

10 A    Looks like we're still paused there.

11 Q    Why do you begin to drive towards the aircraft?

12 A    Because at that point that's when the alarm was tripped

13 from the transponder.

14 Q    About how much time had passed between the Defendant

15 entering the avionics and the alarm tripping?

16 A    Around 20 seconds.

17 Q    Where do you drive to?

18 A    We drive to the right side of the aircraft by the nose

19 there.

20         MS. SCHIERBERL:  Ms. Cronin, could we please play

21 from 7:20:02 to the end of the video.

22         (Video played; video stopped.)

23 Q    Officer Robinson, what are you doing in this clip?

24 A    I'm walking towards the avionics compartment, crouching

25 underneath and getting a view inside.

1  Q    And what are you observing at that time?

2  A    I saw the back of the Defendant.  He was crouched in

3  front of the area where the bricks were hidden.  I saw him

4  adjusting his body to get out, so I moved to make space.

5  Q    What's happening now?

6  A    And now he's out of the compartment and we're starting to

7  talk to him.

8          MS. SCHIERBERL:  Your Honor, permission to show only

9  to defense counsel and the witness what has been previously

10 marked for identification purposes only as Government

11 Exhibits 203 and 204.

12         THE COURT:  Yes, you may.

13 Q    Officer Robinson, what is this?

14 A    That's the entry hatch to the avionics compartment on the

15 737 aircraft.

16 Q    And looking at Government Exhibit 204, what is this?

17 A    That's a better view of inside.  That's actually the view

18 that I saw.  And that's right -- the area where the bricks

19 were hidden.  There's a duct that's there, the pneumatic duct.

20 Well, right behind that is the area where the bricks were

21 hidden, and the insulation blanket is laying on top of that

22 area.

23 Q    Do these appear to be fair and accurate copies of

24 photographs of the avionics compartment of the 737 -- a

25 737 airplane as it appeared to you that night?

1    A    Yes.

2         MS. SCHIERBERL:  Your Honor, the government offers

3    Government Exhibits 203 and 204 in evidence.

4         THE COURT:  Any objection to either?

5         MR. COHEN:  No.

6         THE COURT:  They are admitted.

7         (Government Exhibits 203 and 204 received in

8    evidence.)

9         MS. SCHIERBERL:  Permission to publish to the jury?

10        THE COURT:  Yes.

11   Q    Officer Robinson, beginning with Government Exhibit 203,

12   what do we see in this image?

13   A    We see the entry hatch to the avionics compartment.

14   Q    And turning to Government Exhibit 204, what do we see in

15   this image?

16   A    We're seeing more of the interior of the avionics

17   compartment.  And that's the area behind that duct where the

18   bricks were hidden.  And that's the insulation blanket laying

19   on top of that area.

20   Q    Was this your view as you were crouching down and looking

21   up into the avionics compartment on February 4th, 2020?

22   A    Yes.

23   Q    Can you please show us with an "X" approximately where

24   you found the drugs that day?

25   A    Well, the drugs are all across this area here.

1      MS. SCHIERBERL:  Your Honor, may the record reflect

2  the witness has drawn a dotted line in the upper portion of

3  the center of this photograph.

4      THE COURT:  So noted.

5  A    I would say it goes a little further to the left as well.

6  Q    Officer Robinson, can you draw an "X" where you saw the

7  Defendant reattaching the insulation blanket in this

8  photograph?

9  A    I saw his hands approximately in this area here.

10      MS. SCHIERBERL:  Your Honor, may the record reflect

11  the witness has drawn an "X" in the center to the right of

12  this photograph.

13      THE COURT:  So noted.

14  Q    And Officer Robinson, can you please place an "X" where

15  you placed the sham and the transponder underneath the

16  insulation blanket in this photograph?

17  A    Towards this end, more on the left side.

18      MS. SCHIERBERL:  Your Honor, may the record reflect

19  the witness has drawn a second "X" to the top left corner of

20  this photograph.

21      THE COURT:  Noted.

22      MS. SCHIERBERL:  Your Honor, permission to approach

23  defense counsel and the witness with what has been previously

24  marked for identification purposes only as Government

25  Exhibit 4.

1          THE COURT:  Yes.

2    Q    Officer Robinson, do you recognize Government Exhibit 4?

3    A    Yes.

4    Q    What is it?

5    A    These are gloves that the Defendant was wearing.

6    Q    Were these the same -- do these appear to be in the same

7    or substantially the same condition as they were taken from

8    the Defendant on February 4, 2020?

9    A    Yes.

10         MS. SCHIERBERL:  Your Honor, the government moves to

11   enter to admit Government Exhibit 4 in evidence.

12         THE COURT:  Any objection?

13         MR. COHEN:  No.

14         THE COURT:  Admitted.

15         (Government Exhibit 4 received in evidence.)

16   Q    Officer Robinson, what is Government Exhibit 4?

17   A    Government Exhibit 4 are the gloves that the Defendant

18   had on him the night that we found the drugs.

19   Q    Have you tried, prior to today, to see if these gloves

20   display any remnants of the Clue Spray that you sprayed on the

21   sham cocaine that night?

22   A    Yes.

23   Q    And were there?

24   A    Yes.

25         MS. SCHIERBERL:  Your Honor, I would ask permission

1  at this time for the witness to be able to step down from the

2  witness stand for a short demonstrative to the jury involving

3  Government Exhibits 2 and 4.

4             THE COURT:  Yes.

5             MS. SCHIERBERL:  And I'd ask with the Court's

6  indulgence to dim the lights of the courtroom as much as

7  possible for this exhibit.

8             THE COURT:  Yes, I don't think we are going to be

9  able to get it down completely, but we will do our best.

10            Okay.  So why don't you step down first before we

11  get dark.

12            MS. SCHIERBERL:  Thank you, Judge.

13  Q    Officer Robinson, I'll ask you to place Government 2 and

14  Government 4 on the lectern and just take a moment for counsel

15  to position themselves.

16            I'll also direct to you a black light on the front

17  corner of counsel table.

18            MS. SCHIERBERL:  Ms. Carosella, whenever you're

19  ready.  That's great.

20  Q    So Officer Robinson, I know it's dark, but can you walk

21  us through what you're doing?

22  A    Okay.  I'm going to start with the sham.  I'm going to

23  shine the black light on the sham itself.  You'll see some

24  remnants of the Clue Spray on it.  I'm not surprised that

25  there's not that much on this because this has been in our

1  duffle bag with other shams, so there's a lot of transfer.

2  It's rubbed off.

3           MR. COHEN:  Objection, Your Honor.  Move to strike.

4           THE COURT:  Overruled.

5  Q    Officer Robinson, has that brick been used since

6  February 4th, 2020?

7  A    No.

8  Q    And can you please demonstrate with the Defendant's

9  gloves with the black light?

10  A    Okay.  Starting with the left glove, very faint.  I don't

11  know if you can see that.

12  Q    And what do we see reflected on the left glove, if

13  anything?

14  A    You see remnants of the Clue Spray on that.

15  Q    And moving to the Defendant's right glove?

16  A    You see a much better image of the Clue Spray on the

17  gloves themselves.

18  Q    And where specifically do we see the Clue Spray on these

19  gloves?

20  A    On the ends of the fingers, the fingertips area, inside

21  of the thumb where you would grasp.  I don't know if you could

22  see that.

23  Q    Thank you very much, Officer Robinson.

24           Just pause for a moment, if you don't mind, because

25  it's so dark.

1      MS. SCHIERBERL:  I will ask Ms. Carosella to return
2  the lights if possible.
3           Thank you so much.
4  Q    And you can retake the witness stand.
5           I'm relieved to see the lights came back.
6           THE COURT:  It's hit or miss sometimes.
7  Q    Officer Robinson, did the Defendant leave the tarmac at
8  any point that night?
9  A    Yes, he was taken to what we call a JNSU.
10 Q    What is JNSU?
11 A    Joint Narcotics -- I forget the S.  Joint Narcotics Unit.
12 I forget the S.
13 Q    Does the S stand for Smuggling?
14 A    That's it.
15      MR. COHEN:  Objection.
16      THE COURT:  Overruled.
17 Q    Officer Robinson, what is JNSU?
18 A    That's where they take the drugs when we find them.  And
19 any person that's connected to that, the drugs, they take them
20 to that area.  And we usually write up a seizure report in
21 that room, especially if there's an arrest or somebody's being
22 detained along with those drugs.
23 Q    Did you yourself go to JNSU that night?
24 A    I did.
25 Q    What did you do at JNSU, if anything?

1    A    Not too much.  I was observing, because there -- it's

2    also -- the drugs are weighed and they're tested to determine

3    the type of drug that they are and what they weigh.  My

4    partner was writing up a seizure report, so...

5    Q    To your knowledge, were the drugs found on

6    February 4, 2020, weighed at JNSU?

7    A    Yes.

8            MS. SCHIERBERL:  Your Honor, permission to show only

9    defense counsel and the witness what has been previously

10   marked for identification purposes only as Government

11   Exhibit 206.

12           THE COURT:  Yes.

13   Q    Officer Robinson, what is this?

14   A    That's a picture of the bricks of cocaine on a scale.

15   Q    Is this a fair and accurate copy of an image of the drugs

16   that night being weighed at JNSU?

17   A    Yes.

18           MS. SCHIERBERL:  Your Honor, the government offers

19   Government Exhibit 206 in evidence.

20           THE COURT:  Any objection?

21           MR. COHEN:  No.

22           MS. SCHIERBERL:  Permission --

23           THE COURT:  They are admitted.

24           (Government Exhibit 206 received in evidence.)

25           MS. SCHIERBERL:  I beg your pardon, Your Honor.

1              Permission to publish to the jury?

2              THE COURT:  Yes.

3    Q    Officer Robinson, approximately how much did the drugs

4    weigh?

5    A    25 and a half pounds.

6    Q    To your knowledge, were the drugs field-tested at JNSU?

7    A    Yes.

8    Q    What does it mean to field-test?

9    A    To check if they turn up positive for cocaine or heroin

10   or whatever drug it is that we're testing for.

11   Q    And do you know the results of that testing?

12   A    It came up positive for cocaine.

13   Q    Was each brick tested?

14   A    Yes.

15   Q    And what was the result of the testing of each brick?

16   A    Positive.

17   Q    Positive for?

18   A    Cocaine.

19             MS. SCHIERBERL:  Thank you, Your Honor.

20             At this time I would just ask for a moment to confer

21   with counsel before I conclude.

22             THE COURT:  Yes.

23             MS. SCHIERBERL:  At this time the government has no

24   further questions, Your Honor.  Thank you.

25             THE COURT:  Thank you.

1          You may inquire if you wish.

2          MR. COHEN:  Thank you, Your Honor.

3    CROSS-EXAMINATION

4    BY MR. COHEN:

5    Q    Good afternoon, Officer Robinson.

6    A    Good afternoon.

7    Q    Just to start off, if there's anything that I ask you

8    that is hard to understand or doesn't make sense, please ask

9    me to repeat the question, I'll be glad to do that.

10         Officer Robinson, you had no prior knowledge that

11   there were drugs on this plane?

12   A    Correct.

13   Q    Right?

14   A    No prior knowledge.

15   Q    Did you have any knowledge about who put them on the

16   plane?

17   A    No.

18   Q    Did you have any knowledge of who was supposed to receive

19   them?

20   A    No.

21   Q    Did you know if they were supposed to -- if their final

22   destination was JFK?

23   A    No.

24   Q    And did you know if they were put on at Montego Bay,

25   Jamaica where the plane came from prior to going to JFK?

1   A      No.

2   Q      Did you know the plane, after it left JFK, went to

3   San Diego, correct?

4   A      I don't know.

5   Q      Did you contact Montego Bay to let them know what you had

6   found on the plane?

7   A      No, I didn't.

8   Q      Do you know if any other law enforcement officers

9   contacted Montego Bay to let them know?

10  A      I don't know that information.

11  Q      Did you share any of the information about the drugs that

12  you have recovered with anyone related to any of the airports

13  where the plane had previously traveled to?

14  A      Not to my knowledge.

15  Q      Now, those questions all have to do with right after

16  the -- you recovered the drugs.

17          To this day now, as you sit here today, do you have

18  any idea who put those drugs on the plane?

19  A      No.

20  Q      Have you continued to investigate to try to find out who

21  did that?

22  A      Not me personally.

23  Q      Who has?

24  A      If anything, it would be HSI.

25  Q      And do you know if they have done any further

1    investigation?

2    A    I haven't had any contact with that -- or communication

3    about that until the case came up here with the court.  But I

4    have no idea what they're doing in this case.

5    Q    Did you share your information with any U.S. agents that

6    are stationed in Jamaica?

7    A    Not that I know of.

8    Q    So you did not do any?

9    A    No.

10   Q    Now, when you were up here working with the transponder,

11   there were a few issues.

12         Can you describe why you had a few issues trying to

13   get it to respond the way you had wanted it to?

14   A    I would surmise it was the piling up of the wires that

15   was the whole length of the wire bundling it up, so...

16   Q    And you were putting that sham brick on a flat surface;

17   is that right?

18   A    On this here?

19   Q    Yeah.

20         Now in the fuse lodge in the avionics compartment,

21   that's not a flat surface, is it?

22   A    There's a slight curvature to it.

23   Q    It's fair to say it's a little more difficult to put on a

24   curved surface than it is a flat surface?

25   A    Probably get the -- the -- the switch to be depressed

1   completely.

2   Q    Okay.  And you also talked about how you have to be very

3   careful in how you put the covering over the switch; is that

4   right?

5   A    Correct.

6   Q    And you said that, in one respect, it could be too taut.

7         And what's the problem if it's too taut?

8   A    That it won't release to set off the alarm signal.

9   Q    Okay.  And on the other side, what's the problem if it's

10  too loose?

11  A    I don't know if there would be any problem if too loose.

12  Q    Now, you also spoke about the transponder switch wasn't

13  working.

14        Can you explain to us what the problem with the

15  transponder switch was prior to placing the transponder on the

16  airplane?

17  A    The original switch would not release to the open

18  position, so it would not give us an alarm signal.  It would

19  only give a confidence tone.

20  Q    And how did you determine that to be the case?

21  A    Well, I turned the radio on and put in the batteries in

22  the transponder, laying the sham on top of that, or just

23  holding the switch closed itself and then releasing it.  I

24  mean, as a matter of fact, as soon as you put the batteries

25  in, it automatically goes to the alarm mode because it hasn't

1    been depressed yet.  And it wasn't going to alarm mode.

2    Q    And where did you determine that to be a faulty switch?

3    A    That was when we were inside the avionics compartment

4    getting ready to set up the gear.

5    Q    So you had to go back out to your vehicle and change the

6    switch?

7    A    No.

8    Q    What did you do to get the new switch?

9    A    We have extra switches inside the little case there, the

10   carrying case.  There's actually two extra switches in there

11   now.

12   Q    Okay.  And you fixed the switch inside the avionics

13   compartment?

14   A    Yes.

15   Q    And can you just describe what you had to do to fix the

16   switch exactly?

17   A    Just unscrew or loosen the screws, two screws, for the

18   wires that are on the end of the switch.

19   Q    And did you have to loosen them by hand?

20   A    We have a screwdriver.

21   Q    And is that screwdriver also inside the transponder case?

22   A    Yes.

23   Q    And who was the one who changed the transponder switch?

24   A    My partner.

25   Q    And Officer Morelli did that inside of the avionics

1  compartment?

2  A    Yes.

3  Q    While you were there with him?

4  A    Yes.

5  Q    Now, you said you got to the plane sometime around

6  three -- excuse me.  Withdrawn.

7        The plane landed at 3:30, you said?

8  A    Approximately.  It got there around approximately 3:30.

9  I don't remember the exact times, but we'll say approximation.

10 Q    And at what point did you determine that you were going

11 to do a routine inspection of that inbound plane?

12 A    As we were actually on the tarmac driving towards

13 American Airlines terminal.  We have an app on the phone that

14 shows us what flights are coming in, and then we just randomly

15 select from that app which flight we want to do.

16 Q    And you and Officer Morelli can make that decision

17 yourselves, you don't need any permission to do that; is that

18 right?

19 A    Correct.

20 Q    When you were driving towards -- the Terminal 8 it was

21 you were driving toward?

22 A    Yes.

23 Q    And was it just you and Officer Morelli in the CBP

24 vehicle?

25 A    Yes.

1  Q    And you were in uniform like you are today?

2  A    It's a similar uniform.  It's more of like -- we call

3  them BDUs, like, you know, working uniforms.  This is more

4  like office attire.

5  Q    But basically it's a CBP uniform.

6            I know it's not the exact one, but it's similar to

7  the one you're wearing?

8  A    Yeah.

9  Q    Officer Morelli was dressed the same way?

10  A    Yes.

11  Q    And what CBP vehicle were you traveling in?

12  A    We have our own pickup truck.

13  Q    How do I know it's a CBP vehicle?  It says it on the

14  side?

15  A    Yes, a marked vehicle.

16  Q    It's a marked vehicle, you said, sir?

17  A    Yes.

18  Q    Thank you.

19            And when you and Officer Morelli drove over to

20  Terminal 8 and Gate 7, where did you initially park your

21  vehicle?

22  A    Initially behind the aircraft.

23  Q    And when you got -- presuming you both decided to get out

24  of the car and do the search; is that right?

25  A    Yes.

1    Q    And how did you decide who was going to search where?

2    A    Whoever gets out and whoever -- I don't know, it just

3    falls into place.  My partner immediately went towards the

4    belt loader, so I took the other route of checking the panels.

5            If he had done the reverse, he had started going

6    towards the outer panels, I would have gone towards the belt

7    loader and watched the offloading the bags.

8    Q    And now you said "the outer panels," and you have a lot

9    more experience with those searches than we do.

10           Can you explain what you mean by "the outer panels"

11   of the plane?

12   A    Well, the panels that are underneath it are some

13   equipment that's below it, air conditioner, air exchangers

14   underneath there.

15   Q    Are all the panels that you checked, are they underneath

16   the airplane?

17   A    On that particular aircraft, yes.

18   Q    And can you just explain how you checked just one panel

19   not all of them?  I presume how you did one was how you did

20   all of them; is that right?

21   A    Well, they have -- yeah.  They have -- there's, like,

22   laches.  And a latch has a little spring-loaded lever.  You

23   push that in and that'll release the lock and a series of

24   those locks you unlatch and drop them down and open them.

25   Q    And they're supposed to be empty inside those

1   compartments?

2   A    Well, it shouldn't have anything that's, you know, FOD.

3   Q    And how many of those panels do you believe you checked

4   on the 737 that day?

5   A    That particular day, I checked -- there's one panel after

6   the wheel well.  I checked the wheel well.  And then I went to

7   the avionics compartment.

8   Q    Is it fair to say -- well, let me ask you, how long did

9   it take you to check those outside panels?

10  A    I'm not sure.  I mean, it doesn't take that long.

11  Q    Ten minutes?

12  A    Ten minutes, maybe more, because you're looking around.

13  I don't really time it.

14  Q    No, I know, but this is a routine check, so you've done

15  this dozens of times, I imagine, right?

16  A    Yeah.

17  Q    Is 20 minutes a fair estimate?

18  A    More than fair.

19  Q    And the whole time while you're checking the panels,

20  Officer Morelli is -- because you've worked with him before

21  and you've done his job, he's standing by the belt loaders to

22  watch the luggage come off of the plane; is that right?

23  A    Yes.

24  Q    And when you were done checking the -- withdrawn.

25           So we understand what goes on here, is it one

1  officer watches the belt loader and the other officer does

2  what you've described to the jury?

3  A    Yes.  Or sometimes if they have both cargo holds --

4  there's a forward cargo hold and an aft cargo hold.  If

5  they're offloading both at the same time, then one officer

6  will be at the aft cargo hold, and the other officer will be

7  at the forward cargo hold.  And when that's finished, then we

8  get to the outer panels and all the rest, but it varies.

9  Q    Well, on the 737, there isn't that?

10 A    No.  The 737, there's a forward cargo hold and an aft

11 cargo hold.

12 Q    Okay.  And who was watching the forward cargo hold?

13 A    No one was.  My partner was looking at the aft cargo

14 hold.  Sometimes they don't offload them both at the same

15 time, sometimes only one cargo hold at a time.

16 Q    And on this particular day, were they offloading them

17 both -- both at once?

18 A    I don't remember.

19 Q    Speaking about the forward and the aft, on a 737 like

20 this -- this was a regular 737; it wasn't a 737 max, correct?

21 A    Correct.

22 Q    This 737 also has a forward avionics compartment and an

23 aft avionics compartment, correct?

24 A    Correct.

25 Q    And the forward avionics compartment is in front of the

1   front landing gear; is that right?

2   A    Yes.

3   Q    And the aft avionics compartment is behind the forward

4   landing gear; is that right?

5   A    Correct.

6   Q    And the aft avionics compartment on a 737 is referred to

7   as the main avionics compartment, right?

8   A    Yes.

9   Q    And the reason it's referred --

10         THE COURT:  It would be nice if the witness

11  testified and not counsel.

12  Q    And the aft avionics compartment, does that contain -- is

13  it the main avionics compartment because it contains all of

14  the equipment you described previously?

15  A    Yes.  It contains much more equipment.

16

17         (Continued on the next page.)

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. COHEN:  (Continuing)

3    Q    And we've all heard the term black box or black boxes.

4    In the aft avionics compartment, are there black boxes?

5    A    I don't recall right now because I'm usually not looking

6    for a black box.  I think it's in the forward avionics

7    compartment.  But that's not really my focus of attention.

8    Q    And are there racks of equipment in the aft avionics

9    compartment?

10   A    Yes.

11   Q    And what do those racks of equipment contain?

12   A    Well, avionics is not my expertise.  I just know it's got

13   electronic equipment in there.  I can't list all of them.  I

14   just know that, generally speaking, what I have listed is

15   what's usually in an avionics compartment.

16   Q    You listed the navigation system for the plane; is that

17   right?

18   A    Yes.

19   Q    Okay.  And electrical equipment; is that right?

20   A    There is electronic equipment, yes.

21   Q    What is a pack unit?

22   A    Pack, that's usually air conditioning.

23   Q    Is that because of the electronic part of a plane?

24   A    Well, the packs, it's more mechanical, I mean, but it

25   has, you know, I would assume a computer attached to it,

1  operating it.

2  Q    And the -- the control for the pack unit is in the aft

3  avionics compartment; is that right?

4  A    Yes.

5  Q    Now, when you went inside the aft avionics compartment --

6  what should I refer to it as, sir, the aft or the main

7  avionics compartment?  What are your most comfortable with?

8  A    It doesn't really matter.  I was really focused on the

9  compartment, the main compartment that we found the drugs.

10 Q    So the main avionics compartment?

11 A    Yes.

12 Q    And when you went inside the main avionics compartment,

13 can you describe what you did when you first went in, please?

14 A    Well, to enter it, you have to face aft to climb up

15 inside.

16        THE COURT:  You have used the word aft.  For us

17 civilians who don't know what aft is, can you tell us what

18 that means?

19        THE WITNESS:  I have to face the tail of the

20 aircraft, climbed up inside, and I started patting down the

21 insulation blankets, then I felt something hard under the

22 insulation blanket on the left-hand side.  I lifted up the

23 blanket and I saw bricks in there.

24 Q    Were the insulation blanket, to the best of your

25 understanding of how they're supposed to be, were they in the

1  proper position when you went there?

2  A    Well, if you remember looking at the photograph, you can

3  see tape at the bottom and the insulation blanket looked very

4  old.  It wasn't secured very well, but it was laying on top of

5  where the bricks were concealed.

6  Q    I do remember seeing those photos, sir.

7         THE COURT:  Please, no commentary.  Ask a question.

8  Q    The photo --

9         THE COURT:  It doesn't matter what you remember

10 seeing.

11 Q    The photos that you saw, Officer -- I'm sorry.  The

12 photos that we saw were photos that you had taken after you

13 had pulled the insulation blanket back;  is that right?

14 A    There was photos before removing the insulation blanket

15 and photos after the insulation blanket was removed.

16 Q    Officer, did you photograph the insulation prior to

17 seeing the bricks?

18 A    No.

19 Q    So you needed to move the insulation blanket in order to

20 see the bricks; is that right?

21 A    Yes.

22 Q    So there were no photos taken prior to moving the

23 insulation blanket; is that right?

24 A    Prior to the discovery of the bricks, correct, there were

25 no photos taken.

1  Q    I'm sorry.  My question was different.

2         There were no photos taken prior to pulling back the

3  insulation blanket; is that right?

4  A    You mean before?  I mean, there would be no reason for me

5  to take photographs if I didn't pull back the blanket to

6  discover the bricks behind there.

7  Q    I'm sorry, Officer, my question is simply were --

8         THE COURT:  He answered it.  The answer was no.

9  Move on.

10        MR. COHEN:  Great.

11 Q    So the photos that we observed before were taken when the

12 insulation blanket had already been removed?

13 A    To discover the bricks, yes.

14 Q    And the reason you pulled back the insulation blanket was

15 you said you felt something hard underneath; is that right?

16 A    Yes.

17 Q    And it was not because it looked like it was disturbed;

18 is that correct?

19 A    Correct.

20 Q    How long were you inside the avionics compartment before

21 you decided to pull back the insulation blanket?

22 A    It was very shortly upon entering it.  I mean, I started

23 a routine systematic way of search.

24 Q    Can you describe for us what that routine systematic way

25 of search was, please?

1   A    I start on the left-hand side and I work my way around.

2   Q    When you start on the left-hand side, what is it that you

3   do?

4   A    I start doing a pat down of the insulation blanket in

5   place, run my hands down, see if I notice any obstruction,

6   like a brick underneath there, and then I lift up the blanket

7   if I -- you know -- or sometimes I'll just lift up the blanket

8   itself if I see it's not well done, just lift it up.

9   Q    Sir, thank you for telling us generally, and I'm going to

10  speak about specifically February 4, 2020.

11          When you got into the avionics compartment, what was

12  the first place you went to to do your routine search?

13  A    First place would have been the left-hand side.

14  Q    And on the left-hand, there is insulation?

15  A    Yes.

16  Q    What does that insulation cover?

17  A    It covers the outer fuselage -- or the inner fuselage of

18  the aircraft.  It covers the ribs.

19  Q    Is there more that it covers?

20  A    Are you looking for something in particular?

21  Q    No, no.  It sounded like you were still testifying as to

22  other things that it covers.

23  A    No.

24  Q    So -- I'm sorry.  Did I interrupt you?

25          The insulation, is that -- the left side, is that

1   where you found the drugs underneath the insulation blanket?

2   A    Yes.

3   Q    Okay.  So it was basically within a minute or so when you

4   got in the avionics compartment; is that right?

5   A    Possible.

6   Q    Possible it was a few minutes?

7   A    Yes.

8   Q    When you go to conduct these routine searches, do you

9   tell anybody that you're going there?

10  A    No.

11  Q    You certainly don't tell any American Airlines employees;

12  right?

13  A    Well, they see us.  You have the ground crew offloading

14  the bags.  You have security personnel.  They see us doing

15  what we're doing.

16  Q    After you found the bricks underneath the insulation

17  blanket in the avionics compartment, did you initially take a

18  photo of what you saw?

19  A    I didn't take the photographs; my partner did.  And the

20  photographs were taken after I exited the compartment and got

21  my partner to bring him back to the avionics compartment to

22  show him what I found.

23  Q    So immediately upon discovering the bricks, then you went

24  out to speak to your partner?

25  A    I may have looked a little further to make sure there

1  were no other areas where there may be bricks.

2  Q    Did you -- I'm sorry.  Go ahead.

3  A    But then I exited the compartment.

4  Q    So you finished the search to see if there were any other

5  concealed narcotics in that main avionics compartment?

6  A    It's possible.  I don't really remember.  I just remember

7  finding the drugs.  It's possible that I continued, but I

8  don't remember.

9  Q    Is it fair to say that a routine search would -- in a

10  routine search you would search the whole avionics compartment

11  to see if there were drugs there?

12  A    Yes.

13  Q    Then if you, like in this instance, found something, you

14  would want to make sure there were no other drugs in the

15  avionics compartment?

16  A    Yeah.

17  Q    So is it likely that you finished your search before you

18  leaving to make sure there were no other drugs in the avionics

19  compartment?

20  A    Yes.

21  Q    And have you done these routine searches inside main

22  avionics compartments prior to this date?

23  A    Yes.

24  Q    How many times, would you say?

25  A    Lots of times.  I can't count.

1  Q    Okay.  So then could you tell us how long a routine

2  search of an avionics compartment takes?

3  A    I would say between five and ten minutes, maybe five.  I

4  don't know.  I never timed it.  Maybe longer.  It depends.

5  Sometimes I'll open up an electronic compartment, but ... I'll

6  say five minutes is fair.

7  Q    After completing the full search of the avionics

8  compartment, did you exit the avionics compartment?

9  A    Yes.

10 Q    And then did you go to speak to Officer Morelli?

11 A    Yes.

12 Q    Where was Officer Morelli?

13 A    He was at the front belt loader, at the forward cargo,

14 closer to the nose of the aircraft.

15 Q    And were the bags still being unloaded off the aircraft?

16 A    Yes.

17 Q    Did Officer Morelli finish his duties watching the rest

18 of the luggage come off the aircraft?

19 A    No.

20 Q    So he stopped his observation at that point?

21 A    Yes.

22 Q    Then you told Officer Morelli what you had found?

23 A    Yes.

24 Q    And then did Officer Morelli and yourself go back into

25 that main avionics compartment?

1  A    Yes.

2  Q    Did you -- the two of you do anything beforehand between

3  the time you told him about what you had found and going into

4  the avionics compartment?

5  A    No.

6  Q    And had you --  withdrawn.

7       When you went back to the avionics compartment, did

8  the both of you go inside the avionics compartment?

9  A    I climbed inside and he just stood in the entry hatch.

10 His feet were still on the tarmac.  His upper body was inside.

11 Q    Got it.

12      And to the best of your knowledge, was he able to

13 see the drugs underneath the insulation blanket while standing

14 on the tarmac?

15 A    Yes.

16 Q    You spoke about, on direct examination, how big the

17 avionics compartment.  Do you remember speaking about that?

18 A    Yeah.

19 Q    Could you describe the shape of the avionics compartment?

20 A    Well, it's -- the outer contour of the aircraft is round,

21 so it's kind of rounded walls outwards.  It's kind of short,

22 not much space above head, but it's very wide.  It's got a lot

23 of equipment racks in there.

24 Q    I believe you testified on direct examination about 10

25 feet wide.  Is that about right?

1    A    Possible.  I never measured it.

2    Q    And you said it's sort of mirrors the curvature of the

3    plane; is that right?

4    A    Yes.

5    Q    So if the plane is sort of oblong, is it fair to say it's

6    like the bottom half of an oblong?

7    A    It's like a tube.  But it's such a large diameter tube

8    that it's not a drastic curvature in there.

9    Q    After you had brought Officer Morelli over to the

10   avionics compartment, I'm assuming he confirmed what you had

11   seen?

12   A    Yes.

13   Q    And then the two of you decided to strategize about what

14   to do next?

15   A    He took photos first.

16   Q    He took photos with his feet on the ground; is that

17   right?

18   A    As far as I remember, yes.

19   Q    Okay.  And he also took a video; is that right?

20   A    Yes.

21   Q    And those are the photos and video that are already in

22   evidence that you saw on direct examination?

23   A    Yes.

24   Q    Now, you were in the avionics compartment while he was

25   taking those photos?

1   A     Yes.

2   Q     While he was taking the video?

3   A     Yes.

4   Q     All right.  And you had recovered the insulation so the

5   video could show you pulling it back and exposing the bricks;

6   is that right?

7   A     Yes.

8   Q     And what was the purpose of that, sir?

9   A     We take photos and videos so that we can share that with

10  other officers throughout the nation so that -- because where

11  we find drugs in one location, we're going to find it in the

12  same location in another city.

13  Q     When you said the nation, you mean the United States;

14  correct?

15  A     Yes.  They may share it with other agencies

16  internationally, but I'm not sure.

17  Q     So in the video we see is -- you are the one who is

18  pulling back the insulation blanket; is that right?

19  A     Yes.

20  Q     And you're standing inside the avionics compartment doing

21  that?

22  A     Yes.

23  Q     And Officer Morelli is down video'ing from the ground?

24  A     Yes.

25  Q     Now, the video is over and you and Officer Morelli decide

1    to strategize.  That's what you testified to; correct?

2    A    The video was taken before removing the bricks, so it was

3    after we had strategized.

4    Q    Well, let me get to the timeline again.  I'm sorry.  I'm

5    a little confused.

6              You brought Officer Morelli in to see the bricks;

7    correct?

8    A    Yes.

9    Q    All right.  You didn't take a video at that time; is that

10   right?

11   A    Correct.

12   Q    I see.  Then you left the avionics compartment to go back

13   to the truck to talk to Officer Morelli?

14   A    Yeah.

15   Q    Okay.  When you had left the avionics compartment to go

16   strategize prior to the video, did you put the insulation back

17   on the bricks?

18   A    Yes.

19   Q    All right.  And you and Officer Morelli went back into

20   your vehicle to strategize; is that right?

21   A    Yes.

22   Q    Is this a scene -- and by "scene," I mean the uncovering

23   of narcotics and then deciding what to do that you and Officer

24   Morelli have gone through before?

25   A    Yes.

1   Q    And where did you have this strategy session?

2   A    It would be inside the truck.

3   Q    And that's right on the side of the 737?

4   A    Well, at this point the truck was still parked behind the

5   airplane.  We moved it forward of the wings to be closer to

6   the area.

7   Q    Got it.  And when you brought the truck back to be closer

8   to the area, can you tell us what happened in that strategy

9   session, please?

10  A    Discussed, you know, how many bricks there were.  We had

11  to call the supervisors.  We had to go back to the bed of the

12  truck and look for how many shams that we have to replace it

13  with, see if we have correct colored tape, how we're going to

14  do it, first we're going to move the -- first we're going to

15  remove the bricks, then we are going to spray the shams and

16  set up the transponder.

17        Just talked out the game plan.

18  Q    After you talked out this game plan, did you have all of

19  this equipment when you went back in?

20        Can you describe for us first what happened after

21  you decided what you were going to do?  What happen next?

22  A    We went back to the avionics compartment.  I climbed in

23  first.  My partner had the duffle bag that contained the

24  shams, the transponder and the clue spray.

25  Q    I'm going to stop you for a second because we skipped

1    something.

2             You decided what to do?

3    A    Right.

4    Q    And then you went through your vehicle to see if you had

5    all of the equipment that you would need to set up the gear;

6    is that right?

7    A    Correct.

8    Q    And you went into the -- it's a pickup truck, did you

9    say?

10   A    Yes.

11   Q    And in the bed of the pickup truck you had the fake

12   cocaine or the shams, as you call them; right?

13   A    Yes.

14   Q    Then you had the transponder there as well?

15   A    The transponder is in the cabin of the aircraft.

16   Q    Cabin of the aircraft?

17   A    Cabin of the truck.

18   Q    And you had the clue spray in the truck, whether it's the

19   cabin or the bed?

20   A    Right.

21   Q    And you also said that you had come colored duct tape; is

22   that right?

23   A    Yes.

24   Q    And now it's inside -- Well, let me ask you:  Is it

25   inside the cab of your truck that you wrap the shams with the

1    tape?

2    A    Yes.

3    Q    And who does that, you or Officer Morelli?

4    A    I was starting it.  He may have helped.  I don't

5    remember.

6    Q    And were each of the three bricks wrapped in the colored

7    duct tape?

8    A    It was three bricks and then the fake brick with the

9    transponder inside, so a total of four.

10   Q    And all four of them were wrapped?

11   A    Yes.

12   Q    And we saw only one of the ones, the ones with the

13   transponder in it.

14        Is it fair to say that the other three bricks are

15   basically the same?

16   A    Well, you got the sham right there on the podium and

17   there's also the transponder.  So, yeah.

18   Q    My question is:  Are the other three bricks that do not

19   house a transponder, are they just like that?

20   A    That one, yes.

21        MS. SCHIERBERL:  Just to be clear for the record, I

22   would ask the record indicates the witness is referring to

23   Government Exhibit 2 when he points.

24        THE COURT:  So noted.

25   Q    And is the -- what is the idea of wrapping the fake

1  bricks with the tape?

2  A    To get it as close as possible in color to the real

3  bricks.

4  Q    And how long would you say the process took to wrap the

5  bricks?

6  A    I don't remember.  You know, however long it takes to,

7  you know -- I didn't time it.  I don't remember.

8  Q    And but this is a procedure you've done in the past; is

9  that right?

10 A    Actually, that was the first time we did that one because

11 usually the bricks were of matching color.

12 Q    So setting up the bricks in the way that you did this day

13 was a new procedure for you?

14 A    Wrapping it with the duct tape, yes.  It was unusual.

15 Q    And after you had wrapped the bricks with the duct tape,

16 did you then spray the clue spray on the bricks while you were

17 inside the vehicle?

18 A    Not in the vehicle.  Inside the avionics compartment.

19 Q    So after you wrapped the bricks, you then took the

20 bricks, put them in a duffle bag; is that right?

21 A    Yes.

22 Q    And then you and Officer Morelli went back into the

23 avionics compartment?

24 A    Yes.

25 Q    Do you have any idea, from the time you left the avionics

1  compartment until you went back in, how long that process was?

2  A    No.  I couldn't tell you.

3         Actually, I could tell you because he took a

4  photograph the first time we went inside and the photographs

5  were like 3:54 and 3:55.  And then the video itself, when we

6  returned was, at 4:12, so between that time.

7  Q    Thank you.

8         When you went back into the avionics compartment, it

9  was you who went back inside; is that right?

10 A    I climbed inside, yes.

11 Q    And then the video was then taken of the real cocaine

12 bricks?

13 A    Yes.

14 Q    And that was taken by Officer Morelli?

15 A    Yes.

16 Q    In the way that you described previously?

17 A    Yes.

18 Q    And then after he had taken the video of the real bricks,

19 Officer Morelli removed the sham bricks from the duffle bag he

20 was carrying them in; right?

21 A    He removed the sham bricks from the duffle bag when he

22 got inside and when he was about to take them out, I said wait

23 a second, let me videotape this.  Then he videotaped it.

24 Q    Now, you said when he got back inside.  This time did he

25 climb inside or was he standing on the tarmac?

1  A    No, standing on the tarmac with his upper body inside.

2  Q    Right.  But your full body was inside the avionics

3  compartment?

4         THE COURT:  Okay.  That's been asked and answered

5  several times already.  Move on.

6  Q    And while you were still inside the avionics compartment,

7  Officer Morelli took a video, and then is when he removed the

8  sham bricks from the duffle bag?

9  A    I believe -- no, he removed them first.

10 Q    And then you began to hand the bricks from the avionics

11 compartment to Officer Morelli?

12 A    After it was videotaped, yes.

13 Q    And you removed all ten of them to give to Officer

14 Morelli?

15 A    Yes.

16 Q    And after they were all removed, how did you replace

17 those 10 bricks with the four bricks that you had?

18 A    We -- he would spray the sham, hand it to me, I would put

19 it in place.  I don't remember if I stacked them or if I just

20 had them straight across.  I believe I may have stacked them.

21 I don't remember.  I kind of wish that we took pictures of the

22 placement of the shams afterwards, but we didn't.  I can't

23 tell you.

24 Q    Why do you wish you would have taken the pictures?

25 A    It would be more clear.

1    Q    Easier to remember as you're testifying today?

2    A    Yes.

3    Q    So the clue spray, it's like an aerosol can; is that

4    right?

5    A    Yes.

6    Q    Like a spray paint can, sort of?

7    A    Yes.

8    Q    And Officer Morelli is spraying them inside the avionics

9    compartment, one by one?

10   A    Yeah.

11   Q    And then after he sprays them inside the avionics

12   compartment, he hands it to you and you put one down?

13   A    Yeah.

14   Q    And you go through that process for all four; right?

15   A    Yeah.  Except for the transponder.  He didn't spray the

16   transponder.  He set it up, handed it to me.  Once I put it in

17   place and got the confidence tone, then I sprayed that, pulled

18   the insulation blanket down on top of it, set up the

19   insulation blanket, sprayed the insulation blanket with the

20   clue spray, and then we exited.

21   Q    So the whole insulation -- the whole insulation blanket

22   was then put back on top of the fake bricks?

23   A    Yes.

24   Q    And that's where you sprayed it?

25   A    Yes.

1  Q    And then after you sprayed the clue spray on top of the

2  insulation blanket, you left out of the avionics compartment;

3  is that right?

4  A    Yes.

5              THE COURT:  Why don't we stop there and take our

6  lunch break.

7              I'm going to ask everyone to come back at 2:15, and

8  remember, jurors, as I previously instructed you, remember not

9  to have any contact or conversations with any of the parties

10  in this case, any witnesses or court staff, wherever you might

11  encounter.

12             Remember, if any attempt is made by anyone to

13  converse with you about this case or any incident occurs

14  within your knowledge involving any attempt by any person to

15  improperly influence any member of the jury, report it

16  promptly to the Court.

17             Do not discuss the incident either -- do not discuss

18  either the incident or the fact that you feel it necessary to

19  report it to the Court with any other juror or anyone other

20  than my case manager or my law clerks, Reed Erhardt or Joshua

21  Couce.

22             Remember that you can't discuss any aspect about

23  this case, including jury selection, with anyone, family

24  members, whoever, in person or through your phones or any

25  other media.

1          Keep an open mind.  Do not form any opinion about

2     the guilt or non-guilt of the defendant on trial until such

3     time as the evidence has been presented, you've been

4     instructed on the law and have had an opportunity to

5     deliberate with your fellow jurors.

6          Remember that you can't read or listen or view

7     anything at all about this case over any kind of media.  You

8     cannot do any research or investigation about the case over

9     any kind of media, and you may not visit or view any location

10    that may be involved in this case or mentioned during the

11    trial.  I highly doubt that in the lunch hour you could get to

12    JFK in the middle of the day from here.

13         But in any event, please be here promptly and

14    remember that each of you is important.

15         I just do want to add a couple of things.  I meant

16    to mention this earlier this morning.  Some people may have

17    special dietary needs, whether it is eating Halal food or

18    kosher food, or maybe your diabetic.  I strongly encourage --

19    as you saw, we have a refrigerator for you in the jury room.

20    It gets a little expensive eating out as well, as many nice

21    places as we have around here to eat.  So I encourage,

22    especially if you have special dietary needs, feel free to

23    bring your own food, bring snacks.

24         And for those of you who have any, you know, special

25    physical conditions, if you start to feel dizzy or anything

1   like that, please raise your hand right away and let us know,

2   okay?  We do want to make sure that you're comfortable and

3   that you stay well throughout this process.  Okay?

4           And that's part of reason why we take these breaks

5   in the middle of the day, to help accommodate folks who have

6   special dietary, physical needs.  All right?

7           So enjoy your lunch.  I hope it is still sunny

8   outside so you can enjoy the park or wherever you go.

9           We'll see you at 2:15.

10          THE COURTROOM DEPUTY:  All rise.

11          (Jury exits the courtroom.)

12          THE COURT:  Officer Robinson, so now you are on

13  cross examination, so you can discuss scheduling with the

14  Government but not your testimony.  Okay?

15          And I will see everybody back here at 2:15.

16          MR. POLLACK:  Thank you, Your Honor.

17          MS. SCHIERBERL:  Thank you, Judge.

18          (Lunch recess.)

19

20

21

22

23

24

25

1    A F T E R N O O N   S E S S I O N

2              (Time noted:  2:15 p.m.)

3         THE COURT:  In the future, before we bring the

4    witness can you ask me if that's what I want to do because I

5    may have things that I want to address with counsel.

6         All the jurors are back so unless there is anything

7    else, Mr. Cohen you can take your position as well.  Please

8    refrain from making commentary after answers.  Don't do that,

9    please.

10             (Jury enters.)

11        THE COURT:  Everyone may be seated.  Do the parties

12   agree that all of our jurors are present and properly seated,

13   government?

14        MS. SCHIERBERL:  Yes, Your Honor.

15        THE COURT:  Defense?

16        MR. COHEN:  Yes.

17        THE COURT:  Thank you.  This is -- well, first of

18   all, I hope everyone had a good lunch.  I hope you're

19   refreshed because you have a lot of work to do this afternoon.

20   This is continued cross-examination of Officer Robinson by

21   Mr. Cohen.

22             I remind you, sir, that you are still under oath.

23             You may inquire when you're ready, Mr. Cohen.

24        MR. COHEN:  Thank you, Your Honor.

25             (Continued on the following page.)

CROSS-EXAMINATION

BY MR. COHEN: (Continued.)

Q    Officer Robinson, how long and wide -- what were the
dimensions of the insulation blanket that you had to spray
with the clue spray?

A    I couldn't tell you.  I didn't measure it.

Q    Was it longer than three feet do you know?

A    Yes.

Q    Was it wider than one foot?

A    Yes.

Q    And you sprayed it inside the avionics compartment after
you covered the sham drugs; is that right?

A    Yes.

Q    And what did you us to make sure that the clue spray
didn't get on anything else?  Did you put duct tape around it
or anything?

A    No.

Q    Did you use anything to make sure it didn't get anyplace
else?

A    No.

Q    Now, you said you took photos of where the drugs were
found, that's right?

A    Yes.

Q    But no photos of how you left it after the installation
was sprayed with the clue; is that right?

1  A    Yes.

2  Q    When you replaced the insulation blanket, did you put the

3  clips back in to hold it into place?

4  A    There was no clips holding it in place.

5  Q    Are there normally clips that hold the insulation

6  blankets in place in there?

7  A    Yes.

8  Q    Okay, so you didn't put any clips back on; is that right?

9  A    There was none to begin with.

10 Q    When you put it down, was it clipped in place?

11 A    It was not.

12 Q    Okay.  Now, you said --

13           THE COURT:  I'm sorry, Mr. Cohen.

14           You folks in the back you, need to swear a mask if

15 you're going to sit in this courtroom.  We have masks that we

16 can give you.  Thank you, I appreciate it.

17 BY MR. COHEN:

18 Q    Now I understand you said you wish you would have taken

19 photos because it would have helped you remember what it

20 looked like; correct?

21 A    Yes.

22 Q    It would have helped the jury see what it looks like;

23 correct?

24 A    Yes.

25 Q    When you were outside of the plane with your partner you

1    testified that you saw an American Airlines vehicle driving

2    around and stop in front of the plane; is that right?

3    A    Yes.

4    Q    And at what point during the investigation as you

5    testified was it that you saw that?  At what point in the

6    investigation?  Was it prior to putting the sham drugs in the

7    plane?

8    A    Yes.

9    Q    Or post?

10   A    Yes.

11   Q    It was prior to doing that?

12   A    Yes.

13   Q    And that's why you were in the CBP vehicle?

14   A    Yes.

15   Q    And dressed in your uniform; right?

16   A    Yes.

17   Q    And this was suspicious to you, right?

18   A    Yes.

19   Q    And you called it in to your supervisor; right?

20   A    Yes.

21   Q    And you even took down the alphanumeric code; is that

22   right?

23   A    Right.

24   Q    Where did you write down the code?

25   A    I didn't.

 1  Q    Where did you write down that you saw a suspicious
 2  vehicle?
 3  A    I didn't.
 4  Q    Is it the only information we have about you seeing a
 5  suspicious vehicle then is your testimony; is that right?
 6  A    Yes.
 7  Q    You put all of these -- withdrawn?
 8          MR. COHEN:  I'm going to ask, Christie, could we put
 9  up Government Exhibit 206 in evidence, please?
10          THE COURT:  You mean Ms. Carosella.
11          MR. COHEN:  I'm sorry.
12          THE COURTROOM DEPUTY:  Are you using the document
13  camera?
14          MR. COHEN:  I need it on the screen.
15          THE COURTROOM DEPUTY:  I need to know where it's
16  coming from.
17          THE COURT:  Which exhibit was that again, sir?
18          MR. COHEN:  206.
19          (Exhibit published.)
20  BY MR. COHEN:
21  Q    Is this a fair and accurate representation, Government
22  Exhibit 206 in evidence of what the ten kilos, the ten bricks
23  that you found looked like?
24  A    Yes.
25  Q    And you said you put those ten bricks inside of a duffle

1   bag; is that right?

2   A    Yes.

3   Q    And you told us how high that duffle bag was and high to

4   the inch; is that right?

5   A    I gave approximations.

6   Q    And can we see that duffle bag?  Where is that duffle bag

7   now?

8   A    I don't have it with me.  It's in my work vehicle at

9   Kennedy Airport.

10  Q    Have you ever provided that to the Government?

11  A    I did not.

12  Q    Did you ever take a photo of it?

13  A    No.

14  Q    So again we only have your word about that duffle bag's

15  existence; is that right?

16  A    Yes.

17  Q    A photo of that would help you explain is the size to the

18  jury to the exact inch; is that right?

19          THE COURT:  Move on.

20  BY MR. COHEN:

21  Q    Now, before you drove away from the airplane, you and

22  Officer Morelli were in the car together; is that right?

23  A    Yes.

24  Q    And you're in that CBP vehicle you testified to earlier?

25  A    What do you mean, when we left the area after putting in

1   the transponder.

2   Q   Before you left the area, you were in the CBP vehicle the

3   whole time; correct?

4   A   Yes.

5   Q   And you testified earlier that you would be observable to

6   all American Airlines employees, right?

7   A   If they were in that area, yes.

8   Q   And when you left the airplane you were carrying a duffle

9   bag with ten kilos of cocaine; is that right?

10  A   May partner was, yes.

11  Q   And that duffle bag, that we haven't seen yet, was placed

12  inside your vehicle; is that right?

13  A   Yes.

14  Q   And that was brought from the plane to the vehicle; is

15  that right?

16  A   Yes.

17  Q   And then you decided that you needed to change cars; is

18  that right?

19  A   Yes.

20  Q   And you wanted to change cars because you wanted to go

21  undercover; is that right?

22  A   Yes.

23  Q   Because it was your belief --

24          THE COURT:  Are you testifying or asking questions

25  because it sounds like testimony; and saying is it correct

1   does not make it a question.  So please, ask a question.

2   BY MR. COHEN:

3   Q    Were you in a marked vehicle when you were next to the

4   plane?

5   A    Yes.

6   Q    And what did the marked vehicle identify you as?

7   A    CBP.

8   Q    And what did your uniform identify you as?

9   A    CBP.

10  Q    And what did Officer Morelli's uniform identify him as?

11  A    CBP.

12  Q    And when you got to the location approximately 3:30 what

13  did your marked vehicle identify you at that point?

14  A    CBP.

15  Q    And when you were retrieving and replacing the cocaine

16  inside the plane, what did your marked vehicle identify you

17  as?

18  A    CBP.

19  Q    And when you decided to leave the area, why did you want

20  to switch vehicles?

21  A    So that we could conduct our surveillance in an unmarked

22  vehicle.

23  Q    And why would you want to conduct your surveillance in an

24  unmarked vehicle?

25  A    In case whoever was going to come pick up the drugs if

1   they saw our vehicle it would deter them from doing that.

2   Q    How many years have you been working at JFK, sir?

3   A    I started working at JFK with Pan American Airlines in

4   1988.

5   Q    Are you familiar with the best places to conduct

6   undercover surveillance at JFK?

7   A    The best places?  We go by case scenario, individual

8   scenarios.  You've got to go with what have.

9   Q    And on this day, February 4, 2020, did you determine what

10  the best place to conduct undercover surveillance of this

11  particular airplane was?

12  A    Yes.

13  Q    Are you familiar with Terminal 8, Gate 7?

14  A    Yes.

15  Q    All right.

16         MR. COHEN:  With the Court's permission I would like

17  to show the witness and the Government and the Court a

18  previously marked defense exhibit, C-1, which is a video.

19       (Exhibit published to witness, counsel and Court only.)

20  BY MR. COHEN:

21  Q    Are you able to see that Officer Robinson?

22  A    Yes.

23         (Video played; video paused.)

24  Q    Were you able to see the whole video Officer Robinson?

25  A    Yes.

1    Q    Are you familiar with what was -- do you recognize what

2    was depicted in the video in C-1?

3    A    Yes, it was Gate 7 and the surrounding area.

4    Q    And does that video fairly and accurately reflect the

5    tarmac area and Terminal 8 around Gate 7 where you removed the

6    drugs from the plane?

7    A    Yes.

8            MR. COHEN:  Your Honor, I offer Defense C-1 into

9    evidence.

10           THE COURT:  Any objection?

11           MS. SCHIERBERL:  No objection, Your Honor.

12           THE COURT:  It is admitted.

13           (Defense Exhibit C-1 received in evidence.)

14           MR. COHEN:  Your Honor, I ask that we publish that

15   to the jury at this time.

16           THE COURT:  It may be published.

17           (Exhibit published.)

18           MR. COHEN:  Ms. Cronin, can you please go to 19

19   seconds in the video, please.

20   BY MR. COHEN:

21   Q    Officer Robinson, do you see what is circled at 19

22   seconds in C-1 in evidence?

23   A    Yes.

24   Q    Can you tell us what that is?

25   A    No.

1   Q    Do you see a pole in C-1?

2   A    Yeah.

3   Q    And do you see a pinkish circle around two cameras on

4   that pole there?

5   A    Yes.

6   Q    Are those cameras that face directly to Gate 7?

7           THE COURT:  To be accurate, there are two circles.

8   Q    Those are both cameras; is that correct, sir?

9           THE COURT:  What are they?  Are you testifying or

10  what?  Do you want to switch chairs?

11  BY MR. COHEN:

12  Q    What is the top circle, sir?

13  A    The top circle looks like a camera and I couldn't

14  identify the bottom one as a camera but I will take your word

15  for it if you say it is.

16          THE COURT:  He is not the witness and he's not under

17  oath and he's not going to testify anymore.

18  Q    Where is that top camera facing toward, Officer Robinson?

19  A    It looks like it's facing towards the ground.

20          MR. COHEN:  Can you go to 33 seconds, please?

21          (Exhibit published.)

22  Q    Are you familiar with what is depicted in C-1 at 36

23  seconds, Officer?

24  A    It looks like the building at American Airlines Terminal

25  by Gate 7.

1  Q     And do you see what at 36 seconds is being circled in

2  pink?

3  A     Yes.

4  Q     And what is being circled in pink at 36 seconds on C-1?

5  A     It looks like a camera.

6  Q     Okay.  And now there's a bottom circle, the 36 seconds on

7  C-1?

8  A     It looks like a camera.

9  Q     And now in the middle right of the screen, there is a

10 third circle.  Can you tell us what that is?

11 A     It looks like a camera.

12 Q     And there's a fourth circle on the bottom right at 36

13 seconds.  Can you tell us what's depicted there?

14 A     It looks like a camera.

15 Q     Do you recognize what's depicted at 54 seconds in C-1?

16 A     That's the jet bridge at Gate 7 to the right of the

17 picture is the jet bridge.

18 Q     Is that the jet bridge that you observed Mr. Belloisi go

19 on to?

20 A     Yes.

21 Q     Can you show where you set up surveillance?

22 A     It's not depicted in this photo.

23 Q     Was it depicted in this video at all?

24 A     Yes.

25 Q     And when Ms. Cronin starts playing the video will you say

1   stop when you see where you had set up surveillance on

2   February 4, 2020 and before she plays it, can you see that

3   area now?

4   A    I do, but if you can go back further it would be a better

5   reference.  Right there is good.  I'm looking to get a

6   reference to where it was in relation to a small alcove that's

7   to the right of where we were parked.  I have my reference, so

8   if you can let the video play a little bit.

9   Q    Please let us know when we should stop it.

10  A    Stop.

11           (Video played; video paused.)

12  Q    With the Court's permission you can draw on the screen

13  where you set up surveillance?

14  A    (Indicating.)  Now this would be an approximation.

15  Q    Understood, sir.  And you put an X about three-quarters

16  of the way from the -- reading left to right on the bottom

17  part of the screen; is that accurate?

18  A    Yes.

19  Q    And you did it in front of a pole; is that accurate?

20  A    Yes.

21  Q    And on that pole are there also a top camera on that

22  pole?

23  A    I have no idea.

24  Q    You've been in there since the '80s and you don't know if

25  there's a camera on it?

1   A     I don't pay attention to cameras.  That camera may not

2   have been there in 1988 if there is a camera there.

3   Q     Do you see what is circled in pink in the top right

4   corner next to the number seven at 54 seconds in C-1?

5   A     Yes.

6   Q     And can you tell us what that is?

7   A     A camera.

8   Q     And does that -- where is that camera in relation to the

9   jet bridge that you said Mr. Belloisi went up into?

10  A     It looks like the pole for the camera is behind the

11  stairway to the jet bridge.

12  Q     In the middle to the left there is a second circle.  Can

13  you tell us what is inside of that circle?

14  A     It looks like cameras.

15  Q     The third circle on the left-hand side of the screen, can

16  you tell us what's inside that circle?

17  A     It looks like cameras.

18  Q     Have you ever had the opportunity to see any of the

19  recordings from February 4, 2020 -- withdrawn, because you

20  have one in evidence.

21        By the way what time did surveillance start, what

22  time?

23  A     After the video was taken.  The video was taken at 4:12,

24  so I would approximate maybe 4:30.

25  Q     Did you take any notes about when you started your

1   surveillance?

2   A      No.

3   Q      Did you take any notes at all regarding your activities

4   on February 4, 2020?

5   A      No.

6   Q      Did you fill out any paperwork at all regarding your

7   activities on February 4, 2020?

8   A      The only paperwork would be meeting sheets that record

9   the flights that we did for the day and what areas we

10  searched.  But notes on what we did and timelines as far as

11  surveillance or when the drugs are found, the answer is no.

12  Q      And when you say "we," I just want to stick to you, not

13  what other people do.

14  A      Right.

15  Q      You didn't take any notes that day or fill out any

16  paperwork?

17  A      No.

18  Q      You and Officer Morelli when you began your surveillance

19  did you stay in one place to surveil the plane?

20  A      Yes.

21  Q      And what was your focus and what was your role in

22  surveilling the plane?

23  A      My focus was looking at the nose tire of the aircraft

24  using binoculars because right behind the nose tire is where

25  the avionics compartment is.

1  Q    Does the avionics compartment go by another name as well?

2  A    E&E compartment, Electronic equipment compartment.

3  Q    Thank you.  And you testified you first saw Mr. Belloisi

4  pull up to the plane in what type of a vehicle?

5  A    A blue van the first time.  I didn't even know if it was

6  him.

7  Q    Mr. Belloisi --

8  A    It was the small utility-like vehicle.

9  Q    And when you saw Mr. Belloisi pull up in that blue

10 utility vehicle --

11 A    I don't know if the utility vehicle was blue, but it was

12 a small utility vehicle.

13 Q    When you saw Mr. Belloisi pull up in the utility vehicle,

14 did he initially go into the avionics compartment?

15 A    No.

16 Q    Where did he initially go to?

17 A    The jet bridge.

18 Q    And did you see Mr. Belloisi actually enter into the

19 aircraft?

20 A    I saw him go up the stairs and eventually, yeah.

21 Q    Yeah --

22 A    He entered the --

23 Q    And you actually observed Mr. Belloisi enter the cabin of

24 the aircraft, didn't you?

25 A    No, you can't see that.  Once they enter the jet bridge,

1   that's it.  I can't see them anymore.

2   Q    So is it your testimony that you did not see him enter

3   the cabin of the aircraft?

4   A    I did not see him enter the cabin.  After he entered the

5   jet bridge, I couldn't tell you where he went.

6   Q    Officer Robinson you've testified in this case

7   previously; is that right?

8   A    Yes.

9   Q    And you've testified in the same courtroom; is that

10  right?

11  A    Yes.

12  Q    And that testimony was on Friday, June 17th of 2022;

13  correct?

14  A    Correct.

15  Q    And that was regarding a suppression hearing in this

16  courtroom in this case; is that right?

17  A    Yes.

18  Q    I'm going to direct the Government's attention to page

19  180 -- 181, excuse me, line -- on June 17th of 2022 when you

20  testified in this courtroom regarding the suppression of

21  evidence hearing, can you tell me if you were asked these

22  questions and gave these answers:

23          "Question:  Okay, and when you noticed him the

24  second time when you came down the jet bridge, your attention

25  was drawn to him because you saw him go under the aircraft; is

1   that right?

2           "Answer:  Yes."

3           And then Her Honor asked you:

4           "Can I stop you there for one second?"

5           You answered:  "Of course."

6           The judge says:  "If he's on the jet bridge is he in

7   the plane or is he outside the plane?"

8           Your answer:  "The jet bridge.  It connects to the

9   side of the aircraft.  He had to go up the stairs to get into

10  the jet bridge and then from the jet bridge he entered into

11  the cabin of the aircraft."

12          Do you remember being asked those questions and

13  giving those answers?

14  A    Yes.

15  Q    Today you testified -- is it your testimony that

16  Mr. Belloisi was in there for about two minutes?

17  A    Approximately, yes.

18  Q    Isn't it right that you believed he was actually in there

19  for ten minutes?

20  A    No.  Are you talking about from the suppression hearing?

21  Q    I'm asking you the question, do you believe he was in

22  there for about ten minutes?

23  A    I may have because I wasn't paying attention at the time

24  and since then I saw the surveillance videos and saw what the

25  actual time was.

1  Q    So are you saying before testifying in the suppression
2  hearing June --
3            THE COURT:  There's been reference to a suppression
4  hearing.  It was a hearing.  The kind of hearing is completely
5  irrelevant.
6            MR. COHEN:  I can leave it out, Your Honor.  No
7  problem.
8            THE COURT:  And your commentary is irrelevant also.
9  BY MR. COHEN:
10 Q    When you testified at the hearing June 17, 2022, two and
11 one-third years after the arrest of Mr. Belloisi, are you
12 saying at that point you had never looked at the video of your
13 actions?
14 A    That's correct.
15 Q    When was the first time you looked at the video?
16 A    At the last hearing on June 17th.
17 Q    Do you believe the video to be an accurate representation
18 of what lapped on February 4, 2020?
19 A    Yes.
20 Q    And you testified you had no notes from that day?
21 A    Correct.
22 Q    And the first time you looked at the video was after you
23 were sworn in as a witness?
24 A    Yes.
25 Q    After Mr. Belloisi exited the aircraft, where did you --

1  withdrawn.

2         Where did you observe Mr. Belloisi exit the aircraft

3  on February 4, 2020?

4  A    Well, when I was -- I had my attention on the nose tire

5  peripherally with the binoculars I was able to see someone

6  exit the jet bridge and go down the stairs.

7  Q    And you later learned that that someone was Mr. Belloisi?

8  A    Yes.

9  Q    And when you saw him enter the avionics compartment, what

10 did you do?

11 A    I notified my partner what I was seeing through the

12 binoculars and narrated it step-by-step what I saw.

13 Q    Was your partner taking notes of what you were telling

14 him?

15 A    No.

16 Q    Did you begin driving to the aircraft before the

17 transponder went off?

18 A    Yes.

19 Q    And did the transponder go off just as you reached the

20 aircraft?

21 A    No.  It went off -- if you remembered looking at the

22 video, there's a point where my partner paused the car and was

23 paused there for a little bit and then you see him start up

24 again accelerating towards the aircraft.  At that point we

25 were behind the wing.  At that point that's when we heard the

1  transponder go off.
2  Q    So the transponder didn't go off just as you reached the
3  aircraft?
4  A    No.
5  Q    Directing your attention to the hearing, on page 186 line
6  24, Officer Robinson -- at the suppression hearing on June
7  17th --
8            MR. COHEN:  I apologize, Your Honor.
9  Q    At the hearing on June 17, 2022, can you tell us if you
10 were asked this question and gave this answer:
11           "Question:  But the beeps changed that indicated to
12 you that the brick had been moved; is that right?
13           "Answer:  Yes.
14           "Question:  And you heard that while driving over to
15 the aircraft?
16           "Answer:  Just as we reached the aircraft."
17           Were you asked that question and did you give that
18 answer?
19 A    Yes.  But when you said reached the aircraft --
20 Q    There's no question, sir.  When the transponder goes off,
21 where is the history of the transponder recorded?
22 A    I don't think there is a recording of the history.  You
23 mean on the unit itself?
24 Q    Anywhere at all.
25 A    No.

1  Q    Do you have a history of the recording of the transponder

2  going off on February 4, 2020?

3  A    No.

4  Q    The only evidence that you have of the transponder

5  actually going off is your testimony; is that right?

6  A    Yes.

7  Q    As a law enforcement officer for Customs and Border

8  Patrol, is it your understanding that JFK Airport have cameras

9  blanketing the tarmac?

10 A    Yes.

11 Q    Have you ever used surveillance footage captured from

12 those cameras in your investigations?

13 A    No.

14 Q    Do you know as a CBP officer at JFK that there are

15 cameras that capture all the gates at the terminal?

16 A    Yes.

17 Q    Do you know that these cameras also record?

18 A    Yes.

19 Q    And do you know that because you have seen recordings

20 from the cameras?

21 A    The first time I saw a recording from the cameras was at

22 the hearing in July -- June or July of last year, yeah, last

23 year.

24 Q    So it's your understanding that the cameras record?

25 A    Yes.

1        MR. COHEN:  With the Court's permission I would like

2   to show the witness, the Court and the Government Defense C-2.

3        (Exhibit published to witness, counsel and Court only.)

4        THE COURT:  And just to be clear that's C-2 for

5   identification.

6            (Exhibit published.)

7            (Video played; video paused.)

8        THE COURT:  Is there a question here?

9        MR. COHEN:  I was having the witness look at the

10  video Your Honor.

11  BY MR. COHEN:

12  Q    Are you familiar with what's depicted in this video,

13  Officer Robinson?

14  A    Yes.

15  Q    And do you recognize what's depicted in this video?

16  A    It looks like a bunch of CBP officers and I'm assuming,

17  but I know I shouldn't assume, that Paul Belloisi is in that

18  mix.  I couldn't tell you what was going on.

19  Q    Have you seen this video before?

20  A    Yes.

21  Q    Is this a fair and accurate depiction of your arrival at

22  the plane on February 4, 2020 and concluding a few minutes

23  after your arrival?

24  A    Yes.

25          MR. COHEN:  I ask to move this into evidence, Your

1    Honor.

2            THE COURT:  Any objection?

3            MS. SCHIERBERL:  No objection, Your Honor.

4            THE COURT:  It is admitted.

5            (Defense C-2 received in evidence.)

6            MR. COHEN:  I'm going to ask Ms. Cronin to start at

7    four and a half minutes.

8            Your Honor, may we publish it to the jury?

9            THE COURT:  Yes.

10           (Exhibit published.)

11           (Video played; video paused.)

12   BY MR. COHEN:

13   Q    Officer Robinson, is this a continuation of the video

14   that you had seen earlier just more video on the back end?

15   A    Yes.

16   Q    We'll start it at 3:07.

17           (Video played; video paused.)

18   Q    Officer Robinson, who's depicted in the middle bottom of

19   that photo at 3:14 of the video?

20   A    That would be me.

21           MR. COHEN:  Play the video, please.

22           (Video played; video paused.)

23   BY MR. COHEN:

24   Q    And at 3:17, is that you crouched down under the airplane

25   there?

1   A    Yes.

2   Q    Officer Robinson, I'm going to ask Ms. Cronin to play the

3   video and I'm going to ask you if at any point you see

4   yourself go further underneath the video [sic] to directly

5   underneath the avionics compartment.

6            (Video played; video paused.)

7   A    It looks like I'm going under further there.

8   Q    So is it your testimony now that you went further under

9   airplane in that video than staying crouched down beside of

10  it?

11  A    It looks like I edged closer, yes.

12           (Video played; video paused.)

13  Q    Officer Robinson, you testified on direct examination

14  that you were able to see from crouched down there into the

15  avionics compartment; is that right?

16  A    Yes.

17  Q    But you never in fact put your head into the avionics

18  compartment while Mr. Belloisi was in there, did you?

19  A    That is correct.  The last time I was here I gave an

20  explanation of where I was.

21  Q    The question --

22  A    I was continuing to answer.  I was continuing my answer.

23  Q    You told me "correct."

24  A    I continued the answer.

25  Q    You --

1          THE COURT:  Please don't argue.  Don't argue.

2          MR. COHEN:  Thank you, Your Honor.

3          THE COURT:  No, don't thank me either.  I'm talking

4    to you too.  Do not argue with the witness.

5          And you don't argue with counsel.  The only one who

6    can argue here is me.

7    BY MR. COHEN:

8    Q    Officer Robinson, did you ever put your head inside the

9    avionics compartment while Mr. Belloisi was inside the

10   avionics compartment?

11   A    I don't think so.

12         THE COURT:  The gentleman in the back corner there,

13   would you mind putting on a mask, please.  I would appreciate

14   it.  Thank you.

15   BY MR. COHEN:

16   Q    With your head in the avionics compartment Officer

17   Robinson, would it have been easier to see inside the avionics

18   compartment than if you were crouched down next to the plane?

19   A    Perhaps.

20   Q    The June 17, 2022 hearing, page 169.  Sorry, the bottom

21   of page 168.  At that hearing, Officer Robinson, were you

22   asked these questions and given [sic] these answers:

23         "Question:  Did you ever see someone enter the

24   avionics compartment?

25         "Answer:  Yes.

1          "Question:  Approximately when did that happen?

2          "Answer:  After a four hour wait we saw somebody

3    enter the avionics compartment.  So we drove over there

4    towards the aircraft and within ten seconds of this performed

5    entering the avionics compartment he had tripped the

6    transponder, which is sending us a signal that you know the

7    alarm was going off.  So we drove up to the front of the

8    aircraft.  We both exited the vehicle.  I walked over to the

9    underside of the aircraft and poked my head into the entry

10   hatch" --

11         THE COURT:  If you're going to read it, read it

12   accurately, please.

13   Q    "I poked my head up into the entry hatch of the avionics

14   compartment and I saw Paul Belloisi with his back to me

15   readjusting and resecuring the insulation blanket."

16         Were you asked those questions and did you give

17   those answers?

18   A    Yes.

19

20         (Continued on the following page.)

21

22

23

24

25

1  CROSS-EXAMINATION

2  BY MR. COHEN:  (Continuing)

3  Q    But you did not, in fact, put your head in the avionics

4  compartment, did you?

5  A    I'm note sure if I did.  I assumed the last time I spoke

6  to you.

7  Q    Well, the questions that I just read and the answers you

8  just gave, who asked you those questions in this hearing in

9  June?

10  A    You did.

11  Q    Isn't it a fact that it was Mr. Pollack who asked you

12  those questions and not me?

13  A    I thought it was you.  We're going back a year.

14        THE COURT:  He doesn't have the transcript in front

15  of him, Counsel.  Just move on, please.

16        MR. COHEN:  Your Honor, I can provide it if you'd

17  like.

18        THE COURT:  Move on, please.

19        Thank you.

20  Q    At 356 at C2, which is in evidence, can you see that in

21  front of you now, Officer Robinson?

22  A    What's depicted on the screen?

23  Q    Yes, sir.

24  A    Yes.

25  Q    And does that depict CBP officers, law enforcement

1  officers including yourself, near and around Mr. Belloisi?

2  A    Yes.

3  Q    Okay.  At that point, when he came out of the aviation --

4  that was -- withdrawn.

5         Was that right after he came out of the avionics

6  compartment?

7  A    Shortly afterwards, yes.

8  Q    He wasn't carrying a bag with him, was he?

9  A    No.

10  Q    There were multiple law enforcement officers around

11  watching him; is that right?

12  A    Yes.

13  Q    And you testified that you know that there are cameras

14  that are blanketing the tarmac; is that right?

15  A    I do now.  But I assumed at the time, but I never really

16  gave much thought to it.

17  Q    You didn't know what Mr. Belloisi was going to do when he

18  came out of that avionics compartment, did you?

19  A    No.

20  Q    Did you know if he was going to call his supervisors to

21  tell him what he saw on the plane?

22  A    No.

23  Q    Did you know if he even saw anything under there at that

24  point?

25  A    I assumed that he did because the transponder was set

1   off.

2   Q    Did you know that he had seen anything on the plane when

3   he had come out of the avionics compartment?

4   A    I can't say I knew.  I just assumed.

5   Q    Did you have any idea what he was going to do when he

6   came out from underneath that plane?

7            THE COURT:  Asked and answered.  Move on.

8   Q    The question is, why didn't you just wait to see what he

9   was going to do when he came out of the avionics compartment

10  instead of running up to him?

11  A    Sounds like Monday morning quarterbacking.

12  Q    I don't know if that's an answer, sir.

13           Why didn't you just wait?

14  A    Didn't think of it.

15  Q    You were surveilling him for four hours, you set up a

16  strategic plan with your partner, did you not?

17  A    To set up the gear.

18  Q    And part of that gear was you watching and surveilling

19  the plane, wasn't it?

20  A    Yup.

21  Q    And you got Homeland Security to sit and watch the plane;

22  isn't that true?

23  A    What do you mean?

24  Q    Customs and Border Patrol contacted Homeland Security to

25  come and watch the plane as well; isn't that right?

1  A      Yes.

2  Q      Okay.  And Agent John Moloney sitting right here was one

3  of those agents that same day, right?

4  A      Yes.

5  Q      So you knew while surveilling the plane that Customs and

6  Border Patrol were watching the plane, correct?

7  A      Yes.

8  Q      And did you know that Homeland Security was also watching

9  the plane?

10  A      Yes.

11  Q      And when Mr. Belloisi came out of the avionics

12  compartment, you knew he wasn't carrying any drugs; isn't that

13  right?

14  A      Yes.

15  Q      So I ask you, why didn't you wait to see what he was

16  going to do next?

17  A      I didn't think -- think about doing that.

18  Q      Well, as Monday morning quarterback, do you think it

19  would've been a better idea to wait a little while?

20  A      No.

21  Q      And why not?

22  A      I think a better idea is, if I had a camera on the unit

23  having it rolling to film him while he was up in there.

24  Q      Because that would've given an objective recording of

25  what actually happened, right?

1   A      Yes.

2   Q      And that would've helped this jury know what really

3   happened, right?

4   A      Yes.

5   Q      Because of your role in the uncovering of the ten kilos

6   of cocaine on February 4th, 2020, you had to provide facts to

7   your supervisor about what happened; is that true?

8   A      Yes.

9   Q      And did you have to tell them where you found the bricks?

10  A      Yes.

11  Q      Did you have to tell them how you removed them?

12  A      We just told them we removed them.  We didn't give them a

13  detailed explanation of how we removed them.

14  Q      Did you have to tell them that you replaced it with sham

15  bricks?

16  A      Yes.

17  Q      Did you have to tell them about your interaction with

18  Mr. Belloisi on the tarmac?

19  A      I'm sure we did.  I don't recall.  Because once he left

20  the tarmac with HSI, he was no longer our concern.

21  Q      And your -- the facts that you gave to your supervisor

22  made up part of the incident report that was filled out by

23  your supervisor; is that right?

24  A      My partner filled out the seizure report.

25  Q      And that contained facts of what you did; is that right?

1  A    It didn't list everything that we did; just a general

2  area, a general outline.

3  Q    When you testified previously at a hearing, you testified

4  that you found bricks on the right side of the aircraft; is

5  that correct?

6  A    I made a mistake, because I entered the aircraft facing

7  the tail.  So it was to my right.

8  Q    So the answer is yes, you made a mistake?

9  A    Yes.

10 Q    And it makes sense, because you entered one way, it was

11 on your right, but you know that the planes are right and left

12 when you're facing the nose?

13 A    Yes.

14 Q    Fair to say it was an honest mistake?

15 A    Yes.

16 Q    You mistook the left for the right because --

17          THE COURT:  Enough.  Could you move on to the next

18 question.

19 Q    And then the next day, you alerted the prosecutor to the

20 mistake, correct?

21 A    Yes.

22 Q    You sent him a text message; isn't that right?

23 A    Yes.

24 Q    And you told him that it was good that it was noted in

25 the seizure report, the correct side, even though you made a

1   mistake on the testimony, right?

2   A    Yes.

3   Q    And that's because you saw the seizure report which said

4   the correct side, right?  That's how you knew it was in the

5   seizure report that it was correct?

6   A    I -- well, yeah, I guess.

7   Q    Well, we don't want you to guess.

8         But you told them in that text message:  At least

9   the seizure report has it on the correct side, right?

10  A    Right.  But that wasn't -- I didn't correct -- send the

11  correct -- the correction via text after reviewing the seizure

12  report.  I remembered thinking back to myself about it.

13  Q    And you said that it was correct in the seizure report?

14  A    Yes.

15  Q    And you knew that because you were the one who provided

16  the correct information initially?

17  A    Yes.

18  Q    And that seizure report was filled out at the time of the

19  incident, not the two plus years later when you were

20  testifying, correct?

21  A    Yes.

22  Q    Now, when you first encountered Paul Belloisi on the

23  tarmac, he said to you, "What's up, guys?"

24         Right?

25  A    Correct.

1   Q    He didn't appear nervous to you, correct?

2   A    Correct.

3   Q    But he did appear a little surprised, right?

4   A    Yes.

5   Q    You don't work for American Airlines, do you?

6   A    No.

7   Q    And you had never seen him before that day?

8   A    No.

9   Q    But he did have an American mechanic's ID on him?

10  A    Yes.

11  Q    Excuse me.

12       And you immediately asked him what he was doing in

13  the avionics compartment, right?

14  A    Yes.

15  Q    And did he tell you he was going to hit a reset button

16  for the air conditioning?

17  A    Words to that effect, yes.

18  Q    And you told him that he's lying or that's not true,

19  right?

20  A    Yes.

21  Q    And then he told you that he was going to take food from

22  the galley, correct?

23  A    He didn't tell me that.

24  Q    Didn't he tell you:  You notice the temperature was

25  moderately warmer than usual, and then he went down to the

1  flight deck, under the flight deck?

2  A    That was noted in the seizure report, but he didn't tell

3  that to me.

4            MS. SCHIERBERL:  Objection, Your Honor.

5            THE COURT:  I am going to strike all of this.  First

6  of all, assuming facts that are not in evidence.

7            And secondly, you can't testify to hearsay.

8            MR. COHEN:  I'm asking the officer about --

9            THE COURT:  Stricken.  It's stricken.  Move on.

10           MR. COHEN:  Your Honor, could we have a sidebar,

11  please.

12           THE COURT:  Yes.

13           MR. COHEN:  Thank you.

14           (Sidebar.)

15           (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1    (Sidebar conference held on the record in the presence of the

2    Court and counsel, out of the hearing of the jury.)

3              MR. COHEN:  The witness testified that he remembered

4    the mistake because of something that was contained in a

5    seizure report.  The seizure report also contains

6    information --

7              THE COURT:  This is not proper cross-examination

8    because he did not prepare that report.  He said he didn't

9    prepare that report.  It's not his statements.  So what you're

10   eliciting is hearsay from other witnesses.  So this is

11   improper.

12             And I am also going to tell you what is also

13   improper here.  What is improper is these facial expressions

14   and your emotional reactions to answers and to my comments.

15   So you're going to control that and keep that in check because

16   you're getting snarky, your tone is getting snarky, and I

17   don't appreciate that.

18             MR. COHEN:  Your Honor, I have the utmost respect

19   for the Court.  I am not making faces at all.

20             THE COURT:  You are, absolutely.

21             MR. COHEN:  I disagree with you, Your Honor.

22             THE COURT:  You are, absolutely.  You are absolutely

23   doing that.

24             MR. COHEN:  Again, I respectfully --

25             THE COURT:  So you shall refrain.

1          MR. COHEN:  I respectfully disagree, Your Honor.

2          THE COURT:  Well, can you see your face?

3          MR. COHEN:  No, but I can feel it; I'm the one

4    making the faces.

5          THE COURT:  I am telling you that you are doing it,

6    so you shall refrain.

7          The objection is sustained.  Can you move on.

8          MR. COHEN:  Can I make a further record since we're

9    here on this issue?

10         MR. SIMPSON:  Your Honor, the witness has literally

11   just made reference to this report containing correct

12   information that he supplied regarding what he did and what he

13   experienced.  And Mr. Cohen confirmed that with him in the

14   terms of the correct side of the aircraft in which he found

15   the drugs.

16         THE COURT:  But that's gone over already.  What he's

17   eliciting now is additional comments that were allegedly to

18   the defendant, not made to this witness, and there's testimony

19   that I imagine is going to come from other witnesses from the

20   government.  And this is my recollection from the suppression

21   hearing, is that there were other comments that the defendant

22   made in the presence of other witnesses.

23         MS. SCHIERBERL:  That's correct, Judge.

24         THE COURT:  So when those witnesses come up, you

25   will have your opportunity to talk about that, but not with

1    this witness because you are -- what you're trying to elicit

2    is hearsay based on what was said and a report that this

3    witness did not prepare.

4            MR. SIMPSON:  But Judge, it's our position that he

5    has adopted this report.

6            THE COURT:  It's over.  It's over and I made a

7    ruling that I posted online yesterday on the docket.  He did

8    not adopt this report.  That's the law of the case, so cut it.

9    Let's move on.

10           MR. COHEN:  Your Honor.

11           THE COURT:  Let's move on.

12           MR. COHEN:  I want to say, that's why we wanted

13   to -- we didn't get this information until after the --

14           THE COURT:  Let's move on.  Cut it out.  You had

15   that report last year.  Move on.

16           MR. SIMPSON:  Judge, we did not have this report

17   last year.

18           THE COURT:  I made the ruling already in writing.

19   You have a copy of it.  This officer did not adopt that

20   record.  You are not rearguing the motion.  I made my rulings,

21   and I told you what I'm ruling now, and you're going to move

22   on and accept it.

23           (Sidebar ends.)

24           (Continued on the next page.)

25

1         THE COURT:  The objection is sustained.

2    BY MR. COHEN:

3    Q    Did Mr. Belloisi ever tell you that he was in the

4    avionics compartment patting down the insulation to put it

5    back into place?

6    A    No.

7    Q    Did you ever provide that information -- withdrawn.  Stay

8    within Your Honor's ruling.

9         Now --

10        THE COURT:  The comment is stricken.

11        MR. COHEN:  I'm sorry, Your Honor.  I wanted to

12   acknowledge that I recognized it.

13        THE COURT:  The remark is stricken.  That was

14   inappropriate.

15        And I remind the jury that you're not to consider

16   anything that is stricken.

17        I also remind the jury, as I told you in the very

18   beginning, that whatever exchanges the Court has with counsel,

19   do not put any weight on it, do not be swayed by it, because

20   all of your decisions is just going to be based on the

21   evidence, the admissible evidence that is presented here.

22        You may proceed.

23   Q    Officer Robinson, everything that Paul Belloisi said to

24   you on the tarmac is from your memory; is that correct?

25   A    Yes.

1  Q    And all your testimony today is either from your memory
2  or what somebody else wrote down about what you told them; is
3  that right?
4  A    My testimony of what he said is only from my memory.
5  Q    Not just your testimony --
6            THE COURT:  Don't argue.  Move on.
7  Q    Did you prepare for your testimony today, Officer
8  Robinson?
9  A    I went to a pretrial hearing, yeah, pretrial
10 preparations.
11 Q    And how did you prepare for your testimony today at
12 pretrial preparation?
13 A    They would ask a question and I would answer their
14 questions.
15 Q    And when you say "they," who do you mean?
16 A    The prosecutors.
17 Q    And the prosecutors sitting at the table?
18 A    Yes.
19 Q    And was Special Agent John Moloney there for your
20 pretrial prep?
21 A    Yes.
22 Q    Did you meet with the prosecutors in preparation for your
23 testimony on March 20, 2023?
24 A    March 20, 2023?
25 Q    Yes.

1   A     I don't remember the dates.

2           MR. COHEN:  With the Court's permission, I'd like to

3   show the officer something that may help refresh his

4   recollection.

5           THE COURT:  Yes, you may, to the witness only.

6           MR. COHEN:  I'm putting it on the overhead.

7           THE COURT:  What are you --

8           MR. COHEN:  Do you want me to say what it is,

9   Your Honor?

10          THE COURT:  Is there a docket number on there?

11          MR. COHEN:  Yes, it is.

12          THE COURT:  What is the document number?

13          MR. COHEN:  It's 3500 material, MR-6.

14          THE COURT:  Okay.

15  Q     Can you see that, Officer Robinson?

16  A     Yes.

17  Q     Does that refresh your recollection about whether you met

18  with the government on March 20, 2023, to prep for this trial?

19  A     Yes.

20  Q     How long did you meet with the government on

21  March 20, 2023, to prep for this trial?

22  A     Well, looking at the paperwork here, it says:  Start

23  time, 1335.

24          THE COURT:  You can't read from the document.  It's

25  not in evidence.  Just take a look at it and just tell us if

1   it refreshes your recollection.

2   A     Yes, it refreshes my recollection.

3   Q     And how long was that meeting for, sir?

4   A     It looks like two and a half hours.

5   Q     Did you also meet with the government to prepare for your

6   testimony on April 3rd, 2023, Officer Robinson?

7   A     April 3rd, 2023?  Possible.  I don't remember the dates.

8   Q     Okay.

9   A     But I met with them more than once.

10  Q     And during those times meeting with you, was it always

11  with United States attorneys who are sitting here today?

12  A     Yes.

13  Q     And was it always with Special Agent Moloney too?

14  A     Yes.

15  Q     And were any notes taken by anybody during those

16  meetings?

17  A     I don't know.  I didn't take any notes.

18  Q     Did you see them taking any notes?

19  A     They may have.  I wasn't paying attention if they were

20  taking notes.

21        MR. COHEN:  Nothing further, Judge.

22        THE COURT:  Any redirect?

23        MS. SCHIERBERL:  Thank you, Judge.  The government

24  has no redirect for this witness.

25        THE COURT:  Okay.  Thank you.

1          You may step down, sir.

2          THE WITNESS:  Thank you.

3          (Witness steps down.)

4          THE COURT:  May I just see counsel very briefly just

5     for administrative.

6          MR. POLLACK:  Yes.

7          (Sidebar.)

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Sidebar conference held on the record in the presence of the

2    Court and counsel, out of the hearing of the jury.)

3              THE COURT:  I was thinking of taking the afternoon

4    break now before you start with the -- who is your next

5    witness?

6              MS. SCHIERBERL:  Our next witness is CBP Officer

7    Cambry.

8              And I think it's a perfect time for a break if the

9    Court is comfortable.

10             MR. SIMPSON:  That makes sense.

11             THE COURT:  So we'll do that.  Thank you.

12             (Sidebar ends.)

13             (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  So we are going to take our afternoon

2    break now before the government calls their next witness.  And

3    from time to time you might see me meet with the lawyers at

4    the side.  Please don't read anything into that.  Either we're

5    discussing legal arguments that are not for the jury's

6    consideration or we're talking about housekeeping matters.

7    And you are not to speculate about anything that we are

8    discussing at the side.

9          Remember to keep an open mind, not to draw any

10   opinion about this case at this juncture.  Remember not to

11   talk about the case among yourselves or with anyone else.  And

12   I am going to ask everyone to come back at 2:40.  And thank

13   you all for being so very prompt.

14          MR. POLLACK:  3:40.

15          THE COURT:  You've been great so far.

16          I'm sorry.  3:40.  No wonder everybody is looking at

17   me crazy.  3:40.  Okay?

18          All right.  We will see you then.

19          THE COURTROOM DEPUTY:  All rise.

20          (Jury exits.)

21          THE COURT:  All right.  And you all can take a break

22   as well.  3:40.

23          MS. SCHIERBERL:  Thank you, Judge.

24          (Recess taken.)

25          THE COURT:  All right.  Everyone can have a seat.

1    All of our jurors are back.

2              So if you are all ready, everyone's ready, this is

3    case on trial continued.  Same appearances as this morning.

4    And we are going to bring our jury back.

5              We have to break tomorrow at 3:00 o'clock.  We will

6    talk about that some more later.

7              (Jury enters.)

8              THE COURT:  Everyone may be seated.

9              Do the parties agree that all of our jurors are

10   present and properly seated?

11             Government?

12             MR. POLLACK:  Yes, Your Honor.

13             THE COURT:  Defense?

14             MR. SIMPSON:  Yes.

15             THE COURT:  All right.  And the government may call

16   their next witness.

17             MR. POLLACK:  The government calls CBP Officer

18   Journael Garry Cambry.

19             (Witness takes the stand.)

20             THE COURTROOM DEPUTY:  Good afternoon.

21             THE WITNESS:  Good afternoon.

22             THE COURTROOM DEPUTY:  Raise your right hand, sir.

23             (Witness sworn.)

24             THE COURTROOM DEPUTY:  Thank you.  Please be seated.

25   There's bottled water there for you.

1          THE WITNESS:  Sure.  Thanks.

2          THE COURTROOM DEPUTY:  Please state and spell your

3    name, sir.

4          THE WITNESS:  My name is Journael Garry Cambry.

5    Journael, J-O-U-R-N-A-E-L; Garry, G-A-R-R-Y; Cambry,

6    C-A-M-B-R-Y.

7          THE COURT:  Good afternoon, sir.

8          And you can adjust the mic so that it is a little

9    more comfortable for you.

10         THE WITNESS:  Okay.

11         THE COURT:  And if you are comfortable, you could

12   take the mask off while you testify.

13         THE WITNESS:  Okay, that's fine.

14         THE COURT:  And I am just going to ask you to keep

15   your voice up nice and loud and speak slowly if you would,

16   please.

17         THE WITNESS:  Sure.

18         THE COURT:  Thank you.

19         And you may inquire when you're ready, Mr. Pollack.

20         MR. POLLACK:  Thank you, Your Honor.

21   **JOURNAEL GARRY CAMBRY**,

22        called as a witness, having been first duly

23        sworn/affirmed, was examined and testified as follows:

24   DIRECT EXAMINATION

25   BY MR. POLLACK:

1   Q      Good afternoon, Officer Cambry.

2   A      Hi.

3   Q      Who do you work for?

4   A      I work for United States Customs and Border Protection.

5   Q      And what's your title?

6   A      My title is actually officer and, slash, aircraft

7   technician.

8   Q      So you're a CBP officer and aircraft technician?

9   A      That's correct.

10  Q      What does it mean to be an aircraft technician?

11  A      Aircraft technician is actually a person, we're licensed

12  by the FAA, and we're -- actually have the ability to work the

13  aircrafts, various area of the aircrafts.

14  Q      How long have you been a CBP officer?

15  A      Nearly 20 years now.

16  Q      Are you assigned to a particular team?

17  A      Yes.

18  Q      What team is that?

19  A      The team is actually called the A-TCET, which is

20  Antiterrorist and Contraband Enforcement Team.

21  Q      And do you have a specialization within that team?

22  A      Right.  And my -- I have another team, which actually is

23  my team, we're called the Aircraft Search Team, the AST team.

24  It's under the umbrella of the A-TCET.

25  Q      And what does the Aircraft Search Team do?

1  A    It's a group of aircraft technicians that U.S. Customs

2  hired.  And our purpose is actually open up -- since

3  September 11th, we actually developed the team a little more

4  to actually look into aircrafts, inbound and outbound

5  aircrafts coming in and going out for terrorist-related items,

6  as well as contraband in any types, all types of contrabands.

7  Q    I think you referred to them as U.S. Customs; is that the

8  same as CBP?

9  A    Right.  That's actually as September 11th, they merged

10 right after that.  So it's U.S. Customs and CBP, they merged.

11 Q    I may have missed it.

12        Did you say you're based at a particular airport?

13 A    John F. Kennedy Airport here in New York, yes.

14 Q    How long have you been assigned to the Aircraft Search

15 Team at JFK?

16 A    Pretty much the time I started, so we're looking at

17 almost 19 years.

18 Q    Have you received training to perform your duties as a

19 CBP officer on the Aircraft Search Team?

20 A    Yes.  Prior to U.S. Customs, I was an aircraft

21 technician.  I worked the airlines, various airlines.  And

22 that's pretty much one of the training we -- you know, you

23 work the aircraft, you know the ins and out of the aircraft.

24 And that's one of the reasons that U.S. Customs hire you for

25 your training, yes.

1   Q    How long --

2            THE COURT:  I'm sorry to interrupt you.

3            What do you mean by "work the aircraft"?

4            THE WITNESS:  We actually do maintenance and pretty

5   much like automotive, car, so we pretty much do all the

6   maintenance of the aircraft, tire change, break change,

7   lights, whatever it needs, engine change.  That's what we used

8   to do, yes.

9            THE COURT:  Okay.  Thank you.

10  Q    And how long did you do that as an aircraft technician

11  before you were hired by CBP?

12  A    Roughly ten years, yes.

13  Q    Do you hold any relevant licenses?

14  A    Yes.

15  Q    What licenses do you hold?

16  A    To work the aircraft, we have multiple licenses.  And I

17  have the airframe and powerplant license, which they call it

18  A&P license.

19  Q    Who gives those licenses?

20  A    That's actually issued by the FAA.

21  Q    You said the FAA?

22  A    Yes, the Federal Aviation Administration, yes.

23  Q    So you said -- did you say airframe and powerplant?

24  A    Yes.

25  Q    Are those two separate things?

1  A      Two separate license, but they work together.

2  Q      What's the airframe part of that?

3  A      The airframe of -- actually, the airframe license allows

4  you to work the fuselage, the body and anything around the

5  aircraft besides the engine pretty much except the -- of

6  course, sorry, except the avionics area which is the

7  electronic, because that needs another license also.

8  Q      And what's the powerplant?

9  A      And the powerplant allows you to work the powerplant of

10 the aircraft, the engine of the aircraft.

11 Q      How long have you held these licenses?

12 A      30 -- about 34 years.

13 Q      What are your duties as an officer on the Aircraft Search

14 Team and aircraft technician?

15 A      Our duty -- I'm actually one of the team leader for

16 the -- for that team.  And our duties is actually, we go out,

17 we target flights, and we just search aircrafts coming in and

18 going out and pretty much looking for contraband and all types

19 of contraband, and as well as terrorist-related items within

20 the aircraft.

21 Q      Do you have any additional responsibilities in

22 association with being an aircraft technician?

23 A      Within CBP, also, I'm an instructor for the -- what you

24 call the academy for -- which is the Federal Law Enforcement

25 Academy and where I teach -- I do travel to teach other CPOs,

1  what you call other officers, how to do -- the antiterrorism

2  team, how to work on that team and how to work different part

3  of the aircraft as well.

4  Q    What was your role at CBP in February of 2020?

5  A    February 2020, I was actually a temporary supervisor for

6  that team, for the antiterrorism team and the Aircraft Search

7  Team.

8  Q    What is a temporary supervisor?

9  A    A temporary supervisor would be an individual that the

10 management find that you're capable enough to do the work as a

11 supervisor.  And you pretty much around everything, you've

12 done pretty much everything in the job, so they give you that

13 offer, you could say yes or no.  And if you wanted to keep it

14 as a supervisor, supervisor, you stay in, you continue.  If

15 not, you could just go back as a regular officer.

16 Q    How long were you a temporary supervisor?

17 A    I did it for three months.

18 Q    Did you continue after that or go back to --

19 A    No.  I decided just to remain as an officer.

20 Q    I'll direct your attention to February 4th, 2020.

21       Were you working that day as a temporary supervisor

22 on the Aircraft Search Team at JFK?

23 A    Yes, sir.

24 Q    What were you assigned to do, if anything, on that day?

25 A    Pretty much as a supervisor, we oversee the operation,

1   daily operation of the workload actually we have.  We just

2   assign tasks for -- to the officers, and they go out in the

3   field and make sure that they take care of whatever needs to

4   be taken care of.  And pretty much like I had guys who just

5   send them out there to do the work; and if anything, they call

6   back and report to us.

7   Q    To the best of your recollection, what was your shift

8   that day?

9   A    That day I was working a 1600 to 2400.

10  Q    And in civilian terms, what does that mean?

11  A    It's four to midnight.  Sorry.

12  Q    How many people were you supervising that day?

13  A    Roughly about ten for that day.  Every day changes as

14  well.  But around that time, around that number, ten.

15  Q    So about what time did you get to work that day?

16  A    Right around 4:00 o'clock.

17  Q    And what, if anything, happened when you got to work that

18  day?

19  A    As soon as I walk in that day -- and as a matter of fact,

20  I didn't even had a chance to change and even go to the

21  office -- we -- right in our break room, we -- the coordinator

22  for our team -- and usually that person just takes the phone

23  calls -- called and mentioned that they -- we have a term we

24  use, "in," that we're "in."  And that's when we had few other

25  supervisors there and few other officers.

1          But when he said we're in, and that's when -- that's

2    actually when he told us that there was something that one of

3    our officers found inside of the aircraft.

4    Q    So just to be clear, in your workplace, what is the

5    phrase "we're in" mean?

6    A    We're in is -- actually, we use it -- instead of saying

7    that we found something within an item or a cargo shipment or

8    an aircraft, we just say "we're in."  We just keep it short

9    and say "we're in," meaning that we got something.

10   Q    Did you -- at that time when you arrived at work that

11   day, did you have an understanding of what had been

12   discovered?

13   A    Yes.

14   Q    What -- what was your understanding of what had been

15   discovered?

16   A    From our daily work when we got the phone call, "we're

17   in," I believe that one of our officers had found narcotics

18   within the body of the aircraft.

19   Q    Did you have an understanding of what officers found

20   that?

21   A    Yes.

22   Q    Who?

23   A    We had -- at the time, it was Officer Frank Morelli and

24   Officer Michael Robinson.

25   Q    And did you have an understanding of where the drugs had

1   been discovered?

2   A    Yes.

3   Q    Where?

4   A    At the time they mentioned it, it was actually in the

5   avionics area.  I didn't know the exact location, but they

6   said avionics area.

7   Q    Do you know what an avionics area is?

8   A    Yes, sir.

9   Q    What is an avionics area?

10  A    Avionics, as we call it, another word, E&E compartment,

11  it's the brain of the aircraft.  That's pretty much where all

12  the avionics components, the boxes, the computer boxes are.

13  And it's very crucial spot.  And that's pretty much where they

14  told me that they found it.

15  Q    How is that compartment accessed?

16  A    Depending on the aircraft, some of them, you could access

17  them from the cabin area in at the bottom of the aircraft

18  itself, but some are just mainly at the bottom.

19  Q    Do you know, in connection with the aircraft that was

20  relevant that day, how the avionics compartment could be

21  accessed?

22  A    Solely on the aircraft, the front nose of the aircraft.

23  Q    And generally, who has access to that?  Who can open it?

24  A    Aviation field.  I would say 99 percent, even 100 percent

25  of the time, mainly it's an aircraft maintenance technician

1  that pretty much train to go inside that area, pretty much.

2  Yeah.

3  Q    Are you familiar with the term "FOD"?

4  A    Yes, sir.

5  Q    What is FOD?

6  A    FOD is a term we use in -- again, in aviation field that

7  I guess it's something that we once you get in the aviation

8  field, you learn that from day one.  It's anything that -- FOD

9  is foreign object damage or debris, anything that doesn't

10 belong around the aircraft or around the tarmac.

11          Sometimes you have a piece of paper.  It could be a

12 piece of metal that doesn't belong in the area.  It could be

13 anything, whether it's outside or within the aircraft.  We

14 call that FOD.

15 Q    Is a foreign object hidden in the avionics compartment an

16 example of FOD?

17 A    Yes, sir, that would be.

18 Q    And why, if at all, is that significant?

19 A    For having anything, especially that type of -- the size

20 of it or anything like that, it doesn't belong, it was not

21 part of the aircraft, it's not where it was -- because the

22 aircraft, they -- every section of the aircraft is -- when you

23 look at the -- I just don't want to get into too much detail,

24 but everything has to be weighed and everything has to be,

25 like, well placed.  And -- and the -- the -- what you call it,

1    the -- the maintenance air -- the maintenance facility, they

2    should know what's in place inside the aircraft so they know

3    exactly what's there.  And if something happens, they could

4    just go directly to it.

5            So having an item like that where it's not placed

6    properly and it's loose, it's not actually fastened or it's

7    not safely placed in there, that could actually fly around and

8    just cause any kind of damage throughout the avionics --

9    especially the avionics area.  So it's a very crucial area

10   where you have to be very careful what's there, period.

11   Q    On February 4th, 2020, when you got to work and learned

12   that drugs had been discovered in the avionics compartment,

13   what, if anything, did you do?

14   A    Once we got the call and immediately I set up with two

15   other supervisor at the time and we decided to -- our

16   protocol, we head out -- out in the field.

17   Q    And what was the plan?

18   A    The plan was -- is actually we do call the officer and we

19   find out if they actually -- we have a surveillance equipment.

20   And we found out if that's been placed.  And that's actually

21   one of the phone call we actually make to make sure that's

22   there.

23           And from there we would call our counterpart, the

24   HSI agents, which is the investigative part of CBP.  And we

25   would tell them that there is something going on in this

1    aircraft and the location.

2            Then from there they could also come out -- you

3    know, come out with us.  So once we got all that established,

4    then we start driving towards the area.

5    Q    So you said "surveillance equipment."

6            What were you talking about?

7    A    It's actually a -- an equipment we use where if we found

8    anything, especially narcotics, anything that actually to that

9    point we're pretty much replace that, we will take that out,

10   the real narcotics.  And then we'll just add -- what we call

11   it a fake shams, we call it, fake narcotics, in place of that.

12   And we'll actually have a transponder placed underneath it, so

13   we'll just pretty much like put that there.

14           And once that individual, somebody actually is

15   supposed to come and get it, one of the problem we have over

16   at JFK Airport is internal conspiracy, the -- you know, so

17   eventually the personnel within the airlines will come and

18   retrieve that item.  And then from there, we just make a --

19   we'll just make a move and detain that person.

20           MR. COHEN:  Objection, Your Honor.

21           THE COURT:  Overruled.

22   Q    You referred to "internal conspiracy."

23           What is that?

24   A    We also have a team, like, call it ICG, which is Internal

25   Conspiracy Group, that I work with.  And it's all part of the

1   Aircraft Search Team, part of the Antiterrorist Contraband

2   Team.

3          So Internal Conspiracy, it's one of the leading

4   issue we have throughout the country where we'll have trusted

5   personnel, trusted personnel that the airline will trust to

6   work for the airline, that they work for the airline, and they

7   will actually take that opportunity and then just use it for

8   their criminality work.

9   Q    So when you got word on February 4, 2020, that "we're

10  in," was it your understanding that the transponder had

11  already been placed?

12  A    Yes, that's correct.

13  Q    And you mentioned also contacting HSI; is that right?

14  A    That's correct.

15  Q    Can you tell us more?  Who is HSI?

16  A    It's actually -- again, it's our Homeland Security

17  investigator.  And they're our counterpart, kind of like we

18  work together.  So if we find anything, they just -- like any

19  police department, they'll have their investigative team and

20  that investigative detective, as we call it.  So that will be

21  part of a detective part we call it, yeah.

22  Q    And so did you contact HSI that day?

23  A    Yes.

24  Q    And after you came to the understanding that the

25  transponder had been placed and you contacted HSI, what did

1  you do next?

2  A    From there I contacted the -- the two officers that was

3  actually out there, out in the field.  And I wanted to find

4  their location and any -- any new detail that they may have.

5         And from that point on, they had told me that they

6  already set up the transponder and they already move away from

7  the aircraft, so give me the opportunity now, instead of going

8  to that aircraft, I move and I position myself in another area

9  around the terminal.  And that's where I waited.

10 Q    You said "the two officers."

11        Were you referring to Robinson and Morelli?

12 A    That's correct, yes.

13 Q    Can you say, to the best of your recollection,

14 approximately, what time it was when you drove down there?

15 A    Looking at 20 minutes.  So we're looking at 1620, 1630,

16 4:30, around that time when I walked in and got the news, and

17 around 4:30 I started to drive, headed out there.

18 Q    And you said you went to a particular gate; is that

19 right?

20 A    Yes, I -- not to the gate where the aircraft was, but

21 opposite, on the other side of the terminal, yes.

22 Q    And why did you go to that location?

23 A    It's probably a little hard to set it up, but the

24 terminal was set up in a way where there are actually blind

25 spots.  So when we doing the surveillance, we want to make

1    sure we cover all our bases.  So I would pretty much -- just

2    not me, but other individuals will stay, position themselves

3    in different part of the terminal just to make sure that they

4    have all corners covered.

5              So that's one of the reasons I stay in that area

6    there, which was actually on the opposite side of the -- that

7    subject terminal.

8              MR. POLLACK:  Could we publish Government

9    Exhibit 401 already in evidence.

10             THE COURT:  Yes.

11             THE COURTROOM DEPUTY:  Oh, I'm sorry.  It got

12   switched.

13             There we go.

14   Q    Officer Cambry, can you see that?

15   A    Yes.

16   Q    Can you tell us, first of all, just in general terms,

17   what are we looking at?

18   A    This is the layout of pretty much the east side, the

19   Terminal 8, which is American Airline terminal.  Yeah, that's

20   the layout of that area and some of the taxiway, yes.

21   Q    And are you able -- it may be a little bit hard to see,

22   but are you able to indicate for us on here by touching your

23   screen where the airplane with the drugs was?

24   A    Looking at the -- as Terminal 8 here, and this aircraft

25   would be here.

1          That's it.  Right?

2          Okay.  Yup.

3          MR. POLLACK:  And may the record reflect that the

4  witness identified a spot on the lower right-hand side of the

5  photograph.

6          THE COURT:  So noted.

7

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MR. POLLACK: (Continuing)

3    Q    Can you tell us on this approximately where you drove to?

4    A    Once I head outside from our office, I actually wind up

5    on the opposite side of the terminal and was actually by --

6    which is across Gate 12, and I would be by Gate 45 -- 43, 45,

7    which is right on that side there.  That's where I stayed the

8    whole time.

9    Q    Can you tell us why that spot was a good spot for you to

10   be?

11   A    Again, with the layout of this terminal, I stayed there

12   just the fact that I -- at the time we had the other two

13   officers most likely were closer to the aircraft, so we could

14   see the aircraft itself, the subject aircraft.  And what I

15   did, I stayed on the opposite side just in case there is

16   traffic that's coming from the side that they were and then

17   they cannot see on what's on the other side of the terminal,

18   so I stay there so they could just like tell me, hey, some

19   thing is coming my way.  Then I could actually make sure --

20   look out for that particular vehicle or person, whatever it

21   may be.  So I kind of like spread myself in that area to keep

22   an eye on that location as well.

23   Q    Could you directly see the aircraft yourself?

24   A    Not from that location.

25   Q    But you understood that Robinson and Morelli could?

1  A    Yes.

2  Q    Were you in communication with him?

3  A    That's correct.

4  Q    How were you in communication with him?

5  A    Through the phone.

6        MR. POLLACK:  Ms. Cronin, can we put up Exhibit 2

7  already in evidence.

8  Q    Officer Cambry, can you tell us on this more zoomed in

9  version where the aircraft was and where you were

10 approximately?

11 A    The aircraft was right here.  I will just circled it,

12 actually.  More.  There you go.

13       And I actually stationed myself right on the

14 opposite side, which is on that side there.  Okay, yeah.  It's

15 good.

16       MR. POLLACK:  So may the record reflect that the

17 defendant [sic] indicated the aircraft was in the bottom

18 center of the photograph, in the interior angle of that

19 building and the defendant was -- sorry -- the witness was at

20 the top center of the photograph?

21       THE COURT:  So noted.

22 Q    So what did you do, if anything, when you got to that

23 area?

24 A    I just -- I talked to the other two officers and I told

25 them my position and from there I just -- that's where I

1   stayed the whole time.

2   Q    And did you ever observe anything after that?

3   A    Right after that, I got a phone call from one of the

4   officers that they were witnessing a vehicle that was moving

5   around that particular aircraft.  And from that aircraft, he

6   was actually driving towards me.  And that's basically when I

7   asked them for the description and they told me.

8   Q    What was your understanding of what that vehicle looked

9   like?

10  A    It was actually -- they said it was a maintenance, an

11  American Airlines maintenance van.  Throughout the airlines,

12  they all have their own vehicles.  So it was a maintenance van

13  that was coming on the opposite side where I was actually

14  stationed.  It was a blue maintenance van coming in.

15  Q    And In what way was it coming towards you?

16  A    Throughout this terminal, they have actually an overpass

17  or a tunnel, we call it, and it was actually right next to

18  Gate 7, and it was coming through that tunnel towards where I

19  was stationed.

20  Q    Can you draw a line on the image to show us where that

21  tunnel is?

22  A    Sure.  Here, and coming out.

23       MR. POLLACK:  May the record reflect the witness has

24  drawn a line right through the terminal in the center of the

25  photograph.

1          THE COURT:  So noted.

2    Q    So did you see the blue van coming through that tunnel?

3    A    Correct.  Yes.

4    Q    What, if anything, did you do when you saw it?

5    A    And right at -- once I spotted the van and I told the

6    officers, yes, I have sight on that van and I keep an eye on

7    the van from that point.

8    Q    What, if anything, did the van do?

9    A    That point on, the van proceeded to go -- to drive east

10   towards the east side of the terminal and from there, there

11   was an aircraft that was parked in that location further up,

12   and that's where the van stopped and went up to the -- and

13   stopped and went up inside the aircraft, the individual went

14   up inside the aircraft.

15   Q    Was that aircraft at a gate?

16   A    No.

17   Q    Where was that aircraft?

18   A    The aircraft was -- what you call it?  A hardstand.  It's

19   like an overflow area where if there's not enough space for a

20   particular aircraft or it's not being used immediately,

21   they'll put those aircraft in an area.  It's not too far from

22   a terminal, but close enough they call it hardstand.

23   Q    Is it a parking lot, essentially?

24   A    Parking lot, yes.

25   Q    Is that hardstand visible in this photograph?

1  A    Yes.

2  Q    Can you indicate with -- maybe draw an X where the

3  hardstand is?

4  A    It will be right here in this area here.

5           MR. POLLACK:  May the record reflect that the

6  defendant [sic] made an X on the black area of asphalt on the

7  right side.

8           THE COURT:  So noted.

9  BY MR. POLLACK:

10  Q    So did you have to move your vehicle to see the van go

11  there?

12  A    No, sir.

13  Q    You could see it?

14  A    That's correct.

15  Q    Did you see someone get out of the van?

16  A    That's correct.

17  Q    And what did you see, if anything?

18  A    I noticed an individual got out of the van and went

19  upstairs and probably five, ten minutes tops and came back

20  out.

21  Q    What does it mean that he went upstairs?

22  A    There was an aircraft in that hardstand there and he got

23  out of the van and he proceeded to go upstairs to the

24  aircraft.

25  Q    Can you describe the individual that you saw to the best

1   of your recollection?

2   A    It was a white male, middle age.  I'd say probably 40.

3   Q    Do you remember what he was wearing?

4   A    At the time, yes.  It was an American Airline uniform.

5   It's actually a maintenance uniform at the time with a jacket

6   and a little beanie hat.

7   Q    Do you remember what color or colors the jacket and

8   beanie hat were?

9   A    The jacket would be gray and the beanie hat light gray as

10  well.

11  Q    Have you ever at any time seen any surveillance videos

12  related to this date?

13  A    No, sir.

14  Q    After the man got out of that airplane, what, if

15  anything, did he do?

16  A    Again, I let Officer Morelli and Officer Mike Robinson, I

17  just told them that individual got out, went upstairs and came

18  back downstairs in the van again.

19  Q    Did the van do anything?

20  A    From that point on, the van proceeded to drive away from

21  the terminal and started driving more towards east of the

22  terminal.  Yes.

23        MR. POLLACK:  Can we put up Government Exhibit 401

24  in evidence.

25        THE COURT:  Yes.

1          (Exhibit published.)

2   Q    So can you -- on this different level of zoom, can you

3   show us where that hardstand is?

4   A    All right.  The hardstand is right here, again, in that

5   spot.

6          MR. POLLACK:  May the record reflect that the

7   witness has identified the same areas in the last photo on the

8   bottom right-hand quadrant.

9   Q    Can you indicate on this map where the van went?

10  A    I could draw it through, right?

11  Q    Yeah, you can tap your finger.

12  A    Okay.  Right.  From that point, start driving east of the

13  area and continued -- we have actually like local roadways

14  around the airport.  So he was driving on the roadways, and

15  there is like loops.  He went around.  And again, he just do

16  more loops.  He went around those areas.

17         And at one point, actually there is a cutout in this

18  runway here, which is actually a taxiway.  You can't see it,

19  but the person actually went around and into the American

20  Airlines hanger here, which is right here, so there is a

21  cutout.

22         I'm sorry.  I can take that back a little bit here

23  because this road here.  Sorry.  This road here.

24  Q    To be clear, were you following in your own vehicle?

25  A    That's correct, yes.

1      MR. POLLACK:  So I won't try to recreate that entire

2    path, but let the record say that the witness has indicated a

3    line going somewhere around the map, ultimately up to the

4    upper left side of the image.

5            THE COURT:  Noted.

6    Q     And what is that building in the upper left side of the

7    image?

8    A     Actually, the American Airlines maintenance hanger.

9    Q     What is a maintenance hanger?

10   A     That is where there would -- the aircraft technician,

11   they would place the aircraft, especially when there's

12   heavy-duty work, heavy checks, once they -- let's say you have

13   to change an engine or you have to do a lot of fuselage work

14   and they'll place that aircraft inside hanger.  You know, it's

15   like a big tent and they will -- that's where they'll do the

16   work.

17   Q     Is it similar to a garage?

18   A     Pretty much, yes.

19   Q     And what, if anything, did you see the person who was

20   driving that van do?

21   A     From that point on, I drove and I stationed myself

22   actually right in this -- I will just draw this.  That's where

23   I stayed, right in this opposite end here.  I will put an X

24   here.

25   Q     Is that on the roadway across from the hanger?

1   A    That is correct, yes.

2   Q    Were you able to see the hanger from there?

3   A    That's correct.

4   Q    Did you have binoculars or --

5   A    Yes.  We have a set of binoculars.  I had a set, yes.

6   Q    Did you see what, if anything, that the man driving the

7   van did?

8   A    I noticed that the individual got out of the van and

9   proceed to go inside the hanger.

10  Q    And what did you do then, if anything?

11  A    I let the other officers know what was going on, that the

12  individual went inside the hanger and I'm just standing by and

13  I told them I'll be there.

14  Q    Can you tell us just a rough approximation of how long a

15  drive that was from where you started from the hardstand to

16  the hanger?

17  A    From -- I would say probably like a mile and a half, give

18  or take, mile and a half, probably.

19  Q    And how long did you wait there watching the hanger?

20  A    I know it was a long time.  I'll say probably at least an

21  hour and a half, or close to two hours maybe.

22  Q    What, if anything, happened that?

23  A    Right after that, I waited, and that's when I saw the

24  same individual came out the hanger and proceeded to get into

25  a white pickup truck, again, maintenance pickup truck.

1  Q    And what, if anything, happened that?

2  A    And that's when he started driving back towards the

3  terminal again.

4  Q    Did you follow him?

5  A    That's correct, yes.

6  Q    And where did you follow him to?

7  A    Back to the terminal, but as soon as he -- I called my

8  partners out there.  I told them that he was heading towards

9  them.  So I assume they had a sight of the vehicle that I

10 described and I move away and I went back to my original spot

11 inside the -- by the terminal there.

12 Q    Do you mean back to that location where you could not see

13 the aircraft?

14 A    Right.  The initial point there, yes.

15 Q    And then can you -- to the best of your memory, can you

16 say approximately how long you were waiting there before

17 anything else happened?

18 A    I would say probably 30, 40 minutes maybe.  That's when I

19 got another phone call and that the transponder had tripped.

20 Q    And what did you understand that to mean?

21 A    That somebody actually went on and actually had hands on

22 on that device and moved the shams and the transponder

23 actually move around and tripped and it just send an alarm.

24 Q    What, if anything, did you do then?

25 A    That's when I proceeded to drive towards the gate where

1    they were at.

2    Q    Do you remember what gate that was?

3    A    That was actually Gate 7, yes.

4    Q    And what, if anything, did you see when you arrived at

5    Gate 7?

6    A    At the time, when I got there, they had already

7    questioning an individual there and they had a few other CP --

8    U.S. Customs officers and agent, they were already there.

9    Q    Did you see the person they were talking to?

10   A    Yes.

11   Q    Was it the same person that you had seen earlier and you

12   were following in the blue van?

13   A    Yes.

14   Q    Did you talk to that individual there on the tarmac?

15   A    No.

16   Q    Do you know what a Customs seal is?

17   A    Yes.

18   Q    What is a Customs seal?

19   A    A Customs seal is a -- actually, it's almost like a

20   permit.  We actually allow -- as U.S. Customs, we actually

21   give to airline employees and different people around the

22   airport and that allows them to work in the international

23   zone.

24          The aircraft that's coming in from overseas and

25   those individuals, we vet them, we vet them, and background

1   checks, make sure that they okay to work those areas, so they

2   could mingle with international passengers.

3   Q     And how can you tell someone has a Customs seal?

4   A     Each individual, they'll have actually a lower logo

5   inside their ID and that's actually a mark saying they have

6   the seal.

7   Q     And what's your understanding of what can happen if an

8   airport employee without a Customs seal is found in an

9   airplane that had arrived from an international flight?

10  A     It's actually a big issue because we do not want an

11  international passengers mix with -- or unprocessed passengers

12  mixed with regular -- what you call it?  -- workers because

13  they not process yet.  They haven't been admitted into the

14  country and we haven't inspected the passengers or the

15  aircraft.  And that's one the reason we want to make sure that

16  nobody without a seal mingle with these passengers or the

17  aircraft.

18  Q     So if an employee who does not have a Customs seal is

19  found in an aircraft that arrived from an international

20  flight, what's your understanding of what could happen as a

21  result?

22  A     What we do is we have an office.  We actually issue a

23  violation.  We call it Chase violation, which we've done

24  numerous times.  It's just one of the issues that we have

25  around the airport.  So we'll issue a violation and that

1   violation stated that they would bring and come forward with

2   their managers to our office and we actually talk and even

3   we'll actually -- what you call it?  -- give a fine, which is

4   up to $1,000.

5           So sometime like if the airlines, the management,

6   they find out that the person is not merit to stay within the

7   airline and if they give them trouble, they just fire them

8   there, right then and there.  If they actually have to pay

9   $1,000 for them, they just decide to let them go.

10  Q    Do you remember seeing the ID of the individual who was

11  stopped there at the tarmac?

12  A    Yes.

13  Q    And did that individual have a Customs seal on his ID?

14  A    No.

15  Q    After that individual was stopped there on the tarmac and

16  it was found that he did not have a Customs seal on his ID,

17  did you go anywhere next?

18  A    Yes.

19  Q    Where did you go?

20  A    Once I noticed the individual and the ID, I proceed to go

21  towards the American Airlines maintenance office -- what you

22  call it?  -- the line maintenance office, and that's actually

23  where you have the airline maintenance supervisors and other

24  maintenance personnel.

25  Q    And what was the purpose of you're going to the American

1  Airlines maintenance office?

2  A     One, I wanted to find out if the -- this particular

3  person works in the area because the airline, they actually --

4  they have the -- they sectionize [sic] the zones where

5  employees work, the agent or the aircraft technician.  So each

6  individual, they would assign a certain area.  So I went in

7  there to find out if that particular person worked Gate 7 and

8  further, yeah.

9  Q     So I'm not -- to be clear, I'm not asking you to re-say

10 what anyone in the American Airlines maintenance office told

11 you, but did you do anything based on what you learned in the

12 American Airlines maintenance office?

13 A     Yeah.  Immediately -- again, my purpose is to find out

14 whether he was working that area.  So from what I learned from

15 the American Airlines maintenance supervisors, I went on and

16 relayed that to the rest of my team and the HSI agent.  Yes.

17 Q     And based on what you learned, did any further action

18 take place?

19 A     That's when we decided to detain the person and proceed

20 toward our office, JNSU.

21 Q     You said JNSU.  Is that J-N-S-U?

22 A     Yes.

23 Q     Do you know what that stands for?

24 A     JFK Joint Narcotics Smuggling Unit.

25 Q     What is that, in general?

1   A    It's pretty much an office.  Once we find narcotics

2   within the aircrafts or within the passenger, the HSI agents

3   and our CPOs will go in that one particular area, that office,

4   and that's where we'll process the narcotics, and that's also

5   where the HSI will further question the individual.

6   Q    And did you yourself go to JNSU?

7   A    Yes.

8   Q    And did you see the narcotics there?

9   A    That's correct.

10  Q    Did you see them being weighed?

11  A    That's correct.

12  Q    Did you see them being field tested?

13  A    That's correct, yes.

14  Q    Was every brick field tested?

15  A    Yes.  That's the protocol.

16  Q    So, to the best of your recollection, what was the result

17  of the field testing?

18  A    Each brick or each components were tested positive for

19  coke, cocaine.

20           MR. POLLACK:  No further questions, Your Honor.

21           THE COURT:  You may inquire.

22           MR. COHEN:  Thank you, Judge.

23  CROSS-EXAMINATION

24  BY MR. COHEN:

25  Q    Good afternoon, Officer Cambry.

1   A    Good afternoon.

2   Q    Sir, if there is anything that I ask you that you don't

3   understand or sounds confusing, please ask me to repeat the

4   question, I'll be happy to do so.

5   A    Okay.

6   Q    When you were speaking about a Customs seal on an ID, can

7   you tell me what the purpose of the Customs seal is again,

8   please, sir?

9   A    Customs seal goes back, again, that's actually a seal

10  that we will issue to employees around the airport and that

11  seal will serve as an education.  Once that person have the

12  seal on the ID, that will serve as an education that the

13  person has been vetted by U.S. Customs and they are okay to

14  work certain area of our international zone, our international

15  gates and aircrafts.

16  Q    What is an international plane considered?

17  A    International plane considered as a vessel that's

18  basically flew from an international point where -- let's take

19  an example:  Europe, and let's say, France, flew from France

20  and land in JFK, and that's actually our first point of entry

21  into the United States, and that will consider as

22  international aircraft, and it has to be cleared by U.S.

23  Customs and Immigration.

24  Q    And what happens after the plane and its occupants and

25  the luggage is clear by U.S. Customs, does it still reman an

1    international plane?

2    A    We deem the plane -- once we actually do the inspection,

3    that's when we'll deem the plane cleared and people do their

4    work, yes.

5    Q    Then you don't need a Customs seal anymore once it's

6    cleared of Customs?

7    A    Yes and no because the area still remains an

8    international zone.  You do need the Customs seal.  And at the

9    same time, most of the -- knowing that the areas is actually

10   could be mixed use for international and sometime they have

11   domestic flight going out of that, so the airline would go

12   ahead and proceeded and issue -- make sure each employees has

13   a Customs seal knowing that they cover all the bases, that

14   this employee -- they can utilize that employee anywhere

15   around the airport no issue.

16   Q    Thank you.

17   A    I hope I clear the -- okay.

18   Q    I think you said mixed use.  Is that what you said?

19   A    When I say mixed use, they can bring an international

20   aircraft, offload it, offload -- deplane the passengers,

21   deplane the cargo, the bags, and if we have to do an

22   inspection on that aircraft, once we finish, then we say we

23   will let the airline know that, okay, this aircraft is clear

24   to go, you can do whatever you want with that aircraft.

25   Q    And is it fair to say, Officer Cambry, that once Customs

1    clears the plane and if the plane has a domestic flight,

2    American Airlines or any airline choose who works on that

3    plane?

4    A    Correct.

5    Q    Thank you, sir.

6              You said that excuse me --  withdrawn.

7              You've been at JFK for 19 years; is that correct,

8    sir?

9    A    That's correct.

10   Q    And that whole time were you on the aircraft search team?

11   A    That's correct, yes.

12   Q    Is it fair to say you have been involved in hundreds or

13   is it thousands of investigations?

14   A    Not investigations, but seizures, we call it.

15   Q    And what happened on February 4, 2020 is a seizure?

16   A    Seizure and/arrest, as we call it, and investigation,

17   yeah.  It led to an investigation.

18   Q    So there was an investigation, you testified to, prior to

19   the arrest; is that right?

20              You testified about surveillance.  I don't -- would

21   you call a surveillance an investigation?

22   A    Right.

23   Q    And is it fair to say that you've been involved in

24   hundreds of those?

25   A    Throughout the airport?

1  Q    Yes.

2  A    Yes.  Right.  In that term, yes.

3  Q    Okay.  Now, as a CBP officer, are you more on the Customs

4  side?

5  A    I do pretty much everything.  I do immigration work and

6  customs as well.  Pretty much like they call us super

7  inspectors.

8  Q    So you've done investigations on immigration-related

9  matters?

10 A    Don't get too involved with it, but pretty much I'm

11 around those areas as well.

12 Q    Is that just checking for valid visas and things like

13 that?

14 A    Sure.

15 Q    And especially on the Customs side, are some of your

16 tasks trying to keep terrorists out of the United States?

17 A    That's what we do.

18 Q    And keep weapons out of --

19 A    Weapons, mass destructions, narcotics, to get outside in

20 the field and out on the street, yes.

21 Q    As a Customs and Border Patrol officer, have you ever

22 recovered impermissible contraband?

23 A    Can you rephrase that?  Like?

24 Q    Sure.

25       Have you ever -- outside of February 4, 2020, have

1  you ever been involved in the seizure of illegal contraband?

2  A    Yes.

3  Q    And can you -- I'm sorry.

4  A    Go ahead.  I'm sorry.

5  Q    Can you approximate how many times?

6  A    Probably 15, 20.  Rough, give or take.

7  Q    And as you and I defined investigation and surveillance,

8  can you approximate how many times you've been involved in

9  things like that?

10 A    10, 15, roughly, give or take, yeah.

11 Q    So what would your regular duties be during the time

12 period that we're talking about up to the present?

13 A    From February 2020 until?

14 Q    Sure.  Please.

15 A    My duties pretty much what I've done --

16        THE COURT:  I'm sorry.  Can I stop you?  Can we

17 stick to the day at issue, please?

18        MR. COHEN:  Certainly, Your Honor.  I'm happy to

19 give you a sidebar and explain why I'm asking him these

20 questions.

21        THE COURT:  Then let's have a sidebar.

22        (Continued on next page.)

23        (Sidebar conference.)

24

25

1          (The following occurred at sidebar.)

2          MR. COHEN:  A good deal of what Officer Cambry has

3   testified to is not present in any of his notes and I would

4   want to explain that with all of the duties he has had since

5   2020, I want to check his memory because he has done many

6   other investigations.

7          THE COURT:  It's irrelevant.  What happened after

8   February 4th to today is not germane to the facts at issue in

9   this trial.

10          MR. COHEN:  My -- I'm sorry.  I'm waiting for you to

11   finish.

12          THE COURT:  I'm sorry, no.  Let's stick to the facts

13   of this case and what's relevant to this case.

14          MR. COHEN:  My only purpose, Your Honor, was to test

15   his memory --

16          THE COURT:  Test his memory about what happened on

17   February 4th.

18          MR. COHEN:  Right, but his memory would be

19   interceding between now and then all of the other activity and

20   duties at his job, so his ability to --

21          THE COURT:  You're not going to go into irrelevant

22   investigations.

23          MR. COHEN:  No, I'm not going to ask --

24          THE COURT:  No.  Really, no.

25          MR. COHEN:  I'm not going to ask any of --

1      THE COURT:  No, no.  What happened from then to now

2  is not relevant.  Stick to the date at issue.

3      MR. COHEN:  So I'm not allowed to ask him about

4  anything that's happened between February 2020 and today?

5      THE COURT:  Unless it relates directly to this case,

6  no, because I'm assuming that the Government -- I don't know

7  if he testified in the grand jury or whatever, but, I mean, he

8  didn't testify at the hearing.  So that's the only thing

9  that's relevant to this case that happened subsequent to

10  February 4th.  Anything that he did in preparation for trial

11  in this case would be relevant, obviously.

12      MR. COHEN:  Okay.

13      THE COURT:  But you're not going to go into all

14  kinds of other investigations and other work that he may have

15  done from February 4th to now.  That's not relevant.

16      MR. COHEN:  I would just note --

17      THE COURT:  No.  We are not going to go into, you

18  know, to the ends of the earth here.

19      MR. COHEN:  I understand.

20      I'm going to note --

21      THE COURT:  Because already we have spent far more

22  time than was necessary on the witnesses today.

23      And the Government needs to stop being a

24  potted-plant here.

25      MR. COHEN:  I would just note my objection.  I would

1    like to ask him about other events to testify his memory.

2              THE COURT:  Noted.

3              (End of sidebar conference.)

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  You may inquire when you're ready, sir.

3          MR. COHEN:  Thank you, Your Honor.  Just one moment.

4  BY MR. COHEN:

5  Q    Officer Cambry, you testified on direct examination that

6  you chose to relinquish the temporary supervisory role and

7  remain a regular CBP officer; is that correct?

8  A    That's correct, yes.

9  Q    And how long were you a supervising officer for?

10 A    Three months.  That's actually the maximum they give you

11 to do that, yes.

12 Q    And on the date in question, February 4, 2020, you were

13 an acting or temporary supervisor at that time; right?

14 A    That's correct, yeah.

15 Q    What is the difference between a supervisory CBP officer

16 and a regular or a non-supervisory CBP officer?

17 A    You say a supervisor versus an officer?

18 Q    A supervisor verse what you are when you relinquish being

19 a supervisor.  I don't know what that's called?

20 A    It's just you are a supervisor.  They give you the

21 position and it's up to you if you want to stay.  You could

22 apply and stay.  If not, you just remain as a regular officer.

23 Right.

24 Q    My question is what is the role of a supervisor versus

25 the role of a regular officer.

1    A     The role of supervisor, we supervise officers.  We do a

2    task.  We go out there with the officers.  We work.  We pretty

3    much do our jobs, supervise our deputies.  We go out there, we

4    do what needs to be done.

5            And we go back to the office.  If there's paperwork,

6    we do paperwork.  Pretty much a little bit of everything.

7            That job is one unique job, especially my position

8    as an aircraft technician:  I instruct, I supervise, I pretty

9    much do everything.

10   Q    As a supervisor, are you the one responsible for the

11   paperwork?

12   A     As well.

13          Make sure the paperworks are done.  I do my part and

14   they do their part, the officers do their part as well, yes.

15   Q    I see.

16          And on -- so for the arrest of Paul Belloisi, you

17   were responsible for filling out the significant incident

18   report.

19   A    The officers would do one section.  That's their section,

20   and I have a section called the SITROOM Report and I'll write

21   that portion.

22   Q    And the Significant Incident Report, that is what's was

23   filed in this case, the person making the report, you were the

24   person making the report; is that correct?

25   A     No.  The officer would make the report and I go over the

1  report.

2  Q    Isn't it true, Officer Cambry, that for this particular

3  arrest the person making the report was SCBPO Journael Cambry?

4  A    That's correct.  Now is that -- which report are you

5  mentioning here?

6  Q    The Significant Incident Report for the arrest of Paul

7  Belloisi on 2/4/20.

8  A    I would write the SITROOM Report and I will approve --

9  Cambry will approve the report that the Significant Report

10 that the officer writes.

11 Q    Okay.  And the officer who wrote the Significant Incident

12 Report in this matter was whom?

13 A    That would be Officer Morelli and Robinson, most likely.

14       The SITROOM Report would be me, the SITROOM Report.

15 Q    And the point of contact for the Significant Incident

16 Report filed in this case is you as well; correct?

17 A    Okay.

18 Q    No --

19 A    Well, that would be the SITROOM Report.  That's actually

20 what you have in your hand there.

21       THE COURT:  What is that report?

22       THE WITNESS:  It's an internal report that we use

23 within management that goes in our -- that would distribute

24 between deputies -- deputies, chiefs within the airport.  And

25 if it's significant, it will go higher up also.  But that's

1    our an internal report we write versus the other report that

2    the officer will write in what call a system SEACAS, they will

3    write that report.  That's basically their report and then

4    they'll write a narrative.

5              But the SITROOM Report, that will be my report that

6    I write and that stays internally between the managers.  It's

7    called a SITROOM Report.

8              MR. COHEN:  Can I show the witness the report so we

9    can talk about the same one, Your Honor.

10             THE COURT:  You may show it to the witness and the

11   Government.

12             Do you have an identifying number on that document,

13   please?

14             MR. COHEN:  I do, Your Honor.  It's 3500-GC-1.

15             THE COURT:  You need to minimize it.

16             MR. COHEN:  I'm trying to, Your Honor, but it

17   doesn't seem to be working, or I'm incapable.

18   BY MR. COHEN:

19   Q    Officer Cambry, are you able to see 3500-GC-1?

20   A    Yes, sir.

21   Q    Is that the significance -- do you recognize it?

22   A    Yes.  That's the Significant SITROOM Report, yes.

23   Q    I'm sorry.  I didn't hear you.

24   A    That's the Significant SITROOM Report that I wrote, yes.

25   Q    Okay.  And that -- this is your report that you created?

1  A    That's correct, yes.  Timeline, yes.

2  Q    You created the timeline?

3  A    That -- I created the timeline based on what the -- the

4  officers also gave, also, would be part of that.

5  Q    And that's because you didn't do all the things that are

6  in the timeline; you're reporting what other people did; is

7  that right?

8  A    Right.  It's actually a combined -- it's a combined

9  report that we put together and we send out to -- what you

10  call it?  -- the rest of the management.

11         THE COURT:  Is it fair to say it's a summary of the

12  incident?

13         THE WITNESS:  Pretty much, it's a summary of what's

14  happened so we can give everybody an update what's going on,

15  even though the investigation is not stopped, but we just -- I

16  just send that out so everybody else, all the managers

17  throughout the terminals knows actually what's going on.

18         THE COURT:  Okay.  Can we move on now?

19         MR. COHEN:  Sure.

20  Q    And you said there's a timeline.  There's also a synopsis

21  section in that; is that correct?

22  A    Yes.

23  Q    And that gives a brief description of what happened?

24  A    Overall quick description and just send it out.

25  Q    And then there's a details section which contains more of

1    the details of actually what transpired; right?

2    A    As much as possible, yes, and send it out, right.

3    Q    In each of those sections, you are not the originator of

4    all of the information --

5              THE COURT:  That's gone over.  Asked and answered.

6    Can we please move on?

7    Q    Do you remember, Officer Cambry, which officers gave you

8    information to fill in this report?

9    A    From that report is the fact that I was part of the whole

10   investigation, as you mentioned, so I would write my section

11   as well, and then Officer Robinson and Officer Morelli will

12   give me part of their incident report, and I'll put whatever

13   input, extra stuff, but.  I cannot write a lot, so I just put

14   as much as possible and then I'll send that out, yes.

15   Q    It contains what your role was and part of what their

16   role was; is that fair to say?

17   A    Pretty much.

18   Q    Now, going back to the date that you're testifying to,

19   how long at that point had you been working with Officer

20   Morelli?

21   A    Prior to that, pretty much since I got on the job.  He

22   was there before me.  Yeah.  He was out and he came back.

23   Yeah, he was military and then he came back, 15, 20 -- 19

24   years.  Yeah.

25   Q    How about Officer Robinson?

1    A    Seven years.  You know, again, I've been on the team for

2    a while.  So it's probably seven years since I've worked with

3    him, or more, roughly.

4    Q    And you testified, is it true, sir, that narcotics were

5    found on the plane -- you were contacted about the narcotics

6    being found on the plane at 4:00 p.m.?

7    A    Not me directly.  It was the coordinator in our office

8    that they contacted, yes.

9    Q    Okay.  And then was it Officer Wolfe who told you about

10   what was happening?

11   A    No.  Mainly, I was actually right in the lunch room when

12   the conversation -- I walked in and that's when the phone call

13   came and from there Officer Wolfe, Officer Sferazzo, they all

14   were there and we just got it at the same time pretty much.

15   Q    And according to the information you had -- and I'm not

16   asking you to testify from memory -- Morrelli, Robinson

17   extracted the suspected narcotics at 4:25 p.m.?

18   A    From what I believe, yes.

19   Q    And at 4:45, the cocaine was -- the substance was tested

20   for the presence of cocaine --

21            THE COURT:  Again --

22   Q    -- is that right?

23            THE COURT:  That's not a question.

24   Q    What time was the substance tested to see if it was

25   cocaine?

1  A    We would actually do twice.

2          So, at first, when the officer would find something,

3  they would -- because we do have our test kits in the car.  So

4  they would actually test it real fast, say, hey, this is what

5  we have, at least when they send out the information, okay, we

6  have coke right now.

7          So the supervisors, when we submit the report to the

8  HSI, when they come in and say at least we have coke for the

9  time being.  And further up -- later on, when we go to the

10 JNSU, the office of the Joint Narcotics Smuggling Unit, that's

11 when we'll do a final test of everything.

12 Q    Was the first test done at 4:45?

13 A    I believe so.  I wasn't really sure exactly, but roughly

14 around that time, I guess, I believe.

15 Q    Would me showing you the timeline help you remember?

16 A    Sure.  Sure.

17          MR. COHEN:  With the Court's permission, I'm going

18 to show the same thing, GC-1.  It is the third page.

19 Q    I ask you to look at that, Officer Cambry, tell me if

20 that refreshes your recollection about what time the cocaine

21 was initially tested?

22 A    Okay.  At 1645.  Right.

23 Q    In civilian time, that's 4:45 p.m.?

24 A    That's correct.  Yes.

25 Q    And then you testified on direct examination that

1  Homeland Security was notified.  Were you the one who notified
2  them?
3  A    No.
4  Q    And they were notified at 5:10 p.m.; is that right?
5  A    That would be roughly around that time, I guess.  Yeah, I
6  believe.
7  Q    Were you the one who spoke to Officer Gabay and Officer
8  Moloney?
9  A    No.
10 Q    And it's your understanding that Officer Gabay and
11 Officer Moloney began their surveillance at 6:30 p.m.?
12 A    That's I guess the -- I believe that's the time they
13 arrived from their location, right.  That's correct.
14 Q    You don't have an independent memory of that but your
15 report helps you remember; is that right?
16 A    Right.
17 Q    And that Significant Incident Report was filled out on or
18 about February 4, 2020?
19 A    That's correct.  Yes.  Same day.  Yes.  Same day.
20 Q    Now, Officer Cambry, is it true that you were the one who
21 told Officer Morelli and Robinson to set up the gear?
22 A    Right.  Our protocol, once we get the -- somebody who say
23 -- my team, again, I'm part of that team, we have narcotics,
24 the gear's already set up pretty much because we'll tell them
25 to set up the gear, and from there we'll make the rest of the

1  phone calls.  Yeah.  So -- that was actually some

2  understanding that I told them to set up the gear, yeah.

3  Q    And does the Significant Incident Report reflect

4  accurately what time you told them to do that?

5          THE COURT:  The question should be do you recall

6  what time you told them to do that and whether he recalls

7  that, not whether the report is accurate.  The report is not

8  in evidence.

9          MR. COHEN:  I'm going to withdraw that question.

10          THE COURT:  The question is stricken.

11          Would you remove the exhibit, please.  Thank you.

12          MR. COHEN:  Certainly.

13  BY MR. COHEN:

14  Q    Officer Cambry, what time did you arrive on the scene?

15  A    Approximately, anywhere within -- again, I wasn't really

16  looking at my watch every second.  We are looking at 1630,

17  1640, roughly.

18  Q    How about -- I'm sorry, sir.

19  A    Sorry.

20  Q    Please.

21  A    Yeah.  That was like 1630, 1640.

22  Q    How about at the scene of the aircraft where the

23  narcotics were seized from?

24  A    I did not get there until later on that evening when the

25  transponder tripped and that's when Officer Morelli said the

1  transponder tripped and that's when I drove over.  That's when

2  the transponder -- that's like 19 -- like 1940, almost 8

3  o'clock, right.

4  Q    Did you hear the transponder trip?

5  A    No.

6  Q    Did you make notes anywhere that the transponder had

7  tripped?

8  A    No, sir.

9  Q    And how did you learn that the transponder had tripped,

10 sir?

11 A    I got the announcement from Officer Morelli.

12 Q    Did you at all make notes, Officer Cambry, about what the

13 details were of setting up the sham cocaine inside the

14 airplane?

15 A    Can you repeat that again?

16 Q    Sure.  Did you make notes in your SIR about what time the

17 sham cocaine was placed into the aircraft?

18 A    I can't recall that.  I can't recall what notes I made

19 from that time, no.  Sorry.

20 Q    It's okay?

21        Did you make notes in your SIR that the clue spray

22 was sprayed on to the sham cocaine, as well as the insulation

23 blanket?

24 A    Most likely that would be -- that would be a note that

25 the officers would pretty much do.  The fact that I wasn't

1    doing it per se myself.  So that was something that they would

2    make their own note on that and they would put that on the

3    incident if that's possible, that they'll actually do that.

4    Q    And would you -- I'm sorry, where would they do that in

5    that report, sir?

6    A    That would be under their incident report into like --

7    which is like in SEACAS.  They would enter their own --

8    there's actually a page that they do their -- the whole

9    seizure and arrest.  That's where they will enter that.

10   Q    By "them," you mean Morrelli and Robinson?

11   A    I mean, officer -- yes.  Right.

12   Q    Would it also be their job to note when the transponder

13   went off?

14   A    I believe so.

15   Q    And they would make it in that same document that you're

16   speaking about?

17   A    Right.  I believe so.

18   Q    And in the detail section of your Significant Incident

19   Report, who fills in all of the information in there?

20            THE COURT:  You've gone over all of this already.

21   Move on.  Move on, please.

22            MR. COHEN:  Can I get an answer to that question,

23   Your Honor.

24            THE COURT:  No, no.  I've said you've already gone

25   over all of this.  Move on.

1    BY MR. COHEN:

2    Q    You testified, Officer Cambry, about getting information

3    regarding a vehicle moving around the aircraft from one of

4    your officers; is that right?

5    A    That's right.

6    Q    Which officer gave you that information?

7    A    Officer Morelli.

8    Q    I'm sorry, Officer Morelli did you say?

9    A    Yes, Officer Morelli.

10   Q    Did he also give you a tag or a license plate number, an

11   alphanumeric code about what that plate was?

12   A    If he did, I can't remember what he -- you know, it's a

13   little while.  I didn't really take a note on it.

14             I just visualize the vehicle that was coming towards

15   me, right, and that's pretty much it, yeah.  Because it's not

16   like a lot of blue van driving around the airport, that

17   terminal.  So it would be like one of a kind.  So I don't

18   really -- if he does or he did, I'm sure I -- I just don't

19   recollect that.

20   Q    And did you take notes regarding the information about

21   the blue van driving around by the airport?

22   A    No.  That would be pretty much he would take -- I take

23   the -- what you call it?  -- the phone call from him and from

24   there we just -- you know, I just do the visualize of the van

25   moving around and then on the phone with him going back and

1  forth saying okay, I see the van, but not a particular --

2  note-wise, no, I didn't.  No.

3  Q    And what about the testimony you gave about the white man

4  getting into a white pickup truck, did you make any notes

5  about that?

6  A    No.

7  Q    And what -- there was a drawing about all the way that

8  the car drove through the airport.  Do you remember seeing

9  that on the screen before?

10  A    Right.

11  Q    Did you make any notes about that?

12  A    No.  We just go from point A to B pretty much.  Not

13  driving -- I just -- you know, we followed it to the hanger

14  and from the hanger back to the terminal.

15  Q    And what about when it was done, did you take notes about

16  the surveillance that you just described?

17  A    As far as on my side?

18  Q    Yes.

19  A    From my side, my report was to inform my managers as to

20  what was going on and I did that part and the officers would

21  write their part also.  So that part was for me just to tell

22  the other managers, hey, this is what went on and we just let

23  them aware of what's going on immediately so they know for

24  their report.  That's pretty much it.

25  Q    Who were the managers that you would have given that

1   information to?

2   A    It's throughout the airport.  It's a list, distro list we

3   have.

4   Q    And then that information would be put in the report the

5   next day you believe?

6   A    I believe, yes.

7   Q    Officer Cambry, have you made any notes in regard to your

8   investigation on February 4, 2020?

9           MR. POLLACK:  Objection.

10          THE COURT:  Sustained as to form.

11          Did you make any notes -- aside from the Significant

12  Incident Report that you just testified about, did you take

13  any notes on what you observed and what you did on February

14  4th?

15          THE WITNESS:  Pretty much the incident report.

16  That's pretty much what I have there.

17          THE COURT:  I'm talking about aside from the

18  Significant Incident Report --

19          THE WITNESS:  No.  No.

20  Q    In the Significant Incident Report, did you make any

21  mention of a blue van?

22  A    No.

23  Q    Did you make any mention of a white pickup?

24  A    No.

25  Q    Did you make any mention of your following a potential

1  target?

2  A      No.

3  Q      Did you notify HSI about following the blue van?

4  A      They were aware that -- most likely on the officers that

5  would actually mention that to them.  No.  Me, myself, no, I

6  did not know.

7  Q      Did you tell HSI about you following a white pickup?

8  A      No.

9  Q      Did you tell HSI about people -- the man from those two

10 vehicles being inside a hangar?

11 A      Say that again.

12 Q      Did you tell HSI about the man from the blue van being

13 inside the hanger?

14 A      I relate the message to the officers that were with me at

15 the time, but not HSI, because I didn't have HSI's number

16 right off.  So I just relayed that message -- all the question

17 that you just asked me, I relayed those messages to the

18 officers that were with me.

19 Q      All right.  And when the subject was the arrest of Mr.

20 Belloisi, you went back to JNSU, you said?

21 A      Yes.

22 Q      That's where HSI was speaking with Mr. Belloisi?

23 A      That's correct.

24 Q      And did you tell HSI then about what you had seen earlier

25 in the day?

1    MR. POLLACK:  Objection.

2    THE COURT:  I will allow this last question.

3  Q    When you went back to JNSU and you met --  withdrawn.

4       When you went back to JNSU --

5    THE COURT:  The question was asked already.  Can you

6  read back the question, please.

7       (Record read.)

8  A    Yes.  We discussed that.

9  Q    And by "that," we mean your following those two vehicles

10 that you described earlier?

11 A    That's correct.

12 Q    And why did you tell them that, sir?

13 A    That was part of our movement throughout the airport for

14 that evening, so I told them what I saw.

15 Q    And was it your understanding that the person that you

16 had been following for an hour, more than an hour and a half,

17 was he ultimately the subject who was arrested?

18 A    That's correct.

19    MR. COHEN:  Nothing further.

20    THE COURT:  Do you have any redirect?

21    MR. POLLACK:  No, Your Honor.

22    THE COURT:  You may step down, sir.  Thank you.

23    THE WITNESS:  Thank you, ma'am.

24    (Witness steps down.)

25    THE COURT:  So, ladies and gentlemen, it's a little

1  bit after 5:00.  I had asked Judge Levy, and I don't know if

2  he got to it because there's a lot that's covered during jury

3  selection, that some time if we have to go a little bit past

4  5:00 to finish up with a witness to move the case along, that

5  we might do that.

6          I have a Board of Judges meeting tomorrow afternoon

7  that's very important.  And while the trial is very important,

8  we also have to participate in the administration of the

9  court.  So we are going to end early tomorrow.  We are going

10  to end at three o'clock tomorrow afternoon.  So I wanted to

11  let you know that today so that you can plan your afternoon.

12          You don't have any obligation to tell anybody else

13  so that you could play hooky for those few hours.  That's all

14  entirely up to you.  But I do want to remind you that you

15  cannot have any contact or conversations with any of the

16  parties that you may encounter, either in the courthouse or

17  out in the street or anywhere else.

18          Remember, please not to discuss this case or any

19  aspect of this case, including jury selection with anyone at

20  all:  Family, friends, neighbors, coworkers, anyone else in

21  person or over any kind of media.

22          Keep an open mind.  Do not form or draw any opinion

23  about the guilt or non-guilt of the defendant on trial until

24  such time as all the evidence has been presented and you've

25  been instructed on the law by me and have had an opportunity

1  to deliberate with your fellow jurors.

2          Remember that you can't read or listen to or view

3  anything at all about this case or anything touching on this

4  case over any kind of media.  You can't conduct any kind of

5  research or investigation on your own over any kind of media

6  or view any of the locations that have been mentioned during

7  the course of the trial.

8          I can see already that you're a very prompt group.

9  We really appreciate that.  And we are going to start tomorrow

10 at 9:30.  So we appreciate your being prompt.  Get some good

11 rest and we will see you tomorrow.

12         Remember to bring snacks or something for you to eat

13 during the breaks.

14         THE COURTROOM DEPUTY:  All rise.

15         (Jury exits the courtroom.)

16         THE COURT:  Just have a seat a for a couple of

17 minutes.  I'm not going to keep you guys long.

18         What's your lineup for tomorrow?

19         MR. POLLACK:  We intend to begin with Captain

20 Randall John LeRuth.

21         THE COURT:  How do you spell LeRuth?

22         MR. POLLACK:  L-E-R-U-T-H.

23         THE COURT:  Okay.

24         MR. POLLACK:  And after Mr. LeRuth, or actually

25 Captain LeRuth, is Phil Guerra, G-U-E-R-R-A.  And then Sean

1   Gabay, Gabay is G-A-B-A-Y.

2          After that will be Michael Guarnieri, Guarnieri is

3   G-U-A-R-N-I-E-R-I.

4          THE COURT:  What was the first name, Michael?

5          MR. POLLACK:  Michael.

6          And if we get to it, next and hopefully last will be

7   Darryl Valinchus, Valinchus is V-A-L-I-N-C-H-U-S.

8          THE COURT:  E H?

9          MR. POLLACK:  V, as in Victor, A-L-I-N-C-H-U-S.

10  Valinchus.

11         THE COURT:  Okay.  And the first name, I'm sorry?

12         MR. POLLACK:  Darryl, D-A-R-R-Y-L.  Darryl.

13         THE COURT:  Okay.

14         MR. POLLACK:  I will note, Your Honor, most of these

15  witnesses we anticipate are more like the second witness today

16  rather than the first, so hopefully it will go a little

17  quicker.

18         THE COURT:  And if you haven't been able to tell,

19  you know, I don't believe in asking the same question 15

20  different ways.  I understand that sometimes there is a

21  nuance, but there is no need to keep beating the same dead

22  horse over and over again.

23         MR. COHEN:  Your Honor, respectfully, I just want to

24  let the Court know that I was intending to ask Officer Cambry

25  about other details in the report that he took authorship from

1    and I didn't because of the Court's position that I had asked

2    sufficient amount of questions.  There were other facts in

3    there that I think would have elicited and highlighted for the

4    jury things that Officer Cambry did and, most importantly,

5    things that Officer Cambry didn't do, as this was the only

6    paperwork that he filled out in connection with the actions on

7    February 4, 2020, and I think it would have highlighted some

8    of the things that Officer Robinson --

9           THE COURT:  You were asking about a report that was

10   not in evidence, okay.  There was nothing to stop you from

11   asking him about things that he actually did, and you asked

12   him about what he did and the Government asked him about what

13   he did in quite a bit of detail.

14          MR. COHEN:  And I would --

15          THE COURT:  So your point was in trying to get into

16   a report that was not in evidence about what other people told

17   him that was included in that report that he didn't do.

18          MR. COHEN:  I believe he did state he filled out the

19   report, Your Honor, and I wanted to challenge the Government's

20   --

21          THE COURT:  No.

22          MR. COHEN:  -- what he testified on direct.

23          THE COURT:  Don't mischaracterize.  Don't

24   mischaracterize.  You're mischaracterizing his testimony, his

25   testimony and what's in the report.

1          He said that there were portions of that report that

2     was based on information provided to him by some of the

3     officers.  It did not include everything that he did.

4          MR. COHEN:  Right.  And I wanted to challenge him

5     based on what his direct examination said about things that

6     were important to him that were not included in the report, as

7     well as information that Officer Robinson provided him and I

8     was not permitted to go into about --

9          THE COURT:  It was already elicited, that the report

10    did not contain everything, that it was a summary.

11         My point is that you don't need to beat that to

12    death.  The point was made.

13         All right.  I will see everybody back here at 9:30.

14         MR. POLLACK:  Thank you, Your Honor.

15         MS. SCHIERBERL:  Thank you, Judge.

16         (Matter adjourned to April 26, 2023 at 9:30 a.m.)

17

18                         ooo0ooo

19

20

21

22

23

24

25

I N D E X

**WITNESS**                                           **PAGE**

    OPENING STATEMENT-MR. POLLACK                15

    OPENING STATEMENT - MR. COHEN               20

**MICHAEL ROBINSON**

    DIRECT EXAMINATION BY MS. SCHIERBERL         34

    CROSS-EXAMINATION BY MR. COHEN               92

**JOURNAEL GARRY CAMBRY**

    DIRECT EXAMINATION BY MR. POLLACK           172

    CROSS-EXAMINATION BY MR. COHEN              202

1                    **E X H I B I T S**

2
Government Exhibits 401-405                          33

3
Government Exhibits 201, 201A, 202, 202A            46

4
Government Exhibit 301                              52

5
Government Exhibit 301A                             55

6
Government Exhibit 2                               56

7
Government Exhibit 6                               61

8
Government Exhibit 7                               76

9
Government Exhibit 306                             78

10
Government Exhibits 203 and 204                    84

11
Government Exhibit 4                               86

12
Government Exhibit 206                             90

13
Defense Exhibit C-1                               134

14
Defense C-2                                       148

15

16

17

18

19

20

21

22

23

24

25