1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2

- - - - - - - - - - - -     X
3

UNITED STATES OF AMERICA,     :     20-CR-219(DLI)(RLM)
4

5      -against-       :    United States Courthouse
                        Brooklyn, New York
6

PAUL BELLOISI,        :
7                      April 26, 2023, Wednesday
        Defendant.   :   9:30 o'clock a.m.
8

- - - - - - - - - - - -     X
9

10             TRANSCRIPT OF JURY TRIAL
       BEFORE THE HONORABLE DORA L. IRIZARRY
11          UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Government:      BREON PEACE
                     United States Attorney
14                   BY: ROBERT M. POLLACK
                       MARGARET SCHIERBERL
15                       FRANCISCO J. NAVARRO
                    Assistant United States Attorneys
16                   271 Cadman Plaza East
                   Brooklyn, New York
17

18  For the Defendant:       COHEN & FORMAN, LLP
                    950 Third Avenue, 10th Floor
19                   New York, NY 10022

20                   BY: DAVID J. COHEN, ESQ.
                       BENJAMIN L. SIMPSON, ESQ.
21

22  Court Reporter:  Michele D. Lucchese, RPR, CRR
                 225 Cadman Plaza East
23               Brooklyn, New York
               (718) 613-2272
24

Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

1           (In open court; jury not present.)

2           THE COURTROOM DEPUTY:  Criminal cause on trial,

3    Docket No. 20-CV-219, United States versus Paul Belloisi.

4           Please state your appearances.

5           MR. POLLACK:  I am Robert Pollack for the United

6    States.  I am accompanied by my colleagues, Assistant US

7    Attorneys, Margaret Schierberl, Francisco Navarro, Paralegal

8    Specialist Sophia Cronin, and Special Agent John Moloney of

9    Homeland Security.

10          Good morning, Your Honor.

11          THE COURT:  Good morning to all of you.

12          On behalf of the defense.

13          MR. COHEN:  David Cohen and Benjamin Simpson for

14   Paul Belloisi who is seated at counsel table.  Good morning.

15          THE COURT:  Good morning to all of you.

16          We did have a little bit of a delay because a couple

17   of the jurors were late, but everyone is here.  There was some

18   train delay.

19          So everyone is here.  And unless there is something

20   that the parties need to decrease few, I'm ready to call the

21   jury back in.

22          MR. POLLACK:  The Government's is ready to proceed.

23          THE COURT:  Okay.  And who's going to be your next

24   witness?

25          MR. SCHIERBERL:  Your Honor, our first witness for

1   the morning will be Captain Randall LeRuth.

2          THE COURT:  Okay.  And defense is ready to go

3   forward?

4          MR. COHEN:  Yes, Your Honor.

5          THE COURT:  Let me say this:  If for some reason --

6   things happen.  Trial is a fluid thing.  So, if for some

7   reason there is something that we need to address before we

8   bring the jury in, please notify my case manager, Ms.

9   Carosella, as soon as you are aware because we can meet before

10  9:30.  I'm usually here before that time, so we don't have to

11  hold up the jury.  Okay?

12         All right.  So let's bring in the jury.

13         Jury entering.  All rise.

14         (The jury enters the courtroom.)

15         THE COURT:  Everyone may be seated.

16         Do the parties agree that all our jurors are present

17  and properly seated?

18         MR. POLLACK:  Yes, Your Honor.

19         MR. COHEN:  Yes, Your Honor.

20         THE COURT:  Good morning, everyone.

21         JURORS:  (Collectively) good morning.

22         THE COURT:  I know there was a little bit of a

23  transportation issue, as is usual in New York City.  But we

24  appreciate your efforts to get here on time this morning.

25         We are continuing with the Government's

1  case-in-chief.

2          The Government may call its next witness.

3          MS. SCHIERBERL:  Thank you, Judge.

4          The Government calls Captain Randall LeRuth to the

5  stand.

6          THE COURT:  If he wants to testify -- Agent Moloney,

7  if he wants to testify without the mask, he is fine.

8          THE WITNESS:  Thank you, Your Honor.

9          THE COURT:  You may proceed.  Thank you, sir.

10          THE COURTROOM DEPUTY:  Raise your right hand, sir.

11          Do you swear or affirm that your testimony will be

12  the truth, the whole truth and nothing but the truth?

13          THE WITNESS:  I do.

14          THE COURTROOM DEPUTY:  Thank you.

15          THE COURT:  Please be seated, there's bottled water

16  there for you.

17          THE WITNESS:  Thank you very much.

18          THE COURTROOM DEPUTY:  Please state and spell your

19  name.

20          THE WITNESS:  My name is Randall LeRuth,

21  R-A-N-D-A-L-L, L-E-R-U-T-H.

22          THE COURTROOM DEPUTY:  Thank you.

23          THE COURT:  Good morning, sir.

24          THE WITNESS:  Good morning.

25          THE COURT:  You can adjust that microphone so that

1  the height and everything is good for you.

2          THE WITNESS:  Thank you.

3          THE COURT:  I'm going to ask you to please speak

4  slowly and keeping your voice at that tone would be perfect.

5  Thank you.

6          THE WITNESS:  Thank you.

7          THE COURT:  You may inquire when you are ready.

8          MS. SCHIERBERL:  Thank you, Judge.

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **RANDALL LERUTH**,

2         called as a witness, having been first duly

3         sworn/affirmed, was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MS. SCHIERBERL:

6   Q    Good morning, Captain LeRuth.

7   A    Good morning.

8   Q    Who do you work for?

9   A    American Airlines.

10  Q    What's your title?

11  A    Captain.

12  Q    What does it mean to be a captain?

13  A    The captain is responsible for the aircraft and its

14  contents, including the passengers and the cargo and the

15  airplane itself.

16  Q    How long have you been a captain with American Airlines?

17  A    I first became a captain in 2001.

18  Q    Was this a promotion?

19  A    Yes.

20  Q    What was your title prior to becoming captain?

21  A    First officer.

22  Q    What is a first officer?

23  A    A first officer, generally called the copilot, it's -- he

24  assists the captain in the duties on the flight deck and then

25  preflight inspections and everything.

1    In practice, we take turns flying, but the captain

2  has the ultimate authority and responsibility for the

3  airplane, but we're grooming copilots to be captains one day,

4  so we try to share those responsibilities with them as much as

5  possible.

6  Q    Tell us about your responsibilities as a captain.

7  A    As I mentioned, we are ultimately responsible for the

8  safety of the airplane and the people, primarily the people on

9  board.

10    We do what we can to keep the airplane moving on

11  time.  If there are any maintenance issues, we are the people

12  -- we can be the people to alert the maintenance folks so that

13  if there's a problem, we might be the first to notice it.  So

14  we play a role in keeping the airplane in sound condition.  If

15  there's passenger issues, we have the authority to address

16  those, including denying a passenger passage should that be a

17  problem.

18    But, ultimately, we are responsible for the safety

19  -- I feel like we are responsible primarily for the safety of

20  the people, and that includes the airplane as well.  But when

21  push comes to shove, it's the people's -- we literally have

22  the peoples' lives in our hands.  So, ultimately, that's our

23  number one priority, is the safety of the passengers on board.

24  Q    What, if anything, did you do prior to becoming a captain

25  for American Airlines?

1    A    I was in the U.S. Air Force.

2    Q    How long did you serve in the Air Force?

3    A    Seven years of active duty.

4    Q    Let me direct your attention to February 4th of 2020.  At

5    that time, were you working as a captain for American

6    Airlines?

7    A    Yes.

8    Q    What was your flight schedule that day?

9    A    On that day, the copilot and I came from a hotel.  We had

10   arrived earlier that morning from the west coast, went to the

11   hotel, slept, came back to JFK for a scheduled 8 o'clock

12   departure from JFK to San Diego.

13   Q    Do you recall the tail number of your aircraft that day?

14   A    It was 3BG, Bravo Gulf.

15   Q    Do you know where the plane you were about to fly had

16   come from before landing at JFK?

17   A    Yes, it arrived earlier that day at 3:30 from Montego

18   Bay, Jamaica.

19   Q    Where were you intending to fly that plane to?

20   A    Our schedule was to take it to San Diego and we did.

21   Q    I think you mentioned this, but what time was that flight

22   scheduled to depart?

23   A    The schedule was at 8 o'clock and we actually left the

24   gate four minutes early.

25   Q    Upon arriving to work that day, at approximately what

1  time did you board the aircraft?

2  A    Typically, we arrive at the gate an hour prior.  The

3  pilot and the flight attendants will arrive an hour prior to

4  the scheduled departure time.  So we arrived at the gate

5  around 7 o'clock.

6        So to board the airplane, we need the assistance of

7  the gate agent.  I can't recall exactly if the gate agent was

8  there exactly at 7 o'clock on that day.  But as soon as -- if

9  the gate agent was there at 7:00, we would've boarded at 7:00.

10 If not -- if the gate agent was there a few minutes later, we

11 would have boarded at that time after our IDs were scanned in

12 into the system.

13 Q    Who, if anyone, boarded the plane with you that night?

14 A    My copilot, First Officer Dodd.

15 Q    Other than the copilot, was there anyone else on the

16 plane when you boarded?

17 A    No.

18 Q    Do you have any preflight duties that you take care of

19 prior to the flight departing?

20 A    Yes.  There's an interior inspection and exterior

21 inspection that happens.  Typically the captain will focus on

22 the interior duties and the copilot goes down some stairs on

23 the jet bridge and walks around the airplane looking for any

24 kind of obvious problems:  Flat tires, leaky engines, or

25 missing panels, anything obvious that might have been

1    overlooked by the maintenance guys on the inbound flight.  And
2    that's done 100 percent of the time, somebody goes and walks
3    around.  So the copilot went out to do the walk-around.
4            I start my duties in the cockpit, which would
5    include getting the air conditioning, running -- starting the
6    APU, the auxillary power unit, which runs electrical system
7    and air conditioning system for the airplane when it's not in
8    flight.
9            I would load the flight computer, check the
10   maintenance logbook.
11           There -- in normal circumstances, all that stuff is
12   pretty perfunctory.  If there's no problems, it goes pretty
13   quickly.  If you have a problem loading the flight plan, maybe
14   it's not communicating with the system, that might take a
15   little bit longer.  If there is a problem in the logbook,
16   meaning there's a write-up that the previous crew has put in
17   there but it hasn't been addressed, then we try to start
18   tracking that down and see if there's maintenance coming out
19   up.
20           So there's chores for us both to do and normally
21   it's without any -- if there's no open-ended things, it goes
22   pretty quickly.  But we are there an hour ahead of time so if
23   something does arise we have the time to take care of it.
24   Q    When you boarded that plane at 7:00 p.m. was it hot on
25   the aircraft?

1   A    Not to my recollection, I don't believe it was hot, no.

2   Q    Is it part of your normal preflight duties to turn on APU

3   when you board the airplane?

4   A    Me personally, the first thing I do when I get in the

5   cockpit is I turn on APU to get the power internal to the

6   airplane.

7            The alternative -- if the APU is not running, they

8   have a big electric plug that they jam in on the side of the

9   airplane then it supplies power to the plane that way.

10            I like to have APU running because if I turn it on

11   and it doesn't work, you need to get that addressed and,

12   secondly, it has an air conditioning function that will help

13   control the climate in the airplane.

14            It was February.  I don't recall it being warm.  And

15   the first thing I would have done if it was warm or cold or

16   anything was turn on APU, which gets the air conditioning unit

17   on anyhow.  So that would have helped the climate situation

18   inside the airplane one way or the other, but I don't recall

19   it being hot on that plane at all.

20   Q    By 7:15 or 15 minutes after you boarded, was it hot on

21   the airplane?

22   A    No, it would not have been.  With the APU running for 15

23   minutes, if it was hot or cold, it would have moderated the

24   temperature to normal at that time.

25   Q    Do you have any recollection of any issues with the APU

1  running that night?

2  A    No.  There were none.  If there were, I would have

3  entered it into the logbook and I did not.

4  Q    So let's talk about the logbook.  You mentioned that was

5  part of your preflight responsibilities.  What is a logbook?

6  A    It's a maintenance logbook.  All of the maintenance

7  activity that's done to the airplane, including things like

8  adding oil to the engines or hydraulic system, everything

9  that's done from a maintenance standpoint is entered in the

10  logbook.  It's an FAA requirement for tracking purpose so they

11  can see what procedures were done, if they were followed

12  correctly.

13         It allows us also to track trends on the airplane.

14  Let's say one of the engines burns more oil than the other

15  one, that would be something for the maintenance guys to know

16  as far as future maintenance inspections are concerned.

17         But everything that happens from a maintenance

18  standpoint gets entered into the logbook.

19         We, as the flight crew, often notice a problem

20  first, so we can enter it into the logbook.  But there are

21  occasions also when maintenance might notice something in

22  their inspections that they do on a routine basis, but they

23  will still -- even though they are the maintenance guys, they

24  will still enter the problem in the problem section of the

25  logbook, and then each part of the logbook that has a problem

1  listed has to have a corresponding signoff before the airplane

2  can fly.

3  Q    Are you able to fly the aircraft with an open or

4  unaddressed issue reflected in the logbook?

5  A    No.

6  Q    Did you, in fact, review the logbook for that aircraft

7  before your flight on February 4, 2020?

8  A    Yes.  It's part of our procedure to review the past three

9  flight days of the airplane to see what write-ups were entered

10 and if there are any trends.

11 Q    Were there any open items noted in the logbook for that

12 aircraft when you first reviewed it?

13 A    No.

14 Q    Was there anything noted in that logbook that would

15 impact the conduct of the flight or that had not yet been

16 addressed?

17 A    No.

18 Q    Were there any deferred items in the logbook that night?

19 A    There was some beacon lights, the lights on the airplane

20 that are kind of navigational and warning purposes, there was

21 some lights that needed to be changed.  That was all.

22        MS. SCHIERBERL:  Your Honor, permission to show only

23 defense counsel and the witness what has been previously

24 marked for-identification purposes only as Government Exhibit

25 101?

 1            THE COURT:  Yes.

 2   Q    Captain LeRuth, can you see this document?

 3   A    Yes.

 4   Q    What is it?

 5   A    This is a page from the maintenance logbook for flights

 6   that were conducted on the 3rd of February.

 7            MS. SCHIERBERL:  Ms. Cronin, can you scroll to the

 8   second and third pages for the witness, please.

 9   Q    Do you recognize the second and third page of this

10   exhibit?

11   A    I do.

12   Q    Do these pages reflect fair and accurate copies of pages

13   of the logbook that you reviewed for the aircraft that you

14   flew on February 4, 2020?

15   A    Yes.

16            MS. SCHIERBERL:  Your Honor, the Government offers

17   Government Exhibit 101 in evidence?

18            THE COURT:  Any objection?

19            MR. COHEN:  No.

20            THE COURT:  It's admitted.

21            (Government's Exhibit 101 received in evidence.)

22            MS. SCHIERBERL:  Permission to publish to the jury.

23            THE COURT:  Yes.

24            MS. SCHIERBERL:  Thank you, Judge.

25   Q    Captain LeRuth, looking at Government Exhibit 101, can

1    you tell us what this first page reflects?

2    A    This is an example of a maintenance logbook page.

3            I can tell looking down the left side the nose

4    number of the airplane that I was flying was 3BG.  That's

5    correct.  That's something that we make sure that we have the

6    right logbook for the right airplane that we're flying.  So

7    that's part of our check, is to make sure 3BG is the airplane

8    that we're flying and they haven't mistakenly switched

9    logbooks with other airplanes.

10           Below that is the journey log.  Each captain that

11   reviews the logbook will put in the date and the flight number

12   that they're flying and their initials to indicate they have

13   done the review as required.

14           The large blocks to the right of that, the top box

15   are mechanical discrepancies, as I mentioned.  Those are what

16   we call the write-ups.  So if we notice a problem, we enter

17   the problem in those top blocks.  And then when the block

18   below it says action taken, if there's anything entered in the

19   top box, then there must be something entered in the bottom

20   box by maintenance.  And if there is not, we call that an open

21   write-up and we get in touch with maintenance to have that

22   resolved because we cannot leave the gate with an open

23   write-up.

24   Q    Does this page reflect any open or unaddressed problems

25   with the aircraft?

1   A      No.

2          What I see on this page is that there are three

3   uneventful flights.  The boxes were crossed out because at the

4   bottom you see that they added oil to the engine at -- both

5   engines at JFK.  And, so, these white pages have carbon copies

6   that stay in the book.  The white pages are pulled and go into

7   the maintenance facility for permanent-record* purposes.  So

8   when the white pages are complete and pulled for archive value

9   purposes, if the mechanic -- if the mechanical discrepancies

10  have not been entered, they're crossed out to show that they

11  were not used.

12         So this to me is three uneventful flights.  They

13  added oil, and they pulled the page to take it down to put it

14  in the archive.

15  Q     Turning to page 2 of this exhibit, what does this page

16  reflect?

17  A     This is the flight -- these are flights in 3 Bravo Gulf

18  on the 4th of February:  The two flights with the same flight

19  number going to and from Montego Bay, the initials of the

20  captain.  There is an entry in the top that the IFE check is

21  due.

22         IFE stands for in-flight entertainment.  So that's a

23  kind of a routine passenger service thing that is done once in

24  a while.  I honestly don't know what that entails, whether

25  it's rebooting it, like booting your computer at home.

1  Sometimes it's to clear error, somebody's seat video is not

2  working.  But they do a routine IFE system check that's done

3  at a panel inside the entry door right above the closet.  On

4  the 737, there's a little panel that controls all the

5  in-flight entertainment system.  So that's a real routine

6  non-safety-related entry.

7            But in keeping with the fact that everything that's

8  done to the airplane is documented, this routine entertainment

9  system check is documented.

10  Q    When you say it's documented, what do we see in this

11  document?

12  A    We see the mechanical discrepancy.  So the IFE check is

13  due, the in-flight entertainment system check is due.  And

14  then on the bottom, it says it was performed per aircraft

15  maintenance manual.  And then the reference there on the

16  bottom, it says -- it has the date, the person who did it and

17  their employee number.

18  Q    Where does one access the in-flight entertainment system?

19  A    The controls are in the entry -- when you come in through

20  the entry door on the 737, there's a closet right on the

21  right-hand side, and above that, there's a little

22  instrumentation panel, like a control panel for the seats, but

23  a little more elaborate that controls the in-flight

24  entertainment system.

25  Q    Is the mechanic who resolved this issue name on this

1  document?

2  A    I see a signature.  It may.  I don't know.  It could be.

3  I don't know what that is.

4        We would reference the employee number to find out

5  who that was, but there is a signature there as well.

6  Q    Is there any reason to be in the avionics compartment to

7  check the in-flight entertainment?

8  A    No.

9  Q    Turning page 3 of Government Exhibit 101, what does this

10  page reflect?

11  A    Another page from 3 Bravo Gulf's maintenance logbook, the

12  journey log.  That's my entry.  It has my entry for my review

13  that I did for Flight 366 with my initials.  There was no

14  mechanical discrepancy entered on the top, but there was

15  action taken for a previous item that had been deferred, and

16  we can see that it was done in San Diego.  They replaced the

17  lens in the lamp for the lower anti-collision light, the

18  lighting system for the airplane.  As I mentioned earlier,

19  that had been deferred.  So that was taken care of in San

20  Diego after we brought the airplane to San Diego.

21        And, again, they also put some oil -- you could see

22  in the bottom they put some oil in the engines in San Diego as

23  well.  And then the other boxes were crossed out as the page

24  was pulled from the archive.

25  Q    Did you make any entry in the logbook after boarding this

1   aircraft at JFK and before flying to San Diego?

2   A    No.

3          And you can see that by the fact that my initials

4   are there in the journey log, but there is no entry -- I made

5   no mechanical discrepancy entry.  The next entry is a sign-off

6   of a deferred item after we arrived in San Diego.

7   Q    Other than the deferred item that was addressed in San

8   Diego, were you aware of any mechanical issues facing that

9   aircraft before you flew it across the country that night?

10  A    No.  We would not have done that flight had we had any

11  issues that were not addressed.

12  Q    After you boarded that aircraft that night, where did you

13  go?

14  A    Where did I -- what did we do with the airplane?

15  Q    Where did you specifically go --

16  A    Where did I specifically go?

17  Q    -- when you stepped on to the aircraft?

18  A    -- I went into the cockpit and did my duties and sat in

19  my seat and stayed there until we got to San Diego.

20  Q    Did you leave the cockpit after you boarded the flight

21  that night?

22  A    No.  I may have used the restroom during the five-hour

23  flight, but that would have been in flight and not prior to

24  departure.  No, I did not leave the cockpit.

25  Q    Other than the first officer that you have mentioned, did

1   anybody enter the cockpit after you had entered it?

2   A    About 20 minutes prior to our scheduled departure time,

3   so around 7:40, Special Agent Moloney came up to the cockpit

4   and informed me of what was transpiring on the ramp, gave me

5   kind of a brief overview of what was happening.  We changed

6   information and that was it.

7   Q    Other than the first officer and Special Agent Moloney,

8   did anybody enter that cockpit after you boarded the flight

9   that night?

10  A    No.

11  Q    Would you have known if someone had?

12  A    Yes.  It's very close quarters.  I would have known.

13  Q    At approximately what time did law enforcement come to

14  speak with you that night?

15  A    It was, as I mentioned, about 20 prior to departure, so

16  I'd say roughly 7:40.

17  Q    What generally did you speak about with law enforcement?

18  A    When the first officer came back -- excuse me -- from his

19  walk-around, he mentioned that there was a lot of law

20  enforcement on the ramp, so I was kind of curious what was

21  going on down there.  And when Special Agent Moloney came to

22  the cockpit, he just informed us that there was an action

23  going on to seize some smuggled goods out of our avionics

24  compartment, and that was it.  Just kind of real broad

25  overview of what was happening, not a lot of details, just to

1   kind of let us know why there were so many people around the

2   airplane, which would, of course, be of interest to me.

3   Q     What is an avionics compartment?

4   A     Airplanes all have systems on board.  We have engines and

5   hydraulic systems, electrical systems, fuel control systems

6   and they all have control boxes, black boxes of some sort.

7            Airplane designs are so that most of those control

8   systems are in the avionics compartment, which is a

9   compartment below the cockpit.  Maintenance will access the

10  avionics compartment to run tests on systems that might

11  indicate a fault.  A lot of those boxes down there have

12  built-in test systems in it.  But in the big picture, the --

13  we have a hydraulic system doing a lot of things.  The brains

14  to control all those things are in the avionics compartment:

15  The hydraulic system, oil system, engine system, air

16  conditioning system, pressurization system.  All of those

17  control boxes live in the avionics compartment.

18  Q     Are the electronics housed in the avionics compartment

19  critical to the success or the safety of the flight?

20  A     Yes.

21  Q     Why?

22  A     All of those systems serve a purpose.  The hydraulic

23  system controls the flight controls.  So to be able to control

24  the airplane, we need to have a fully functional hydraulic

25  system.

1          The fuel control controls the engines and moderates

2    the fuel to the engines.  So to be able to control the

3    engines, we need an operating fuel control system.

4          Pressurization is cabin pressure.  So we're flying

5    at 30,000 plus feet, but the cabin altitude is maintained at a

6    lower altitude, so we don't have to wear oxygen masks and the

7    passengers don't.

8          So all of these have some bearing on the safe

9    operation of the airplane plane.

10   Q    As captain of that flight, are you ultimately in charge

11   of the safety and success of that flight?

12   A    Yes.

13   Q    Given your role as captain and your review of the logbook

14   for that flight, was there any reason, to your knowledge, on

15   either a routine or exceptional basis for someone to be in the

16   avionics compartment of your aircraft that night?

17   A    No.

18          MS. SCHIERBERL:  Thank you, Captain.

19          Your Honor, I would ask for a brief moment to confer

20   with my co-counsel.

21          THE COURT:  Yes.

22          MS. SCHIERBERL:  Thank you, Judge.

23          (Pause.)

24          MS. SCHIERBERL:  Your Honor, at this time the

25   Government has no further questions for this witness.

1    THE COURT:  Does the defense wish to inquire?

2    MR. COHEN:  We do, Your Honor.

3    THE COURT:  You may proceed.

4    MR. COHEN:  Thank you.

5    THE COURT:  This is cross-examination by Mr. Cohen.

6  CROSS-EXAMINATION

7  BY MR. COHEN:

8  Q    Good morning, sir.

9  A    Good morning.

10 Q    If I ask you anything that is poorly worded or you don't

11 understand, just please ask me to repeat the question.

12 A    Thank you.

13 Q    Thank you.

14      Captain LeRuth, have you and I ever met before?

15 A    No, sir.

16 Q    We've never exchanged electronic communication, text

17 messages, e-mails, anything like that?

18 A    No, sir.

19 Q    And prior to February 4, 2020, had you ever met Agent

20 Moloney?

21 A    No, sir.

22 Q    Prior to testifying today, you've met with each of the

23 Government agents that are sitting at that desk?

24 A    Yes, sir.

25 Q    You've exchanged e-mail communications with them as well?

1  A    Yes, sir.

2  Q    And you have provided them with some records; is that

3  right?

4  A    Yes, sir.

5  Q    And all of that was in relation to the subject matter

6  that you are testifying to today?

7  A    Yes, sir.

8  Q    When was the first time that you met with the Government

9  agents?

10  A    On February 4, 2020, Special Agent Moloney came to my

11  cockpit.  That was my first contact with anyone at the

12  prosecution table.

13  Q    Did anyone come with Agent Moloney to the cockpit?

14  A    Not to my recollection.

15        I believe there may have been another agent with

16  him, but he was not in the cockpit.  He was with him behind --

17  in the cabin, but not in the cockpit.

18  Q    Is -- cockpit and flight deck, do they mean the same

19  thing?

20  A    Yes.

21  Q    Thank you.

22        And when was the first time you met with Mr. Pollack

23  and Ms. Schierberl?

24  A    Sometimes in the past weeks, four to six weeks when I was

25  contacted about this trial today.

1    Q     So sometime in the month of March is fair to say?

2    A     Yes.

3    Q     And did you have an initial phone conference with them?

4    A     Yes.

5    Q     And Mr. Pollack, Ms. Schierberl, and Agent Moloney were

6    on that phone call with you; is that right?

7    A     I know at certain times there were various people on the

8    calls.  I can't state with certainty who was on which call at

9    what time.  But I know in the -- in the time since March and

10   today we did have conversations where all of us were involved

11   and I can't tell you the -- who was on each particular call.

12   Q     And you also had videoconferences with them; is that

13   right?

14   A     Yes.  Yes.

15   Q     And all of that was related to what you're testifying to

16   today; is that right, sir?

17   A     Yes, sir.

18   Q     The questions that Ms. Schierberl just asked you, are

19   those generally the questions that you've heard in the past?

20   A     Yes.

21   Q     And were your answers today any different than they were

22   six weeks ago?

23   A     No, sir.

24   Q     And between yesterday and today, did you speak with

25   either of the prosecutors in this case?

1   A      Yes, sir.

2   Q      Did you discuss the subject matter of your testimony

3   today?

4   A      Yes, sir.

5   Q      And did they tell you at all about what the witnesses

6   testified to yesterday?

7   A      No, sir.

8   Q      And during the course of the interactions with the

9   prosecutors, did they provide you with any notes to review in

10  preparation for your testimony?

11  A      Did they provide me with notes?

12  Q      Yes, sir.

13  A      Apart from the logbook pages, no.

14  Q      When you were speaking with them, did you make any of

15  your own notes regarding what you've testified to today?

16  A      Yes, sir.

17  Q      And did you provide those notes to the Government?

18  A      Yes, sir.

19  Q      And what were those notes?

20  A      My flight.

21  Q      I'm sorry.  I'm not asking you the details of them.  A

22  poorly-worded question.  Let me try that again.

23         You took handwritten notes during your conversations

24  with them?

25  A      No.

1    Q    Did you take them after the conversations with them?

2    A    No.

3    Q    So the information you provided them, was it not our your

4    own notes, but just information that you had from other

5    sources?

6    A    Information relating to the particular flight and the

7    aircraft.

8    Q    Thank you, sir.

9         Is there anything that the Government asked you for

10   that you were not able to provide to them?

11   A    No, sir.

12   Q    It's right, Captain LeRuth, that when the -- when Agent

13   Moloney came on to your aircraft he informed you that cocaine

14   were found in the avionics compartment of the aircraft?

15   A    Yes.  That was my understanding.

16   Q    And is that fair to say since that date moving forward

17   until today you've done what you could to assist the

18   Government in the investigation?

19        THE COURT:  That's commentary.  That's not a

20   question.

21   Q    Have you done what you could to assist the Government in

22   their investigation?

23   A    Yes, sir.

24   Q    I believe you testified on direct, sir, anything found in

25   the avionics compartment that doesn't belong there could be

1   dangerous for the plane; is that right?  Anything found in the

2   avionics compartment that doesn't belong there could be

3   dangerous for a flight?

4           THE COURT:  That's not a question.  That's a

5   statement.

6   Q    Is it true that anything found in the avionics

7   compartment that's not germane to the plane could be

8   problematic during a flight?

9   A    Yes, sir.  That is true.

10  Q    And what would happen, sir, if a foreign object becomes

11  dislodged in the avionics compartment during a flight?

12  A    It could come in contact with some of those boxes, the

13  control boxes in there and have undesired effects.  It could

14  cause them to stop working entirely or stop working partially,

15  but it could affect the system that it controls in a way that

16  would have a negative impact on the operation of the airplane

17  and possibly it's safety.

18  Q    And in the worst-case scenario?

19  A    Worst-case scenario could result in an emergency that we

20  would need to -- that I, as the captain, would have the

21  authority to do whatever is necessary to safely get the people

22  on the ground.

23  Q    What is your first concern when operating an aircraft?

24  A    Safety.

25  Q    Who's job is it to make sure that the comfort features of

1    the aircraft are working properly?

2    A    Mine.

3    Q    Are you based out of LAX?  Is that --

4    A    At the time I was, yes.

5    Q    Where are you based out of now?

6    A    New York.

7    Q    Did you provide the Government with information about the

8    routing of the aircraft that you've testified to?

9    A    Yes.

10   Q    And did you provide the Government a copy of your entire

11   trip?

12   A    Yes.

13   Q    And that's from February 3rd to February 4th?

14   A    Yes.

15   Q    And did you provide the Government with information about

16   where you stayed on the morning of February 4th after landing

17   at JFK?

18   A    Yes.

19   Q    And you gave -- did you give them a document called A

20   Crew Hotel and Limo Info?

21   A    Yes.

22   Q    Where is it that you stayed that morning?

23   A    The Hamilton Inn, I believe it was.

24   Q    And in the information you provided to the Government,

25   did that have your check-in or checkout times at the Hamilton

1  Inn?

2          THE COURT:  That's completely irrelevant.  Let's

3  move on, please.

4  Q    Do you remember the times of the departure from San Diego

5  on the night of February 3rd?

6  A    Do I recall the departure from San Diego?

7  Q    From San Diego, yes, sir.

8          THE COURT:  February 3rd?

9          MR. COHEN:  Yes, Your Honor.

10         THE COURT:  Which departure from San Diego?

11         MR. COHEN:  His departure, Your Honor.

12         THE COURT:  How is that relevant?

13         MR. COHEN:  It was the flight.

14         THE COURT:  Move on.  No.

15         MR. COHEN:  Okay.

16         THE COURT:  No.

17  Q    Do you recall the time of your departure -- --

18  withdrawn.

19         Did you say that you landed at JFK in the morning of

20  February 4th?

21  A    Yeah.  I believe it was 5:20 in the morning.

22  Q    Where were you coming -- I'm sorry, sir.  Finish --

23  A    We flew San Diego to Phoenix, Phoenix to JFK, landed

24  around 5:20 in the morning.

25  Q    What did you do after you landed?

1   A      Went to the hotel.

2   Q      Did you hook up to ground power?

3   A      I don't recall.  I typically leave the APU running.

4   Q      And why is that, sir?

5   A      You can't turn the APU off until the ground power is

6   plugged in, and normally the ground power does not get plugged

7   before -- before we're ready to leave the airplane and not to

8   wait around for that to happen, so you just leave the power on

9   and go.

10  Q      With ground power on, can you run the pack units on the

11  plane?

12  A      No.

13  Q      Can you please describe what the pack units on the plane

14  are?

15  A      The packs are the air conditioners.  They're the heat

16  cycle machines that cool the air or -- yeah.  They cool the

17  air.

18          They typically run off of engine air that is taken

19  off of some of the compressed air from the engine, which runs

20  the turbine, which runs the heat exchanger.

21          I don't want to talk too much about thermodynamics.

22  It cools the air.  Or the engine air itself is hot, so between

23  the mix of the cooling air from the heat machine, the air

24  cycle machine and the hot engine air, it can make whatever

25  temperature is required inside the cabins.

1        When we're on the ground and the APU is not running,

2   if we have external power connected to the airplane, which is

3   just a big electric plug that's stuck inside the airplane

4   plane, there's a big hose that they can attach to the airplane

5   that has pre-conditioned air, and that is controlled by the

6   machine that supplies it.  There's a little thermometer that

7   they'll put inside the airplane to try to tell the machine

8   what the temperature is.  But it's set to a certain

9   temperature to try to maintain the airplane's temperature.

10       But if we're running the APU, that's all done

11  internally.  If you're not running the APU, you must have the

12  electric plug for external ground power, and also the

13  pre-conditioned air hose in order to -- the electric plug

14  gives you the electric power to run the airplane, but the air

15  conditioning packs do not run on electrics; they run on

16  pressurized air.  So that either comes from the engines or it

17  comes from the APU.

18       If neither the engine or the APU is running, then

19  pre-conditioned air is the only way to control the temperature

20  inside the airplanes.

21  Q    Does the pack unit also control the heat?

22       When you say the temperature, that includes the

23  heating?

24  A    Yes.  Heating and cooling.

25  Q    Why, in February, would it be important to have the heat

1  running in the aircraft?

2          When you're not on the aircraft, why would it be

3  important to have the heat controlled inside the aircraft?

4  A    The airplane, generally speaking, you don't want it to go

5  to temperature extremes.

6          The E and E compartment -- the avionics compartment,

7  we also calls it E and E, electronics and equipment.  It's

8  just another term of art for that compartment.  Those machines

9  -- those boxes produce a lot of heat because of the electrical

10  systems in there and part of systems of the airplane is to

11  control the heat in the airplane.

12          Me personally, I would like to leave the APU running

13  because it's a sure thing.  I know that I'm going to have air

14  available to keep the temperature in the airplane consistent

15  and also supply conditioned air to cool the avionics

16  compartment.

17          What can happen when external power is plugged in is

18  it can get knocked off; it can get unplugged.  And the same

19  with the pre-conditioned air, it can get turned off.  So those

20  things are out of my control.

21          The APU is in my control.  So I typically leave the

22  APU running to make sure the electrical system and the cooling

23  systems are operating as I would like them to be to keep the

24  airplane's temperature within an appropriate range.

25  Q    And did you testify earlier, sir, that there was

1   something problematic about having a temperature exchange, you

2   don't want it to go through much of an exchange?  Did I hear

3   you correctly?

4   A    Just generally speaking, again, these are not necessarily

5   procedures, these are just experiences, life experience.  If

6   you -- if you, say, in your home, in the wintertime you let it

7   get down to 40 degrees and then you want to heat it up to 70,

8   it takes a lot more effort to make that change.  Your heating

9   system is going to work a lot longer and a lot harder to make

10  that change than it would be if you just left it on and it was

11  at 70 the whole time.  It would run just occasionally rather

12  than to having it run to try to make up that difference.

13        The same is true on the airplane.  And not only is

14  there a concern about what the heat situation is, what the

15  temperature situation is in the avionics compartment, you

16  don't want it to get too hot, but I also don't want the cabin

17  to get to an extremely cold or an extremely hot temperature

18  depending upon what the environmental temperature is because

19  we're going to board passenger and they need to be comfortable

20  as well.  And in my practice, I run APU almost all the time.

21  Q    And do you know if that's the common practice for other

22  American Airlines pilots?

23        THE COURT:  It's irrelevant.  Move on.

24  Q    On February 4th, when you said you stayed at the Hamilton

25  Inn, how did you get from the Hamilton Inn back to JFK?

1          THE COURT:  Irrelevant.  Move on.

2          MR. COHEN:  Your Honor, can we have a sidebar,

3   please?

4          THE COURT:  Yes.

5          (Continued on next page.)

6          (Sidebar conference.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (The following occurred at sidebar.)

2            THE COURT:  What relevance is it how he got to the

3    airport from the hotel area?

4            MR. COHEN:  I'm happy to explain that, Your Honor.

5    Our position is that he was not on the airplane when my client

6    went on the airplane.  Our position is that he has not

7    provided any documentation and I think the Government will

8    attest to this, about the time he got on to the airplane other

9    than what he has testified today.  There's nothing else we

10   have.

11           THE COURT:  So what?  Maybe he didn't record

12   anywhere when he got there.

13           MR. COHEN:  Right.  But as our whole theme has been

14   throughout this trial, that what people have done is only

15   coming to them -- and we opened on this -- from memory, and

16   our position is that --

17           THE COURT:  Well, that's your problem for doing

18   that.

19           MR. COHEN:  And our position is that the time that

20   various witnesses have done things is very vital to our

21   defense.

22           This captain -- and I would like to continue to

23   question him, about what he did during the course of the day

24   to show that there was many opportunities to document when he

25   got to the plane and the timeline from when he -- from that

1  very day.

2       THE COURT:  Stop nodding your head.  Okay.  You've

3  done that.  You have either shook your head or nodded your

4  head at various times during testimony.  Don't do that.

5       MR. COHEN:  The various times that he has done

6  things throughout the day I believe will show that his memory

7  is faulty.

8       THE COURT:  No.  What's relevant here is when he

9  actually boarded the plane.  No.  His transportation to JFK,

10  whether he went to the bathroom, whatever he did, whether he

11  had breakfast or any of that stuff is irrelevant.  Okay.  And

12  part of my role as gatekeeper is to make sure that you're not

13  confusing the issues and that irrelevant evidence is not going

14  before the jury.

15       MR. COHEN:  My --

16       THE COURT:  No. This can be -- really this is not --

17  you don't need to go into every single step that he took from

18  to the airport to the plane, what time did he get to the

19  airport, when did he get on the plane.

20       MR. COHEN:  Your Honor, my intention would be -- and

21  I'm going to run this by you before I go back and begin my

22  questioning to get the Court's ruling so I don't run afoul --

23       THE COURT:  Because you use 50 questions to get to

24  one point and you're going to have to cut that back, because

25  it's not necessary.

1          MR. COHEN:  I believe it is necessary and also --

2          THE COURT:  I disagree, and I'm telling you it's not

3    necessary and that's my role as gatekeeper.

4          MR. COHEN:  I understand.  I didn't finish my

5    sentence, Your Honor, if I may.

6          THE COURT:  Yes.

7          MR. COHEN:  I believe it is necessary to challenge

8    the witness on his actions throughout the course of the day

9    before arriving at the airport to show the jury that his

10   memory about that day is limited and it was tailored to

11   exactly the facts that the Government is trying to put before

12   the jury to support their theory of prosecution.

13         The fact that there were many opportunities to

14   provide objective verification, validation of what he did at

15   particular times goes to his ability to recall and also -- and

16   consistent with our theory of defense -- shows a lack of

17   objective evidence that could have been secured but was not

18   secured.

19         THE COURT:  Denied.  Move forward as I said and I

20   expect you to comply with that ruling.

21         MR. COHEN:  I will, Your Honor.  And, Your Honor,

22   just so I understand so I can fully comply with it, at what

23   point am I allowed to start asking him about his actions --

24         THE COURT:  What did I say?  What did I say?  Are

25   you not listening me?  Obviously not.

1              MR. COHEN:  Actually --

2              THE COURT:  I said at what time did he board the

3       plane.

4              MR. COHEN:  So am I allowed to ask him about when he

5       arrived at the airport and what he did inside the airport?

6              THE COURT:  How is that necessary to the actions

7       here and what has to be proven here?

8              MR. COHEN:  I'm going to --

9              THE COURT:  No.  When did he board the plane.

10             MR. COHEN:  I'm going to tell you how -- I'm going

11      to answer your question, Your Honor.  He's talked about a

12      swipe card at the gate.  I also -- the Government didn't go

13      into it, but there's also a need to do a swipe card to get

14      through security.  I would like to ask him about the special

15      security lines he gets through and how he swipes through them

16      and that there's a record of how --

17             THE COURT:  Denied.  Denied.  Get to the plane.

18             (End of sidebar conference.)

19             (Continued on next page.)

20

21

22

23

24

25

1    BY MR. COHEN:  (Continuing.)

2    Q    Captain LeRuth, are you familiar with the term "known

3    crew member"?

4    A    Yes, sir.

5    Q    Can you please explain for us what a known crew member

6    is?

7    A    There's a separate entrance to the secure side of the

8    airport at many airports, including JFK, where crew members,

9    pilots and flight attendants, can bypass the normal security

10   screening line.  The premise is TSA should be focused on where

11   the threat is, and the crew is probably not the threat.  So

12   the crews are vetted in many ways so we're entered into this

13   known crew member system, KCM, as we call it.  And there's a

14   KCM line that we go through to access this secure area, to not

15   only get us more expedient access to our job, but also to take

16   us out of the normal screening process and let us deal with

17   potential threats, which the crews are not.  That's the

18   premise.

19   Q    And then how is one identified as a KCM, known crew

20   member?

21   A    We have a little ID card that has a bar code on it where

22   when you register in the KCM system, there's a bar code on it.

23   You walk up to the KCM station, scan your bar code.  That

24   brings up your personnel record in front of the agent that's

25   standing at the agent station to verify that you are in the

1  system and cleared to go through.

2  Q     Do you use the KCM bar code when you enter the gate at

3  Terminal 8 in Gate 7 or --

4          THE COURT:  May I speak to counsel, please, at the

5  side.

6          (Sidebar held outside of the hearing of the jury.)

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following sidebar took place outside the
2     hearing of the jury.)
3          THE COURT:  You specifically raised one or two
4     events to question, the security access and so on.  And I
5     specifically said that you could not, that you should start
6     directly with when he got to the plane.
7          MR. COHEN:  Your Honor, this is at the gate.  He had
8     to swipe at the gate to get onto the plane.  Remember he said
9     the gate agent sent him in.
10         THE COURT:  No, you've gotten into all kinds of
11    other things here.
12         MR. COHEN:  I asked about the known crew member
13    because I know that he needs that ID and he swiped at the
14    gate.  I'm not asking about security.
15         THE COURT:  You're talking about the gate, not on
16    the plane.
17         MR. COHEN:  Your Honor, the gate is onto the plane.
18    You swipe on the gate and walk down the jet bridge into the
19    plane.  Right at the gate where all the passengers go
20    through --
21         THE COURT:  Yes, I know.
22         MR. COHEN:  I'm sorry, don't yell at me, Your Honor.
23         THE COURT:  I know, because I specifically told you
24    to get him on the plane, to start with that.
25         MR. COHEN:  Your, Honor, he -- he has the swipe card

1  that gets him in.  He testified to that on direct.

2          THE COURT:  That gets him into the gate.

3          MR. COHEN:  Yes, right.  And the gate is what gets

4  you onto the plane.

5          THE COURT:  Get him on the plane.  Move on from

6  here.  Move on from here.  I'm not going to tell you again, or

7  else I'm going to have you sit down.

8          (Sidebar ends.)

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. COHEN:

2   Q    You testified on direct, Captain LeRuth, about using your

3   swipe card to get into the gate?

4   A    Yeah.  That's different than the KCM card.  The back of

5   our company IDs, we have our employee number and bar code on

6   that.  So we use the same reader that the passengers use to

7   scan their tickets, and we do that and that validates that we

8   are on the crew and an employee, but it's a separate card from

9   the KCM card.

10  Q    And did you need to swipe the card that you just

11  described to get onto the gate on February 4th, 2020?

12  A    The ID card, yes.

13  Q    Yes.

14  A    99 percent of the time, that's true.  There is a way for

15  the gate agents to do it manually, but 99 percent of the time

16  we just swipe our card just like passengers going through on

17  the gate reader.

18  Q    And have you provided the Government with any history of

19  that swiping at the gate on February 4, 2020?

20  A    No, I don't have access to when that was done.  That's --

21  I'm sure American Airlines has that record somewhere.

22  Q    I believe you testified on direct, Captain LeRuth, that

23  the flight was scheduled to depart at 8 a.m. on February 4,

24  2020; is that right?

25  A    Yes.

1  Q    But you took off about four minutes early; right?

2  A    Yes.

3  Q    I'm sorry, sir.  I missed something.  When you go through

4  the gate, how do you get from the gate to the plane?

5  A    Down the jet bridge.

6  Q    Did you go down the jet bridge on February 4, 2020 to get

7  from the gate to the plane?

8  A    Yes, sir.

9  Q    And do you know if there are cameras on the jet bridge?

10 A    I'm pretty sure there are.

11 Q    Are you familiar with Terminal 8, Gate 7?

12 A    I've used it before.  I'm not sure what you imply by

13 "familiar."  I don't think I could draw a picture of it from

14 memory, but, yes, I've used it.

15 Q    I want to show you --

16       MR. COHEN:  With the Court's permission, can I show

17 the witness C-1 in evidence, please?

18       THE COURT:  Yes.

19       (Exhibit published.)

20       THE COURT:  This is Defendant's Exhibit C-1.

21 BY MR. COHEN:

22 Q    I'm going to ask you, Captain LeRuth, to take a look at

23 it and watch the whole thing.

24 A    Okay.

25       (Video played; video paused.)

1    BY MR. COHEN:

2    Q    Were you able to see that, Captain LeRuth?

3    A    Yes, sir.

4    Q    Does that depict the tarmac around Gate 7 at JFK?

5    A    Yes, sir.

6            MR. COHEN:  And I'm going to ask Ms. Cronin put it

7    back to 54 seconds, please.

8            (Video played; video paused.)

9    BY MR. COHEN:

10   Q    What is depicted in C-1 in evidence at 54 seconds,

11   Captain LeRuth?

12   A    We're looking at the ramp.  We can see on the very far

13   right side the jet bridge for Gate 7.  And I see Gate 5 and

14   Gate 3.  There's 737 on Gate 3.  There's no airplanes on Gate

15   7 or Gate 5.  There's some vehicles, some loaders.  And it

16   looks like a nice day.

17   Q    Do you see what I've drawn a very poor circle around?

18   A    Yes.  It looks like one of the cameras that are used to

19   monitor ramp activity.

20   Q    And that's -- Captain LeRuth, is the circle I drew just

21   on the photo there, just to the left of what says the Number

22   7, outside the jet bridge at Terminal 8, Gate 7?

23   A    Yes.  It looks to me like you're trying to circle a

24   camera that's on the light stand that's next -- closer to the

25   terminal itself.  There's a camera that is down a little bit

1   from those three lights on the top of the light stand.

2   Q    And, Captain LeRuth, if you look across the screen as

3   it's there now, are there identical light stands by each of

4   the jet bridge at the other gates?

5   A    Yes, it appears so.

6   Q    And are you familiar with those lights and the cameras

7   attached to them?

8   A    I'm familiar that they exist.

9   Q    That's what I'm asking.

10  A    So -- okay.

11  Q    And do you know, Captain LeRuth, whether there was also a

12  lower camera on each of those light stands?

13  A    I'm not familiar with the location and number of

14  placement of the cameras.  I think corporate security would be

15  a better person to ask that.

16            MR. COHEN:  With the Court's permission, Your Honor,

17  I would like to show the witness, the Government and Your

18  Honor Defendant's Exhibit A-2, A-3, A-6, A-7, A-9 and A-10.

19            THE COURT:  That is 2, 3, 6, 7 --

20            MR. COHEN:  Nine and 10.

21            THE COURT:  Just to the witness and the Government.

22  That's for identification?

23            MR. COHEN:  Correct, Your Honor.

24            If we can start with A-2.

25        (Exhibit published to witness, counsel and Court only.)

1          BY MR. COHEN:

2     Q    Do you recognize what's depicted in defense A-2 for

3     identification, Captain LeRuth?

4     A    Yes, sir.

5     Q    And can you please -- how are you familiar with it?

6     A    It's a different view of Gate 7 that we saw in the video.

7     Q    And does that A-2 for identification that you're

8     presently looking at is that a fair and accurate

9     representation of what it looks like outside of Gate 7

10    Terminal 8 at JFK?

11    A    Yes, sir.

12    Q    Thank you, sir.

13          MR. COHEN:  Can we now show the witness A-3, please.

14         (Exhibit published to witness, counsel and Court only.)

15    BY MR. COHEN:

16    Q    Do you recognize what's in Defense A-3 for

17    identification, sir?

18    A    Yes, sir.  It's almost the same view, but from a further

19    back perspective.  So it's Gate 7, JFK.

20    Q    And is this the gate, sir, that the airplane that we've

21    been discussing in question was located on February 4, 2020?

22    A    Yes.

23    Q    And is this photo also a fair and accurate

24    representation?

25    A    Yes.

1          MR. COHEN:  A-6, please.

2       (Exhibit published to witness, counsel and Court only.)

3  BY MR. COHEN:

4  Q    Captain LeRuth, can you see A-6 for identification?

5  A    I can.

6  Q    And do you recognize what is depicted in A-6 for

7  identification?

8  A    Yes.  I see Gate 7 off -- I see the jet bridge opening

9  where the jet bridge meets to the airplane off to the left.  I

10  see a baggage cart.  I see a vehicle on the service road that

11  runs --

12          THE COURT:  I am sorry, that has to be stricken.

13  This is for identification.  The question is does he recognize

14  what that is.

15          THE WITNESS:  Yes, I do, Your Honor.

16  BY MR. COHEN:

17  Q    And is that a fair and accurate representation of the

18  view -- one of the views at Terminal 8, Gate 7 at JFK?

19  A    Yes, sir.

20          MR. COHEN:  A-7, please, Ms. Cronin.

21       (Exhibit published to witness, counsel and Court only.)

22  BY MR. COHEN:

23  Q    Can you see Defense A-7 for identification, Captain

24  LeRuth?

25  A    Yes, sir.

1  Q    Do you recognize it?

2  A    Yes, sir.

3  Q    How do you recognize it?

4  A    Gate 7, JFK.

5  Q    Is it a fair and accurate representation of how that Gate

6  7 at Terminal 8 at JFK appears?

7  A    Yes, sir.

8           MR. COHEN:  And A-9, please, Ms. Cronin.

9        (Exhibit published to witness, counsel and Court only.)

10 BY MR. COHEN:

11 Q    Captain LeRuth, can you see A-9 for identification?

12 A    Yes, sir.

13 Q    And do you recognize it?

14 A    Yes, sir.

15 Q    And how do you recognize it?

16 A    Gate 7, JFK.

17 Q    And is it a fair and accurate representation of what it

18 depicts there and how it looked on February 4th, 2020 minus

19 any aircraft that might have been there at the time?

20          THE COURT:  Well, time of day?

21 A    I can say I recognize it as Gate 7.  I can't tell you

22 that that was the condition on that day.

23 BY MR. COHEN:

24 Q    Have you been there since then, since February 4, 2020?

25 A    Most likely, yes.

1  Q    Has the tarmac outside changed at all?

2  A    No.

3  Q    Is it a fair and accurate representation of how the

4  tarmac and jet bridge and the building in the front and the

5  back appeared on February 4, 2020?

6  A    Yes, sir.

7         MR. COHEN:  And A-10, please, Ms. Cronin.

8       (Exhibit published to witness, counsel and Court only.)

9  BY MR. COHEN:

10 Q    Captain LeRuth, do you recognize what's in Defense A-10

11 for identification?

12 A    Yes, sir.

13 Q    And how do you recognize it?

14 A    Gate 7, JFK.

15 Q    Is it a fair and accurate representation of how that Gate

16 7, Terminal 8 looked on February 4, 2020?

17 A    Yes, sir.

18        MR. COHEN:  Your Honor, with the Court's permission,

19 I would like to enter into evidence Defendant's Exhibits for

20 identification A-2, A-3, A-6, A-7, A-9 and A-10.

21        THE COURT:  Any objection?

22        MS. SCHIERBERL:  No objection, Your Honor.

23        THE COURT:  They are admitted.

24        (Defense Exhibits A-2, A-3, A-6, A-7, A-9, A-10

25 received in evidence.)

1          (Exhibit published.)

2     BY MR. COHEN:

3     Q    Captain LeRuth, right now you're looking at Defense A-10

4     in evidence.  Can you see that, sir?

5     A    Yes, sir, I can.

6     Q    Can you -- you are able to draw on the screen there.  Can

7     you draw on the screen approximately where the nose of your

8     plane would have been on February 4, 2020?

9     A    A better indication of that would be if we -- at the

10    bottom, about a third from the right, you can see a yellow

11    line extending from the bottom of the picture towards the

12    light pole with some cross -- with yellow lines crossing it.

13    If we can zoom in on that, you will see that there are black

14    boxes to the side of those side stripes that show where the

15    nose wheel of the airplane should stop.  When we are parking

16    the airplane, we come along the lead-in line and then there's

17    either a grounds crew person with wands guiding us in or we

18    have what we call a DGS, which is a docking guiding system,

19    which is a laser system, I believe, that's visible on the side

20    of the building to the left of the pole that will guide us in

21    there and bring us to the right spot.

22    Q    That's the DGS, sir?

23    A    DGS is docking guiding system, is what we refer to that

24    as.  The airplane would have stopped -- I believe we stop on

25    the second -- the line that's at the very bottom of this

1  picture, but I can't --

2  Q    Captain, I don't mean to interrupt you, but I believe you

3  can manipulate it and draw a line exactly where you are

4  talking about.

5  A    I think it's that line.  This -- I don't know if

6  that's -- the one that's at the very bottom of the screen, if

7  you can see that.  There's one that's further -- further down

8  the line closer to the light pole.  I believe, if we can zoom

9  in on that, it would say 737 on the little black box next to

10  that line.  But we stop, and maybe it's not from this

11  perspective, but we stop on -- I believe our airplane stops at

12  that second to the last line.  But from a different

13  perspective, a more overhead perspective we can see those

14  lines, so I'm able to -- the nose gear stops on that sign

15  which allows the proper positioning for the jet bridge then to

16  make it to the airplane.

17  Q    Do you see what I've drawn a line around, Captain LeRuth?

18  A    Yes, sir.

19  Q    And what is that?

20  A    It's the bottom of the light pole with some boxes on it.

21  I'm not sure exactly what they are.

22  Q    And do you see anything directly above the light -- I'm

23  sorry, on the light pole above the box?

24  A    I do see something, but I don't know what it is.

25          MR. COHEN:  If you can zoom out, please, Ms. Conlin.

1   Thank you so much.

2   BY MR. COHEN:

3   Q    What did I draw a circle around, sir?

4   A    That looks like a security camera at the top of the pole.

5   Q    Would that security camera would be facing the plane that

6   would be docked at Terminal 8, Gate 7?

7   A    I think to say -- when we're inside there they can look

8   in any direction they want, but it does look oriented towards

9   the jet bridge, yeah.

10  Q    For the record, sir, I drew a circle around the light

11  pole in the middle of the screen at the top part of that light

12  pole where you said it looks like a camera; is that right?

13  A    It does look like a camera to me, yeah.

14  Q    Is this similar to the light poles with the cameras that

15  we discussed in the previous photos?

16  A    It's similar if not the exact one that we've talked

17  about.

18  Q    So all of those light poles, they all have upper cameras?

19  A    Again, you'll have to ask security about that, but I

20  believe that is correct.

21  Q    And do you know if they all have lower cameras as well?

22  A    I don't know.

23  Q    Is it fair to say, sir, that this would be the angle that

24  you would be looking at if you were in the cockpit or flight

25  deck?

1 | A    A little bit.  We would be closer to the pole, but -- and
2 | oriented a little bit more -- facing more a little bit to the
3 | left, but, generally speaking, yes, that's correct.
4 | Q    Captain LeRuth, when Agent Maloney entered the flight
5 | deck on February 4, 2020, were you expecting him to come up
6 | there?
7 | A    Him personally, no.  I did expect for somebody to tell me
8 | what was going on with all the law enforcement that was on the
9 | ramp.  And my First Officer mentioned that I expected to know
10 | something about what was happening, and I would have inquired
11 | had I not learned by other means because of my
12 | responsibilities for the airplane.
13 | Q    And had your First Officer finished his walk-around by
14 | the time that the agents came onto the plane?
15 | A    Yes.
16 | Q    Did he report any issues with the aircraft?
17 | A    No issues with the aircraft.  He just mentioned that
18 | there was a lot of law enforcement around the plane.
19 | Q    And the First Officer, is it right, sir, that he just
20 | does a visual inspection on the outside; is that right?
21 | A    That's right.
22 | Q    When he's reporting to you that there's no issues, he's
23 | just reporting what he can see from the outside; is that
24 | right?
25 | A    Right, if he does -- doing the walk-around, normally

1   there's no report.  If he mentions engines leaking or tires

2   flat, that would be unusual, but normally it's just a cursory

3   check to make sure nothing obvious was wrong.

4   Q    If there was, for instance, fuel leaking, that would be a

5   problem that would go into your logbook?

6   A    It would be investigated for sure, yeah.  It would go in

7   the logbook it would have to be addressed before we took off.

8   Q    Is that the same with a flat tire?

9   A    Yes.

10  Q    When Agent Maloney came into the cockpit, he asked you a

11  few questions about things may have been wrong with the plane?

12  A    Yes, I remember him asking basic questions about if there

13  were any maintenance issues, anything in the logbook, anything

14  that would necessitate accessing the avionics compartment.

15  Q    Had he asked you when you had gotten onto the plane?

16  A    I don't recall.

17  Q    Was anyone else asking you questions or was it just Agent

18  Maloney?

19  A    Just Agent Maloney.

20  Q    About how long was he on the flight deck with you for?

21  A    Five minutes, maybe.

22  Q    Is that something you would record in the logbook, the

23  agent come onto the flight deck?

24  A    No.

25  Q    Would you report that back to American Airlines at all?

1    A    No.

2    Q    Was that an unusual occurrence?

3    A    Yes.

4    Q    Is there anybody that you would tell about the Special

5    Agent coming onto the flight deck?

6    A    Not procedurally, no.  I may mention it to my buddies

7    because it was such an unusual event, but, procedurally, no,

8    there was no one to notify.

9    Q    Did you mention it to your buddies?

10   A    I don't recall exactly, but I suppose -- I think I might

11   have said, yeah, we had some Drug Enforcement action on my

12   flight.  I might have mentioned that, but I don't remember

13   exactly.

14   Q    Might you have texted somebody or called somebody from

15   the flight deck?

16   A    No, no, not at the moment.  It would have been days --

17   days later after I got back to San Diego.

18   Q    Are you familiar with the term of getting the numbers

19   while you're in the cockpit?

20   A    I believe you're referring to the load closeout?

21   Q    Yes, sir.  Can you please explain what that is?

22   A    When the flight is planned, it's planned over a certain

23   route at a certain weight and then fuel is uploaded based on

24   the route of flight and the weight.  The weight of the

25   airplane changes as the fuel burn, and flight changes fuel

1   burn depending on whether we're high altitude, low altitude,

2   winds are strong.  So the original plan and load plan is based

3   on predicted weights.  When the airplane is finally loaded and

4   we know how many people and how much cargo has been loaded

5   exactly how much.  Then the final load plan -- the load

6   closeout is given to us, which gives us our actual weights,

7   actual passenger count, the people who are on board, and then

8   we compare that to the plan to make sure that we're not

9   overweight and we need more fuel or to make sure that the

10  passenger count agrees with what we have on board.  It's our

11  final check to make sure everything is in sync before we can

12  leave the gate.  We can leave the gate, but we can't leave the

13  ground until that's resolved.

14  Q    When do you get those final numbers?

15  A    Typically, after we leave the gate before we get to the

16  end of the runway.

17  Q    So by the time Agent Maloney came off the plane, you

18  don't believe that you had those final numbers?

19  A    I believe we did not.

20  Q    Once you get those final numbers, does that somehow help

21  you determine routes that you would take or any other things

22  that may be necessary to do to the plane prior to taking off?

23  A    It wouldn't affect our route.  The only thing that

24  would -- that might change on a typical basis from getting a

25  load closed out is we have the ability to derate our engines,

1   which means they're certified to produce a certain amount of

2   thrust, but they can be derated, which means we will

3   pretend -- let's say it can produce 10 thrust, we will on this

4   day take off at 9 thrust because that's less wear and tear on

5   the engine, and the weight supports it, the runway supports it

6   and it just preserves and prolongs the life of the engine by

7   taking off at a lower power setting rather doing max power

8   every time.

9           What typically would happen is when we have a load

10  closeout that's over what we expected is, if we were planning

11  to go at 9 thrusts we're going to go at 10 because we're

12  heavier.  The numbers don't work out at 9, it works out at 10.

13  So we may change a power setting, but that's a typical change.

14  If we're really close to our maximum gross weight, there's

15  different things to do, but 99 percent of the time if there's

16  a change that results from the load closeout, it's a power

17  setting change.

18  Q    I want to speak to you about alarms in the cockpit and

19  ask you what a master cautions is.

20  A    There's -- if we have -- a master caution is an

21  indication that there is a fault of some sort that requires

22  our attention.

23  Q    And does the master caution make any sound or emit a

24  light?  How do you know a master caution is on in the cockpit?

25  A    There's a yellow light right in front of us on the

1  instrument panel in our line of sight.  The yellow light is
2  master caution is yellow, master warning is red.  The master
3  caution will come on and there will be three beeps, little
4  beeps that sound like -- almost like a text message sound, but
5  louder than that.
6  Q    How do you shut off the master caution?
7  A    You can press the light, and it would turn off.
8  Q    Would a -- withdrawn.
9         Would an open cargo door, for instance, cause a
10 master caution?
11 A    No.
12 Q    How about an open refueling door, would that cause a
13 master caution?
14 A    On the ground, you're not going to get the oral warning.
15 We have a system called the NYCAS system that shows things
16 like open doors and the engine is not running and the
17 hydraulic system is low pressure, things like that.  When the
18 plane is sitting on the gate, all of those things are
19 illuminated because the engines aren't running and nothing
20 is -- it's not ready to go.
21        So on the ground, we have a lot of lights on.  The
22 overhead panel has door lights -- individual door lights as
23 well.  So if the door light comes on on the instrument panel,
24 we can look and see which particular door it is that's open.
25 There's entry doors, there's cargo doors, there's service

1    doors, there's the avionics door.  And they're all

2    individually indicated on the door flight overhead panel.

3    Q    But while sitting at the gate, those are not concerns of

4    yours; is that right?

5    A    Yeah, they're concerns in the sense that the doors need

6    to be closed before we leave the -- the gate, but, in general,

7    the cargo doors will be open and the entry doors will be open.

8    Avionics door is generally not open.  It's very unusual for

9    the avionics compartment door to be open.  And that would

10   happen if there was some system problem that was being

11   addressed by the maintenance guys.  And in a circumstance like

12   that, the crew, the pilots would know about that.

13   Q    Did you tell Agent Maloney about an avionics light that

14   came on on February 4, 2020?

15   A    We did not see an avionics light come on at all.

16   Q    Captain LeRuth, is there a -- are you familiar with a

17   flight recorder and cockpit voice recorders?

18   A    Yes.

19   Q    Can you describe what they are, please?

20   A    They are the black boxes that you hear about in airplane

21   crashes.  One of them is a recorder that records all the

22   voice -- all the sound that happens in the cockpit, and the

23   other one records a bunch of parameters, airplane parameters,

24   what power setting are you using, where the flaps are, what's

25   the hydraulic pressure.  And those things are all used and

1    recorded to assist in accident investigations.

2    Q    And it's mandatory that those remain plugged in and

3    working; is that right?

4    A    Yes.

5    Q    Were they, as far as you know, working on February 4,

6    2020?

7    A    Yes.

8    Q    Do you have access to those recordings?

9    A    To the recordings?

10   Q    Yes, sir.

11   A    No, sir.

12   Q    Do you know who does have access to those recordings?

13   A    No, sir.  NTSB does.  Beyond that, I have no idea.

14   Q    Is there a reset button for the pack unit in the avionics

15   compartment?

16   A    I don't know.

17   Q    Captain LeRuth, do you have the A&P licenses that some

18   mechanics hold?

19   A    No, sir.

20   Q    So do you have any reason to go into the A&E compartment?

21   A    No, sir.

22   Q    Are you familiar with the term gate call?

23   A    No.

24   Q    You testified on direct examination about things being

25   recorded in the logbook.  Is everything that is fixed or dealt

 1   with on a plane put into the logbook, every mechanical or

 2   maintenance or comfort issue put into the logbook?

 3   A    If we're changing a light bulb and a light cap, I can do

 4   that myself.  That doesn't get in there.  There are some very

 5   routine, mundane issues that are just fixed without putting in

 6   the logbook, such as a light bulb.  Changing a light bulb,

 7   it's not something that I would put in the logbook.

 8   Q    What about if a mechanic comes on the plane to do some

 9   work, is that always recorded in the logbook?

10   A    For example, if the seat won't recline and the linkage in

11   the seat is not working right, it's coming disconnected,

12   the -- we may -- the mechanic may come out and reconnect the

13   linkage, and that may not enter into the logbook.  It's not

14   safety of flight item.  Something mundane, something routine

15   can be corrected without it being entered into the logbook.

16   Q    Captain, there's certain things that are discretionary of

17   what's put in the logbook or is it mandatory?

18   A    Safety of flight items are mandatory.

19   Q    Who can enter things into the logbook?

20   A    The captain and the maintenance personnel can enter

21   something into the logbook.

22   Q    Once something is entered into the logbook by a captain,

23   must it be signed off by maintenance before you can take off?

24   A    Yes, sir.

25   Q    And according to the rules, is it -- if a mechanic does

1   something, even though it's a comfort concern, but not a

2   safety concern, is it technically supposed to go into the

3   logbook?

4   A    Any entry -- if there's an entry made in the logbook, the

5   mechanic must make the corresponding signoff.  You're asking

6   about the discretion to enter something in the logbook?  I'm

7   not sure what the question is.

8   Q    Sure, sure.  Thank you.  I'll reword it, sir.

9        If something is fixed on the plane, like the

10  reclining that you were giving as an example.

11  A    Right.

12  Q    Technically, is that supposed to be entered into the

13  logbook?  I understand you said it might not, but is it

14  supposed to be, according to the rules?

15  A    I know that we must put safety of flight items in the

16  logbook.  I do not -- I do not know -- I don't want to say for

17  sure that every light bulb that I've changed in my career

18  should have been entered in a logbook.  I've been changing

19  light bulbs for 32 years.  I hate to think that I've been

20  doing it wrong.  But I don't believe that non-safety of flight

21  items need to be entered in there, but I don't want to go out

22  on a limb and say that that's our official airline policy.

23  Q    Is air-conditioning a safety concern?

24  A    Yes.

25  Q    It's not considered a comfort concern?

1  A    It's not, because it also has to do with the

2  pressurization of the airplane.  So from the air-conditioning

3  system also pressurizes the airplane.

4  Q    Are there -- how many pack units are there on the plane?

5  A    Two.

6  Q    Left side and right side?

7  A    Yes.

8  Q    Can the plane run safely when one of those are not

9  working?

10  A    Yes.  There are some restrictions altitude restrictions

11  because of the pressurization function if you're down to one

12  pack, but, yes, it can run safely on a single pack.

13  Q    Did you say earlier, sir, I don't remember that, you

14  don't know if there's a reset button for the pack in the A&E?

15  A    I know there's one in the cockpit, but I don't know

16  anything about the controls in the avionics compartment.

17  Q    And one in the cockpit, the reset, that only happens --

18  does that only happen when the pack unit has been completely

19  overheated?

20  A    We get lights that come on to indicate pack issues, and

21  there are procedures for us to follow to try to get the light

22  out.  And when the procedure calls for us to press the button,

23  we press the button.  I'm not really sure under what

24  circumstances it is required.  We're just following our

25  checklist.  And I'm not sure what system it resets if it's an

1  overheat system or if it's a pressurization system or what the

2  reset actually does.  But we press the button when there's an

3  issue with the air-conditioning system and it's called for on

4  our checklist.

5  Q    And there are certain times when there are issues with

6  the air-conditioning unit that you and the flight deck are not

7  supposed to do anything, it's a mechanic's job to take care of

8  that; is that right, if you know?

9  A    We have our procedures that we can run, and if it doesn't

10 correct it, then -- then it's beyond our ability with the

11 things that we have access to.  At that point, that would be

12 something that would go into the logbook and maintenance would

13 be called.

14 Q    Are there other issues that happened with the

15 air-conditioning or pack units that there are no procedures

16 that the pilot is supposed to do and needs to be taken care of

17 by somebody else?

18 A    I don't understand the question.

19 Q    Sure.  You said that when you see the light in the

20 cockpit for a pack unit issue, there -- sometimes they give --

21 there is a procedure you must follow to try to get the light

22 off; is that right?

23 A    Yes.

24 Q    And then is there sometimes that there's a light on for

25 the pack unit in the cockpit where there is no procedure

1  called for for what you must do inside the cockpit?

2  A    Every light that comes on in the air-conditioning system,

3  the pressurization system has a corresponding procedure for it

4  in our -- in our manuals.  So we -- we run our procedure on

5  it.  And if it works, it works, and if it doesn't, then it's

6  beyond our control and that is when it gets into the

7  maintenance logbook.  I may be misunderstanding your question

8  again.  But there's no light on a critical system that comes

9  on that does not have a procedure involved with it.  Is that

10  the answer to the question that you were asking?  I'm not

11  really clear.

12

13              (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1  CROSS EXAMINATION

2  BY MR. COHEN: (Continuing.)

3  Q    No, but it's fine.  When Agent Moloney had -- withdrawn.

4  One second, sir.

5         MR. COHEN:  One second, Your Honor.

6  Q    On February 4, 2020, when you were inside the flight deck

7  prior to your takeoff, were there certain warning amber lights

8  that were on in the cockpit that you did not have to deal with

9  prior to takeoff?

10  A    You're asking about at the gate?

11  Q    Yes, at the gate.

12  A    At the gate, it's normal to have warning lights on

13  because the airplane is not running, the engines are not

14  running.

15  Q    And it's normal of things you wouldn't have to address

16  until you were ready to push back or engage the brakes; is

17  that right?

18  A    Yes.

19  Q    Thank you, sir.

20         THE COURT:  Any redirect?

21         Is that the end of you cross?

22         MR. COHEN:  Nothing further.

23         THE COURT:  Any redirect?

24         MR. POLLACK:  No, Your Honor.

25         THE COURT:  Thank you, sir.  You may step down.

1          (The witness steps down.)

2          THE COURT:  May I please see Counsel at the side.

3          (The following occurred at sidebar.)

4          THE COURT:  So I did have a thought --

5          THE COURTROOM DEPUTY:  The jurors are indicating

6   they need a break.

7          THE COURT:  We're going to take a break right now,

8   but before I give them the break, I was considering, rather

9   than breaking for lunch, just ending at 2:00 o'clock.  I had

10  told them yesterday that we would end at 3:00, but if we took

11  a break for lunch, we're just sort of kind of interrupting

12  things.

13         We do have somebody who is diabetic on the panel, so

14  I just want to make sure that's not going to be an issue.

15         MS. SCHIERBERL:  Of course.

16         THE COURT:  So my thought was to suggest this to

17  them as an alternative, and if they do want to proceed to have

18  lunch, then we'll probably break about 12:30 and have an early

19  lunch and then come back at 1:30 just so there's a meaningful

20  amount of time for witness questioning.

21         MR. COHEN:  May I make another --

22         THE COURT:  Because --

23         MR. COHEN:  May I make another suggestion.

24         THE COURT:  Yeah.

25         MR. COHEN:  Because I was here when the woman spoke

1    to Judge Levy about her issue.  If you want to do that, we're

2    fine with it, but can I just suggest just for the diabetic

3    especially, we'll have one more break, right, another

4    15-minute break a little later because I think she said --

5            THE COURT:  No, no, they seem --

6            THE COURTROOM DEPUTY:  They're desperate right now.

7            THE COURT:  Yeah.  So I'm going to give them the

8    break now and then I'll make sure that when they come back,

9    Christie can let me know -- I will have them tell Christy what

10   their preference is.

11           MS. SCHIERBERL:  Okay.

12           THE COURT:  Okay.  Thank you.

13           (End of sidebar conference.)

14           (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1     (In open court; jury present.)

2     THE COURT:  I know we had an extra long morning but

3  I do have a -- we're going to take a break right now.  I will

4  make it a little bit of an extra longer break, but I do have

5  a proposition for you to consider during the break; as

6  opposed to interrupting, say at around 12:30 for lunch and

7  coming back to 1:30 and breaking at 3:00, I propose skipping

8  lunch, if that's going to be okay, but letting you go at

9  2:00 o'clock.

10     So just think -- I see some of you already nodding

11  your head, but, you know, you have the break to think about

12  it.  This, you can discuss among yourselves, okay?  You can't

13  discuss the evidence or anything else, but the question of

14  breaking at 2:00 as opposed to having a lunch break.  I know

15  some of you do need to have something to eat, so I will just

16  have you come back at a quarter to 12:00, at 11:45, okay, give

17  you a little bit of an extra long break, okay?

18     Remember, you have to keep an open mind, don't talk

19  about the case among yourselves or anyone else, or read or

20  listen to anything that might be reported about this case or

21  do any research.  You know the drill.

22     All right.  We'll see you at 11:45.  Thank you for

23  your patience.

24     (Jury exits the courtroom.)

25     THE COURT:  All right.  You all can take a break as

1    well.

2              Who is going to be your next person?

3              MS. SCHIERBERL:  Yes, Your Honor, we have American

4    Airlines Mechanic Philip Guerra, G-U-E-R-R-A.

5              THE COURT:  Got it.  Thank you.

6              MS. SCHIERBERL:  Thank you, Judge.

7              THE COURT:  All right.  I'll see everybody back here

8    at 11:45.

9              (A recess was taken.)

10             THE COURT:  All right.  This is case on trial

11   continued, same appearances as this morning.

12             So, my case manager has advised me that the jurors

13   would like to leave at 2:00 o'clock, which it kind of seemed

14   like they were leaning that way.  So we will break for the day

15   at 2:00 o'clock.  And just a couple of other things:

16             Just a reminder, I know there's an inclination, and

17   when you're on trial, when you're in recess, to chat about the

18   case and so on, but be mindful not to do that in the hallways

19   of the courthouse or even on the street because the jurors may

20   be going out there to use the facilities or to get the

21   elevator to maybe buy something in the newsstand or to walk a

22   little bit.  They may be out in the street and you may not be

23   aware that they're around.  So I've seen too many lawyers make

24   that mistake and chatting in elevators and so on, so you

25   really should avoid doing that.

1        And then just one other thing that I just wanted to

2   correct the record from the sidebar.  Mr. Cohen, at one point,

3   you asked the Court not to yell at you, and I just want to

4   note that we were at a sidebar, we were not talking in raised

5   tones and I was not yelling at you.  So I would appreciate not

6   misstating the record and not making any misrepresentations or

7   trying to create issues where there are none.  So if we're all

8   ready, let's bring in the jury.

9        Jury entry.  All rise.

10       (Jury enters the courtroom.)

11       THE COURT:  Everyone can be seated.

12       Do all of the parties agree that all of our jurors

13  are present and properly seated?

14       MR. POLLACK:  Yes, Your Honor.

15       MR. COHEN:  Yes.

16       THE COURT:  Thank you.

17       So, I have been advised of the consensus.  So the

18  general agreement of the jury is to leave at 2:00 o'clock.  So

19  I will keep my eye on the clock and we will end a little bit

20  early today, and I hope everybody is comfortable because we're

21  ready to proceed the Government's continued Case in Chief.

22  You may call your next witness.

23       MS. SCHIERBERL:  Thank you, Judge.

24       The Government calls Mr. Philip Guerra to the stand.

25       THE COURTROOM DEPUTY:  Please state and spell your

1   name.

2              THE WITNESS:  Philip Guerra, P-H-I-L-I-P,

3   G-U-E-R-R-A.

4              THE COURTROOM DEPUTY:  Thank you.

5              THE COURT:  And we're still in the morning.  Good

6   morning, sir.

7              THE WITNESS:  Good morning, sir -- ma'am.

8              THE COURT:  I'm just going to ask you to keep your

9   voice up just like the way you're doing right now.

10             THE WITNESS:  Okay.

11             THE COURT:  Speak slowly if you would, please, and

12  you can adjust the mike so it's comfortable, so it's at the

13  right height and so on.  You can adjust it.

14             THE WITNESS:  Understood.

15             THE COURT:  And you may inquire when you're ready.

16             MS. SCHIERBERL:  Thank you, Judge.

17             (The witness was sworn.)

18             (Continued on next page.)

19

20

21

22

23

24

25

1   **PHILIP GUERRA**,

2            called as a witness, having been first duly

3   sworn/affirmed, was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MS. SCHIERBERL:

6   Q    Good morning, Mr. Guerra.

7   A    Good morning.

8   Q    Who do you work for?

9   A    American Airlines.

10  Q    Where do you work?

11  A    JFK Airport.

12  Q    What is your title?

13  A    Aircraft maintenance manager.

14  Q    How long have you been an aircraft maintenance manager at

15  JFK?

16  A    Five years.

17  Q    Tell us about your duties as an aircraft maintenance

18  manager at JFK.

19  A    I'm responsible for approximately 60 mechanics per shift,

20  make sure the aircraft are available to the flying public,

21  decide which work gets done and doesn't get done, and just

22  make sure we have airplanes to fly every day.

23  Q    You mentioned as part of your duties, you keep aircraft

24  available.  Do aircraft sometimes become unavailable because

25  of mechanical issues?

1  A     Yes.

2  Q     So do they sometimes come out of service or otherwise get

3  rerouted?

4  A     Yes.

5  Q     Who do you supervise in your role as an aircraft

6  maintenance manager?

7  A     I supervise supervisors.

8  Q     Do you know who those supervisors supervise?

9  A     Mechanics -- well, actually, crew chiefs and then

10 mechanics.  There's a pecking order.

11 Q     Do you manage a specific area at JFK?

12 A     Currently, I manage the whole hanger and the terminal.

13 Q     In February of 2020, did you manage a specific area of

14 JFK?

15 A     I did.

16 Q     What was that?

17 A     The terminal.

18 Q     What is the terminal?

19 A     That's where the flights depart from.  That's where the

20 passengers get on the aircraft and they've leave to where ever

21 they want to go.

22 Q     What is the hanger?

23 A     The hanger, essentially, is a garage for aircraft.

24 Q     Is that separate and distinct from the terminal?

25 A     It is.

1  Q    Are you familiar with the term Spot One?

2  A    I am.

3  Q    What is Spot One?

4  A    It's an extra, like, overflow parking, extra space by the

5  terminal where we place aircraft that are not going to fly

6  immediately.

7  Q    Is Spot One separate and distinct from the terminal?

8  A    It is.

9        MS. SCHIERBERL:  Ms. Cronin, can we pull up what is

10 in evidence as Government Exhibit 401.

11 Q    Mr. Guerra, are you able to view Government Exhibit 401?

12 A    Yes.

13 Q    Do you recognize this?

14 A    I do.

15 Q    And what is it?

16 A    It's a map of -- well, some of JFK Airport, but it

17 encompasses my terminal hanger.

18 Q    Can you please indicate with an X on the screen where the

19 terminal is located.

20 A    My finger?

21 Q    Yes, sir.

22 A    Oh.

23       MS. SCHIERBERL:  Your Honor, may the record reflect

24 the witness has drawn two X's in the bottom right quadrant of

25 the photograph.

1        THE COURT:  Yes.

2   Q    Mr. Guerra, can you please indicate with an X where the

3   hanger is located on this exhibit.

4        MS. SCHIERBERL:  Your Honor, may the record reflect

5   the witness has drawn an X in the top left quadrant of the

6   photograph.

7        THE COURT:  So noted.

8   Q    And, Mr. Guerra, can you please draw with an X using your

9   finger where Spot One is located.

10        MS. SCHIERBERL:  Your Honor, may the record reflect

11   the witness has drawn a smaller X to the right of the first

12   two X's in the bottom right quadrant of the screen.

13        THE COURT:  Yes, and that's to the bottom most X,

14   large X.

15        MS. SCHIERBERL:  Thank you, Judge.

16   Q    Mr. Guerra, I would like to turn your attention to

17   February 4th of 2020.  Were you working that day?

18   A    I was.

19   Q    What was your shift?

20   A    Afternoon shift.

21   Q    What are the hours of an afternoon shift?

22   A    Twelve to 22:30.

23   Q    And what is 22:30 in civilian time?

24   A    10:30 p.m.

25   Q    What location, if any, were you managing on that day?

1   A    The terminal.

2   Q    As a result of your position, did you manage all

3   mechanics working on terminal aircraft that day?

4   A    I was managing and supervising, yes.

5   Q    Are you familiar with the defendant, Mr. Paul Belloisi?

6   A    I am.

7   Q    Do you recall where the defendant was assigned to work on

8   February 4, 2020?

9   A    To the hanger.

10  Q    On that day, were you specifically managing the

11  defendant?

12  A    No.

13  Q    Did there come a time on February 4, 2020, that law

14  enforcement came to speak with you?

15  A    Yes.

16  Q    Who did you speak with?

17  A    I don't remember their names.  It was just two gentlemen

18  that came in and think started asking me questions about Paul,

19  but their names, I don't remember.

20  Q    What, if anything, did you speak to those officers about?

21  A    They came in asking if Paul Belloisi is one of my

22  mechanics, if he had any business being at the terminal, if he

23  had any business of being over at Gate 7 and being in the E&E

24  Compartment and just in general if he had any business being

25  over in the terminal side of the hanger for American Airlines.

1  Q    Did you recognize the defendant's name when they raised
2  it that day?
3  A    Of course, yes.
4  Q    How?
5  A    I know Paul.
6  Q    How do you know Paul?
7  A    Well, I also managed -- when I was a supervisor in the
8  hanger, I just knew him as mechanic that always worked, you
9  know, terminal -- I'm mean aircraft at the hanger.  Sorry.
10 Q    What, if anything, did you in response to those officers'
11 questions?
12 A    I said I don't know, I don't know where he belongs to
13 today as far as being on this side, but I did have my hanger
14 counterpart Norman would know because Norman was the manager
15 for that day.
16 Q    What, if anything, did you do next?
17 A    I called Norman, I asked him where Paul was supposed to
18 be because we have a sheet and Paul said -- Normal said give
19 me a second.  He found the sheet.  He told me he's supposed to
20 be at Spot One.  I said can you bring the sheet over to me and
21 he drove it over because he's -- he was at hanger.
22 Q    So did you, in fact, obtain the defendant's work
23 assignment sheet for that day?
24 A    I did, yes.
25 Q    Do you provide that sheet to law enforcement?

1  A    Yes.

2        MS. SCHIERBERL:  Your Honor, permission to show only

3  defense counsel and the witness at this time what has been

4  previously marked for identification purposes only as

5  Government Exhibit 103.

6        THE COURT:  Yes.

7  Q    Mr. Guerra, can you see Government Exhibit 103?

8  A    Yes.

9  Q    What is this document?

10 A    This is an aircraft assignment sheet, worksheet.

11 Q    To your knowledge, is this the type of document that was

12 made in the regular course of business in February 2020 to

13 provide assignments to mechanics?

14 A    Yes.

15 Q    Is this the type of document that was made daily at or

16 around the time those assignments were given to mechanics?

17 A    Yes.

18 Q    Was this the kind of document that was kept in the

19 ordinary course of business for some time by the crew chief?

20 A    Yes.

21 Q    Is this a fair and accurate copy of the work assignment

22 sheet that you provided law enforcement on February 4, 2020

23 check?

24 A    Yes.

25        MS. SCHIERBERL:  Your Honor, at this time, the

1    government offers Government Exhibit 103 in evidence.

2              THE COURT:  Any objection?

3              MR. COHEN:  No.

4              THE COURT:  It's admitted.

5              (Government Exhibit 103 was received in evidence.)

6              MS. SCHIERBERL:  Permission to publish the same to

7    the jury?

8              THE COURT:  Yes.

9              (Exhibit published.)

10   Q    What is this document?

11   A    It's a work assignment sheet generated by the crew chief

12   for the hanger.

13   Q    Whose work -- is this the work assignment sheet for the

14   defendant, Mr. Paul Belloisi?

15   A    Yes.

16   Q    How can you tell?

17   A    Because his name is on there.

18   Q    What is the date of this document?

19   A    February -- February 4, 2020.

20   Q    Can you please place an X with your finger where the

21   defendant's name is indicated on this document.

22             MS. SCHIERBERL:  Your Honor, I ask the record to

23   reflect that the witness has placed an X over the word

24   Belloisi in the top left corner of the document.

25             THE COURT:  Noted.

1  Q    Does this document reflect where the defendant was

2  assigned to work on February 4, 2020?

3  A    Yes.

4  Q    Where was that?

5  A    Spot One.

6  Q    Can you please place an X on the document where it says

7  Spot One?

8         MS. SCHIERBERL:  Your Honor, I'd ask that the record

9  reflect that the witness has drawn an X over the words Spot

10 One in the top right quadrant of the document.

11        THE COURT:  Noted.

12        MS. SCHIERBERL:  Ms. Cronin, can we please pull up

13 what's in evidence as Government Exhibit 401.

14 Q    Mr. Guerra, can you, again, please an X where Spot One is

15 located on Government Exhibit 401.

16        MS. SCHIERBERL:  Your Honor, I'd ask the record to

17 reflect the witness has placed an X over Spot One located in

18 the bottom right quadrant of the document.

19        THE COURT:  Noted.

20 Q    Based on that work assignment, Mr. Guerra, and your role

21 as manager of the terminal, to your knowledge, did the

22 defendant have any business working different aircraft in the

23 terminal that day?

24 A    No.

25 Q    In February of 2020, was it possible to buy coffee in the

1    terminal?

2    A    Yes.

3    Q    Looking at Government Exhibit 401, can you indicate for

4    us the location where it was possible to buy coffee in the

5    terminal?

6    A    With an X?

7    Q    Yes, sir.

8    A    Incited building would be right around here-ish and then

9    you also had a -- like, a food court that was more up here.

10   The depending -- the bottom one was in the arrivals area where

11   Dunkin Donuts is where most guys get their coffee, and the

12   upper area was just a general food court area and you can get

13   coffee or drinks there, too.

14          MS. SCHIERBERL:  Your Honor, I'd ask the record to

15   reflect that the witness has placed two smaller X's in the

16   bottom right quadrant of the screen over the American Airlines

17   terminal.

18          THE COURT:  Noted.

19   Q    In February of 2020, what was the easiest way to get to

20   Dunkin Donuts from Spot One?

21   A    Draw it?

22   Q    You can explain it in words.

23   A    Okay.  So, where the X is, you would come around and

24   right under here more or less, there's a little tunnel that

25   goes under so it's kind of like a short cut, and you would

1  drive this way and you'd park there somewhere and then go

2  inside and get your coffee.

3        MS. SCHIERBERL:  Your Honor, I'd ask the record to

4  reflect the witness has drawn a line from the top to the

5  bottom of the screen in the bottom right quadrant to indicate

6  the location of the tunnel.

7        THE COURT:  Noted.

8  Q    Mr. Guerra, do you know what is Customs seal is?

9  A    I do.

10 Q    What is a Customs seal?

11 A    It's a seal that's issued replacing your ID and it gives

12 you authority to be on an aircraft with international arrival

13 departure.

14 Q    Can a mechanic work on an international flight without a

15 Customs seal?

16 A    They're not supposed to.  They can work on anything, but

17 they're not supposed to without a Customs ID.

18 Q    I am going to publish what is already in evidence as

19 Government Exhibit 7 using the Elmo.

20        Mr. Guerra, do you recognize that?

21 A    I do.

22 Q    What is it?

23 A    It's a Port Authority ID.

24 Q    Whose Port Authority ID is it?

25 A    Paul Belloisi.

1    Q    Does this ID reflect a Customs seal?

2    A    No.

3    Q    Do you know what the avionics compartment of an airplane

4    is?

5    A    Yes.

6    Q    What is it?

7    A    It encompasses all of the radio -- all of the electronics

8    that you see in the cockpit, all the bells and lights and

9    screens and monitors, everything you see in there is pretty

10   much the computers for those systems.

11   Q    To your knowledge, based on the defendant's role and work

12   assignment that day, is there any reason he would be in the

13   avionics compartment of an aircraft positioned at the

14   terminal?

15   A    No.

16   Q    Are there special technicians or avionic, in particular

17   mechanics, that work at American Airlines?

18   A    There are, yes.

19   Q    Is the defendant an avionics mechanic to your knowledge?

20   A    No.

21   Q    Finally, looking back briefly at Government Exhibit 103,

22   was the defendant assigned to a specific aircraft on February

23   4th of 2020?

24   A    Yes.

25   Q    And what aircraft was that?

1  A    Seven Charlie Charlie.

2  Q    Based on this document, can you tell where Seven Charlie

3  Charlie was located?

4  A    Spot One.

5  Q    Thank you, sir.

6        MS. SCHIERBERL:  Your Honor, I just ask for a moment

7  to confer with my colleagues.

8        THE COURT:  Yes.

9        MS. SCHIERBERL:  At this time, the government has no

10 further questions for this witness.

11        THE COURT:  Okay.  You.

12        You may inquire if you wish.

13        MR. SIMPSON:  Thank you, Judge.

14 CROSS EXAMINATION

15 BY MR. SIMPSON:

16 Q    Good afternoon, Mr. Guerra.  My name is Ben Simpson.  I

17 am one of the attorneys for Mr. Belloisi.

18 A    Good afternoon, sir.

19 Q    Thank you.  Mr. Guerra, have you and I ever met before?

20 A    A few minutes ago, outside.

21 Q    Before that, have we ever met before?

22 A    No, sir.

23 Q    Okay.  Now, you're currently what is known as a -- the

24 level five supervisor at the hanger; is that correct, sir?

25 A    No, sir, I'm a level five manager.

LEEANN N. MUSOLF, RPR, CCR, Official Court Reporter

1  Q    Level five manager.  What is the difference between a
2  level five manager and a level five supervisor?
3  A    There is no level five supervisor.  Level four is a
4  supervisor.
5  Q    Is being a level five manager, what -- are there other
6  level five managers at JFK Airport?
7  A    There are, yes.
8  Q    How many others are there?
9  A    Five -- well, I'm five, so four others, five total.
10 Q    Got it.  And on February 4, 2020, you were a gate -- the
11 gate supervisor at Terminal 8; is that correct?
12 A    The gate manager.
13 Q    Gate manager, I'm sorry.  And how are your duties
14 different now than they were on February 4th 2020?
15 A    Now I manage both the terminal and the hanger.  So now I
16 primarily sit more at the hanger because my decision-making
17 happens more at the hanger than from the terminal.
18 Q    And the person doing your current job on February 4th,
19 2020, was that Norman Gordan; is that correct?
20 A    My current job, no.  We had two managers at the same
21 time.  So he had the hanger, I had the terminal.  Currently, I
22 have both, but post-Covid, we let go of people and we lost
23 managers.
24 Q    So now you're wearing two hats essentially; is that
25 correct?

1  A    Yes, sir.

2  Q    Okay.  And can you tell us again, what was Paul's

3  assignment that day -- the defendant's assignment on

4  February 4, 2020?

5  A    Where he was supposed to be?  He was a hanger mechanic.

6  Q    Correct.  And specifically that day, do you remember

7  where, what location he was assigned to?

8  A    The hanger.

9         MR. SIMPSON:  Can we pull up Government's 103,

10  please.

11  Q    You've seen this document on redirect and testified just

12  a moment ago.  Correct?

13  A    Yes.

14  Q    Now, when it says aircraft location, what does it say on

15  this assignment sheet for aircraft location?

16  A    Spot One.

17  Q    And Spot One is not located at the hanger, is it?

18  A    Correct.

19  Q    In fact, Spot One is much closer to the terminal than it

20  is to the hanger; is that correct?

21  A    Yes.

22  Q    Okay.

23         MR. SIMPSON:  Can we also pull up the ID badge

24  again, please, the government's.

25  Q    Do you recall seeing this badge just a moment ago on your

1   direct examination, Mr. Guerra?

2   A    Yes.

3   Q    Okay.  Does it say anywhere on this badge Mr. Belloisi is

4   a hanger mechanic rather than a terminal mechanic?

5   A    No -- excuse me.  No.

6   Q    Okay.  Thank you.

7        THE COURT:  Do the IDs generally show the

8   designation of where a person works?

9        THE WITNESS:  No.

10       MR. SIMPSON:  And, I'm sorry, can we have 103 again,

11  please, I apologize, Government's 103.

12  Q    I want to ask specifically, Mr. Guerra, about the

13  specific assignment for Mr. Belloisi that is reflected in this

14  document.  Do you see a specific assignment on the aircraft,

15  like a particular job that he was supposed to be doing that

16  day?

17  A    Yes.

18  Q    Okay.  And what job was that?

19  A

20       THE INTERPRETER:  Check.

21  Q    And what is a?

22       THE INTERPRETER:  Check, sir.

23  A    It's a transitory check, check the tires, check the

24  brakes, check for leaks, check for general condition, check

25  the logbook to see if there's any write-ups.  It's a check to

1  make sure everything's okay with the aircraft.  It's done

2  daily.

3  Q    And does that involve a check on the avionics, as well?

4  A    The E&E?

5  Q    Well, would it involve check of the avionics systems,

6  generally, in the airplane?

7  A    No, no.

8  Q    Okay.  Now, you didn't give him that assignment, correct?

9  A    No.

10 Q    And Norman Gordon hadn't given him that assignment

11 either, right?

12 A    No.

13 Q    It's crew chiefs who determine which mechanics under them

14 work --

15             THE COURT:  Are you testifying?

16             MR. SIMPSON:  Withdrawn.

17             THE COURT:  Who determines the assignment?

18             THE WITNESS:  The crew chief does.

19 Q    And do you know who Mr. Belloisi's crew chief was at that

20 time, February 4th, February?

21 A    I could tell by the handwriting of his paperwork, yes.

22 Q    Who is that?

23 A    Lino.

24 Q    Does Lino have a last name?

25 A    Prantil.

1  Q    And so it was Lino Prantil who created this assignment

2  for Mr. Belloisi, correct?

3  A    Yes.

4  Q    Okay.  And, in fact, Mr. Guerra, as a gate supervisor at

5  the time, is it correct that did you not have authority to

6  assign Mr. Belloisi any particular work assignment?

7  A    Correct.

8  Q    When did you first have occasion to become aware of

9  Paul -- Mr. Belloisi's actual assignment on February 4th?

10  A    When I called Norman to ask him where he was supposed to

11  be?

12  Q    Why did you call Normal to ask him where he was supposed

13  to be?

14  A    I had two law enforcement gentlemen enter my office

15  asking where he was supposed to be.

16  Q    Did you call Lino Prantil to find out where Paul was

17  supposed to be?

18  A    No, sir.

19  Q    Why did you not call Lino?

20  A    Because Lino is not my crew chief.  Lino is Norman's crew

21  chief.  Since Norman is my equal, I would go to my equal and

22  ask him where he is.

23  Q    Did you know that Lino was Paul's crew chief at that

24  time?

25  A    No.

1 Q    And looking at 103, was there another mechanic that

2 Mr. Belloisi was specifically working on the T1 Transit Check

3 with?

4 A

5         THE INTERPRETER:  Check, yes.

6 Q    And who was that?

7 A    Mr. Nunez.

8 Q    And, again, is that correct that that was not something

9 you were aware of before CBP came to speak with you?

10 A    Yes.

11 Q    Now, this job that Mr. Belloisi was assigned, the

12 T1 Check, how long does that normally take to complete?

13 A    It's a.

14         THE INTERPRETER:  Check.  It normally takes two to

15 three hours on a Triple 7.

16 Q    Two to three hours?

17 A    Yeah, it depends.

18 Q    And are you aware of whether Mr. Belloisi had completed

19 his assignment that day by the time CBP officers came and

20 spoke to you?

21 A    No.

22 Q    You were not aware at the time?

23 A    No.

24 Q    Are you aware now?

25 A    No.

1 Q    Mr. Belloisi's crew chief, would he have been able to

2 tell you whether or not Mr. Belloisi had completed his

3 assignment by that point in the day?

4 A    It's part of his job duties to know what his mechanics

5 are doing, so he should have known.

6 Q    At that point in time, were you trying to determine

7 whether Mr. Belloisi had finished his specific assignment for

8 the day?

9 A    No.

10 Q    When you determined what his assignment was, did you then

11 try to determine whether he had completed his assignment that

12 day or not by that point?

13 A    No.

14 Q    Why not?

15 A    He's not my mechanic.  He wasn't in my work -- in my work

16 area.  I was working the terminal -- hanger was with -- Norman

17 was working the hanger.  He was not my responsibility.

18 Q    Were you ever asked by CBP officers whether Mr. Belloisi

19 had completed his specific assignment that day?

20 A    Not that I recall.

21 Q    After February 4, 2020, did you ever learn whether

22 Mr. Belloisi had, in fact, completed his specific assignment

23 that day?

24 A    No.

25 Q    Before CBP officers came to your office on February 4th,

1  of 2020, were you looking for Mr. Belloisi at any point that

2  evening for any reason?

3  A    Nope.

4  Q    Generally speaking, Mr. Guerra, once a mechanic like

5  Mr. Belloisi has completed their assignment, they may still

6  have a few hours left in their shift; is that fair to say?

7  A    Yes.

8  Q    And when they've completed their assignment, are they

9  free to just leave the airport?

10 A    Not the leave airport.  They should stay on company

11 property, but they're free to stay within their working area.

12 If we're looking for them, they should be findable.

13 Q    Is it fair to say that they have to remain on-call?

14 A    Yes.

15 Q    And is that because they maybe needed to work on

16 something that comes up over the remainder of the --

17       THE COURT:  Are you testifying or asking a question?

18       MR. SIMPSON:  Withdrawn.

19 Q    Why must they remain on-call?

20 A    To be able to find them if we need something that needs

21 to be done.

22 Q    Did you ever speak to Lino Prantil about whether he

23 needed Mr. Belloisi to work on something after he completed

24 his assignment on February 4, 2020?

25 A    No.

1  Q    As you sit here today, do you know whether Mr. Prantil

2  until had contacted Mr. Belloisi about an additional job after

3  completing his assignment that day?

4  A    No.

5  Q    Now, you said a mechanic is sort of free after they

6  complete their assignment; is that your testimony?

7  A    More or less, yes.

8  Q    There's different things that they can do that are not

9  specific to their assignment; is that fair to say?

10 A    Such as?

11 Q    Such as, they can go and have a meal, is that correct?

12 A    Yes.

13 Q    Okay.  They can go and get coffee; is that also something

14 they can do?

15 A    Yes, of course.

16 Q    Maybe have a cigarette in a designated location if

17 they're a smoker; that's something they can do?

18 A    Yes.

19 Q    They can even take a personal phone call if they needed

20 to; is that fair to say?

21 A    Yes.

22 Q    And some mechanics might take that freedom --

23        THE COURT:  Do you want to testify again?

24        MR. SIMPSON:  Withdrawn.

25 Q    Might some mechanics -- might some mechanics use that

1  time to do some scrounging?
2        THE COURT:  What do you mean by scrounging?
3  Rephrase.
4        THE WITNESS:  That's a good question --
5        THE COURT:  Rephrase.
6        MR. SIMPSON:  Okay.  Withdrawn.
7  Q    Mr. Guerra, have you ever heard of the term scrounging?
8  A    I've heard of it but I don't know what it means.  I'm not
9  sure what you're talking about.
10 Q    Have you ever heard mechanics being referred to as being
11 seagulls?
12 A    No.
13 Q    Have you ever heard of the term silver diners?
14 A    No.
15 Q    Have you ever heard of mechanics taking snacks or drinks
16 off of an airplane?
17 A    I have heard of it, yes.
18 Q    Is there any specific term that you would use to describe
19 that practice?
20 A    No.
21 Q    Is that a fairly widespread practice?
22 A    Taking food and drinks?
23 Q    Off of an airplane, yes.
24 A    I've heard of it, I don't know -- I don't know how often
25 that happens.  They don't do it in front of me.

1    Q    Because you're the boss, right?

2    A    Correct.

3    Q    So is it fair to say it's a prohibited practice?

4    A    It's against company policy.  It's considered stealing

5    and fireable.

6    Q    That being said, is it still something that happens?

7    A    From what I've heard, yes.

8    Q    Would you say it's true you can go to a break room at JFK

9    and you're going to see cups and food wrappers filling up a

10   wastebasket in that break room?

11   A    Yes, but not necessarily from the aircraft, if that's

12   what you're implying.

13   Q    Okay.  When you were a line mechanic, Mr. Guerra, did you

14   ever take a drink or a snack off of an airplane?

15   A    The funny thing is I wasn't a line mechanic in the

16   commercial industry.  I came in straight at management, so I

17   didn't touch an airplane in American Airlines.  Prior to that,

18   my biggest career, I was in the Navy.

19   Q    So you've never personally taken anything off --

20             THE COURT:  Asked and answered.  Move on.

21   Q    Now, you said a moment ago, you had not been looking for

22   Mr. Belloisi for any reason, correct?  That's your testimony?

23   A    Yes.

24             THE COURT:  Asked and answered.

25   Q    And you told the government on redirect there would be no

1 | reason whatsoever for a mechanic assigned to the hanger to be
2 | at an aircraft at a gate, correct?
3 | A    Correct.
4 | Q    And that's the same for a mechanic assigned to a
5 | hardstand such as Spot One?  Is that the same for a mechanic
6 | assigned to a hardstand?
7 | A    It depends on where the mechanic's located.  If he did
8 | the hanger, then he could be at hardstand, if he did the
9 | terminal, then he shouldn't be.  It depends on your location
10 | and your assignment.
11 | Q    Isn't it true though, Mr. Guerra, that there are many
12 | instances in which a mechanic assigned to the terminal may end
13 | up at the hanger, or a mechanic assigned to the hanger or a
14 | hardstand may end up at the gate?
15 | A    Yes.
16 | Q    What's one example of when that would happen?
17 | A    Paul's example.  He's a hanger mechanic, he was assigned
18 | to Spot One.  Spot One's located at the terminal.  So he would
19 | have to treck it from the hanger, the vehicle, to the
20 | terminal, Spot One and do his assignment.
21 | Q    Okay.  Now, if a mechanic had been assigned -- let's say
22 | a mechanic had been assigned to a terminal gate.
23 | A    Assigned to a terminal gate?
24 | Q    They're assignment was a terminal gate.
25 | A    No.  So a terminal mechanic would be assigned to a

1   terminal gate.

2   Q    If they're assigned to a terminal gate, are there ever

3   instances where that mechanic may end up following a plane to

4   a hanger?

5   A    It depends on manpower.  If I have the manpower, I would

6   let them go.  If I don't have the manpower, I would keep them.

7   Q    But there are instances where --

8            THE COURT:  Asked and answered.  Move on, please.

9   Q    For a mechanic who's assigned working on a plane that is

10  out of service, those are the hangers; is that correct?

11  A    They can be out of service at the gate or the hanger.

12  They can be out of service in both areas.

13  Q    Okay.  But the hanger is only planes that are out of

14  service, is that -- do I have that right?

15  A    No.  The hanger would be -- like I said, we're a garage

16  warehouse.  So we park extra aircraft there, we work on

17  scheduled maintenance, we do overnight maintenance, we can do

18  many things.  But the hard aircraft, like, engine changes,

19  something crazy they can't do at the gate is what we send to

20  the hanger.  So, basically, whatever is out of service at the

21  gate that cannot get fixed there, gets sent to the hanger to

22  be repaired.

23  Q    Understood.  If a mechanic working on an aircraft at the

24  hanger needs to look at an identical airplane or airplane part

25  and the only matching part is on an aircraft at the gate, will

1 | that mechanic sometimes go to the gate for that purpose?

2 | A    Yeah, you're asking for me troubleshoot and I can't do

3 | that.  That's a mechanic's -- what a mechanic would do.

4 | Q    Well, I'm asking about --

5 |           THE COURT:  Can I see counsel at the side, please.

6 |           (Continued on the next page.)

7 |           (Sidebar conference.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (The following occurred at sidebar.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  What is the point of all of this
2    hypothetical business here?
3          MR. SIMPSON:  The point is he's testifying to that
4    there are certain things that would never happen, you know,
5    there's this policy that would never be violated, and think
6    he's already said a few times that there are different
7    situations in which that policy actually would not apply and
8    I'm just trying to explore what some of those might be.
9          THE COURT:  You're done.  Let's move on, please.
10   Move on.
11         MR. SIMPSON:  May I ask one more question?
12         THE COURT:  What do you plan to ask?
13         MR. SIMPSON:  If won't be a hypothetical.
14         THE COURT:  What do you plan to ask?
15         MR. SIMPSON:  Simply it will be to ask him to tell
16   us any scenario in which a mechanic who is assigned to a
17   hanger may end up at the gate or vice versa.  That's all.  I
18   will leave it open to him, it's not going to a leading
19   question, nothing like that.
20         THE COURT:  You know, you're engaging in a lot of
21   speculation and I don't know where the government is in all of
22   this.  I mean, these are your witnesses and you've prepared of
23   this and you know what the relevance of all of this is.  It's
24   not looking relevant to me.
25         I will let you ask that one question because I'm

1  feeling generous right now, but, frankly, I don't see it as

2  relevant.  I see it as going into other speculation -- please

3  no talking in the courtroom.  I also don't allow drinks like

4  coffee and other things in the courtroom.  If you're going to

5  drink water, fine.

6            MR. SIMPSON:  Thank you.

7            THE COURT:  But that's it.

8            (End of sidebar conference.)

9            (Continued on the next page.)

1              (In open court; jury present.)

2              THE COURT:  Rephrase your question, please.

3              MR. SIMPSON:  Thank you, Your Honor.

4              BY MR. SIMPSON:

5   Q    Mr. Guerra, can you please explain to us any scenarios

6   that you are aware of where a mechanic assigned to the gate

7   will end up at the hanger or vice versa?

8              THE COURT:  You mean the terminal mechanic?

9              MR. SIMPSON:  A terminal gate mechanic, yes.

10             THE WITNESS:  Terminal and gate are the same thing,

11  ma'am.

12             THE COURT:  I'm sorry?

13             THE WITNESS:  The terminal and the gate would be

14  considered the same thing.

15             THE COURT:  Okay.  All right.

16  A    So would you like to know?

17  Q    Yes.  I would like to know from your experience, what are

18  examples or an example, multiple examples where a mechanic who

19  is assigned to the hanger will end up at the terminal gate or

20  vice versa a mechanic who is assigned to the terminal gate

21  will end up at the hanger?

22  A    Sure.  So at the terminal, I have a minimum requirement

23  for manpower.  I would like to have 30 guys at the terminal

24  every day.  If I have 16 or 15, I'll pull from my hanger

25  manpower to go to the gate because live departures are more

1  important than the overnight workload.  So if there's a plane

2  that goes out of service at the gate, depending on what the

3  issue is and how many guys I have at the gate, they may come

4  with the aircraft to the hanger.  So it would go one way from

5  hanger to terminal for shortage of manpower at the gate, but

6  it if it goes from the gate to the hanger, it would be for out

7  of service aircraft that they're following it back to the

8  hanger depending on what the issue is.

9  Q    Got it.  Thank you.  You were asked on direct examination

10 about the Customs stamp; do you recall being asked about that

11 on redirect?

12 A    Yes.

13 Q    And the Customs stamp is necessary --

14      THE COURT:  You want to not testify, please?

15 Q    Withdrawn.

16      Is the Customs stamp integral to working on

17 international flights?

18 A    Yes.

19 Q    Okay.  When does a flight that has arrived at JFK cease

20 considered being an international flight?

21 A    Once the Customs officials come off the aircraft.  So --

22 Q    I'm sorry, go ahead.

23 A    -- the plane will pull in, passengers will come off, the

24 Customs officials will come on, they'll check whatever they

25 got to check, they do their thing, and then once they're off

1  the aircraft, they give us the okay to go on the aircraft.

2  Q    And at that point when you're given the okay, does that

3  mean that it's no longer an international flight?

4  A    It doesn't mean that.  It just means we can board the

5  aircraft and do what we have to do.

6  Q    And a Customs stamp is no longer needed for someone to do

7  that; is that correct?

8  A    I don't know.  I do not know to be honest.

9  Q    Thank you.

10 A    That's a question I've never been asked before, even at

11 work.

12 Q    That's fine, that's fine.  I appreciate your honest

13 answer.  Mr. Guerra, swapping shifts between line mechanics,

14 is that a common practice at JFK?

15 A    Very.

16 Q    How?

17 A    Yes.

18 Q    How often does that happen?

19 A    Every day, every shift.

20              (Continued on the following page.)

21

22

23

24

25

1  CROSS-EXAMINATION

2  BY MR. SIMPSON: (Continuing)

3  Q    When shifts are swapped, would that be before or after

4  assignments are designated by crew chiefs?

5  A    You cannot swap a shift after.  It has to be before

6  because you have to -- you have to pick up an afternoon shift,

7  for example.  Now they'll know who was on afternoon shift.

8  They have their manpower and they assign the workload based on

9  the manpower that's there that day.  So a swap has to happen

10 before so the crew chiefs know who to assign.

11 Q    So a swap -- in terms of this time sequence, the swapping

12 of the shift will happen before the specific assignment is

13 made by the crew chief; is that your testimony?

14 A    The swapping of the shift must occur before the shift

15 starts.

16 Q    And when does the assignment happen?

17 A    The crew chief comes in half hour prior to the mechanics,

18 so he starts assigning maybe a half hour to 45 minutes after

19 he's in.  So it's during the beginning of shift when he does

20 the assignments.

21 Q    And is it fair to say he has to deal with the manpower

22 that he has for those assignments?

23 A    Yes.

24 Q    Now, Mr. Guerra, at some point after speaking with CBP

25 officers on February 4, 2020, you got a little curious about

1    what was going on; is that right?

2    A    I did.

3    Q    And you wanted to see what the situation was all about;

4    is that right?

5    A    Yes.

6    Q    You have viewed some video footage relating to this

7    situation?

8    A    I did.

9    Q    When did you view video?

10   A    Later on that evening, after everyone had left.

11   Q    How did you access that video?

12   A    Cameras.

13   Q    Where did you go to access the cameras?

14   A    My computer.  I have access to them.

15   Q    How many cameras do you have access to, sir?

16   A    The whole airport, well, not the whole airport.  American

17   Airlines terminals.

18   Q    Can you tell us how many different cameras that would be?

19   A    No.

20   Q    Why is that?

21   A    I have no idea.  It's a lot.

22   Q    More than 100?

23   A    Maybe close to that, I think.  I don't look at them on a

24   daily basis.

25   Q    Did you look at multiple angles of surveillance video

1    relating to this incident?

2    A    I tried.

3    Q    Is it fair to say JFK is blanketed with security cameras?

4    A    It is.

5              MR. SIMPSON:  Nothing further.

6              THE COURT:  Any redirect?

7              MS. SCHIERBERL:  No, Your Honor, thank you.

8              THE COURT:  Thank you, sir.  You may step down.

9              THE WITNESS:  Thank you.

10             (Witness leaves the stand.)

11             THE COURT:  The Government may call its next

12   witness.

13             MR. POLLACK:  The Government calls Special Agent

14   Sean Gabay.

15             THE COURTROOM DEPUTY:  Please raise your right hand.

16             Do you affirm that your testimony will be the truth,

17   the whole truth and nothing but truth?

18             THE WITNESS:  I do.

19             THE COURT:  Thank you.  Please be seated, sir.

20             THE WITNESS:  Thank you.

21             THE COURT:  There's bottled water for you.

22             Please state and spell your name.

23             THE WITNESS:  My name is Sean Gabay, S-E-A-N,

24   G-A-B-A-Y.

25             THE COURTROOM DEPUTY:  Thank you.

1           THE COURT:  Good afternoon, sir.

2           THE WITNESS:  Good afternoon, Your Honor.

3           THE COURT:  If you feel comfortable, you can take

4    your mask off while you testify.

5           THE WITNESS:  Is that okay with you?

6           THE COURT:  Sure.  And you can adjust the microphone

7    so it's comfortable for you.  And that volume is perfect.  I'm

8    just going to ask that you speak slowly.

9           And you may inquire when you are ready, Mr. Pollack.

10          MR. POLLACK:  Thank you, Your Honor.

11   **SEAN GABAY**,

12       called as a witness, having been first duly

13       sworn/affirmed, was examined and testified as follows:

14   DIRECT EXAMINATION

15   BY MR. POLLACK:

16   Q    Good afternoon, Special Agent Gabay.

17   A    Good afternoon.

18   Q    Who do you currently work for?

19   A    Homeland Security Investigations.

20   Q    Is that part of the Department of Homeland Security?

21   A    Yes.

22   Q    What is your title?

23   A    My title is special agent.

24   Q    How long have you been a special agent at Homeland

25   Security?

1  A    17 years.

2  Q    Were you assigned to a particular unit in February of

3  2020?

4  A    Yes, I was.

5  Q    What unit was that?

6  A    The Internal Conspiracy Group.

7  Q    What is the Internal Conspiracy Group?

8  A    It's a group of agents and task force officers at JFK

9  Airport that investigate corrupt airport employees.

10 Q    By February of 2020, how long had you been assigned to

11 the Internal Conspiracy Group?

12 A    Just under two years.

13 Q    Can you tell us a little bit about your responsibilities

14 as a special agent in that group?

15 A    In that group, we investigate, like I said, corrupt

16 airport employees, basically airport employees who use their

17 positions and their access to the airport to smuggle

18 contraband in and out of the airport.

19 Q    Are you familiar with the term controlled delivery?

20 A    Yes, I am.

21 Q    What does it mean?

22 A    A controlled delivery would be a lot of times when -- if

23 you seize narcotics and you're going to try to arrest

24 somebody, it can be -- you would use -- you would try to

25 deliver the narcotics or -- there's a few different ways to

1    conduct controlled deliveries, but, yes.

2            It's hard for me to explain.

3    Q    Is the idea to catch the person who was there --

4    A    Yeah.  Narcotics -- yes, you want to try to catch the

5    person that is getting narcotics.

6    Q    Can you estimate, even with very rough numbers, how many

7    narcotics investigations you've been involved in?

8    A    Over the years, I would have to say over 100, more.

9    Q    Have you received any particular training to be a special

10   agent in the Internal Conspiracy Group?

11   A    I attended the federal law enforcement training center in

12   Brunswick, Georgia, in 2006.

13   Q    Prior to becoming a special agent, what did you do for

14   work?

15   A    I was a New York City police officer from 2000 to 2006.

16   Q    What did you do before then?

17   A    I was in college.  I was working at a pool in the summer.

18   Q    In total, how long have you worked in law enforcement?

19   A    This is my 23rd year.

20   Q    I will now direct your attention to February 4, 2020.

21           Were you working that day as a special agent in the

22   Internal Conspiracy Group at JFK?

23   A    Yes, I was.

24   Q    And what, if anything, were you assigned to do that day?

25   A    That day I was assigned as the backup duty agent to

1  Special Agent Moloney.  We were going to cover -- we were in

2  the office that day, but covering the -- if any calls came in

3  over night, internal conspiracy related, we would be getting

4  the phone calls, responding.

5  Q    And what was your shift that day?

6  A    A regular 9:00 to 5:00 shift.

7           THE COURT:  Is that 9:00 in the morning?

8           THE WITNESS:  Yeah, I mean, it's not set in stone,

9  but, yes, our shifts would be 9:00 to 5:00.  A day shift.

10 Q    Did there come a time that day when you became aware of a

11 criminal investigation?

12 A    Yes.

13 Q    Can you recall, to the best of your memory, approximately

14 what time that was?

15 A    I believe it was the early evening.  I think I recently

16 returned home from work when I got the phone call.

17 Q    So you -- you'd finished your 9:00 to 5:00 and got home;

18 is that right?

19 A    Yeah.

20 Q    And where were you when you got the call?  You said at

21 home?

22 A    I think I just arrived or I recently arrived at my house.

23 Q    Who called you?

24 A    CBP officers, Customs and Border Protection officers.

25 Q    Why did they call you?

1  A    They called us because they discovered 10 bricks in the

2  avionics hold of an America Airlines flight from Montego Bay,

3  Jamaica.

4  Q    And why does that implicate the Internal Conspiracy

5  Group?

6  A    Because cocaine coming from, you know, in the avionics

7  hold in this particular part of the plane would require -- or

8  on any plane would require an airport employee that would have

9  access to that area and the plane, it would require an airport

10  employee where these drugs were put on the plane.  It would

11  also require an employee that had access to that area of the

12  plane to get the drugs off.

13  Q    So after you got home and you got the call that drugs had

14  been found in the avionics compartment, what, if anything, did

15  you do?

16  A    I called Special Agent Moloney to let him know.

17  Q    Why did you call Special Agent Moloney?

18  A    Because he was the duty agent for the day.  So we would

19  respond together.

20  Q    And what, if anything, did you do after that?

21  A    I drove to the airport and met with Agent Moloney.

22  Q    Do you recall approximately when you got to the airport?

23  A    I don't have a timeline, but I got the call.  I probably

24  gathered my stuff and I left soon after that, but I don't have

25  an exact time, no.

1   Q    This is after you had already went home at 5:00?

2   A    Yes.

3   Q    When you got to JFK, where did you go?

4   A    I believe we met and he got in my car and then we drove

5   on to the tarmac of the airport.

6   Q    What did you do then?

7   A    We met up with customs officers kind of off the set area,

8   not directly in front of -- what the -- wherever they were

9   conducting their activities, we met up with someone kind of

10  off the set.

11  Q    What does the set and off the set mean?

12  A    Well, they were conducting a controlled delivery at the

13  time where they were initiating it and they were watching the

14  plane in question, and with somebody's that's not in like a

15  direct line of sight, kind of off the area a little bit.  So

16  we drove and pulled up next to their car.

17  Q    And, so, what was your understanding of what the CBP

18  officers were doing?

19  A    Excuse me?

20  Q    What is your understanding of what the CBP officers were

21  doing?

22  A    There were officers monitoring the plane to see if anyone

23  approached it.

24       There were also -- I believe -- when they discovered

25  the cocaine, they removed it and replaced it with sham bricks

1  of cocaine, which are fake, and I believe they outfitted that

2  with a trip device.  It's some sort of a device where they put

3  it on the sham bricks and they can tell -- they were listening

4  to a radio frequency and this radio frequency beeps and then

5  they can tell -- it beeps faster when its moved.

6                  MR. COHEN:  Objection.

7                  Move to strike.

8                  THE COURT:  Overruled.

9  Q    So with that understanding, where did you go?

10 A    We met up off the site because we didn't want to

11 interrupt what was happening.  We didn't want to make our

12 presence known, so we kind of stayed off the set and pulled up

13 next to another car with the CBP officer.

14 Q    Were you in contact with CBP during this time?

15 A    Yes.

16 Q    How were you in contact with them?

17 A    We were next to him, I believe, in a car.

18 Q    To be clear, you're talking about not the CBP officers

19 who were on set, but other CBP officers?

20 A    Yes.

21 Q    And who all -- did you say that was just you and Agent

22 Moloney in the vehicle?

23 A    Yes.

24 Q    And what, if anything, were you and Agent Moloney doing

25 in that vehicle while you were waiting?

1   A    We were just sitting and waiting.

2   Q    How long were you waiting?

3   A    I don't remember.  It wasn't -- it wasn't that long.  I

4   couldn't say exactly the time.  I don't have the timeline,

5   like I said, it could have been a half hour, 40 minutes.  I'm

6   not 100 percent sure.

7   Q    When something eventually did happen, what was it that

8   happened?

9   A    I believe CBP told us that the device had tripped.

10  Q    Do you remember how CBP told you?

11  A    Is there any they told us through the win don't have the

12  car, if I remember correctly.

13  Q    And do you remember eastern roughly what time that was?

14  A    I really don't.  I apologize.  I don't have --

15  Q    No need to apologize.

16  A    I don't have the timeframe.

17  Q    What, if anything, did you do next?

18  A    We followed the CBP officer that was next to us.  We

19  followed his car to where the plane was.

20  Q    And what, if anything, did you see when you got to the

21  plane?

22  A    We saw CBP officers and Mr. Belloisi standing on the

23  tarmac.

24  Q    At that time, did you know who he was?

25  A    No.

1   Q    To your knowledge, when you were on the tarmac, when you

2   arrived at the tarmac, do you know whether anyone had asked

3   the defendant why he --  asked Mr. Belloisi why he was in the

4   aircraft?

5   A    When we first arrived, no, at that point -- after we

6   arrived.

7   Q    After you arrived, on the tarmac still, you came to learn

8   that he had told someone why he was on the airplane?

9   A    Yes.

10  Q    And what was your understanding of what that reason was?

11  A    He was there to fix the air conditioning.

12  Q    Did you do anything to attempt to verify whether that was

13  true?

14  A    Yes, we did.

15  Q    What did you do?

16  A    We went and spoke to the pilot.

17  Q    Did you talk to the pilot?

18  A    Myself and Agent Moloney, yes.

19  Q    Do you remember going into the airplane?

20  A    I believe we did go up the outside steps and then towards

21  the airplane.  I don't remember how far we went in.

22  Q    And did you take any action based in part on what you

23  learned from the pilot?

24  A    Yes.

25  Q    What was that?

1   A      We detained Mr. Belloisi.

2   Q      What did you do after you detained Mr. Belloisi?

3   A      We brought him to our -- we handcuffed him and brought

4   him to our office at -- in Terminal 4, we have an office, JNSU

5   office.  We brought him there to question him further.

6   Q      Is JNSU J-N-S-U?

7   A      Yes.

8   Q      Do you happen know what that stands for?

9   A      JFK Narcotics Smuggling Unit.

10  Q      Why did you bring Mr. Belloisi there?

11  A      There's an interview room there and that's where the

12  drugs would be processed also and stored.

13  Q      Before you took Mr. Belloisi to JNSU, did you look inside

14  the vehicle near the aircraft?

15  A      Yes.

16  Q      Why did you do that?

17  A      We looked inside the vehicle that Mr. Belloisi arrived

18  in, the tug.

19  Q      Did you see anything in that vehicle?

20  A      Yes.  There was a red tool bag in the vehicle.

21  Q      I'm going to show you --

22          MR. POLLACK:  Just the witness, defense, and the

23  Court a document that has been marked for identification as

24  Government Exhibit 205.

25          THE COURT:  Yes.

1   Q     Can you see that?

2         THE COURT:  That's for identification.

3   A     I'm looking everywhere else but here.

4         Yes, I see it.

5   Q     Do you recognize the photograph?

6   A     Yes.

7   Q     Is that a photograph taken that night?

8   A     Yes, it is.

9   Q     Is it a fair and accurate depiction of what you saw?

10  A     Yes.

11        MR. POLLACK:  The Government offers Government

12  Exhibit 205.

13        THE COURT:  Any objection?

14        MR. COHEN:  No objection.

15        THE COURT:  It's admitted.

16        (Government's Exhibit 205 received in evidence.)

17        MR. POLLACK:  Your Honor, may we publish to the

18  jury?

19        THE COURT:  Yes.

20  Q     So, Agent Gabay, can you orient us in this photo, what

21  exactly are we looking at?

22  A     It's a picture of a red tool bag that was in the tug that

23  Mr. Belloisi arrived in.

24  Q     And is -- what is it sitting on there or what is it in?

25  What is it around?

1   A    It looks like it's sitting.

2   Q    -- withdrawn.  Let me clarify that.

3        Is this photograph taken in the tug?

4        MR. COHEN:  Objection.

5   A    Yes, I believe it was --

6        THE COURT:  If you hear objection, you have to wait

7   a minute --

8        THE WITNESS:  I'm sorry.

9        THE COURT:  -- until I get a chance to rule on it.

10       Sustained as to form.  Rephrase, please.

11  BY MR. POLLACK:

12  Q    Where is this photograph taken?

13  A    In the tug.

14  Q    Did you look in that tool bag?

15  A    Yes, we did.

16  Q    Was there anything inside of it?

17  A    No.

18  Q    Can you tell from its appearance whether it was a new

19  tool bag or it had been used?

20  A    It looked pretty new to me.

21       MR. POLLACK:  I would like show the witness only

22  what has been marked for identification as Government Exhibit

23  205A.

24       THE COURT:  It may be shown.

25  Q    Do you recognize this?

1    A    Yes.

2    Q    What is this?

3    A    This is a picture of the metadata from the photo.

4    Q    Does this truly and accurately reflect the metadata from

5    the photograph at the time that it was taken?

6    A    Yes is.

7              MR. POLLACK:  The Government offers Government

8    Exhibit 205A.

9              THE COURT:  Any objection?

10             MR. COHEN:  No.

11             THE COURT:  It's admitted.

12             (Government's Exhibit 205A received in evidence.)

13             MR. POLLACK:  May we publish to the jury?

14             THE COURT:  Yes.

15   Q    Can you tell us, with reference to the photo, what time

16   that photo was taken?

17   A    7:51 p.m. on February 4, 2020.

18   Q    After that photograph was taken at 7:51 p.m., is that

19   when you took the defendant to JNSU?

20   A    Probably shortly after that.  Like I said before, I don't

21   have an exact timeline of events, but, yes.

22   Q    You referred already to what you had heard the defendant

23   had said to others about why he was in the plane, but when you

24   got to JNSU, did you ask him yourself --

25   A    Yes, we did.

1   Q      -- why he went to that airplane?

2   A      Yes.

3   Q      What did he tell you?

4   A      He told us it was common practice for employees to go to

5   the galley of planes to take chips and a soda, steal them and

6   eat them.

7   Q      Did he say that he went into the plane?

8   A      Yes.

9   Q      Did he say that he, in fact, ate anything in the plane?

10  A      Yes.  He told us that he went to the galley and had chips

11  and a soda.

12  Q      Did he say whether anyone else was in the plane?

13  A      No, he was alone.

14  Q      He said he was alone?

15  A      Yes.  He said he was by himself.

16  Q      And what did he say happened after that?

17  A      He said while he was in the galley he noticed that one of

18  the air conditioning packs wasn't working correctly, so he

19  decided that one of the ways to fix it is in the cockpit.  So

20  he went to the cockpit and I think he said there was a switch

21  or something that you could try to fix it with.  So he went to

22  the cockpit to flip the switch to fix it.

23  Q      And what happened -- what did he say after that, if

24  anything?

25  A      He said that didn't work, so another way to fix it is in

1    the avionics hold underneath the plane.

2    Q    Did you or other law enforcement in your presence collect

3    any items from the defendant while at JNSU that night?

4    A    Yes.

5    Q    Did you or anyone in your presence photograph those

6    items?

7    A    Yes.

8         MR. POLLACK:  I would like to show, if we may, Your

9    Honor, the witness only the documents marked for

10   identification as Government Exhibits 207, 208, 209, and 210.

11        THE COURT:  Yes.  These are all for identification.

12   Q    Do you recognize those images?

13   A    Yes.

14   Q    Are they fair and accurate reflections of the items that

15   were taken from the defendant in your presence?

16   A    Yes.

17        MR. POLLACK:  The Government offers Government

18   Exhibits 207, 208, 209, and 210.

19        THE COURT:  Any objection?

20        MR. COHEN:  No.

21        THE COURT:  They are admitted.

22        (Government's Exhibits 207, 208, 209, and 210

23   received in evidence.)

24        MR. POLLACK:  Can we publish to the jury Government

25   Exhibit 207?

1          THE COURT:  Yes.

2    BY MR. POLLACK:

3    Q    Can you explain to us, Agent Gabay, what is shown in this

4    photograph?

5    A    This is a photograph of the items that Mr. Belloisi had

6    on him on February 4, 2020.

7    Q    Is that a jacket that he was wearing on the tarmac?

8    A    Yes.

9          MR. POLLACK:  Can we put up 208.

10   Q    Can you tell us what this photograph shows?

11   A    This is a photograph of the inside of the jacket.

12         MR. POLLACK:  And can we put up 209D.

13   Q    What does this photograph show?

14   A    This is another photograph of the inside of the jacket.

15         MR. POLLACK:  And can we put up 210?

16   Q    What is this?

17   A    That is a photograph of a slit in the -- it looks like

18   the left breast side of the jacket.

19   Q    Why were those photographs taken with the jacket open?

20   A    Because we thought that that was a significant item of

21   interest, that items could be concealed in that area.

22   Q    Are you familiar with the practice of putting slits like

23   that on the interior lining of jackets?

24         MR. COHEN:  Objection.

25         THE COURT:  Sustained as to form.  Rephrase.

1          During the course of your narcotics investigations,

2    have you ever encountered jackets like that or items of

3    clothing like that?

4          THE WITNESS:  In my training and experience, I've

5    heard of this happening before.

6          At the time, I wasn't in that group for very long,

7    but I had heard of that in the past, so, yes, that was

8    something that I was familiar with.

9    Q    And in your training and experience, what were those

10   slits used for?

11   A    It can be used to place items, bricks of cocaine --

12         MR. COHEN:  Objection.

13   A    -- into the lining of the jacket.

14         THE COURT:  Overruled.

15         MR. POLLACK:  Your Honor, permission to approach the

16   witness to show him the items marked for identification as

17   Exhibits 3 and 5?

18         THE COURT:  Yes.

19   Q    Do you recognize those?

20   A    Yes.

21   Q    What are they?

22   A    This is the bag that contains the American Airlines

23   jacket Mr. Belloisi had, and this is the bag that contains the

24   phone that Mr. Belloisi had that evening.

25         THE COURT:  I'm sorry.  Can you just identify by --

1    there's a little exhibit tag on the bottom.

2            THE WITNESS:  I apologize.

3            The jacket is marked Government Exhibit 3.

4            And the iPhone is marked Government Exhibit 5.

5    Q    Do they appear to be in the same or substantially the

6    same condition as when they were collected from the defendant?

7    A    Yes.

8    Q    February 4, 2020?

9    A    Yes, I believe they are.

10           MR. POLLACK:  Your Honor, the Government offers

11   Government Exhibits 3 and 5.

12           THE COURT:  Any objection?

13           MR. COHEN:  No.

14           THE COURT:  They are admitted.

15           (Government's Exhibits 3 and 5 received in

16   evidence.)

17           MR. POLLACK:  Your Honor, permission to have the

18   defendant -- sorry -- the witness remove them from the bags

19   and present them, show them to the jury.

20           THE COURT:  Yes.

21   Q    Let's perhaps start with the cell phone.

22           THE COURT:  Just so that the jurors know, once you

23   are deliberating, you can request to see physical items that

24   are introduced in evidence, except for contraband.  Okay.

25           MR. POLLACK:  Your Honor, may the witness step down

1  to hold them up?

2           THE COURT:  Yes.

3           THE WITNESS:  How far down do you want me to go, in

4  the middle?

5  Q    And the jacket.

6           Agent Gabay, while you're holding that, can you tell

7  us whether those holes on the inside are in the seam or in the

8  armpit or where they are in the jacket?

9  A    They are not in the armpit or the seam.

10          They look like they're in the breast area of the

11 jacket, like on the front area.

12          MR. POLLACK:  Thank you.  You can return.

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. POLLACK:  (Continuing.)

2  Q    Did you voucher these items when you took them from the

3  defendant?

4  A    Yes, we did.

5  Q    In the process of doing that, did you ask the defendant

6  his home address?

7  A    Yes, we did.

8  Q    Without giving the exact address, can you tell me in

9  general terms where you said he lived at the time?

10 A    Yes.  He lived in Hicksville, New York.

11 Q    Do you know where that is?

12 A    Yes, it's in Long Island in Nassau County.

13 Q    When you were there in JNSU did you receive the cocaine

14 this CBP had seized?

15 A    Yes, we did.

16 Q    What, if anything, did you do with it?

17 A    We weighed it at CBP and put it in an evidence box and

18 locked the evidence box up.

19 Q    Approximately how much cocaine was that?

20 A    It was ten bricks.  I believe it was over 11,000 grams of

21 cocaine, the gross weight.

22 Q    Was each brick about a kilo?

23 A    Probably right, probably exactly a kilo I think.

24 Q    You referred to having worked over 100 narcotics

25 investigation; is that correct?

1  A    That's correct.

2  Q    In those investigations, did you learn an approximate

3  street value in New York City of a kilo brick of cocaine?

4  A    Yes.

5  Q    What was that?

6  A    At that time, I would estimate that a kilogram of cocaine

7  would be approximately 20 to $32,000.

8  Q    You said 20 to 32?

9  A    28 to 30,000 per kilo low.

10  Q    So for ten bricks what's the approximate value of that?

11  A    It would be 280,000 to 310,000, I would say.

12  Q    And this may be a silly question, but in your experience

13  is ten bricks of cocaine a personal consumption quantity?

14  A    No, definitely not.  It's distribution.

15  Q    Can you see the box on counsel table here?  Is your line

16  of sight blocked?  Do you recognize it?

17  A    Would you like to come down?  I'll come down --

18          MR. POLLACK:  Your Honor, is it all right if he

19  looks at the box?  We'd like to give him gloves and if it

20  falls, that would be an issue with that?

21  Q    The first question, Agent Gabay, is do you recognize that

22  box?  What is that box?

23  A    This is the evidence box that we use to put the narcotics

24  in.

25  Q    Can you recognize it by the markings on the box that it's

1   the same box that you used to package the drugs seized on

2   February 4, 2020?

3   A     The label on the top looks like my handwriting and --

4            THE COURT:  Can you all hear them?  Keep your voice

5   up really nice and loud because between the mask and no

6   microphone, we want to be sure to hear you.

7   A     Yes, looking at the chain of custody, this is the box.

8            MR. POLLACK:  At this time, Your Honor, the

9   Government offers Government Exhibit 1.

10           THE COURT:  Any questions for voir dire?  Any

11  objection?

12           MR. COHEN:  No objection, no.

13           THE COURT:  All right it's admitted.  And I'm sorry,

14  that was exhibit number?

15           MR. POLLACK:  Exhibit Number 1.

16           (Government Exhibit 1 received in evidence.)

17           MR. POLLACK:  Your Honor, may we publish this by

18  having Agent Gabay remove the contents of the box and placing

19  them on that table outside of the box.

20           THE COURT:  Yes.

21  Q     Can you tell us what that piece is?

22  A     That is the wrapping on the bricks.

23  Q     Who removed the wrapping to your knowledge?

24  A     This would be done at -- I believe the DEA lab did this.

25           THE COURT:  You have to speak a little bit louder

1   and you can move the --

2           Mr. Pollack, if you can move the microphone over

3   next to him.

4   A    This is the wrappings and the DEA lab would have

5   extracted the narcotics from these wrappings.

6   Q    Can you take out the context from the rest of the box?

7   A    This is more wrapping it appears.  The same thing that

8   would be done by the lab, the bags of cocaine in here that

9   were extracted from that by the lab.

10  Q    Are the bags individually wrapped inside the bag?

11  A    They do.  They look to be individually wrapped.

12  Q    Is it on the table?

13          MR. POLLACK:  At this time, Your Honor, the

14  Government offers the stipulation marked for identification as

15  Government Exhibit S-1.  S-1 admitted?

16          THE COURT:  Yes.

17          (Government Exhibit S-1 received in evidence.)

18          MR. POLLACK:  May we publish on the jury?

19          THE COURT:  Yes.

20          (Exhibit published.)

21          THE COURT:  Before you get started, just a reminder

22  to our jury that a stipulation is simply means that the

23  Government and the defendant have accepted the truth of a

24  particular proposition or fact and as there's no disagreement,

25  there's no need for evidence apart from the stipulation and

1   you must accept the stipulation as evidence and regard that

2   fact and give it whatever weight you choose.

3           You may continue, Mr. Pollack.

4           MR. POLLACK:  Thank you, Your Honor.  "It is hereby

5   stipulated and agreed by and between the parties that; one, on

6   or about February 6, 2020, the United States Department of

7   Justice Drug Enforcement Administration Northeast Laboratory

8   or 'the DEA lab' received box 1621252 from the Department of

9   Homeland Security, Homeland Security Investigations, John F.

10  Kennedy International Airport, or JFK, office.  Box 1621252

11  had an unbroken seal upon receipt by the DEA lab."

12          And we pause here to ask Special Agent Gabay, is

13  that box box 1621252.

14  A    Yes, there's a sticker on the side of it.

15          MR. POLLACK:  Continuing to read the stipulation

16  paragraph three, "Box 1621252 contains ten multilayered bricks

17  containing a white powder substance, box 1621252, at a gross

18  weight of 12.24 kilograms.  The contents of box 1621252 had a

19  net weight of 10.02 kilograms.  The contents of box 1621252

20  were analyzed at the DEA lab by forensics chemists trained for

21  such matters and in compliance with the standards and best

22  practices normally acceptable by experts in testing and

23  knowledge of controlling substances, testing conducted at the

24  DEA lab of the white powder substance present in box 1621252,

25  confirmed the presence of cocaine.  This stipulation marked as

1  Government Exhibit S-1 may be received in evidence as a
2  Government Exhibit at trial."
3  BY MR. POLLACK:
4  Q    Going back to February 4, 2021 after you did all the
5  things you testified about, was a decision made to formally
6  arrest the defendant?
7  A    Yes.
8  Q    Were photos taken of the defendant that night, Agent
9  Gabay?
10  A    Yes.
11         MR. POLLACK:  Your Honor, I would like, if I may,
12  show the witness the documents marked for identification as
13  Government Exhibits 211 and 212.
14         THE COURT:  Yes.
15     (Exhibit published to witness, counsel and Court only.)
16  BY MR. POLLACK:
17  Q    Do you recognize those images?
18  A    Yes.
19  Q    What are they?
20  A    They are photographs of Mr. Belloisi on February 4, 2020.
21         MR. POLLACK:  The Government offers Exhibits 211 and
22  212.
23         THE COURT:  Any objection?
24         MR. COHEN:  No.
25         THE COURT:  They are admitted.

1           (Government Exhibits 211 and 212 received in

2   evidence.)

3               MR. POLLACK:  Can we publish 211?

4               THE COURT:  Yes.

5           (Exhibit published.)

6               MR. POLLACK:  And can we put up 212?

7               THE COURT:  Yes.

8           (Exhibit published.)

9   BY MR. POLLACK:

10  Q    What happened after that?

11  A    After that he was -- after the decision was made to place

12  him under arrest, he was brought to court the following day on

13  February 5th to be arraigned on the charges and then he was

14  released on bond.

15              MR. POLLACK:  No further questions, Your Honor.

16              THE COURT:  You may inquire.

17  CROSS-EXAMINATION

18  BY MR. COHEN:

19  Q    Agent Gabay, if I ask you questions that are confusing or

20  not clear in some way, would you let me know so I can rephrase

21  them for you?

22  A    Sure, okay.

23  Q    You've been with Homeland Security for 23 years?

24  A    No, no.  17 with this agency and then I had prior time

25  with the New York City Police Department before that.

1    Q    And on February 4, 2020, your partner was Agent Maloney

2    at that point?

3    A    Yes.

4    Q    At that time how long had you been working with Agent

5    Maloney?

6    A    He was on the team when I got to it.  Under two years.

7    Q    Do you continue to work on a team with Agent Maloney?

8    A    No.

9    Q    On direct examination I believe you said you've done more

10   than 100 arrests for narcotics; is that right?

11   A    No, I believe I said that I've been involved in probably

12   over 100 narcotics investigations in my career.

13   Q    And if they're not arrests, what does it mean to be

14   involved in a narcotics investigation?

15   A    You can participate in any way.  They could be an

16   interview.  It could be -- it could be an arrest.  It could be

17   search warrant.  It could assist in investigations and in

18   many, many ways.

19   Q    Did you have an opportunity to interview a suspect who is

20   suspected of narcotics smuggling in the past?

21   A    Can you repeat that?

22   Q    Did you have an opportunity aside from Mr. Belloisi

23   accused of narcotics smuggling?

24   A    Yes.

25   Q    And how many times would you say you've done that?

1   A    I couldn't put a direct number.  Probably 50 or more, I

2   don't know.

3   Q    Out of those 50 or more, and I understand it's an

4   approximation, were they in any way similar in the

5   investigation of Mr. Belloisi --

6            THE COURT:  That is a very convoluted question.

7   Please rephrase.

8            MR. COHEN:  Sure.

9   BY MR. COHEN:

10  Q    On the night that you arrested Mr. Belloisi, did you

11  interview others who -- withdrawn.  You testified that you had

12  interviewed the pilot on the night you arrested Mr. Belloisi;

13  is that right?

14  A    Yes.

15  Q    Did you have any role in interviewing Mr. Belloisi's

16  manager?

17  A    No, I believe he was spoken to on the phone.  I don't

18  recall.

19  Q    Did you speak with anyone from American Airlines security

20  in connection with the arrest of Mr. Belloisi?

21  A    That night?

22  Q    At all.

23  A    I don't believe I spoke to anybody that night and I

24  don't -- sometimes we have to deal with American Airlines on

25  other cases too so I don't believe that I did but I don't

1   recall for this case.

2   Q    And who was the lead agent for the arrest of

3   Mr. Belloisi?

4   A    Agent Maloney.

5   Q    Were you with Agent Maloney in the course of the

6   investigation and arrest of Mr. Belloisi?

7   A    Yes, I was with him that evening.

8   Q    Were you involved in any of the note taking that happened

9   during the investigation with Mr. Belloisi?

10  A    No, I was not.

11  Q    Did you fill out any paperwork in response to the arrest

12  and investigation of Mr. Belloisi?

13  A    I probably filled out some chains of custody, I'm sure,

14  and I believe I filled out the information on the box.  It

15  looks like my handwriting.

16  Q    Did you fill out a case opening report?

17  A    I would have typed that into our system on the computer.

18  Q    The case opening report, does it contain any facts about

19  what happened during the course of the investigation?

20  A    It's basically a synopsis of how an investigation is

21  initiated and then once it's approved it generates a case

22  number related to that case.

23  Q    When you received the call that there was narcotics found

24  on an airplane, were you the one that contacted Agent Maloney?

25  A    Yes.

1    Q    Obviously you had an opportunity to meet up with Agent

2    Maloney sometime after you called him?

3    A    Yes.

4    Q    Where did you guys meet?

5    A    I believe we met at -- in a parking lot outside the

6    airport.

7    Q    Did you drive together to the tarmac?

8    A    Yes.  He got in my car.

9    Q    During the course of the surveillance, were the two of

10   you together?

11   A    Yes.

12   Q    And then once you got information that there was someone

13   in the E&E compartment, did you travel to the plane together?

14   A    We were in the car together and we traveled together once

15   we got word that the device was tripped, yes.

16   Q    Did you two of you go to the JNSU office together?

17   A    Yes, I believe he was in my car at the time.

18   Q    Was Mr. Belloisi in your car as well?

19   A    Yes.

20   Q    Was he handcuffed while he was in your car?

21   A    Yes.

22   Q    Was he arrested while he was handcuffed?

23   A    No, he was detained at that time.

24   Q    Did he have his phone on him when he was in the car and

25   in handcuffs?

1  A    I don't remember if he had a phone.

2  Q    Would it be your normal practice to keep their phone on

3  them?

4  A    He may have.  If he was being detained, he might have had

5  it at that point.

6  Q    And when you interviewed Mr. Belloisi in JNSU was anyone

7  else present in the room when you were speaking with him

8  besides you and Agent Maloney?

9  A    No, I don't believe so.

10  Q    How long were you speaking with Mr. Belloisi for?

11  A    I don't have a timeline.  I couldn't tell you how long.

12  It wasn't five minutes but I don't want to say exactly how

13  long it was.

14  Q    And approximately what time does he get to the JNSU

15  office?

16  A    I don't have any notes or a timeline.

17  Q    What's the difference between the case agent or the lead

18  agent and someone like yourself in an investigation like this?

19  A    The difference?

20  Q    Yes.

21  A    I'm assisting him with an investigation.  That's why

22  there's two of us on-call that night.  He's the duty agent.

23  He's going to be checking whatever comes in and I will be

24  assisting him.

25  Q    Does that mean that Agent Maloney is responsible for

1    taking notes during the investigation?

2    A    Not necessarily, but it depends on people's preference.

3    Q    And in this investigation was Agent Maloney the one that

4    was taking the notes?

5    A    Yes.

6    Q    Did you take any notes?

7    A    No.

8    Q    Are you prohibited from taking notes?

9    A    Prohibited, no.  But generally one agent takes notes.

10   Q    And Agent Maloney wrote the reports out for the arrest of

11   Mr. Belloisi?

12            THE COURT:  Asked and answered.

13   Q    Who swore out is the affidavit for the search warrant in

14   this case?

15   A    I don't have it in front of me.  I would think Agent

16   Maloney or I don't --

17            MR. POLLACK:  Objection.

18            THE COURT:  Sustained, sustained.  May I see counsel

19   at the side, please.

20            (Sidebar held outside of the hearing of the jury.)

21            (Continued on next page.)

22

23

24

25

1          (The following sidebar took place outside the

2     hearing of the jury.)

3          THE COURT:  What is the relevance of talking about a

4     search warrant?  There is absolutely no relevance.  I already

5     made a decision as to suppression in this case, so there is

6     absolutely no relevance here as to whether or not there's a

7     search warrant.

8          MR. COHEN:  Understood.

9          THE COURT:  So, move on.

10         MR. COHEN:  Understood.

11         THE COURT:  It's already clear that Maloney did the

12    reports.  So don't beat the dead horse, please.

13         (Sidebar ends.)

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. COHEN:  (Continuing.)

2          THE COURT:  Ladies and gentlemen, whether or not

3  there was a search warrant in this case is irrelevant to your

4  consideration of the evidence and at the end of the case I'm

5  going to be giving you instruction on the law that does apply

6  to the case that you can use to assess witness' credibility

7  and assess the evidence that's presented to you.

8          You may proceed, Mr. Cohen.

9  BY MR. COHEN:

10  Q    Officer Gabay, did Agent Maloney take notes while you

11  were speaking with the pilot together?

12  A    I would imagine he did.  I wasn't paying attention.

13  Q    Did you ever have the opportunity to review those notes?

14  A    No.

15  Q    Did you ever review any of the notes that Agent Maloney

16  has taken in this matter?

17  A    No.

18  Q    In the three-plus years since the investigation, you

19  never looked at any of the notes you took?

20  A    No.

21  Q    Is there a particular reason you didn't look at the case

22  agent's notes before testifying today?

23          THE COURT:  Move on, please.

24  BY MR. COHEN:

25  Q    When you and Agent Maloney were on the tarmac, were you

1   able to observe the plane?

2   A    Yes, when -- that depends on the question actually

3   because we were on the tarmac from when we left our office and

4   got on to when we -- the tarmac is a big area, so if you can

5   be more specific that would be appreciated.

6   Q    Sure.  When -- you said that someone told you -- a CBP

7   official told you through a window about what was going on at

8   the time, when you pulled up to that CBP official, were you

9   able to see the plane?

10  A    No, I don't believe we're in line of site of the plane.

11  I don't know where it was at that point.

12  Q    Is that where you were waiting up until the point that

13  you proceeded to go to the aircraft?

14  A    Yes.

15  Q    How long would you say you were there?

16  A    Like I said before, I don't remember exactly how long.

17  Maybe 30 minutes, 40 minutes.  I couldn't -- like I said, I

18  don't have a timeline with me so I really don't know for sure,

19  but it wasn't hours.

20  Q    So some of the events of that evening are not so easily

21  a --

22          THE COURT:  Commentary.

23  BY MR. COHEN:

24  Q    Why is it difficult to remember something that happened

25  three and a half years -- a little over three years ago when

1   you made an arrest in an international drug smuggling

2   conspiracy?

3   A    Is that a question?

4   Q    Yes.  Why is it difficult to remember something that

5   happened more than three years ago when it involved you

6   arresting somebody for an international drug smuggling

7   conspiracy?

8             MR. POLLACK:  Objection.

9             THE COURT:  Sustained.

10  BY MR. COHEN:

11  Q    As to whatever time it took for you waiting on the tarmac

12  before driving to the plane, when you ultimately got to the

13  plane with Agent Maloney, were there other CBP officers

14  already there?

15  A    Yes.

16  Q    And when you got to the plane and there were other CBP

17  officers already there, was Mr. Belloisi with those CBP

18  officers?

19  A    Yes.

20  Q    And how many CBP officers were around Mr. Belloisi when

21  you got to the plane with Agent Maloney?

22  A    I don't have an exact number.  Maybe ten.  I'm not sure

23  of the exact amount.

24  Q    AND when you got to the plane and saw Mr. Belloisi with

25  approximately ten CBP officers, what did you do?

1  A    I believe we were standing and kind of letting them do

2  their thing.  They were speaking to him.

3  Q    And at some point you testified that you saw a tug;

4  right?

5  A    Yes.

6  Q    And in that tug was a tool bag that we saw on direct

7  examination; is that right?

8  A    Yes.

9  Q    Were you the one who noticed the tool bag in the tug?

10 A    I don't know if CBP showed it to us or who had noticed it

11 first.

12 Q    But at some point did you see that tool bag in the tug?

13 A    Yes.

14      THE COURT:  Asked and answered.

15 BY MR. COHEN:

16 Q    We saw a photo, Government Exhibit 205, in evidence of

17 that tool bag.  Did you take that photo?

18 A    No, I did not.

19 Q    Do you know who took that photo?

20 A    Agent Maloney took the photograph.

21 Q    Did you believe that that tool bag was of some value or

22 importance in your investigation?

23 A    That's why we took a picture of it, yes.

24 Q    Now, we saw a whole bunch of Mr. Belloisi's property that

25 was vouchered as evidence in connection with this

1   investigation.  Do you remember seeing that property?

2   A    Yes.

3   Q    Was that tool bag vouchered into evidence?

4   A    No it was not.

5   Q    Is there a particular reason it wasn't?

6   A    At the time it was discovered we felt it was important to

7   take a picture of it, but we didn't take it at that time.

8   Q    And is there a reason that you didn't take it at the

9   time?

10  A    Like I said we felt it was important enough to take a

11  picture of it, but not to seize as evidence at the time.  I

12  wish we had in hindsight.

13  Q    And why did you think it was important at the time?

14  A    Under the circumstances, it was in the tug of the

15  individual that arrived at the plane and was in the avionics

16  compartment.  So, personally I thought it could have been used

17  to put narcotics in.

18  Q    When you said it was in the avionics compartment, did you

19  mean the tool bag or the person who you believe had the tool

20  bag was in the avionics compartment?

21  A    No, Mr. Belloisi had been in there.

22  Q    When you got to the plane you knew that Mr. Belloisi had

23  been in the avionics compartment; is that right?

24  A    When we got to the plane, we had been told that the

25  device had tripped before that and we spoke to CBP officers on

1   the tarmac, yes.  I believe --

2   Q    My question was Agent Gabay, excuse me, I'll repeat it.

3   When you got to the plane and spoke to CBP officials, was it

4   your understanding that Mr. Belloisi had been in the avionics

5   compartment?

6   A    Yes, that he was -- I don't know exactly what's

7   considered -- is it as soon as you get in there?  Is it the

8   avionics compartment -- I'm not a mechanic, but, yes, we --

9   Q    Was it your understanding when you got to the plane and

10  spoke to the CBP officers that Mr. Belloisi was in the area of

11  the plane where the drugs were found?

12  A    Yes.

13  Q    And it was your belief that -- with drawn.

14          And was it your understanding that that tool bag was

15  also in the compartment where the drugs were found on the

16  plane?

17  A    No.

18  Q    Was it your understanding that the tool bag was not in

19  the compartment where --

20          THE COURT:  Same question, move on.

21  BY MR. COHEN:

22  Q    Did you have any understanding of whether that tool bag

23  ever went onto the plane?

24  A    No.

25  Q    Was it your belief that that tool bag somehow would have

1   been related to the transportation of the narcotics?  Is that

2   why you took a photo of it?

3   A    Yes.

4   Q    Besides taking a photo of it did you measure how big the

5   tool bag was?

6   A    No, I didn't measure it.

7   Q    Did anybody measure the tool bag to your knowledge?

8   A    No.

9   Q    Do you know how big one kilo of cocaine is and by that I

10  mean the physical size, not the amount that it weighs?

11  A    Approximately.

12  Q    How big is that?

13  A    I couldn't tell the measurement.  I guess it depends on

14  the wrapping.

15  Q    Well, you described the wrapping today.  Do you remember

16  describing it on direct examination?

17  A    I said the wrapping was in that bag, yes.  So there was

18  initially ten separate --

19          THE COURT:  Okay, do you want to stop testifying,

20  please, and ask a question?

21  BY MR. COHEN:

22  Q    Was it your understanding that there were -- how many

23  separate kilos of cocaine was it your understanding were found

24  inside the airplane?

25  A    Ten.

1   Q    What was your understanding about how they were packaged

2   and by that I mean individually or together?

3   A    Individually.

4   Q    You previously held up the government's -- the big bag

5   with all of the cocaine in it.  Do you remember holding that?

6   A    Yes.

7   Q    Is that how the kilos looked when they were taken back to

8   the JNSU office?

9   A    Like that, no.

10  Q    Can you describe how the cocaine was wrapped when it was

11  taken to the JNSU office?

12  A    At that point I didn't see it until we got back to the

13  JNSU office.  So I can't describe how it was then, but back at

14  the JNSU office it was wrapped in dark plastic, like in a bag.

15  I didn't look at the inner wrappings of it, but I'm sure it

16  was wrapped several times.

17  Q    To the best of your knowledge, the wrapping on each

18  individual kilo of cocaine are now contained in the

19  Government's Exhibit 1 and it was shown to the jury before; is

20  that correct?

21          THE COURT:  Asked and answered.

22  BY MR. COHEN:

23  Q    Were you ever told by anyone that Mr. Belloisi was

24  carrying that empty tool bag that you described before?

25  A    No.

1    Q    Now, while you were on the tarmac, what are you and Agent

2    Maloney doing while CBP is speaking to Mr. Belloisi?

3    A    We were standing on the tarmac.

4    Q    Were they the ones conducting the investigation of

5    Mr. Belloisi at that moment while you were on the tarmac on

6    the plane?

7    A    Yes, they were speaking to him at that time.

8    Q    And were they occasionally giving you or reporting back

9    to you some of the things that Mr. Belloisi was telling them?

10   A    Yes, we were getting some information during the course

11   of he -- on the tarmac from CBP, yes.

12   Q    And somebody from CBP told you that the guy that came out

13   of the bay where the narcotics was found was the person he was

14   speaking with?

15            THE COURT:  That has been gone over already.  Can

16   you move on, please?

17   BY MR. COHEN:

18   Q    When did you receive the information that somebody in the

19   avionics compartment in the bay where the narcotics were found

20   was speaking with CBP?  How long were you at the tarmac before

21   you found out?

22            THE COURT:  That is multiple questions.

23   BY MR. COHEN:

24   Q    How long were you at the tarmac before you found out that

25   the person that they were speaking to was the person in the

1  avionics compartment?

2  A    Like I said before, can you be more specific when you say

3  on the tarmac?

4  Q    Certainly.  Any question I ask you now will be when you

5  are on the tarmac at the plane.

6           When you are at the tarmac at the plane how long

7  were you there for before somebody told you that the person

8  they were speaking to was the person who was found coming out

9  of the avionics compartment?

10 A    I believe when we exited the vehicle and were able to see

11 Mr. Belloisi speaking to CBP officers that were there, I don't

12 know if somebody exactly told us, when they told us, but I

13 think it was inferred that that was him.  I don't remember

14 someone saying that's him, but --

15 Q    And at some point did a CBP official and I believe you

16 can't testify to this on direct, but at some point when you

17 were on the tarmac at the plane, a CBP official told you that

18 Mr. Belloisi told them that there was a problem with the air

19 conditioning; is that right?

20 A    Yeah, I believe that's why he told them that he was in

21 the avionics compartment.

22 Q    And do you know, Agent Gabay, how long you were at the

23 tarmac at the plane before you received that information?

24 A    I couldn't say for sure.

25 Q    Is that because it was a long time ago so it's hard to

1  remember?

2  A    Yes.

3  Q    And how long, Agent Gabay, were you at the tarmac at the

4  airplane before you went up to speak to the pilot?

5  A    Again, I'm not really sure of the exact time frame.  I

6  don't want to put ten minutes or 15.  I don't know for sure.

7  Q    And again that's simply because of the time that's

8  elapsed between then and now?  Is that the reason why?

9  A    I don't know if a month later if I would be able to tell

10 you the exact date without having something in front of me,

11 the exact timeline.

12 Q    Have you ever had a chance to watch the video about the

13 CBP officers around the airplane and Mr. Belloisi at the

14 tarmac on February 4, 2020?

15 A    No, I don't believe I reviewed any of the video of that.

16 Q    You do know that one exists; is that right?

17          THE COURT:  That's not a question.

18 Q    Do you know if one exists?

19 A    I believe that one exists, yes.

20 Q    Do you believe it or do you know it?

21 A    Yes.  Yes, I believe that one does exist.  I believe

22 there is video.  I haven't reviewed it though.

23 Q    And how do you know that there is video?

24 A    Just from interacting in the office with Agent Maloney, I

25 believe he went to get video.  It would be common practice.

1    Q    And do you know when Agent Maloney got to get the video?

2              MR. POLLACK:  Objection.

3              THE COURT:  Sustained.

4              MR. COHEN:  Your Honor can we have a sidebar?

5              THE COURT:  Assuming facts not in evidence.

6    Sustained.  Next question.

7    BY MR. COHEN:

8    Q    Why is it common practice to get surveillance video when

9    you're making an arrest of an international drug smuggler at

10   John F. Kennedy Airport?

11   A    It would be common practice to get the video to see when

12   the individual arrived and what you can see from the video on

13   the tarmac of the incident.

14   Q    When you're speaking to CBP officers, did they ever tell

15   you anything about Mr. Belloisi driving around the tarmac

16   prior to being arrested?

17             MR. POLLACK:  Objection.

18             THE COURT:  Sustained.

19   BY MR. COHEN:

20   Q    When you were speaking to CBP officers by the airplane or

21   at any time thereafter, did they ever tell you that they saw

22   Mr. Belloisi in the hours preceding his arrest at the time?

23             MR. POLLACK:  Objection.

24             THE COURT:  Sustained.

25             (Continued on the following page.)

1   CROSS EXAMINATION

2   BY MR. COHEN: (Continuing.)

3   Q     Do you have any understanding whether the surveillance

4   that CBP officials did of Mr. Belloisi or of the Tarmac in the

5   hours proceeding his arrest?

6   A     Before his arrest?

7   Q     Correct.

8   A     No.

9   Q     Did you speak with any CBP officer about their

10  surveillance prior to Mr. Belloisi being arrested?

11  A     No.

12  Q     And my question was not did you speak to them before he

13  was arrested, but did you speak to them afterwards about what

14  they were observing beforehand?

15  A     I didn't, no.

16  Q     Do you remember the aircraft crew you spoke to when you

17  went on the airplane?

18  A     The aircraft crew?

19  Q     Yes.

20  A     I don't remember speaking -- I don't remember -- you mean

21  the pilot?

22  Q     Or anyone else.  The pilot inclusive of the aircraft

23  crew.

24  A     I think the only person we spoke to was the pilot and

25  might be the co-pilot.  I think the pilot, though, definitely.

1    Q     And you spoke with them on the flight deck -- withdrawn.

2          Did you speak with them -- where did you speak with

3    him?

4          THE COURT:  Which question do you want him to

5    answer?  There are, like, three or four different questions.

6          MR. COHEN:  I'm just going to ask the proper one.

7    Q     Where did you speak with the pilot when you went onto the

8    airplane?

9          THE COURT:  Did you speak directly to the pilot?

10         THE WITNESS:  I was with Agent Moloney yes, we spoke

11   to the pilot.

12         THE COURT:  The question is whether you spoke

13   directly to the pilot or did Agent Moloney speak to the pilot?

14         THE WITNESS:  I believe I was next to him.  I don't

15   know if I said anything or he was the only one speaking, I --

16   I don't.

17   Q     Okay.  And where was that conversation?

18   A     I believe we walked up the stairs.  I don't know exactly

19   where it was but it was up the stairs by -- like, we're on the

20   Tarmac, so the plane is raised up.  I know we walked up the

21   stairs.  I don't remember how far into the plane or if we were

22   inside the plane or if it was just outside when we spoke to

23   him.

24   Q     When you say the stairs, which stairs are you talking

25   about?

1   A      I think we walked up -- I'm trying to remember.  Like,

2   the outside stairs to the jet bridge area, I believe.  That's

3   how you would get to the plane.

4   Q      And what was the purpose of going to speak to the pilot

5   on the plane?

6   A      To see if there were any issues with the plane.

7   Q      Did you believe that it was plausible that somebody could

8   be in the avionics compartment to fix an air-conditioning

9   issue?

10  A      Yes, at the time.

11  Q      Was the information you were trying to obtain from the

12  pilot important to your investigation?

13  A      Yes.

14  Q      And why was that information important to your

15  investigation, sir?

16  A      About the plane, about the problems -- any problems with

17  the plane, mechanical problems?

18  Q      Correct.

19  A      Because -- because Mr. Belloisi, we had thought was there

20  to fix the air-conditioning, and in the avionics, we wanted to

21  see if there was, in fact, any documented issues with the

22  aircraft.

23  Q      When you say documented issues, what do you mean by that,

24  sir?

25  A      Well, the -- if the pilot knew of any problems with the

1   aircraft's air-conditioning that would warrant Mr. Belloisi to
2   be there to fix it.
3   Q    And did you ask the pilot about any air-conditioning
4   issues?
5   A    I believe we asked if there were any problems with,
6   specifically, air-conditioning, we may have.
7   Q    So it's not -- are you saying that you're unsure if you
8   asked about the air-conditioning or -- is that what you're
9   saying?  So I can get an understanding exactly.
10  A    I can't remember the exact questions we asked him, but we
11  asked about mechanic issues with the plane.  I believe we
12  asked him about the air-conditioning specifically because I
13  think we knew that at that time.
14  Q    But you're uncertain, is that what you're saying when
15  you're saying I think?
16  A    I'm fairly certain we asked about the air-conditioning at
17  that time.
18  Q    And what did the pilot tell you about that?
19           MR. POLLACK:  Objection.
20           THE COURT:  Sustained.
21  Q    What did you learn from speaking with the pilot?
22           THE COURT:  Sustained.
23  Q    Did you discuss alarms in the cockpit with the pilot?
24           MR. POLLACK:  Objection.
25           THE COURT:  Did you ask the pilot any questions

1   about alarms in the cockpit?

2           THE WITNESS:  I don't remember, specifically, asking

3   about alarms.

4   Q    Did you ask the pilot any questions about warning lights

5   in the cockpit?

6   A    Again, I don't remember, specifically, asking about

7   warning lights in the cockpit.

8   Q    And when you say that, are you saying you don't remember

9   if you did or if Agent Moloney did or are you speaking for the

10  both of you now?

11  A    I don't have any notes from -- from that, so I don't

12  remember exactly what was -- what was said about, verbatim.  I

13  can't remember.

14  Q    Do you remember, generally, if you don't remember

15  verbatim?

16          THE COURT:  Move on.  Move on.

17  Q    Do you know when Agent Moloney wrote his notes about what

18  he discussed with the pilot in the cockpit?

19          THE COURT:  Sustained as to form.  Rephrase it,

20  please.

21  Q    Did you testify earlier --

22          THE COURT:  Do you know when Agent Moloney wrote the

23  reports?

24          THE WITNESS:  The reports?

25          THE COURT:  The reports, any reports or notes in

1  this case.

2          THE WITNESS:  Notes, he would be taking while --

3  while we were getting information.  Reports would be written

4  at a later time.

5          THE COURT:  Okay.

6          Move on.

7  Q    So any notes with the pilot would have been taken while

8  you were in the cockpit?

9  A    I would think so.  I wasn't -- like I said before, I

10 wasn't watching Agent Moloney, but if -- I would take notes

11 while I was talking to somebody.

12 Q    Do you recall how long you were in the cockpit

13 questioning the pilot?

14 A    A few minutes.  I don't think it was longer than that.

15 Q    Five minutes or less; is that fair to say?

16 A    Without a time line, it's hard for me to say exactly.

17 Q    And I understand you haven't taken any notes or filled

18 out the reports, but do you know if Agent Moloney created a

19 timeline of the events --

20         MR. POLLACK:  Objection.

21         THE COURT:  Sustained.  Move on, please.

22 Q    Were any questions asked to the pilot about how long he

23 had been on the plane when you went to speak with the pilot in

24 the cockpit?

25 A    Again, I don't remember.  I don't have that information

1  in front of me.

2  Q    Is there something you believe that would refresh your

3  recollection?

4  A    I had notes.

5  Q    But you don't have any, right?

6  A    No.

7  Q    Is there anything that does exist that you believe would

8  refresh your recollection?

9  A    Agent Moloney may have notes of that, I -- I haven't read

10  them.  I just -- I don't know if he has --

11  Q    Okay.  Agent Gabay, you and I have engaged in this one

12  time before, right, this question-and-answer that we're doing

13  today?

14        THE COURT:  Would you please stop that.  No.

15  Q    Have we ever met before, Agent Gabay?

16  A    Yes, a couple of times.

17  Q    And when was that?

18  A    Last year --

19        THE COURT:  Excuse me, can I see counsel at the

20  side, please.

21        (Continued on the next page.)

22        (Sidebar conference.)

23

24

25

1    (The following occurred at sidebar.)

2    THE COURT:  This conversation like that is

3 inappropriate and don't do it, period.  Secondly, if you're

4 going to ask him questions about the hearing, that's

5 another -- that's something else.  Just go directly to the

6 question.

7    MR. COHEN:  My question is have we ever met before,

8 have we ever talked before, under what circumstances did those

9 things happen.  That's what I want to ask him.

10    THE COURT:  But this whole exchange about have we

11 talked like this at another -- like this before, that's not

12 appropriate.

13    MR. COHEN:  Okay.  I --

14    THE COURT:  He didn't testify at the hearing, did

15 he?

16    MS. SCHIERBERL:  He did, Your Honor.

17    THE COURT:  Okay.  So then just get to the heart of

18 it and stop pussyfooting around.

19    MR. COHEN:  It's not just the hearing that I want to

20 ask him about.  I want to ask him about things outside the

21 hearing and I want to show that we have never had a

22 conversation outside of the courtroom.  He says we'd met on

23 multiple occasions.  I don't believe that's, in fact, true.

24 So I want to ask him when were those multiple occasions, when

25 did that happen, what were the circumstances.

1    THE COURT:  How is that relevant?

2    MR. COHEN:  About how many times he's spoken with me

3  versus how many times he's met with the prosecutors and under

4  what circumstances, I think that's extremely relevant to show

5  that we have no connection to him, we don't have any

6  interactions, outside of court, and he has those interactions

7  outside of court with the government.  I believe that that is

8  relevant.

9    THE COURT:  Well, first of all, with respect to any

10  of his testimony at the hearing, unless you're going to

11  discuss any purported prior inconsistent statement question

12  about the hearing is not relevant and not appropriate.  So

13  that's the first thing.

14    You can ask him one question:  Have you and I

15  discussed this case directly.

16    MR. COHEN:  I'm sorry, I don't know if I follow your

17  ruling, Your Honor.  Am I not allowed --

18    THE COURT:  Well, because you've gone way afoul of

19  my rulings already all day.  And stop it with the facial

20  expressions.

21    MR. COHEN:  Your Honor, I have a mask on.  I'm not

22  making any facial expressions.

23    THE COURT:  I'm not talking about right now.  I'm

24  talking about when you're questioning the witness.  Whether

25  you're doing it unconsciously, subconsciously, or whatever,

1  rein it in.

2         MR. COHEN:  Okay, Your Honor.  First off, I'm doing

3  something subconsciously --

4         THE COURT:  There's a smirk that you get on your

5  face when I make my rulings.

6         MR. COHEN:  Your Honor, this is the face that I

7  have.  I'm not changing it when you make your rulings.  I'm

8  sorry if you think that I'm being snarky.  I apologize in

9  advance and for the past.  I'm not doing it.

10         THE COURT:  Your colleague didn't do it.

11         MR. COHEN:  Well, he has a different face than me,

12  Your Honor.  We have different mannerisms.  We have different

13  emotions.

14         THE COURT:  We're wasting time here.  Now, I suggest

15  that you get moving with this witness and get to the heart of

16  matters.  Your preambles and your introductory commentary has

17  to stop.

18         MR. COHEN:  Your Honor, since this is the first time

19  we've been able to speak outside of the presence of the jury

20  --

21         THE COURT:  No, we've had a number of sidebars.

22         MR. COHEN:  I mean since Agent Gabay has been on the

23  witness stand, I have tried to ask Agent Gabay about

24  information that other witnesses have testified that they have

25  given --

1      THE COURT:  That's hearsay.  It's hearsay.

2      MR. COHEN:  They have testified that they had gave

3  information to him.

4      THE COURT:  But those witnesses testified as to what

5  they said and they did.  You are trying to elicit rank

6  hearsay, and quite frankly, there's already been enough

7  hearsay that's been elicited between the government's

8  questions and the defense.  Nobody has objected and I've let

9  it go, but it's going far afield here.

10     MR. COHEN:  Your Honor, I believe that I have the --

11     THE COURT:  It's enough, okay?  It's enough.

12 Enough.  You're trying to elicit hearsay.  It is not

13 permitted.  Move on, please.

14     MR. COHEN:  Okay.  My last point while we're at the

15 sidebar, Your Honor, is that when another witness testifies

16 about a material fact that was told to other law enforcement

17 agents who are now testifying, I believe I have the right to

18 confront that law enforcement agency -- agent who was the

19 listener to that statement to ask him if that fact was

20 actually conveyed to him at that time, and I believe the Court

21 has prevented me from doing that.

22     THE COURT:  You were eliciting rank hearsay, period.

23 Period.  You can ask this witness, well, did you have a

24 conversation with so and so; yes; based on that, what did you

25 do.  That is the proper question to ask.

1      MR. COHEN:  I believe on cross-examination I can go
2  further than that, Your Honor.
3      THE COURT:  No.  You have some leeway, but I also
4  have the right to curtail it if you're eliciting improper
5  information.
6      MR. COHEN:  Your Honor, this is your courtroom and I
7  know you can -- it's your rules.  I just need to make a record
8  because I respectfully disagree with you on it.  Not -- not at
9  your right to do it, you can do anything that you want, but in
10 appearance rulings on the law, so I needed to make a record.
11     THE COURT:  You need to move on, okay?  You have
12 already elicited what you are saying you wanted to elicit and
13 you've done it, so move on.
14     MR. COHEN:  Okay.  But for the record, Your Honor, I
15 have not elicited what I want to elicit.  I've been prevented
16 from doing that.
17     THE COURT:  Well, I know you haven't finished with
18 this witness, but there's a certain amount that you're going
19 down the wrong path.
20          (End of sidebar conference.)
21          (Continued on the next page.)
22
23
24
25

1          (In open court; jury present.)

2          THE COURT:  You know what, it's almost 2:00 o'clock.

3   I think about five minutes to 2:00, so we're going to end

4   here.

5          And, Agent Gabay, we're going to ask you to come

6   back tomorrow --

7          THE WITNESS:  Okay.

8          THE COURT:  -- at 9:30 to resume.  We will start

9   with cross-examination.  Again, because you're on

10  cross-examination, you cannot discuss your testimony with the

11  government, you can certainly discuss scheduling, but not your

12  testimony.

13         And, ladies and gentlemen of the jury, we're going

14  to have you come back tomorrow at 9:30.  I hope you have

15  better luck with the trains and transportation tomorrow.  We

16  know it's a daily challenge.  I remind you to please not talk

17  about this case among yourselves or with anyone else or any

18  kind of media, whether it's electronic, in person, the phone,

19  whatever.  Remember, please, to keep an open mind and not to

20  form any opinion about the guilt or nonguilt of the defendant

21  on trial until such time as you've heard all of the evidence,

22  all of the evidence has been presented, and you've been

23  instructed on the law by me and you've had an opportunity to

24  deliberate with your fellow jurors.  Remember that you cannot

25  read or listen to or view anything at all about this case over

1  any kind of media and you cannot conduct any research or

2  investigation about this case over -- or any matter concerning

3  this case on your own over any kind of media.

4        Again, I encourage you, you know, bring snacks with

5  you and so on for the breaks.  And I am expecting to have a

6  full day tomorrow, so you can plan on that for tomorrow.  So

7  be careful out there, get home safely, enjoy the rest of the

8  day, and we will see you tomorrow.

9        THE COURTROOM DEPUTY:  All rise.

10       THE COURT:  All rise.  Jury is exiting.

11       (Jury exits the courtroom.)

12       THE COURT:  And, Agent Gabay, see you tomorrow at

13 9:30.  You're excused.  Thank you.

14       THE WITNESS:  Thank you, Your Honor.

15       (The witness steps down.)

16       THE COURT:  And the parties can have a seat.

17 Everyone can have a seat.

18       In addition to finishing with Agent Gabay, who else

19 do you have for tomorrow?

20       MR. POLLACK:  Your Honor, we have two witnesses

21 after Agent Gabay.  Those are Michael Guarnieri, spelled

22 G-U-A-R-N-I-E-R-A, and Darryl Valinchus.

23       THE COURT:  Is there going to be enough to take us

24 through tomorrow?

25       MR. POLLACK:  Your Honor, I hesitate to make

1  predictions in light of the fact we've already taken more time

2  than anticipated.  It's certainly more than enough time than

3  the government needs and we could rest tomorrow depending on

4  the length of cross.

5              THE COURT:  Yeah.  So, Guarnieri and --

6              MR. POLLACK:  Valinchus with a C-H.

7              THE COURT:  Valinchus, okay.

8              I know you have the opportunity to decide until the

9  very end, but do you expect to put on a defense case?

10             MR. COHEN:  I expect that we may need to put on a

11  rebuttal depending on how the rest of Agent Gabay's statement

12  testimony goes.  We are still seeking to find if we have a

13  rebuttal witness that we're looking for.  I will certainly let

14  you know as soon as we know, but I do believe we will be,

15  Your Honor.

16             THE COURT:  I am not adjourning this trial for to

17  you look for a witness.  You've known about the date of this

18  trial for a very long time.

19             MR. COHEN:  We just weren't sure until testimony

20  whether we would need a rebuttal case.

21             THE COURT:  I understand, but you line people up in

22  the eventuality.

23             So Agent Moloney is not testifying?

24             MR. POLLACK:  Agent Moloney is not testifying.  Of

25  course, if the defense --

1      THE COURT:  It's not up to me.  I'm just verifying

2  who we're going to have.  I want to plan it out for tomorrow

3  so that we know what the next steps are.

4      MR. POLLACK:  I understand, Your Honor.  I only

5  wanted to say that if in the event that there's a defense

6  case, we may or may not want to call Agent Moloney on our

7  rebuttal case but not on our Case in Chief.

8      THE COURT:  Right.  Well, if you're going to put on

9  a rebuttal case, you're going to have to be prepared to put it

10  on tomorrow because you've had plenty of time to prepare this

11  case, months and months of time.  And I suggest that you take

12  this time to review your questions and word them

13  appropriately.  I don't like to interrupt counsel, I really

14  don't.

15      So the parties should be prepared, potentially, for

16  a charge conference I suppose.  If today is any indication,

17  given that these were extremely brief witnesses for the

18  government and it took pretty much the whole day, it probably

19  will take us at least to a good chunk of the day.

20      (Continued on the following page.)

21

22

23

24

25

1  (continuing)

2         THE COURT:  So either we will have a charge

3  conference tomorrow afternoon or Friday and we will set a time

4  for that.

5         Anything else that you want to raise?

6         Just make sure you take all of your evidence back

7  with you.

8         MR. POLLACK:  No, Your Honor.

9         MR. SIMPSON:  Your Honor, I did want to raise

10  something in the interest of economy.

11         THE COURT:  Yes, sir.

12         MR. SIMPSON:  With regard to the Government witness

13  who will be testifying tomorrow, Michael Guarnieri, on a

14  defense exhibit -- it's Exhibit D-1 and D-1A that we intend to

15  show that witness.  I understand from talking with the

16  Government they do not have an objection to authenticity; they

17  have an objection with respect to relevance.  And I thought

18  rather than waylaying the Court with a long sidebar about that

19  tomorrow, perhaps we should have that discussion now.

20         THE COURT:  D-1 and D-1A.

21         This is some sort of an express -- D-1.  I have D-1.

22         MR. SIMPSON:  Take mine.

23         THE COURT:  There is a D-1 only here in the copies

24  that the Court received.

25         I only have D-1.

1          MR. SIMPSON:  I gave it to your deputy yesterday.

2          THE COURT:  So what am I looking at?

3          MR. SIMPSON:  Judge, so this is -- the Government I

4    believe is going to be introducing --

5          THE COURT:  I'm sorry.  What's the Government's

6    objection to this?

7          MR. POLLACK:  So the Government is planning to offer

8    a shorter version of the same document that includes

9    information about the flight immediately before and

10   immediately after the events in question.  This document,

11   which comes from discovery, so we don't dispute the

12   authenticity -- this document, which we produced in discovery,

13   it is an American Airlines document, so we don't challenge the

14   authenticity; it just contains much more detail about many

15   more flights of the same airplane both before and after.

16         THE COURT:  Why is all of that information

17   necessary?

18         MR. SIMPSON:  I will explain, Judge.

19         The reason why we believe it is necessary, the most

20   important reason is because of the importation charges, right.

21         We are not -- we are not -- may I explain?  I will

22   explain to you, Your Honor.  Obviously, it's an element of the

23   crime that in order to convict the defendant of importation of

24   narcotics or conspiracy to import narcotics the Government

25   must prove beyond a reasonable doubt that the defendant knew

1   or intended that the narcotics would be imported into the

2   United States.

3             THE COURT:  Right.  And we are talking about

4   specific narcotics from a specific plane and a specific date

5   and time.

6             MR. SIMPSON:  Correct, Judge, but --

7             THE COURT:  We're not talking about every possible

8   flight that might have come into the airport that might have

9   had marijuana or even other kinds of contraband, like I've

10  had, you know, Gold Finches from Guyana.

11            MR. SIMPSON:  Judge, I understand that.

12            THE COURT:  Or monkey meat from Africa.

13            MR. SIMPSON:  I understand that, Judge.

14            However, in this case, the way that the evidence is

15  coming in, right, there is no named co-conspirator.  They are

16  going to put in a lot of information about an unnamed

17  co-conspirator who has a moniker.  There's not going to be any

18  communication evidence that says it's coming in on this

19  flight, it's coming in from this country.

20            We believe that there will be a reasonable view of

21  the evidence for the jury at the end of the case -- we don't

22  intend to make this argument, but we believe there will be a

23  reasonable view of the evidence where the jury may be

24  convinced beyond a reasonable doubt that the defendant is

25  guilty of conspiracy to possess with the intent to traffic the

1  cocaine but the evidence has not proved beyond a reasonable

2  doubt that he knew or intended that cocaine was coming from

3  outside the United States.

4          THE COURT:  But --

5          MR. SIMPSON:  And that's why this document is

6  relevant, Judge.  The cocaine -- the jury could find that it

7  hasn't been proven beyond a reasonable doubt that he knew it

8  came from the flight that immediately proceeded it.

9          This material could have been on the flight, could

10  have been put on four or five or six flights earlier.

11          They're saying that a co-conspirator essentially

12  directed him when it was time to go and take these narcotics

13  from that plane.

14          There's not evidence that this plane just came in

15  from Jamaica, you need to get those off of the flight from

16  Jamaica.

17          It could have been just directing Mr. Belloisi to

18  any plane.  It could have been a domestic flight.  It's not

19  necessarily international.

20          And we believe there's going to be a reasonable view

21  of the evidence at the end where the jury might find one of

22  the charges are proven beyond a reasonable doubt, but the

23  others not.

24          And that is the relevance of this document because

25  there are numerous domestic flights that that airplane took in

1   the two and three days before.  And if the cocaine was put on

2   in one of those U.S. cities and if that was the defendant's

3   understanding, that that was where the cocaine was put on, he

4   was simply taking it off at JFK, but it came from Charlotte or

5   it came from Texas, that would not be importation of cocaine,

6   and the jury has to be able to see that and evaluate --

7              THE COURT:  That is ridiculous.

8              MR. SIMPSON:  Judge, it isn't, because there's not --

9              THE COURT:  Let me let the Government address that.

10             MR. POLLACK:  Yes, Your Honor.

11             There is testimony already in this case that part of

12  the reason why this particular flight was targeted is because

13  it came from Montego Bay, Jamaica, which is known as a transit

14  country.  There was testimony about the difference between

15  source countries and transit countries.

16             There is no evidence in this case, and it's hard to

17  imagine there even being conceivable evidence that cocaine

18  will be put on an airplane domestically in order to leave the

19  United States prior to its arrival in Montego Bay to then

20  return to New York City.  I think that is an implausible

21  suggestion.

22             And the fact that there already is evidence in the

23  case and there will be more through another witness, that this

24  flight arrived in New York City from Montego Bay, Jamaica is

25  more than sufficient to find beyond a reasonable doubt that

1    the cocaine was imported into the United States.

2            And I believe there is even testimony from Officer

3    Robinson that they only searched international incoming

4    flights.  They can't search domestic flights.

5            MR. SIMPSON:  Judge, respectfully the issue, though,

6    is the element of whether he knew, whether he knew that it was

7    coming from outside the United States.

8            THE COURT:  No.  You're not going into all of these

9    different flights that occurred over several periods of days.

10   No.

11           All right.  I will see everybody tomorrow at 9:30.

12           (Matter adjourned to April 27, 2023 at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **I N D E X**

2

3  **WITNESS**                                    **PAGE**

4  RANDALL LERUTH

5       DIRECT EXAMINATION BY MS. SCHIERBERL         240

6       CROSS-EXAMINATION BY MR. COHEN               257

7  PHILIP GUERRA

8       DIRECT EXAMINATION  BY MS. SCHIERBERL        309

9       CROSS EXAMINATION BY MR. SIMPSON             321

10 SEAN GABAY

11      DIRECT EXAMINATION BY MR. POLLACK            345

12      CROSS-EXAMINATION BY MR. COHEN               370

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **E X H I B I T S**

2

Government's Exhibit 101                              248

Defense Exhibits A-2, A-3, A-6, A-7, A-9,
A-10                                                 285

Government Exhibit 103                               316

Government's Exhibit 205                             355

Government's Exhibit 205A                            357

Government's Exhibits 207, 208, 209, and 210         359

Government's Exhibits 3 and 5                        362

Government Exhibit 1                                 366

Government Exhibit S-1                               367

Government Exhibits 211 and 212                      370