1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - -    X
3
   UNITED STATES OF AMERICA,    :    20-CR-219(DLI)(RLM)
4
5       -against-              :    United States Courthouse
                                    Brooklyn, New York
6
   PAUL BELLOISI,              :
7                                   April 27, 2023, Thursday
           Defendant.         :    9:30 o'clock a.m.
8
   - - - - - - - - - - - -    X
9

10              TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE DORA L. IRIZARRY
11             UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Government:        BREON PEACE
                               United States Attorney
14                             BY: ROBERT M. POLLACK
                                   MARGARET SCHIERBERL
15                                 FRANCISCO J. NAVARRO
                               Assistant United States Attorneys
16                             271 Cadman Plaza East
                               Brooklyn, New York
17

18  For the Defendant:         COHEN & FORMAN, LLP
                               950 Third Avenue, 10th Floor
19                             New York, NY 10022

20                             BY: DAVID J. COHEN, ESQ.
                                   BENJAMIN L. SIMPSON, ESQ.
21

22  Court Reporter:  Michele D. Lucchese, RPR, CRR
                     225 Cadman Plaza East
23                   Brooklyn, New York
                     (718) 613-2272
24

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

1          (In open court; jury not present.)

2          THE COURTROOM DEPUTY:  Criminal cause on trial,

3    Docket No. 20-CV-219, United States versus Paul Belloisi.

4          Please state your appearances.

5          MR. POLLACK:  I am Robert Pollack for the United

6    States.  I am accompanied by my colleagues, Assistant U.S.

7    Attorneys Margaret Schierberl, Francisco Navarro, Paralegal

8    Special Sophia Cronin and Special Agent Moloney.

9          Good morning, Your Honor.

10         THE COURT:  Good morning to all of you.

11         On behalf of the defense.

12         MR. COHEN:  David Jason Cohen, Benjamin Simpson, for

13   our client, Paul Belloisi, who's sitting to my right at

14   counsel table.

15         Good morning.

16         THE COURT:  Good morning.

17         All of our jurors are here and ready to proceed.

18         Are the parties ready to proceed?

19         MR. POLLACK:  Your Honor, almost.  We do have a

20   couple of issues that we wanted to put on the record.  I don't

21   think any of them requires a ruling.

22         THE COURT:  Okay.

23         MR. POLLACK:  But we did want to put them on the

24   record.  One is that last night for the first time defense

25   counsel notified us that they intend, potentially intend to

1    call two witnesses in the defense case, and they produced some

2    materials in connection with that, and one of those two

3    witnesses we don't really know very much about and we are

4    trying to get more information.  I don't think we have an

5    objection to him.

6              The other we told defense counsel we have a good

7    faith reason to believe that he cannot testify without either

8    perjuring himself or implicating himself in crimes that were

9    committed with, with the defendant and others, and we think he

10   should speak with unconflicted counsel before he makes the

11   decision to testify or waive his privileges against

12   self-incrimination.  I don't know whether that's going to

13   change defense counsel's mind, but I wanted to put that on the

14   record in the event that that individual is called to testify.

15             The other issue is that defense counsel -- and Mr.

16   Simpson will perhaps add more details to this that I leave

17   out.  He intends, as part of his cross-examination of our cell

18   phone expert, to use a document which he does not intend to

19   offer as evidence but just to -- as a sort of starting point.

20   It's materials taken from the records that the cell phone

21   expert reviewed.  And he intends to put that in front of the

22   witness in order to ask him questions of a general nature of

23   how he did his analysis.  I told him that we don't object to

24   that in principle.  We would object to that --

25             THE COURT:  I'm sorry, what is this document?

1         MR. POLLACK:  It's a document that is -- that

2    extracts some data from -- I believe -- is it just one

3    document or is it two?

4         MR. SIMPSON:  Well, the document we were talking

5    about is one document.  There's a handful of reports that are

6    essentially extracted reports from the Cellebrite data which

7    is the raw data, I think Mr. Pollack will agree, that the

8    expert used to create his reports.

9         Mr. Pollack, do you want me to explain the whole

10   issue?

11        MR. POLLACK:  Sure.

12        MR. SIMPSON:  There are some communications in the

13   records from Mr. Belloisi's phone that the Government is not

14   seeking to introduce and that they believe are evidence of

15   uncharged crimes.  This was the subject of some of the motions

16   in limine that the Court had dealt with.  The Government has

17   not -- has represented they're not planning to put that

18   material into their case-in-chief unless we open the door.

19        THE COURT:  Right.

20        MR. SIMPSON:  And Mr. Pollack and I have had an

21   extensive conversation about the scope and the nature of the

22   questions that I will ask about those records.  I will not be

23   asking about the content of any text messages that are

24   contained in the raw data.  I will not be asking about the

25   party to whom any of those messages or calls were sent or

1    received.  I will not be identifying the phone number.

2             THE COURT:  You know what?  You all, on the defense

3    side, have a tendency of finding a way to make everything

4    longer than it needs to be.  Right.  In the military, they

5    have an acronym:  BLUF; bottomline upfront.

6             What I am hearing is that there are documents

7    relating to the extraction process that this witness was

8    engaged in?

9             MR. SIMPSON:  That's right.  And I'm going to be

10   very narrowly examining him so as is not to venture into the

11   territory for the Government would considerer --

12            THE COURT:  Well, why can't you do that with the

13   documents that the Government does seek to introduce?

14            MR. SIMPSON:  Because it's not the raw data.  Those

15   are work product of the expert that he created from the raw

16   idea.  I am simply showing him different elements of the raw

17   data to ask him questions about the process, about how he

18   performs his analysis and how he got to his results.

19            THE COURT:  All right.  I'm going to suggest that

20   you get to the point quickly and not ask the same questions

21   over and over again today.

22            MR. SIMPSON:  I will, Your Honor.

23            THE COURT:  Because it's tedious and it can border

24   on confusing, and maybe that's your tactic.  But as the

25   gatekeeper of the evidence to the jury, it's my role to make

1   sure that the evidence comes out in a way to the jury that is

2   understandable to them.

3              I'm not playing favorites on one side or the other

4   here, because if the Government were doing the same thing, I'd

5   be saying the same thing to them.

6              MR. SIMPSON:  I understand, Judge.

7              We're telling you we have sort of an agreement about

8   how I will proceed with the Government.  We wanted to make the

9   Court aware of it so the Court understands why I'm proceeding

10  the way I am with the documents so we don't have to have a

11  bunch of sidebars and explain it in the middle of the

12  proceedings with the jury.

13             MR. POLLACK:  And to be clear, Your Honor, we don't

14  object to him asking questions about the document.  We told

15  defense counsel that if the questions imply or elicits the

16  idea that the defendant was engaged in many communications on

17  February 4, 2020 and there is an implication that we

18  cherry-picked the ones we selected, we would consider that

19  opening the door to actually putting on the evidence of what

20  the --

21             THE COURT:  And that's the risk that you run.  So

22  that falls into be-careful-what-you-wish-for category.

23             MR. SIMPSON:  Exactly.  And I will be proceeding

24  with that in mind, Judge.  I just want the Court to understand

25  why I'm sort of tiptoeing around a little bit during my

1   examination.

2           THE COURT:  Why is which -- I don't understand why

3   you couldn't possibly do the same type of thing with the

4   documents that the Government is seeking to introduce that was

5   extracted from raw data.

6           MR. SIMPSON:  But it's not extracted from raw data.

7   It is a work product of the expert where he's drawing

8   information from different raw data sets.  It's not just the

9   raw data that they've introduce.  It's work product.

10          THE COURT:  Well, you don't need to go into 10,000

11  conversations to make the point.

12          MR. SIMPSON:  I will not.  I absolutely will not.

13          THE COURT:  And is there anything else?

14          MR. POLLACK:  Not for the Government.

15          MS. SCHIERBERL:  No.

16          THE COURT:  Okay.  Just one other thing, we do have

17  a class of college students that's going to be visiting and

18  observing shortly for maybe about an hour.  When they do come,

19  those that are sitting to my left, I'm just going to ask you

20  to scoot over when they get here.  It's only about -- it's

21  under 15 kids, I believe.

22          MR. SIMPSON:  Judge, we did have one -- there was

23  one more issue.

24          THE COURT:  Yes.

25          MR. SIMPSON:  Sorry.  Yesterday, at the very end, we

1   had a discussion and the Court made a ruling to exclude

2   defense counsel D-1 and D-1A.

3            THE COURT:  Yes.

4            MR. SIMPSON:  I have spoken to the Government.  One

5   thing that was not addressed or brought up to the Court in the

6   discussion of that ruling was that the Government had already

7   put in evidence of three earlier flights of the same aircraft

8   in their Exhibit 101 through Captain LeRuth so three of the

9   flights that I was intending to ask about in that document the

10  Government has already brought in through their evidence and

11  the testimony of their witness about their Exhibit 101.  I

12  mentioned that to the Government.  The Government is sticking

13  to its position that the document that I was seeking to

14  introduce, D-1, D-1A continued to be not relevant and should

15  not be introduced to the jury.  However, the Government -- and

16  they can state their own position -- has represented that they

17  do not believe it objectionable for me to ask him about the

18  existence of prior flights, not the specifics of prior

19  flights, but the existence of prior flights and whether some

20  of those flights were domestic flights without getting into

21  any of the detail or spending a great deal of the Court's

22  time.

23           THE COURT:  There's testimony from the CBP officers

24  that they target international flights, not domestic flights.

25  So what's the point?

1          MR. SIMPSON:  The point, Judge, is under the Second

2    Circuit case of Londono-Villa, U.S. verse Londono-Villa, 930

3    F.2d 994, in an importation and conspiracy to import case,

4    there is an additional element that the Government must prove

5    beyond a reasonable doubt the defendant knew or intended that

6    the narcotics would be imported into the United States.  It's

7    our position --

8          THE COURT:  Right.  Imported into the United States

9    from a place outside thereof.  That's what the charge is.

10          Domestic flights are internal U.S. flights.

11          MR. SIMPSON:  I understand, Judge.

12          THE COURT:  Correct.  So the point is you want to

13    bring out other extraneous domestic flights.

14          MR. SIMPSON:  Other extraneous flights have already

15    been introduced into the record and are already in evidence.

16    They are going to have a witness come in to talk and introduce

17    two flights.  They have already talked about more.  I simply

18    want to ask the witness for whom that the flight history

19    that's coming in now a couple of questions, Judge, about

20    whether or not there had been earlier flights.  If he's aware

21    of it.  If he says he's not aware of it, I'm not going to be

22    able to go any further.  So I just want to be able to ask him --

23          THE COURT:  That hasn't stopped you or your

24    colleague from going any further to repeatedly ask the same

25    question.

1          MR. SIMPSON:  Well, I will --

2          THE COURT:  I will play it by ear.  You do not need

3    to introduce those two documents.

4          MR. SIMPSON:  And I understand the Court is going to

5    stick to that ruling.  I just needed to make the record,

6    Judge.  Thank you.

7          THE COURT:  Anything else?

8          MR. POLLACK:  Not for the Government.

9          THE COURT:  All right.  So let's bring in the jury.

10         We are continuing with Agent Gabay; correct?

11         MR. POLLACK:  Yes.

12         MR. COHEN:  Yes.

13         THE COURT:  So why don't you bring in Agent Gabay.

14   And who was questioning Agent Gabay?  That was you, Mr. Cohen;

15   right?

16         MR. COHEN:  Yes.

17         THE COURT:  Why don't you set yourself up while we

18   are waiting for the jury?

19         All rise.

20         (The jury enters the courtroom.)

21         THE COURT:  Everyone may be seated.

22         Do the parties agree that all of our jurors are

23   present and properly seated?

24         MR. POLLACK:  Yes, Your Honor.

25         MR. SIMPSON:  Yes, Your Honor.

1          THE COURT:  Thank you.

2          Good morning to everyone.  Good morning, Agent

3    Gabay.  Good morning jurors and all of our people in the

4    audience.

5          I hope you had a restful evening.

6          And we are continuing today with cross-examination

7    by defense counsel, Mr. Cohen, of Special Agent Sean Gabay.

8          And I remind you, sir, that you are still under

9    oath.  Remember to keep your voice up nice and loud.

10          THE WITNESS:  Yes.

11          THE COURT:  Try to speak a little slowly.

12          One just other thing I do want to address to the

13    jurors.  I'm sorry for the delay this morning.  Sometimes we

14    have housekeeping things to take care of.  Thankfully, we

15    haven't had too much of it during the course of the trial.

16    Hopefully we'll be able to move through the day smoothly

17    having taken care of that upfront.

18          The other thing is that at some point this morning

19    we are expecting a class of college students to come and

20    observe.  Courtrooms are open to the public and it's a great

21    teach vehicle, so we always encourage students to come and

22    observe.  I don't want you to get all distracted by that.

23    Okay?

24          All right.  Mr. Cohen, whenever you are ready, you

25    may proceed.

1        MR. COHEN:  Thank you very much, Your Honor.

2   **SEAN GABAY**,

3        called as a witness, having been previously duly

4        sworn/affirmed, was examined and testified as follows:

5   CROSS EXAMINATION

6   BY MR. COHEN:

7   Q    Good morning, Agent Gabay.

8   A    Good morning.

9   Q    Did you testify yesterday you and Officer Moloney are no

10  longer partners?

11  A    We are not on the same team anymore, no.

12  Q    Do you still work for HSI though?

13  A    Yes.

14  Q    Have your duties changed at all since 2020?

15  A    Yes.

16  Q    What are they now?

17  A    Now I handle physical security and access to the office

18  and a list of other things, but, yes.

19  Q    Does it still -- do your duties still involve

20  investigations, speaking with targets and witnesses about

21  particular crimes, et cetera?

22  A    Generally not as of late.

23  Q    And when did those duties end and your new duties begin?

24  A    I think it was around April of last year.

25  Q    And was that about the time you left Agent Moloney's

1  team?

2  A    Yes.

3  Q    And since your testimony yesterday, have you reviewed any

4  notes?

5  A    No.

6  Q    Yesterday, I believe you testified that Mr. Belloisi had

7  told you that he went to the airplane to take some snacks; is

8  that right?

9  A    Yes.

10 Q    And then -- do you remember what question that was in

11 response to?

12      THE COURT:  Sustained as to form.

13 Q    What question was asked of Mr. Belloisi that elicited

14 that response?

15 A    I -- let me think.

16      I can't say exactly what question that....

17 Q    Did you also say yesterday that he told you that he went

18 on the plane and actually ate the snacks?

19 A    Yes.

20 Q    Is it possible, Agent Gabay, that he said he went to get

21 some snacks, but he never said that he actually ate the snacks

22 on the plane?

23 A    No.  I remember that he ate the snacks on the plane or

24 while he was eating the snacks is when he realized that.

25 Q    And -- I'm sorry, sir.  I didn't mean to cut you off.

1  A     No.  No, I was finished.

2  Q     So you're 100 percent sure he ate a bag of chips on the

3  plan?

4            THE COURT:  Asked and answered.

5  Q     So you're 100 percent sure he drank a soda on the plane?

6            THE COURT:  Asked and answered.

7  Q     Officer Gabay, when you brought Mr. Belloisi back to the

8  JNSU office, where did you place him?

9  A     We brought him into an interview room.

10 Q     And when he went into the interview room, was he patted

11 down before he went into the interview room?

12 A     Probably.  I don't remember that specifically, though.

13 Q     Would it be your standard procedure before you bring a

14 target or a suspect into that interview room to make sure, for

15 instance, there is no contraband on them?

16 A     Or no weapons would be, yes.

17 Q     And at that point you had taken some of his personal

18 property; is that right?

19 A     I didn't take any of his personal property, no.

20 Q     Would somebody in law enforcement have taken his personal

21 property before going into the interview room?

22 A     It depends, not all of his -- I don't really know in this

23 instance, but....

24 Q     Was Mr. Belloisi allowed to make phone calls while inside

25 that room?

1  A     No.

2  Q     Law enforcement would have had his phone by that point?

3  A     I don't remember specifically, but he wouldn't have been

4  allowed to make phone calls at that point.

5  Q     And who are the people that were in the room when you

6  were interviewing Mr. Belloisi?

7  A     It was myself and Agent Moloney.

8  Q     Were the CBP officers present at JNSU in a different area

9  outside the interview room?

10  A     Yes, there were CBP officers there.

11  Q     And during the interview of Mr. Belloisi, did you ever go

12  out to speak with the CBP officers?

13  A     Yes.  CBP officers.

14  Q     Do you know if Agent Moloney ever went outside to speak

15  to the CBP officers?

16  A     Yes, I believe he did.

17  Q     After you would speak with the CBP officers, would you

18  come back in the interview room to speak with Mr. Belloisi?

19  A     Yes.

20  Q     And how long did that process go on of speaking with Mr.

21  Belloisi and then going to speak with CBP officers and coming

22  back and speaking with Mr. Belloisi?

23  A     I couldn't tell you an exact timeframe offhand how long

24  the interview lasted.

25  Q     Was it a few hours or a few minutes?

1  A    It was more than a few minutes.  I really -- I don't know

2  the timeline.

3  Q    More or less than an hour?

4         THE COURT:  He said he does not know.  Move on.

5  Q    At some point after speaking with Mr. Belloisi in the

6  JNSU interview room, was he placed under arrest?

7  A    Yes.  As I said before, he was -- can you repeat the

8  question again for me, please?

9  Q    Sure.

10        At some point while speaking with Mr. Belloisi in

11  the JNSU interview room, was he placed under arrest?

12  A    Not while speaking to him, no.  He -- no.

13  Q    When was he placed under arrest?

14  A    I believe, if my memory is correct, Agent Moloney spoke

15  to prosecutors who --

16  Q    You don't have to say what they said.

17        Was it after Agent Moloney spoke to prosecutors that

18  Mr. Belloisi was placed under arrest?

19  A    I believe so, but it wasn't during -- it wasn't at the

20  end of the interview that he was placed under -- it was after

21  that at some point, yes.

22  Q    And was Mr. Belloisi then put in a cell, a jail cell at

23  the JNSU office?

24  A    At some point, yes.

25  Q    Any other personal property removed from him?

1    A    It would be common to not have your personal property in

2    a holding cell, but like I said, I can't recall exactly in

3    this instance.

4    Q    And did you and Agent Moloney -- when you were in the

5    interview room, did you have your cell phone with you and do

6    you know if Agent Moloney had his cell phone with him?

7    A    I don't recall.  I probably did.

8    Q    Did you record any of the interview with Mr. Belloisi in

9    the JNSU office?

10   A    I did not.

11   Q    Do you know if Agent Moloney recorded any of the

12   interview with Mr. Belloisi in the JNSU office?

13   A    I don't believe so.

14   Q    It is not prohibited, is it, sir, to record an interview

15   with the suspect?

16              MR. POLLACK:  Objection.

17              THE COURT:  I will allow the question.

18              You may answer.

19   A    No.

20   Q    It is not prohibited?

21   A    It is not.

22   Q    Yesterday you were shown what is allegedly or purportedly

23   the jacket that Mr. Belloisi was wearing; is that right?

24   A    Yesterday I was what?

25   Q    You were shown a jacket that purportedly Mr. Belloisi was

1   wearing when he was arrested.  Do you remember --

2              THE COURT:  Do you recall being shown the jacket

3   that Mr. Belloisi was wearing on February 4th?

4              THE WITNESS:  Yes.

5   Q    Do you recall being shown the jacket that Mr. Belloisi

6   was wearing on February 4th and indicating slits that were on

7   the inside of that jacket?

8   A    Yes.

9   Q    And do you recall being shown and actually carrying the

10  box of bricks of cocaine that were found under the avionics

11  compartment yesterday?

12  A    Yes.

13  Q    Did you ever try to see if those bricks of cocaine would

14  fit inside the slits of the jacket that was taken from Mr.

15  Belloisi?

16  A    No.

17  Q    Did you ever measure the size of the slits that were

18  taken from Mr. Belloisi?

19  A    No.

20  Q    Did you ever measure the size of the bricks that were

21  taken out of the airplane before they were removed from their

22  pack?

23  A    No.

24  Q    Did you ever measure the size of the bricks that were

25  taken from the avionics compartment after they were removed

1    from the packaging?

2    A    Say that -one, that last one again.

3    Q    Did you ever measure the size of the bricks of cocaine

4    that were -- after they were removed from the packaging that

5    surrounded them?

6    A    No.

7    Q    As you sit here today, do you have any knowledge of

8    whether those bricks that were taken from Mr. Belloisi in

9    their original condition before they were removed from

10   packaging would fit inside the slits inside Mr. Belloisi's

11   jacket?

12   A    No.

13            MR. COHEN:  Nothing further.

14            THE COURT:  Any redirect?

15            MR. POLLACK:  No, Your Honor.

16            THE COURT:  Thank you, sir.  You may step down.

17            THE WITNESS:  Thank you.

18            THE COURT:  Thank you.

19            (Witness leaves the stand.)

20            THE COURT:  The Government may call its next

21   witness.

22            MR. POLLACK:  The Government calls Mr. Michael

23   Guarnieri.

24            THE WITNESS:  Good morning.

25            THE COURT:  Good morning.

1          THE COURTROOM DEPUTY:  Please raise your right hand.

2          Do you affirm that your testimony will be the truth,

3     the whole truth and nothing but truth?

4          THE WITNESS:  I do.

5          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

6     State and spell your name.

7          Please state and spell your name.

8          THE WITNESS:  My name is Michael Guarnieri.  Common

9     spelling Michael.  Last name is G-U-A-R-N-I-E-R-I.

10         THE COURT:  Good morning, sir.

11         THE WITNESS:  Good morning.

12         THE COURT:  I'm going to ask you to keep your volume

13    up just as you have it right now.  You can adjust microphone

14    so that it's comfortable for your height and so on.  I would

15    just ask you to speak slowly, if you would please.

16         THE WITNESS:  Sure.

17         THE COURT:  I think we have some water there for

18    your use.

19         And, Mr. Pollack, you may inquire when you are

20    ready.

21         MR. POLLACK:  Thank you, Your Honor.

22         (Continued on next page.)

23

24

25

1    **MICHAEL GUARNIERI**,

2          called as a witness, having been first duly

3          sworn/affirmed, was examined and testified as follows:

4    DIRECT EXAMINATION

5    BY MR. POLLACK:

6    Q    Good morning, Mr. Guarnieri.

7    A    Good morning.

8    Q    Who do you work for currently?

9    A    I work for American Airlines Corporate Security.

10   Q    What is your title?

11   A    Senior investigator.

12   Q    Where are you based?

13   A    I'm based at JFK International Airport, Terminal 8.

14   Q    Can you tell us a little bit about your job

15   responsibilities?

16   A    Yes.  I'm responsible for criminal investigations,

17   employee misconduct.

18          I also assist local law and federal law enforcement

19   with their investigations.

20   Q    And as part of fulfilling your duties, do you have access

21   to American Airlines records?

22   A    I do.

23   Q    How long have you been a senior investigator for American

24   Airlines?

25   A    December 2020.

1   Q    What did you do before that?

2   A    I was in the private sector for eight years and in

3   aviation security.

4   Q    What did you do before you did that?

5   A    I'm retired from the Port Authority Police.  I did 30

6   years there.  I was retired as a police chief.

7   Q    What did you do before you were a Port Authority police?

8   A    Prior to Port Authority police?

9   Q    Yes.

10  A    I went to college.

11  Q    So in total, how long have you worked in aviation

12  security?

13  A    I've been working at the airports since 1985.

14        MR. POLLACK:  Your Honor, may I show the witness and

15  counsel only a document marked for identification as

16  Government Exhibit 104?

17        THE COURT:  Yes.

18        MR. COHEN:  Judge, the monitor.

19        THE COURTROOM DEPUTY:  Someone had changed.

20        THE COURT:  You all can take out your monitors

21  because I'm sure at some point we are going to use it.  We

22  will make sure that it is not showing.

23        To our folks in the audience, are the monitors --

24  well, it wouldn't display this to you, but let us know if it's

25  not displaying once we show it to everyone.

1  Q    Do you recognize this document?

2  A    I do.

3  Q    Can you say just in very general terms what it is?

4  A    This is an American Airlines aircraft tower log.

5  Q    Is it a document of a kind that is kept in the ordinary

6  course of business of American Airlines?

7  A    It's kept at the American Airlines operations center for

8  aircrafts.

9  Q    Pardon me.  Is this a true and accurate of that data?

10 A    Yes, it is.

11        MR. POLLACK:  The Government offers Government

12 Exhibit 104?

13        THE COURT:  Any objection?

14        MR. SIMPSON:  No.

15        THE COURT:  It's admitted.

16        (Government's Exhibit 104 received in evidence.)

17        MR. POLLACK:  Can we publish to the jury, Your

18 Honor?

19        THE COURT:  Yes.

20 Q    Mr. Guarnieri, we will start sort of on the left and try

21 to get through what some of this information means.

22        Do you see in the left-most column there's an

23 abbreviation at the top, it looks like actual aircraft tail?

24 Do you see that?

25 A    I do.

1  Q    What does that mean?

2  A    That's the recorded information for the aircraft.

3  Q    Of a particular aircraft?

4  A    Of a particular aircraft.

5  Q    And each row underneath that, what does that say?

6  A    So are you --

7  Q    The two rows beneath, in that same column, underneath

8  actual aircraft tail.

9  A    So the 3B gulf indicates the aircraft tail number.

10 Q    So are those two rows, are those two records about that

11 aircraft --

12 A    Yes.

13 Q    -- with that tail number?

14      And can you explain to us what the next column

15 means?

16      THE COURT:  Before we get into that, what is the

17 purpose of a tail number, an aircraft tail number?

18      THE WITNESS:  It's like a registration for each

19 aircraft so that you can distinguish one aircraft from

20 another.

21 Q    Does each aircraft have a unique tail number?

22 A    Yes, they do.

23 Q    The next column, it looks like it says, Operating airline

24 IATA code or IATA CD.  What does that mean?

25 A    IATA is the International Airport Transportation

1  Association and the AA stands for the company name, which is

2  American Airlines.

3  Q    So do both of those rows show information about an

4  American Airlines flights?

5  A    Yes.

6  Q    And 3BG, is that an American Airlines airplane?

7  A    I'm sorry.  Could you repeat that?

8  Q    3BG, is that the aircraft?

9  A    Yes.

10 Q    Is that an American Airlines airplane?

11 A    Yes.

12 Q    The next row, or next column -- excuse me -- operating

13 flight number, what does that mean?

14 A    That's the designated flight number for that particular

15 route.

16 Q    So is the top -- those two rows, are those two different

17 flights of the same aircraft?

18 A    That's correct.

19 Q    The next column actual leg arrival gate.  What does that

20 mean?

21 A    That's the designated gate arrival at the terminal.

22 Q    And the next actual, actual leg rival does that say local

23 date?

24 A    That's correct.

25 Q    What does that mean?

1   A     That's the date of the arrival of the aircraft, which is

2   February 4, 2020.

3   Q     The next column, actual leg arrival airport IATA code,

4   what does that mean?

5   A     So that's the designation of the route of the aircraft

6   and the first line is JFK, which is John F. Kennedy Airport.

7   Q     Looking back at the top row that we have seen so far, we

8   have airplane 3BG Flight 1349 arriving on February 4, 2020 at

9   Gate 7 at JFK, is that all; correct?

10  A     That's correct.

11  Q     The next row, actual leg arrival local time.  What does

12  that mean?

13  A     Okay, so that's the arrival the aircraft and, so, the

14  time is in military time.  So to translate it to regular time,

15  that would be 5:36 p.m.

16  Q     I'm sorry --

17  A     I'm sorry, 3:36 p.m.

18  Q     Thank you.  The next column, actual let dpt airport, is

19  that departure?

20  A     Yes.

21  Q     What is that code?

22  A     So that's the IATA code for Montego Bay, Jamaica.

23  Q     The next column, scheduled leg departure local time, what

24  does that mean?

25  A     That's 12:16 p.m.

1  Q    And what does that mean for the schedule leg departure?

2  A    So that's the scheduled time of the departure from

3  Montego Bay, Jamaica.

4  Q    The next column, actual leg departure local time, what is

5  the difference between the scheduled and the actual leg

6  departure time?

7  A    So that means that the aircraft deported the gate at

8  12:05, so it was actually ahead of the scheduled departure

9  time.

10  Q    That was departing from Montego Bay?

11  A    That's correct.

12  Q    And the next column actual leg taxi out minutes, what

13  does that mean?

14  A    That's 16 minutes.  So that's the aircraft leaving the

15  gate, taxiing out to a runway, and it's a 16-minute time

16  lapse.

17  Q    And the next column, actual leg taxi-in minutes?

18  A    189 minutes flight time too.

19  Q    I'm sorry.  I read the wrong column.  You went to the

20  next column correctly.  I apologize.

21  A    Okay.

22  Q    The next column is actual leg en route minutes and you

23  said 189.  What does that mean?

24  A    189 minutes is the actual flight time.

25  Q    From Montego Bay to JFK?

1  A     Yes.

2  Q     And the next column, actual leg taxi-in minutes, what

3  does that mean?

4  A     So that's the arrival, the taxiing from the runway to the

5  gate at JFK Airport.

6  Q     And the next one, actual leg off local time, what is the

7  difference between actual leg off and actual leg departure?

8  A     So when you look at the leg time, the 12:16, the 12:21

9  indicates is when it actually took off into the air from the

10 runway.

11 Q     So is that arithmetic with the taxi time and the

12 departure time?

13 A     Yes.

14 Q     So it departed at 12:05 -- I'm sorry.  Am I reading that

15 wrong?

16        Actual leg departure time 12:05, taxi out 16

17 minutes?

18 A     Uh-hum.

19 Q     So actual leg off is takeoff time 12:21; right?

20 A     That's correct.

21 Q     And in the next column, actual leg on local time, what

22 does that mean?

23 A     That's the arrival time for the aircraft at JFK Airport.

24 Q     When you say arrival time, different from the arrival

25 time further on the left, that's because that's the landing

1  time?

2  A    That's -- that's the actual time that's indicated when

3  the aircraft lands and taxis to the gate.

4  Q    So does that mean that the plane landed at JFK at 3:30

5  and taxied i for six minutes and was at the gate --

6  A    That's correct.

7  Q    -- at 3:36?

8        The next column flight leg total available seat

9  count, what does that mean?

10 A    That's the seat capacity for the aircraft, which is 160.

11 Q    And the next column onboard revenue PAX count, what does

12 that mean?

13 A    78 paying passengers.

14 Q    And onboard N ref PAX count, what does that mean?

15 A    So that's non-revenue, that's usually American Airlines

16 employees or other airline employees that get a non-revenue

17 ticket.

18 Q    Can you add those two numbers together to say how many

19 people were on the plane not including flight crew?

20 A    So that would be 82.

21 Q    So that top row, which is the flight from Montego Bay,

22 Jamaica to JFK, looking at the next row, is that the flight

23 from JFK to the next destination?

24 A    Yes.

25 Q    And the code for the next destination, SAN, what does

1   that mean?

2   A     San Diego.

3           MR. POLLACK:  Okay.  Can we show just the witness

4   only the document marked for identification as Government

5   Exhibit 105.

6   Q     Do you see that?

7   A     I do.

8   Q     Do you recognize it?

9   A     I do.

10  Q     What is this in general?

11  A     It's an American Airlines gate scan.  So that's where you

12  scan your boarding pass.  The gate agent would scan your

13  boarding pass at the gate.

14  Q     And is this a true and accurate copy of American Airlines

15  records?

16  A     Yes, it is.

17          MR. POLLACK:  The Government offers Government

18  Exhibit 105.

19          THE COURT:  Any objection?

20          MR. SIMPSON:  No.

21          THE COURT:  It's admitted.

22          (Government's Exhibit 105 received in evidence.)

23          MR. POLLACK:  May we publish?

24          THE COURT:  Yes.

25  Q     So taking a look at the left-most column there where it

1   looks like every row the number is 366, what does that column

2   indicate?

3   A    That's the flight number.

4   Q    Is that the flight from JFK to San Diego that we saw on

5   the previous page?

6   A    I'd have to look at it.

7            MR. POLLACK:  Can we go back to -- what was it?

8            THE COURT:  104.

9            MR. POLLACK:  104.

10  A    That's correct.

11           MR. POLLACK:  Okay.  Ms. Cronin, can we return.

12  Q    So this is -- am I understanding correctly, this is all

13  data about the fight from JFK to San Diego?

14  A    That's correct.

15  Q    And the second column is all JFK, that's also the same

16  flight; right?

17  A    That's correct.

18  Q    And we have the date and the scheduled leg out time.

19  What is the scheduled leg out time there?

20  A    It's 20:00 hours, so that would be 8:00 p.m.

21  Q    The next column says PNR.  I don't know if that means

22  locator ID, and there's a bunch of code.

23           What does that mean?

24  A    So American Airlines and all airlines assign passengers a

25  PNR number.  So that's your gate boarding identification.

1   Q    So those codes represent individual passengers?

2   A    Yes.

3   Q    And then the last column, PAX check-in times, what does

4   that signify?

5   A    That's when the gate agent scans your boarding pass at

6   the gate prior to you going into the jetway.

7   Q    Are those in chronological order?

8   A    They appear to be, yes.

9        THE COURT:  Just one second.  So the gate boarding

10  number for each passenger is a unique number for each

11  passenger?

12       THE WITNESS:  Yes, and it's reflected on the

13  boarding pass.

14  Q    And just for clarity sake, I will note that those -- Your

15  Honor said number, but they're six digit alphabetic codes

16  rather than numeric codes.

17       Is that correct?

18  A    That's correct.

19       MR. POLLACK:  Ms. Cronin, can we zoom in on the top

20  right corner of that.

21  Q    Can you tell, Mr. Guarnieri, what is the time of the

22  first passenger swipe on to that airplane?

23  A    9:28 hours, which would be 7:28 p.m.

24  Q    To your knowledge, does American Airlines also record

25  this kind of swipe-on data for pilots and crew?

1   A    They do not do it for pilots.  They do it for flight

2   attendants.

3   Q    Do you know how long those records are maintained?

4   A    Approximately 30 days retention.

5   Q    Do you know what a SIDA card is?

6   A    I do.

7   Q    What is a SIDA card?

8   A    A SIDA card is the airport operator identification card

9   that's issued to employees to access sterile environments.

10  Q    What are sterile environments?

11  A    It's when you go from the public side of the terminal,

12  which is like baggage claim or check-in, beyond TSA

13  checkpoints is considered sterile.

14  Q    Do airline or airport employees have to swipe those cards

15  in order to get through those areas?

16  A    Yes, they do.

17  Q    Why is that?

18  A    Well, you're granted that ability after you take a class

19  from the Port Authority, and if you're sanctioned by the Port

20  Authority and the American Airlines, you have -- you're issued

21  a SIDA card so you can gain access for business purposes into

22  the officer administer.

23  Q    Are those swipes logged?

24  A    Yes, they are.

25          MR. POLLACK:  Can we show just the witness and

1  counsel and the Court what has been marked for identification

2  as Government Exhibit 102.

3           THE COURT:  Just for the record, can you spell SIDA

4  card?

5           THE WITNESS:  S-I-D-A.

6           THE COURT:  Thank you.

7           THE WITNESS:  You're welcome.

8           MR. POLLACK:  Thank you, Your Honor.

9  BY MR. POLLACK:

10 Q    Do you recognize this document?

11 A    I do.

12 Q    What is it?

13 A    It's an American Airlines SIDA swipe card record.

14 Q    Is this a true and accurate copy of American Airlines

15 business records?

16 A    Yes, it is.

17          MR. POLLACK:  The Government offers Government

18 Exhibit 102.

19          THE COURT:  Any objection?

20          MR. SIMPSON:  No.

21          THE COURT:  It's admitted.

22          (Government's Exhibit 102 received in evidence.)

23          MR. POLLACK:  May we publish?

24          THE COURT:  Yes.

25 Q    I guess it's the third column from the left where it says

1  message text and each row begins with the word admitted, what

2  is the name that follows that?

3  A    You're looking at line three?

4  Q    All of the lines, the third column?

5  A    I'm sorry.

6  Q    Admitted and then there is a name?

7  A    So it has server date, which is the date, then it has

8  admitted.  It has the employee's name, the employee's SIDA

9  card number, which starts with a 644.

10  Q    Thank you.

11  A    And then it has the location.

12  Q    What's the employee's name?

13  A    Paul Belloisi.

14  Q    And then all the way on the right, the final column,

15  message, date, time, there are dates and timestamp.  What does

16  that indicate?

17  A    That's the date the individual employee swiped, so that's

18  February 30, 2020, and the time is 22:57 hours, which is 10:57

19  p.m.

20  Q    And the -- what is the location of that swipe?

21  A    Hanger 10, lane two.

22  Q    Can you tell us where that location is?

23  A    Hanger 10 is the American Airlines maintenance facility

24  for aircrafts.

25  Q    I'd like to show you a document already in evidence as

1    Government Exhibit 401.

2          MR. POLLACK:  Can we bring that up, Ms. Cronin.

3    Q    Do you recognize this photo?

4    A    I do.

5    Q    What is this?

6    A    It's an aerial shot of JFK Airport.

7    Q    Can you show us -- if you press the screen, you can mark

8    on it.  Can you indicate where the hanger is that is

9    referenced in the prior document?

10   A    I'm --

11   Q    Can you draw with your finger?

12   A    I'm trying to.  It's not doing anything.

13         THE COURT:  It is not marking.

14         THE COURTROOM DEPUTY:  It's not working.

15   Q    In the meantime, can you describe for us as best you can

16   what hanger 10 is on this image?

17   A    Hanger 10 is an American Airlines maintenance facility

18   that they do general maintenance on aircrafts and emergency

19   repairs on aircrafts and routine maintenance.

20         MR. POLLACK:  Ms. Carosella, can we switch to the

21   Elmo.

22         THE COURTROOM DEPUTY:  Sure.

23         THE COURT:  The other alternate might be to re-boot

24   the whole thing.  Shut it off and turn it back on.

25         THE COURTROOM DEPUTY:  If you want to try it now.

1    THE WITNESS:  I don't have anything on the screen at

2  the moment.

3          THE COURT:  Is this the same document?

4          That's from the ELMO.

5          THE COURTROOM DEPUTY:  Do you want to try it now?  I

6  want to see if that worked.

7  Q    Can you try now and indicate the hanger?

8  A    There you go.

9          MR. POLLACK:  And let the record reflect that the

10  witness has identified an area in the upper left corner of the

11  screen.

12          THE COURT:  So noted.

13          MR. POLLACK:  Can we go back to 102, Ms. Cronin.

14  Q    The second row there also says, Hanger 10, gate lane two;

15  is that right?

16  A    Yes.

17  Q    What date and time is that one?

18  A    February 4, 2020, 13:39 hours, which is 1:39 p.m.

19  Q    Does that mean that the defendant or Paul Belloisi swiped

20  the SIDA card at that same location?

21          MR. SIMPSON:  Objection.

22          MR. POLLACK:  Withdrawn.

23  Q    Can you tell us what the meaning of the timestamps and

24  the locations in the first two rows?

25  A    On February 4, 2020, at 1:39 p.m., Paul Belloisi swiped

1  into hangar 10 gate, which is the access gate to the hanger,

2  hanger 10.

3  Q    And that's the same location as the previous night?

4  A    That's correct.  The first line is February 3, 2020,

5  22:57, which is 10:57 p.m.

6  Q    Can you tell us what's the location of the third row?

7  A    So it's February 4, 2020, the swipe is 13:42, which is

8  1:42 p.m., and that's hanger 10 turnstile, which is the

9  turnstile that you swipe with your SIDA card to access the

10  sterile area, which is the maintenance area on the sterile

11  area of the hanger.

12  Q    So -- I'm sorry to interrupt you.

13  A    That's okay.

14  Q    What's the difference between hanger 10, gate lane 2 and

15  hanger 10 turnstile here?

16  A    So the hanger 10, gate lane 2 is the swipe location when

17  you are driving into the hanger with your vehicle and

18  presumably parking your car and going into the hanger.

19  Q    And then turnstile?

20  A    Turnstile is when you physically walk into the hanger,

21  you walk to a turnstile, and then you have to swipe in order

22  to access the turnstile.

23  Q    On February 4, 2020, how much time was there between when

24  Mr. Belloisi swiped at gate lane 2 and when he swiped in the

25  turnstile?

1  A     Three minutes.

2  Q     And then the next few -- or the next couple of rows also

3  say hanger 10 turnstile.  Can you tell us the times of those?

4  A     Okay.  So February 4th, at 14:15 hours is 2:15.  Again,

5  it's the hanger 10 turnstile in, which means the employee is

6  accessing the turnstile into the sterile area.

7  Q     Why are there three swipes in without any swipes out?

8  A     When you exit the area but a turnstile at hanger 10, it's

9  a push bar to get out of the sterile area, so there wouldn't

10 be a recording of the SIDA swipe.  It's not necessary.

11 Q     The next row, which is 15:53.  Is that 3:53 p.m.?  Is

12 that right?

13 A     Yes.

14 Q     What is that location?  Can you read it for us?

15 A     So that is gate 21-315, and that's at Gate 8 and 10 and

16 that's at Terminal 8, JFK Airport.

17 Q     And the one after that?

18 A     So the other entry is at February 4th, and that's at

19 15:57 hours, which is 3:57 p.m., and, again, it's at gate

20 21-3:15, Gates 8 through 10 domestic out, which means the

21 employee swiped from the terminal on to the ramp.

22 Q     So that's to go out, you said; is that right?

23 A     Yeah.  And when you swiped out on to the ramp, it's a

24 sterile environment.

25 Q     So how long is there between that Gate 8 and 10 swipe in

1   and Gate 8 and 10 swipe out?

2   A    Four minutes.

3   Q    And what does it mean that it's in and then out, what's

4   the actual location?

5   A    So the in location is from the ramp swiping into the

6   terminal and the second entry is from the terminal swiping out

7   on to the ramp.

8   Q    Is the ramp another word for the tarmac?

9   A    AOA, which is the aeronautical or tarmac.

10          MR. POLLACK:  Can we put up, Ms.  Cronin, the

11  document already in evidence as Government Exhibit 403.

12  Q    Do you recognize this?

13  A    I do.

14  Q    What is it?

15  A    That is the Terminal 8 American Airlines at JFK.

16  Q    Are you able to indicate on here for us, approximately,

17  where the swipe in Gate 8 and 10 domestic is?

18  A    Do you want me to circle it?

19  Q    If you can.

20  A    Okay.

21  Q    Do you know on this map where Gate 7?

22  A    I do.

23  Q    Can you indicate that?

24          MR. POLLACK:  And may the record reflect that the

25  defendant [sic] put two circles on --

1      THE COURT:  That the witness.

2      MR. POLLACK:  Sorry.  Excuse me.  -- that the

3  witness indicated two circles in the center of the image on

4  opposite sides of the terminal building, above the building

5  and beneath the building.

6  Q     Are you familiar with that area inside the terminal there

7  by Gates 8 and 10?

8  A     I am.

9  Q     If somebody swipes in at that terminal and stands in

10  there for those four minutes, can you see from that location

11  an aircraft parked at Gate 7?

12  A     You can.

13      MR. POLLACK:  Can we go back to Government Exhibit

14  102.

15  Q     The next lines beneath the Gates 8 and 10 domestic,

16  10-105 SIDA out, what does that mean?

17  A     That is a location by baggage claim at Terminal 8,

18  American Airlines terminal, which is the public area where an

19  employee swipes a door that accesses them into the sterile

20  area at Terminal 8.

21  Q     And what time was that?

22  A     17:00 hours, which is 5:00 p.m.

23  Q     Can you tell us the next three timestamps after that?

24  A     Yes.  So the time is -- the date is February 4, the time

25  is 17:01 hours, which is 5:01, and the door number is 10-105,

1  which allows the employee access from the sterile area to the

2  public area.

3  Q    What's the difference between the 10-105B SIDA and 10-105

4  SIDA?

5  A    So 10-105B is the gate, is the door that leads from the

6  AOA, which is the ramp area, into the terminal.

7  Q    And the one without the B, the 10-105?

8  A    That's the public area that allows you access from the

9  baggage claim area into the sterile area.

10 Q    So can you tell us in general terms what that sequence of

11 four swipes mean from 5 o'clock to 5:03?

12 A    Those swipes indicate that the employee swiped from the

13 air side into the terminal and then from the sterile area of

14 the terminal to the public area, and then from the public area

15 back into the sterile area of Terminal 8, and then on to the

16 last entry, which is 10-105B, which allows the employee to

17 swipe from the sterile area inside the terminal to the ramp

18 area.

19 Q    Do you know with reference to 8, 7 approximately where

20 those doors are?

21 A    The 10-105B is in proximity of Gate 7.

22 Q    And then the last swipe, what time was that?

23 A    So the last swipe on February 4th at 19:01 hours, which

24 is 7:01 00 p.m. is at hanger 10 turnstile, which is at the

25 American Airlines maintenance hanger at JFK.

1  Q     Looking back at those four swipes from 5:00 p.m. to 5:03,

2  did American Airlines locate and give the Government videos

3  showing the area around those swipes?

4  A     They did.

5  Q     Have you previously reviewed videos that have been marked

6  for identification as Government Exhibits 302, 303, 304, and

7  305?

8  A     I did.

9  Q     Are those fair and accurate copies of the American

10 Airlines videos?

11 A     Yes, they are.

12           MR. POLLACK:  The Government offers Government

13 Exhibits 302, 303, 304, and 305?

14           THE COURT:  Is there any objection?

15           MR. SIMPSON:  No.

16           THE COURT:  They are admitted.

17           (Government's Exhibits 302, 303, 304, and 305

18 received in evidence.)

19           MR. POLLACK:  Can we publish 302?

20           THE COURT:  Yes.

21           (Video playing.)  (Video stopped.)

22           MR. POLLACK:  Can you pause briefly, Ms. Cronin.

23 Q     The timestamp here, we have paused the video at 5:00 p.m.

24 and 17 seconds on February 4, 2020.

25           Can you just orient us in the video?  What are we

1   looking at here?

2   A    So you're looking at the ramp area in the area of Gate 7

3   and you could access the door from the ramp if you had a SIDA

4   card into the terminal, which is still sterile because it's

5   behind the public area.

6   Q    Is this near Gate 7?

7   A    It is.

8   Q    Can you see the reflection in the windows there?

9   A    I can.

10  Q    What is that a reflection of?

11  A    It's a reflection of an American Airlines aircraft.

12  Q    Is that the aircraft at Gate 7?

13  A    Yes, it is.

14  Q    And can you see the white -- it looks like a little white

15  cone on the left side of the screen?  I don't know if I can

16  mark it.  Yeah, I can.

17           Do you see that right there?

18  A    Yes.  That's the nose cone of the aircraft.

19  Q    Is that the same aircraft parked at Gate 7?

20  A    Yes, it is.

21  Q    Do you see this -- I'm going to indicate.  You can't see

22  anymore.  I changed it.

23           There's a rectangle on the upper left portion of the

24  screen.  Is that a tunnel?

25  A    Yes, it is.

1          MR. POLLACK:  Ms. Cronin, can you play the video.

2          (Video playing.)

3          MR. POLLACK:  Pause it there.

4          (Video stopped.)

5          MR. POLLACK:  Thank you.

6    Q    So I have paused at 5 o'clock and 20 seconds p.m.

7          What did we just see in the video?

8    A    You see a van operating on the AOA area.

9    Q    Can you tell us what direction that van is coming from?

10   A    It's coming from an area away from Gate 7.

11   Q    Is it driving near the aircraft?

12   A    It's in close proximity of the aircraft, yes.

13         (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1  DIRECT EXAMINATION

2  BY MR. POLLACK: (Continuing.)

3  Q    Does it appear that it came from a tunnel?

4  A    No.

5           MR. POLLACK:  You can continue playing.

6           (Video playing.)

7  Q    While this continues playing, we're at five minutes and

8  45 seconds and a few seconds thereafter.  What are we seeing

9  there?

10  A    Well, you're seeing an employee exit the van and then

11  swipe into the slider card, access for that door.

12  Q    Do we see the swipe there?

13  A    You do not see the swipe because there's a concrete wall

14  that blocks the view of it.

15  Q    Is it your understanding that there's a --

16  A    Yes, there is.

17           MR. POLLACK:  Can we now publish Government's 303.

18           (Exhibit published.)

19           MR. POLLACK:  And can you pause.

20  Q    Now is 05:01 seconds, p.m.  What do you see here?

21  A    You see an American Airlines employee swiping door that

22  allows you access from the public area into the stairwell area

23  Terminal 8 at JFK Airport.

24  Q    Thank you.  And does that correspond to the swipes of

25  Paul Belloisi we saw on the other document?

1  A     Yes, it does.

2          MR. POLLACK:  Okay, we can stop here at 05:01 and 31

3  seconds.

4          And can we put up 304.

5          (Video playing.)

6          MR. POLLACK:  Can you pause.

7  Q     Is this video from the same door we saw a second ago?

8  A     That's correct.

9          MR. POLLACK:  Can you hit play at 05:03 and seconds.

10 Q     And what did we see there?

11 A     So, you're seeing an American Airlines employee swiping

12 from the public area, which is the baggage claim area, lower

13 level of Terminal 8, into the stairwell at Terminal 8.

14 Q     And, again, like other video, did you actually see the

15 swipe in that area?

16 A     You can't see the swipe because of the door, but the

17 swipe is located on the right-hand side of the --

18 Q     So --

19 A     -- it is on the left-hand side.

20 Q     I apologize.

21         THE COURT:  I don't know if the reporter can take it

22 down, but I didn't understand what was being said because two

23 people were speaking at the same time.

24         I'm sorry, can you just repeat your answer, please.

25         THE WITNESS:  Can you repeat your question?

1  Q    Can you see the swipe on the video itself?

2  A    No, you cannot.

3  Q    Why can't you?

4  A    Because the door is blocking the physical view of the

5  swipe.

6  Q    Do you know that there is a swiping device on the other

7  side of that door?

8  A    I do.

9         MR. POLLACK:  And can we put up 305, Exhibit 305.

10        (Video playing.)

11        MR. POLLACK:  And pause, Ms. Cronin.

12 Q    We're at 05:04 p.m. and two seconds on the video.  Is

13 this the same camera we were looking at a few minutes ago?

14 A    Yes.

15        MR. POLLACK:  Go ahead and play, Ms. Cronin.

16        (Video playing.)

17 Q    And as this continues to play, we're at 5:04 p.m. and 20

18 seconds or thereabouts, what are we seeing?

19 A    You're seeing an American Airlines employee exit the

20 swipe location and then entering a van on the ramp.

21        MR. POLLACK:  May I have one moment with my

22 colleagues?

23        THE COURT:  Yes.

24 Q    Was that the same van in both of the two videos that we

25 saw?

1  A    Yes, it was.

2  Q    It was Gate 7 in both of those videos?

3  A    It's in the area of Gate 7, yeah.

4  Q    Was the airplane there in both of those videos?

5  A    Yes.

6            MR. POLLACK:  No further questions, Your Honor.

7            THE COURT:  I assume the defense wants to

8  cross-examine?

9            MR. SIMPSON:  Yeah, and --

10           THE COURT:  Okay.

11           You want to take your break now, your morning break

12 now, ladies and gentlemen, before we get started?

13           Okay.  I see some thumbs up.

14           All right.  So we're going to continue with you

15 after the short break, and you cannot discuss your testimony

16 with the government, you can discuss scheduling.

17           Ladies and gentlemen, you know the drill; you can't

18 talk among yourselves or anybody else or any kind of media

19 about anything connected with this case, you cannot do any

20 research or independent investigation on your own.  You're not

21 going to have enough time to go visit the areas that are at

22 play here, and we will come back at 11:15.

23           (Jury exits the courtroom.)

24           THE COURT:  All right.  The jury is no longer

25 present.  Everyone can take a break until 11:15, you as well

1  sir, and we will see you back here at that time.  Thank you.

2          THE WITNESS:  Thank you.

3          (The witness steps down.)

4          (A brief recess was taken.)

5          THE COURT:  Everyone, please be seated.  Thank you.

6  This is case on trial continued.  Same appearances at this

7  morning.  Jury is not present.  Witness is not present.

8          Just a couple of things that I did want to address.

9  Apparently someone who may have been a defense witness was in

10  the courtroom a few minutes ago.

11          THE COURTROOM DEPUTY:  It was Mr. Guarnieri.

12          THE COURT:  Oh, Mr. Guarnieri was in the courtroom,

13  okay.  Just a reminder that witnesses are not supposed to be

14  in the courtroom until they're actually called to testify.  I

15  thought it was a potential defense witness as we were

16  discussing that this morning.

17          With respect to the discussion we had earlier this

18  morning in connection with the potential defense witnesses,

19  and specifically the concern that the government has with

20  respect to one of the witnesses possibly incriminating

21  themselves in one way or another, is that witness here today

22  for potential testimony today?

23          MR. SIMPSON:  The witness was told to be here before

24  noon this morning because we know that the government's

25  witnesses would take a little bit of time.  So he's expected

1   to be here soon.

2          THE COURT:  The witness understands that they're not

3   supposed to enter the courtroom, correct?

4          MR. COHEN:  I can certainly reach out to the witness

5   now, Judge, to make sure --

6          THE COURT:  You should have made sure of that as a

7   preemptive matter.

8          MR. COHEN:  Well, Your Honor, what I did is -- what

9   I said I can reach out to them to make sure now.  I told them,

10  but I can reaffirm it with them if you would like me to.

11         THE COURT:  Well, I think that that would be a good

12  thing because the witness can't just waltz in here.

13         MR. COHEN:  I'm happy to do that, Your Honor.

14         THE COURT:  Before you do anything, the other thing

15  is I have had my deputy reach out to the Criminal Justice Act

16  attorney who is on duty that would be Justine Harris, I don't

17  think she's had any connection with this case, correct,

18  government?

19         MR. POLLACK:  That is correct, Your Honor.

20         THE COURT:  So she would be independent counsel and

21  we can have her available to talk to the witness.  Be advised

22  that either the defendant or the witness himself or herself

23  may have to reimburse the CJA panel for the funds if they are

24  financially capable of doing that.  But this is something you

25  should have thought about in advance.  The trial date was set

1    in September, on September 22nd of last year.  This is

2    something, regardless, you had an idea, defense counsel, of

3    what the government's case was and what the witnesses -- who

4    the witness were, we had already had the hearing on this case,

5    so there is absolutely no excuse for waiting until the last

6    minute for this.

7              MR. COHEN:  Now may I inform the witness and remind

8    him not to come into the courtroom, Your Honor?

9              THE COURT:  He's here already?

10             MR. COHEN:  Not that I know of.

11             THE COURT:  What are you going to do?  Send a text

12   message?

13             MR. COHEN:  I would call him and let him know.  I

14   don't want to have communication if he's going to be assigned

15   new counsel at this time.

16             THE COURT:  Okay.  You can step out to do that.

17   Make sure there's no witnesses around.

18             MR. COHEN:  Certainly.

19             (Pause in proceedings.)

20             THE COURT:  Were you able to notify the person?

21             MR. COHEN:  He did not pick up his phone,

22   Your Honor, it went straight to voice mail.  I left him a

23   voice message.  I told him on the voice message not to come

24   into Courtroom 4A, you must sit outside until somebody comes

25   out to see you, and then I also sent him a text message saying

1   the exact same thing.  I told the prosecutor before, now I'm

2   putting it on the record.

3           THE COURT:  Okay.  Otherwise, are we ready to

4   proceed?

5           MR. POLLACK:  The government is.

6           MR. COHEN:  Yes.

7           THE COURT:  Okay.  So why don't we get Mr. Guarnieri

8   and position him back here.  Mr. Cohen, you can position

9   yourself back at the podium.

10          MR. SIMPSON:  I'll be doing this examination, Judge.

11          THE COURT:  Oh, I'm so sorry.  That's right.  You

12  hadn't started yet.  Okay.  Sorry.

13          You can have a seat, sir.

14          (The witness resumes the witness stand.)

15          THE COURT:  All rise.  Jury entering.

16          (Jury enters the courtroom.)

17          THE COURT:  Everyone may be seated.  Thank you.

18          Do the parties agree that all of our jurors are

19  present and properly seated?

20          MR. POLLACK:  Yes, Your Honor.

21          MR. COHEN:  Yes, Judge.

22          THE COURT:  Thank you.  Okay.  And this is the

23  commencement -- welcome back, ladies and gentlemen.

24          First of all, apologies for the delay.  Again, we'

25  were taking care of some administrative issues, I know you

1   were all ready promptly and we appreciate that.

2            This is now cross-examination of Mr. Guarnieri by

3   Mr. Simpson on behalf of Mr. Belloisi.  And I remind you, sir,

4   that you're still under oath.

5            And you may inquire when you're ready, Mr. Simpson.

6            MR. SIMPSON:  Thank you, Judge.

7            MR. SIMPSON:  Can we pull up

8   Government's Exhibit 402 in evidence, please.

9   CROSS EXAMINATION

10  BY MR. SIMPSON:

11  Q    Mr. Guarnieri, can you take a look at your screen,

12  please?

13  A    Yes.

14  Q    Do you recognize this?

15  A    I do.

16  Q    What is this?

17  A    This is Terminal 8 JFK Airport American Airlines

18  terminal.

19  Q    Okay.  Are you familiar with the term hardstand?

20  A    I am.

21  Q    What is a hardstand, sir?

22  A    So, a hardstand a residual location where aircrafts are

23  parked away from gates.

24  Q    Are you familiar with a hardstand on a Spot One?

25  A    No, I'm not.

1   Q    You joined American Airlines in December 2020; is that

2   correct?

3   A    Yes.

4   Q    Okay.  Has there been construction in the area that's

5   depicted on this exhibit?

6        THE COURT:  At what point in time?

7   Q    Has there been construction since you've joined

8   American Airlines on this area depicted in this exhibit?

9        THE COURT:  Well, what specific time frame?

10  Q    At anytime since you have joined American --

11       THE COURT:  No, no, a specific time frame relevant

12  to this case.

13       MR. SIMPSON:  Withdraw the question, Your Honor.

14  Q    Mr. Guarnieri, do you see the gate on the far right-hand

15  corner of your screen?  Can you identify that by just doing a

16  mark?

17  A    So, if I'm understanding your question, you're --

18  Q    Is that correct?

19  A    You're referring to that area?

20  Q    I am.

21  A    Okay.

22  Q    Can you please draw a circle around that for us?

23  A    Is that the area you're referring to?

24  Q    Sure.  Yes.  Do you know what gate that is?

25  A    I'm not sure what gate designation it is.  It's an

1  additional gate added to the terminal to accommodate British

2  Airways that is now a tenant of the Terminal 8.

3  Q    Okay.  And do you know where the American Airlines

4  maintenance office for Terminal 8 is located?

5  A    We have several locations.

6  Q    Are you aware of a maintenance office between Gates 1 and

7  3?

8  A    No, I am not.

9  Q    Okay.  Can you identify Gates 1 and 3 on this exhibit?

10  A    I believe it's in this area right here.

11  Q    Now, can you, again, identify for us -- are you able to

12  identify us for us on this exhibit where the blue van pulled

13  up in the video that you were shown on direct examination?

14        THE COURT:  Well, in the first place, the video was

15  in black and white, so there was no color.

16        MR. SIMPSON:  Okay, Judge, that's fine.

17        THE COURT:  Rephrase.

18        MR. SIMPSON:  Withdrawn.

19  Q    Do you know where -- is there a Dunkin Donuts location

20  inside Terminal 8?

21  A    Yes, there is.

22  Q    Do you know where that would be located on this exhibit,

23  sir?

24  A    It's in -- as you saw in the previous video, it's in the

25  area of Gate 7.  So the employee who is on the ramp, any

1  employee on the ramp has to access that gate, that door, and

2  then they go into the baggage area and Dunkin Donuts is there.

3  Q    Can you identify the area on this exhibit that you were

4  just talking about?

5        THE WITNESS:  Well, you can't -- you can't see it

6  because the finger -- this is a -- this is a departure gate

7  finger, okay.  So if I was to give you an estimation, it would

8  be in this area right here on the ground level.

9  Q    And are you indicating where you believe the blue van you

10  pulled up to?

11  A    No, No, the blue van pulled over right here.  Check.

12        THE COURT:  Okay.  First of all, the first

13  indicating around the center of the photograph, an area that's

14  projecting out from a rectangular structure that is running

15  diagonally from left to right and then demonstrating where the

16  van was just to the left of that.

17        THE WITNESS:  MICH-hmm.

18  Q    Mr. Guarnieri, if somebody was going to drive from the

19  first area that you circled on the right here, this area right

20  here, and they were going to go to Gate 1 and then go to

21  Dunkin Donuts, would they -- do you think they would always

22  use the tunnel that you identified previously?

23  A    No, because the tunnel is multipurpose.  It has a baggage

24  claim system in there, as well.  So if there's congestion

25  there, they would go around, theoretically, the entire

1  departure gate area.

2  Q    Can you draw how you think they would go around in that

3  scenario?

4  A    So, if the tunnel was -- is not available, they would

5  drive, theoretically, this way.

6           MR. SIMPSON:  Judge, at this time, I would like the

7  record to reflect the witness has drawn a line going around

8  Terminal 8 and all the way back around toward what's been

9  identified previously as the area of Gate 7.

10           THE COURT:  Going from the top to the bottom of

11  the -- from the middle top of the photograph to the bottom

12  center of the photograph.  Noted.

13           MR. SIMPSON:  Thank you, Judge.

14           Can we pull up Government's 302, please.

15  Q    Mr. Guarnieri, do you recognize this from a few moments

16  ago?

17  A    I do.

18           MR. SIMPSON:  You can play it.

19           (Video playing.)

20           MR. SIMPSON:  Okay, you can pause.

21           (Continued on the following page.)

22

23

24

25

1   CROSS-EXAMINATION

2   BY MR. SIMPSON:  (Continuing)

3   Q    Mr. Guarnieri, on what you just saw, did you see the

4   vehicle pull up to the nose of the plane and the individual

5   sit inside the vehicle and not exit?

6   A    Could you repeat the question.

7   Q    Yes.

8        In the video that you just saw, did you see the

9   vehicle and its driver pull up in front of the plane and

10  simply sit and not exit the vehicle?

11  A    No.

12  Q    Did you see the van pull up and the individual exit and

13  proceed into the building?

14  A    Yes.

15  Q    Thank you.

16       MR. SIMPSON:  Done with 302.

17       Can we pull up 304, please.

18       (Video played.)

19  Q    Do you recognize this video?

20  A    I do.

21       MR. SIMPSON:  And pause.

22       (Video stopped.)

23  Q    Mr. Guarnieri, do you see the individual in this -- in

24  this video?

25  A    I do.

1    Q    And do you see anything in his hand?

2    A    I do.

3    Q    What appears to be in his hand?

4    A    It looks like a coffee cup.

5    Q    Can you draw a circle around that, please.

6              THE COURT:  It's pretty obvious.

7              MR. SIMPSON:  Withdrawn.

8              THE COURT:  Let's move it.

9              MR. SIMPSON:  Thank you, Judge.  That's fine.

10             Done with 304.

11   Q    Mr. Guarnieri, have you ever seen any other video

12   depicting an individual in a blue van from this day?

13   A    No, I have not.

14   Q    Thank you.

15             MR. SIMPSON:  Can we pull up Government's 102,

16   please.

17   Q    Now, Mr. Guarnieri, it can you tell us again what this

18   is?

19   A    This is a SIDA card access record for Terminal 8 at JFK,

20   which is American Airlines terminal.

21   Q    Well, are they all for Terminal 8?

22   A    No.  They're for Hangar 10 and Terminal 8.

23   Q    And the top entry, what is that -- what's the date for

24   that?

25   A    February 3rd, 2020.

1    Q    And time?

2    A    Time is 2257, which in military terms turned into a

3    standard time is 10:57 p.m.

4    Q    Did you ever become aware of Mr. Belloisi's work schedule

5    on February 4th or on the days before?

6    A    No, I did not.

7    Q    Is it fair to say that the top entry here indicates that

8    Mr. Belloisi was at the hangar, at the very least, at 10:57 on

9    February 3rd, 2020?

10   A    That's correct.

11   Q    Thank you.

12        MR. SIMPSON:  Pull up Government's 104, please.

13   Q    Now, Mr. Guarnieri, this is the AA tower log, I believe

14   you testified on direct; is that correct?

15   A    That's correct.

16   Q    And we see two flights depicted here, yes?

17   A    That's correct.

18   Q    And this kind of flight information for a particular

19   aircraft is one type of records that American Airlines keeps

20   regarding --

21        THE COURT:  Are you testifying or asking a question?

22   Q    Is this one of -- just one of the type of records that

23   American Airlines keeps regarding its flights?

24   A    I'm not aware of any other records.

25   Q    Are you aware of any more comprehensive records regarding

1  the same aircraft's flight history?

2  A    I can only assume that there are, but I haven't seen any.

3  Q    You have never seen a more comprehensive history?

4  A    No, I have not.

5  Q    Thank you.

6          If one wanted to obtain a more comprehensive flight

7  history, would that be available to American Airlines?

8          MR. POLLACK:  Objection.

9          THE COURT:  I will allow the question.

10         Do you know?

11 A    I would imagine that if a subpoena was served to American

12 Airlines flight operations, they would possibly provide a more

13 detailed manifest of the aircraft.

14 Q    Was a subpoena supplied to provide this document to the

15 government?

16         MR. POLLACK:  Objection.

17         THE COURT:  Sustained.

18 Q    Do you know if a subpoena was supplied --

19         THE COURT:  Sustained.

20         Whether or not a subpoena was supplied is

21 irrelevant.  Jury is not to speculate.

22         Move on.

23 Q    American Airlines also maintains swipe --

24         THE COURT:  Not a question.

25 Q    Is it true that American Airlines also maintains

1    employees' swipe histories?

2    A    Yes, they do.

3           MR. SIMPSON:   Can we pull up Government's 102,

4    please.

5    Q    And this is the swipe history for Mr. Belloisi, is that

6    correct, for February 3rd and February 4th?

7    A    That's correct.

8    Q    And why is it important for American Airlines to keep

9    these types of employee swipes or access records?

10   A    It's required by the airport operator, the Transportation

11   Security Administration, for compliance factors.

12   Q    Are there any other reasons?

13   A    Well, American Airlines can look at their employees and

14   see what time they come and go.

15   Q    And why is that important?

16   A    For whereabouts of employees.

17   Q    And would you say that keeping these types of records is

18   business as usual at American Airlines?

19   A    Yes.

20   Q    Are there any employees who are exempt from American

21   Airlines' recordkeeping rules and protocols?

22   A    There are no American Airline employees that are exempt.

23   Q    Pilots aren't exempt?

24   A    Pilots who enter the restricted area, the sound area,

25   need to swipe.  However, I do believe that when they get to

1  the gate, departure gate areas, they do not swipe at that

2  location.  They do not have a gate pass, so they're not

3  required to swipe there.  The gate agent allows them into the

4  jetways and onto the aircraft.  All passengers and American

5  Air employees other than captains are required to swipe.

6  Q    You talked a moment ago about the swipe that is required

7  to get into the secure part of the airport.

8            Pilots are required to do that as well; is that your

9  testimony?

10  A    That is correct.

11  Q    And American Airlines maintains those records; is that

12  right?

13  A    They do.

14  Q    And would American Airlines produce those records if the

15  government asked for them?

16            MR. POLLACK:  Objection.

17            THE COURT:  Sustained.

18  Q    Was American Airlines asked to --

19            THE COURT:  Sustained.

20            MR. SIMPSON:  Your Honor, may I have a sidebar,

21  please.

22            THE COURT:  Yes.

23            MR. SIMPSON:  Thank you.

24            (Sidebar.)

25            (Continued on the next page.)

1   (Sidebar conference held on the record in the presence of the

2   Court and counsel, out of the hearing of the jury.)

3           MR. SIMPSON:  I just want to make sure I'm

4   understanding the basis for the objection and why the Court is

5   not allowing me to ask him about records that he says he's --

6   he said on the stand that they have is --

7           THE COURT:  No, but what you're asking him is

8   whether or not the government subpoenaed records.

9           MR. SIMPSON:  I'm asking whether --

10          THE COURT:  Excuse me.

11          Maybe you would know whether this witness is a

12  witness who is qualified to attest to that, who gets the

13  subpoenas, the legal department at American Airlines, we don't

14  know.  And frankly it's really not relevant here, so you need

15  to start moving it on.

16          MR. SIMPSON:  I understand, Your Honor.

17          However, he just testified that he knows that there

18  is a swipe that pilots do when they go into the secure part of

19  the airport and that those records are maintained.  I'm not

20  asking if it was subpoenaed, I simply asked --

21          THE COURT:  That's fine.  But you're asking whether

22  the government sought those records and that's not

23  appropriate, so move on.

24          MR. SIMPSON:  Sorry, it's not appropriate for me to

25  ask whether the government sought records in the case?  I'm --

1        THE COURT:  Of this particular witness.  How would

2   he know?

3        MR. SIMPSON:  He seems to be the witness to who

4   they're putting in a lot of business records that were

5   obtained extensively.  The government asked American Airlines

6   to produce those records.

7        THE COURT:  I'll let the government respond.

8        MR. POLLACK:  Your Honor, this witness is the person

9   American Airlines identified as someone who can comment on the

10  particular records.  He did not produce the records itself.

11  He would not have direct knowledge of who subpoenaed, what the

12  contents of the subpoena were.  He can only interpret the

13  documents we put in front of him, which we received from

14  American Airlines.

15       THE COURT:  It's done.  It is done.

16       MR. SIMPSON:  Okay.

17       May I ask a followup question?  Just a followup

18  question.

19       THE COURT:  What kind of followup question?

20       MR. SIMPSON:  May I ask him about what the procedure

21  is when the government wants to acquire records from American

22  Airlines, just what the procedure is, how the request is made,

23  how the request is satisfied?  Am I allowed to ask that?

24       MR. POLLACK:  Your Honor, as he said, he's a part of

25  corporate security, he's not in the legal department.  There

1  are lawyers who give him advice as a representative of the

2  security department, but he does not have direct knowledge of

3  the processes the legal -- the lawyers handle to comply with

4  subpoenas.

5         THE COURT:  Denied.  You're denied.

6         MR. COHEN:  Can we ask him, Your Honor, how he got

7  the records, how he came to testify about the records since he

8  is the proponent of the records for the government?

9         THE COURT:  Did he produce the records?

10        MR. POLLACK:  No.

11        MR. COHEN:  Can we ask how he received the records

12 to come and testify about the records?

13        THE COURT:  First of all, the government just said

14 that he's not the person who received the records.  He was

15 shown the records by the government.  The government received

16 the records.

17        MR. COHEN:  Right, but if he can testify that

18 that --

19        THE COURT:  Can we move on?

20        No, this line of questioning is precluded, so move

21 on.

22        (Sidebar ends.)

23        (Continued on the next page.)

24

25

1  BY MR. SIMPSON:

2  Q    Mr. Guarnieri, since taking your position with American

3  Airlines corporate security, have you become familiar with the

4  records that have been provided to the government?

5            THE COURT:  What --

6  Q    Regarding this case?

7            THE COURT:  As to form.

8  Q    Concerning this case, Mr. Guarnieri?

9            THE COURT:  As to form.  There are a lot of records

10  that the government has obtained.

11  Q    With regard to the records that you have testified about

12  today, are you aware of how the government came into

13  possession of those records?

14            MR. POLLACK:  Objection.

15            THE COURT:  Sustained.

16            MR. SIMPSON:  Okay.

17            THE COURT:  A ruling is a ruling.

18            MR. SIMPSON:  I'll move on, Your Honor.

19  Q    Mr. Guarnieri, with respect to the video that you've

20  testified about today, do you know who provided that to the

21  government?

22  A    No, I didn't because --

23            THE COURT:  Again, can I see counsel, please.

24            (Sidebar.)

25            (Continued on the next page.)

1          (Sidebar conference.)

2          MR. SIMPSON:  I'm sorry, Judge.

3          THE COURT:  You are not going to go and try to step

4    outside of the ruling that I made and ask him a question

5    different ways.  It is not going to change what you're trying

6    to do.  You are not that clever.  Move on to something else or

7    I will assume that you've got nothing else and you will sit

8    down.

9          MR. SIMPSON:  May I respond?

10         I did not mean to -- I was not -- I didn't -- I

11   obviously did not understand that the Court --

12         THE COURT:  You are side-stepping my ruling.  I made

13   it very clear what my ruling is.

14         MR. SIMPSON:  I did not know that that pertained to

15   the video, Your Honor.  I didn't.  I recognize that --

16         THE COURT:  If you have a question about the video,

17   ask him a question directly about the video.  Show him the

18   video.  That's fine.  Show him the video as many times as you

19   want.  But where he got it -- where they got it, you will not

20   be going into that with this witness.

21         MR. SIMPSON:  I'm sorry, I didn't know the ruling

22   you just made applied to the video.

23         THE COURT:  And if you do not go into some other

24   area, I am telling you, you will be deemed finished.

25         (Sidebar ends.) (Continued on the next page.)

1   BY MR. SIMPSON:

2   Q    Mr. Guarnieri, separate and apart from any questions with

3   respect to provision of video, are you aware of the amount of

4   cameras that American Airlines has at JFK?

5   A    We're currently adding to the robust system here at

6   Terminal 8 and Hangar 10, so I don't know the approximate

7   number of cameras.

8   Q    Do you know the approximate number of cameras at -- just

9   at Terminal 8?

10  A    The approximate number of cameras at Terminal 8 that are

11  currently in service range between 200 and 230.

12  Q    And who has access to those cameras, as far as American

13  Airlines employees?

14  A    Only corporate security and the American Airlines

15  operation center.

16  Q    Maintenance supervise -- do maintenance supervisors have

17  access to all the cameras?

18  A    I can't say with 100 percent certainty.  I'm not sure.

19  Q    Is it true that there are multiple cameras covering the

20  runway at Terminal 8 at all times?

21  A    That's correct.

22          MR. SIMPSON:  Nothing further, Judge.

23          THE COURT:  Any redirect?

24          MR. POLLACK:  No, Your Honor.

25          THE COURT:  Thank you, sir.  You are excused.

1              (Witness steps down.)

2              THE COURT:  The government may call its next

3    witness.

4              MR. POLLACK:  The government calls Darryl Valinchus.

5              THE COURTROOM DEPUTY:  Please raise your right hand,

6    sir.

7              (Witness sworn/affirmed.)

8              THE COURTROOM DEPUTY:  Thank you.  Please be seated.

9              Bottle of water there for you.

10             THE WITNESS:  Thank you.

11             THE COURT:  Please state and spell your name, sir.

12             THE WITNESS:  Darryl Valinchus, D-A-R-R-Y-L,

13   V-A-L-I-N-C-H-U-S.

14             THE COURTROOM DEPUTY:  Thank you.

15             THE COURT:  And good afternoon, sir.

16             If you are comfortable, you can testify without your

17   mask on.

18             THE WITNESS:  Thank you.

19             THE COURT:  And I am going to ask you to keep your

20   voice up nice and loud, just as you were doing a second ago.

21   You can adjust the mic so that it is at a comfortable height

22   for you.  There is water there for you.

23             And you may inquire, Mr. Pollack, when you're ready.

24             MR. POLLACK:  Thank you, Your Honor.

25             (Continued on the next page.)

1  **DARRYL VALINCHUS,**

2      called as a witness, having been first duly

3      sworn/affirmed, was examined and testified as follows:

4  DIRECT EXAMINATION

5  BY MR. POLLACK:

6  Q    Good afternoon, Mr. Valinchus.

7  A    Good afternoon.

8  Q    Where do you work?

9  A    I work for TeleFore, LLC.

10 Q    What is TeleFore, LLC?

11 A    It's a company I created and I'm the president of.

12 Q    What kind of work does the company you created do?

13 A    I provide analysis of communications records and

14 geospatial visualization of communications records and

15 anything else that has location information.

16 Q    What do you mean by "communications records"?

17 A    Communications records, incoming and outgoing telephone

18 calls, data connections, SMS connections for landlines and/or

19 cellular telephones.

20 Q    And what do you mean by "geospatial visualization"?

21 A    With the proper information from cellular communications

22 companies, I am provided location information, whether cell

23 sites or handset locations, that I could visualize on a map to

24 show where they were connecting to and when they connected.

25 Q    I think you just referenced "cell sites"; is that right?

1   A    Yes, sir.

2   Q    What are cell sites?

3   A    Cell sites are physical antennas that transmit and

4   receive radio waves that allow the cell phones on their

5   network to communicate with the network so they can make and

6   receive telephone calls, text messages or data.

7   Q    And I think you may have also alluded to other kinds of

8   location data; is that right?  Did you allude to other kinds

9   of location data?

10  A    From communications companies?

11  Q    Yes.

12  A    Yes.  So communications companies have different types of

13  information.  They could provide the location of a handset if

14  necessary.

15  Q    And is there also location data in handsets?

16  A    Yes, there is.

17  Q    And are you -- as part of your work with TeleFore, do you

18  also analyze that data?

19  A    Yes, sir.

20  Q    When did you found TeleFore?

21  A    Approximately 11 years ago.

22  Q    And who are your customers or who are TeleFore's

23  customers?

24  A    Primarily law enforcement or prosecutors offices.

25  Q    Have you ever done work for defendants?

1    A    Yes.

2    Q    Before you founded TeleFore, what did you do?

3    A    I was in the New York City Police Department.

4    Q    What did you do for the New York City Police Department?

5    A    I was a uniformed sergeant.  But my last ten years, I was

6    in charge of the analytical programs unit within the

7    intelligence bureau.  And my responsibility was the

8    collection, analysis and visualization of all the

9    communications records gathered for the City's terrorists

10   investigations in any of the high-profile cases.

11   Q    How long were you with the NYPD?

12   A    Almost 30 years.

13   Q    What was your rank when you retired?

14   A    Sergeant.

15   Q    In that work you did with the NYPD, did you apply

16   specialized knowledge and training to criminal cases handled

17   by the NYPD?

18   A    Yes, sir.

19   Q    What kind of cases did you work on?

20   A    Homicides, narcotics cases, burglary patterns, robbery

21   patterns and anything else my supervisors deemed necessary.

22   Q    Did you receive training in the analysis of location

23   data?

24   A    Yes, sir.

25   Q    What kind of training?

1  A    I learned to understand how that data is collected by the

2  communications companies.  I've taken classes to identify the

3  responses from the communications companies and how to

4  structure their data based upon their explanation documents.

5  I've taken numerous courses to understand how to visualize

6  this information and how it should be visualized.

7          I've taken numerous software classes, including the

8  FBI's CAST, cellular system support team training.  I've taken

9  numerous software classes, how to visualize this information.

10  I've also taken GeoTime Desktop Level I, Level II, their

11  certification.  And I'm also certified to teach their Level I

12  and Level II class as the software I utilize to visualize

13  those records.

14  Q    I don't know whether this is included in that response,

15  but did you receive training in GPS in particular?

16  A    GPS is included as a type of location information that's

17  predominant in cell phone, handsets and/or the geographical

18  location information for cell sites and/or handsets.

19  Q    And have you ever trained other people in the analysis of

20  location data?

21  A    Yes, sir.

22  Q    Have you testified in court as an expert in the analysis

23  of location data in geospatial visualization?

24  A    Yes, sir.

25  Q    Can you say approximately how many times?

1    A    Approximately 56 times.

2    Q    What courts have you testified in in this way?

3    A    Both Eastern and Southern Federal Districts in the state

4    of New York, Niagara County, Kings County, Richmond County,

5    Nassau County, Suffolk County and in the state of Iowa, and in

6    the state of Missouri.

7    Q    Do you know offhand approximately how many times you've

8    testified as an expert here in this court?

9    A    Approximately ten times.

10   Q    And when did you most recently do that here in this

11   court?

12   A    November of last year.

13   Q    When have you most recently done that anywhere?

14   A    March of this year.

15   Q    To your knowledge, has a challenge to your qualifications

16   as an expert in geospatial visualization or location data or

17   the analysis of location data ever been sustained?

18   A    No, sir.

19        MR. POLLACK:  Your Honor, at this time, the

20   government moves to qualify Mr. Valinchus as an expert in cell

21   phone data analysis and geospatial visualization --

22        THE COURT:  You need to speak slower.

23        MR. POLLACK:  The government moves to qualify

24   Mr. Valinchus as an expert in cell phone data analysis and

25   geospatial visualization of cell phone location data pursuant

1    to Federal Rule of Evidence 702.

2            THE COURT:  Okay.  I am trying to get the entire

3    title.  Geospatial visualization?

4            MR. POLLACK:  Of cell phone location data.

5            THE COURT:  Any objection?

6            MR. SIMPSON:  May I voir dire the witness, Judge.

7            THE COURT:  Yes, you may.

8            MR. SIMPSON:  Thank you.

9            THE COURT:  As to his qualifications.

10           MR. SIMPSON:  Yes, Judge.

11           Judge, shall I stand or do you have a preference?

12           THE COURT:  It would be -- I think you can be heard

13   from there, but perhaps if you sit, you're closer to the

14   microphone from there.

15           MR. SIMPSON:  That's fine.  May I remove my mask,

16   Your Honor?

17           THE COURT:  Yes, certainly.

18           MR. SIMPSON:  Thank you, Judge.

19   VOIR DIRE EXAMINATION

20   BY MR. SIMPSON:

21   Q    Mr. Valinchus, after 30 years in law enforcement, is it

22   correct, you went private and started your own business?

23   A    Started it prior to my retirement, yes.

24   Q    And your business, is that -- it's TeleFore; is that

25   correct?

1  A     Yes, sir.

2  Q     And are you partnered with another company?

3         THE COURT:  Okay.  That's not -- does not go to his

4  qualifications.

5  Q     You mentioned that you have testified -- that you have

6  worked with defendants before; is that correct?

7  A     Yes, sir.

8  Q     And you've testified over 50 times in criminal trials; is

9  that correct?

10 A     Yes, sir.

11 Q     But you've never testified for a criminal defendant; is

12 that correct?

13 A     Yes, sir.

14 Q     It's correct that you have never testified for a criminal

15 defendant?

16 A     That is correct.

17 Q     Mr. Valinchus, you advertise yourself as a law

18 enforcement liaison; is that right?

19 A     That is one of the titles for my company, yes.

20 Q     And would that mean that you hold yourself out as someone

21 who's available to help law enforcement --

22        THE COURT:  That goes beyond the qualifications.

23 Q     Do you teach professional seminars and presentations in

24 the areas that you're here to testify about today?

25 A     Yes, sir.

1  Q    And you teach about reading and understanding

2  communications data; is that correct?

3  A    That's one of the things I touch on, yes, sir.

4  Q    As well as cell phone extraction?

5  A    I don't teach cell phone extractions.

6  Q    You teach cell site location analysis?

7  A    Correct.

8  Q    And you teach your students that every contact leaves a

9  trace --

10            THE COURT:  Again, questions, please, and not

11  testimony.  Form.

12            MR. SIMPSON:  Yes.

13  Q    And in these seminars that you teach to law enforcement

14  officers, do you instruct them on how to exploit

15  communications data?

16  A    Teach them how to utilize the data they're able to

17  acquire, yes, sir.

18  Q    You don't use the word "exploit"?

19  A    Not any longer.

20  Q    Why don't you use it any longer?

21            THE COURT:  Again, that doesn't go to

22  qualifications.

23            Voir dire.

24  Q    Mr. Valinchus, have you authored any books or

25  peer-reviewed papers or articles on cell site location

1  analysis?

2  A    No, sir.

3  Q    Have you published any academic work of any kind on this

4  topic?

5  A    No, sir.

6  Q    Is it accurate to say that outside of what you're

7  specifically hired to do by law enforcement agencies, most of

8  what you do professionally consists of giving presentations to

9  law enforcement officers about this subject?

10  A    No, sir.

11  Q    What else do you do besides casework and giving

12  presentations to law enforcement officers on this topic?

13  A    I am contracted by a company called PenLink.  I am a

14  subject matter expert for their company.  I'm termed a

15  solutions engineer.  And I assist other prosecutors and/or law

16  enforcement when they don't understand the data they have or

17  help to explain to them the data they do have.

18  Q    With regard to cell site location, Mr. Valinchus, how

19  accurate is this process?

20         THE COURT:  That goes beyond the scope of voir dire.

21         MR. SIMPSON:  Nothing further at this time, Judge.

22         THE COURT:  Any objection to qualifying the witness?

23         MR. SIMPSON:  No.

24         THE COURT:  The witness is qualified as an expert in

25  cell phone data analysis and geospatial visualization of cell

1    phone location data.

2            And, ladies and gentlemen, briefly I just want to

3    instruct you that the witness has just been qualified in the

4    area that I just mentioned.  And his scientific, technical or

5    other specialized knowledge will help the jury understand the

6    evidence or decide a disputed fact.  A witness qualified as an

7    expert by knowledge, skill, experience, training or education

8    may testify about such evidence or facts in issue in the form

9    of an opinion.

10           The rules of evidence ordinarily do not permit

11   witnesses to testify to opinions or conclusions.  An exception

12   to this rule exists for those qualified as expert witnesses

13   who may state their opinions and the reasons for them.  You

14   should consider the expert opinion received in this case and

15   give it such weight as you think it deserves.  If you should

16   decide that the opinion of the expert witness is not based

17   upon sufficient education and experience or that the reasons

18   given in support of the opinion are not sound or that the

19   opinion is outweighed by other evidence, you may disregard the

20   opinion entirely.

21           In short, the expert witness is in all other

22   respects the same as any other witness.  You should consider

23   his qualifications, experience, interest in the outcome, if

24   any -- in the case, if any, demeanor and all other factors you

25   will be instructed on later in the case to consider in

1   assessing the credibility of a witness.

2          You may give expert testimony whatever weight, if

3   any, you find it deserves in the light of other evidence

4   before you.  You should not accept -- you should not, however,

5   accept the testimony of a witness merely because he is an

6   expert in a field or merely because I allowed the witness to

7   testify concerning his opinion, nor should you substitute it

8   for your own reason, judgment and common sense as the

9   determination of the facts in this case rest solely on you.

10         You may proceed to inquire, Mr. Pollack.

11         MR. POLLACK:  Thank you, Your Honor.

12  CONTINUING DIRECT EXAMINATION

13  BY MR. POLLACK:

14  Q    I think you mentioned "GPS" before.

15         Can you tell us what GPS is?

16  A    GPS stands for global positioning satellite.  It's a

17  system surrounding this planet where satellites transmit a

18  geographical date and time to the planet.  And devices have

19  the ability to capture that information.  And when they

20  capture it from more than four satellites, they're able to

21  pinpoint their location on the planet.

22  Q    When you say "their location," what do you --

23  A    It could be a cellular device, it could be a GPS device,

24  it could be a laptop, it could be anything that can receive

25  that information from the satellites.

1   Q     Are you able to say approximately how accurate or how

2   precise that location from the GPS is?

3   A     Based upon the amount of GPS data after the decimal

4   point, that increases its accuracy.  The accuracy is increased

5   based upon the amount of satellites the device receives from.

6   Q     As a general matter, can you say approximately how

7   accurate GPS location data is?

8   A     Very accurate.

9   Q     You said -- I think you referred a few times to

10  "handsets."

11        Does that just mean a cell phone or do you mean

12  something else?

13  A     Yes.  That's just a different term that I utilize for

14  cellular telephone.

15  Q     Do cell phones or handsets store location data

16  themselves?

17  A     Yes.

18  Q     And what -- do cell phones record that data continuously?

19  A     If the user allows it to, yes.

20  Q     If the user doesn't allow it to, when do cell phones

21  record the location data?

22  A     Depending on the applications that are used in a

23  smartphone or what types of activities are being utilized or

24  the permissions the user gave it, it would capture that

25  information and store it within the device.

1  Q    Do cell phones capture and store the location if, for

2  example, the user activates a map application?

3  A    Yes.  It has to know where you are to give you directions

4  from that point, yes.

5  Q    And what about when a cell phone takes photographs, does

6  it sometimes record the location data?

7  A    Yes.  That option is turned on and will store the

8  location information.

9  Q    Let's talk a little bit about cell phone providers, like

10  T-Mobile or AT&T.

11        At the most basic level, how is a cellular telephone

12  call made?

13  A    Your handset's in constant communication with the network

14  when it's not in use transmitting a radiowave to the cell

15  sites allowing the network to know where you are and allowing

16  the device to understand which cell site is providing the best

17  service at that given moment.

18        When you push the send button, it transmits the

19  ten digits you're calling to the cellular antenna and to the

20  computer that's controlling that cell site.  At that point,

21  it's decided if it's an internal call or within the same

22  network, it's routed through the computer system and

23  distributed to the geographical area where the person is

24  you're calling on their cell phone.

25        If it's not a cell phone that's on the same network,

1    it's routed out to a public telephone switch.  And then it's

2    either routed to a business phone, a landline or to another

3    communications company.

4    Q    I think you said both "cell site" and "cell antenna."

5         Is there a difference between those?

6    A    They're the same thing.

7    Q    What about cell tower?

8    A    Cell tower is a physical structure that holds up some

9    cell sites, but not every cell site is on a cell tower.

10   Q    What else are cell sites on besides towers?

11   A    They could be affixed to buildings, they could be affixed

12   to water towers, they could be affixed to the elevated train

13   stations, billboards, anything that the communications

14   companies can pay for that would provide good service to their

15   customers.

16   Q    As a general matter, will a cell phone typically connect

17   to a nearby cell site or cell tower?

18   A    It connects to the one providing the best service in its

19   area.

20   Q    Is that always going to be the closest one?

21   A    Not always.

22   Q    What are some of the factors that affect which cell site

23   a phone connects to?

24   A    Basic factors would be geography, if there was a building

25   between the handset and the cell site it's trying to connect

1   to.  It could be the strength of the battery, the weakness of

2   the battery, whether the handset's inside or outside or in a

3   vehicle or out of a vehicle.  Those all take affect of the

4   radio waves and would determine which ones are providing --

5   which cell sites are providing the best service at that

6   moment.

7   Q    Speaking generally in your experience, what kind of

8   information is stored by cell phone companies when someone

9   makes a call?

10  A    They store the time; the date; the duration; the type of

11  transaction, whether it's a telephone call or a text message;

12  the other number involved in the communication, whether the

13  call came in or didn't come in; the duration; and the cellular

14  cell site the handset was connected to and the sector or side

15  if it's available.

16  Q    What does that mean about the sector or side?

17  A    Most cell sites in our geographical area are three-sided.

18  They will provide you the compass bearing for the center of

19  the side of the cell site it's connecting to.

20  Q    And can those records give an approximation of a cell

21  phone's location?

22  A    Yes.

23  Q    How can they do that?

24  A    The cell site's in a specific geographical area, it's an

25  exact location.  And it has to be transmitting radio waves

1  that the handset can connect to in that area.

2  Q    Is that going to be an exact location?

3  A    No, sir.

4  Q    Were you asked by the government to review certain

5  records in this case?

6  A    Yes, sir.

7  Q    Speaking generally, what kinds of records did you review?

8  A    Call detail records from T-Mobile with location

9  information and a Cellebrite extraction report for another

10 device.

11 Q    What is a Cellebrite extraction report?

12 A    Cellebrite is a tool that is utilized to forensically

13 extract the information it understands from a cellular

14 telephone and make an exact replica of what was in that device

15 for analysis or anything else you need to do with it.

16       MR. POLLACK:  Your Honor, if I may, I would like to,

17 at this time, offer a stipulation, which is marked as

18 Government Exhibit S-3.

19       THE COURT:  Yes, you may.

20       MR. POLLACK:  Can we publish?

21       THE COURT:  Yes.

22       MR. POLLACK:  This stipulation, I will read.

23       It says:  It is hereby stipulated and agreed by and

24 between the undersigned parties that:

25       The item marked for identification as Government

1  Exhibit 500 contains a forensic digital extraction of the

2  iPhone with IMEI Number 359495081509001, which is marked for

3  identification as Government Exhibit 5.

4          The item marked for identification as Government

5  Exhibit 600 contains true and complete records of T-Mobile

6  U.S., Incorporated, showing call details and cell site data

7  for the cellular device identified by the Call Number

8  (646) 940-1227.

9          This stipulation marked as Government Exhibit S-3

10 may be received in evidence as a government exhibit at trial.

11 Q    Mr. Valinchus, the records that you just described that

12 you were asked to analyze, were those the extraction marked

13 for identification purposes only as Government Exhibit 500 and

14 the T-Mobile data marked for identification only as Government

15 Exhibit 600?

16 A    Yes, sir.

17 Q    Are those records voluminous?

18 A    Yes, sir.

19 Q    As part of your analysis, did you create summary exhibits

20 that extract and compile certain data from those voluminous

21 records?

22 A    Yes, sir.

23 Q    And did your analysis also include visualization of the

24 location data contained in those records?

25 A    Yes, sir.

1  Q     How did you do that?  How did you make the

2  visualizations?

3  A     By utilizing the location information that was provided

4  in both sets of records, I am available to visualize it using

5  the GPS coordinates on a map and showing the geographical

6  location of their connections or usage.

7             MR. POLLACK:  I would like to show the witness only,

8  and of course counsel and the Court, what's been marked for

9  identification as Government Exhibit 505.

10 Q     Do you see that, Mr. Valinchus?

11 A     Yes, sir.

12 Q     Do you recognize it?

13 A     Yes, sir.

14 Q     What is it?

15 A     It is a static view or a top-down view map that I

16 created, one with cell site location information for one

17 handset and for geographical locations of another handset for

18 the period of time of February 3rd, 2020, through February 4th

19 of 2020.

20 Q     And based on your knowledge, training and experience in

21 the field of cell phone location analysis and geolocation

22 visualization, do you have an opinion as to whether these --

23 whether that exhibit fairly and accurately summarizes your

24 analysis of the records that you analyzed?

25 A     Yes, it does.

1           MR. POLLACK:  The government offers Government

2     Exhibit 505.

3           THE COURT:  Any objection?

4           MR. SIMPSON:  Objection as to relevance.

5           THE COURT:  Overruled.

6           It is admitted.

7           (Government Exhibit 505 received in evidence.)

8           MR. POLLACK:  May we publish, Your Honor?

9           THE COURT:  Yes.

10          Just a question for the government.  Are you seeking

11    to introduce Exhibits 500 and 600?

12          MR. POLLACK:  No, Your Honor.

13    Q    Now that everyone can see, Mr. Valinchus, can you

14    describe for us what this is?

15    A    Yes, sir.

16          So this is a top-down or static view map of parts of

17    Long Island, Queens, Brooklyn, the Bronx and New York City.

18    The red dots represent the geographical cell site locations

19    for the connections for this period of time for the red

20    handset identified as Lester.  The blue dots represent the

21    geographical locations of the handset based upon a Cellebrite

22    extraction for the handset associated with individual named

23    Belloisi.

24    Q    The red marks, which you referred to as the ones with

25    Lester, is those associated with the cell phone number that I

1    just read from the stipulation from T-Mobile?

2    A    Yes, sir.

3    Q    And where did the name Lester come from?

4    A    That came from the physical extraction of the Cellebrite

5    device.

6    Q    So is that Mr. Belloisi's handset, his phone?

7    A    Yes, sir.

8    Q    So the number from the T-Mobile records, is that the

9    number that is saved as the name Lester in the Defendant's

10   phone?

11   A    Yes, sir.

12   Q    Are the blue dots in the map everywhere that Belloisi

13   went?

14   A    No, sir.

15   Q    What are they?

16   A    Those blue dots represent location information extracted

17   from the cellular device based upon actions on the device.

18   Q    And are the red dots everywhere that Lester went?

19   A    No, sir.

20   Q    What are they?

21   A    Those red dots represent the cell site geographical

22   location the handset connected to when it made and received

23   the event that's depicted on the date and time there.

24            (Continued on the next page.)

25

1    DIRECT EXAMINATION

2    BY MR. POLLACK:  (Continuing)

3    Q    And can you conclude anything about the Belloisi handset

4    and the Lester handset based on the geographic distribution of

5    those blue and red dots?

6    A    Yes, sir.

7                The blue handset associated with Belloisi spends

8    most of its time on Long Island based upon this information,

9    and the red handset associated with Lester spends the majority

10   of its time up in the Bronx.

11   Q    Is there any instance on the records that you saw where

12   the Belloisi handset was actually in the Bronx?

13   A    Yes, sir.

14   Q    Can we see that on this map?

15   A    Yes, you can.

16   Q    Where?

17   A    On the left-hand side towards the top, there is a blue

18   dot identified by the Belloisi annotation for 2/4 of '20 at

19   12:58 and 30 seconds a.m.

20   Q    So is that a little bit 1:00 in the morning the night of

21   February 3rd into February 4th of 2020?

22   A    Yes, sir.

23   Q    Did you create a visualization exhibit for that Bronx

24   location where the Belloisi handset was at almost 1:00 a.m. on

25   February 4th?

1  A    Yes, sir.

2         MR. POLLACK:  Can I show only the witness what has

3  been marked for identification as Government Exhibit 506.

4         THE COURT:  Yes.

5  Q    Do you recognize this?

6  A    Yes.

7  Q    Is this the visualization you just referenced?

8  A    Yes.

9  Q    Does this fairly and accurately represent your opinions

10 of the analysis of the location data from the defendant's

11 phone?

12 A    Yes, sir.

13        MR. POLLACK:  The Government offers Government

14 Exhibit 506.

15        THE COURT:  Any objection?

16        MR. SIMPSON:  As to relevance.

17        THE COURT:  Overruled.

18        (Government's Exhibit 506 received in evidence.)

19        MR. POLLACK:  May we publish?

20        THE COURT:  Yes.

21 Q    Mr. Valinchus, can you describe for us what this shows?

22 A    This is a Google map identified the geographical point at

23 12:58 and 30 seconds a.m. based upon the exactly latitude and

24 longitude taken from the previous map for that location for

25 the Belloisi extraction that depicts with a phone number

1   (51) 641-3710.

2   Q    And that the Belloisi phone?

3   A    Yes, sir.

4   Q    What is that location?

5   A    That is a parking lot of a White Castle restaurant.

6        MR. POLLACK:  Can we turn to the second page, Ms.

7   Cronin.

8   Q    What is this?

9   A    This is the street view from Google for the White Castle

10  restaurant giving you visualization of the streets and the

11  parking lot next to it that that point was located.

12  Q    Did you also conduct analysis of the communication data

13  from the defendant's phone that shows communication between

14  the defendant and Lester during this time period?

15  A    Yes, sir.

16       MR. POLLACK:  May we show the witness only what has

17  been marked for identification as Government Exhibit 501.

18       THE COURT:  Yes.

19  Q    What is this?

20  A    This is a communications report that I created for the

21  communications between the Belloisi handset ending in 7106 and

22  the handset associated with Lester ending in 1227 for the

23  period of time of February 3, 2020 through February 4th of

24  2020.

25  Q    And does this fairly and accurately summarize the

1   voluminous data you analyzed?

2   A    Yes, sir.

3           MR. POLLACK:  The Government offers Government

4   Exhibit 501.

5           THE COURT:  Any objection?

6           MR. SIMPSON:  As to relevance.

7           THE COURT:  Overruled.

8           (Government's Exhibit 501 received in evidence.)

9           MR. POLLACK:  May we publish?

10          THE COURT:  Yes.

11          (Exhibit published.)

12  Q    I'd like to direct your attention to -- before I do that

13  --  withdrawn.

14          Can you tell us, on an overview looking at this

15  document -- I know you can't read it very well zoomed out, but

16  what is this generally showing?

17  A    This is showing all the communications between the

18  Belloisi handset and the Lester handset and their content

19  available from February 3rd through February 4th.

20  Q    And what's the difference between the gray bubbles on the

21  left and the blue bubbles on the right?

22  A    The gray bubbles on the left indicate that the messages

23  or communications was instigated from the handset identified

24  as the one belonging to Lester.

25          And the blue bubbles on the right-hand side are

1 indicating that the message or call was initiated by the

2 Belloisi handset on the right-hand side.

3 Q    Now, I would like to direct your attention to the entry

4 on February 3, 2020 that's marked on here as 22:36.

5          First of all, what is 22:36 in civilian time?

6 A    That is 10:36 p.m.

7 Q    So what happens at 10:36 p.m. on February 3, 2020 that we

8 can see on this document?

9 A    An outgoing voice call was made from the handset

10 associated with Belloisi using the WhatsApp application to the

11 Lester number.

12 Q    Was that communication successful?

13 A    No, sir.  It has zero duration?

14 Q    What does it mean that it has zero duration?

15 A    It was an attempted call but it was never answered.

16 There was no further communication.  It was not completed.

17 Q    And what, if anything, happens right after that?

18 A    There was an outgoing text message sent on the WhatsApp

19 application from the Belloisi handset to the Lester handset.

20 Q    And what did that say?

21 A    Call me when you're not busy.  I got to tell you

22 something.

23 Q    And what happened after that?

24 A    Then there was an outgoing phone call made by the

25 Belloisi handset on the WhatsApp application to the Lester

1  handset.

2  Q    How long was that call?

3  A    Approximately 59 seconds.

4       MR. POLLACK:  Can we zoom further down.

5  Q    What happened after that 59-second phone call initiated

6  by Belloisi?

7  A    The next day, on the 4th, in the early morning, there was

8  an outgoing voice call from the Lester handset using the

9  WhatsApp application to Belloisi.

10 Q    And you said early morning, but what time was that?

11 A    That was 20 minutes after midnight on February 4th.

12 Q    So we're talking about the night of the February 3rd into

13 the morning of February 4th; is that right?

14 A    Yes, sir.

15 Q    And what happened after that?

16 A    There was a text message response on the WhatsApp

17 application from the Belloisi handset to the Lester handset.

18 Q    And what did Belloisi say to Lester at that point?

19 A    Stated:  Here.

20 Q    Does that approximately coincide with the location data

21 at the south -- at the White Castle in the South Bronx?

22 A    Yes, sir.

23 Q    What comes after that?

24 A    An outgoing voice call on the WhatsApp application to the

25 -- from the Belloisi handset to the Lester handset.

1   Q    And did Belloisi reach Lester at that point?

2   A    No, sir.

3   Q    And what happened after that?

4   A    An outgoing call on the WhatsApp application from the

5   Lester phone to the Belloisi handset.

6   Q    And how long was that?

7   A    Approximately 23 seconds.

8   Q    And what happened after that?

9   A    And then there was an outgoing voice call from the

10  WhatsApp application from the Belloisi handset to the Lester

11  handset.

12  Q    Was that call successful?

13  A    No, sir.  That had a zero duration.

14  Q    What happened after that?

15  A    There was an outgoing WhatsApp text message from the

16  Belloisi handset to the Lester handset.

17  Q    What does that text message say?

18  A    "Where are you?  I don't mean to rush you, but I got to

19  pick up my daughter."

20  Q    And what time was that?

21  A    That was at 12:43 a.m.

22  Q    Is that also approximately -- does that also

23  approximately coincide with the time of the White Castle in

24  South Bronx?

25  A    Yes, sir.

1           MR. POLLACK:  Can we zoom a little bit further down,

2    Ms. Cronin.

3    Q    What's the next communication after the "Where are you

4    message"?

5    A    There was an outgoing WhatsApp voice call from the Lester

6    handset to the Belloisi handset.

7    Q    What time?

8    A    That was at 2:25 p.m. on February 4th.

9    Q    So that was the next afternoon; is that right?

10   A    Yes, sir.

11          MR. POLLACK:  Can we put up 505 again already in

12   evidence.

13   Q    After that text message that said, Where are you, I need

14   to pick up my daughter, is there location data here that would

15   suggest where the defendant picked up his daughter?

16   A    Yes.

17   Q    Where do we see that?

18   A    That would be the middle of the map on the far left side

19   by -- it's actually right on La Guardia Airport.  It's dated

20   2/4 of '20 and the timestamp of 1:11:40 seconds a.m.

21   Q    Thank you.

22          MR. POLLACK:  Can we go back to 501.

23   Q    So going back to the following afternoon, I think you

24   said it was 2:25 p.m. on February 4, 2020; is that right?

25   A    Yes, sir.

1  Q     Can you tell us what happened then on this document?

2  A     Then there was an outgoing WhatsApp voice call from the

3  Belloisi handset to the Lester handset.

4  Q     How long did they speak?

5  A     Approximately 4 minutes and 48 seconds.

6  Q     And what happened after that?

7  A     There was another outgoing voice call on the WhatsApp

8  application from the Belloisi handset to the Lester handset.

9  Q     What time was that?

10 A     That was at 6:33 and 58 seconds p.m.

11 Q     How long was that call?

12 A     Approximately 2 minutes and 11 seconds.

13 Q     What happened after that?

14 A     And there was another outgoing voice call from the

15 Belloisi handset on the WhatsApp application to the Lester

16 handset.

17 Q     At what time?

18 A     6:45 and 12 seconds p.m.

19 Q     How long was that call?

20 A     Approximately 30 seconds.

21 Q     What happened after that?

22 A     There was on outgoing WhatsApp text message from the

23 Lester handset to the Belloisi handset.

24 Q     What time was that?

25 A     6:47 and 47 seconds p.m.

1          MR. POLLACK:  At this time, Your Honor, I would like

2     to offer a stipulation signed by the parties and marked as

3     Government Exhibit S-4.

4          THE COURT:  Yes.

5          MR. POLLACK:  This says, "It is hereby stipulated

6     and agreed by and between the undersigned parties that the

7     text message received via WhatsApp on the defendant's phone

8     from the contact saved as Lester on February 4, 2020 at

9     approximately 6:47 and 47 seconds p.m. eastern time, which

10    reads in its entirety:

11         Confirmado Me acaban de confirmar.  Ya todos

12    salieron los van a llevar cenar que tienen hambre, can be

13    fairly and accurately translated into English as Confirmed.

14    They just confirmed to me.  They all already left, they're

15    going to take them to dinner because they're hungry.

16         This stipulation, marked as Government S-4, may be

17    received in evidence as a Government exhibit at trial.

18         Can we bring Government Exhibit 501 back up, Ms.

19    Cronin.

20    Q    After that confirmed text message at 6:47 p.m. on

21    February 4, 2020, what happened next?

22    A    There was an outgoing WhatsApp voice call from the Lester

23    phone to the Belloisi handset.

24    Q    At what time?

25    A    9:21:16 seconds p.m.

1       MR. POLLACK:  Ms. Cronin, can we go to the next

2  page.

3  Q     What happened after that?

4  A     There was an outgoing call from the Lester handset on the

5  WhatsApp application to the Belloisi handset.

6  Q     What time was that?

7  A     9:23 and 44 seconds.

8  Q     Is it accurate to say that after that the same thing is

9  repeated multiple times?

10 A     Except for one difference in one.

11 Q     So first explain to me the difference.  Can you explain

12 the difference?

13 A     Yes.

14 Q     Please do.

15 A     The difference is that the call at 21:35 and 13 seconds

16 or 9:35 and 13 seconds p.m. is an outgoing voice call from the

17 Lester handset to the Belloisi handset on the cellular

18 communications network not using the application.

19 Q     And how is that different from the other ones?

20 A     Because that had connectivity and was utilizing the

21 telephone number and the telephone communications of T-Mobile.

22 Q     So that was not using the WhatsApp application; is that

23 right?

24 A     Correct.

25 Q     Now, can you just go down us and tell us the times for

1   each of those attempted calls from Lester to Belloisi?

2   A    9:23 and 44 seconds p.m.

3             9:28 and 5 seconds p.m.

4             9:34 and 17 seconds p.m.

5             9:34 and 48 seconds p.m.

6             9:35 and 13 seconds p.m.

7             9:39 and 44 seconds p.m.

8             9:46 and 49 seconds p.m.

9             9:48 and 3 seconds p.m.

10            And then 11:41 and 4 seconds p.m.

11  Q    Did you create a visualization of Lester's locations

12  leading up to and including those missed calls?

13  A    Yes, sir.

14            MR. POLLACK:  I would like show, if I may, the

15  witness only what has been marked for identification as

16  Government Exhibit 507.

17            THE COURT:  Yes.

18  Q    Do you recognize this?

19            I'm sorry.  Do you see it now?

20  A    Yes, sir.  Yes, I do.

21  Q    Is this the visualization you referenced that shows

22  Lester's locations leading up to those missed calls?

23  A    It shows his cell cite locations leading up to those

24  calls.

25  Q    Thank you for clarifying.

1          Does this summarize the voluminous data and express

2     your expert opinion as to meaning of those location data?

3     A     Yes, sir.

4               MR. POLLACK:  The Government offers 507.

5               THE COURT:  Any objection?

6               MR. SIMPSON:  As to relevance.

7               THE COURT:  Overruled.

8               MR. POLLACK:  May we publish?

9               THE COURT:  Yes.  It's admitted.

10              (Government's Exhibit 507 received in evidence.)

11    Q     Mr. Valinchus, can you walk us through this, what it

12    means?

13    A     Yes, sir.

14              So this is a top down visualization map for February

15    4th from 7:00 p.m. to 9:35 p.m.  The red dots represent

16    incoming/outgoing telephone calls or text messages made or

17    received by the Lester handset.

18              The red points on the map represent the geographical

19    location of the cell site that handset was connecting to when

20    it made or received those telephone calls or text messages.

21              The annotations are the date and time that they took

22    place.

23    Q     And based on the locations of those cell sites and the

24    timestamps, are you able to make a conclusion about movement

25    of the Lester handset?

1  A    Yes, sir.

2  Q    What are those conclusions?

3  A    That handset started in the Bronx and ended up at the end

4  of this period of time to just outside to a cell site outside

5  of JFK Airport.

6         MR. POLLACK:  Can we bring back up Government

7  Exhibit 501 already in evidence, and can we zoom in where the

8  call with Lester is at 2:26 p.m.

9  Q    So, Mr. Valinchus, I think you already said some things

10  about these phone calls and there is one there at 2:26:35

11  p.m.; is that right?

12  A    Yes, sir.

13  Q    Can you tell us again how long that phone call was?

14  A    Approximately 4 minutes and 48 seconds.

15  Q    And did that begin or end at 12:26 and 35 seconds?

16  A    It began at that time.

17  Q    In your analysis of the Cellebrite data, did you find

18  anything in the defendant's phone that shows what the

19  defendant was doing around the time of that call?

20  A    Yes, sir.

21  Q    Did you extract those photos and videos from the

22  defendant's phone and makes exhibits that showed their

23  metadata?

24  A    I didn't extract them from the phone.  I extracted them

25  from the report.

1  Q    Thank you for clarifying that.

2        Are those items that were in the defendant's phone a

3  fair and accurate copies of data taken from the defendant's

4  phone or from the report extracted from the defendant's phone.

5  A    Yes, sir.

6        MR. POLLACK:  The Government --  excuse me.

7  Withdrawn.

8  Q    Have you reviewed those in advance of your testimony

9  today?

10 A    Yes, sir.

11 Q    Are they marked for identification as Government Exhibit

12 508 through 512?

13 A    Yes, sir.

14        MR. POLLACK:  At this time the Government offers

15 Exhibit 508 through 512.

16        THE COURT:  Any objection?

17        MR. SIMPSON:  As to relevance.

18        THE COURT:  Overruled.

19        (Government's Exhibits 508 through 512 received in

20 evidence.)

21        MR. POLLACK:  Can we publish first Government

22 Exhibit 509.

23        (Exhibit published.)

24 Q    Can you tell us what this is?

25 A    It is a picture taken of the Belloisi handset of an

1  individual wearing either a security or law enforcement

2  uniform --

3           MR. SIMPSON:  Objection.

4           THE COURT:  There is no need to scream, first of

5  all.

6           May I see you on the side, please?

7           (Sidebar.)

8           (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar conference held.)

2          THE COURT:  Basis of the objection?

3          MR. SIMPSON:  The witness is editorializing.  He is

4    saying someone appears to be in a security outfit.  There's no

5    way that he -- they're trying to sneak in a description of how

6    this person looks.  It is a man at an extremely great distance

7    that seems to have a dog.

8          THE COURT:  He looks like a law enforcement officer.

9    It is plain to anybody who has ever seen law enforcement

10   officers and you're talking about an ex-cop.

11         MR. SIMPSON:  But --

12         THE COURT:  I will allow the Government to rephrase

13   the question.

14         And let me tell you this:  I'm not a big fan of

15   drama.  I don't like it a when lawyers pound on the table or

16   yell or anything else in the courtroom.  An objection that

17   screams out like that, I don't appreciate.

18         MR. SIMPSON:  I apologize.  I was too close to the

19   microphone.

20         THE COURT:  Cases are won on the facts and the law.

21         MR. COHEN:  Your Honor, is the witness confined to

22   just describing what the photo shows, in other words, what the

23   person is wearing as opposed to making conclusion of what that

24   person's job responsibility is?

25         THE COURT:  What's the question?

1          Hold on a second.

2          Let me have the reporter read back the question.

3          (Record read.)

4          THE COURT:  I'm going to allow the answer to stand.

5   You can ask a follow-up question:  What is the basis for that

6   conclusion?

7          MR. POLLACK:  I will do that, Your Honor.

8          We didn't mean to delve into it.  Obviously the

9   picture speaks for itself.

10         THE COURT:  Well, you asked him what the picture

11  shows.

12         MR. POLLACK:  Thank you, Your Honor.

13         (End of sidebar conference.)

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  The objection is overruled.

3          You may inquire.

4    BY MR. POLLACK:

5    Q    I think you started to describe the person, what else is

6    in the photo aside from the person?

7    A    He is working or walking with a black dog.

8          MR. POLLACK:  Can we put up 509-A?

9    Q    Can you tell, Mr. Valinchus, what this is?

10   A    This is the same image except to the right-hand side of

11   the image it has the metadata based upon the date and time the

12   image was taken and then the device information from it.

13   Q    And what is the date and time of that photograph?

14   A    February 4, 2020 at 2:26 p.m.

15   Q    Is that about the same time as the 2:26 phone call to

16   Lester?

17   A    Yes, sir.

18         MR. POLLACK:  Now, can we look at Government Exhibit

19   510 in evidence, and 511.

20   Q    Is there any difference between those photos?

21   A    It's a forward movement in time.  You can see the

22   individual is moving further away from the person taking the

23   pictures.

24   Q    Are 510-A and 511-A metadata similar to 509-A?

25   A    Yes, sir.

1   Q    How close in time were those photos taken?

2   A    Within the same minute.

3        MR. POLLACK:  Can we look now at 512 in evidence.

4   Q    Is this another photo from the phone?

5   A    Yes, sir.

6   Q    Can you tell us in general terms what's in this photo?

7   A    This is a picture.  It appears to be inside of an

8   airplane taking a picture from front towards back of another

9   individual wearing the same type of uniform with a dark jacket

10  and tan pants.

11       MR. POLLACK:  And now can we put up Exhibit 412-A.

12  Q    What is this?

13  A    This is the same image with the metadata displayed next

14  to it.

15  Q    What time was this image taken?

16  A    2:36 p.m. on February 4, 2020.

17  Q    Is that about ten minutes after the photos with the dog?

18  A    Yes, sir.

19  Q    Now, Government Exhibit 408 already in evidence, is that

20  a video from the phone?

21  A    Yes, there a video.

22  Q    Is 508-A the metadata associated with that?

23  A    Yes.

24       MR. POLLACK:  Can we look at first the metadata,

25  508-A?

1  Q    Tell us if we need to zoom, but can you see what time

2  that video was taken?

3  A    Yes.  That was taken at 2:37 and 22 seconds p.m. on

4  February 4th.

5  Q    Is that around the same time as the photo inside the

6  plane?

7  A    Just after.

8         MR. POLLACK:  Ms. Cronin, can we play Government

9  Exhibit 508 in evidence.

10        (Video playing.)  (Video stopped.)

11 Q    Can you tell us what we saw on that video?

12 A    A picture of an individual taking a video with his right

13 hand holding his phone down around his waist as he walked past

14 that little aisle area and then peaked the phone around the

15 corner to continue recording.

16 Q    Did you see on the defendant's phone whether he did

17 anything with that video after recording it?

18 A    Yes, sir.

19 Q    Did you create an exhibit that summarizes that data?

20 A    Yes, sir.

21        MR. POLLACK:  Your Honor, I'd like, if we may, to

22 show the witness only and, of course, the Court, and defense

23 counsel what has been marked for identification as Government

24 Exhibit 513.

25        THE COURT:  Yes.

1  Q    Mr. Valinchus, is this the exhibit that you created

2  showing what the defendant did with that video?

3  A    Yes.

4  Q    Does this fairly and accurately summarize the voluminous

5  records?

6  A    Yes, it does.

7         MR. POLLACK:   The Government offers Government

8  Exhibit 513.

9         THE COURT:  Any objection?

10         MR. SIMPSON:  As to relevance.

11         THE COURT:  Overruled.

12         MR. POLLACK:  May we publish?

13         THE COURT:  Yes, it's admitted.

14         (Government's Exhibit 513 received in evidence.)

15  Q    Mr. Valinchus, can you explain to us what this document

16  shows?

17  A    This is a specific excerpt for the -- two messages that

18  were sent from the handset associated with Belloisi, the dates

19  and times and what was involved with it, where it was sent to

20  and when it was received.

21  Q    And can you take us row by row what the rows indicates?

22  A    Yes, sir.

23         On the very first video it represents i-Message at

24  7:00 p.m. and 57 seconds being sent from the handset assigned

25  to Belloisi (516) 413-7106 itself and it was delivered itself

1    at 7:01 and 47 seconds p.m.

2    Q    What is the last column where it has source file

3    information and there is a file name?  What does that mean?

4    A    That was the attachment that was part of the message and

5    the name of the file below it was IMG_O367.MOV.

6    Q    Is that the video we just what happened?

7    A    Yes, sir.

8    Q    Can you tell us in layperson's terms what happened on the

9    phone to create that record?

10   A    That video was attached to an i-Message itself and then

11   sent to itself.  So it was sent through Apple network and back

12   to the telephone again and the phone acknowledged it.

13   Q    Does that mean the person using the phone, the

14   defendant's phone, sent the video message to himself?

15   A    Yes, sir.

16   Q    And what does the next row indicate?

17   A    The next row is an indication of when it was sent at 7:00

18   p.m. and 57 seconds, but it identifies the handset is actually

19   reading the response at 7:01 and 43 seconds, or opening up the

20   message.

21   Q    What does the third row indicate?

22   A    That at 7:02 and 37 -- 30 seconds p.m. it sent another

23   message itself with the same attachment and the handset

24   received it at 7:03.

25   Q    Is that doing the same thing a second time, sending the

1  video to one's self in the message?

2  A    Yes, sir.

3  Q    And then the last row?

4  A    That is for the same outgoing message with a timestamp

5  7:02 and 37 -- 30 seconds p.m., but it shows that the message

6  was read at 7:03 and 43 seconds p.m.

7  Q    So am I understanding correctly that although there are

8  four rows here that reflects the sending of two messages to

9  one self or sending the video to one self twice?

10 A    Yes, sir.

11 Q    What, if anything, is the effect of sending one's self a

12 video like this in a message?

13 A    You have the ability to send it out again or you have it

14 in your device besides it being saved in the device for videos

15 and photos.

16 Q    Could it have any effect on the appearance of the time

17 that the video was taken?

18 A    The timestamp would reflect the timestamp of the message.

19 It would not reflect when the video was created.

20 Q    Could that make it appear that the video was recorded at

21 about 7 o'clock instead of about 2:37?

22 A    It could make that appear that way, yes.

23 Q    You mentioned before you analyzed T-Mobile data relating

24 to the Lester phone; is that right?

25 A    Yes, sir.

1   Q    Did that data show how long that phone had been active?

2   A    Yes, sir.

3   Q    When did that phone first start to be used?

4   A    Just prior to calls approximately the 21st or 22nd of the

5   month.

6   Q    Of January --

7   A    Yes.

8   Q    -- 2020?

9        Did it show when that phone stopped being used?

10  A    It showed lack of activity on the device, yes, sir.

11  Q    After approximately what date and time, do you recall?

12  A    Approximately after late February 4th, early February

13  5th.

14       MR. POLLACK:  I'm going to -- I would like to show

15  just the witness the document marked for identification as

16  Government Exhibit 504.

17       THE COURT:  Yes.

18  Q    Do you recognize this?

19  A    Yes, sir.

20  Q    Does this summarize data from the Lester phone?

21  A    It summarizes the communication made by the Lester.

22  Q    I see.  Is that coming from the T-Mobile records?

23  A    Yes, sir.

24  Q    Does it fairly and accurately summarize those voluminous

25  records?

1    A     Yes, it does.

2              MR. POLLACK:  The Government offers Government

3    Exhibit 504.

4              THE COURT:  Any objection?

5              MR. SIMPSON:  As to relevance, Judge.

6              THE COURT:  Overruled.

7              MR. POLLACK:  May we publish?

8              THE COURT:  It's admitted.

9              (Government's Exhibit 504 received in evidence.)

10             MR. POLLACK:  May we publish?

11             THE COURT:  Yes.

12             Before we get started, why don't we break here for

13   lunch and we will come back at about 2:15.

14             And I'm going to remind our jurors, remember that

15   you cannot talk about this case or anything at all connected

16   with this case among yourselves or with anybody else.  You

17   cannot read or listen to anything that might be reported about

18   this case over any kind of media.  And you can't view or go to

19   any location that touches on this case.  And you cannot do any

20   kind of research or investigation on your own of over any kind

21   of media.

22             Remember to keep an open mind and not to form or

23   draw any conclusions about this case.  We've have not finished

24   with the presentation of evidence.  You have not heard of my

25   instructions on the law, and you have not had the opportunity

1    to deliberate with each other.

2            So enjoy your lunch.  I hope the sun came out a

3    little bit.  And we'll see you at 2:15.

4            (Jury exits the courtroom.)

5            THE COURT:  Thank you, sir.  You can take a lunch

6    break too.

7            THE WITNESS:  Thank you, ma'am.

8            THE COURT:  We will need to you come back at 2:15.

9    You are still on direct, so you can discuss your testimony

10   with the Government if necessary.  And we will see everybody

11   back here.

12           Hold on to the lawyers while the witness leaves.

13           You all can sit for a minute.

14           MS. SCHIERBERL:  Thank you, Judge.

15           THE COURT:  Okay.  Neither the witness nor the

16   jurors are in the courtroom at this time.

17           Do you have -- Mr. Cohen, did you have any

18   communication with your prospective witness?

19           MR. COHEN:  I do not, Your Honor.  I will note for

20   the Court that my text message that I sent him hasn't been

21   read, so he may have come and given his phone to security.

22   With the Court's permission, I can check over lunch break and

23   report back.

24           THE COURT:  I need to know what to do with respect

25   to the -- I assume this is the witness who possibly might need

1   the assistance of counsel.

2          MR. COHEN:  That's all we're talking about right

3   now, Your Honor.

4          THE COURT:  Okay.  All right.  I need to know --

5   because that attorney is on-call, is on duty today and I don't

6   know what's going on in arraignments and so on today.

7          Mr. Navarro?

8          MR. NAVARRO:  Could I suggest that Mr. Cohen take a

9   minute to go and see if he's in the waiting area outside and

10  perhaps we can expedite things rather than having to wait

11  after the lunch break and potentially having to delay the

12  jury.

13         THE COURT:  Sure.

14         And I do know based on the communication from the

15  duty attorney, Justine Harris, that she had a status

16  conference between 12:00 and 1:00.  So I don't know if it's --

17  it's just about 1:00 now.  So I don't know if she is done as

18  well.  But I know she is free after that, I guess subject to

19  whatever is going on in arraignments today.

20         Why don't you go and check and we will wait here for

21  you.

22         (Pause.)

23         THE COURT:  Yes.

24         MR. COHEN:  I checked the fourth floor and I have

25  not seen him.  During the lunch break I will check other parts

1   of the building because I told him we are in courtroom 4-A

2   don't come in, he may not be outside, I will continue to reach

3   out to otherwise.  If he is not here, I can't put him on and

4   we can't assign him counsel.

5           THE COURT:  Okay.  You said you might have two

6   witnesses.  Is the other witness available for this afternoon.

7           MR. COHEN:  Yes, Your Honor.

8           THE COURT:  And Mr. Simpson is back here.  I guess

9   you did not have luck either.

10          MR. SIMPSON:  I did not.  I went down to the floor

11  above and below, I did not see him.

12          THE COURT:  All right.

13          Is the Government presenting any other witness after

14  this one?

15          MR. POLLACK:  No.  We don't anticipate that we will,

16  Your Honor, in our case-in-chief, anyway.

17          THE COURT:  Well, obviously we'll see where we are

18  at the end of the cross.  What you should know in

19  anticipation, so that you're ready for it, is once we're done

20  with this witness, I'm not going to ask the Government to rest

21  at that point.  We will do a sidebar, or if it's appropriate

22  at that point to take a break, or we will take a break for the

23  jury, and then I will entertain motions at the end of the

24  Government's case, and then we can talk more about proceeding

25  with any defense case.  Okay?

1          Assuming that we're going to go forward with a

2    defense case, then the Government can rest on the record and

3    we'll proceed with the defense case.

4          And also, just for planning purposes -- and I want

5    to let you guys go and have lunch and do whatever you have to

6    do -- I would expect to do a charge conference at some point

7    tomorrow that we can schedule at the end of the day today.  I

8    only have one matter on, I think, for tomorrow, so I have some

9    flexibility there.  Okay?

10          MR. POLLACK:  Thank you, Judge.

11          MS. SCHIERBERL:  Thank you, Judge.

12          THE COURT:  Thank you.

13          (Lunch recess.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2            (In open court.)  (Parties present.)

3            THE COURT:  Please have a seat, everyone.

4            This is a case on trial continued.  Same appearances

5    as this morning.

6            Mr. Cohen, have you had an opportunity to contact

7    your witness?

8            MR. COHEN:  We made a decision not to call the

9    witness that the government was suggesting should get on

10   conflict of counsel and I --

11           THE COURT:  Okay.

12           MR. COHEN:  May I continue?

13           THE COURT:  Yes.  I'm sorry.  I didn't mean to

14   interrupt you.

15           MR. COHEN:  And our other witness is here and he's

16   just waiting for when the government is done, and we'll call

17   him this afternoon.

18           THE COURT:  Is he in the courtroom?

19           MR. COHEN:  No, no, no, no, no.  When I mean "here,"

20   I mean in the courthouse, but not in the courtroom.

21           THE COURT:  Understood.  Okay.

22           All right.  So Kristi, we can notify Ms. Harris.

23           MR. COHEN:  Your Honor, I don't mean to interrupt,

24   but I spoke with Ms. Harris and let her know because I know

25   she had other duties today.

1      THE COURT:  All right.  Thank you.  I appreciate

2 that.

3      All right.  So if you are ready to proceed, we can

4 bring -- I know I am going to butcher his name -- Valinchus.

5      MR. POLLACK:  Valinchus.

6      THE COURT:  Valinchus back to take the stand and we

7 will get the jury.  I think they are all here.

8      MR. POLLACK:  May I return to the podium,

9 Your Honor?

10      THE COURT:  Yes.

11      (Witness takes the stand.)

12      THE COURT:  Jury is entering.  All rise.

13      (Jury enters.)

14      THE COURT:  Everyone may be seated.

15      Welcome back, everyone.

16      Do the parties agree that all of our jurors are

17 present and properly seated?

18      Government?

19      MR. POLLACK:  Yes, Your Honor.

20      THE COURT:  Defense?

21      MR. COHEN:  Yes, Your Honor.

22      THE COURT:  Thank you.  This is continued direct

23 examination of Mr. Darryl Valinchus.  I hope I pronounced that

24 correctly.  And this is continued direct examination by the

25 government by Mr. Pollack.

1        You may inquire when you are ready.

2            MR. POLLACK:  Thank you, Your Honor.

3            And first of all, Your Honor, am I remembering

4    correctly that Government Exhibit 504 was already admitted?

5            THE COURT:  Yes.

6            MR. POLLACK:  Okay.  Can we publish, please, 504?

7    DIRECT EXAMINATION

8    BY MR. POLLACK:  (Continuing)

9    Q    I can't remember exactly where we left off,

10   Mr. Valinchus, but can you just, in general terms, describe

11   for us what this document shows?

12   A    This is a sequential communications report for the

13   handsets communications records for the phone associated with

14   the name Lester, (646) 940-1227 and the communications with

15   the Belloisi handset, (516) 413-7106 beginning at a point of

16   April 4th [sic] through March 18th of 2020.

17   Q    And is this -- tell me if you need to zoom in to answer

18   this question, but is this drawn principally from the T-Mobile

19   data?

20   A    This is all drawn from the T-Mobile data.

21           MR. POLLACK:  Can we zoom in on the top --

22           THE COURT:  Of April 4th?

23           THE WITNESS:  February 4th, Your Honor.

24           MR. POLLACK:  Could we zoom in on the top few rows,

25   Ms. Cronin.

1   Q    Can you, Mr. Valinchus, just look at that top line and

2   tell us what that shows?

3   A    That is the header line describing the data that's below

4   it.

5        The first line is Subject.  That identities whose

6   records the report is based upon.

7        The Direction is the direction of the communication,

8   whether it's incoming or outgoing.

9        The Other Party is the phone number that this

10  subject handset was in communications with, whether it made or

11  received the communication.

12       The Name, if there are any names, are associated

13  with the contacts that were taken out of the Belloisi handsets

14  extraction and other names associated with known

15  communications records.

16       The Date is the date and time the event was

17  initiated.

18       The Duration is the approximate time of how long the

19  communication took place.

20       And the Subtype defines the type of communication.

21  Voice would be voice.  SMS would be text message.

22       And some of the records have a service code taken

23  directly from the communications records themselves.

24  Q    So do I understand your answer correctly that the name

25  P. Belloisi that appears does not come from the T-Mobile

1    record, but from the Belloisi handset?

2    A     That is correct.

3    Q     But otherwise, does all that information come from the

4    T-Mobile records?

5    A     All the actual communications do, yes.

6    Q     And how did you know that the phone number on that top

7    row is the P. Belloisi phone number?

8    A     That number came from the extraction.  And that name was

9    associated with that phone number from the Cellebrite

10   extraction.  Even though these are the Lester phone records,

11   the phone number in the Lester records was the same as the

12   name associated with the Belloisi number.

13   Q     So that -- the top row where it says -- subject is

14   Lester, direction is Outgoing, other party is P. Belloisi,

15   there's a date and time and duration, what does that all mean?

16   A     So with the first row, this means that at that date and

17   time, the Lester handset had an outgoing communication with

18   the phone number associated with the Belloisi handset, the

19   duration for approximately two seconds, and it was a voice

20   call.

21   Q     What's the date and time on that?

22   A     That was on February 4th, 2020 at 9:35:13 p.m.

23   Q     Is that one of those failed calls from Lester to Belloisi

24   that we saw in the other exhibit?

25   A     That was the call that was depicted on the map.  And the

1  only call in the list on the communications call was actually

2  on the communications network itself from the Lester phone.

3  It connected to the cell site outside of JFK Airport.

4  Q    And can you tell whether that was a successful phone call

5  from this record?

6  A    The call went through, but the duration would make me

7  believe that nobody answered the phone.

8  Q    After that there are six or seven rows.

9          In general, speaking in very general terms, what do

10  those rows show?

11  A    It shows the Lester handset being in communication with

12  other telephone numbers, either making or receiving calls or

13  text messages.

14  Q    And what's the range of time and date of those calls?

15  A    That was starting at approximately, on

16  February 5th, 2020, at 2:02:54 p.m. through an outgoing SMS --

17  an incoming SMS, excuse me, on February 5th, 2020, at

18  8:42:28 p.m.

19          MR. POLLACK:  Ms. Cronin, can we include a little

20  bit more in the zoomed area if you zoom down.

21  Q    Do you see the -- the first row that has the Service

22  Code 02B next to it?

23  A    Yes, sir.

24  Q    What does the Service Code 02B mean?

25  A    02B is a definition from T-Mobile that the phone cannot

1    be reached.

2    Q    And what could be the causes of the phone not being

3    reachable?

4    A    It was turned off, the battery was moved, they had no

5    cellular connection or it was destroyed, broken.

6    Q    And what's the time of the first 02B code?

7    A    That was for an incoming call on February 5th, 2020, at

8    9:46:28 p.m.

9    Q    After that, there's a row without the 02B code and it

10   says SMS.

11        What does that mean?

12   A    That was a text message that was sent through the network

13   for the specific handset.  The 128 is a voicemail notification

14   code for T-Mobile.

15   Q    And do text messages get that 02B indication on them?

16   A    They do not.

17   Q    Just looking here, what is the latest time where you can

18   confirm there was activity on the phone itself, user-direct

19   activity on the device?

20   A    User-direct activity would have been on February 5th

21   6:15:13 p.m., an outgoing SMS message.

22        MR. POLLACK:  Ms. Cronin, can you move the zoom down

23   a bit to include all of the -- yes, that's good right there.

24   Q    Can you see here there are numerous rows that have a

25   phone number, and it says Marco Buono, and there are two

1    numbers that say Carolina with a heart emoji?

2    A    Yes, sir.

3    Q    First of all, where did those -- the names Marco Buono

4    and Carolina heart emoji, where did you get those names from?

5    A    Those were imported to the system from the Cellebrite

6    extraction.

7    Q    So does that mean that the phone numbers are from

8    T-Mobile, but the name associated with those phone numbers

9    comes from the Defendant's phone, the Cellebrite extraction

10   from the Defendant's phone?

11   A    That is correct.

12   Q    As a general matter speaking not about these people in

13   particular, but as a very general matter, is it possible to

14   examine data in a phone to try to determine the nature of a

15   person's relationship with a person whose contact information

16   is saved in their phone?

17              MR. COHEN:  Objection.

18              THE COURT:  Can I have the question read back,

19   please.

20              (The record was read.)

21              THE COURT:  I will allow it.

22              Overruled.

23   A    Yes.

24   Q    What kinds of things can you look at to make that

25   determination?

1  A    I can go through the extraction itself and read the

2  contents of any SMS messages, iMessages, regular text messages

3  and understand what kind of relationship or communications

4  they have between the two.

5  Q    Is it possible also to examine metadata for that purpose?

6  A    What are you asking is metadata, because it's a big --

7  Q    Sure.  Let me clarify.

8        Can you examine, for instance, the number of calls,

9  the number of text messages, can you compile data like that to

10 get an idea about the nature of the relationship?

11 A    Yes.  You could look at the volume and the direction of

12 the communications.

13 Q    And did you make a summary chart like that to show

14 information in the Defendant's phone about Marco Buono and

15 Carolina heart emoji?

16 A    Yes, sir.

17        MR. POLLACK:  If I may, can I show the witness only

18 a document marked for identification as Government

19 Exhibit 502?

20        THE COURT:  Yes.

21 Q    Can you see that, Mr. Valinchus?

22 A    Yes, sir.

23 Q    Is this the summary document that you described?

24 A    It is.

25 Q    Does this fairly and accurately summarize voluminous data

1    from the Defendant's phone?

2    A    Yes, it does.

3            MR. POLLACK:  The government offers Exhibit 502.

4            THE COURT:  Any objection?

5            MR. SIMPSON:  As to relevance.

6            THE COURT:  It is admitted subject to connection.

7            MR. POLLACK:  Thank you, Judge.

8            (Government Exhibit 502 received in evidence.)

9            MR. POLLACK:  May we publish?

10           THE COURT:  Yes.

11   Q    Can you walk us through this document and tell us what it

12   says?

13   A    This is a -- excuse me, a synopsis of all the

14   communications between the handset associated with Belloisi

15   with Carolina at (631) 542-3676 and an individual called

16   Marco Buono at (917) 676-6464.

17           The report is a complete accounting for the

18   communications that were obtained from the Belloisi handset to

19   those two specific phone numbers.

20   Q    How many separate -- withdrawn.

21           What does the column Event Count mean?

22   A    Event Count is the total amount of communications in or

23   out to the Belloisi handset from the other party phone number.

24   Q    And what's the total event count showing communications

25   between the Defendant and the Carolina contact?

1  A    698.

2  Q    And for the Marco Buono contact?

3  A    117.

4  Q    And what's the approximate time range -- it doesn't need

5  to be exact, but approximate date range of those contacts?

6  A    Well, the date range was for the entire period of time on

7  the phone, which dated back as far as 2019.

8  Q    What does the Total Duration column mean?

9  A    The Total Duration for the first number belonging to

10  Carolina was 16 minutes and 29 seconds.  And the phone number

11  associated with Marco Buono was one hour, two minutes and

12  19 seconds.

13  Q    And just for clarity, what does that column actually

14  mean?  What does it mean to --

15  A    That's the total amount of time of talk time, of

16  communications.  Text messages are not associated with the

17  duration because they're almost instantaneous.

18  Q    And are there different types of communications reflected

19  on this document?

20  A    Yes, sir.

21  Q    Can you explain to us what those are?

22  A    For the Carolina handset, that handset had communications

23  with the Belloisi handset through iMessage, through voice

24  calling, through the WhatsApp application and regular SMS

25  messaging.

1           And on the Buono handset, it had communications via

2   voice, via iMessage and by WhatsApp application.

3   Q    Did you examine any particular text messages between --

4           THE COURT:  Before you go there, can you tell us,

5   please, what the differences are between iMessage, voice,

6   WhatsApp and SMS?

7           THE WITNESS:  Yes, ma'am.

8           iMessage is a platform utilized by iPhones that you

9   could communicate with another iPhone that's signed into their

10  network.  And that messaging would be transported through data

11  and the Apple communications or servers to the other Apple

12  users.  It's not available to a non-Apple user to Apple user.

13  It would be considered an SMS that way.

14          SMS stands for short messaging service.  It's

15  149 characters of text messages, usually only text, letters

16  and spaces and numbers.

17          Voice is a voice call, back and forth.

18          And WhatsApp is defined communications, whether it's

19  a voice communication or a written communication using the

20  WhatsApp application.

21          THE COURT:  Thank you.

22  Q    Did you examine particular text messages between Belloisi

23  and the Marco Buono phone contact?

24  A    Yes, sir.

25          MR. POLLACK:  I'm going to, if I may, Your Honor,

1   just show the witness, the Court and the defense a document

2   marked for identification as Government Exhibit 503.

3             THE COURT:  Yes.

4   Q    Do you recognize this?

5   A    Yes, sir.

6   Q    In general terms, what is this?

7   A    These are iMessage communications between Marco Buono and

8   the Belloisi handset on February 2nd, 2020, from 2:00 a.m. to

9   9:10 a.m.

10  Q    Is this a fair and accurate compilation of data contained

11  in the voluminous records?

12  A    Yes, sir.

13            MR. POLLACK:  The government offers Exhibit 503.

14            THE COURT:  Any objection?

15            MR. SIMPSON:  Yes, Judge, as to -- may we have --

16  actually have a quick sidebar, Judge, on this exhibit?

17            THE COURT:  Yes.

18            (Sidebar.)

19            (Continued on the next page.)

20

21

22

23

24

25

1   (Sidebar conference held on the record in the presence of the

2   Court and counsel, out of the hearing of the jury.)

3           MR. SIMPSON:  Judge, my objection is actually the

4   caption does not match the information.  The information, the

5   dates --

6           THE COURT:  Can I look at your paper?

7           MR. SIMPSON:  The dates all say 2/4, but the caption

8   says February 2nd.  It seems internally inconsistent and not a

9   proper evidentiary exhibit.

10          MR. POLLACK:  We replaced it.

11          MR. SIMPSON:  But the one on the screen --

12          MR. POLLACK:  That one?

13          MR. SIMPSON:  Yeah, I have no problem with you doing

14  that.

15          MR. POLLACK:  Should we replace the one on the

16  computer quickly so it doesn't have the typo?

17          MR. SIMPSON:  There was also an issue with 501, to

18  be honest.

19          MR. POLLACK:  It may just be a mistake.

20          MR. SIMPSON:  You can do it with the witness if you

21  want.

22          MR. POLLACK:  That's fine with the government.

23          MR. SIMPSON:  I'm objecting to the document as is.

24  If you want to make a modification, that's up to you.

25          THE COURT:  Is that the only objection to the

1   document, is the typo on the header?

2          MR. SIMPSON:  The apparent typo, yes, if that's what

3   their witness is going to say what it is.

4          And I do have a general relevance objection as I

5   have to each of these exhibits, but this one just --

6          THE COURT:  Let me clarify.

7          There has been a series of objections to exhibits as

8   to relevance and perhaps I should have clarified, as I did for

9   the last one, that is subject to connection.  I assume that

10  the government is going to connect all of these things, so

11  they are all admitted subject to connection at some point.

12         MS. SCHIERBERL:  Yes.

13         THE COURT:  I don't know if through this witness or

14  anybody else, but subject to connection.

15         Unless you feel that some of them are already

16  connected to -- can you get me my exhibit list?  It's right up

17  there.

18         THE LAW CLERK:  Yes.

19         THE COURT:  I'm sorry.

20         THE LAW CLERK:  That's it, Judge.

21         THE COURT:  Okay.  So some of them, there's the

22  photo inside the plane, there were a couple of photos inside

23  the plane, that's fine.

24         There's a video, that's fine.

25         I'm mostly talking about the ones with the cell site

1   locations and the text messages.

2          So we're looking at 505, 506.  I have them in the

3   order that they were presented.

4          MR. SIMPSON:  I have them kind of in order as well.

5          THE COURT:  505.

6          MR. POLLACK:  So, Your Honor, 505 shows the --

7          THE COURT:  That's a records analysis.

8          MR. POLLACK:  This is a records analysis showing the

9   defendant's --

10         THE COURT:  I understand.

11         MR. POLLACK:  I apologize.

12         THE COURT:  I guess my point is, their objection is

13  as to relevance; your job is to make it relevant.

14         MR. POLLACK:  Yes, Your Honor.

15         THE COURT:  That's the connection part.

16         MR. POLLACK:  I understand.  I don't know --

17         THE COURT:  Right?

18         So it's subject to connecting how that relates to

19  the charges.

20         MR. POLLACK:  Yes, Your Honor.

21         The defendant was in communications with the Lester

22  contact --

23         THE COURT:  We understand.

24         MR. POLLACK:  -- as you've seen.

25         THE COURT:  I understand that.

1          MR. POLLACK:  We will establish momentarily that

2     shortly after those final phone calls, Lester, his phone went

3     off permanently with an abandoned phone, with a burner phone,

4     which shows consciousness of guilt on the part of Lester.

5     After the defendant's arrest, Lester abandoned his phone.  The

6     fact that the defendant, the previous night, had a meeting in

7     the middle of the night in a location in the South Bronx when

8     his other travels are all in Long Island shows -- shows

9     evidence of a conspiracy.

10          Additionally, the fact that when the defendant was

11     already in custody, the Lester contact was driving down from

12     the Bronx to meet him at JFK and then calling him over and

13     over from JFK the following day he abandoned the phone.  This

14     was the subject of a motion in limine which your --

15          THE COURT:  I understand that.  I understand that.

16          MR. SIMPSON:  Judge, may I say something?

17          MR. NAVARRO:  Can I add one thing, Your Honor?

18          The other thing that's important -- I know it's hard

19     to see here -- is the sequencing of events.  You have the text

20     saying "confirmado," so confirmed, and, right after, you start

21     to see the movement towards JFK.  So the sequencing is also

22     important, it's not just the locations.

23          MR. SIMPSON:  Judge, may I just say something?

24          You know, Mr. Pollack is explaining this has all of

25     his activity.  You're looking at two days.  So the idea of all

1   of somebody's activity in two days, it really can't be

2   captured.  That's part of the relevance objection that we

3   have.  They're not showing -- this phone, this Lester phone

4   was apparently in use since January 22nd.  That's what this

5   witness said.  We don't see any of the activity between

6   Mr. Belloisi and Lester for the vast majority of this time.  I

7   don't really see how this can be relevant and say "all the

8   activity" because it's such a tiny pocket of time.

9           THE COURT:  No, no, no.  You're going far afield

10  here.  The point is relevance to the events of February 4th.

11          Okay.  I'm satisfied with the explanation.  That

12  still doesn't get us to the Marco Buono and Carolina.

13          MR. POLLACK:  So what we're establishing with the

14  number of communications and that the communications were

15  about those two contacts is that Marco Buono and Carolina are

16  people close to the defendant, contact him often, had a lot of

17  time, therefore, inference that he has access either to their

18  phones or that he worked in concert with him.

19          Those two people never contacted Lester prior to the

20  defendant's arrest and release on bail.  The night after the

21  defendant was released on bail, they called Lester over and

22  over and over again after the phone had been abandoned.  We

23  intend to argue in summation that that shows that the

24  defendant, since his actual cell phone was already seized, he

25  was either using phones of other people close to him or was

1   working in concert with people close to him --

2           THE COURT:  You have got to keep your voice down.

3           MR. POLLACK:  Oh, I'm sorry.

4           -- to reach his coconspirator in particular.

5           Although I don't want to put up -- I don't plan to

6   put up actual communications of Carolina, I do intend to

7   elicit from the witness that the Carolina contact refer -- I

8   am going to ask him whether the Carolina contact, whether

9   those text messages, without asking about the content, whether

10  they refer to the defendant by his name or by any other title

11  that would indicate a family relationship.  And I expect he

12  will testify that the Carolina person refers to the defendant

13  as her father.  We believe that in the middle of the night,

14  the night after the defendant was released on bond, he was

15  using his child's cell phone to get ahold of his

16  coconspirator, Lester, whose phone had already been abandoned.

17          THE COURT:  Okay.  So, getting back to your other

18  point, the header has to be corrected.

19          The other header is correct?

20          MR. SIMPSON:  As far as I know, this is the only

21  header that looks internally inconsistent with the data that's

22  below it.

23          THE COURT:  Okay.  I didn't notice that, thank you.

24          So just to clarify, so it's admitted and you will

25  make the correction.

1           MR. POLLACK:  I will.

2           THE COURT:  Do you want to correct it through the

3    witness?

4           MR. POLLACK:  I will ask the witness.

5           MR. COHEN:  Are all admitted or subject to?

6           THE COURT:  Yes, they are all admitted.

7           MR. POLLACK:  Thank you, Judge.

8           (Sidebar ends.)

9           (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  So I think the issue was the

2     introduction of Exhibit 503.  I think you still have some

3     additional questions to ask in connection with that with

4     respect to admissibility.

5          MR. POLLACK:  Yes, Your Honor.

6     BY MR. POLLACK:

7     Q    Mr. Valinchus, can you look at the dates down the side of

8     the document in the caption and tell us whether the caption is

9     correct?

10    A    The dates in the document in each individual line are

11    correct, yes.

12    Q    Okay.  Now, can you compare that to the caption of the

13    document, the title, the header?

14    A    The header has the wrong date on it.

15    Q    Is that just a typo?

16    A    It is on my behalf, yes.  The way the date is written on

17    the system, it's not the normal layout of the date.

18         MR. POLLACK:  With that understanding, Your Honor,

19    the government will offer 503.

20         THE COURT:  Any objection?

21         MR. SIMPSON:  Same relevance objection, Judge.

22         THE COURT:  Okay.  It is admitted.

23         (Government Exhibit 503 received in evidence.)

24         MR. POLLACK:  So can we publish, Your Honor?

25         THE COURT:  Yes, you may.

1  Q    So I recognize, Mr. Valinchus, you said that the date on

2  the top is wrong where it says February 2nd; is that right?

3  A    That is correct.

4  Q    So can you just tell us, looking at the side, what the

5  actual date and time is of those messages?

6  A    Certainly.

7          The first one was on February 4th, 2020 at

8  2:09:56 a.m.; and then 2:10:13 a.m.; and then 2:10:20 a.m.;

9  then at 9:02:12 a.m.; 9:02:17 a.m.; and then 9:08:20 a.m.

10  Q    And just going down, can you read us the content of those

11  messages and tell us who was saying what?

12  A    Sent from the Belloisi handset was:  You close?

13          And then sent by the handset associated with

14  Marco Buono:  Here.

15          Then:  Come out.  Call me.  Please.  Paul.

16  Q    I'm not going to ask you to express any opinions or

17  conclusions about that, but can you tell us, as a general

18  matter, what are the facts about this from which one might

19  make inferences about the nature of the relationship?

20          MR. SIMPSON:  Objection.

21          THE COURT:  Overruled.

22          I will allow it.

23  A    I am going to say they're friendly.

24  Q    Can you say in general terms of how -- what are the bases

25  from which a person can draw that?

1          MR. SIMPSON:  Objection.

2          THE COURT:  Sustained.

3   Q    Let's turn back to 504, already in evidence.

4          Did you also look -- so we just looked at some text

5   messages from the Defendant's phone between the Defendant and

6   Marco Buono.

7          Did you also look at text messages with Carolina

8   heart emoji?

9   A    Yes, sir.

10  Q    I'm not going to put any of those up or ask you to

11  describe the content of those in any way, but can you tell me

12  whether that contact referred to the Defendant by his name or

13  by any title that would indicate a family relationship?

14  A    Not by name; by a title.

15  Q    And what family relationship does that title indicate?

16  A    A father-daughter relationship.

17  Q    What's the first time that that Carolina phone number

18  called the Lester phone?

19  A    That was on February 6th at 11:14:29 p.m.

20  Q    Is that -- from looking at all of the Lester calls, is

21  that the first time that that phone number, Carolina phone

22  number, ever called the Lester phone number?

23  A    Yes, sir.

24  Q    And did Lester answer that phone call?

25  A    No, he did not.

1    Q    How can you tell?

2    A    Code 2B [sic] defined by T-Mobile that it was -- the

3    phone was unreachable, went directly to voicemail.

4    Q    And did that number try calling Lester again?

5    A    Yes.

6    Q    At what time?

7    A    On February 7th at midnight -- or 39 minutes after

8    midnight.

9    Q    And did Lester answer that call?

10   A    No.

11   Q    How can you tell?

12   A    Again, it has the Code 02B.  It went directly to

13   voicemail.

14   Q    Can you tell us -- I don't know if we need to zoom out in

15   order for you to tell us this, but what's the first time that

16   the Marco number called the Lester phone?

17   A    That was on February 6th at 9:34:33 p.m.

18   Q    And was that the first time that the Marco phone number

19   ever called the Lester phone number, according to the Lester

20   phone records?

21   A    Yes, sir.

22   Q    Can you just go down the list and read to us all the

23   times that the Marco number tried calling Lester?

24   A    9:34:33; 10:41:37; 10:47:01; 10:47:26; 10:47:29.  That

25   was two SMSs, excuse me.  10:55:08; 11:14:13; then at

1  11:16:50; 11:18:33; 11:19:43; 11:20:28; 11:23:16; 11:23:48;

2  11:57:54.

3          And then on the 7th of February, 12 minutes after

4  midnight and 14 seconds; 13 minutes and sixteen seconds after

5  midnight; 6:56:39 a.m.; 9:23:01 a.m.; 9:23:22 a.m.;

6  9:27:36 a.m.; 11:00:22 a.m.; and 11:00:42 a.m.

7  Q    Was the Lester phone off the network or 02B on all of

8  those calls?

9  A    Yes.

10 Q    After the last -- that last call from Marco, what's the

11 rest of the activity on this account after that?

12 A    All incoming, except for some network showing outgoing

13 communications, but network activity based upon voicemails.

14 Q    So does that mean nothing was originated from the phone

15 itself?

16 A    Correct.

17 Q    I think you already testified that the phone went off

18 network or 02B between 6:50 p.m. and 9:46 p.m. on

19 February 5th, 2020; is that correct?

20 A    Yes, sir.

21 Q    Did the Lester phone ever go back on the network ever

22 again after that point?

23 A    No, sir.

24          MR. POLLACK:  No further questions.

25          THE COURT:  You may inquire.

1         MR. SIMPSON:  Thank you, Judge.

2   CROSS-EXAMINATION

3   BY MR. SIMPSON:

4   Q     Good afternoon again, Mr. Valinchus.

5   A     Good afternoon.

6   Q     Let me just ask you, prior to my questions to you during

7   Mr. Pollack's examination called voir dire, have you and I

8   ever met or spoken before?

9   A     No, sir.

10  Q     Did I reach out to you last week asking to speak to you

11  before this trial?

12  A     Yes, sir.

13  Q     Did you decline my request?

14  A     Yes, sir.

15  Q     Even though you would not talk to me, did you review some

16  reports relating to the Cellebrite data that I had sent to

17  prosecutors to send to you?

18  A     Yes, sir.

19  Q     Have you had a chance to review certain marked Defense

20  exhibits sent to prosecutors earlier this week relating to

21  your work and your testimony?

22  A     One.

23  Q     Did you have a chance to review the report I sent to them

24  last night?

25  A     That's the one I'm referring to.

1   Q    Mr. Valinchus, would you agree the documents I sent for

2   you to review before your testimony today consist of either a

3   portion of the T-Mobile records that you spoke about on direct

4   or your review of digital data directly from the Cellebrite

5   extraction of Mr. Belloisi's phone?

6   A    Yes.

7   Q    Do you know anything about the facts of this case?

8   A    No, sir.

9   Q    Did you know the Cellebrite data was from the phone of

10  someone accused of a crime?

11  A    I presumed that.

12  Q    Why did you presume that?

13  A    Because it was sent to me from the prosecution and I was

14  looking at the communications of it.

15  Q    And did you know the T-Mobile records were for another

16  user or another person who the government believes was

17  involved in a criminal enterprise with the Defendant?

18  A    Based upon the information in the records I received,

19  they were involved, yes.

20  Q    Is it fair to say you knew the government wanted you to

21  connect the Defendant and the T-Mobile user and their

22  activities as much as possible?

23  A    No.

24  Q    Is it fair that they wanted you to connect these two as

25  much as the data would allow?

1   A    Yes.

2   Q    Did you know anything whatsoever about Mr. Belloisi's

3   work schedule on February 3rd or February 4th?

4   A    No, sir.

5   Q    Did you know anything about the relationship between the

6   Defendant and Lester?

7   A    No, sir.

8   Q    Did you know anything about why the Defendant and Lester

9   were meeting late on February 3rd, early on February 4th?

10  A    No, sir.

11  Q    Do you know anything about why friends or family of

12  Mr. Belloisi's may have been trying to reach Lester in the

13  days after his arrest?

14  A    No, sir.

15  Q    Do you know Marco Buono?

16  A    No, sir.

17  Q    Do you know what type of communicator he is?

18       Are you familiar with Marco -- withdrawn.

19       Are you familiar with Marco Buono's typical

20  communication patterns with his friends and associates?

21  A    No.  Just the records I've seen.

22  Q    And did you ever get Marco Buono's call records?

23  A    No, sir.

24  Q    Do you recall speaking with me earlier for a moment

25  regarding seminars that you have given to law enforcement

1  officers on the topics of your testimony today?

2  A    On this specific testimony?

3           THE COURT:  I'm sorry, do you mean a separate

4  conversation or the questioning in the courtroom?

5           MR. SIMPSON:  I meant the questioning in the

6  courtroom, Judge.

7  Q    And I mean the general topics, not the specific content

8  of your testimony, sir.

9  A    Yes.

10  Q    And do you recall me asking if law enforcement officer --

11  if during these seminars, you instruct law enforcement

12  officers on how to exploit communications data?

13  A    That's part of the titles of one of my --

14  Q    I'm sorry, that's not my question, sir.

15           Do you recall me asking you that during voir dire?

16  A    Yes.

17  Q    And did you say you don't use word "exploit" anymore?

18  A    I did say that, yes.

19  Q    Does that imply that you used to use the word "exploit"?

20  A    Yes.

21  Q    Is it true, Mr. Valinchus, that in some of the seminars

22  or webinars you lead, you or the moderator will ask the

23  viewers not to record the webinar?

24  A    Yes.

25  Q    And is that because you would not want someone like me or

1   Mr. Cohen hearing what you say to other law enforcement agents

2   about how you approach this work?

3   A    That's not the reason why.

4   Q    What is the reason why?

5   A    Some of the information that I put out there is law

6   enforcement sensitive, how to acquire information or types of

7   information that's obtained by networks.  And I don't want

8   that out in the real world unless those companies want to put

9   it out there.

10  Q    You want to protect the privacy for the cell phone

11  companies?

12  A    I want to protect the privacy for law enforcement

13  Q    Ah.

14        Why did you stop using the word "exploit" to

15  describe what you do?

16  A    Because the challenge came up to me during one of my

17  criminal proceedings while I was testifying.  And they harped

18  on the word "exploitation," which is not what's being done,

19  but I removed it from my website at the time.

20  Q    Is that because of the connotation of the word

21  "exploitation"?

22  A    There's different meanings to it.

23  Q    Are you paid to be here today, Mr. Valinchus?

24  A    Yes, sir.

25  Q    Paid by the government?

1   A    I will be.

2   Q    How much are they paying you?

3   A    I get paid by the hour.

4   Q    And is that payment just for your testimony, or does that

5   include your work reviewing the data and making your reports

6   and visualizations?

7   A    It includes all my time.

8   Q    And it is true, is it not, that any time you've ever

9   appeared to give testimony in court, it's been as a paid

10  government witness, correct?

11  A    Yes.

12  Q    Mr. Valinchus, I'd like to ask you generally about cell

13  site location.

14           Is that all right?

15  A    Certainly.

16  Q    So cell site location starts -- withdrawn.

17           Is it true that cell site location starts with

18  records that you get from law enforcement, cell site location

19  analysis?

20  A    Starts with the records that are provided to me from the

21  communications companies.  It doesn't -- depending on where

22  they are acquired from and then forward it to me.

23  Q    In this instance, was this information forwarded you from

24  law enforcement?

25  A    It was forwarded to me from the prosecutor's office.

1   Q     And these are records that prosecutors or law enforcement

2   officers will have acquired from an individual's handset or

3   that they have culled or extracted information from with a

4   program like Cellebrite; is that correct?

5   A     You're describing two different things.

6   Q     You're right.  Let me break that up.

7         Are some of the records that you will review records

8   that have been extracted from a suspect or defendant's device

9   with a program like Cellebrite?

10  A     Yes, sir.

11  Q     And are the other type of records, records that have been

12  produced by a cellular service provider?

13  A     Yes, sir.

14  Q     Okay.  And in a nutshell, is it the case that these

15  records --

16        THE COURT:  I'm sorry to interrupt you.

17        Can you tell us what the difference is between the

18  two kinds of records; in other words, the difference between

19  an extraction from Cellebrite and the phone records that you

20  get from a service provider?

21        THE WITNESS:  Yes, ma'am.

22        Communications records from the service provider

23  provide you the interaction between the telephone numbers.  If

24  it's historical records, there's no content, there's no

25  information, there's no recordings; it's just Number A spoke

1   to Number B based upon the subjects' phones.

2            On a Cellebrite extraction, depending on the device

3   and the capabilities of the Cellebrite at the time, you can

4   extract all the information out of the physical cell phone.

5   You can read the content of their text messages, their

6   e-mails.  You could listen to downloaded voicemails.  You

7   could listen to audio messages.  You could basically see

8   everything the user can see on that device.  And each device

9   is different than the next based upon the Cellebrite's

10  capabilities.

11           THE COURT:  Thank you.  You can continue.

12           MR. SIMPSON:  Thank you, Your Honor.

13  Q    Mr. Valinchus, is it true that essentially some of the

14  information in these records that you review will tell you

15  which cell site location a subscriber's handset or phone

16  connected to for a particular call; is that correct?

17  A    Yes, sir.

18  Q    And when we say "handset," we mean a phone; is that

19  right?

20  A    Yes, sir.

21  Q    And is it the case that, within those records, you find

22  those addresses or coordinates for those cell site locations

23  in those records?

24  A    For T-Mobile, yes.

25  Q    So for the Lester records here, that's -- that would be

1  accurate?

2  A    Yes, sir.

3  Q    And then you essentially plot them onto a map so it

4  becomes represented visually.

5         Do I have that right?

6  A    Yes, sir.

7         (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SIMPSON (Continuing):

2    Q    And is that the point at which your visualization

3    software from Telfor comes into play?

4    A    It's not my software, but the software I utilize.

5    Q    Whose is it?

6    A    It's now owned by a company called PenLink.

7    Q    Am I correct that the software helps you with essentially

8    taking the cell site location information in the records and

9    then putting it on to the map; is that correct?

10   A    Yes, and all the other information with that I have

11   available.

12   Q    Would that include the name of the subscriber as well as

13   the date and time?

14   A    The name of the subscriber is in a second document, but

15   the date and time is included.

16   Q    And to be clear, these visual representations,

17   Mr. Valinchus, is it the case that they are not and they are

18   not presumed to be the actual locations of the phone or the

19   person using it but merely the cell sites that they connected

20   to at any given point in time?

21   A    That's correct.

22   Q    All things being equal, would you say that generally a

23   handset will connect to the closest cell site?

24   A    It connects with the cell site providing the best service

25   at the moment.

1  Q     And is it your testimony that that would generally be the

2  closest one?

3  A     It's usually the closest by line of sight but not always.

4  It's not the rule.

5  Q     When would it not be connecting to the closest one?

6         What are some examples of when that would happen,

7  sir?

8  A     You could be right next to a cell site and the radio

9  waves being transmitted outwards transmit right above you.

10 It's not connecting to your phone.  So, it would be connected

11 from a cell site further away who's transmitting radio waves

12 until it connects to you.

13        You could be in a building, in a 20-story building

14 in Manhattan, another cell site would cover that.  You could

15 be in a tunnel, a different cell site may cover that than the

16 cell site in the geographical area.  You could be on the Long

17 Island Expressway at rush hour and they turn on more cell

18 sites to cover the area and reduce covering by other cell

19 sites.

20        There's many different reasons.

21 Q     Fair enough.

22        What is the furthest away that a phone can be to

23 connect to a cell site?  What's the limit?

24 A     Can you clarify, connect from the phone or from the cell

25 site connecting to the phone?

1  Q     Sure.  You review the records and you get specific

2  locations of cell sites that the phone connected to for an

3  individual communication; is that right?

4  A     Yes, sir.

5  Q     And my question is, how far away could that cell site be

6  from that phone?

7         Is there any limit to how far away it could be?

8  A     Yes.

9  Q     What would that limit be?

10  A     It depends and it varies and it's proprietary information

11  that's not given out by the communications companies.

12  Q     So, is the answer that you can't say?

13  A     Each cell site is different.  They vary based upon

14  geography, based upon the communications company, based upon

15  the type of connection you have.  It varies greatly.

16  Q     Then what is the correlation between the cell site

17  location and the actual location of the phone or the person

18  using it?

19  A     The handset would have to be in a reasonable distance

20  from the cell site to connect to transmit or have a clear

21  voice call or do something along those lines; if it was

22  streaming audio, it may have to be closer or have a better

23  connection; if it's a text message, it could have a worse

24  connection, but it's still connecting to the cell site in that

25  geographical area.

1    Q    You said a "reasonable distance" just now.

2         For a telephone call, sir, what is a reasonable

3    distance?

4    A    In my opinion, the handset should be within two miles of

5    that cell site.

6    Q    Should be within two miles.

7    A    Yes, sir.

8    Q    Make sure I get that down.

9         Is it accurate to say, Mr. Valinchus, this entire

10   network connection, cell site connection process was created

11   and exists for the purpose of cellular service providers

12   giving their customers the best possible service?

13   A    Yes.

14   Q    And is it accurate that over time, the companies have

15   sought to sort of blend these cell sites and their ranges and

16   coverage areas so that basically everything is covered in as

17   many areas as possible; is that correct?

18        THE COURT:  I don't understand what you mean.

19   Rephrase the question.

20        MR. SIMPSON:  Withdrawn.

21        THE COURT:  Confusing.

22        MR. SIMPSON:  Thank you.

23   Q    Have cellular companies sought to improve coverage over

24   time?

25   A    Yes, sir.

1  Q    Have they greatly improved coverage for their customers

2  over, say, the last ten years?

3  A    Yes, sir.

4  Q    And the system is designed for the best customer service;

5  is that true?

6  A    Best customer experience, yes.

7  Q    It is not designed for the purpose of tracking customers'

8  movements or locations, is it?

9  A    No, sir.

10 Q    Is it fair to say that what you do is you tap into the

11 realities of that customer's service, the fact that more often

12 than not the handset -- and say that more often than not the

13 handset is going to be close to the cell site?

14 A    I can't tell you where the handset is, sir.

15 Q    Right.  But in your opinion, it would be within

16 two miles; is that right?

17 A    For a voice call it should be, in my opinion.

18 Q    Okay.  Now, it's true, Mr. Valinchus, is it not, that

19 reliance on cell site location to determine the actual

20 location of a user's handset has some well-documented

21 problems; isn't that true?

22 A    Well, I don't understand what problems you're referring

23 to.

24 Q    I'll tell you.

25         THE COURT:  Well, you're not a witness.

1        MR. SIMPSON:  I'm sorry.

2   Q    Let me ask you, let me ask you.

3        Isn't it true, Mr. Valinchus, that there have been

4   documented problems in Manhattan --

5        THE COURT:  The question is "have there been."

6   Q    Have their been documented problems in Manhattan with

7   people on the West Side calling 911 and their emergency calls

8   being routed to emergency operators in New Jersey?

9        Have you heard of that?

10  A    It's possible.

11  Q    Have you heard of it?

12  A    No, sir.

13  Q    Have you heard of the same thing happening with people in

14  southern New Jersey having their 911 calls go to Philadelphia?

15  A    I have not heard of that, no.

16  Q    Have you heard of the fact that in 2018, the FCC made a

17  recommendation in a notice of inquiry that 911 service

18  providers should stop using --

19       MR. POLLACK:  Objection.

20  Q    -- tower-based cell site location technology?

21       Were you aware of that?

22       THE COURT:  Sustained.

23  Q    Mr. Valinchus, are you aware that in 2019, prosecutorial

24  authorities in Denmark --

25       THE COURT:  Sustained as to form.

1  Q    Are you aware of any countries outside of the United

2  States in which the use of cell site location data --

3            MR. POLLACK:  Objection.

4            THE COURT:  Sustained.

5  Q    Mr. Valinchus, I'd now like to speak to you just a little

6  bit --

7            THE COURT:  Just ask a question, please.

8            MR. SIMPSON:  I'm just introducing an area --

9            THE COURT:  You don't need to introduce.  Ask a

10 question.

11 Q    Are you a certified Cellebrite extractor, Mr. Valinchus?

12 A    Yes, I passed the qualification.

13 Q    Can you explain what that means, passing the

14 qualification?

15 A    It means I've taken the courses to understand how their

16 software works, how to connect it to a cell phone, how to

17 follow directions and do an extraction, save that data

18 properly, and then generate a report using their physical

19 analyzer software.

20 Q    And in order to become certified, did you have to learn

21 about the best practices in the area of Cellebrite extraction?

22 A    Yes, sir.

23 Q    Would you agree that those best practices include taking

24 immediate steps to preserve the evidence contained in the

25 device until the Cellebrite extraction --

1          MR. POLLACK:  Objection.

2          May we have a sidebar, your Honor?

3          THE COURT:  Yes.

4

5          (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following occurred at sidebar.)

2          MR. POLLACK:  I just want to note and make sure that

3   it's clear it has been stipulated that the records that

4   Mr. Valinchus has testified he analyzed, Government Exhibit

5   500, which is not in evidence, only for identification,

6   contains a forensic digital extraction of the iPhone, which is

7   also in evidence as Exhibit 5.

8          I just want to make sure -- the basis of my

9   objection is because I thought the question was starting to

10  call into doubt the reliability or the -- essentially, the

11  notion that the records he analyzed are, in fact, a forensic

12  digital extraction of the iPhone.

13         MR. SIMPSON:  I am not going to imply or assert that

14  the records have been changed in any way since the extraction

15  took place, which I understand to be February 25.  And I

16  believe that --

17         THE COURT:  I'm sorry, what's the question?

18         MR. SIMPSON:  The question that I'm -- I believe my

19  question was just going to be -- my question was about the

20  best practices in Cellebrite extraction.  That's what the

21  question was.

22         THE COURT:  I'm sorry, I know you got interrupted in

23  finishing the question.

24         Can I get what there is of counsel's question?

25         (The record was read as follows:

1          "Question, Would you agree that those best practices
2     include taking immediate steps to preserve the evidence
3     contained in the device until the Cellebrite extraction --"
4          MR. SIMPSON:  I was about to say, "can be
5     performed."  That's what I was going to say.
6          I don't understand why that implicates the
7     stipulation.
8          THE COURT:  Can I just look at the stipulation?
9          MR. POLLACK:  Yes, your Honor.
10         MR. SIMPSON:  The last three words were going to be
11    "can be performed."
12         THE COURT:  Are you referring to -- I think you
13    could clarify your question a little bit better.
14         You're referring to preserving the phone itself,
15    yes?
16         MR. SIMPSON:  Yes, I'm referring to the --
17         THE COURT:  I don't take the question to mean the
18    records themselves --
19         MR. SIMPSON:  Are somehow inaccurate --
20         THE COURT:  No, no.  Preservation of the records,
21    you're not talking about preservation of the records.
22         MR. COHEN:  I'm not --
23         THE COURT:  I'm not clear.
24         MR. SIMPSON:  I'm not clear what's not clear
25    exactly.

1        THE COURT:  Let's backtrack a second.

2        Correct me if I'm wrong, I am understanding

3   counsel's question to be whether it is a best practice to

4   preserve -- if you're talking about the phone, just use that.

5        MR. SIMPSON:  Well, I said the device.

6        THE COURT:  -- to preserve the phone on which the

7   extraction is going to be performed.

8        MR. SIMPSON:  Correct, that's what I'm asking.

9        THE COURT:  That's what he's asking.

10       MR. POLLACK:  I understand.

11       THE COURT:  I don't think that that implicates the

12  documentary evidence that's part of Stipulation S3.

13       MR. POLLACK:  I appreciate the clarification.  I

14  just wanted to make sure that there's no suggestion that the

15  forensic --

16       THE COURT:  May I make a suggestion?  It would be a

17  whole lot easier if you could just ask short questions instead

18  of convoluted ones.

19       MR. SIMPSON:  I'll really trying not to ask leading

20  questions, your Honor, because I know the Court does not want

21  me to do that.

22       THE COURT:  You don't have to ask --

23       MR. SIMPSON:  I could move faster if I could.

24       THE COURT:  No, no.  That's because you're used to

25  do cross-examination in a sloppy way.

1            MR. SIMPSON:  Okay.

2            THE COURT:  Because a lot of people don't care.  But

3    I care.

4            MR. SIMPSON:  I understand.  I appreciate it.

5            THE COURT:  I think it's a simple question:  Is it

6    considered a best practice to preserve the cell phone or

7    device from which --

8            MR. COHEN:  You plan to do an extraction.

9            THE COURT:  -- you plan to do an extraction so that

10   it is in the same condition as first obtained?

11           MR. SIMPSON:  Exactly.

12           THE COURT:  Or something like that.

13           MR. SIMPSON:  That's what I was exactly trying to

14   ask.

15           THE COURT:  I think that's clearer.

16           MR. SIMPSON:  I didn't mean to confuse anybody.

17   Thank you.

18           MR. POLLACK:  I appreciate the clarification.  Thank

19   you.

20           THE COURT:  All right.

21

22           (Continued on the following page.)

23

24

25

1          (Sidebar ends; in open court.)

2          THE COURT:  The objection is sustained as to form.

3    You may re-word the question.

4          Do you have a lot more?

5          MR. SIMPSON:  I do.

6          THE COURT:  You do.  Okay.  So, maybe this is --

7          Do you want to take a break?

8          I like to see hands up.  That's very clear.

9          All right, so, we're going to take a break.  We'll

10   come back at 3:45.  Remember, you cannot talk about this case

11   among yourselves or anyone else over any kind of media.

12   Anything at all connected with this case you cannot discuss.

13   Please keep an open mind and not form or draw any opinions

14   about anything you've seen or heard thus far.  Remember, you

15   can't do any research or investigation on your own or read or

16   listen to anything about this case over any kind of media.

17         And we will see you back here at 3:45.

18         (Jury exits.)

19         THE COURT:  The jury is no longer present.  You all

20   can take a break too until 3:45.

21         That includes you, sir.

22         THE WITNESS:  Thank you.

23         THE COURT:  We'll just ask you to come back here.

24         Because you're on cross-examination, you cannot

25   discuss your testimony with the Government.  You can discuss

1    scheduling but not the content of your testimony.

2              THE WITNESS:  Yes, ma'am.

3              THE COURT:  Thank you.  I'll see everybody back

4    here.

5              (Recess taken.)

6              THE COURT:  Is everybody all set?

7              Why don't we bring in the witness and Mr. Simpson is

8    already set.  If everybody is in, she'll just bring them in.

9              (Jury enters.)

10             THE COURT:  Everyone may be seated.

11             Do you all agree that all of our jurors are present

12   and properly seated.

13             Government?

14             MR. POLLACK:  Yes, your Honor.

15             THE COURT:  Defense?

16             MR. COHEN:  Yes.

17             THE COURT:  This is continued cross-examination of

18   Mr. Darryl Valinchus by Mr. Simpson.

19             Mr. Valinchus, I remind you that you are still under

20   oath.

21             THE WITNESS:  Yes, ma'am.

22             THE COURT:  You may inquire when you are ready,

23   Mr. Simpson.

24             MR. SIMPSON:  Thank you, Judge.

25             Ms. Cronin, can we please pull up Defense Exhibit B1

1  for the witness, please, and the parties?

2  BY MR. SIMPSON:

3  Q    Mr. Valinchus, have you seen this report before -- have

4  you seen this before?

5          THE COURT:  This is an exhibit for identification

6  only for the parties, correct?

7          MR. SIMPSON:  That's correct.

8  A    Yes, sir.

9  Q    What is this report, Mr. Valinchus?

10  A    This appears to be a PDF document generated from the

11  timeline view for the Belloisi handset extraction for a period

12  of time, February 4, 2:30 p.m. through February 5, 20:20 p.m.

13  with, I believe, most of the information that was captured

14  from the timeline.

15  Q    Thank you.  Now, Mr. Valinchus, without making any

16  comment as to the amount of communications or the names of any

17  parties of any specific -- or any specific telephone numbers

18  listed here, I would like to ask you some general questions

19  about this report and the records --

20          THE COURT:  It's not in evidence.

21          MR. SIMPSON:  I would like to ask the witness some

22  questions about the report, Judge.

23          May we have a brief sidebar?

24          THE COURT:  It's for identification only.

25          (Continued on the following page.)

1                (The following occurred at sidebar.)

2        MR. SIMPSON:  I'm sorry, your Honor, the reason I

3   was prefacing that question is because I want to make sure the

4   witness understands the limits of the questions that I'm going

5   to be asking so that we do not run afoul of the agreement we

6   have with the prosecution about what we will and will not go

7   into with respect to these records.

8        I simply want him to take me through the columns and

9   what information means that is non person specific.

10       THE COURT:  But the document is not in evidence.

11  You're going to be asking him questions about a document

12  that's not in evidence.

13       MR. SIMPSON:  Right.

14       THE COURT:  What do you mean "right," like you can

15  do that?

16       You can ask him questions about the document to the

17  extent that he identifies the document, identifies what it is,

18  identifies the accuracy of it.  And presumably, if it

19  qualifies under the Federal Rules of Evidence, that's one of

20  those documents that can be introduced.

21       MR. SIMPSON:  I simply want to ask him about the

22  nature of the report and what it produces.  I don't want to

23  ask him about any of the content of the report.  And I don't

24  believe the report is proper to be introduced as evidence.

25       But it is -- the type of material is the type of raw

1   data upon which his reports were formed.

2          THE COURT:  Let me ask you this:  Why do you need a

3   report to ask him questions about the types of data that can

4   be produced?

5          MR. SIMPSON:  Because I have never talked to him

6   before.  You declined my request to speak to him.  So, I'd

7   like the opportunity to get --

8          THE COURT:  Why do you need the report to do that is

9   my question.

10         MR. SIMPSON:  Because his reports are based on

11  exactly these kinds of reports.  These are the reports that he

12  goes through --

13         THE COURT:  Let me hear from the Government because

14  you all have reached some sort of understanding.

15         MR. POLLACK:  This is the issue other than the

16  witness who needed a lawyer that we raised this morning.

17         We have had prior discussion about this document.

18  We had the witness verify for himself that the data in that

19  document is contained in the raw data that he analyzed.  And

20  we told the defense we don't object to his asking generally

21  about the types of data, we would object if he sought to

22  introduce the document.  And he told us he does not intend to

23  introduce it, only to use it as a starting point to ask about

24  the types of data.

25         MS. SCHIERBERL:  I understand the Court's question

1  to be, though, is it possible to ask about those type of data

2  without the document?

3           THE COURT:  Correct.  You can't reference your

4  questions by referring to data that's on a document that's not

5  in evidence.

6           Do you follow what I'm saying?

7           I have no problem with you asking generally, I

8  think, getting out what I think you want to get out, which is

9  that there are all different kinds of data, right, that can be

10  extracted from devices using the various different

11  applications that he's trained in, right?

12           MR. SIMPSON:  Yes.

13           THE COURT:  Okay.  I don't see why it's necessary to

14  use --

15           MR. SIMPSON:  I see what you're saying.

16           THE COURT:  -- that document with the witness based

17  on him looking at it.  It's another thing if you use that

18  document for yourself as a reference point so that you know

19  the kinds of information that you want to ask him about.

20           Do you understand what I mean, sort of to use that

21  document as a reference note for yourself as opposed to having

22  the document up for the witness?

23           MR. SIMPSON:  Have him talk about the things in the

24  document.

25           THE COURT:  That's my concern because the document

1   is not in evidence.

2            MR. SIMPSON:  I understand.

3            THE COURT:  I don't have an issue with you asking

4   him questions about what kinds of data can be extracted, the

5   different kinds of information that can be extracted, assuming

6   it's within his bailiwick, right, within his realm of

7   expertise.

8            MR. SIMPSON:  But asking him to, say, look at the

9   document and tell me what it says --

10           THE COURT:  That's the problem that I have --

11           MR. SIMPSON:  I hear the Court and I understand.

12           THE COURT:  -- because it's not in evidence.  And I

13   think you all reached some sort of agreement that that wasn't

14   the point.

15           MR. SIMPSON:  Yes.

16           THE COURT:  I guess that's the bottom line here.

17           MR. SIMPSON:  Yes.

18           THE COURT:  So, I don't see you being precluded from

19   asking the questions, it's about making reference to that

20   document in order to do so.

21           MR. SIMPSON:  Okay.  Thank you.

22           THE COURT:  Okay?

23           MR. SIMPSON:  Okay.

24           MR. POLLACK:  Thank you, Judge.

25           (Continued on the following page.)

1          (Sidebar ends; in open court.)

2    BY MR. SIMPSON:

3    Q    Mr. Valinchus, generally speaking, timeline documents

4    like this --

5          THE COURT:  I'm sorry, you want to take down the

6    document?

7          MR. SIMPSON:  Yes, let's take it down.  Thank you,

8    Judge.

9          THE COURT:  Thank you.

10   Q    Generally speaking, will timeline extraction reports like

11   the one you just looked at, will those include information

12   about the type of communication that is at a particular point

13   in time?

14   A    It will timeline the event.

15   Q    And what type of events will be in that timeline?

16   A    Anything that happened on that device, the event would

17   fall within the timeline.  So, depending on the device and

18   what the extraction had, those would fall into the timeline

19   categories.

20   Q    And are you able to make a separate report --

21         THE COURT:  Can I just stop you here?

22         What do you define as an "event"?

23         THE WITNESS:  So, a telephone call made by the

24   cellular telephone using the communications company would be

25   considered a call and be listed as a timeline event in a call

1    log.

2            A voice call for an application may also be counted

3    as a call in a call log.

4            THE COURT:  Like the WhatsApp application.

5            THE WITNESS:  Yes, ma'am.

6            So, they are vague categories, so you have to look

7    at for what they are.  And the timeline is the last product of

8    the extraction, which compiles all the different sets of data

9    they bring in there and gives you the ability to look by date

10   and see what took place.

11           And then if you want to go look at the exact

12   feature, you click it, and it would take you to what exactly

13   it was.

14           THE COURT:  You may inquire.

15           MR. SIMPSON:  Thank you, Judge.

16   Q    And Mr. Valinchus, my question is you can also make much

17   more particular type of extraction reports than a timeline

18   that just deal with one type of communication; is that true?

19   A    Yes, you can make different reports, yes, sir.

20   Q    You can do an extraction of just a call log with one

21   particular individual; is that correct?

22           One particular phone number.

23   A    I understand that, but you're saying "extraction."  So,

24   the extraction is the entire set of data pulled out.  An

25   extraction cannot focus on one phone number to extract just

1  that out of the phone.

2  Q    Understood.  Is it not true, however, that if you select

3  to just get a call log for one phone number, that the document

4  that will be produced by Cellebrite is called an extraction

5  report?

6           Is that correct?

7  A    Not in that term.  An extraction report is a report of

8  the entire extraction.

9           You're able to go in there and narrow down your

10 reporting to different sections from that larger report, yes.

11 You can narrow down and focus on a specific phone number and

12 generate a report based upon that, but that is not an

13 extraction report.  The extraction report is the entire

14 report.

15 Q    Understood.  Thank you for the nomenclature.

16          THE COURT:  Is there some specific term that you use

17 for those more fine-tuned reports, if you will?

18          THE WITNESS:  You're able to generate little reports

19 based upon your analysis.  Looking through the data, you can

20 flag it to extract it as something you flagged.  Or you can

21 look at a specific thing that took place and export it to

22 review.

23          And when you export it to review, you would export

24 it in either Excel or PowerPoint to look at it.  It would have

25 a header similar to what my report showed:  This is what it is

1  and that's how many connections there are.

2         THE COURT:  It would be a subset of the extraction;

3  is that correct?

4         THE WITNESS:  That is correct.

5         MR. SIMPSON:  Thank you, Judge.  That is exactly

6  what I was going to ask.

7  Q    Mr. Valinchus, as far as one of these subsets that you

8  could isolate, would that be text messages with a particular

9  user; is that something that you could isolate?

10 A    Yes, sir.

11 Q    And when you look at -- let me back up.  Withdrawn.

12        With respect to messages, there's different types of

13 messages that you can isolate, correct?

14 A    Yes, sir.

15 Q    You can isolate SMS messages; is that right?

16 A    Yes.

17 Q    You can isolate just WhatsApp messages; is that correct?

18 A    Yes.

19 Q    And you can isolate even native text messages, right?

20 A    Which would classify as SMS or anything that took place

21 on that device, yes.

22 Q    Or iMessages could be individually isolated; is that

23 true?

24 A    Yes, sir.

25 Q    It just has to do with selecting the way you want to

1   isolate it within Cellebrite; is that correct?

2   A     Within their physical analyzer software.

3   Q     Right.  And Mr. Valinchus, if you were to look at an

4   isolated WhatsApp chat, for instance, what information would

5   be represented in that isolated document that you produce from

6   the Cellebrite software?

7   A     If it was just between two parties?

8   Q     Yes.

9   A     It would be the date and time that the initial chat was

10  started, any other communications that were between them, and

11  the date and time of last communication, the content of the

12  messages that went back and forth, images or audio that was

13  included in that, and the parties involved, their phone number

14  or their WhatsApp identifier.

15  Q     Thank you.

16        MR. SIMPSON:  Can we pull up Defense Exhibit B6,

17  please, for the witness?

18  Q     Mr. Valinchus, on your screen is what has been marked for

19  identification as Defense Exhibit B6.

20        Can you take a look at that, please?

21  A     Yes, sir.

22  Q     What does that look like to you, sir?

23  A     WhatsApp communication or part of a chat between the

24  WhatsApp number associated with Paul Belloisi and the WhatsApp

25  associated with Lester.

1    Q    And how many pages is this document that you have here?

2         MR. SIMPSON:  If we are able to show the witness how

3    many pages it is?

4    Q    Were you able to count how many pages?

5    A    It appears to be four pages of WhatsApp communications

6    between the two and system-generated messages.

7    Q    And that's between Belloisi and the contact Lester; is

8    that correct?

9    A    And the application itself.

10   Q    Right.  And when you said "the application itself," are

11   you referring to the fact that there are missed calls that

12   appear as text messages?

13   A    They are notifications, yes.

14   Q    And they are represented almost identically to the actual

15   messages; is that true?

16   A    It comes in as a message, I believe, as text, yes.

17        MR. SIMPSON:  Can we go back to the first page of

18   this document, Ms. Cronin?

19   Q    What is the beginning date of the first message that

20   you're seeing?

21        THE COURT:  This document is not in evidence.

22        MR. SIMPSON:  I'm sorry, I would offer Defendant's

23   B6 in evidence.

24        THE COURT:  Any objection?

25        MR. POLLACK:  No objection.

1      THE COURT:  It's admitted.

2      (Defendant's Exhibit B6 so marked.)

3      MR. SIMPSON:  Permission to publish for the jury?

4      THE COURT:  Of course.

5      (Exhibit published to the jury.)

6  Q    Mr. Valinchus, what are the two colors that we're seeing

7  here for the messages?

8  A    Green and blue.

9  Q    What is the date and time of the first message?

10      THE COURT:  You have two questions there.  One

11  question at a time.

12  Q    What is the date of the first message that you see?

13  A    The date of the first message was 2/3/20 at 12:50:25.

14  Q    Thank you.

15      MR. SIMPSON:  And then can we take a look at the

16  second message please?

17      Can we isolate or blow that up, the first blue

18  message, please?

19  Q    What do you see there, Mr. Valinchus?

20  A    A response back from the Lester handset on the WhatsApp

21  application.

22  Q    What does it say below the response in the blue bubble?

23  A    The content?

24      MR. SIMPSON:  Can we keep that isolated for the

25  witness, please?

1    Q    Below the words "is one already," what's below that, sir?

2    A    Status read.

3    Q    What does that mean?

4    A    That means somebody looked at the text message --

5    WhatsApp message, excuse me.

6    Q    Why does that show up when somebody looks at the text

7    message?

8    A    It's a read receipt to let somebody know that somebody

9    looked at it.  It doesn't mean they read it, it means they

10   opened it up or saw it.

11        MR. SIMPSON:  You can unisolate that, Ms. Cronin.

12   Q    As you look down the page at the blue bubbles,

13   Mr. Valinchus, do you see the status of "read" for each of the

14   two additional messages that appear there?

15   A    No.

16        MR. SIMPSON:  Can we blow up the second message?

17   A    I thought you meant below that, sir.

18   Q    No, no, I meant this second message, do you see the

19   status "read"?

20   A    Yes.

21        MR. SIMPSON:  You can unisolate that.

22        And for the third blue message, can we please

23   isolate laid that, Ms. Cronin?

24   Q    Do you see the status of "read" on this text,

25   Mr. Valinchus?

1    A    Yes, sir.

2    Q    Thank you.

3         MR. SIMPSON:  Thank you, Ms. Cronin.

4         Can we go to the final page of this document,

5    please?

6         I'm sorry.  The second to last page, Ms. Cronin, I'm

7    sorry.

8         Can you isolate the top message, please?

9    Q    Have you seen that message before, Mr. Valinchus?

10   A    Yes, sir.

11   Q    Where have you seen that before?

12   A    That was in the report that I created for the

13   communications between the Lester handset and the Paul

14   Belloisi handset.

15   Q    Do you see a read stamp in that text, Mr. Valinchus?

16   A    A read stamp?

17   Q    Do you see the read stamp, the status "read" that we saw

18   in the other three messages we just looked at?

19   A    No, sir, it's not there.

20   Q    What would that indicate to you?

21   A    They didn't physically touch their phone and open up the

22   messaging app.

23   Q    Wouldn't it indicate that this message wasn't read by the

24   user?

25   A    Not necessarily.  It's when you open up the app.

1  Q    Do you have any information as to whether or not --

2  withdrawn.

3            MR. SIMPSON:  You can put the document down.

4            Can we pull up Government Exhibit 504, please?

5            (Exhibit published to the jury.)

6  Q    Mr. Valinchus, did the Government ask you to make this

7  exhibit?

8  A    For the specific period of time?  Yes.

9  Q    Did the Government want an easier way to present part of

10 the T-Mobile call records?

11           Is that why this document was made?

12 A    To reduce the volume of them?  Yes.

13 Q    To make an easier visualization; is that true?

14 A    Yes, sir.

15 Q    Now, these are only part of the records from the T-Mobile

16 records that you received, correct?

17 A    Yes, sir.

18 Q    And this report is only showing the activity beginning

19 with a telephone call to Mr. Belloisi at 9:35 p.m. on

20 February 4 of 2020, correct?

21 A    Yes, sir.

22 Q    Were you asked to put anything together for this exhibit

23 from earlier calls in the T-Mobile records?

24           Withdrawn.  Confusing question.

25           Were you asked to put anything together similar to

1  this exhibit from earlier calls in the T-Mobile records for

2  Lester?

3  A    I had the entire period of time at one time between the

4  two of them.

5  Q    Now, this exhibit is limited to what appears in the

6  T-Mobile records for Lester, correct?

7  A    Yes, sir.

8  Q    And isn't it true, Mr. Valinchus, that WhatsApp phone

9  calls and messages that Lester engaged in would not be

10 recorded in the T-Mobile records?

11 A    That's true.

12 Q    So, there could be a lot of calls that were both incoming

13 and outgoing through WhatsApp with Lester that are not

14 reflected in this document during this exact period of time;

15 isn't that true?

16 A    I would not be in Lester's records, correct.

17 Q    You would be none the wiser about those communications

18 unless they were with Mr. Belloisi, correct?

19 A    Yes, sir.

20       MR. SIMPSON:  Could we pull up the Government

21 Exhibit 501, please?

22       I'm sorry, your Honor.  One moment, please.

23 Q    This is a document, Mr. Valinchus, that you produced

24 through a combination of the Cellebrite data for

25 Mr. Belloisi's phone and from the Lester T-Mobile records,

1    correct?

2    A    This is based upon the Belloisi perspective at this time.

3    Q    I'm sorry, the Belloisi perspective?

4    A    Yes, sir.

5         MR. SIMPSON:  Can we take a look at the second page

6    of your report?

7    Q    So, I'd like to talk to you about the one call that was

8    not through WhatsApp; do you see that call?

9    A    Yes, sir.

10   Q    Would it be fair to say that is the only call that would

11   appear in the T-Mobile records?

12        Is that right?

13   A    No, sir -- excuse me, it would be only in Lester's

14   records, that is correct.

15        MR. SIMPSON:  Can we go back to Page 1?

16   Q    Just looking at this communication between Belloisi and

17   Lester, would you agree that it would be fair to say Lester

18   seems to communicate through WhatsApp quite a bit?

19   A    With Mr. Belloisi, yes.

20        (Continued on the following page.)

21

22

23

24

25

1   CROSS-EXAMINATION

2   BY MR. SIMPSON:  (Continuing)

3   Q    And you have no idea about who else Lester may have been

4   communicating with through WhatsApp; correct?

5   A    Correct.

6           MR. SIMPSON:  Thank you.

7   Q    Mr. Valinchus, I believe you told me a bit earlier that

8   today that in your opinion a handset will not be further than

9   two miles from the cell site that it connects to; is that

10  accurate?

11  A    No.  I said I believe a cell phone should be within two

12  miles of the cell site for a voice call.

13  Q    What do you mean "should"?

14  A    Cell phones and cell sites communicate to each other.  To

15  make a voice telephone call you must have a reasonable

16  connection with the cellular cell site to make that call.

17          If that one cell site isn't providing reasonable

18  service, another one will.

19          So in the City of New York, there are tons of cell

20  sites.  So to be within two miles of a cell site is not

21  unreasonable when you are making a voice call.

22  Q    Would that apply to Queens and the Bronx as well to

23  Manhattan?

24  A    The more population and the more buildings there are,

25  changes the coverages, so it would be a lot closer for most

1    communications in the Bronx and Manhattan and parts of Queens.

2           But I said, in general, a cell phone should be

3    within two miles for a voice call.  I didn't specify the

4    geographical area when you asked me.

5    Q    Can you specify what you, in your opinion, believe is the

6    outer limit of that geographical area that a cell phone can

7    connect to a cell site?

8           THE COURT:  For a voice call?

9           MR. SIMPSON:  For a voice call.

10   A    In the City of New York, the visualizations that do I are

11   a quarter to a half mile.

12   Q    What about if we moved to, let's say, outer Queens, how

13   does that change that geographical proximity analysis of

14   yours?

15   A    There is less taller buildings in the border of Queens

16   and Nassau County.  So the coverage may be a little further.

17   There's less interference there.  But there are still a lot of

18   cell sites due to the amount of people there or the roadways

19   that are there.

20   Q    And so what's the furthest away that you believe that a

21   handset could possibly be from a cell site for a voice call in

22   that geographical area?

23   A    It depends on the layout of the cell site, sir.  There is

24   no specific answer to answer your question about a cell site's

25   coverage.

1      Cell sites and networks are living and breathing.

2   They adjust based upon what's going on.  So the time of day,

3   the geographical location, your phones, it could all depend on

4   what cell site you connect to that's providing the best

5   service at that moment, but your handset will always connect

6   to one that's providing service in the area that you are in.

7   Q    Let me ask you this:  For the cell sites that you plotted

8   in this case, did you go out and try to determine what the

9   range or coverage area of those particular cell sites would

10  be?

11  A    No, sir.

12  Q    Why not?

13  A    I can't afford the equipment to do that.

14  Q    Why not?

15  A    It's over $200,000.

16  Q    About does your experience as an expert give you any

17  information about any of these cell sites and what that

18  expected coverage area would be even though you didn't go out

19  there personally?

20  A    So I'm trained in JVSU, which is the tool that's used to

21  do that and cell sites do not transmit in a perfectly square

22  or round fashion.

23       They transmit radio waves that reflect, refrac --

24  excuse me -- refract to do two different things there.

25       So for visualization purposes, depending on the

1  geography, the amount of people that are there, you visualize

2  it like that.

3          On my maps that I showed today, I only put a point

4  on the map.  I didn't represent any coverage except for the

5  site that it was on.

6  Q     Right.

7          MR. SIMPSON:  Well, let's pull up Government Exhibit

8  505, if we can, please.

9  Q     This is what we're sort of referring to?  Yes?

10 A     Yes, sir.

11 Q     For example, can we -- taking a look at --

12         MR. SIMPSON:  Ms. Cronin, if you can focus in on

13 let's just say the two Lester cell sites at the bottom letter

14 of that map, if we can.  Thank you.

15 Q     So am I correct in my understanding, Mr. Valinchus, these

16 are two separate cell sites; is that right?

17 A     Yes, sir.

18 Q     And this is in Queens, New York?  Yes?

19 A     Yes, sir.

20 Q     And you are not able to give us any sort of definitive

21 range as to how close you believe the user of that phone was

22 when connecting to those cell sites, is that accurate?

23 A     Correct.

24 Q     So, the person connecting to that cell site could have

25 been 10 miles away?

1   A    No, sir.

2   Q    Why not?

3   A    He would have been in the water then.

4   Q    Which direction?

5   A    South.

6   Q    Did I say south?

7   A    Well, you asked the direction and you asked the coverage

8   for the cell site.

9   Q    I'm asking could the person possibly be in 10 miles in

10  any connection, sir?

11  A    No, sir, because those cell sites are pointing and

12  they're represented by their sectors, by those black legs.

13       Those cell sites are transmitting towards JFK

14  Airport.  After JFK Airport is Jamaica Bay.  That's why I said

15  this.

16       MR. SIMPSON:  Ms. Cronin, can we zoom out, and maybe

17  let's zoom in -- could we zoom in on the blue Belloisi, I

18  believe it's in the Bronx, upper left.  Yes, that one.  Thank

19  you.

20  Q    So for this one, which way are the -- is it a sector?

21       Which way is the sector pointing for this cell site?

22  A    That's not a cell site.

23  Q    Oh, what is this?

24  A    That's the geographical location of the physical device

25  based upon the cell phone.

1  Q    Right.  It's different for Belloisi and for Lester;
2  correct?
3  A    Yes, sir.
4  Q    Are you more confident that that is exactly where Mr.
5  Belloisi actually was at that time?
6  A    Confident that's where Mr. Belloisi's cell phone was at
7  that time.
8  Q    Okay.  Fair.
9         MR. SIMPSON:  We can zoom out, please.
10 Q    I'd like to bring your attention to the point right in
11 the middle of the map that we have, the blue Belloisi in the
12 middle.  If we can isolate that.
13         Thank you, Ms. Cronin.
14 Q    So, Mr. Belloisi's device was absolutely at that point at
15 that time, is that your testimony, sir?
16 A    Based upon on the cell phone's extraction, yes, sir.
17 Q    What's the time on that?  Can you just read that aloud to
18 us?
19 A    8:52, 37 seconds p.m. on February 3, 2020.
20         MR. SIMPSON:  We can unisolate that.  Can we move to
21 the right, Ms. Cronin, to the east.  No, no, not that one,
22 even further.  Thank you.
23 Q    Do you see that top one?
24 A    Yes, sir.
25 Q    What is the time and date of that information?

1  A    The top one is February 3, 2020 at 8:55 and 44 seconds.

2  Q    Is that 2 minutes and 7 seconds after the last one we

3  just looked at?

4  A    Yes, sir.

5          MR. SIMPSON:  Can we unisolate?  Can we re- isolate

6  on the one right in the middle of the map, please.  That whole

7  thing.  Yes.  Thank you.

8  Q    What's the name of the city right above the blue dot

9  there?

10  A    Hicksville, New York.

11          MR. SIMPSON:  Can we unisolate that.  Thank you.

12  Can we go back and isolate the one to the right.  Thank you.

13  Q    Do you see the two-letter abbreviation for the highway

14  that runs north and south that is left -- to the left of that

15  Belloisi information?

16  A    Yes, sir.

17  Q    Do you know what highway that is, sir?

18  A    Yes, sir.

19  Q    What is it?

20  A    Sagtikos Parkway.

21  Q    Have you ever in your life heard of people -- someone

22  being able to get from Hicksville to East of the Sagtikos

23  Parkway in 2 minutes and 7 seconds?

24  A    Not by car, not.

25  Q    I didn't think so.

1     THE COURT:  The comment is stricken from the record.

2     MR. SIMPSON:  Thank you.

3     THE COURT:  That was inappropriate.

4     MR. SIMPSON:  Sorry.

5     THE COURT:  The jury will disregard.

6     MR. POLLACK:  One second, Your Honor.

7     THE COURT:  Any redirect?

8     MR. POLLACK:  No redirect, Your Honor.

9     THE COURT:  Thank you, sir.  You may step down.

10    THE WITNESS:  Thank you, Your Honor.

11    (Witness steps down.)

12    (Pause.)

13    THE COURT:  May I please speak with counsel?

14    (Continued on next page.)

15    (Sidebar conference.)

16

17

18

19

20

21

22

23

24

25

1            (The following occurred at sidebar.)

2            (The following occurred at sidebar.)

3            THE COURT:  Is this the end of the Government's

4    evidence?

5            MR. POLLACK:  Yes, Your Honor.

6            THE COURT:  Does the Government rest?

7            MR. POLLACK:  The Government rests.

8            THE COURT:  Motions at the end of the Government's

9    case.

10           MR. SIMPSON:  Yes, Judge.

11           We would have a motion that the Government -- there

12   is not sufficient evidence before this jury for the jury to

13   find beyond a reasonable doubt that all of the elements of any

14   of the charges have been proven.  However, we would make

15   special note that there is a particular lack of the required

16   element that the defendant must -- that there must be proof

17   beyond a reasonable doubt that the defendant knew and intended

18   that the narcotics were coming from outside the United States.

19           There has been no direct evidence of any

20   co-conspirator statement, any co-conspirator's action that is

21   a direct evidence of drug trafficking.  Therefore, we think

22   that there's insufficient evidence for the jury to find proof

23   beyond a reasonable doubt on any of the charges.

24           THE COURT:  The Government, what do you say?

25           MR. POLLACK:  Yes, Your Honor.

1       I submit that there is more than sufficient evidence

2   for a reasonable jury to find the defendant guilty of every

3   count, in the first instance, simply the fact that the

4   defendant was in the place where the drugs were seized after a

5   long period of law enforcement surveillance, the testimony

6   that no one else entered that location from the time the

7   airplane landed until the defendant entered the plane.  The

8   plane was almost about to take off at that time, so there was

9   not much more time for anyone else to go into the plane.

10      The defendant had the glowing substance on his

11  gloves.  The defendant tripped the device.  That alone is

12  sufficient without any other evidence for a reasonable jury to

13  find that the defendant was there because he knew the drugs

14  were there, he went to get them.

15      As for the importation counts charges and the

16  element of knowledge, the fact that the defendant worked at an

17  airport around airplanes and that that flight came from out of

18  the country is sufficient for a reasonable jury to infer that

19  the defendant knew that that plane came from overseas, and

20  that he would have knowledge that the drugs he was intending

21  to remove therefore came from overseas and were being imported

22  in the United States.

23      For all of those reasons, I submit there is more

24  than sufficient evidence for a reasonable jury to convict.

25      THE COURT:  The Court finds that the Government has

1  made a prima facie case in its case-in-chief.

2        The Court must view the evidence in the light most

3  favorable to the Government.

4        For all of the reasons that the Government has

5  stated with respect to the evidence that has been presented,

6  there is sufficient evidence to proceed with the rest of the

7  case.

8        Obviously we will wait until defendant defense rests

9  and I will entertain motions at the end of the entire case.

10        Is your witness ready to go?

11        MR. COHEN:  Yes, ma'am.

12        THE COURT:  Let's go.

13        MR. COHEN:  Let's go.  Can I walk outside to get

14  him?

15        MR. SIMPSON:  I can get him.

16        MR. POLLACK:  Your Honor, should I rest in the

17  presence of the jury.

18        THE COURT:  Yes.

19        We need to have him rest first and then you can go

20  out and get your witness, okay.

21        MR. SIMPSON:  Okay.

22        MR. POLLACK:  Thank you, Judge.

23        (Sidebar ends.)  (Continued on next page.)

24        (In open court.)

25        THE COURT:  Does the Government have any additional

1   evidence to present?

2           MR. POLLACK:   No, Your Honor.  The Government

3   rests.

4           THE COURT:  Does the defense wish to present a case?

5           MR. COHEN:  Yes, Your Honor.

6           THE COURT:  You may call your first witness.

7           MR. COHEN:  The defense calls Frank Ricci.

8           THE COURT:  Will you be doing the examination, sir?

9           MR. COHEN:  I will, Your Honor.

10          THE COURTROOM DEPUTY:  Please raise your right hand.

11          Do you affirm that your testimony will be the truth,

12  the whole truth and nothing but truth?

13          THE WITNESS:  I do.

14          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

15  There's bottled water for you.

16          Please state and spell your name.

17          THE WITNESS:  My name is Frank Ricci, R-I-C-C-I.

18          THE COURT:  Good afternoon, sir.

19          THE WITNESS:  Good afternoon.

20          THE COURT:  I'm going to ask you to keep your voice

21  up noise and loud.

22          THE WITNESS:  Okay.

23          THE COURT:  You can adjust the microphone so it is

24  at a comfortable height for you.

25          THE WITNESS:  Okay.

1          THE COURT:  I'm going to ask you to speak slowly if

2   you would, please.  And there is water there for you in case

3   you need it.

4          THE WITNESS:  Yes.

5          THE COURT:  Mr. Cohen, you may examine when you're

6   ready?

7          MR. COHEN:  Thank you, Your Honor.

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **FRANK RICCI**,

2        called as a witness, having been first duly

3        sworn/affirmed, was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MR. COHEN:

6   Q    Good afternoon, Mr. Ricci.

7   A    Good afternoon.

8   Q    If I ask you any questions that are hard to understand or

9   they seem confusing, please let me know and I will attempt to

10  rephrase them.  Okay?

11  A    I will.  Thank you.

12  Q    Mr. Ricci, are you employed?

13  A    Yes, I am.

14  Q    Who are you employed by?

15  A    I'm currently employed by American Airlines.

16  Q    And what is your job title at American Airlines?

17  A    Aircraft maintenance technician.

18  Q    And do you hold any license in your role as an aircraft

19  technician at American Airlines?

20  A    Yes, I do.  I have my Airframe and my Powerplant

21  licenses.

22  Q    And how long have you been working at American Airlines

23  as an aircraft technician?

24  A    I have been working as an aircraft technician since March

25  of 1996.

1   Q    Is it --

2   A    That's 24 years.

3   Q    And how long have you been working as an aircraft

4   technician --  withdrawn.

5            Were you working anywhere before American Airlines?

6   A    No, I have not.

7   Q    As an aircraft technician similar or different than an

8   aircraft mechanic?

9   A    That's the title they give us.  It's a mechanic.  An

10  aircraft mechanic is called a technician.

11  Q    What is your role as an aircraft mechanic for American

12  Airlines?

13  A    To ensure that the aircraft are safe and airworthy for

14  departures.

15  Q    Are you qualified to work on 737s?

16  A    Yes, I am.

17  Q    Have you gone to school for work on American Airlines

18  737?

19  A    Yes.  I attended the American Airlines training course in

20  2001.

21  Q    And since you began working at American Airlines, have

22  you worked for any other airlines?

23  A    No, I have not.

24  Q    Since you began working for American Airlines, where has

25  your job been stationed?  Where have you been working?

1    A    I have been at JFK Airport for the entirety of my career.

2    Some years were spent at the hangers; some years were spent at

3    the terminal.

4    Q    Is your job as a mechanic different if you work at the

5    terminal verse if you work at the hanger?

6    A    No, not really.

7    Q    Are you familiar with Terminal 8, Gate 7 at JFK?

8    A    Yes, I am, very familiar.

9    Q    How are you familiar with Terminal 8, Gate 7 at JFK?

10   A    I have worked at the terminal since 1999 with the old

11   terminal and now with the new terminal, I've been there ever

12   since, since they opened.

13   Q    When did it the new terminal open?

14   A    It was between 10 and 15 years ago.

15            MR. COHEN:  Ms. Cronin, can we please pull up

16   defense C-1 already in evidence with the Court's permission.

17            THE COURT:  Yes.

18            MR. COHEN:  And that is for all parties, please, Ms.

19   Cronin.  Okay.

20   Q    Mr. Ricci, Ms. Cronin is about to show you what is C-1,

21   Defense Exhibit in evidence.  I ask you to look at it and then

22   I will ask you questions once it's over.

23            (Video playing.)  (Video stopped.)

24   Q    Were you able to see Defense Exhibit C-1 in evidence,

25   sir?

1  A    Yes, I was.

2  Q    Are you familiar with what is represented by Defense C-1

3  in evidence?

4  A    That is Gate 7 at JFK Terminal 8.

5  Q    Does that video in C-1 fairly and accurately represent

6  Terminal 8, Gate 7 at JFK as it existed in 2020?

7  A    Yes, it does.

8        MR. COHEN:  Ms. Cronin, can you please pull up

9  Defense A-2 in evidence.

10        And with the Court's permission, may we show it to

11  all parties?

12        THE COURT:  Yes.  I'm sorry.  What was that again?

13        MR. COHEN:  A-2 in evidence.

14        THE COURT:  Thank you.

15  Q    Are you able to see Defense A-2 in evidence, Mr. Ricci?

16  A    Yes, I am.

17  Q    Can you please describe for the members of the jury, if

18  you are familiar with it, what it shows?

19  A    That is the jet bridge that is used to take passengers --

20  put passengers on or off an airplane on Gate 7.

21  Q    Do you see to the left of the jet bridge a light pole?

22  A    Yes, I do.

23  Q    Are you familiar with that light pole?

24  A    Yes.

25  Q    Do you see the pink circle I've drawn at the top of that

1   light pole?

2   A    Yes, I do.

3   Q    Do you know what's represented in the pink circle at the

4   top of the light pole?

5   A    Those are video cameras that are stationed at Gate 7.

6   Q    Do you see what I have circled on the bottom of the same

7   light pole at the bottom left of Defense A-2 in evidence?

8   A    Yes, I do.

9   Q    What is it that is circled there?

10  A    That is a lower camera.

11  Q    Is that also a video camera, sir?

12  A    Yes, it is.

13  Q    Do you know the two cameras that I just circled in

14  Defense A-2 in evidence what they video, what part of that

15  photograph do they video?

16  A    They can video any part of the tarmac from 360 degrees

17  from those cameras.  They are movable at 360 degrees.

18  Q    Are they able to video the jet bridge attached to Gate 7?

19  A    They would get a back view of the jet bridge --

20          MS. SCHIERBERL:  Objection.

21          THE COURT:  Sustained.  What's the basis of

22  knowledge?

23  Q    Are you familiar with the security offices at American

24  Airlines?

25  A    Yes, I am.

1  Q    And how are you familiar with the security offices at

2  American Airlines?

3  A    I have gone up there several times.  Whenever we find

4  lost articles on the airplane, we bring them up to them.

5        When I was involved with the union, I was up there

6  as a representative for people there.

7  Q    Were you ever shown what the video cameras videotape on

8  the tarmac at Terminal 8, Gate 7?

9  A    Yes.  We have seen videotapes from....

10 Q    Do you know if the bottom camera circled now on A-2 in

11 evidence could capture the stairs leading up to the jet bridge

12 at Gate 7?

13 A    Absolutely.

14       MR. COHEN:  Ms. Cronin, can you please put that down

15 and bring up Defense A-9 already in evidence.

16       And with the Court's permission, I would like to

17 show it to all parties.

18       THE COURT:  Yes.

19 Q    Are you familiar with what's in A-9 in evidence?  Are you

20 familiar with that photo?

21 A    Yes, that's another angle of Gate 7.

22 Q    Do you see two light poles in the distance there?

23 A    Yes, I do.

24       MR. COHEN:  Ms. Cronin, can you focus on the light

25 pole on the left-hand side, please.

1  Q    Do you see what I have circled on the light pole in

2  Defense A-9 in evidence?

3  A    Yes, I do.

4  Q    Is that also a video camera, sir?

5  A    Yes, it is.  It is also a video camera.

6  Q    Is there also a video camera on the bottom of that light

7  pole, sir?

8  A    Yes.

9  Q    Do you see a light pole to the right of that light pole

10 in Defense A-9 in evidence?

11 A    Yes.

12 Q    Does that also have an upper and lower camera as well?

13 A    Yes.

14 Q    Are they also video cameras as well?

15 A    Yes, they are.

16 Q    And where -- can they capture?

17 A    Yes, they can.

18 Q    Okay.  Can they capture what goes on at Terminal 8, Gate

19 7 on the tarmac there?

20 A    Yes, they can.

21 Q    In Defense A-9 in evidence, sir, do you see a bank of

22 windows starting at the left-hand side running three-quarters

23 of the way down to the right-hand side of the photo?

24 A    Yes, I do.

25 Q    Are you familiar with those windows?

1    A    Yes, I am.

2    Q    Could you please tell the members of the jury what is

3    behind those windows?

4    A    There's the hallway that leads down to Customs and

5    there's offices in like on the sides of them.

6    Q    Are those Customs office else?

7    A    I believe so, yes.

8              THE COURT:  You're talking about the windows on the

9    lower portion; correct?

10             MR. COHEN:  Yes, and I will make that clearer, Your

11   Honor.

12   Q    Are these the windows that have the customs side of the

13   airport behind them, sir?

14   A    Yes.

15   Q    If you know, sir, do those windows give a view of the

16   tarmac?

17   A    Yes, they do.

18             MR. COHEN:  Ms. Cronin, can you please pull up

19   Defense A-2 in evidence, and with the Court's permission, show

20   it to all parties.

21             THE COURT:  Yes.

22             MR. COHEN:  Thank you.  If I said A-2, I meant A-10,

23   I'm sorry.

24             THE COURT:  This is A-10.

25             MR. COHEN:  Yes, Your Honor.

1          Can you enlarge it for the whole screen, please.

2  Q    Are you familiar with what's depicted in Defense A-10 in

3  evidence, sir?

4  A    Yes, I am.

5  Q    And what is that?

6  A    That is the -- off to the right-hand side of the picture

7  is the yellow line that the aircraft would park on for Gate 7.

8  Q    And that's Gate 7 at Terminal 8; right?

9  A    Yes, it is.

10 Q    And that's the same one we've been looking, the same

11 terminal, the same gate?

12 A    Yes, that is correct.

13 Q    Is there also a light pole with an upper and lower camera

14 in the front of picture?

15 A    Yes, there is.

16 Q    Do both of those cameras record as well?

17 A    Yes, they do.

18 Q    Do you see the lower camera, Mr. Ricci, on --

19 A    Yes.

20 Q    There's more, but thank you.

21          -- in the bottom of the pole that is circled now in

22 pink or fuchsia?

23 A    Yes, I do.

24 Q    And do you know if that camera would capture what was

25 going on in the cockpit of a plane parked at Terminal 8,

1  Gate 7?

2  A    If it was a narrow body airplane, yes.  If it was a wide

3  body, no, not really.

4  Q    Is a 737 a wide body or a narrow body?

5  A    It's a narrow body.

6  Q    So if a 737 was parked at Terminal 8, Gate 7, the camera

7  circled in A-10 in evidence would capture what was happening

8  in that cockpit?

9  A    Yes, it would.

10             MR. COHEN:  You can take it down, Ms. Cronin.  Thank

11  you.

12  Q    Mr. Ricci, if you know, are there other cameras that

13  faced Terminal 8, Gate 7 other than the ones that I have

14  already shown you?

15  A    Yes, there are.  Directly behind the gate at the

16  automotive building, there are other light poles there that

17  have cameras, upper and lower cameras, and there are also

18  cameras -- under the building at certain doorways there are

19  cameras also.

20  Q    Are there any cameras that are not visible to the naked

21  eye outdoors facing the tarmac?

22  A    Yes, there are.

23  Q    If you know, what is the purpose of cameras that are not

24  visible to the naked eye at Terminal 8, Gate 7?

25  A    I believe it is for corporate security.

1  Q    Mr. Ricci, are you familiar with American Airlines

2  aircrafts that are 737s?

3  A    Yes, I am.

4  Q    Are you familiar with the avionics compartments in 737

5  aircraft that belong to American Airlines?

6  A    Yes, I am.

7          MR. COHEN:  Ms. Cronin, can you please pull up, with

8  the Court's permission, Government Exhibit 204 in evidence.

9  Q    Can you see Government Exhibit 204 in evidence, Mr.

10 Ricci?

11 A    Yes, I can.

12 Q    Does that photo fairly and accurately represent what the

13 opening of a 737 avionics hatch looks like?

14 A    It looks much larger in the picture than it does in real

15 life.

16 Q    When was the last time that you saw the hatch door of a

17 737 aircraft?

18 A    Two days ago.

19         MR. COHEN:  Ms. Cronin, can you please pull that

20 down.  And with the Court's permission, show only the witness,

21 the Court and the Government Defense E-8 marked for

22 identification only.

23 Q    Mr. Ricci, do you recognize what is Defense E-8 for

24 identification?

25 A    Yes, I do.

1  Q     How do you recognize it?

2  A     That's my hand in the picture.

3  Q     And do you recognize was being depicted outside of your

4  hand in the picture in Defense E-8 for identification?

5  A     That is the aft E and E door of A 737.

6  Q     Is the aft E and E door of a 737 the same as a main

7  avionics compartment door?

8  A     Yes.

9  Q     And do you know how wide and an avionics door --

10 withdrawn.

11        Do you know how wide the avionics door for a 737

12 compartment is?

13 A     Yes, I do.

14 Q     How wide that?

15 A     It is -- from side to side, it's 17 inches and it's 23

16 long.

17 Q     All right.  Does the Defense E-8 for identification

18 fairly and accurately represent one of the either length or

19 width for what the hatch door to a 737 avionics compartment

20 looks like?

21 A     That is the length of the door, yes.

22        MR. COHEN:  With the Court permission, I would like

23 to move into this evidence.

24        THE COURT:  Any objection?

25        MS. SCHIEBERL:  No objection, Your Honor.  Thank

1    you.

2              THE COURT:  It's admitted.

3              (Defendant's Exhibit E-8 received in evidence.)

4              MR. COHEN:  I would like to publish -- we can wait a

5    moment.

6              Can you please pull up E-9 and just show it to the

7    witness and the Court.

8    Q    Mr. Ricci, do you recognize what is depicted in Defense

9    E-9 for identification?

10   A    Yes, I do.

11   Q    How do you recognize it?

12   A    I took the picture.

13   Q    What do you see in the picture?

14   A    That is the width of a 737's avionics compartment door.

15   Q    And does what you see in E-9 fairly and accurately

16   represent how the width of an avionics compartment door on a

17   737 is?

18   A    Yes, it does.

19             MR. COHEN:  Your Honor, with the Court's permission,

20   I would like to move that into evidence.

21             THE COURT:  Any objection?

22             MS. SCHIERBERL:  No objection, Your Honor.

23             THE COURT:  Admitted.

24             (Defendant's Exhibit E-9 received in evidence.)

25             MR. COHEN:  Thank you.

1          At this time I would like to publish first E-8 and

2    then E-9 to the jury.

3          THE COURT:  It may be published.

4          MR. COHEN:  Just leave that on the screen for a

5    moment, Ms. Cronin.

6    Q    Mr. Ricci, you may have said this already, but what is

7    the size of the opening to the aft avionics compartment door

8    on an American Airlines 737?

9    A    It's 18 inches wide and 23 inches long.

10   Q    How do you know that?

11   A    I measured it.

12   Q    How long ago did you measure it?

13   A    Two days ago.

14   Q    Are the American Airlines 737s that are used in April of

15   2023 the same as the American Airlines 737s that were used in

16   February of 2020?

17   A    Yes, they are.

18         MR. COHEN:  You can pull that down.  Thank you.

19   Q    As an American Airlines mechanic workings on 737s, are

20   you familiar with the flight deck inside a 737?

21   A    Yes, I am.

22   Q    Are you familiar with the warning lights inside a flight

23   deck on a 737?

24   A    Yes, I am.

25   Q    Are you familiar with the term master caution?

1  A     Yes.

2  Q     What is a master caution inside a 737?

3  A     On the glare shield for the pilot and copilot, there are

4  three lights that are square lights.  When there is an issue

5  that comes up, they will give you a chime and a light, and

6  that will give you a warning as to the pilot should look to

7  see what is going -- what is wrong.

8  Q     And how can a pilot find out when the master caution is

9  going off what is exactly wrong?

10  A     If you look up, there will be other panels for different

11  types of systems that will have fault lights on them.

12  Q     So does a fault light that you're speaking about

13  correspond with the master caution?

14  A     The master caution will go off, yes, and the fault light

15  will light up.

16  Q     What purpose does the fault light serve?

17  A     The fault light will tell you what system is faulting.

18  The master caution will just tell you there is a fault on one

19  of the systems.

20  Q     Does the master caution have a sound or does it have a

21  light?

22  A     It has a light and a chime.

23  Q     How do you close the light and chime on the master

24  caution?

25  A     You press the button and it silences it.

1   Q    Does that fix the problem?

2   A    No, it does not.

3   Q    Are you familiar with the pack system on a 737?

4   A    Yes.

5   Q    Can you please tell us what a pack system on a 737 is?

6   A    There are two packs in the aircraft and what they are is

7   they are compressor units that compress air to make air

8   conditioning and heating for the aircraft, also air for

9   starting and different stuff.

10          MR. COHEN:  With the Court's permission, can we show

11  the witness and the Government Defense E-4 for identification.

12          THE COURT:  Yes.

13  Q    Can you see what is E-4 for identification on your

14  screen, sir?

15  A    Yes, I can.

16  Q    Do you recognize it?

17  A    Yes, I can.

18  Q    What does E-4 for identification depict?

19  A    It is the cockpit of a 737.

20  Q    How do you recognize it?

21  A    Just by the look of it, that I am familiar with the 737.

22  Q    Does E-4 for identification fairly and accurately the

23  flight deck of a 737 airplane that is used by American

24  Airlines?

25  A    Yes, it does.

1    MR. COHEN:  I'd like to move into evidence and

2  publish it to the jury, Your Honor.

3         THE COURT:  Any objection?

4         MS. SCHIERBERL:  No objection, Judge.

5         THE COURT:  It's admitted.

6         (Defendant's Exhibit E-4 received in evidence.)

7  Q    Mr. Ricci, do you know where the photo of the flight deck

8  depicted in E-4 in evidence was taken from, where this photo

9  was taken from?

10  A    Yes, I do.

11  Q    Where was it?

12  A    It was taken at hanger 10, bay 10 at American Airlines.

13  Q    Where inside the plane would this photo be taken from?

14  A    Right from the alley -- the hallway right between the

15  entry door and the galley.

16  Q    Would this be what one would see standing outside the

17  cockpit on the 737?

18  A    Absolutely.

19  Q    Could you show us with your telestrator where the master

20  caution is located on that flight deck?

21  A    Yes, I could.

22         THE COURT:  You can just touch it.

23  A    Okay.  There's one on each side:  One for the FO and one

24  for the pilot.

25  Q    Would you be able to see those master cautions from the

1  galley?

2  A    Yes, you wold.

3        THE COURT:  Indicating, for the record, almost about

4  the middle of each windshield on the left and on the right.

5  Q    Is that called the glare shield where they are present?

6  A    It's like the equivalent of your dashboard in your car.

7  It would be the top of the dashboard right before the

8  windshield starts.  It would be right at the top of the

9  dashboard.

10 Q    If a 737 aircraft has a pack unit issue, could you please

11 describe what would happen?

12 A    You would have -- your master caution would go.  Your

13 oral alarm would go, and you would get a light on the pack

14 panel.  You would have a fault.  It would light up on the pack

15 panel.

16 Q    And can you see the pack panel in Defense E-4 in

17 evidence?

18 A    Yes, I can.

19 Q    Could you please use a different color and circle the

20 pack panel?

21 A    How do I switch colors?

22 Q    There are people smarter than me.

23 A    I'm sorry.

24 Q    How many pack units are on a 737?

25 A    There are two pack units.

1    MR. COHEN:  For the record, Mr. Ricci has circled

2    the pack unit warning lights on the top right-hand side of the

3    photo.

4    Q    If you had a pack unit issue, would the master caution go

5    off?

6    A    Yes, it would.

7    Q    Would you see an amber warning light inside the blue

8    inside the blue circle that you have there?

9    A    Yes, you would.

10   Q    If you closed the master caution that we see circled in

11   fuchsia, would the pack warning light that you circled in

12   blue, would that go off?

13   A    No, it would not.

14   Q    If you wanted to shut off the amber warning light, what

15   would you have to do?

16   A    You would have to go into the lower E and E and reset the

17   left-hand and right-hand pack control units.

18   Q    Could you do that from the flight deck?

19   A    No, you cannot.

20   Q    Whose responsibility would it be to go into the avionics

21   compartment or the E and E compartment to reset the pack unit?

22   A    Any maintenance member.

23   Q    By maintenance member, do you mean mechanic?

24   A    Any mechanic, yes.

25   Q    Do pilots go inside the E and E compartments?

 1  A    No, they do not.

 2  Q    If you know, Mr. Ricci, would a pilot know what needed to

 3  be done to reset a pack unit in the E and E compartment?

 4            MS. SCHIERBERL:  Objection.

 5            THE COURT:  Sustained.

 6  Q    How many different types of pack issues would cause a

 7  warning light?

 8  A    There are -- any issue with the pack would cause the

 9  warning light on the overhead.

10            There's flow control.  There's either pack outlet

11  temperatures.  There's different -- the zone control

12  temperatures wouldn't be right if they're not set to the right

13  setting.

14            It would all cause warnings.

15            MR. COHEN:  Okay.  We can take that down, Ms.

16  Cronin?

17  Q    I believe you testified that you are familiar with the

18  inside of an avionics compartment on a 737?

19  A    Yes, sir.

20  Q    Have you ever worked inside of one?

21  A    Yes, I have.

22  Q    Are you familiar with insulation that is present inside

23  the avionics compartment?

24  A    Yes, I am.

25  Q    Can you describe how an insulation blanket in an avionics

1    compartment is kept down and taught and tight in the avionics
2    compartment?

3    A    The insulation has these like barbed plastic fittings
4    that go through the insulation and through the ribs of the
5    airplane and then they have these washers that snap on to them
6    to hold it, conform to the ribs.

7    Q    When you say hold it, conform to the ribs, do you mean
8    hold the insulation to conform it to the ribs?

9    A    Yes.  Yes.

10   Q    On a, let's say, two-foot-by-five-foot insulation, how
11   many clips would be necessary to hold that down?

12   A    There would be at least a dozen.

13   Q    What would happen if the insulation was placed down but
14   there were no clips attaching it?

15   A    It wouldn't -- because of the shape of the belly, it
16   wouldn't stay in place.

17   Q    So what would it look like if it wasn't in place?

18   A    It would be hanging down.  You know, depending how long
19   it's been there, it would be hanging off the wall or away from
20   where it should be.

21   Q    If you would go inside of an avionics on a 737 and there
22   were no clips on the insulation, how quickly would you notice
23   that?

24   A    It would be noticeable.  It would hanging away.

25          When it conforms to -- when there are certain areas

1  that conforms and you can see the outline of the structure

2  underneath it, with the plastic underneath it, if you don't

3  have it held to those structures, it's just flat.  So it would

4  be very noticeable.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MR. COHEN:  (Continuing)

3    Q    And if you went inside the avionics compartment and saw

4    that, would that be a concern to you as an airline mechanic?

5    A    Yes, it would.

6    Q    And why would that be a concern?

7    A    Because there's other components in those areas that this

8    could get caught in or tangled in or -- you know, we tend to

9    put things back in place when they're like that.

10   Q    And if you went inside the avionics compartment of a 737

11   and you saw a two-foot-by-five-foot employees of insulation

12   that was hanging down and not sitting properly, what would you

13   do?

14   A    I would push it back in place.

15         MR. COHEN:  Please pull up Government 202 in

16   evidence.

17   Q    Do you recognize the photo, Government 202, in evidence?

18   A    Yes.  That is the left-hand side of the avionics

19   compartment.

20   Q    Can you describe the best you can what it is that we're

21   seeing there?

22   A    You're seeing a -- there's a duct for the air

23   conditioning there and then the insulation below it and the

24   upper fuselage, like the fuselage from the floor of the

25   cockpit down to the E&E door.

1   Q    And where we see the tape -- I don't know if it's green

2   or yellow or yellowish green, but do you see the -- is that

3   what you were describing as the ribs?

4   A    If you look at the lower portion directly down, you see

5   the Number 9?

6   Q    You can use your telescreen to look at --

7   A    The Number 9 here?

8   Q    Yes.

9   A    These are the plastic clips that hold it in place.  If

10  these are missing, it would not conform to the ribs and it

11  would just be flat across.  You could see the holes for that

12  upper portion where they go through, but there's nothing there

13  holding the insulation down.

14  Q    So if insulation was placed on top of those ribs right

15  now, would it stay in place?

16  A    It would flop around.  It wouldn't stay for long.  Like

17  it would definitely flop around.

18  Q    You see what I've circled in green in Government 202 in

19  evidence?

20  A    Yes, I have.

21  Q    You were describing the inside of the avionics

22  compartment.

23        Can you describe the shape of the inside of the

24  avionics compartment?

25  A    The easiest way to describe it is like the face of a

1    clock.  It's round.  And from the floor, you see up above your

2    green line, that's the floor of the cockpit.  So that's -- the

3    lower half would be like a half a circle.  And it would be the

4    lower half of, like, from 9:00 o'clock to 3:00 o'clock on a

5    clock.  That area, the whole lower area.

6    Q    And what I have circled in green, would that be at the

7    top of the clock between 9 and 12?

8    A    That would be -- yeah, between 10 and 11 somewhere.

9            MR. COHEN:  Let the record reflect that I have

10   circled where the photo was taken by HSI describing where the

11   cocaine was found inside the avionics compartment.

12           MS. SCHIERBERL:  Your Honor, just to clarify for the

13   record, this photo was not taken by HSI.  The record should

14   reflect that this photograph was taken by CBP Officer

15   Frank Morelli.

16           THE COURT:  Correct.

17           MR. COHEN:  Misspoke.  I apologize.

18           THE COURT:  Do you have much more, Counsel?

19           MR. COHEN:  I would say halfway through, Your Honor.

20           THE COURT:  Well, let me speak to counsel, please.

21           (Sidebar.)

22           (Continued on the next page.)

23

24

25

1   (Sidebar conference held on the record in the presence of the

2   Court and counsel, out of the hearing of the jury.)

3              MR. COHEN:  Probably more than halfway.

4              Two-thirds of the way.  I was looking at how many

5   pages; it's two-thirds.

6              MS. SCHIERBERL:  Okay.  If Your Honor is comfortable

7   and the jury is willing, I know the government is very happy

8   to conclude with the direct of this witness.

9              THE COURT:  Well, the question is how many minutes

10  does that translate to.

11             MR. COHEN:  Right, right.  Fair, fair.  I would say

12  20 or less.  I -- yeah, honestly, this is the first time we

13  are going through this.  But he seems to be not obfuscating

14  and giving direct answers, so my guess would be 20 minutes.

15  It has been -- what has it been, 30?

16             MR. SIMPSON:  Yeah, about 30.

17             MR. COHEN:  I would say definitely no more than 20,

18  but maybe less.

19             THE COURT:  All right.  Let's at least finish with

20  the direct.  And then we'll --

21             MR. COHEN:  I would hate to keep them longer if

22  you're thinking they're uncomfortable.  I'll do my best.  I

23  know we have the diabetic, which concerns me.

24             THE COURT:  She knows well enough to raise her hand

25  if she has an issue, so let's just move on.  (Sidebar ends.)

1   BY MR. COHEN:

2   Q    Mr. Ricci, can a 737 aircraft take off?  By "take off," I

3   mean fly with an open E&E door?

4   A    You would have all sorts of warnings going off and bells

5   and whistles.

6   Q    So if you have an open avionics compartment door while

7   you're still sitting at the gate, you haven't pushed back yet,

8   would the master caution light go on?

9   A    Yes, it would.

10  Q    Would a warning light go on?

11  A    Absolutely.

12  Q    Is that similar to what would happen if there was a PAC

13  unit issue?

14  A    Yes.

15  Q    And is that the same whether you're at the gate or --

16  withdrawn.

17          Now, what if the 737 plane is on ground power, would

18  the master caution go off if the avionics cart door was open?

19  A    Yes, it would.

20  Q    And why is that?

21  A    It's -- the master caution is not governed by the ground

22  power or the APE power.  It's just when the door opens and the

23  lock releases, you get an oral warning, you get the master

24  caution and the light on the overhead.

25  Q    If the E&E door is open and the master caution goes off,

1  how can you close the master caution?

2  A    You press the button that would silence the alarm and the

3  light.  But then you have to go downstairs and cycle the lock

4  to lock the door to make the light on the overhead go out.

5  Q    Is that the only way to close the master cautions from

6  inside the cockpit?

7  A    Well, you press the button to silence it.  And then once

8  you close the door -- the door wouldn't -- if you don't

9  silence it, it would continue to ring until you -- until you

10  shut the door and then it would stop going.

11  Q    Are you familiar with the logbook that's kept on all

12  airplanes?

13  A    Yes, I am.

14  Q    Okay.  And what is the logbook?

15  A    The logbook is a record of maintenance done on the

16  airplane, overnight checks, certain different types of checks

17  and different things that are looked at on the aircraft.

18  Q    And who controls what goes into the logbook?

19  A    Any mechanic can put something in the logbook, any pilot

20  can put something in the logbook.

21  Q    Now, according to official rules, what must be put in the

22  logbook?

23  A    We're supposed to put everything in the logbook.

24  Q    Changing a light bulb, does that go in a logbook?

25  A    It's supposed to, yes.

1  Q    In practice, does everything go into a logbook?

2  A    No, it does not.

3  Q    Can you give some examples of fixes that a mechanic would

4  do to an aircraft that would not go in a logbook?

5  A    Something that's a simple reset.  If I -- if I went out

6  to an airplane and a pilot informed me of some warning or some

7  message he had on his screen, something that would get rid of

8  the problem quickly wouldn't necessarily be put in the

9  logbook.

10         I've had tires that were questioned where a pilot

11 would question a tire and ask me about it but not put in the

12 logbook.  And then I'd go out with the reference showing him

13 that it was okay, and he'd be okay with that.  It would never

14 go in the logbook.  Hydraulic servicing usually doesn't go in

15 the logbook.

16 Q    Hydraulic servicing, is that important to the aircraft?

17 A    Everything is important.  Yes, it's important, but it

18 just doesn't -- people don't usually write it into the

19 logbook.

20 Q    And why is that?  If it's important, why doesn't it go

21 into the logbook?

22 A    Sometimes the -- fixing the item takes ten minutes and

23 finding a reference to sign off the item takes a half an hour.

24 So to avoid lengthy times or delays, they don't put a lot of

25 stuff in the logbook.

1  Q    Is avoiding delay something that a pilot or mechanic is

2  concerned with?

3  A    Yes.

4  Q    Mr. Ricci, after 20 plus years as American Airlines

5  mechanic at JFK, are you familiar with how mechanics bring

6  their tools to a particular job at a particular aircraft?

7  A    Yes, I am.

8  Q    And how would a mechanic bring their tools to an

9  aircraft?

10  A    Well, every mechanic has -- we have, like, tool bags,

11  line bags we call them.  We keep the basic tools in there.  We

12  have toolboxes with bigger tools if we have a bigger job.  But

13  we generally bring our line bag out to every airplane.

14  Q    Would it be unusual to see a mechanic bring a tool bag

15  inside of an E&E compartment of a plane?

16  A    No, it wouldn't.

17  Q    As an airline mechanic at JFK, are you familiar with the

18  vehicles that mechanics use to move around the airport?

19  A    Yes, I am.

20  Q    Does American Airlines have its own vehicles?

21  A    Yes, it does.

22  Q    Does it have blue vans?

23  A    It has -- there is a blue van, there is white vans, there

24  are white pickup trucks and what we call high-speed tows.

25  Q    Are the vehicles assigned or are they specific to a

1   particular mechanic?

2   A     No, they are not.

3   Q     Who decides which mechanic gets which vehicle?

4   A     Basically if I have a gate call, I'll walk out of the

5   room, and whatever is parked out there I'll take.

6   Q     In the course of a shift, do you use only one vehicle?

7   A     No, I do not.  I'll use many.

8   Q     Are there any prohibitions for mechanics of taking photos

9   in and around the airport at JFK?

10  A     No, there's not.  I mean, we've taken -- we take pictures

11  of many things.  I've taken pictures to show a supervisor or

12  something wrong with an airplane, showed damage on an

13  airplane.  I've taken pictures -- anything -- anything you

14  find kind of piques your interest.  You know, there are people

15  who takes pictures of different kinds of birds they see there,

16  or, you know, different cars or anything -- anything that

17  basically piques your interest.

18  Q     Do you have videos or photos inside of JFK on your phone

19  right now?

20  A     Absolutely.

21  Q     And how many would you say, approximately?

22  A     Hundreds.

23  Q     Could you explain what the term "ground power" means?

24  A     There is -- on the jet bridge, there is a generator and

25  there's a cable.  And the cable is lowered down from the --

1  from the generator and plugged into the airplane.  And it

2  only -- it runs the systems in the airplane that are

3  necessary, like all the lights and the basic -- basic

4  necessities.

5  Q    In your experience as an American Airlines mechanic at

6  JFK, would ground power be hooked up to a plane in February

7  that was scheduled to depart a few hours after it landed?

8  A    No, it wouldn't.

9  Q    Why would you not hook up the ground power to a plane in

10 that situation?

11 A    Because most likely, the APU would have to be running to

12 run the pack, so you wouldn't have APU and ground power both

13 hooked up to the airplane.

14 Q    Well, why would you need to run the packs?

15 A    Because the plane would get cold.

16 Q    And what's the problem if the plane gets cold?

17 A    The passengers complain, the flight attendants complain.

18 And so we tend -- we'll go out to an airplane and set it to,

19 like, 70 degrees, so when they get on, everything's nice and

20 warm.

21 Q    Is there any problem if a blanket is too cold and there's

22 no passengers on it?

23 A    It can cause problems.  I mean, things have frozen to

24 where, you know, if you hadn't run anything, it has frozen.

25 But in a short term like that, it's not going to freeze; it's

1   just going to be a comfort issue.

2   Q    So would you normally have the APU running for those few

3   hours?

4   A    Yes, we would.

5   Q    Is there any notations made when ground power's used on

6   an airline -- airplane?

7   A    You have a -- on the switch, the power switch, you'll

8   have like a light that'll say ground power available and

9   ground power and -- like, if you press it, it'll switch from

10  APU to ground power.

11          MR. COHEN:  Ms. Cronin, can you please pull up

12  Government 306 in evidence.

13  Q    This is already in evidence.  This is a three minute

14  and 55 second video.

15          MR. COHEN:  You can let it run, Ms. Cronin.

16  Q    I'd like you to take a look at it, please, sir.

17          (Video played.)

18          MR. COHEN:  Can you please stop the video,

19  Ms. Cronin.

20          (Video stopped.)

21  Q    Do you see the time at the top left-hand corner, sir?

22  A    Yes, I do.

23  Q    What time does it read?

24  A    7:17:18.

25  Q    Is that -- withdrawn.

1          Have you seen this video before?

2    A    I have seen portions of it, yes.

3    Q    Do you recognize where the ground power hose is in this

4    video?

5    A    Yes, I do.

6    Q    Can you please circle it?

7          MR. COHEN:  The record should reflect that the

8    witness drew an oblong shape on the bottom right-hand side of

9    the jet bridge.

10   Q    Is that correct, sir?

11   A    Yes.

12   Q    On that video, the Government's 306 in evidence, can you

13   tell if the ground power was hooked up to the airplane?

14   A    The ground power was not hooked up to the airplane.

15         MR. COHEN:  The Government's 306 in evidence at

16   7:17:18.

17   Q    Do you know if there is a fuel person at that aircraft?

18   A    Yes, there is.

19   Q    Okay.  Can you please use a different color and circle

20   the fuel person?  What is that person called, sir?

21   A    It would be -- they're Ogden Allied fuelers.  Ogden

22   Allied is the company they work for and they're fuelers.

23         This is the fueler and this is his truck.

24   Q    Now, when you see a fueler at an airplane like you do --

25         THE COURT:  Just -- I'm sorry to interrupt you.

1   It's on the -- the witness just marked the leftmost side

2   around the middle underneath the wing.

3          MR. COHEN:  Yes.

4   Q    By looking at this video now, can you tell if this plane

5   was taking off -- about to take off or just landed or any

6   point of its scheduled flight?

7   A    There is no indication that it's either an inbound or an

8   outbound yet.

9   Q    Would you have a fueling person there if the plane was

10  about to take off?

11  A    Yes, you would.

12  Q    Could you have a fueling person there if the plane had

13  just landed?

14  A    If the plane was going to the hangar and had a heavy load

15  of fuel, they would take fuel off of it.

16  Q    Are you able to see any aircraft at Gate 5, the adjoining

17  aircraft, in this video -- in this photo?

18  A    Yes.  Yes, you can.

19  Q    And can you tell us, Mr. Ricci, what appears in the green

20  circle in the upper right-hand side of the photo?

21  A    That is the loader for a wide-body airplane.

22  Q    And is that loader being used or in use?

23  A    It's currently being used -- or it's in use.  It's

24  started; it's not on the airplane yet though.

25  Q    Would there be people in there?

1    A      There would be one person up on the upper deck on the

2    right-hand side.

3    Q      Would there be anybody else who would be associated with

4    that loader?

5    A      Not -- no.  One person operates the loader.

6    Q      And can you tell by looking at this photo what is

7    happening with the aircraft at Gate 5?

8    A      It's just sitting there really.  I can't tell if they're

9    loading or offloading it.

10   Q      Do you see what I circled in blue on the right-hand side

11   of the aircraft?

12   A      Yes, I do.

13   Q      And what is that?

14   A      That is the aft of the -- behind the cargo door, there

15   are these lights that, when you're loading cargo, you light

16   the light so it gives you a work light, you know, for the guys

17   working outside of the airplane.

18   Q      So would that light be lighting underneath the aircraft

19   at that point?

20   A      Yes, it would.

21          MR. COHEN:  Let the record reflect that is

22   approximately even with the --

23   Q      Did you say the aft, avionics compartment?

24   A      It's the aft edge of the forward door.  It's further aft

25   than the E&E compartment though.

1  Q    How far away from the E&E compartment would it be?

2  A    Five or six feet.

3       MR. COHEN:  Can you please play the video,

4  Ms. Cronin.

5       Thank you.

6       (Video played.)

7       MR. COHEN:  Can you stop it there.

8       (Video paused.)

9  Q    Okay.  Do you see the green circle?

10 A    Yes, I do.

11 Q    Okay.  That's just behind the wing on the copilot's side

12 of the aircraft; is that correct?

13 A    Yes, it is.

14      MR. COHEN:  Can you please play the video.

15      (Video played.)

16 Q    Do you see somebody moving over there?

17 A    Yes, I do.

18 Q    Do you have any idea who that might be?

19 A    No, I do not.

20 Q    Do you know if they're related to what's going on, on the

21 plane?

22 A    No, I do not.

23      MR. COHEN:  Could you stop the video there, please.

24      (Video stopped.)

25      MR. COHEN:  One second.

1          It's all right, Mr. Simpson.  I got it.

2          Maybe you should help me.

3          There we go.  All right.

4          Thank you for your patience.

5          Please start the video.

6          (Video played.)

7     Q    Do you see what's circled in red and just went through?

8     A    Yes, I do.

9     Q    What was that?

10    A    It appeared to be the belt loader for the cargo.

11    Q    And that was approximately 7:17:50; is that right?

12    A    Yes.

13    Q    Okay.  How many people would be on that belt loader in

14    that car that just came by?

15    A    One person.

16         MR. COHEN:  And play the video, please, Ms. Cronin.

17         (Video played.)

18         MR. COHEN:  Thank you.

19         You could keep it running, please.

20    Q    At 7:18:13, did you see people moving under the wing at

21    the aircraft at Gate 5?

22    A    Yes, I did.

23         MR. COHEN:  Keep playing, please, Ms. Cronin.

24    Q    I'm going to talk to you while it's playing Mr. Ricci.

25         Based on your experience of 25 years as an airline

1    mechanic at JFK, if this plane was scheduled to take off in

2    40 minutes, could you describe what would be going on around

3    this plane?

4    A     The plane on Gate 5 or Gate 7?

5    Q     Both of them in terms of who would be around those planes

6    at this point.

7    A     There should be more activity, as far as loading the

8    cargo and the baggage and stuff on the outside of the

9    airplane.  If you -- the guy walking on the right-hand on

10   Gate 7 -- on Gate 5 is either a pilot or a first officer with

11   a flashlight.  He was doing a walk-around.  But they should be

12   up to -- either one of them should be loading something.  At

13   40 minutes, they should be loading the airplane.

14   Q     Would you expect that the aircraft would be loading cargo

15   at this point?

16   A     Yes.

17   Q     And if we were able to see further to the -- our left but

18   the plane's right, would there be other people on the outside

19   of that as well?

20   A     There should be a full crew of cargo people on that -- on

21   that gate.

22   Q     And do you see the person walking at 7:19:30 at the

23   bottom?

24   A     Yes, I do.

25   Q     Would that be American Airlines employee as well?

1  A    Hard to tell.

2  Q    Could that be somebody who's worked on the plane, but not

3  employed by American Airlines?

4  A    It could be, yes.

5         MR. COHEN:  Okay, Ms. Cronin, you can stop that

6  video.  Thank you.

7         (Video stopped.)

8  Q    Mr. Ricci, have you ever had a reason to go into a cabin

9  of a plane that you are not assigned to?

10  A    Yes, I have.

11  Q    Have you ever taken food or snacks from a plane that you

12  were not assigned to?

13  A    Yes.

14  Q    How many times would you say you've done that?

15  A    I couldn't even count how many.

16  Q    Have you been with or seen other mechanics take snacks

17  from a plane they were not assigned to?

18  A    Yes, I have.

19  Q    Is it common practice for American Airlines mechanics to

20  take snacks from planes?

21  A    You could go into any break room or any rest area, any --

22  any department in the airline, you'll find stuff off the

23  airplanes.  Different, you know, sodas, you'll find chips,

24  you'll find coffee cups.  Every department does it.

25  Q    How about supervisors?

1    A    They do have cups in their -- in their offices too.

2    Q    Is that permissible?

3    A    It's not supposed to happen again, but it does happen.

4    Q    And how often does it happen?

5    A    Oh, every day.

6    Q    Where is it more likely to find snacks on an aircraft?

7    Would that be at the gate or would it be at the hangar?

8    A    The gate.

9    Q    And why is that?

10   A    Because usually what they do is, they take the catering

11   carts off the plane at the gate, and then the plane would go

12   to the hangar.

13   Q    What are your normal work hours as a mechanic at JFK?

14   A    I work from 2:00 in the afternoon to 12:30 at night.

15   Q    And how do you get your assignments for work each day?

16   A    The crew chief will give us an assignment on a -- we have

17   a tablet we use, like a -- like an iPad.

18   Q    Is it common for an American Airlines mechanic to finish

19   his assignment before his shift ends?

20   A    Absolutely.

21   Q    How often would you say, Mr. Ricci, that you finish your

22   assignment before the end of your shift?

23   A    Every day.

24   Q    Every day, did you say?

25   A    Every day, yes.

1    Q    What is your responsibility for American Airlines if you

2    finish your assignment early?

3    A    There really is no responsibility.  I mean, they have my

4    cell phone number.  If I go someplace, if they need me, they

5    can call me and I would come back.  I mean, but there is no

6    responsibility to anything.

7    Q    You're not required to stay at your assigned location?

8    A    Not necessarily, no.

9    Q    Are you permitted to wander around American Airlines

10   property at JFK when you're finished with your assignment but

11   not yet finished with your shift?

12   A    Yes.

13   Q    How often does that happen?

14   A    All the time.

15   Q    If you're working the hangar at JFK as an American

16   Airlines mechanic and you finish your assignment early, are

17   you permitted to go to the terminal?

18   A    Yes.

19   Q    Why would you go to the terminal if you're working at the

20   hangar?

21   A    The terminal has -- it has the Starbucks, it has Dunkin'

22   Donuts, it has all the restaurants.  If you wanted food, if

23   you wanted anything, it's at the terminal.  There is no place

24   at the hangar really to eat.

25   Q    Don't they serve coffee in the hangar?

1   A     Off the airplane.  It's not very good coffee.

2   Q     What about food, do they serve that at the hangar?

3   A     There is a vending machine with food that you could put

4   in the microwave if you want, but, again, not very good food.

5   Q     What's the general rule of thumb, Mr. Ricci, about what

6   you can or cannot do once your assignment is complete?

7   A     You could do pretty much whatever you want to do as long

8   as, if they call you, you can come back.  You know, you can be

9   there within a reasonable time.

10  Q     Mr. Ricci, have you ever done any work on a plane that

11  you were not assigned to?

12  A     Yes.

13  Q     Can you please give us an example?

14  A     Two days ago I was helping one of my coworkers with an

15  oxygen bottle in his airplane.  I helped a couple of -- about

16  a month before that, I helped someone with an exhaust fan for

17  the E&E on a plane I wasn't assigned to.  It was a similar

18  problem to the problem I had on my plane a week before, so I

19  knew exactly what it was.

20  Q     Are you prohibited from working on airplanes that you're

21  not assigned to?

22  A     No.

23  Q     Have you ever gone into the E&E compartment on a plane

24  that you were not assigned to?

25  A     Yes.

1    Q    If you went onto a plane that you were not assigned to

2    and noticed a problem on that plane, what would you do?

3    A    If it was something that was an easy fix, I would take

4    care of it.  You know, if it was something more involved, you

5    let the crew chief know that there's something more involved

6    on it.

7    Q    If you went to the cabin of a plane that you were not

8    assigned to and noticed a PAC unit failure, what would you do?

9    A    On a narrow-body airplane?  Reset the box and forget

10   about it.

11   Q    When you say "narrow-body," is a 737 is a narrow body?

12   A    Yes, because it doesn't -- like, to get into the E&E, it

13   doesn't require a ladder or stands or anything.  It's very

14   easy to access.  I would do it, reset the box, and that would

15   be it.

16   Q    Would you notify your supervisor that you did it?

17   A    No.

18   Q    What about the mechanic who was assigned to that plane,

19   did you tell him?

20   A    Yeah, I told him he owed me a cup of coffee.

21            MR. COHEN:  Just about done, Your Honor.

22            I want to confer with the government.

23   Q    Mr. Ricci, do you know Paul Belloisi?

24   A    Yes, I do.

25   Q    Do you know how long Paul Belloisi has been an American

1   Airlines mechanic?

2   A    He was in the class with me that upgraded from cargo into

3   maintenance.

4   Q    Have you ever socialized with Mr. Belloisi outside of

5   work?

6   A    No.

7   Q    Before today, have you seen Paul Belloisi since 2020?

8   A    No.

9            MR. COHEN:  No further questions.

10           THE COURT:  Will the government have any

11  cross-examination?

12           MS. SCHIERBERL:  Yes, Your Honor.

13           THE COURT:  Okay.  It's just too late in the day, so

14  unfortunately, sir, I am going to have to ask you to come back

15  Monday at 9:30.  Okay?  And you're under cross-examination, so

16  you cannot discuss your testimony with defense counsel.

17           THE WITNESS:  Okay.

18           THE COURT:  And you are excused for today.  We will

19  ask you to come back here Monday at 9:30.

20           THE WITNESS:  Monday at 9:30.  Okay.

21           THE COURT:  Yes.  Thank you, sir.

22           THE WITNESS:  Okay.

23           (Witness steps down.)

24           THE COURT:  Okay.  Thank you for your patience,

25  ladies and gentlemen.  I know it's been a very long day, but

1   we really did want to move along.  Believe it or not, with

2   breaks and even with the unexpected interruption I had

3   yesterday for court business, we are ahead of schedule.  So

4   that is a good thing, right?

5          It is entirely possible that you will be getting

6   this case early next week for deliberations.  It is still as

7   important now as it was the very first day that you came here

8   and I told you that you cannot talk about this case with

9   anyone, not your friends, family, neighbors, the dog, cat,

10  nobody over any kind of medium.

11         Do not read or listen to anything that might be

12  connected with this case.  Do not do any research connected

13  with this case, anything at all about this case.  You cannot

14  go to any of the locations that have been discussed here.

15         And remember to keep an open mind and not to form or

16  draw any conclusions.  Again, you have not heard the end of

17  the evidence yet, you haven't heard my instructions on the

18  law, and you haven't had a chance to deliberate with one

19  another.

20         So remember tomorrow is Friday.  We do not meet on

21  Fridays.  So you have tomorrow to do what you want to do.  And

22  we will see you back here Monday at 9:30.

23         We appreciate your promptness.  You've been a

24  wonderful jury.  Okay.  Take care and enjoy the weekend.

25         (Jury exits.)

1          THE COURT:  You can all have a seat.

2          All right.  So scheduling for tomorrow.  I do want

3    to do the charge conference tomorrow.  And I have a matter on

4    in the morning at noon.  I was thinking about 2:30 in the

5    afternoon.

6          MR. COHEN:  Whatever is convenient for the Court,

7    we'll be here.

8          THE COURT:  Okay.

9          Mr. Pollack?

10         MR. POLLACK:  Same, Your Honor, whatever is

11   convenient for the Court.

12         THE COURT:  Okay.  Don't you have a sentencing

13   before Judge Kuntz?

14         MR. POLLACK:  In fact, I do, at noon.  Hopefully

15   I'll be done by 2:30, but if not, I could find somebody to --

16         THE COURT:  We do talk to each other, you know.

17         MR. POLLACK:  I inferred from your question,

18   Your Honor.

19         I've been looking for coverage.

20         THE COURT:  Okay.

21         Yes, sir?

22         MR. NAVARRO:  Yes, Your Honor.

23         I mentioned earlier that I have a trip.  So I,

24   ironically enough, need to get on an American Airlines flight.

25         THE COURT:  Don't get into the avionics compartment.

1          MR. NAVARRO:  I'm going to be an expert by the time

2     I come back to you on Monday.

3          But I would need to leave around 4:00 p.m., but

4     obviously more than competent counsel are here, so I don't

5     think it will be an issue.

6          THE COURT:  Ms. Schierberl can handle it on her own.

7     I have every confidence that she can handle it.

8          MR. NAVARRO:  As do I.  I agree, Your Honor.

9          THE COURT:  So let's do this at 2:30.  Well, I

10    already have -- you already have my proposed charges, I have

11    everybody else's proposed charges.  It's fairly

12    straightforward, so I don't see us going for very long, in any

13    event.  So, hopefully, Mr. Pollack, you will be -- assuming

14    you can't find coverage with Judge -- with the case before

15    Judge Kuntz, I would think that you should be done by 2:30.

16         MR. POLLACK:  I agree, Your Honor.

17         THE COURT:  Okay?  All right.

18         MR. POLLACK:  Thank you, Judge.

19         (Matter adjourned to Friday, April 27, 2023, at

20    2:30 p.m.)

21

22

23

24

25

I N D E X

**WITNESS**                                                    **PAGE**

**SEAN GABAY**

    CROSS EXAMINATION BY MR. COHEN                    425

**MICHAEL GUARNIERI**

    DIRECT EXAMINATION BY MR. POLLACK                 434

    CROSS EXAMINATION BY MR. SIMPSON                  467

**DARRYL VALINCHUS**

    DIRECT EXAMINATION BY MR. POLLACK                 485

    VOIR DIRE EXAMINATION BY MR. SIMPSON              490

    CONT'G DIRECT EXAMINATION BY MR. POLLACK          495

    CROSS-EXAMINATION BY MR. SIMPSON                  560

**FRANK RICCI**

    DIRECT EXAMINATION BY MR. COHEN                   613

1          **E X H I B I T S**

2

3

4     Government's Exhibit 104                          436

5

6     Government's Exhibit 105                          443

7

8     Government's Exhibit 102                          447

9

10    Government's Exhibits 302, 303, 304, and 305     456

11

12    Government's Exhibit 506                          506

13

14    Government's Exhibit 501                          508

15

16    Government's Exhibit 507                          517

17

18    Government's Exhibits 508 through 512            519

19

20    Government's Exhibit 513                          526

21

22    Government's Exhibit 504                          530

23

24    Government Exhibit 502                            544

25

1

2      Government Exhibit 503                                    555

3

4      Defendant's Exhibit B6                                    594

5

6      Defendant's Exhibit E-8                                   625

7

8      Defendant's Exhibit E-9                                   625

9

10     Defendant's Exhibit E-4                                   629

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25