

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

FJN:RMP/MS
F. #2020R00153

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 23, 2024

By ECF

The Honorable Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Paul Belloisi
                  Criminal Docket No. 20-219 (DLI)

Dear Judge Irizarry:

        The government respectfully submits this letter in advance of the sentencing of defendant Paul Belloisi. On May 2, 2023, a jury found the defendant guilty beyond a reasonable doubt of all three counts with which he was charged: conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1); conspiracy to import cocaine, in violation of 21 U.S.C. §§ 963, 952(a), and 960(a)(1); and importation of cocaine, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1). See Verdict Sheet (ECF No. 84). For the reasons stated below, the government submits that a sentence at or near the high end of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 121 to 151 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing.

       I.       Background

            A.       Offense Conduct

        As the government proved at trial, the defendant was the inside man in a cocaine trafficking conspiracy at John F. Kennedy International Airport ("JFK"). Specifically, in February 2020, the defendant was employed by American Airlines as an aircraft mechanic, which gave him access to restricted areas of JFK, including the tarmac. The defendant abused his access to the JFK tarmac and his specialized knowledge of aircraft to smuggle cocaine into the United States in a highly sensitive compartment of a commercial airliner, as further described below.

        At approximately 3:30 p.m. on February 4, 2020, American Airlines aircraft 3BG arrived at JFK as flight 1349 from Montego Bay, Jamaica. See Presentence Investigation Report

("PSR") ¶ 7; Trial Tr. 438–442; GX 104, 401–405.[1]  Shortly before 4:00 p.m., Customs and Border Protection ("CBP") selected that aircraft for an enforcement examination and found ten bricks of cocaine inside the avionics compartment on the underside of the plane, hidden behind an insulation blanket against the fuselage.  PSR ¶ 7; Trial Tr. 42–47; GX 201, 201A, 202, 202A, 301.  The drugs were photographed and video recorded.  Id.  Subsequent laboratory testing confirmed that the bricks were cocaine and that their total net weight was 10.02 kilograms.  PSR ¶ 10; Trial Tr. 91; GX S-1.  The street value of that quantity of cocaine in New York City was well in excess of a quarter million dollars.  Trial Tr. 365.

After discovering and documenting the cocaine bricks, CBP quickly removed them from the aircraft and replaced them with sham bricks—which were an imperfect approximation (CBP had too few sham bricks, and they were not the same color as the real ones).  PSR ¶ 7; Trial Tr. 47–51; 56–58; GX 2, 6.  The sham cocaine was sprayed with a substance invisible to the naked eye that glows under a blacklight.  PSR ¶ 7; Trial Tr. 51; GX 2.  One of the sham bricks was outfitted with a transponder device, which emits a signal received by CBP's portable radio.  Id.; Trial Tr. 58.  When the switch to the transponder is depressed by the weight of the brick, the radio receiving the signal emits a confidence tone every 30 seconds, which signifies that the transponder is working properly and that it is within range of the radio.  Trial Tr. 58–59; Tr. Ex 6.  When the switch to the transponder is released, the radio emits an alarm tone, which signifies that the sham brick has been lifted.  Trial Tr. 59, 65.  After placing the sham bricks and radio transponder, CBP began visual surveillance of the underside of the aircraft from an inconspicuous distance.  PSR ¶ 7; Trial Tr. 68–69.

No one entered the avionics compartment for several hours.  Then, at approximately 7:19 p.m.—shortly before the aircraft was scheduled to depart on its next flight—CBP saw an American Airlines mechanic, later identified as the defendant, drive up to the aircraft; briefly walk up and then back down the jetway stairs; then go under the aircraft, open the avionics compartment, and climb inside.  PSR ¶ 8; Trial Tr. 80–82; GX 306.  Seconds later, the transponder tripped—indicating that the sham brick had been lifted—and CBP quickly drove to the aircraft from across the tarmac to confront the defendant.  Id.; Trial Tr. 82–88.  Upon arriving at the aircraft, CBP Officer Michael Robinson saw the defendant fully inside the avionics compartment, adjusting the insulation blanket in front of where the sham cocaine had been placed.  Trial Tr. 83, 85.  When the defendant emerged from the compartment, he closed the hatch and said to the CBP officers, "What's up, guys?"  Trial Tr. 73–74.  Officer Robinson testified that when he asked the defendant for identification, the defendant presented his airport identification with his hand covering the lower portion, which obscured the fact that the defendant lacked the "Customs Seal" that signifies authorization to be in an international aircraft.  Trial Tr. 74–75.  CBP shined a blacklight and saw that the defendant's gloves glowed, indicating that he had handled the sham cocaine—and at trial it was demonstrated to the jury that the gloves still glow, especially on the gripping surfaces of the fingertips and side of the thumb of the right glove.  PSR ¶ 8; Trial Tr. 86–88; GX 4.

---

[1] Citations to "GX" are to the government's trial exhibits.  Cited exhibits other than physical, video, and sealed exhibits are attached as an addendum to this letter, and other exhibits admitted at trial can be re-produced or made available to the Court upon request.

When CBP asked the defendant what he was doing inside the compartment, the defendant said that he was there to reset the air conditioning system. Trial Tr. 159. The evidence at trial established that there was no problem with the air conditioning system, nor any other mechanical issues with the aircraft. Trial Tr. 249–253; GX 101. The evidence further established that the defendant was not an avionics mechanic, Trial Tr. 320, nor a terminal mechanic, Tr. 314, 324, but was assigned to the hangar and had no legitimate reason to be in the aircraft or the area where it was parked at all, let alone in its avionics compartment. Trial Tr. 256.

Law enforcement discovered that the defendant had driven to the aircraft with an empty tool bag in his vehicle. Trial Tr. 356; GX 205; 205A. He was also wearing an American Airlines jacket with slits cut into the inside lining. Trial Tr. 360–363; GX 3, 210. Homeland Security Investigations ("HSI") Special Agent Sean Gabay testified that in his experience, such cutouts are used by smugglers to conceal contraband. Trial Tr. 361. When HSI interviewed the defendant later that night, the defendant said that he had gone into the aircraft without authorization to take food, and that he had eaten chips and drank a soda alone in the galley of the plane before realizing that there was a problem with the air conditioner. Trial Tr. 358. Video surveillance capturing the defendant's approach to the aircraft—which showed he was not in the aircraft or jetway for more than a minute, if at all, before he entered the avionics compartment—and testimony that the aircraft was already occupied and being prepared for its next flight at that time, proved this statement false. Trial Tr. 242–244; GX 306.

The trial evidence further established that the night before the flight laden with cocaine arrived at JFK, the defendant, who lives on Long Island, had a late-night rendezvous in the South Bronx with someone using a short-term "burner" phone. Specifically, late on February 3 and into early February 4, 2020, the defendant sent several text messages and made several short calls to a contact saved in his phone under the name "Lester." Trial Tr. 507–512; GX 501. The "Lester" cellphone had only been in use for about two weeks. Trial Tr. 529. After midnight on February 4, 2020, the defendant sent "Lester" text messages indicative of an in-person meeting, including one message that said "here" and another that asked, "where are you?" Location data on the defendant's cell phone showed that he sent those messages from the parking lot of a White Castle in the South Bronx. Trial Tr. 506–510; GX 505–506.

Following this midnight rendezvous, the defendant and "Lester" exchanged multiple calls and text messages later in the day on February 4, 2020. PSR ¶ 9; GX 501. At 6:47 p.m.—just minutes before the defendant drove to the aircraft where the cocaine had been hidden—the "Lester" cell phone sent a text message to the defendant stating, in part, "Confirmado!! Me acaban de confirmar." GX 501. (The parties stipulated to the English translation, "Confirmed!! They just confirmed to me.") Shortly thereafter, law enforcement saw the defendant arrive at the aircraft and enter its avionics compartment. Trial Tr. 82; GX 306. Around the same time, the "Lester" phone was traveling from the Bronx to JFK—and after arriving near JFK, "Lester" made numerous attempts to call the defendant, obviously unaware that the defendant had been caught and was in law enforcement custody. Trial Tr. 515–518; GX 504. The day after the defendant's arrest, and after "Lester" drove to JFK and failed to reach the defendant, the "Lester" cell phone was evidently abandoned, as evidenced by the fact that it permanently went off the network. GX 504.

The defendant was released on bond on February 5, 2020. The following night, two phone numbers that had never previously been in contact with the "Lester" phone, but which the defendant would likely have access to (one belonging to the defendant's minor daughter, the other belonging to a close friend) made approximately two dozen attempts to contact "Lester," but the "Lester" phone was already off the network, never to return. PSR ¶ 9; Trial Tr. 542–547; 557–559; GX 502–504.

B. Procedural History

The defendant was arrested at JFK on February 4, 2020. He was presented in court on a complaint (ECF No. 1) the following day and released on bond. On June 18, 2020, a grand jury in this district returned an indictment (ECF No. 11) charging the defendant with three counts: (1) conspiracy to possess more than five kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II); (2) conspiracy to import more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B)(ii); and (3) importation of more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 960(b)(1)(B)(ii).

The charging language in the indictment includes threshold drug quantity allegations that—if found by the jury—carry mandatory-minimum penalties. Before trial, the government filed a letter notifying the Court that, pursuant to recent revisions to Department of Justice policies, the government would seek conviction only on lesser-included offenses that do not carry mandatory-minimum penalties. See Gov. Letter (ECF No. 65). The government accordingly asked the Court not to instruct the jury to make specific findings as to drug quantity (which findings would trigger the mandatory minimums), and the Court granted that request. See Jury Instructions (ECF No. 82); Verdict Sheet (ECF No. 84).

Trial commenced with jury selection on April 24, 2023 before the Honorable Magistrate Judge Robert M. Levy. Your Honor presided over trial thereafter. On May 2, 2023, after less than one full day of deliberations, the jury unanimously found the defendant guilty on all counts.

II. Applicable Law

The Supreme Court has explained that a "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Although the Guidelines are advisory, they play a critical role in trying to achieve the "basic aim" that Congress sought to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." United States v. Booker, 543 U.S. 220, 252 (2005). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. Molina-Martinez v. United States, 136 S. Ct. 1338, 1345–46 (2016) (internal quotation marks omitted); see also United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that [Booker] and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

4

After calculating the applicable Guidelines range, a sentencing court must consider the statutory sentencing factors provided by 18 U.S.C. § 3553(a). Gall, 552 U.S. at 50. Specifically, 18 U.S.C. § 3553(a) requires that, in imposing a sentence, a court shall consider, inter alia:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant[.]

18 U.S.C. § 3553(a). The statute also requires the sentencing court to consider the need to provide the defendant educational training, medical care, or other treatment in the most effective manner, the kinds of sentences available, the applicable Guidelines range and policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victims. Id. The sentencing court, in its consideration of the Section 3553(a) factors, "may not presume that the Guidelines range is reasonable." Gall, 552 U.S. at 50. Rather, the court "must make an individualized assessment based on the facts presented." Id. When weighing those facts, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Accordingly, in sum, the Court should first calculate the applicable Guidelines range, and then consider that range and all relevant facts while applying the Section 3553(a) factors to arrive at an appropriate sentence.

### III. Analysis

#### A. Guidelines Calculation

The government agrees with the PSR that, for purposes of the Guidelines calculation, all three counts are grouped together pursuant to U.S.S.G. §3D1.2(d); that the base offense level is 30 pursuant to §2D1.1(a)(5) and (c)(5); that the defendant abused a position of trust or a special skill, resulting in a two-level increase pursuant to §3B1.3; and that the defendant is a zero-point offender, resulting in a two-level decrease pursuant to §4C1.1.

The government disagrees with the PSR on two significant issues: (1) as noted above, the government sought conviction on lesser-included offenses without mandatory minimum penalties and the Court granted the government's request not to instruct the jury to make special findings as to drug quantity, rendering the PSR's references to mandatory

minimum penalties erroneous;[2] and (2) the government submits that a two-level increase for obstruction of justice (rejected by the PSR) applies pursuant to §3C1.1 because of the defendant's perjured declaration in support of his suppression motion.

### 1. Mandatory Minimum Sentences Do Not Apply

The statutes that the defendant was charged with violating, and which the jury unanimously found that he did violate, prohibit (Count One) conspiring to possess cocaine with intent to distribute (21 U.S.C. §§ 846 and 841(a)(1)); (Count Two) conspiring to import cocaine (21 U.S.C. §§ 963, 952(a), and 960(a)(1)); and (Count Three) importing cocaine (21 U.S.C. §§ 952(a) and 960(a)(1)).  The defendant stands convicted of those crimes.  Each count of the indictment also contained an additional allegation that the amount of cocaine involved was five kilograms or more, which put the defendant on notice that, if he were convicted of the additional element of that threshold quantity, statutorily heightened penalties—including mandatory-minimum sentences—would apply.  Those heightened penalties only apply, however, if the jury specifically finds that the additional element of the threshold quantity is proved (or if the defendant were to allocute to that element in a guilty plea).  See Alleyne v. United States, 570 U.S. 99 (2013) (holding that a fact that triggers a mandatory-minimum penalty is an element that must be submitted to the jury for the mandatory minimum to apply).

Here, pursuant to recent revisions to Department of Justice policies and as explained in the government's April 6, 2023 letter to the Court (ECF No. 65), the government elected not to pursue conviction on the additional element triggering mandatory-minimum penalties.  Accordingly, although the government adduced trial evidence of drug quantity for purposes of the Guidelines calculation, the Court (at the government's request) did not instruct the jury to make a special finding as to drug quantity.  The jury's verdict of guilty on all counts therefore constitutes a jury finding of guilt as to every element of the offenses charged in the indictment except the threshold drug quantities, and thus conviction on all three counts of the indictment as if charged without those threshold drug quantities.  The applicable statutory penalty provisions are therefore those without threshold drug quantities, i.e., 21 U.S.C. §§ 841(b)(1)(C) and 960(b)(3).  Those provisions do not carry mandatory minimum penalties, and the Court has discretion to impose a sentence of imprisonment between zero and twenty years (as to each of the three counts).

### 2. The Obstruction Adjustment Applies

On February 4, 2022, the defendant filed a motion to suppress evidence and submitted as an exhibit to his motion a signed declaration made expressly under penalty of perjury (ECF No. 32-1).  The Court held an evidentiary hearing (in two parts) on May 25, 2022 and June 17, 2022, received post-hearing briefing, and on March 30, 2023 issued a memorandum and order denying the defendant's motion in its entirety (ECF No. 61).

In the defendant's declaration, he provided a false exculpatory narrative of his conduct on the evening of February 4, 2020, largely similar to the false exculpatory he told HSI on the night of his arrest, but modified in ways that appear tailored to the evidence he received in

---

[2] This error is repeated in different forms throughout the PSR, as listed in the government's objection letter to Probation (ECF No. 95, at 2).

6

discovery.  In sum and substance, he claimed to have entered the aircraft to steal food, and to have been thwarted by the presence of the flight crew and others (on the night of his arrest, he claimed to have been alone in the plane and to have eaten chips and drank a soda); he claimed to have noticed on his brief entry that the air conditioning system was malfunctioning, and thus decided to enter the avionics compartment to correct it; and he claimed to have noticed then that there were "several packages that were stuck to the wall," which he recognized as "something dangerous for [him] to have discovered," and so "[i]n his shock and uncertainty," he simply left the avionics compartment.  As demonstrated beyond a reasonable doubt at trial, and as manifest in the jury's unanimous guilty verdict, this exculpatory declaration was false.  And unlike the similar story that he told HSI on the night of his arrest, this one was submitted in a declaration to the Court, and therefore constitutes perjury.

Application Note 2 to U.S.S.G. §3C1.1 provides that a defendant's mere denial of guilt ordinarily is not a basis to apply the obstruction adjustment, but an express exception is "a denial of guilt under oath that constitutes perjury," as the defendant's declaration does.  The Addendum to the PSR (responding to the government's objection to the PSR) rejects this adjustment, citing Application Note 2, which cautions that "inaccurate testimony" does not necessarily reflect a willful attempt to obstruct justice, because it can also "result from confusion, mistake, or faulty memory."  But the defendant's tale of accidentally happening upon drugs is manifestly not the result of an innocent mistake.  Certainly the government would agree that other, comparatively minor aspects of his declaration that differ from the evidence adduced at the suppression hearing and trial—for instance, the precise details and chronology of what was asked of him, when, and by whom—could just reflect mistakes; but not the lie that he only coincidentally went to take food from the one airplane at JFK that had 10 kilograms of cocaine discovered in its avionics compartment that day, and that he only coincidentally entered that very avionics compartment to repair the air conditioner because he noticed it was not working.  Those are not mistakes; as proven beyond a reasonable doubt at trial, they are lies, which he submitted expressly under penalty of perjury.

The defendant, in his response to the government's objections to the PSR (ECF No. 97) disputes the application of the obstruction adjustment, citing United States v. Peña, 751 F.3d 101 (2d Cir. 2014) and United States v. Agudelo, 414 F.3d 345 (2d Cir. 2005), but those cases are inapposite.  The defendant in Agudelo submitted an affidavit in support of suppression in which he claimed to have told the agents questioning him that he wanted to speak to a lawyer, and the district court credited the testimony of the agents that he did not do so.  414 F.3d at 349.  The defendant in Peña submitted a declaration in support of suppression in which he claimed to have asked for a lawyer "at least seven times" and the district court found that he had done so only once.  751 F.3d at 105–06.  In both cases, the Second Circuit held that it was error to find that the defendant made willfully false statements rather than simple mistakes, distinguishing the facts from United States v. Lincecum, 220 F.3d 77 (2d Cir. 2000), in which the Second Circuit affirmed the application of the obstruction adjustment where the defendant submitted an affidavit in support of suppression that the district court found "was not vague but had recounted a series of incidents in considerable detail, and . . . was knowingly false," 220 F.3d at 79.  As the Agudelo court put it, "Lincecum's three detailed statements reeked of fabrication because he could not have simply misremembered so much detail," whereas Agudelo's false statements "were far more vague."  414 F.3d at 350.  Here, the lies in the defendant's declaration are much closer to Lincecum than the relatively minor falsehoods in Peña and Agudelo; indeed, they are

7

more extreme, not merely detailed claims of having asked for a lawyer, but an entirely fabricated account of why he entered an aircraft where he had no legitimate reason to be and what happened there.

Application Note 4(F) provides that one example of conduct to which the obstruction adjustment does apply is "providing materially false information to a judge," as the defendant did in his perjured declaration. The defendant argues in his response to the government's objections to the PSR that the false statements in his declaration were not material to the suppression motion (and therefore do not constitute perjury). But they are quintessentially material: they constitute a detailed and false assertion of innocence. If these false statements were credited, there would have been no lawful basis to detain him for questioning, nor to search his cellphone, and they were thus material to his suppression motion; they were also material in obstructing the investigation and prosecution of his criminal conduct, insofar as they were meant to conceal his criminal behavior under the guise of quotidian antics of airline mechanics; and they were material to the ultimate issues at trial, insofar as they were offered in support of a false alibi. The defendant is of course entitled to persist in his plea of not guilty and to hold the government to its burden of proof at trial (which the government met); he is not entitled to submit under penalty of perjury a false factual recitation. The government respectfully submits that the defendant's declaration is perjurious and that a two-level increase therefore applies pursuant to U.S.S.G. §3C1.1.

3. The Abuse-of-Position-or-Skill Adjustment Applies

The government agrees with the PSR that a two-point increase pursuant to U.S.S.G. §3B1.3 applies because the defendant abused a position of public or private trust or used a special skill in a manner that significantly facilitated the commission of the offense. The defendant objects to that adjustment in the PSR, without explanation (ECF No. 94). The adjustment is properly applied. Cf. United States v. Castagnet, 936 F.2d 57 (2d Cir. 1991) (affirming district court's finding that defendant's status as airline's junior station agent was "position of trust" that permitted increase in base offense level pursuant to §3B1.3).

Application Note 1 provides that this adjustment applies when the defendant held "a position of public or private trust characterized by professional or managerial discretion" that "contributed in some significant way to facilitating the commission or concealment of the offense." Here, the evidence at trial proved that the defendant abused his professional discretion to access the JFK tarmac (a highly secured area not accessible to the public), disguising his actions through his use of the uniform and vehicle of an airline mechanic. He also used his physical access and specialized knowledge as an airline mechanic to gain entry to the avionics compartment of a particular aircraft—a highly sensitive mechanical compartment that would be inaccessible and utterly mysterious to a person without specialized technical training—in his attempt to retrieve the cocaine he was expecting. He then used his specialized knowledge of aircraft to attempt to conceal his criminal acts through false exculpatory statements that were contrived to appear plausible to law enforcement without such technical expertise.

\* \* \*

Accordingly, for the reasons stated above, the government respectfully submits that the correct Guidelines calculation is summarized as follows:

| | |
|---|---:|
| Base Offense Level (§2D1.1(a)(5) and (c)(5)) | 30 |
| Plus: abuse of position or special skill (§3B1.3) | +2 |
| Plus: obstruction of justice (§3C1.1) | +2 |
| Less: zero-point offender (§4C1.1) | <u>-2</u> |
| Total: | <u>32</u> |

Because the defendant falls into Criminal History Category I, see PSR ¶ 33, the applicable Guidelines range—corresponding to Criminal History Category I and offense level 32 on the Sentencing Table—is 121 to 151 months' imprisonment. See U.S.S.G. §5A.

      B.    <u>Section 3553(a) Factors</u>

The government respectfully submits that a significant term of imprisonment, at or near the high end of the Guidelines range, is warranted by the Section 3553(a) factors, and in particular, the seriousness of the offense of conviction, and the need for specific and general deterrence. See 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), and (a)(2)(B).

It goes without saying that the defendant committed an exceedingly serious crime. Indeed, the large quantity of cocaine in this case—<u>double</u> the quantity required to trigger a 10-year mandatory-minimum sentence if the government had pursued it, and worth more than a quarter million dollars—underscores that seriousness. The defendant and his co-conspirators successfully imported into the United States and sought to possess for distribution a very large quantity of a dangerous narcotic. This conduct, even under far less aggravating circumstances, would warrant serious punishment.

The circumstances here, though, are far worse, because of the particular means of illicit importation. The defendant is not a mere courier, and he and his co-conspirators were not trying to smuggle cocaine into the United States by carrying it in their pockets or under false bottoms in their luggage. Rather, they conspired to import—indeed, they successfully imported—over twenty pounds of cocaine into the United States by concealment in a highly sensitive electronics and mechanical compartment beneath the cockpit of a commercial aircraft, unbeknownst to the dozens of innocent passengers and crew relying on the safe conduct of that plane to arrive in New York. As multiple trial witnesses testified, and as may appear obvious, the presence of foreign objects in such a sensitive part of an aircraft poses safety hazards: "inside this avionics compartment, if this plane would hit some serious turbulence, those bricks could go bouncing around and damage some of the sensitive electronic equipment, and that could cause an emergency situation." Trial Tr. 54:4–7; see also Trial Tr. 181:3–182:10 ("So having an item like that where it's not placed properly and it's loose, it's not actually fastened or it's not safely placed in there, that could actually fly around and just cause any kind of damage throughout the avionics—especially the avionics area. So it's a very crucial area where you have to be very careful what's there, period."). The illicit access to and criminal use of the avionics compartment of commercial aircraft flying into the United States and New York City from overseas represents far more than a drug smuggling offense; it is a dramatic breach of security made possible only by the corruption of inside men like the defendant. This conduct threatens

the safety of the public not only through the proliferation of narcotics, but through the vulnerability it exploits in critical national and international transportation infrastructure. That harm underscores the need for general deterrence: this case has garnered and will continue to garner attention in the aviation industry, and other would-be inside men must see that those who abuse their positions of trust are detected and face serious consequences for their crimes.

The government respectfully submits that a sentence at or near the high end of the Guidelines range will adequately punish the defendant for his crime and will provide both general and specific deterrence. Such a sentence would be sufficient but not greater than necessary to achieve the goals of sentencing.

IV. <u>Conclusion</u>

For the foregoing reasons, the government respectfully submits that a sentence at or near the high end of the Guidelines range of 121 to 151 months' imprisonment would be sufficient, but not greater than necessary, to accomplish the goals of sentencing.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/
Robert M. Pollack
Margaret Schierberl
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (DLI) (by ECF)
Counsel of record (by ECF and E-mail)