UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,         :
                :
                :       **OPINION AND ORDER**
     -against-        :       **20-cr-219 (DLI)**
                :
PAUL BELLOISI,            :
                :
          Defendant.   :
-------------------------------------------------------- x

**DORA L. IRIZARRY, United States District Judge:**

This case arises from Customs and Border Patrol's ("CBP") discovery of approximately ten kilograms of cocaine onboard an American Airlines international aircraft at John F. Kennedy International Airport ("JFK Airport") on February 4, 2020, where Defendant Paul Belloisi ("Defendant") was an American Airlines airplane mechanic. After a CBP investigation, Defendant was arrested and arraigned on a criminal complaint on February 5, 2020. Defendant was indicted on June 18, 2020, on charges of conspiracy to possess cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count One); conspiracy to import cocaine in violation of 21 U.S.C. §§ 963, 952(a), and 960(a)(1) (Count Two); and importation of cocaine in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) (Count Three). *See*, Criminal Indictment, Dkt. Entry No. 11.

On May 2, 2023, after trial, a jury convicted Defendant on all counts. *See*, Verdict Sheet, Dkt. Entry No. 84. On May 16, 2023, Defendant moved for a judgment of acquittal on all three counts pursuant to Fed. R. Crim. P. 29. *See*, Mot. for J. of Acquittal, Dkt. Entry No. 86. Defendant filed an amended motion on June 5, 2023 ("Motion"). Am. Mot. for J. of Acquittal, Dkt. Entry No. 89 ("Mot."). The Government opposed Defendant's motion and amended motion ("Opposition"). Opp'n to Mot. for J. of Acquittal ("Opp'n"), Dkt. Entry No. 88; Letter dated June

12, 2023, Dkt. Entry No. 92.  Defendant replied ("Reply").  Reply in Supp. of Motion, Dkt. Entry No. 91.

A jury trial was held from April 24 to May 2, 2023.  In its case in chief, the Government introduced a variety of physical and documentary evidence, including, *inter alia*, the cocaine recovered from the airplane, photographs, surveillance videos, cellular data, the laboratory analysis (by stipulation), and the testimony of seven witnesses, including law enforcement officers who investigated this case, the pilot of the aircraft, a supervisor of American Airlines airplane mechanics at JFK Airport, a senior investigator with American Airlines Corporate Security, and an expert witness in cellular site geolocation data analysis.  Defendant presented a case during which he called one witness, a JFK Airport American Airlines mechanic.

Defendant seeks vacatur of the jury verdict and a judgment of acquittal arguing the evidence was insufficient to prove beyond a reasonable doubt Defendant's knowledge and intent to: (1) join a conspiracy to possess with intent to distribute cocaine (Count 1); (2) join a conspiracy to import cocaine (Count 2); and (3) import cocaine into the United States (Count 3).  The Government maintains that there was sufficient evidence at trial to support a finding of guilt beyond a reasonable doubt on all elements of each charged offense.  Having presided over the trial, assessed the credibility of the witnesses' testimony, and reviewed the record in its entirety, the Court finds that the jury's verdict is supported by more than sufficient evidence beyond a reasonable doubt.  Therefore, Defendant's motion to vacate the jury's verdict and for judgment of acquittal is denied in its entirety.

## I.     Background[1]

American Airlines' aircraft technicians, also called mechanics, play a vital role in ensuring the safe and timely operation of aircraft.  Transcript ("Tr.") at 309-10, 614.  At JFK Airport, American Airlines mechanics are assigned into two groups, "terminal mechanics" or "hanger mechanics."  *Id.* at 310-14.  Terminal mechanics are assigned to work on passenger aircraft at the terminal.  *Id.* at 310.  Hanger mechanics are assigned to work on aircraft at the American Airlines maintenance facility, known as Hanger 10, and at Spot One, also known as the hardstand, a separate parking area for aircraft not flying immediately.  *Id.* at 310-11, 317, 448; GX 401.

JFK Airport aircraft mechanics must carry identification cards, referred to as "SIDA" cards, that control and record access to areas beyond security as well as to other secure, non-public areas such as the hanger and the ramp outside the terminal.  *Id.* at 446, 448, 452.  In addition, mechanics working on or in proximity to aircraft arriving from international flights are required to have a customs seal on their SIDA.  *Id*. at 74-75, 198-200, 319.  A customs seal signifies that CBP performed a background check and vetted the employee, giving them clearance to interact with international cargo and passengers before CBP processes or inspects them.  *Id.* at 198-99.  If an employee without a customs seal works on an international aircraft, CBP may issue a violation and a fine and the employee may be reprimanded or fired.  *Id.* at 199-200

Defendant worked as an American Airlines aircraft mechanic at JFK Airport for over two decades.  *Id.* at 613-14, 656-57.  On February 4, 2020, Defendant was a hanger mechanic, assigned to work on aircraft 7CC located at Spot One.  *Id*. at 313-17, 320-21; GX 103.  He was not assigned

---

[1] The facts set forth herein are based on the evidence adduced at trial viewed "in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor" because Defendant seeks to set aside a jury verdict. *United States v. Rosemond*, 841 F.3d 95, 99-100 (2d Cir. 2016).

to work on aircraft at the terminal nor did his SIDA card have a customs seal.  Tr. at 74, 313-17, 320.

### A.  Discovery of Narcotics and Investigation

On February 4, 2020, CBP Officer Michael Robinson and his partner, CBP Officer Frank Morelli, were on duty as part of CBP's aircraft search team at JFK Airport examining international aircraft for illegal contraband, including narcotics.  *Id*. at 34-35.  They selected American Airlines Flight 1349, a Boeing 737 aircraft with number 3BG arriving from Montego Bay, Jamaica, for a random search.  *Id*. at 37-38, 83, 242, 436-38; GX 104.  Jamaica is a known transit country for narcotics coming into the United States.  *Id*. at 35-36, 38.  3BG landed at 3:30 p.m. and parked at American Airlines Terminal 8, Gate 7 at 3:36 p.m. for the offloading of passengers and baggage. Tr. at 38, 439, 442; GX 104.  While Officer Morelli observed the offloading of baggage, Officer Robinson searched the aircraft's exterior panels, working his way forward to the avionics compartment underneath the airplane.  Tr. at 40.

On a Boeing 737 aircraft, the avionics compartment is located near the front of the plane underneath the cockpit and is accessible via an exterior door on the underside of the aircraft.  *Id*. at 41, 255, 624; GX 104.  The avionics compartment, also called the "E and E compartment," houses electronic equipment essential to the safe operation of the aircraft, including systems used for heating and cooling, "navigation, communication, autopilot and collision avoidance."  *Id*. at 40-41, 255, 624, 628, 630-31.  An insulation blanket inside the avionics compartment covers the fuselage and structural ribs of the aircraft to retain heat and reduce noise.  *Id*. at 42.

During his search of the avionics compartment, Officer Robinson discovered ten brick-shaped objects (the "bricks") concealed behind the insulation blanket.  *Id*. at 42-43.  Based on his training and experience, he believed these contained narcotics.  *Id*.  Later testing confirmed that

each of the bricks contained cocaine.  *Id*. at 91, 202, 367-69; GX S-1.  At 3:54 and 3:55 p.m., the officers took pictures to document the location of the bricks.  Tr. at 43-47; GXs 201, 201A, 202; 202A.  The parties stipulated that the ten packages recovered from the avionics compartment of the aircraft consisted of cocaine with a net weight of 10.02 kilograms.  GX S-1.

After taking the photographs, the officers returned to their marked CBP vehicle to notify their supervisors and strategize.  Tr. at 47-48, 97-98, 114-15.  They decided to replace the bricks with their own fake or "sham" bricks ("sham bricks").  *Id*. at 47-48, 114-15.  In the truck, the officers had three sham bricks, a roll of green duct tape, a can of clue spray, and a transponder.  *Id*. at 48, 50, 58; GXs 2, 6.  Clue spray, contained in an aerosol can, is a clear liquid, invisible to the naked eye, that glows under a black light.  Tr. at 50, 121.  Once sprayed with clue spray, it can be used to show that a person touched a given area or object because the spray will transfer to their hands on contact.  *Id.* at 50-51.  A transponder is a small radio that makes a signal.  *Id*. at 58-59. It is housed within a brick shaped object that resembles a package of narcotics like those found on the airplane.  *Id*.; GX 6.  When turned on, the transponder transmits an alarm to the officer's radio if the transponder brick is picked up or disturbed.  Tr. at 59, 65.

The officers wrapped the sham bricks in green duct tape to simulate the color of the bricks. *Id*. at 48-49, 116-17; GX 2.  Upon returning to the avionics compartment with the sham bricks, transponder, and clue spray, the officers recorded a video of the genuine bricks at 4:12 p.m.  Tr. at 52-56, 118; GX 301, 301A.

In the avionics compartment, the officers replaced the genuine bricks with the sham bricks and transponder, all of which they sprayed with clue spray.  Tr. at 120-21.  Officer Robinson then pulled the insulation blanket back into place and sprayed the insulation blanket with clue spray. *Id*. at 68, 121.  With the sham bricks, the transponder, and the insulation blanket in place, the

5

officers retreated to a secluded location to switch to an unmarked vehicle and begin surveillance of the aircraft.  *Id*. at 68.

Officers Robinson and Morelli informed their supervisor, Officer Journael Garry Cambry, of their discovery.  *Id*. at 172, 178-79.  In turn, Officer Cambry notified agents with Homeland Security Investigations (HSI), the investigative arm of the CBP.  *Id*. at 182-84.  At approximately 4:30 p.m., Supervisor Cambry drove to a location on the opposite side of Terminal 8 from Gate 7 to assist in surveillance.  *Id*. at 185.  Right after taking up the surveillance position, he received a phone call reporting a suspicious blue American Airlines maintenance van heading in his direction through a tunnel underneath Terminal 8.  *Id*. at 49-50, 177-78, 190.

Supervisor Cambry saw the van as it drove through the tunnel.  *Id*. at 190-91.  He observed the van proceed to the hardstand, park, and an individual exit the van and go up into an airplane at the hardstand.  *Id*. at 191-92.  Supervisor Cambry described the individual as a middle aged white male, approximately forty years of age, wearing an American Airlines maintenance uniform, with a gray jacket and light gray beanie hat.  *Id*. at 193.  The man spent an estimated five to ten minutes on the plane before returning to his vehicle and proceeding to the American Airlines maintenance hangar where he exited the vehicle and entered the hanger.  *Id*. at 194-95.  An estimated ninety to one hundred and twenty minutes later, the same individual exited the hanger, got into a white American Airlines maintenance truck and drove back to Terminal 8.  *Id*. at 196-97.  Officer Robinson observed the truck drive by slowly, go to a small alcove near his vehicle, then exit the alcove and leave the area.  *Id*. at 70.  Supervisor Cambry identified Defendant as the driver of the van and the truck.  *Id*. at 198.

Defendant arrived at the surveilled aircraft shortly after 7:17 p.m., entered the jet bridge, exited the jet bridge, and then opened and entered the avionics compartment, all within two

6

minutes of arriving at the aircraft. *Id*. at 79-82. Within twenty seconds of Defendant's entering the avionics compartment, the alarm on the transponder was tripped. *Id*. at 82. Officer Robinson arrived shortly thereafter and observed Defendant inside the avionics compartment near the location of the discovered bricks, reattaching the insulation blanket. *Id*. at 82-85; GXs 203, 204. The officers waited for Defendant to exit the compartment and, as he turned around, he said "what's up guys?" Tr. at 73-74.

When asked why he was in the avionics compartment, Defendant answered that he was resetting an alarm for the air conditioning system. *Id*. at 74. When asked for his identification, he presented a SIDA that did not have a customs seal. *Id*. That day, Defendant was assigned to the hanger and had no reason to be at the terminal or at 3BG. *Id*. at 320-21. In the bed of Defendant's vehicle was a large empty red tool bag. *Id*. at 354-55; GX 205. Defendant's American Airlines jacket had slits cut into its lining, a practice used to create hidden compartments to conceal contraband like narcotics. Tr. at 360-63; GXs 3, 210. Defendant's gloves glowed with clue spray when held under a black light. Tr. at 88-89; GX 4. After speaking to the pilot of 3BG, Captain Randall LeRuth, HSI Special Agents detained Defendant and brought him to the JFK Narcotics Smuggling Unit ("JNSU") for questioning. Tr. at 354.

During the interview at JNSU, Defendant stated that he had gone up the jet bridge and entered the aircraft to take chips and a soda for a snack. *Id.* at 357-58. Defendant stated that he was alone on the aircraft and noticed that one of the air conditioning packs was not working correctly so he went to the cockpit to reset it. *Id.* When this did not work, he went to the avionics compartment to fix the problem. *Id.* at 358-59. This explanation was contradicted directly by testimony that, at the time Defendant claimed to be in the aircraft alone, the aircraft was occupied by crew members, including the pilot and copilot who were in the cockpit. *Id.* at 242-45.

American Airlines flight Captain LeRuth testified that, on February 4, 2020 at 7:15 p.m., he was in the cockpit of 3BG and the temperature was normal. *Id*. at 245. He never saw Defendant in the cockpit or onboard the plane. *Id.* at 254. The maintenance logbook, on which all aircraft maintenance activities are recorded, showed no open maintenance items and no maintenance performed on the air conditioning system or any other aircraft component or system that required accessing the avionics compartment. *Id*. at 246-53; GX 101.

### B. Evidence of Defendant's Whereabouts and Communications on February 3, 4, and 5, 2020

The Government presented substantial evidence regarding Defendant's whereabouts on February 3 and 4, 2020, as well as detailed records of Defendant's contacts with an individual labeled in Defendant's phone as "Lester." *Id.* at 434-62 , 485-530, 537-59. Darryl Valinchus, who was certified without objection as an expert in geospatial visualization of cell phone location data pursuant to Federal Rule of Evidence 702, analyzed the cellular data. *Id*. at 493-95. Mr. Valinchus conducted an examination of a Cellebrite forensic digital extraction from Defendant's iPhone seized at the time of his arrest and T-Mobile records from the Lester cellular device with the number (646) 940-1227. *Id*. at 499-503; GXs S-3, 600, 5. The Lester number was activated late the previous month, January 2020. Tr. at 528-29; GX 504.

From these records, Mr. Valinchus produced a map detailing the movement of both cell phones for the time period of February 3 and 4, 2020 and a report showing the contacts between the two cell phones from February 3 and 4, 2020. Tr. at 501-04, 507-08; GXs 501, 505. This report showed contacts between Defendant and Lester via phone calls, text messages, and through the messaging service WhatsApp. Tr. at 507-09; GX 501. Location data revealed that Defendant spent most of his time on Long Island, where he resided, while Lester spent the majority of his time in The Bronx. Tr. at 504-05; GX 505. Defendant's phone also contained photographs of a

8

law enforcement officer and canine at JFK Airport and a video of officers searching a plane.  Tr. at 519-520, 523-25; GXs 508, 509, 510, 511, and 512.

### C.    Communications and Whereabouts the Evening of February 3, 2020, and the Morning of February 4, 2020

The morning of February 4, 2020, Defendant was in the parking lot of a White Castle in The Bronx at 12:58 a.m.  Tr. at 506-07; GX 506.  Earlier, Defendant and Lester exchanged numerous messages, including an unanswered WhatsApp voice call from Defendant to Lester at 10:36 p.m. immediately followed by a WhatsApp text message from Defendant to Lester, which read "Call me when you're not busy. I got to tell you something."  Tr. at 509; GX 501.  All of these contacts and movements were consistent with an early morning meeting in The Bronx on the day of the discovery of narcotics at JFK.  Tr. at 505-12.

### D.    The Afternoon and Evening of February 4, 2020

Senior investigator Michael Guarnieri of American Airlines Corporate Security testified regarding Defendant's movements on February 4, 2020 based on swipe data collected from Defendant's SIDA card and airport surveillance videos.  *Id.* at 434, 451-62; GX 102.  On February 4, 2020 at 1:39 p.m., Defendant's SIDA card recorded its first swipe of the day when Defendant swiped in though the access gate (gate lane 2) into the American Airlines maintenance hanger.  Tr. at 449-51; GX 102, 401.  Defendant then swiped in through the hanger turnstile at 1:42 p.m.  Tr. at 451; GX 102.[2]  Meanwhile, cell phone data showed that, following an unanswered WhatsApp call from Lester at 2:25 p.m., Defendant made a WhatsApp call to Lester at 2:26 p.m. that lasted 4 minutes and 48 seconds.  Tr. at 512-13; GX 501.

---

[2] The difference between these two swipe locations is that gate lane 2 gives the individual access to the hanger while the hanger turnstile is within the hanger and gives the individual access to the maintenance area of the hanger.  Tr. at 451.

At 3:53 p.m., Defendant swiped into Terminal 8 at access point 21-315 near Gates 8 and 10.  Tr. at 452.  He then swiped out to the ramp (also known as "the tarmac") through the same access point four minutes later, at 3:57 p.m.  *Id*. at 452-53; GX 102.  From this location in the terminal, Defendant would have been able to view the airplane at Gate 7.  Tr. at 454.

Almost exactly one hour later, around 4:00 p.m., Defendant returned to Terminal 8, entering through an access point near Gate 7 and exiting at the same location three minutes later. *Id*. at 455; GXs 302, 303, 304, and 305.  Video evidence showed a van drive up and park near the airplane at Gate 7 and Defendant exit the van and enter the terminal, returning minutes later.  Tr. at 455-59.

At 6:34 p.m., Defendant called Lester via WhatsApp, which call lasted 2 minutes and 11 seconds.  *Id*. at 513; GX 501.  At 6:45 and 12 seconds p.m., Defendant again called Lester via WhatsApp.  Tr. at 513; GX 501.  At 6:47 and 47 seconds p.m., Lester sent Defendant a text message in Spanish.  Tr. at 513; GX 501.  At trial, the parties stipulated that the message translated into English stated, "They just confirmed to me. They all already left, they're going to take them to dinner because they're hungry."  Tr. at 514; GX S-1.  Defendant's final recorded SIDA swipe occurred at 7:01 p.m. at the hanger 10 turnstile.  Tr. at 455; GX 102.

### E.   Post Arrest Attempts at Contact between Defendant and Lester and Lester's Movements

Defendant was detained by the officers shortly after 7:20 p.m. on February 4, 2020.  Tr. at 80–82; GX 306.  The next contact between Defendant's and Lester's devices was a WhatsApp phone call from Lester to Defendant at 9:23 and 16 seconds p.m.  Tr. at 514; GX 501.  This was followed by a quick series of nine unanswered phone calls from Lester to Defendant between 9:23 p.m. and 11:41 p.m.  Tr. at 515-16; GX 501.  Cell site location data showed that, between 7:00

p.m. and 9:35 p.m., the Lester cell phone had been moved from The Bronx to near JFK Airport. Tr. at 517-18; GX 507.

Defendant was released on bond on February 5, 2023. Tr. at 370. T-Mobile records for the Lester cell phone show that, after Defendant's release, phones with numbers associated with Defendant repeatedly were used to try to contact Lester. *Id*. at 541-59; GXs 502–504. The numbers, (917) 676-6464 and (631) 542-3676, were labeled "Marco Buono" and "Carolina (heart emoji)," respectively, in Defendants' phone. Tr. at 541-42; GX 504. February 6, 2020 was the first time that the Marco Buono number or the Carolina number was used to call Lester. *Id*. at 557-58. In total, phones with these two numbers were used to call the Lester cell phone twenty-two times and to text the Lester cell phone twice in an approximately thirteen-and-a-half-hour period, lasting from approximately 9:30 p.m. on February 6, 2020, to 11:00 a.m. on February 7, 2020. Tr. at 555-59; GX 504. By the time of the first call, Lester's phone was unreachable, having permanently gone off the network on February 5, 2020. Tr. at 541, 559.

### F.    The Defense Case

Defendant called one witness during the trial, Frank Ricci, an American Airlines mechanic at JFK Airport. Tr. at 613-60. Mr. Ricci testified regarding the number of video cameras around the airport, airline mechanics' training and certifications, the location and dimensions of the avionics compartment on a Boeing 737 aircraft, the procedure for resetting alarms that might be triggered in the cockpit, and routine workplace practices for American Airlines mechanics at JFK Airport. *Id.* Mr. Ricci also testified that he knew Defendant and had worked with him before. *Id.* at 656-57. In the direct examination of Mr. Ricci, Defendant attempted to establish that some maintenance might not be recorded in the logbook and called into question the testimony of the Government's witnesses. *Id.* at 640-41. On cross-examination, Mr. Ricci corroborated testimony that customs seals give employees clearance to interact with international aircraft, and observed

11

that Defendants' SIDA did not have a customs seal.  *Id.* at 795-96.  Notably, he also testified that

if he had seen objects that did not belong in the avionics compartment, such as the sham bricks, he

would have reported them.  *Id.* at 808-09.

## II.   Legal Standard

When considering a motion under Fed. R. Crim. P. 29(c), a court must view the evidence

presented at trial in its totality, in the light most favorable to the government, with all inferences

drawn in favor of the prosecution.  *United States v. Djibo*, 850 F. App'x 52, 54-55 (2d Cir. 2021)

(quotations omitted).  Viewing the evidence in this way, a court may set aside the verdict only if

it determines that no rationale trier of fact could have found the defendant guilty beyond a

reasonable doubt.  *Id.* at 54.  If it does not, the jury's verdict must stand.  *Id.*  As a result, a defendant

seeking to set aside a jury's guilty verdict "carries a heavy burden."  *United States v. Irving*, 452

F.3d 110, 117 (2d Cir. 2006) (citations omitted).

In reviewing a Rule 29(c) motion, the court must bear in mind the respective roles of the

jury and the court.  *Djibo*, 850 F. App'x at 55.  It is the function of the jury to determine the weight

of evidence presented, assess the credibility of witnesses, and choose between competing

inferences that can be drawn from the evidence presented.  *United States v. Canada*, 858 F. App'x

436, 437 (2d Cir. 2021) (citing *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998)).  The

Court must give the jury's determinations a high degree of deference and cannot substitute its own

determinations for the jury's.  *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (citing

*United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir. 1999)).

In a conspiracy case, this deference to the jury's verdict is of heightened importance

because a conspiracy is secretive by nature.  *United States v. Glenn*, 392 F.3d 539, 544 (2d Cir.

2004).  A jury's guilty verdict on a conspiracy offense can be supported "by evidence from which

it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Hassan*, 578 F.3d 108, 123 (2d Cir. 2008) (quoting *United States v. Rodriguez,* 392 F.3d 539, 545 (2d Cir. 2004)); *See also*, *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (Government must establish specific intent beyond a reasonable doubt). While mere suspicious circumstances are not enough, in the proper context, "'a single act may be sufficient for an inference of involvement in a criminal [conspiracy].'" *United States v. Nusraty,* 867 F.2d 759, 762 (2d Cir.1989) (citation omitted); *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1111 (2d Cir. 1975)). Finally, to prove a conspiracy, there is no requirement that the prosecution present evidence identifying its other members. *See*, *United States v. Carpenter*, 2022 WL 16960577, at *2 (2d Cir. Nov. 16, 2022) (citing *United States v. Harris*, 8 F.3d 943, 946 (2d Cir. 1993)).

The jury may make reasonable inferences in order to reach its verdict. *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019). "'An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist.'" *Id.* (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)). Inferences necessary to find an element of an offense must be more than merely permissible, they must be "'sufficiently supported to permit a rational juror to find that element, like all elements, is established beyond a reasonable doubt.'" *United States v. Landesman*, 17 F.4[th] 298, 320 (2d Cir. 2021) (quoting *Pauling*, 924 F.3d at 657).

## III.    Discussion

Defendant challenges the sufficiency of the evidence on two grounds. As to Counts 1 and 2, Defendant contends the evidence supporting Defendant's agreement to participate in the charged

13

conspiracies is insufficient because neither the evidence of Defendant's contacts with Lester nor any other evidence at trial directly shows his agreement. Mot. at 11-14. Defendant further argues that the evidence does not support a finding that he knew he was engaged in a conspiracy involving cocaine. *Id.* at 15-16. The Government counters that the evidence submitted at trial adequately supports a finding beyond a reasonable doubt that Defendant knowingly and intentionally agreed to participate in a conspiracy involving cocaine. Opp'n at 9-13.

As to Counts 2 and 3, Defendant alleges the evidence evincing his knowledge and intent to import cocaine is insufficient because he did not know the plane was coming from abroad and, therefore, could not have intended to import cocaine. *Id*. at 16-18. The Government maintains that the evidence adduced at trial sufficiently supports a finding beyond a reasonable doubt that Defendant knew of the international origins of the cocaine. Opp'n. at 9-13.

As an initial matter, Defendant argues the evidence was insufficient because there was no direct evidence of his agreement either to join in the conspiracy or possess with intent to distribute or import cocaine. *See*, Mot. at 6. To support his contention, Defendant speculates about the evidence that was not produced at trial, such as testimony about his state of mind, the identity of his coconspirators, recorded phone calls or writings, a confession or admission by Defendant, or evidence that he possessed the cocaine. *Id*. Defendant's contentions fail for two reasons.

First, Defendant presumes that such evidence exists. As properly argued by the Government and noted above, the government may prove all elements of a crime, including the crime of conspiracy, by circumstantial evidence alone. Opp'n at 8-9. This is especially true given a conspiracy's secretive nature. *Landesman*, 17 F.4th at 320. Second, the government need not produce all available evidence, even assuming such evidence exists. *See*, *Lorenzo*, 534 F.3d at 159. In reviewing a Rule 29(c) motion, the question is whether any rational trier of fact could have

14

found the essential elements of the crime beyond a reasonable doubt based on the evidence presented. *Id.* The Court finds that the evidence presented amply supports such a conclusion here.

### A. Counts One and Two: Conspiracy to Possess with Intent to Distribute a Controlled Substance and Conspiracy to Import a Controlled Substance

Defendant challenges the sufficiency of the evidence supporting his conviction on Count One, conspiracy to possess cocaine with intent to distribute, and Count Two, conspiracy to import cocaine into the United States. Mot. at 11-13. To establish a conspiracy, the Government must show an agreement by at least two persons to commit the underlying offense. *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) (citing *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008))

As to Count One, the Government must prove beyond a reasonable doubt that: (1) two or more persons entered into an agreement to possess with the intent to distribute a controlled substance, here, cocaine; and (2) Defendant knowingly and intentionally became a member of the conspiracy. *United States v. Philippe*, 842 F. App'x 685, 687 (2d Cir. 2021) (citing *United States v. Gore*, 154 F.3d 34, 45 (2d Cir. 1998)). As to Count Two, the Government must prove beyond a reasonable doubt that: (1) two or more persons entered into an agreement to import a controlled substance into the United States from another country; and (2) Defendant knowingly and intentionally became a member of the conspiracy. *United States v. Romero-Padilla*, 583 F.3d 126, 129 (2d Cir. 2009) (citing 21 U.S.C. § 959(a)).

Defendant challenges the sufficiency of the evidence on Counts One and Two, specifically with regard to his knowledge of the nature and object of the conspiracy. Mot. at 12. The Government counters, and the Court concurs, that the evidence presented at trial, circumstantial and otherwise, sufficiently supports a finding, beyond a reasonable doubt, that Defendant knowingly and intentionally joined in the conspiracies. Opp'n at 9-15.

15

The evidence adduced at trial regarding Defendant's knowledge and intent was voluminous and sufficient to support the jury's finding beyond a reasonable doubt. First, Defendant went to the plane that had just arrived from Jamaica, a known transit country for cocaine, and in which the cocaine was secreted when he had no authorization or legitimate reason to be there. Evidence showed that Defendant did not have authorization to work on international aircraft nor was he an avionics mechanic. Tr. at 74-75, 256. Other testimony revealed that he was not assigned to the aircraft or even to that area of the airport on the day the cocaine was found. *Id.* at 314, 320, 324.

Officer Robinson credibly testified that Defendant was the only person to access or attempt to access the avionics compartment between the time of the officers' discovery of the cocaine and the plane's scheduled departure. *Id.* at 69-72. He also credibly testified that Defendant tripped the transponder within seconds of entering the avionics compartment and he witnessed Defendant reattaching the insulation blanket in the area where the cocaine originally had been concealed and where the sham packages had been placed by the officers. *Id.* at 82-88. Notably, Defendant's gloves glowed under a black light, as demonstrated during trial, indicating that he had touched the imitation narcotics placed in the area where the cocaine had been located originally. *Id.* at 86-88; GX 4. From this evidence, the jury could infer that Defendant had known the location of the cocaine in advance because he immediately touched the area of the insulation blanket that covered the sham bricks.

The Government also introduced evidence showing that Defendant came to the aircraft with tools to help him carry off the narcotics undetected. Testimonial and documentary evidence showed that Defendant brought to the aircraft a large empty tool bag and a jacket with slits cut into the lining large enough to allow concealment of packages of cocaine. Tr. at 356, 360-63; GXs 3, 205, 205A, 208, 210. This supports an inference that Defendant knew in advance the size and

quantity of the cocaine packages secreted behind the insulation blanket.  To summarize, from undisputed direct evidence of Defendant's actions and the items he had with him, the jury could infer that Defendant knew where his coconspirators had concealed the cocaine and in roughly what dimensions or quantity.

The Government also introduced evidence documenting Defendant's repeated visits to the vicinity of the aircraft throughout the day.  During each visit, he could observe the aircraft from the tarmac and inside the terminal without drawing attention to himself.  *Id.* at 452-62; GXs 102, 302-305.  On Defendant's first visit to the vicinity of the aircraft, around 3:00 p.m., he swiped into Terminal 8, opposite Gate 7, using his SIDA card.  Tr. at 452-53; GX 102.  From inside the terminal, he could view the boarding area of Gate 7 and, through the window, the aircraft outside.  *Id.* at 454.  While Defendant was inside the terminal, he may have observed the CBP truck and officers near the aircraft. Tr. at 44-47; GXs 201, 201A, 202, 202A.

From the evidence of Defendant's movements, the jury could have inferred that Defendant clandestinely was surveilling the locale where he knew he had to go to retrieve the cocaine. Testimonial and video evidence showed that Defendant returned to Gate 7 around 4:00 p.m., this time driving near the aircraft at Gate 7 and entering Terminal 8 at an access point near Gate 7.  Tr. at 455; GXs 302-305.  When considered in light of all the facts of the case, the jury reasonably could have found Defendant's repeated visits to the area of the aircraft incriminating.

Any innocent explanation for Defendant's actions is undermined by evidence contradicting Defendant's false statements regarding his reasons for entering the aircraft.  HSI Special Agent Sean Gabay testified that, during Defendant's interview, Defendant asserted that he had come to the aircraft to procure food and a beverage onboard and then went to the avionics compartment to fix the air conditioning after noticing it was hot and his other attempts to fix it had not worked.  Tr.

at 159, 358.  His story about the heat onboard the aircraft was contradicted by the credible testimony of Captain LeRuth that there were no documented problems with the aircraft's air conditioning.  *Id.* at 242-44; GX 306.  Furthermore, the fact that Defendant almost immediately touched the sham bricks placed in the area where the cocaine had been secreted is inconsistent with his stated reason for going to the avionics compartment.  From this, the jury could conclude that he was lying about his reason for entering the avionics compartment, indicating consciousness of guilt.  *Nusraty*, 867 F.2d at 765 ("False exculpatory statements are not admissible as evidence of guilt, but rather as evidence of consciousness of guilt." (quotations omitted)).

To summarize, Defendant went to an aircraft he had no reason or authorization to be at, entered a compartment he had no reason and no authorization to enter, and immediately reached into a location where ten bricks of cocaine had been concealed.  He also brought with him implements that would aid in carrying off undetected the large amount of cocaine discovered. Repeatedly, he had visited that area of the airport to conduct surveillance of the aircraft, although he had no work related reason to do so.  When confronted, he lied to investigators.  Any inferences required to conclude that Defendant went to the aircraft with the intention of retrieving the discovered bricks are entirely permissible and sufficiently supported by evidence to allow the jury to conclude beyond a reasonable doubt that Defendant was aware of the nature of the conspiracy and that he willingly joined it.  *Landesman*, 17 F.4th at 320.

Defendant also takes exception to the evidence involving Lester and Defendant's relationship with Lester as it supports Defendant's involvement in the alleged conspiracy.  Mot. at 12-14.  According to Defendant, after Defendant and Lester's "general and unexplained relationship" was entered into evidence, it was "flipped back" upon Defendant in order to prove the conspiracy and is susceptible to an innocent explanation.  *Id.* at 13.  The Government counters

that the Lester evidence, when viewed in context, provides further indicia of Defendant's guilt. Opp'n at 12.

That Defendant's communications with Lester may be susceptible to multiple competing inferences is unremarkable; conspiracies are opaque by nature. *See*, *e.g.*, *Landesman*, 17 F.4th at 320. While it is conceivable that the evidence regarding Defendant's relationship and communications with Lester may be susceptible to inferences supporting an innocent explanation, the jury seemingly rejected this inference, which it was entitled to do. The flaw in Defendant's argument is that he fails to consider the evidence as a whole as it must be. *See*, *Guadagna*, 183 F.3d at 130; *Landesman*, 17 F.4th 298, 320. In full context, other inferences that support a finding of guilt beyond a reasonable doubt are more reasonable, logical and comport with common sense.

Defendant's communications with Lester and Lester's movements strongly support Defendant's participation in the conspiracy. The Government introduced evidence from which the jury reasonably could conclude that Defendant met with Lester at a White Castle in The Bronx in the early morning of February 4, 2020. Tr. at 506-10; GXs 505, 506. After Defendant arrived at work on February 4, 2020, he again spoke to Lester and then traveled to the aircraft at Gate 7. He communicated with Lester a number of times, including the final WhatsApp message from Lester in Spanish, which the parties stipulated translates as "They just confirmed to me. They all already left, they're going to take them to dinner because they're hungry." Tr. at 514; GX S-1. After receipt of this message Defendant departed for the aircraft for the last time around 7:00 p.m. Tr. at 455; GX 102.

The jury reasonably could have inferred that it was this message that spurred Defendant to go to the airplane to collect the cocaine. Indeed, with the aircraft due to depart at 8:00 p.m., Defendant was running out of time to offload the cocaine from the aircraft. Tr. at 80-82. A

reasonable reading of the text message is that Lester was giving Defendant the "all clear" to go collect the cocaine.

The suspect nature of these communications is further compounded by evidence of Lester's movements on the evening of February 4, 2020, his attempts to contact Defendant, and subsequent deactivation of his phone.  Cell phone location evidence indicated that Lester traveled from The Bronx to near JFK Airport around 9:00 p.m. consistent with a planned rendezvous to exchange the cocaine.  Tr. at 515-18; GX 504.  Defendant's repeated attempts to reach Lester following his release using other cell phones, because his cell phone had been seized, and Lester's apparent abandonment of his phone, only provide further support for an inference that their relationship revolved around the cocaine seized at JFK airport on February 4, 2020.  *See*, GX 504.  When considered in light of all the evidence, Defendant's relationship and communications with Lester allow reasonable inferences supporting Defendant's knowledge of the conspiracies and guilt beyond a reasonable doubt.

Setting aside the suspicious nature of the Lester evidence, Defendant's focus on this evidence is misplaced for the simple reason that the jury could have found Defendant guilty of both conspiracy counts beyond a reasonable doubt without attaching great significance to the Lester evidence.  *See*, Opp'n at 13-14.  As previously noted, evidence need not show the identity of any coconspirator for a conviction to be sustained.  *Valencia*, 100 F. App'x at 18.

Defendant's reliance on *United States v. Rodriguez* is also unpersuasive.  392 F.3d 539 (2d Cir. 2004).  In *Rodriguez*, the Second Circuit acquitted the defendant, Rodriguez, of participation in a narcotics conspiracy because there was insufficient evidence that he was aware of the type of illegal activity, *i.e.*, a narcotics transaction, he had served as a lookout for.  *Id.*

As the Government correctly argues, the instant case readily is distinguishable from *Rodriguez* due to the nature of Defendant's role in this conspiracy. Opp'n at 12-13.  Here, the evidence shows that Defendant served not as a mere lookout while others engaged in criminal activity of a nature unknown to Defendant.  *Id.*  Instead, Defendant had a major role in offloading the drugs from the aircraft and transporting it away.  *Id.*  His intimate knowledge of the structure of the aircraft and ability to access not only the aircraft, but also the secure areas of the airport without detection were critical to the success of the operation.  Thus, the evidence supports a finding beyond a reasonable doubt that Defendant knew the nature of the conspiracies and knowingly and intentionally agreed to participate in them.  *See*, *e.g.*, *Taylor*, 464 F.2d at 243.

## B.    Knowledge and Intent to Import

Defendant challenges the sufficiency of the evidence supporting his conviction on Count Two, conspiracy to import cocaine into the United States, and on Count Three, importation of cocaine.  Mot. 16-18.  The elements of Count Two are discussed above. To show Defendant's guilt under Count Three, the Government must prove beyond a reasonable doubt that: (1) Defendant imported into the United States from a place outside of the United States a controlled substance containing cocaine; and (2) that Defendant acted knowingly and intentionally in doing so.  *See*, *United States v. Agueci*, 310 F.2d 817, 825 (2d Cir. 1962).

Defendant contends that a conviction on Counts Two and Three cannot be sustained because a rational jury could not conclude beyond a reasonable doubt that Defendant knew the drugs would be coming from abroad.  Mot. at 16-18.  In support of this contention, Defendant argues that there is no evidence of his knowledge of nor could he have inferred the international origin of the drugs.  *Id*. at 16.

As an initial matter, Defendant mischaracterizes the evidence.  There is ample circumstantial evidence from which the jury could infer his knowledge of the international origin of the cocaine as discussed above.  It is undisputed that the cocaine was onboard the aircraft when it arrived from Jamaica.  *Id.* at 7.  The only real issue, therefore, is whether Defendant knew that the aircraft and cocaine were arriving from abroad.  On this point, the jury had more than ample evidence to infer Defendant's knowledge .

The jury reasonably could have concluded and common sense dictates that large quantities of drugs, such as the 10.02 kilograms of cocaine here, originate from outside the United States, especially when transported onboard commercial international aircraft, as the Government maintains in its opposition.  Opp'n at 14.  Alternatively, the jury reasonably could have concluded that, during the meeting or various phone calls with Lester, Defendant learned what flight the cocaine would be on and the flight's origin. *See*, Tr. at 485-530, 537-59.

Evidence also showed that Defendant entered the terminal near the aircraft's gate on multiple occasions, once shortly after the aircraft's arrival.  *Id*. at 452-53; Ex.102.  From this the jury may have inferred that he saw information regarding the origin of the flight inside the terminal.  Alternatively, the jury may have inferred, based on evidence of Defendant's movements and the testimony of Officer Robinson, that Defendant observed the CBP vehicle and officers near the aircraft and, as an aircraft mechanic with over two decades of experience, Defendant would have realized that the flight had come from abroad.  *Id*. at 452-53; Ex.102. He also attempted to cover the portion of his SIDA card where a customs seal permitting him access to international flights would have been located.  This is further evidence of his guilty state of mind.

Defendant maintains that this case is similar to *United States v. Londono-Villa* where the Second Circuit acquitted the defendant of conspiring to import cocaine into the United States.  930

F.2d 994 (2d Cir. 1991). In that case, Second Circuit found that, while Londono–Villa helped load cocaine onto a plane in Colombia, there was no evidence to show that he knew the ultimate destination was the United States, only that he knew the plane's initial destination, Panama. *Id.* at 996. The instant case easily is distinguishable as here Defendant's role was to unload narcotics inside the United States from an aircraft that came from Jamaica. Furthermore, there was ample opportunity for Defendant to learn the origin of the drugs, as discussed above. Therefore, the Court finds there is sufficient evidence for the jury to infer, beyond a reasonable doubt, that Defendant knew that the cocaine was located on board an international flight and intentionally conspired and aided in its importation. *See*, *Taylor*, 464 F.2d at 243.

## CONCLUSION

For the reasons set forth above, in reviewing as it must the evidence as a whole and in the light most favorable to the prosecution, the Court finds that a rational juror could find all elements of all three counts of conviction established and supported by sufficient evidence beyond a reasonable doubt. *Taylor*, 464 F.2d at 243. Defendant's arguments to the contrary focus on pieces of evidence in isolation and on sheer speculation, and, thus, fail to carry the heavy burden required for a judgment of acquittal. *See*, *Irving*, 452 F.3d at 117. Accordingly, Defendant's motion is denied in its entirety.


SO ORDERED.

Dated: Brooklyn, New York
      September 6, 2024

/s/
_____
DORA L. IRIZARRY
United States District Judge
